**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ANNA MCNEIL, ELIANA SINGER, and RY WALKER, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Yale University; Yale Chapter of Alpha Delta Phi International, Inc.; Alpha Epsilon Pi, Epsilon Upsilon; Alpha Kappa Delta of Chi Psi; Delta Kappa Epsilon, Phi Chapter; Leo; Sigma Chi, Theta Upsilon Chapter; Sigma Nu Fraternity Beta Alpha Chapter; Sigma Phi Epsilon, Connecticut Delta Chapter; Zeta Psi, Eta Chapter; Alpha Delta Phi International, Inc.; Alpha Epsilon Pi Fraternity, Inc.; Chi Psi Fraternity; Delta Kappa Epsilon Fraternity; Sigma Alpha Epsilon Fraternity; Sigma Chi International Fraternity; Sigma Nu Fraternity, Inc.; Sigma Phi Epsilon Fraternity; Zeta Psi Fraternity, Inc.; Sig Ep Housing of Connecticut Delta, LLC; Wallace H. Campbell & Company, Inc.; 402 Crown LLC; 340 Elm, LLC; Mother Phi Foundation, Inc.; Connecticut Omega of Sigma Alpha Epsilon House Corporation; House Corporation of Sigma Chi at Yale I; High Street Housing Corporation; ZP Nutmeg Associates Inc.<br><br>Defendants. | COMPLAINT- CLASS ACTION<br><br>No. _____<br><br>JURY TRIAL DEMANDED<br><br><br><br>February 12, 2019 |

**CLASS ACTION COMPLAINT FOR DAMAGES**

## INTRODUCTION

1.      Plaintiffs Anna McNeil, Eliana Singer, and Ry Walker are undergraduate students at Defendant Yale University ("Yale" or the "University"). Yale promised Plaintiffs an educational environment free of "discriminat[ion] … against any individual on account of that individual's sex." Yale also claimed that "sexual misconduct" was "antithetical to the standards and ideals of our community." Yet, as Plaintiffs have come to learn, Yale fails to honor these principles.

2.      When Ms. McNeil, Ms. Singer, and Ms. Walker arrived on campus as first-year students, they encountered a thriving all-male fraternity scene. Yale had a drastic shortage of University-run social spaces, and the fraternities ("Defendant Fraternities" or "the Fraternities")[1] were the de facto social environment for many students. Male students routinely controlled the admission, alcohol, lighting, and music for many Yale social gatherings. This dynamic created dangerous environments in which sexual misconduct thrived.

3.      Ms. McNeil, Ms. Singer, and Ms. Walker were all groped at fraternity parties during their first semesters at Yale. They know of other female and non-binary students who have suffered sexual harassment and assault committed during fraternity parties, after fraternity parties, and by fraternity members.

4.      Many Yale students now accept and assume that female undergraduates risk sexual harassment and assault by attending fraternity events. Fraternity brothers and other male attendees regularly deny female students admission to parties based on their appearance, verbally harass them, grind up against them, grab them, and grope them. Moreover, throughout Plaintiffs' time at

---

[1] As detailed in paragraphs 28-57 below, Plaintiffs bring claims against the national organizations, local chapters, and housing corporations of the fraternities known as: Alpha Epsilon Pi, Alpha Delta Phi, Chi Psi, Delta Kappa Epsilon, Sigma Alpha Epsilon/Leo, Sigma Chi, Sigma Nu, Sigma Phi Epsilon, and Zeta Psi.

Yale, numerous reports have emerged of rape and sexual assault committed by Yale fraternity brothers.

5.      Yale is a microcosm of the ongoing epidemic of sexual harassment and assault at all-male fraternities. For decades, social science research has warned that fraternities perpetuate and normalize forms of gender discrimination and sexual violence. Studies have found that fraternity brothers commit sexual assault at three times the rate of other male college students. Brothers are also reportedly more likely to use alcohol to obtain sex, more likely to be involved in gang rapes, more likely to endorse traditional gender roles, and more likely to espouse rape myths. Nevertheless, fraternities remain powerful institutions. Colleges and universities depend on fraternities to, among other things, house students, serve as social venues, and yield an ever-replenishing source of alumni donors.

6.      At Yale, the University and the Fraternities are mutually dependent. The University has deliberately phased out many on-campus social gatherings and attempted to avoid liability for hosting student social events. Instead, Yale ceded those activities to the Fraternities while refusing to regulate them or enforce appropriate safety standards. Yale now allows the Fraternities to use Yale resources (and recruit Yale students) while largely turning a blind eye to the sexual harassment and assault occurring in connection with the Fraternities.

7.      The Fraternities offer Yale men social and economic opportunities that are denied to Plaintiffs and all of Yale's female and non-binary students. In addition to controlling many of Yale's social gatherings, fraternity brothers have access to a vast, nationwide alumni network, which often results in coveted job opportunities. Indeed, Yale's fraternity alumni include powerful business and political leaders, such as former presidents George H.W. Bush and George W. Bush, and current Supreme Court Justice Brett Kavanaugh—all alumni of Yale's chapter of Defendant

Delta Kappa Epsilon. Women and non-binary students at Yale are excluded from these social and economic privileges of fraternity membership solely because of their gender.

8.      The presence of Yale's sororities does not alleviate this disparity. "Separate but equal" Greek life reinforces gender norms, stereotypes, and prejudices. Sex segregation can hinder cross-gender relationships, facilitate the objectification of people of other genders, and normalize sexual assault. Greek life, with its binary assumptions, also largely excludes non-binary students.

9.      Moreover, Yale fraternities and sororities are not, in fact, equal in economic, associational, and social resources. The sororities are over one hundred years younger than Yale's oldest fraternities, offer fewer total housing units, and upon information and belief, have a smaller and less influential Yale alumni network. The sororities' national organizations also prohibit them from hosting parties, which leaves Defendant Fraternities—i.e. men—with unrivaled influence over Yale's social scene.

10.     Plaintiffs, however, are not willing to let gender inequality, sexual harassment, and sexual assault define their college experiences. In the fall of 2016, Ms. McNeil and Ms. Walker joined with several other students to create a registered student organization called "Engender." Plaintiffs, along with Engender members, believed that the most direct route to prevent sexual harassment and assault—and to challenge the gender disparities in social clout and economic opportunity perpetuated by fraternities—was to integrate Yale's fraternities by gender.

11.     Beginning in 2017, Engender decided to organize female and non-binary students to "rush" (i.e. seek admission to) nine of Yale's all-male fraternities. In early 2017, Ms. McNeil and Ms. Walker, along with other members of Engender sought—and were denied—admission to the membership of Defendant Fraternities. In January 2018, Ms. McNeil, Ms. Walker, and Ms. Singer (who was then a first-year student), along with other female and non-binary students, again

sought—and were again denied—admission to the membership of Defendant Fraternities. In December 2018, Ms. McNeil, Ms. Singer, and Ms. Walker again sought—and yet again, were denied—the opportunity to become members of Defendant Fraternities.

12.     Plaintiffs have repeatedly petitioned Yale to intervene on their behalf and end the discriminatory admission practices of Defendant Fraternities. They have also sought Yale's assistance in ending the hostile environment that exists at the Fraternities and at Yale. They have specifically pointed out that gender-segregated Greek life violates Yale's anti-discrimination policies. The University, however, has refused to take meaningful steps to alter the Fraternities' admission practices or address the hostile environment.

13.     Yale has long maintained a "hands off" approach to the Fraternities, even though it knows that they play an outsized role in gender discrimination on campus. In 2008, pledges of Defendant Zeta Psi posed for a photograph outside the Yale University Women's Center with a sign proclaiming, "We Love Yale Sluts." In October 2010, pledges of Defendant Delta Kappa Epsilon paraded around campus chanting, "No means yes! Yes means anal!" In 2011, a group of Yale students filed a Title IX complaint with the Department of Education's Office of Civil Rights (OCR) accusing Yale of being deliberately indifferent to a hostile environment for women—epitomized by the Zeta Psi and Delta Kappa Epsilon pledging incidents.

14.     Though Yale and OCR reached a Voluntary Resolution Agreement in June 2012, the sexual misconduct continued. In 2014, another Yale student filed a complaint against Yale's chapter of Defendant Sigma Alpha Epsilon after being subjected to sexual harassment from fraternity members both inside and outside the fraternity's house. In the fall of 2015, there were again allegations of sex and race discrimination against Sigma Alpha Epsilon after partygoers alleged that brothers turned away women of color because they wanted "white girls only." And, in

2018, allegations again surfaced about the ingrained culture of sexual misconduct at Delta Kappa Epsilon, including reporting on ten women who suffered sexual misconduct at the hands of Delta Kappa Epsilon brothers.

15.     Through it all, Yale has refused to rein in the Fraternities and has allowed gender discrimination to remain unchecked.

16.     In so doing, Yale has fallen behind peer institutions. For example, in May 2016, Harvard banned student participation in single-gender "final" clubs and Greek organizations. According to Rakesh Khurana, Dean of Harvard College, the College recognized that "the discriminatory membership policies of these organizations have led to the perpetuation of spaces that are rife with power imbalances . . . . In their recruitment practices and through their extensive resources and access to networks of power, these organizations propagate exclusionary values that undermine those of the larger Harvard College community."  Unmoved, Yale has failed to match the progress of its historic rival.

17.     Having been rejected by the Fraternities and rebuffed by their University, Plaintiffs must now assert their rights in a Court of law to make Yale and the Fraternities safer, more equitable organizations for female students. Plaintiffs bring claims against the Fraternities for violation of the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.*; against Yale and the Fraternities for violating Connecticut's law against discrimination in places of public accommodation, Conn. Gen. Stat. §§ 46a–63-64; and against Yale for breach of contract, violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a *et seq*, and violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq*.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' statutory claims under Title IX and the Fair Housing Act present federal questions over which this Court has jurisdiction. Plaintiffs also assert state-law claims over which this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

19.     This Court has personal jurisdiction over Defendant Yale pursuant to Fed. R. Civ. P. 4(k) because Yale is domiciled in and conducts business within Connecticut.

20.     This Court has personal jurisdiction over Defendants Yale Chapter of Alpha Delta Phi International, Inc.; Alpha Epsilon Pi, Epsilon Upsilon; Alpha Kappa Delta of Chi Psi; Delta Kappa Epsilon, Phi Chapter; Leo; Sigma Chi, Theta Upsilon Chapter; Sigma Nu Fraternity Beta Alpha Chapter; Sigma Phi Epsilon, Connecticut Delta Chapter; and Zeta Psi Fraternity, Eta Chapter pursuant to Fed. R. Civ. P. 4(k) because these Defendants are domiciled in, conduct business within, and engaged in the acts complained of within Connecticut.

21.     This Court has personal jurisdiction over Defendants Alpha Delta Phi International, Inc.; Alpha Epsilon Pi Fraternity, Inc.; Chi Psi Fraternity; Delta Kappa Epsilon Fraternity; Sigma Alpha Epsilon Fraternity; Sigma Chi International Fraternity; Sigma Nu Fraternity, Inc.; Sigma Phi Epsilon Fraternity; and Zeta Psi Fraternity, Inc. pursuant to Fed. R. Civ. P. 4(k) because these Defendants transact business within Connecticut, own real property within Connecticut, and committed the unlawful acts complained of within Connecticut.

22.     This Court has personal jurisdiction over Defendants Sig Ep Housing of Connecticut Delta, LLC; Wallace H. Campbell & Company, Inc.; 402 Crown LLC; 340 Elm, LLC; Mother Phi Foundation, Inc; Connecticut Omega of Sigma Alpha Epsilon House Corporation; House Corporation of Sigma Chi at Yale I; High Street Housing Corporation; and ZP Nutmeg

Associates Inc. pursuant to Fed. R. Civ. P. 4(k) because these Defendants transact business within Connecticut, own real property within Connecticut, and committed the unlawful acts complained of within Connecticut. Moreover, this Court has personal jurisdiction over 402 Crown LLC; 340 Elm, LLC; Connecticut Omega of Sigma Alpha Epsilon House Corporation; and ZP Nutmeg Associates Inc., because they have their principal places of business in Connecticut. This Court also has jurisdiction over 402 Crown LLC; 340 Elm, LLC; High Street Housing Corporation; and ZP Nutmeg Associates, Inc. because they are incorporated or formed in Connecticut.

23.     This Court is the proper venue under 28 U.S.C. § 1391(b) because Yale is headquartered in this District, many of the unlawful practices complained of herein occurred in this District, and the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

### I.     Plaintiffs

24.     **Plaintiff Anna McNeil** ("Plaintiff McNeil" or "Ms. McNeil") enrolled as an undergraduate student at Yale University in August 2016. She is currently a third-year student at Yale College. Ms. McNeil resides in New Haven, Connecticut.

25.     **Plaintiff Eliana Singer** ("Plaintiff Singer" or "Ms. Singer") enrolled as an undergraduate student at Yale University in August 2017. She is currently a second-year student at Yale College. Ms. Singer resides in New Haven, Connecticut.

26.     **Plaintiff Ry Walker** ("Plaintiff Walker" or "Ms. Walker") enrolled as an undergraduate student at Yale University in August 2016. She is currently a third-year student at Yale College. Ms. Walker resides in New Haven, Connecticut.

## II.   **Defendants**

27.    **Defendant Yale University** ("Yale") is a specially-chartered and tax-exempt not-for-profit Connecticut Corporation. Yale is located in New Haven, Connecticut.

### a.   *Local Chapter Defendants*

28.    The following Defendants are the local Yale chapters of the Defendant Fraternities (collectively, "local chapters"):

29.    **Defendant Yale Chapter of Alpha Delta Phi International, Inc.** ("Yale Chapter of ADPhi") is a local chapter of Alpha Delta Phi International, Inc. The Yale Chapter of ADPhi was founded at Yale University in 1836, and currently has at least 39 male members. The members of the Chapter include Yale students, who reside in Connecticut. Defendant Yale Chapter of ADPhi is chartered, governed, managed, and controlled by Defendant Alpha Delta Phi International, Inc.  Defendant Alpha Delta Phi International, Inc. has the right to exercise control over the activities, assets, policies, and members of the Yale Chapter of ADPhi.

30.    **Defendant Alpha Epsilon Pi, Epsilon Upsilon** ("Epsilon Upsilon") is a local chapter of Alpha Epsilon Pi Fraternity, Inc. Epsilon Upsilon was founded at Yale University in 1991 and currently has about 53 male members. The members of the Chapter include Yale students, who reside in Connecticut. Defendant Epsilon Upsilon is chartered, governed, managed, and controlled by Defendant Alpha Epsilon Pi Fraternity, Inc. Defendant Alpha Epsilon Pi Fraternity, Inc. has the right to exercise control over the activities, assets, policies, and members of Epsilon Upsilon.

31.    **Defendant Alpha Kappa Delta of Chi Psi** ("Kappa Delta") is a local chapter of Chi Psi Fraternity. Kappa Delta was founded at Yale University in 1924, and currently has at least 51 male members. The members of the Chapter include Yale students, who reside in Connecticut.

Defendant Kappa Delta is chartered, governed, managed, and controlled by Defendant Chi Psi Fraternity. Defendant Chi Psi Fraternity has the right to exercise control over the activities, assets, policies, and members of Kappa Delta.

32.     **Defendant Delta Kappa Epsilon, Phi Chapter** ("Phi Chapter") is a local chapter of Delta Kappa Epsilon Fraternity. Phi Chapter was founded at Yale University in 1844, and currently has at least 39 male members. The members of the Chapter include Yale students, who reside in Connecticut. Defendant Phi Chapter is chartered, governed, managed, and controlled by Defendant Delta Kappa Epsilon Fraternity. Defendant Delta Kappa Epsilon Fraternity has the right to exercise control over the activities, assets, policies, and members of Phi Chapter.

33.     **Defendant Leo** was formerly a local chapter of Sigma Alpha Epsilon Fraternity. The Yale Chapter of Sigma Alpha Epsilon Fraternity became Leo on or about August 9, 2018, when it disaffiliated from Sigma Alpha Epsilon Fraternity. Currently, Leo has at least 41 male members, all of whom are Yale students who reside in Connecticut. However, prior to August 9, 2018, Leo was chartered, governed, managed, and controlled by Defendant Sigma Alpha Epsilon Fraternity. Prior to August 9, 2018, Defendant Sigma Alpha Epsilon Fraternity. had the right to exercise control over the activities, assets, policies, and members of Leo.

34.     **Defendant Sigma Chi, Theta Upsilon** Chapter ("Theta Upsilon") is a local chapter of Sigma Chi International Fraternity. Theta Upsilon was founded at Yale University in 1986, and currently has at least 27 male members. The members of the Chapter include Yale students, who reside in Connecticut. Defendant Theta Upsilon is chartered, governed, managed, and controlled by Defendant Sigma Chi International Fraternity. Defendant Sigma Chi International Fraternity has the right to exercise control over the activities, assets, policies, and members of Theta Upsilon.

35.    **Defendant Sigma Nu Fraternity Beta Alpha Chapter** ("Beta Alpha") is a local chapter of Sigma Nu Fraternity, Inc. Beta Alpha was founded at Yale University in 1889, and currently has at least 39 male members. The members of the Chapter include Yale students, who reside in Connecticut. Defendant Beta Alpha is chartered, governed, managed, and controlled by Defendant Sigma Nu Fraternity, Inc. Defendant Sigma Nu Fraternity, Inc. has the right to exercise control over the activities, assets, policies, and members of Beta Alpha.

36.    **Defendant Sigma Phi Epsilon, Connecticut Delta Chapter** ("SigEp Delta") is a local chapter of Sigma Phi Epsilon Fraternity. SigEp Delta was founded at Yale University in 2002, and currently has at least 69 male members. The members of the Chapter include Yale students, who reside in Connecticut. Defendant SigEp Delta is chartered, governed, managed, and controlled by Defendant Sigma Phi Epsilon Fraternity. Defendant Sigma Phi Epsilon Fraternity has the right to exercise control over the activities, assets, policies, and members of SigEp Delta.

37.    **Defendant Zeta Psi, Eta Chapter** ("Eta Chapter") is a local chapter of Zeta Psi Fraternity, Inc. Eta Chapter was founded at Yale University in 1889, and currently has at least 28 male members. The members of the Chapter include Yale students, who reside in Connecticut. Defendant Eta Chapter is chartered, governed, managed, and controlled by Defendant Zeta Psi Fraternity, Inc. Defendant Zeta Psi Fraternity, Inc. has the right to exercise control over the activities, assets, policies, and members of Eta Chapter.

### b. *National Organization Defendants*

38.    The following Defendants are the national organizations of Defendant Fraternities (collectively, "national organizations"):

39.    **Defendant Alpha Delta Phi International, Inc.** is a fraternal organization that was founded in 1832 at Hamilton College. Alpha Delta Phi International, Inc. is headquartered in

Minneapolis, Minnesota and incorporated under the laws of the state of New York. The fraternity has 32 local collegiate chapters across the United States.

40.     **Defendant Alpha Epsilon Pi Fraternity, Inc.** is a fraternal organization that was founded on November 7, 1913 at New York University. Alpha Epsilon Pi Fraternity, Inc. is a nonprofit corporation headquartered in Indianapolis, Indiana and incorporated under the laws of the state of New York. The fraternity has 182 local collegiate chapters across the United States.

41.     **Defendant Chi Psi Fraternity** is a fraternal organization that was founded in 1841 at Union College. Chi Psi Fraternity is headquartered in Nashville, Tennessee and incorporated under the laws of the state of Michigan. The fraternity has 32 local collegiate chapters across the United States.

42.     **Defendant Delta Kappa Epsilon Fraternity** is a fraternal organization that was founded in 1844 at Yale University. Delta Kappa Epsilon Fraternity is a nonprofit corporation headquartered in Ann Arbor, Michigan and incorporated under the laws of the state of New York. The fraternity has 52 local collegiate chapters across the United States.

43.     **Defendant Sigma Alpha Epsilon Fraternity** is a fraternal organization that was founded on March 9, 1856. Sigma Alpha Epsilon Fraternity is a not-for-profit corporation headquartered in Evanston, Illinois and incorporated under the laws of the state of Illinois. The fraternity has 218 local collegiate chapters across the United States.

44.     **Defendant Sigma Chi International Fraternity** is a fraternal organization that was founded on June 28, 1855. Sigma Chi International Fraternity is a not-for-profit corporation headquartered in Evanston, Illinois and incorporated under the laws of the state of Illinois. The fraternity has 237 local collegiate chapters across the United States.

12

45. **Defendant Sigma Nu Fraternity, Inc.** is a fraternal organization that was founded in 1869 at Virginia Military Institute. Sigma Nu Fraternity, Inc. is a corporation headquartered in Lexington, Virginia and incorporated under the laws of the state of Indiana. The fraternity has 154 local collegiate chapters across the United States.

46. **Defendant Sigma Phi Epsilon Fraternity** is a fraternal organization that was founded in 1901 at Richmond College. Sigma Phi Epsilon Fraternity is a corporation headquartered in Richmond, Virginia and incorporated under the laws of the state of Virginia. The fraternity has 228 local collegiate chapters across the United States.

47. **Defendant Zeta Psi Fraternity, Inc.** is a fraternal organization that was founded on June 1, 1847 at New York University. Zeta Psi Fraternity, Inc. is a not-for-profit corporation headquartered in Pearl River, New York, and incorporated under the laws of the state of New York. The fraternity has 50 local collegiate chapters across the United States.

### c. *Housing Corporation Defendants*

48. The following Defendants are the housing corporations that own the fraternity houses occupied by the local chapters of Defendant Fraternities (collectively, "housing corporations"):

49. **Defendant Sig Ep Housing of Connecticut Delta, LLC** is a corporation organized and operated under the laws of Virginia, with its business address in Richmond, Virginia. Defendant Sig Ep Housing of Connecticut Delta, LLC is the owner and landlord of the SigEp Delta fraternity house, and manages the house for its, Sig Ep Delta's, and Sigma Phi Epsilon Fraternity's mutual benefit. Sig Ep Housing of Connecticut Delta, LLC may also operate as, under the name, or for the benefit of SigEp National Housing, LLC.

50.     **Defendant Wallace H. Campbell & Company, Inc.** is a corporation organized and operated under the laws of Maryland, with its business address in Baltimore, Maryland. Defendant Wallace H. Campbell & Company, Inc. is the owner and landlord of the Yale Chapter of ADPhi house, and manages the house for its, Yale Chapter of ADPhi's, and Alpha Delta Phi International Inc.'s mutual benefit.

51.     **Defendant 402 Crown LLC** is a corporation organized and operated under the laws of Connecticut, with its business address in Bridgeport, Connecticut. Defendant 402 Crown LLC is the owner and landlord of the Epsilon Upsilon house, and manages the house for its, Epsilon Upsilon's, and Alpha Epsilon Pi Fraternity Inc.'s mutual benefit.

52.     **Defendant 340 Elm, LLC** is a corporation organized and operated under the laws of Connecticut, with its business address in New Haven, Connecticut. Defendant 340 Elm, LLC is the owner and landlord of the Kappa Delta house, and manages the house for its, Kappa Delta's, and Chi Psi Fraternity's mutual benefit.

53.     **Defendant Mother Phi Foundation, Inc.** is a corporation with its business address in Ooltewah, Tennessee. Defendant Mother Phi Foundation, Inc. was the owner and landlord of the Phi Chapter house, and managed the house for its, Phi Chapter's, and Delta Kappa Epsilon Fraternity's mutual benefit. Mother Phi Foundation, Inc. may also operate as, under the name, or for the benefit of Delta Kappa Epsilon Council, Inc. or may have been succeeded by Delta Kappa Epsilon Council, Inc.

54.     **Defendant Connecticut Omega of Sigma Alpha Epsilon House Corporation** is a corporation with its business address in New Haven, Connecticut. Defendant Connecticut Omega of Sigma Alpha Epsilon House Corporation is the owner and landlord of the Leo house, and manages the house for its, Leo's, and (until at least August 9, 2018) Sigma Alpha Epsilon

Fraternity's mutual benefit. Prior to August 9, 2018, Connecticut Omega of Sigma Alpha Epsilon House Corporation managed the house for its, the Yale Chapter of Sigma Alpha Epsilon Fraternity's, and Sigma Alpha Epsilon Fraternity's mutual benefit.

55.     **Defendant House Corporation of Sigma Chi at Yale I** is a corporation with its business address in Chicago, Illinois. Defendant House Corporation of Sigma Chi at Yale I is the owner and landlord of the Theta Upsilon house, and manages the house for its, Theta Upsilon's, and Sigma Chi International Fraternity's mutual benefit.

56.     **Defendant High Street Housing Corporation** is a corporation organized and operated under the laws of Connecticut, with its business address in New Haven, Connecticut. Defendant High Street Housing Corporation is the owner and landlord of the Beta Alpha house, and manages the house for its, Beta Alpha's, and Sigma Nu Fraternity, Inc.'s mutual benefit.

57.     **Defendant ZP Nutmeg Associates Inc.** is a corporation organized and operated under the laws of Connecticut, and upon information and belief, has its business address in Manchester, Connecticut. Defendant ZP Nutmeg Associates Inc. is the owner and landlord of the Eta Chapter house, and manages the house for its, Eta Chapter's, and Zeta Psi Fraternity, Inc.'s mutual benefit.

***

58.     Each Defendant Fraternity's local chapter, national organization, and housing corporation operated in concert to engage in the discriminatory and unlawful practices alleged in this Complaint. Accordingly, each local chapter, national organization, and housing corporation are referred to collectively by the common name of the fraternity. For example, "Sigma Chi" refers collectively to Defendant Sigma Chi International Fraternity; Defendant Sigma Chi, Theta Upsilon Chapter; and Defendant House Corporation of Sigma Chi at Yale I.

15

## FACTUAL ALLEGATIONS

### I.   Yale's Decades Long History of Fraternity-Related Sexual Misconduct

59.     For over a decade, there have been numerous prominent cases of sexual assault and gender discrimination at Yale University related to all-male fraternities. Despite having ample notice of the hostile environment, Yale has ignored recommendations and reneged on commitments to exercise greater control over the Fraternities.

60.     In 2008, pledges of Defendant Zeta Psi posed for photographs outside the Yale University Women's Center with a sign stating, "We Love Yale Sluts." A picture of the event was posted on Facebook and in the *Yale Daily News*. One Yale student who was blocked from entering the Women's Center during the Zeta pledging event filed a complaint with Yale's Executive Committee, alleging harassment and intimidation. The Executive Committee later found the Zeta brothers not guilty.

61.     In August 2009, an anonymous email, entitled "The Preseason Scouting Report" listed the names, hometowns, and residential colleges of 53 first-year women, and rated them based on attractiveness and the number of drinks it would take to have sex with them. The email was reportedly first circulated among Yale's athletics teams and fraternities. Yale has never confirmed whether it took any action against the individuals who circulated the message.

62.     In October 2010, at least thirty-five members and pledges of Defendant Delta Kappa Epsilon ("DKE") marched outside the Yale Women's Center on Yale's Old Campus, where first-year students live, with pledges shouting, "No means yes! Yes means anal!" while member's responded, "Louder!" It took Yale over a year to formally respond to the incident. In May 2011, the Yale Executive Committee imposed a five year "ban" on the chapter, which prevented the organization from associating itself with Yale, holding on-campus events, and using Yale email or

16

bulletin boards. The Committee also recommended that Yale only lift the sanctions if the DKE Chapter agreed to "pursue registration as an undergraduate organization." But in 2016, Yale ended the ban even though DKE remained unregistered. As discussed in paragraphs 75-79 below, both the Yale administration and DKE have acknowledged that the "ban" was ineffective.

63.    In March 2011, sixteen Yale undergraduates and recent alumnae filed a Title IX complaint with the Department of Education's Office of Civil Rights (OCR) accusing Yale of being deliberately indifferent to a sexually hostile environment for women—epitomized by the Zeta Psi and Delta Kappa Epsilon pledging incidents.

64.    In response to the Title IX complaint, Yale convened an Advisory Committee on Campus Climate, chaired by former Chief Justice of the Massachusetts Supreme Judicial Court, Margaret H. Marshall. After meeting with over 150 individuals on Yale's campus and small groups in five major cities, the Committee issued its report on September 15, 2011. The report specifically noted the risk that unregulated fraternities posed to Yale's students:

> We learned that social events sponsored by off-campus organizations often involve excessive drinking, including by those who are under 21, the age for the legal consumption of alcohol in Connecticut. Students and others also informed us that off-campus social events have a disproportionate impact on the reality and the perception of the social climate at Yale. Because excessive drinking is a leading cause of sexual violence and other sexual misconduct, it is important that Yale continue to take measures to address this problem.

65.    The report went on to "strongly recommend that all off-campus groups . . . be required to register with the Yale College Dean's Office or the Office of the Secretary, to provide information about their leadership, and to indicate their willingness to abide by University regulations for student organizations, such as the new hazing regulations." The Committee further recommended "that no undergraduate organization, whether registered or not, be allowed to recruit and enlist Yale students unless its officers affirm in writing that they will be bound by the rules of the College in their off-campus housing and activities."

66.     Yet Yale refused to adopt the Committee's recommendations. In his Response to the Report of the Advisory Committee on Campus Climate, Yale's former president, Richard C. Levin, wrote, "I support the Committee's intention that all students be held accountable for complying with the *Undergraduate Regulations*; however, after conferring with [Yale College] Dean [Mary] Miller and others, I believe the better way to achieve this goal is by improved communication, as well as enforcement." In other words, Yale would not change its fraternity policies.

67.     On June 11, 2012, Yale and OCR signed a Voluntary Resolution Agreement. The Agreement required the University to "implement actions intended to improve observance of appropriate behavior norms by campus organizations and at organized student events." In particular, the agreement required Yale to continue efforts to "promote responsible drinking," "create a council of fraternity and sorority leaders," and "address issues related to hazing and initiations by student organizations." Yale also "committed to strengthening students' understanding, through education and enforcement, that they are subject to the *Undergraduate Regulations* both on and off campus."

68.     On June 15, 2012, the OCR issued a letter summarizing its investigation into Yale. The letter devoted several pages to fraternity-related harassment, including the 2010 DKE "no means yes" chant. The letter noted, "Students interviewed expressed concern about the 2010 fraternity incident being part of such a chain of incidents to which the University did not effectively respond."

69.     Yet Yale continued ignoring the sexual misconduct related to the Fraternities.

70.     Beginning in 2011, Yale began providing semi-annual reports to the Yale community that summarize complaints of sexual misconduct. While the reports provide brief

descriptions of each complaint, including basic details about the complainant and respondent, they do not disclose whether reported incidents took place at fraternity houses or in connection with fraternity events. The reports effectively ignore what the OCR and Yale's own Advisory Committee identified as primary drivers of the hostile environment on campus – Yale's fraternities.

71.     In 2012 and 2013, Stephanie S. Spangler, Yale's Deputy Provost for Health Affairs & Academic Integrity and the University Title IX Coordinator, conducted an assessment of certain aspects of the sexual climate at Yale. Ms. Spangler's 2012-13 Report studiously ignores the relationship between fraternities and sexual misconduct, even when the link is plainly obvious. For instance, the Report notes:

> Most students attributed the relative vulnerability of younger students to both social inexperience and limitations on social venues imposed by the drinking age. Due to these limitations, freshmen are more likely to be drawn to large parties where they know very few people.

72.     Despite the veiled reference to fraternities ("large parties"), even here, the Fraternities remain unnamed.

73.     But Fraternity-related misconduct did not go unnoticed by Yale's student body. In 2014, four Yale Law School students submitted a letter to the New Haven Board of Zoning Appeals, voicing opposition to Defendant Chi Psi's efforts to move to Lake Place, where Defendants DKE and Alpha Delta Phi were located. According to the *New Haven Independent*, the law students wrote, "Members of these fraternities and their many male guests make frequent lewd sexual comments and gestures to women, including us, as we walk by." They further stated, "When walking home, on repeated occasions, we have been asked to perform acts of oral sex by unknown members of these fraternities. On numerous occasions, members of a fraternity have

even sexually harassed us while we were in our house, yelling sexually explicit comments through the windows."

74.     Also in 2014, a Yale student filed a complaint against Yale's chapter of Sigma Alpha Epsilon ("SAE"; which later became "Leo") after being subjected to sexual harassment from fraternity members, including during an initiation ritual in which members identified and lampooned the student as someone who had allegedly engaged in sexual relations with five members of the fraternity. In response, the University issued the same sanction that it had issued three years earlier against DKE: Yale "banned" SAE for two years from conducting on-campus activities, communicating via Yale's email systems and bulletin boards, and using the SAE name in connection with Yale.

75.     These sanctions were negligible. Throughout their respective "bans," both DKE and SAE continued recruiting new members, housing students, and hosting parties. As one SAE member told the *Yale Daily News*, "The punishment was a slap on the wrist." According to the *Yale Daily News*, DKE's Executive Director Doug Lanpher echoed this sentiment in an email to a DKE Yale alumnus: "Our 5-year suspension had minimal effect on our ability to operate successfully."

76.     Former Dean of Yale College, Jonathan Holloway, also acknowledged that the sanctions were ineffective. "The people who are supposedly in punishment are just, you know, going about business as usual," Holloway admitted to the *Yale Daily News*. "It's like, how do you grab hold of jello?" In 2016, Holloway claimed, "We can only do so much to stop behavior."

77.     The University failed to take even the most minimal steps to monitor and enforce the sanctions against DKE and SAE. Yale did not provide the Fraternities with a clear sense of

how the University would punish violations, and in fact, refused to penalize the Fraternities when violations occurred.

78.    For example, in December 2014, during the first semester of SAE's sanctions, the "brothers of SAE" advertised on Facebook that they were co-hosting an "Après Ski" party with the "Yale European Undergraduates" and the "Yale Arab Students Association." Despite learning of the event, the University refused to punish the fraternity for using the SAE name in connection with Yale. SAE, for its part, claimed that it was "not aware it constituted a violation of the sanctions."

79.    Worse still, the students who attended the "Après Ski" party did not even know about the "ban." Yale waited over six months—the entire fall semester—before publicizing the sanctions against SAE. Yale never warned the many students who attended SAE's parties that fall that the Fraternity was, in fact, "banned" for sexual misconduct.

80.    Then, in the fall of 2015—while the sanctions were still in place—there were again allegations of sex and race discrimination against Sigma Alpha Epsilon. This time, partygoers alleged that brothers turned away women of color from an SAE party because they were looking for "white girls only." The allegations prompted widespread campus protests.

81.    Shortly after the incident, Senior Associate Dean of Yale College and Associate Vice President of Student Life Burgwell Howard attended a forum at Yale's Afro American Cultural Center. According to the *New Haven Register*, the meeting was attended by "students, faculty, and administrators." At the meeting, female Yale students "described discrimination, antagonisms, and sexual overture from white men on campus. . . . And several asked why a fraternity that has been banned from campus activities was allowed to have a party at all."

82.     In early November of 2015, Dwight Hall, Yale's student-run Center for Public Service and Social Justice, cut formal ties with Yale's fraternities, with which the organization had been collaborating on community service campaigns. Shortly before Dwight Hall's announcement, the organization's institutional service coordinator, who was then a Yale undergraduate, published a column in the *Yale Daily News* in which she described her experiences having "been harassed in dining halls, at fraternity houses and on New Haven streets by Yale fraternity members and male athletes." The student recounted having been called "charity case" and "ghetto Black bitch." "Fear paralyzed me as their discussions of my Black body and hair turned into taunts and fondling. Every incident included jeering and pointing, and some included spanking and screaming." The op-ed echoes the articles of numerous other students who have described fraternities and fraternity culture as sites of sexual misconduct and racial discrimination at Yale.

83.     In November and December 2015, Yale conducted an "investigation" into the allegations of race and gender discrimination against SAE. On December 9, Dean Holloway wrote to the community that his investigation found "no evidence of systematic discrimination against people of color" at SAE. Notably, the investigation made no conclusions about discrimination based on gender. Moreover, Dean Holloway stated that "two students provided credible accounts that they were told, or heard either one or two SAE members say, 'white girls only' as they were seeking admission to the party." "SAE's behavior," said Dean Holloway, "fell short of the community standards and the kind of civic engagement that I have sought to promote." Still, Yale refused to impose further sanctions on SAE. While Yale made vague commitments to "elevate engagement" and "solicit suggestions . . . for hosting more parties on campus," the University did not commit to taking concrete actions to remedy the hostile environment.

84.     The SAE incident occurred just as the University gained statistical insight into the breadth and depth of the sexual misconduct epidemic on its campus. In September 2015, Deputy Provost and Title IX Coordinator Stephanie Spangler released the Yale-specific results of the Association of American Universities' Campus Climate Survey on Sexual Assault and Misconduct (the "Westat-Yale study"). Over 50% of all Yale students and over 60% of Yale's female undergraduates participated in the survey. The survey found that 38.8% of female undergraduate respondents were sexually assaulted while at Yale and 74% were sexually harassed. Among non-binary respondents, 37.8% suffered sexual assaults and 84.2% experienced sexual harassment.

85.     By this time, it was no secret that fraternities played an outsized role in the alarming incidence of sexual assault and harassment at Yale. In fact, according to the *Yale Daily News*, in November 2015, Dean Howard acknowledged, "The Greek chapters definitely do play a role in the social life of Yale … in this manner, they do play a significant role in helping our campus address issues of sexual assault."

86.     Although the Yale administration refused to make systematic efforts to understand and address the sexual misconduct associated with Yale's fraternities, certain student organizations did. In the fall of 2016, the Yale College Council (YCC) Task Force on Greek Life released the results of a survey it conducted in the spring of 2016. According to the report, the majority of women surveyed found that fraternities exhibit a "somewhat negative" or "extremely negative" overall effect on campus.

87.     The report specifically described the close connection between Greek life and sexual misconduct. "We also must address concerns," said the report, "regarding sexual climate and safety at many Greek events and parties, a matter that is particularly pertinent given recent debates regarding the current sexual climate on our campus." The report criticized the University's

prior efforts to address the issue. "It is obvious," noted the report, "that these measures have not changed the Greek life environments enough to ensure that all Yale students feel safe sexually." The report further emphasized that "the University has no effective way of disciplining these organizations for sexual harassment [or] sexual assault . . . ."

88.     The YCC's many recommendations to the University included that Greek organizations be required to register as official student groups and to "establish a social contract with terms agreed upon by Greek organizations"—almost the same recommendations put forth by the Advisory Committee on Campus Climate five years earlier in 2011. And even more alarming, the YCC recommended that the University establish a standing Greek council—a measure that was required by the 2012 Voluntary Resolution Agreement with the Department of Education's Office of Civil Rights.

89.     The YCC report also recommended that Yale "move Yale's social scene back on campus and away from unregulated off campus locations," noting that "where once residential colleges hosted events that served alcohol, this practice has been phased out . . . . Fraternities and off campus houses now provide this service in an objectively less safe and less controlled setting." Upon information and belief, Yale had previously made a deliberate decision to phase out University-sponsored parties in dorms and residential colleges, even though Yale knew or should have known that the decision would increase the number of students who regularly attend fraternity parties.

90.     Upon information and belief, the Yale administration reviewed the Yale College Council report, yet failed to take any action in response.

91.      And the sexual misconduct continued. In 2017 alone, Yale sanctioned at least three fraternity brothers—of Delta Kappa Epsilon, Sigma Alpha Epsilon, and Sigma Phi Epsilon—for

sexual misconduct. Among those sanctioned was the former president of Delta Kappa Epsilon, whom the University found to have engaged in "penetration without consent." The DKE president, however, was not expelled from Yale.

92.     In 2018, allegations again surfaced about the ingrained culture of sexual misconduct at Yale's chapter of DKE. In January, *Business Insider* published a story detailing allegations of sexual assault against two members, including the former DKE president. In February, the *Yale Daily News* published stories of eight additional women who alleged sexual assault against DKE members. Further, nearly thirty first-year counselors, Communication and Consent Educators, and sorority members told the *News* in interviews that "DKE has an institutional culture that condones sexual misconduct, noting that the problem goes beyond 'bad apples' who assault women."

93.     The effects of DKE's hostile environment permeated Yale's campus and the areas around the University. A Yale undergraduate who lived on the same block as DKE told the *Yale Daily News*, "Brothers sometimes all crowd around on the front porch and just watch people as they walk by, and they sometimes yell out comments — ranging from asking us, me and my friends, to join them to drink to typical cat calling. That makes the street feel uncomfortable at times, especially knowing what we know about the sexual harassment and assault that goes on."

94.     On February 22, 2018, two days after the *Yale Daily News* published its article on DKE, Yale College Dean Marvin Chun announced that he had appointed Deputy Title IX Coordinator Jason Killheffer to conduct "a review of the recent concerns brought forward alleging a hostile sexual environment at DKE, as well as to assess concerns brought to his attention about the culture of other student groups." Dean Chun also announced the creation of the Yale College

Committee on Social Life and Community Values (SLCV), which would "review the adequacy of the College's processes for addressing concerns raised about student groups."

95.     Yet neither efforts have changed Yale's status quo. The SLCV reportedly had its *first* official meeting on October 30, 2018—over seven months after the committee was appointed. Although the SLCV conducted a survey on social life at Yale, the methodology and full results of the survey have not yet been disseminated to the student body.

96.     Mr. Killheffer, for his part, took almost one year to complete his investigation. On January 14, 2019, Yale released his findings in a document called *Review of DKE and Campus Culture.* The final section of the *Review* listed various "Student Recommendations," which were geared towards addressing deficiencies in Yale's management of Greek life and the social scene. Those recommendations included: 1) required trainings with "more relevant trainings specific to Greek life"; 2) the creation of a "Greek Life Council" – a measure that was already required by the 2012 Voluntary Resolution Agreement with the Department of Education's Office of Civil Rights; 3) uniform guidelines for party/event management; 4) the creation of "'safe spaces' where sober monitors and other fraternity leadership were clearly identified in advance"; and 5) standardization of "the way that events are conducted and monitored."

97.     On January 14, 2019, in an email to all Yale College students, Dean Chun rebuffed the vast majority of the student recommendations. He explicitly rejected "the suggestion that Yale College establish a council on Greek life," noting that Yale only "makes itself available informally to fraternities and sororities." Dean Chun also refused to mandate that the Fraternities participate in any fraternity-specific trainings or adhere to standardized guidelines for party or event management. Instead, he simply "urge[d] all Yale college students who belong to [Greek organizations] to take advantage of the training and resources available to the entire student body."

In sum, Yale is maintaining its *laissez faire* approach to the Fraternities despite evidence of ongoing misconduct and students' explicit calls for reform.

98.     Indeed, earlier this academic year Yale took steps to *reduce* its ability to supervise Fraternity parties. On September 20, 2018, Yale ended a six-year-old policy which required students to register off-campus parties attended by more than fifty people. Under the former policy, the Dean's Office, Residential Colleges, and the Yale Police were aware of—and exercised jurisdiction over—almost every Fraternity party or event. Now, by design, Yale will remain in the dark.

99.     Despite the decades long history of Fraternity-related sexual misconduct at Yale; the 2012 OCR investigation and Voluntary Resolution Agreement; the numerous warnings and recommendations contained in reports issued by or to the University in 2011, 2013, 2015, 2016, and 2019; the extensive body of op-eds and college news reporting on sexual misconduct at Yale's fraternities; the forums held on campus about sexual misconduct, which Yale administrators have attended; the formal and informal Title IX complaints; and the persistent complaints by Plaintiffs detailed further below, Yale has failed to formulate any policy to prevent the sexual misconduct that occurs in connection with the Fraternities.

100.     As Yale College's former Dean, Jonathan Holloway, told the *Yale Daily News* in 2015, "Some say we really need to strengthen our ties [to fraternities] because then we can control them better. . . . Others say we don't want this risk. This is out of control. They are a liability. I don't think Yale has really made a firm commitment."

101.     In 2018, Dean Howard echoed this sentiment in a comment to the *Yale Daily News* describing Yale's approach to fraternities:

> "I always use the example of a squirrel running across the road: If the squirrel just runs, there's a chance he's going to get hit. But if he runs and he's focused, he might

27

get to the other side . . . . But the squirrel that stops in the middle of the road and says, 'Oh this might be a mistake,' and heads back is definitely going to get hit. I tell my friends, 'Don't be the squirrel. Make a decision. Stay on the sidewalk or go for it, but don't dance in the middle of the road and definitely get hit.' And Yale has been dancing in the middle of the road."

## II.   Plaintiffs Have Experienced, Witnessed, and Know About Sexual Harassment and Assault at the Hands of the Fraternities

102.   When Plaintiffs confronted fraternities for the first time as Yale students, they were disturbed by the openly hostile and aggressive culture at fraternity events. Plaintiffs all found that, as women, their admission to fraternity parties was contingent on their appearance. Brothers who were at the door would look them up and down before agreeing to admit them to a party. Plaintiffs McNeil, Singer, and Walker also found that women were routinely and openly harassed and assaulted at the hands of male partygoers. In their first semesters alone, each of the plaintiffs suffered sexual harassment or assault at Yale fraternity parties.

103.   Plaintiff McNeil suffered assault at Zeta Psi fraternity parties during her first semester at Yale in 2016. At a Zeta Psi party in August or September 2016, she was groped without consent by numerous male attendees, and she witnessed many other women, including a friend of hers, being similarly groped without consent.

104.   In the days following the party, Plaintiff McNeil told her first-year counselor about the sexual assaults at Zeta Psi. The first-year counselor, who, per Yale's policies, was a mandatory reporter of sexual misconduct, simply shrugged off Plaintiff McNeil's account and failed to report the misconduct.

105.   In December 2016, Plaintiff McNeil again attended a Zeta Psi party. Again, a male attendee groped her without consent.

106.    In December 2018, Plaintiff McNeil again experienced sexual assault at a fraternity party—this time at Sigma Phi Epsilon—when a male attendee persistently grinded against Ms. McNeil from behind without her consent.

107.    In addition to her own experiences of sexual assault at Zeta Psi and Sigma Phi Epsilon, Plaintiff McNeil knows fellow Yale students who have been assaulted by brothers of Delta Kappa Epsilon and Alpha Delta Phi.

108.    Plaintiff Walker also experienced sexual assault and witnessed sexual harassment from her first days at Yale. Plaintiff Walker has attended fraternity parties at Alpha Epsilon Pi, Delta Kappa Epsilon, Sigma Chi, Sigma Phi Epsilon, and Zeta Psi.   In or about August or September of 2016, Plaintiff Walker was sexually assaulted at a Zeta Psi party. While dancing in the middle of the dance floor, a large man began grinding on her from behind. He then lifted her skirt and grabbed her crotch. Plaintiff Walker pushed the man away, but she never saw his face or learned his name.

109.    Similarly, at a Sigma Alpha Epsilon party in late August 2016, Plaintiff Walker witnessed open and obvious misconduct. Several brothers approached women from behind and groped them without consent. Other brothers positioned themselves along the fence outside their fraternity house and ogled dancing female students below.

110.    In late September 2016, Plaintiff Walker also faced hostility at the door of Delta Kappa Epsilon. Before going to the Delta Kappa Epsilon party, Plaintiff Walker was warned by an upperclassman that she would not be admitted because she is an African American woman. When she attempted to enter the party, a Delta Kappa Epsilon brother looked her up and down, denied her entrance, and then admitted several white women behind her. Only once Plaintiff Walker noted this unfair treatment was she allowed into the party.

111.   Plaintiff Walker also recalls facing hostility at a Zeta Psi party in December 2016, where a fraternity brother looked her up and down before granting her admission.

112.   At the beginning of her second year at Yale, Plaintiff Walker learned that a female friend was assaulted at a Zeta Psi party in or about August or September of 2017. A male partygoer had violently grabbed Plaintiff Walker's friend by her hair and her body during the party.

113.   Plaintiff Singer also attended several fraternity events during the fall of 2017, including at Alpha Epsilon Pi, Sigma Alpha Epsilon, Sigma Phi Epsilon, Sigma Nu, and Zeta Psi. In or about October 2017, Plaintiff Singer attended a party at Zeta Psi, where she was groped from behind without consent. Indeed, she explicitly pushed away the man groping her, saying "no" very clearly.

114.   Due to their personal experiences at fraternities, combined with the experiences of their classmates and the numerous reports and articles demonstrating the connection between Defendant Fraternities and sexual misconduct, Plaintiffs McNeil, Singer, and Walker no longer feel comfortable attending parties at Defendant Fraternities.

**III.   Fraternities Offer Yale Men Unrivaled Social and Economic Opportunities**

115.   Yale's fraternities are dominant social institutions on campus. Fraternities throw the largest parties and often host vulnerable first-year students. Women and non-binary students at Yale lack comparable spaces in which to host events and socialize. Yale's sororities, for example, are prohibited from hosting parties by their national organizations. Most other student organizations lack the money and space to host regular social gatherings.

116.   Since women and non-binary students cannot join fraternities, Yale men control most large student-run parties. Men decide what kind of alcohol is served, how much water is available, how many (if any) sober monitors are on hand, how event security is administered, how

loud the music is, and how dim the lights are. Men also control admission. Female and non-binary students cannot even attend large Yale parties unless they look and act in ways that please the brothers at the doors. Simply put, fraternities elevate men to social gatekeepers and relegate women and non-binary students to sexual objects.

117.    In addition, fraternities offer male students economic, associational, and social privileges that are foreclosed to female and non-binary students. According to data from the North American Interfraternity Conference, fraternity members make up approximately 70% of United States presidents and 66% of United States vice presidents since 1877. They also comprise 118 current members of the United States Congress, and according to data attributed to the Center for the Study of the College Fraternity, former brothers make up 85% of U.S. Supreme Court justices since 1910.

118.    At Yale, the Fraternities' networks are particularly influential. Fraternities first established themselves at Yale before the Civil War, and Yale's fraternities have produced numerous leaders in business and politics. Current Yale Fraternity alumni include former United States President George W. Bush; Associate Supreme Court Justice Brett Kavanaugh; billionaire Founder, Chairman, and CEO of FedEx Corp Frederick W. Smith; former Chairman and CEO of The Boeing Company Walter James McNerney Jr.; former Governor of Vermont Howard Dean; former Governor of Alaska Tony Knowles; and former Governor and Senator from California Pete Wilson.

119.    Yale Fraternity brothers benefit from their organizations' alumni and professional connections, including connections to prestigious banking and consulting firms, which often result in coveted job offers and economic opportunities. One member of the Yale chapter of Sigma Phi Epsilon told Plaintiff Walker that brothers receive regular emails from recruiters or alumni

professional resources. Upon information and belief, many Fraternity members receive summer internships and job offers thanks to their fraternity alumni networks and contacts. Fraternity brothers also enjoy prime off-campus housing, coveted parking spaces, and a national network of chapters that serve as the members' home bases on other campuses.

120.    Women and non-binary students at Yale are excluded from these social, associational, and economic privileges of Fraternity membership.

121.    Yale's sororities do not alleviate the disparities. Yale's oldest sorority was established in 1986, a full 150 years after Yale's oldest Fraternity, and most of the Fraternities established themselves at Yale well before Yale became coeducational in 1969. Due in part to this history, upon information and belief, Yale's sorority networks do not reach as broadly and deeply into seats of power and influence as those of the Fraternities.

## IV.    Plaintiffs Seek to Join Yale's Fraternities, and The Fraternities Deny Plaintiffs Admission Because of Their Gender

122.    In the fall of 2016, Plaintiffs McNeil and Walker joined with several other students to create a registered student organization, "Engender," to combat discrimination and harassment among Yale students. Plaintiff Singer, who is one year behind Plaintiffs McNeil and Walker, joined Engender in early 2018 during her second semester at Yale.

123.    Plaintiffs and their colleagues in Engender share the view that Yale's fraternities disproportionately contribute to the high levels of gender inequality, sexual harassment, and sexual assault on and around Yale's campus.  In order to make Yale and the Fraternities more equitable— and safer—institutions, Plaintiffs McNeil, Singer, Walker, and other Engender members decided to apply to become members of the Fraternities.

124.    The Fraternities have a relatively uniform application process. At the beginning of the Spring Semester (late January or early February), the Fraternities commence "rush." The rush

is a series of events open to potential applicants. Each Fraternity has its own rush requirements (e.g. attendance at a specified number of events), which applicants must meet in order to request a bid (i.e. apply) to the fraternity. Upon receiving the requests for bids, the Fraternities select new brothers. As described in further detail below, upon information and belief, many fraternities accept the majority of men who submit bids.

## A. Plaintiffs McNeil and Walker Seek Admission to Fraternities in the 2016-2017 Academic Year

125.    In January and February of 2017, Engender organized a group of female students (including Plaintiffs McNeil and Walker) to request access to Defendant Fraternities' rush processes. Engender emailed all Defendant Fraternities' chapter presidents, except for Alpha Epsilon Pi[2] and Sigma Phi Epsilon, requesting access to the fraternity rush process. The chapter presidents of Alpha Delta Phi, Chi Psi, Delta Kappa Epsilon, Sigma Alpha Epsilon, and Sigma Nu denied the requests for a gender-integrated rush process, specifically citing instructions from their national organizations that the national bylaws mandated gender discrimination. The presidents of Sigma Chi and Zeta Psi did not respond to the emails. Accordingly, Defendants Alpha Delta Phi, Chi Psi, Delta Kappa Epsilon, Sigma Alpha Epsilon, Sigma Chi, Sigma Nu, and Zeta Psi excluded Plaintiffs McNeil and Walker (and the other Engender members) from participating in the rush and submitting bids to join their fraternities.

126.    By contrast, in response to outreach from Engender, Defendant Sigma Phi Epsilon voted to allow female and non-binary students to participate in its rush; however, Sigma Phi Epsilon's leadership made it clear from the start that the fraternity would deny all women and non-binary students membership based on its national bylaws, which mandated gender discrimination

---

[2] Engender was not able to obtain the email address of the then-president of Alpha Epsilon Pi.

in admission. Nevertheless, Plaintiffs McNeil and Walker, along with ten to fifteen other women, participated in the rush process.

127.    As part of its rush process, Sigma Phi Epsilon requires rushees to attend five meals with current brothers and encourages rushees to attend a series of fraternity-sponsored social events. Plaintiffs McNeil and Walker attended certain rush events in 2017, but they felt uncomfortable and unwelcomed by the Sigma Phi Epsilon brothers and male rushees. Brothers were uninterested in engaging Engender members, including Plaintiffs McNeil and Walker, and male rushees ignored them, likely out of fear that engaging with Engender would be looked poorly upon by the brothers. Since Sigma Phi Epsilon had made it clear that they would not admit any female rushees to the fraternity, Plaintiffs McNeil and Walker concluded that it would be futile to fulfill all the rush requirements and request bids for membership.

128.    Still, certain members of Engender completed the rush process and formally requested membership "bids." Predictably, on or about February 10, 2017, Sigma Phi Epsilon informed all female rushees that they would not be admitted based on the national bylaws, which mandate gender discrimination in membership.

**B. Plaintiffs McNeil, Singer, and Walker Seek Admission to Fraternities in the 2017-2018 Academic Year.**

129.    In the following academic year, Plaintiffs McNeil and Walker resolved to continue their efforts to gain admission to Defendant Fraternities. On September 8, 2017, Plaintiff Walker reached out to the president of Yale's chapter of Defendant Sigma Chi, to discuss rushing in their fall recruitment process. Sigma Chi's president stated that he thought it was pointless to open the rush process to women and non-binary students, since the fraternity could not admit women as members. Plaintiff Walker further asked the president what would happen if she were to show up

at a Sigma Chi rush event. The president responded that the fraternity would stop Plaintiff Walker at the door.

130.    In January 2018, Plaintiffs McNeil, Singer, and Walker, along with other female and non-binary students, again sought—and were again denied—admission to the membership of Defendant Fraternities.

131.    On January 16, 2018, Plaintiff McNeil emailed the Yale chapter presidents of all Defendant Fraternities (except for Alpha Delta Phi) on behalf of Engender's members.[3] In the email, Plaintiff McNeil requested that the Fraternities open their rush process to non-male students and offered to meet with Defendant Fraternities to discuss an open-gender rush process.

132.    Two fraternities responded with official statements that women and non-binary students would be excluded from their rush processes. On or about January 17, 2018, Chi Psi indicated that female students were not permitted to rush because "Chi Psi's national constitution specifically defines the fraternity as an all-male organization." On or about January 18, 2018, Sigma Nu likewise forwarded a statement from Sigma Nu's National Executive Director, Brad Beacham, stating, "To be eligible for membership in Sigma Nu Fraternity, a person must be a man." None of the other fraternities (except for Sigma Phi Epsilon, discussed in Paragraph 135 *infra*) responded to Plaintiff McNeil's emails.

133.    On or about January 18, 2018, several fraternities reportedly postponed their initial rush events out of concern that Engender's female and non-binary members would show up.

134.    Plaintiffs McNeil, Singer, and Walker, along with several other female and non-binary students, would have rushed fraternities if given the opportunity; however, all Defendant

---

[3] Engender was not able to obtain the email address of the then-president of Alpha Delta Phi.

Fraternities (except for Sigma Phi Epsilon) discriminatorily denied Plaintiffs McNeil, Singer, and Walker access to their rush processes based on gender.[4]

135.    Unlike the other Defendant Fraternities, Sigma Phi Epsilon again agreed to let Engender members rush. Plaintiff Singer decided it was futile to attend Sigma Phi Epsilon's rush events, as Sigma Phi Epsilon made it clear that they would not admit women into the membership. Plaintiffs McNeil, Walker, and several other female and non-binary students, however, decided to rush Sigma Phi Epsilon. They completed all the prerequisites for requesting bids: they attended five meals with current brothers and also attended several Sigma Phi Epsilon social events. Plaintiffs McNeil and Walker, along with several other female and non-binary students, submitted requests for bids on or about February 7, 2018. Yet again, on or about February 9, 2018, Sigma Phi Epsilon denied them admission because the fraternity's national bylaws mandate discrimination against female and non-binary applicants. Accordingly, Defendant Sigma Phi Epsilon discriminatorily denied Plaintiffs McNeil and Walker (and other female and non-binary students) admission to the fraternity's membership based on their gender.

**C. Plaintiffs McNeil, Singer, and Walker Seek Admission to Fraternities in the 2018-2019 Academic Year**

136.    In the current academic year, Plaintiffs McNeil, Singer, Walker, and other members of Engender, again sought and were again denied the opportunity to rush Defendant Fraternities.

137.    On December 12, 2018, Plaintiff Singer emailed the presidents of each of the local chapters on behalf of Engender, requesting access to their upcoming rush process and the schedule

---

[4] Although Plaintiff McNeil was not able to email Defendant Alpha Delta Phi, upon information and belief, Alpha Delta Phi excluded female and non-binary students from the 2018 rush (including Plaintiffs) based on their gender, just as the fraternity excluded Engender members from the 2017 rush based on their gender.

of their upcoming rush events.[5] As before, most of the Fraternities rejected Plaintiffs' request for a gender-integrated rush process. Specifically, on December 12, 2018, the presidents of Defendant Sigma Alpha Epsilon/Leo, Alpha Delta Phi, and Sigma Nu replied that their chapters "offer[] membership only to male undergraduate students" at Yale. The following day, Defendants Sigma Chi and Delta Kappa Epsilon provided substantially similar replies: only men need apply. Defendants Alpha Epsilon Pi, Chi Psi, and Zeta Psi did not even bother responding.

138.    On January 15, 2019, Sigma Phi Epsilon's rush chairs responded to Plaintiff Singer's email and informed her that the fraternity would open its rush to first-year students of all gender identities; however, the rush chairs also noted, "we are ultimately only able to offer bids to those who self-identify as male."

139.    Accordingly, all the Fraternities denied Plaintiffs McNeil, Singer, and Walker the opportunity to become members because of their gender.

## V.    The National Organizations Exercise Control Over the Local Yale Chapters, Mandating Gender Discrimination and Refusing to Sanction Sexual Misconduct

140.    The national fraternal organizations are deeply entwined with the management and operations of the local Yale chapters. The national organizations supply counsel, resources, and benefits to the local chapters and their members. They exercise control over recruitment activities, set boundaries for appropriate behavior for Chapter members, and retain the right to expel members for misconduct.

### A.  The National Organizations Mandate the Yale Chapters' Discriminatory Admissions Practices

---

[5] Plaintiff Singer emailed Alpha Epsilon Pi again on December 20, 2018, after learning about a change in the leadership of the organization.

141.    The national organizations are particularly enmeshed in the local Yale chapters' membership practices. Membership practices are central to the national organizations' missions, in part, because the national organizations earn revenue through annual membership dues.

142.    The national organizations therefore make extensive efforts to recruit as many new male members as possible through their local Yale chapters. Chi Psi, for example, provides local chapters, including the Yale chapter, with templates for alumni and parent newsletters, letterheads, business cards, name tags, and various other promotional materials. According to Sigma Alpha Epsilon's recruitment webpage, it provides its local chapters with "recruitment materials, which have earned national recognition for their design and branding theme." Sigma Phi Epsilon's Marketing and Branding page similarly "offers multiple resources and methods to promote [local] chapter[s]."

143.    The national fraternities also provide detailed recruitment instructions to their local chapters, including their Yale chapters. Delta Kappa Epsilon, Sigma Alpha Epsilon, Sigma Nu, and Sigma Phi Epsilon all have handbooks and/or manuals that include recruitment tactics, topics for discussion with potential members, and general advice on how to "sell" the fraternity to new members. Sigma Alpha Epsilon's manual states that "[o]ne area that is a key to a successful recruitment period is how you market your chapter. Recruitment is selling your chapter and Fraternity to others." Similarly, according to Delta Kappa Epsilon's Recruitment Handbook, "a successful Recruitment period goes year-round and focuses on the selling of an experience." Sigma Nu's "Recruitment Bluebook" serves as "a step-by-step instruction manual on how to create a values-based, year-round recruitment."

144.    The national fraternities also make extensive efforts to provide recruitment trainings to their local chapters. Chi Psi's "Spencer Institute," for example, offers brothers

"comprehensive training focused on recruitment." Similarly, Sigma Chi's "Mission 365" teaches local chapters "how to increase both the quality and quantity of their new members." According to DKE's Recruitment Handbook, "[r]ecruitment workshops should be held at least once a year."

145.    National organizations also retain the ultimate authority over candidate selection. Alpha Delta Phi's constitution explicitly states, "The Board of Directors shall have veto power over . . . any Chapter's vote to induct a candidate." Similarly, Sigma Chi mandates that "the pledging of each candidate [] be promptly reported to the Executive Director."

146.    Underlying this elaborate system of guidance and control rests one bedrock principle: gender discrimination. The national fraternities' constitutions explicitly limit membership to men, and the local Yale chapters lack discretion to alter this basic admissions requirement.

147.    Accordingly, the national fraternal organizations were responsible for, and indeed directed, the Yale chapters to discriminatorily deny Plaintiffs admission or access to their rush processes and membership.

**B. The National Organizations Refuse to Sanction Members Who Engage in Sexual Misconduct**

148.    The national organizations exercise substantial authority and control over the conduct of their members. The fraternities require their members to adopt a predetermined chapter structure, conform to certain brand and merchandise requirements, attend regular meetings, swear oaths of allegiance, and of course, pay dues. The national organizations retain the right to sanction or expel members, or even entire chapters, for violating the rules of the fraternity. For example, upon information and belief, in or about January 2018, Sigma Phi Epsilon's national organization threatened the local Yale chapter with revocation of the right to occupy the fraternity house and/or

cancellation of insurance coverage if the Yale chapter permitted female and nonbinary students to join the Yale chapter.

149.     The national organizations rarely, if ever, exercise their disciplinary powers to punish sexual misconduct. Indeed, the constitutions and bylaws of eight of the nine Defendant Fraternities lack provisions prohibiting sexual harassment or assault. Nor do they contain procedures for investigating and punishing sexual misconduct. To the contrary, the national organizations encourage their members to defend their brothers at all costs. Alpha Delta Phi's Covenant, for example, requires its brothers to promise to "repel [an] attack [on a fellow brother] with an honest and manly indignation" and "that in all things which pertain to his personal character, and his reputation with his associates and the world, you will espouse his cause as if it were your own, and [] you will constantly exercise towards him a spirit of charity, kindness and fraternal love."

150.     The national organizations have the authority to require local chapters, including the Yale chapters, to have zero tolerance policies for sexual harassment or assault at fraternity events, but the national organizations have refused to impose such a requirement on the local chapters.

151.     In fact, national organizations have taken steps to prevent local Yale chapters from sanctioning members who engage in sexual misconduct. For example, in or about March 2016, Sigma Nu's national organization blocked the local Yale chapter from expelling a member after the member was accused of sexual assault.

152.     Because the national fraternal organizations direct, support, and advise the local chapters; because they retain the ultimate authority over local chapters' membership practices; and because they refuse to prohibit or sanction sexual misconduct, the national organizations are

responsible for subjecting Plaintiffs to a hostile environment at fraternity events and on and around Yale's campus.

VI.   **The Housing Corporations Permit the Local Chapters and National Organizations to Determine Who Lives in Fraternity Houses Based on Discriminatory Criteria**

153.   Upon information and belief, the national organizations and local chapters control their respective Defendant housing corporations, which nominally own the fraternity houses at Yale. The national fraternities and local chapters exercise substantial authority over the operation, use, and maintenance of the fraternity houses. Indeed, the fraternity houses are integral to the operations of Defendant Fraternities: they serve as the fraternities' principal party venues, as residences for many fraternity members, and as bases of operations at Yale. Having a fraternity house is central to Defendant Fraternities' abilities to attract new members and therefore garner a steady stream of dues.

154.   The housing corporations earn money by charging fraternity members rent for their units in the fraternity houses. Upon information and belief, each fraternity member who lives in a fraternity house signs a separate rental contract with his respective housing corporation. Members who reside in their fraternity houses do so throughout the academic year. Moreover, members who spend the summer in New Haven often reside at their fraternity houses throughout the summer.

155.   Defendant Fraternities give priority to fraternity members—i.e. to men—in renting residential units in the fraternity houses. In many cases, Defendant Fraternities only allow fraternity members to rent units in the fraternity houses. By denying women admission as members, Defendant Fraternities also deny women the opportunity to rent units in the fraternity houses because of their gender.

156.    Defendant Fraternities therefore have a policy and practice of denying women, including Plaintiffs, an equal opportunity to rent units, and otherwise making housing to women, including Plaintiffs, unavailable because of their gender.

**VII.    Yale Misleads Plaintiffs About the Role of Fraternities on Campus**

157.    In its official policies, Yale claims that it bans discrimination. Yale's *Equal Opportunity Statement* states:

> Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression.

158.    Yale's *Undergraduate Regulations* also "require[] that all student organizations— whether registered or unregistered, operating on or off campus . . . must operate in accordance with Yale policies on equal opportunity."

159.    Despite these ostensibly sweeping prohibitions on discrimination, Yale permits unequal, gender-segregated Greek life to thrive on campus. This derogation of Yale's equal opportunity policies has a ripple effect on gender inequity at Yale: not only are women and non-binary students denied equal status as members of Yale's student body, but they are also deprived of the social and economic privileges of fraternity membership.

160.    In contrast to the experience of many female and non-binary students, Yale also advertises itself as an institution that actively seeks to prevent sexual misconduct. The current version of the University's *Sexual Misconduct Policies* states:

> Yale University is committed to maintaining and strengthening educational, working, and living environments founded on mutual respect in which students, faculty, and staff are connected by strong bonds of intellectual dependence and trust. Sexual misconduct is antithetical to the standards and ideals of our community. Therefore, Yale University prohibits all forms of sexual misconduct. Yale aims to eradicate sexual misconduct through education, training, clear definitions and policies, and serious consequences for policy violations. . . These policies apply to all members of the Yale community as well as to

conduct by third parties (i.e., individuals who are not students, faculty, or staff, including but not limited to guests and consultants) directed toward university students, faculty, or staff members.

161.   In the 2017-2018 version of the *Sexual Misconduct Policies*, Yale also assured students that sexual misconduct "will not be tolerated."

162.   Nevertheless, Yale has done little to control the rampant sexual harassment and assault occurring at the Fraternities. In the past ten years, Yale has sanctioned fraternities for sexual misconduct only twice—DKE in 2011 and SAE in 2014. And, as discussed in paragraphs 62 and 75-79 *supra*, the sanctions were ineffective. Moreover, Yale has refused to follow recommendations aimed at curbing sexual violence at fraternities, including recommendations of the 2011 Advisory Committee on Campus Climate, the 2016 YCC Task Force on Greek Life, and the 2019 *Review of DKE and Campus Culture*. Indeed, Yale failed to promptly implement requirements of the 2012 Voluntary Resolution Agreement with the Department of Education, such as the commitment to form a Greek council. Recently, Yale has even taken steps to exercise *less* supervision over fraternities by abandoning the policy requiring registration of off-campus parties. None of these actions evince a sincere effort to control sexual misconduct related to the Fraternities.

163.   Yale often claims that the University cannot punish the Fraternities because they are unregistered, off-campus organizations. As recently as January 14, 2019, Yale College Dean Marvin Chun claimed, "I don't have any power over them." But Yale's position contradicts the *Undergraduate Regulations*, which specifically impose non-discrimination requirements on unregistered and off-campus organizations, and Yale's past practice of sanctioning DKE and SAE. Moreover, as Dean Chun has acknowledged, Yale has power over the individual students who are members of the Fraternities. Yale simply refuses to use this power to prohibit discrimination by

Fraternity members or to require members to adopt policies and practices aimed at preventing sexual misconduct.

164.    Yale also underreports the number of students in Greek organizations, downplaying fraternities' important social role to prospective students. Yale's promotional materials, some of which provide no information about Greek life, give prospective students the impression that the Fraternities play a minor part in the campus social scene. Indeed, Yale's admissions office claims that the Greek community comprises approximately 10% of the undergraduate population. In an Instagram post on January 31, 2017, Yale's Admissions Office stated, "While only about 10% of students participate in Greek life, sororities and fraternities can be valuable social spaces on campus for those who pursue them." Plaintiff Walker remembers Yale citing the 10% statistic to her as a prospective student.

165.    Only after matriculating did Plaintiffs realize that Yale's Greek scene is actually much larger, an impression confirmed by the YCC Task Force on Greek Life. Of 1,800 responses to the Task Force's 2016 survey, 38% of the student respondents said that they attend open fraternity events at least once or twice a month. Contrary to Yale's portrayal of its campus climate, the YCC Task Force found that Greek life is a "fairly regular and important part of social life for at least a fourth of Yale students." Indeed, in the 2019 *Review of DKE and Campus Culture,* the University admitted that "many students expressed surprise about discovering . . . when they arrived as first years" that the Fraternities were "the de facto social environment for many students." Students "felt that, unlike other institutions, Yale appears to minimize the role of Greek life in its official recruitment and admissions materials."

166.    Yale also fails to warn its students about the specific dangers of fraternities. While Yale provides some training concerning sexual misconduct to its undergraduate students, those

trainings are ineffective and ignore the prevalence of sexual harassment and assault at fraternities. Plaintiffs McNeil, Singer, and Walker each attended a mandatory training for first year students, called the "Myth of Miscommunication," but none of the Plaintiffs learned about the dangers of fraternities. The mandatory training for sophomore students, called "Bystander Intervention," also fails to explicitly mention fraternities as a common site of sexual harassment and assault.

167.    In 2015, a group of Yale undergraduates formed Unite Against Sexual Assault at Yale (USAY), in part, to fill gaps in the University's training program. Plaintiff McNeil has served on the board of USAY. The founder of USAY met separately with two Yale administrators, Deputy Provost Stephanie Spangler and Assistant Dean of Student Affairs Melanie Boyd, regarding sexual misconduct at Yale and USAY's work. Both administrators stated that Yale did not want to focus the University's sexual misconduct prevention efforts on fraternities. They also actively discouraged USAY from concentrating its efforts on fraternities.

168.    Yale's refusal to address fraternity-related discrimination and sexual misconduct directly contradicts representations the University made to Plaintiffs as prospective students. In its promotional materials and on its websites, Yale claimed that it banned discrimination and promoted gender equality and inclusion.

169.    For example, Plaintiff Walker remembers receiving the University's admissions pamphlet as a prospective student, which highlighted campus organizations devoted to promoting gender equality and recited the University's *Equal Opportunity Statement*. Plaintiff Walker also remembers receiving the University's diversity pamphlet, which similarly recited the *Equal Opportunity Statement*. These materials gave Plaintiff Walker the impression that the University would, in fact, be committed to promoting equal social, educational, and career opportunities for all students, regardless of gender.

170.    In the fall of 2014, when she was a junior in high school, Plaintiff McNeil attended an event at which senior Yale administrators, including Yale President Peter Salovey, spoke positively about Yale's efforts to promote gender equality and inclusion. Assistant Dean of Student Affairs Melanie Boyd claimed that Yale had "done a lot of work" to address sexual assault on campus. She regretted that "it took an outrageous act" to get to that point, alluding to the 2010 DKE "no means yes" chant.

171.    During one of the breaks, Plaintiff McNeil approached Vice President for Student Life Kimberly Goff-Crews. She told Vice President Goff-Crews that she was interested in applying to Yale and wanted to learn more about the University's efforts to support female students of color. Mirroring President Salovey's and Dean Boyd's remarks, Ms. Goff-Crews gave Plaintiff McNeil the impression that Yale would be an inclusive and supportive educational environment.

172.    Plaintiffs McNeil, Singer, and Walker each enrolled in Yale expecting that fraternities played a minor role in the campus social scene. They also expected that Yale University's policies meant what they said: that Yale actively promotes gender equality on campus and aims to eradicate sexual misconduct. They decided to matriculate at Yale based, in part, on the University's representations. They have been shocked, disappointed, and disturbed by the prominent role that the Fraternities play in the campus social scene. They have been especially disappointed by Yale's refusal to apply Yale's *Equal Opportunity Statement* to Greek life and by the University's failure to curtail sexual harassment and assault.

**VIII.    Yale Rebuffs Plaintiffs' Efforts to Seek Redress**

173.    For well over a year, Plaintiffs have petitioned Defendant Yale University to end the discriminatory admission practices of Defendant Fraternities and the hostile environment that exists at Defendant Fraternities and at Yale. The University, however, has refused to take any steps

to alter the Fraternities' admission practices and has been deliberately indifferent to the hostile environment.

174.   On August 17, 2017, Plaintiff McNeil sent an email to several Yale administrators, including President Salovey, Dean Chun, and Dean Howard, with the subject line "Fraternities, Sexual Violence, and Gender Inclusion at Yale." The email raised concerns about Defendant Fraternities' discriminatory admissions policies and the hostile environment at Defendant Fraternities and Yale.

175.   On Thursday, August 31, 2017, Plaintiffs McNeil and Walker, along with other Engender members, met with Deans Chun and Howard. The students explained that the Fraternities are some of the only party spaces on campus, especially for first-year students, and are frequent sites of sexual harassment and assault. They also pointed out that the gender-discriminatory admission practices of the Fraternities contravene Yale's anti-discrimination policies. Nonetheless, Deans Chun and Howard declined to take any steps to require the Fraternities to admit female or non-binary students as members. They also failed to follow up with the students with steps the University was prepared to take to address the sexual misconduct occurring at the Fraternities.

176.   On January 26, 2018, Plaintiff McNeil emailed Deans Chun and Howard on behalf of Engender, and informed the deans that Engender and the Executive Committee of the Yale chapter of Sigma Phi Epsilon were exploring the possibility of opening the chapter to women and non-binary students. Plaintiff McNeil further explained that Sigma Phi Epsilon's national organization would not permit the Yale chapter to integrate, and if the chapter pursued integration, the national organization would revoke the chapter's insurance and its fraternity house. In light of these obstacles, Plaintiff McNeil specifically asked Deans Chun and Howard for a meeting to

explore options to assist the Yale chapter in efforts to disaffiliate. Yet Deans Chun and Howard never found the time to schedule a meeting with members of Engender and the Yale chapter of Sigma Phi Epsilon.

177.    On February 17, 2018, Plaintiffs McNeil and Walker emailed Dean of Student Affairs Camille Lizarribar to request assistance filing a complaint with the Yale Executive Committee regarding Defendant Fraternities' discriminatory admissions policies. Under the Yale College *Undergraduate Regulations*, students need the support of certain faculty or staff members in order to file a complaint with the Executive Committee.

178.    Plaintiffs McNeil, Walker, and another Engender member met with Dean Lizarribar on Monday, February 19, 2018. Dean Lizarribar was surprised that the students had asked for a meeting to discuss the Defendant Fraternities' discriminatory admissions policies. She claimed that she already knew about Engender's efforts to integrate Defendant Fraternities and complained that she thought the students had asked for the meeting because "something bad had happened," signaling that she did not take the students' complaint seriously. Further, when a student participant at the meeting specifically mentioned an instance of sexual misconduct against an Engender member at a fraternity, Dean Lizarribar only responded by inquiring as to whether that incident had been reported. The students also pointed out that Defendant Fraternities violated Yale's policies against discrimination and that Yale was refusing to enforce those policies against the Fraternities. The students asked for Dean Lizarribar's support in bringing a complaint to the Yale Executive Committee, but Dean Lizarribar declined to support the students' complaint. Instead, she asked for time to consider ways that she could continue having conversations with Plaintiffs McNeil, Walker, and other Engender members.

179.    On March 5, 2018, Engender members, including Plaintiffs McNeil and Walker, jointly emailed President Salovey, Dean Chun, and Dean Howard to raise further concerns about the negative effects of fraternity discrimination and harassment on their educational experiences. The email specifically notified the president and deans about Defendant Fraternities' refusal to admit Engender members to their membership; of *Yale Daily News* reports of sexual harassment and assault relating to Defendant Delta Kappa Epsilon; and of first semester recruitment by Defendants Delta Kappa Epsilon and Sigma Nu in violation of Yale's *Undergraduate Regulations*. Without substantively responding to the students' concerns, Dean Chun directed them to work with Dean Howard, Dean Lizarribar, and Gregg Peeples, Assistant Dean of Student Conduct & Community Standards and Secretary of the Executive Committee.

180.    On March 29, 2018, Plaintiffs McNeil, Walker, and another Engender member met with Deans Lizarribar and Peeples. The students again explained that Defendant Fraternities' admissions practices were discriminatory and against Yale policy. The students asked the deans whether Yale had any formal avenues for filing a complaint of gender discrimination against the Fraternities. Although the deans agreed the Fraternities' admissions practices were discriminatory, they told the students that there was no formal way for them to raise their complaints of discrimination.

181.    On or about April 5, 2018, Plaintiffs McNeil, Walker, and other Engender members met with Yale's Deputy Title IX Coordinator Jason Killheffer and Labor Relations Director Andrea Terrillion. Drawing from individual experience, campus media reports, and social science research, the Plaintiffs and other Engender members explained in detail how gender discrimination by fraternities at Yale results in disproportionately high occurrences of sexism, sexual harassment and assault, LGBTQ discrimination, and professional disparities among Yale students. Yet, still,

49

Mr. Killheffer, Ms. Terrillion, and the Yale administration failed to take direct action in response to these complaints.

182.    On November 15, 2018, Plaintiff McNeil emailed Dean Howard to note that Leo had officially disaffiliated from Sigma Alpha Epsilon's national organization. She reminded Dean Howard that Leo was an undergraduate organization that violated the *Undergraduate Regulations* by discriminating based on gender in its membership policies. In Dean Howard's response of November 26, 2018, he agreed that Leo's "membership is seemingly composed of Yale students," but disclaimed "formal oversight over *any* unregistered or unaffiliated group here in New Haven, who their members are or their membership criteria." Although he acknowledged that the members of Leo are individually "responsible to the Undergraduate Regulations," he gave no indication that Yale would sanction them for discriminating on the basis of gender.

## IX.    The Fraternities Are Public Accommodations

183.    Yale's fraternities are all local chapters of national fraternal organizations with tens of thousands of members. Upon information and belief, these national fraternities are not selective organizations. They do not have official policies that limit recruitment to specific cohorts of students, such as those with particular political affiliations, high levels of academic achievement, or participation in intercollegiate athletics. Their principal admission requirement is that applicants are men. And, upon information and belief, many fraternities admit the majority of men who request membership.

184.    For some of Defendant Fraternities, male members do not even have to be enrolled students at a university. For example, Sigma Chi's constitution states that a "chapter may initiate any male who is not currently a student at the institution where the initiative chapter is located, but who is otherwise qualified for membership." Similarly, Zeta Psi's bylaws hold that "non-

students…upon election to membership and due certification thereof by the Executive Director of the International Headquarters, may be initiated" by a local chapter.

185.    Like their national parent organizations, Defendant Yale chapters are distinctly unselective organizations. Most chapters offer admission to the majority of men who apply. And, upon information and belief, like their parents, the local chapters have no official policies restricting recruitment to a specific cohort of students (other than men). Indeed, in or about the 2017-2018 academic year, Defendant Zeta Psi released a Google form on its Facebook page, opening its rush process to all interested male undergraduates. Simply knowing a brother within the fraternity is often sufficient to garner an invitation to apply.

186.    Each of Defendant Fraternities opens itself up to the general Yale public. All the Fraternities invite the Yale undergraduate community to their house parties, often sending Facebook invitations to hundreds (or even thousands) of Yale undergraduates per party.  Some of these events recur annually and are known across the Yale community, such as Alpha Delta Phi's "Jammy Jam" party and Delta Kappa Epsilon's "Tang," which is scheduled to coincide with Yale's annual concert event "Spring Fling." Zeta Psi's parties are so well known that the Fraternity boasts on a fundraising website, "Whether it be attending a party to celebrate a huge win by one of our sports' teams or showing up to the weekly late night at Zeta parties, most students can attest to the fact that they have made at least one stop (and hopefully many more) in the historic Zeta basement during their time at Yale." Similarly, a Delta Kappa Epsilon spokesperson told the *Yale Daily News*, "most DKE social events are open to every Yale student."

187.    Moreover, fraternity events are frequently open to the general public. The Fraternities regularly advertise their parties on Facebook as "public events." They also regularly invite female students from neighboring schools, such as the University of New Haven and

Quinnipiac University, whom the brothers derisively refer to as "Q-PAC Girls." Further, the Fraternities often admit partygoers without checking identifications, and even at times, leave their doors unguarded. As one student explained in the *Yale Daily News*, "Upon visiting Yale, my male friends (who attend Maryland public universities, such as Salisbury, Towson and the University of Maryland) were shocked to learn that they could gain entrance to most fraternity parties, as long as the building was not at capacity." Upon information and belief, Defendants Alpha Delta Phi, Sigma Alpha Epsilon/Leo, and Sigma Nu regularly open their events to the broader New Haven community. Moreover, upon information and belief, Zeta Psi opens its "Zeta late night"—a weekly Saturday night party—to the New Haven community.

188.    Defendant Fraternities (through their respective housing corporations) also allow individual students, sororities, and other student groups to host events in their houses. Chi Psi, for example, through its housing corporation, regularly rents its house out to co-ed student groups. Sigma Alpha Epsilon/Leo (also through its housing corporation) similarly rents its house out to co-ed student organizations, such as the Brazil Club at Yale and Yale European Undergraduates, and to students (male and female) for birthday parties and other events. Sigma Chi also allows a broad range of Yale organizations to use its space, including the LGBTQ Student Cooperative and acapella groups.

189.    Sigma Nu (through its housing corporation) has made particularly extensive efforts to profit from its space by opening it to the broader community. Sigma Nu rents its space to the Yale Whaling Crew, the Photography Society, sororities, and to Yale students (male and female) for birthday parties. It also has a close relationship with the Yale women's gymnastics team, which frequently uses the house, and upon information and belief, provides funds to maintain the space.

Sigma Nu also rents out rooms in its fraternity house during the academic year and the summer when those rooms are not being occupied by brothers (who get first priority).

190.    Notably, Sigma Nu and Sigma Chi also name an honorary female "brother," known as the Sigma Nu or Sigma Chi "Sweetheart," who is ostensibly the Yale female student most like "one of the guys."

191.    Despite opening their spaces to the public, the Defendant Fraternities refuse to allow female and non-binary students to become members.

## X.    Yale is a Public Accommodation

192.    Defendant Yale University is a private research university with approximately 12,458 undergraduate, graduate, and professional school students. According to Yale's Office of New Haven and State Affairs (ONHSA), "Yale is New Haven's largest employer" and "one of the top five taxpayers." Yale also actively promotes tourism on campus. Its website brags, "Reader's Digest recently named Yale University as The Best Free Tourist Attraction for Connecticut!"

193.    Much of Yale's campus, including places where Yale's fraternities engage in recruitment activities and publicity, is ungated and open to the general public. Yale's Cross Campus, where the Fraternities have access to Yale bulletin boards, is open to the general public. So is the sidewalk area outside of the Yale's Women's Center, where in 2008, Zeta Psi recruits posed with the "We Love Yale Sluts" sign. Yale's "Visiting" website encourages potential visitors to "stroll through our scenic and historic Old Campus" – which was the site of DKE's 2010 "No means yes" call and response.

194.    According to Yale's website, "Yale's museums, exhibition spaces, concerts and theatre productions are generally open to the public and many programs are free of charge." The Yale Bowl and Ingalls' Rink also offer sporting events that are open to the public. Additionally,

according to Yale ONHSA, Yale University Medical School physicians provide care to the local community and The Yale Jerome N. Frank Legal Services Organization offers free legal assistance to organizations that cannot afford to retain private counsel.

195.    These are just some of the ways in which Yale University opens itself to the general public.

## XI.    Yale and the Fraternities Are Public Accommodations with a Symbiotic Relationship

196.    Yale and the Fraternities have a symbiotic relationship. Yale University has a drastic shortage of sufficient party spaces and relies on Defendant Fraternities to offer students party venues. Upon information and belief, Yale made deliberate decisions to phase out many on-campus events, knowing full well that this would increase the number of students—particularly first-year students—attending fraternity parties. Now, the Fraternities provide party venues (and alcohol) to Yale students, and in exchange, Yale allows the Fraternities to use Yale resources (and recruit Yale students) and largely turns a blind eye to the sexual harassment and assault occurring in connection with the Fraternities.

197.    While Yale claims that it lacks the ability to control the Fraternities, the University simultaneously permits them to use the Yale name, Yale email addresses, Yale bulletin boards, and campus facilities for recruitment. Further, from 2012 through September 2018, Yale required students to register all off-campus events at which 50 or more people might attend (e.g. a fraternity party). Thus, the Dean's Office, Residential Colleges, and the Yale Police were aware of—and exercised jurisdiction over—almost every fraternity party or event.

198.    Although Yale has failed to create a formal and transparent Greek council, as required by the 2012 Voluntary Resolution Agreement with the Department of Education, Dean Burgwell Howard (whom, according to the *Yale Daily News*, brothers think of as "one of the boys"

and refer to as "our boy Howard") maintains contact with the heads of Defendant Fraternities. For example, in January 2018, several fraternities reached out to Dean Howard after Plaintiffs and Engender requested that Defendant Fraternities open their rush to female students. In response, Dean Howard sent a group email to the heads of Yale's fraternities with advice on the rush process. Dean Howard explicitly warned the brothers, "There are some students who, truthfully, will be looking for inconsistencies, biases or discrimination in your processes, so I encourage you to be as clear and transparent as you can about your processes, timelines etc.-to help people understand." He then ended his email with a list of "15 Do's and Don't's of Recruiting High Quality People," which he shared with the students "just for grins . . . because I am cracking myself up with the outdated references… ;-)."

199.    In sum, the Fraternities act as extensions of Yale, providing much needed party venues where Yale students can socialize with one another and members of the general public. Although Yale exercises jurisdiction over these spaces, it refuses to take steps to prevent discrimination, harassment, and assault from occurring in connection with the Fraternities.

## CLASS ALLEGATIONS

A.    **Class Definition**

200.    Plaintiffs and Class Representatives seek to bring this action under Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of every current and former female undergraduate student who has matriculated and/or will matriculate from the beginning of the applicable statute of limitations of each claim asserted on behalf of the class through the date of judgment: for violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 *et seq*, from February 12, 2016 through the date of final judgment; for violation of the Fair Housing Act 42 U.S.C. §§ 3601 *et seq.*, from February 12, 2017 through the date of final judgment; for

violation of Connecticut's law against discrimination in places of public accommodations, Conn. Gen. Stat. §§ 46a–63-64, from January 13, 2018 through the date of final judgment; for breach of contract, from February 12, 2013 through the date of final judgment; and for violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a *et seq*, from February 12, 2016 through the date of final judgment. If necessary for the efficient prosecution of this action, Plaintiffs will seek to form subclasses for each substantively distinct claim.

201.     Plaintiffs reserve the right to modify this Class definition and Class period.

**B.     Efficiency of Class Prosecution of Class Claims**

202.     Certification of the proposed class is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of the Plaintiffs and the Class.

203.     Plaintiffs' individual claims, as Class Representatives, require resolution of common questions concerning whether Yale and Defendant Fraternities discriminate against female Yale students and subject female students to a sexually hostile environment. Plaintiffs seek remedies to eliminate the adverse effects of such discrimination in their own lives and the lives of the class members, and to prevent Yale and Fraternities from continued gender discrimination. Plaintiffs' claims also require resolution of common questions concerning whether Yale engaged in unfair and deceptive practices by, *inter alia,* misleading prospective students about the University's commitment to non-discrimination and addressing sexual misconduct and whether Yale breached its contract with the students by permitting undergraduate organizations to perpetuate gender inequality and sexual misconduct. Without class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations

204.    Plaintiffs have standing to seek such relief because of the adverse effect that such discrimination, unfair and deceptive conduct, and breaches of contract have had on them individually and on female students at Yale generally. Yale and the Fraternities caused Plaintiffs' injuries through discriminatory practices, policies, and procedures and failure to remedy or correct such discrimination. Yale further caused Plaintiffs' injuries by misleading Plaintiffs about the University's commitment to non-discrimination and redressing sexual misconduct, by failing to redress discrimination and sexual misconduct, and by breaching its contract with Plaintiffs by, *inter alia*, permitting undergraduate organizations to perpetuate gender inequality and by failing to take effective measures to eradicate discrimination and sexual misconduct against female students. These injuries are redressable through systemic relief, such as equitable and injunctive relief and other remedies sought in this action.

205.    Certification of the proposed class is the most reasonable and efficient means of presenting the evidence and arguments necessary to resolve such questions, and fashion such relief, for the Plaintiffs and the class members.

## C.    Numerosity and Impracticability of Joinder

206.    The Class that the Plaintiffs seek to represent is too numerous to make joinder practicable.

207.    Upon information and belief, the proposed class consists of thousands of current and former female students during the liability period. The exact size of the Class and the identities of the individual members are ascertainable through records maintained by Yale.

## D.    Common Questions of Law and Fact

208.    Prosecuting Plaintiffs' claims will require the adjudication of numerous questions of law and fact common to their claims and those of the Class they seek to represent.

209.    Common questions of law and fact predominate, and include, but are not limited to, the following: (i) whether Yale has engaged in unlawful, systemic sex discrimination and facilitated a hostile educational environment that violates Title IX; (ii) whether Yale has violated the Title IX and other legal rights of its female students by failing to adequately prevent, investigate, or respond with appropriate corrective action to evidence and complaints of discrimination; (iii) whether Yale is liable for continuing systemic violations of Title IX; (iv) whether the harassment permitted and facilitated by Yale and the Fraternities interfered with the educational opportunities normally available to students; (v) whether Yale acted with deliberate indifferent to notice of a hostile environment; (vi) whether Yale and the Fraternities are places of public accommodation under Connecticut law; (viii) whether Yale and the Fraternities are hostile environments; (ix) whether Yale misleads prospective students about the University's non-discrimination policies and commitment to redressing sexual harassment and assault; (x) whether Yale breached its contract with students by failing to enforce and honor its non-discrimination and sexual assault policies; (xi) whether the Fraternities discriminate against female students by denying them equal access to housing based on gender.

**E.    Typicality of Claims and Relief Sought**

210.    Each Plaintiff is a member of the Class she seeks to represent. The Plaintiffs' claims are typical of the claims of the proposed class. The Plaintiffs possess and assert each of the claims they assert on behalf of the proposed class. They pursue the same factual and legal theories and seek similar relief.

211.    Like members of the proposed class, the Plaintiffs are female undergraduate students who matriculated at Yale during the liability period.

212.    The acts and omissions to which Defendants subjected the Plaintiffs and the Class applied universally within the Class and were not unique to any Plaintiff or Class Member.

213.    The relief necessary to remedy the claims of the Plaintiffs is the same as that necessary to remedy the claims of the proposed class members, and includes the following relief: (i) a declaratory judgment that Yale's policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs and class members under, *inter alia*, Title IX and the applicable Connecticut state laws; (ii) a permanent injunction against Yale and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein; (iii) an Order requiring Yale to initiate and implement programs and policies that remedy the gender discrimination, sexual harassment, and hostile environment at Yale; (iv) an Order requiring Yale to prepare and submit to the Court for approval a plan to implement and enforce the requested relief and any other appropriate relief; (v) a declaratory judgment that Defendant Fraternities' policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs and class members under, *inter alia*, the Fair Housing Act and applicable Connecticut state laws; (vi) a permanent injunction against Defendant Fraternities and their officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein, including (a) enjoining Defendant Fraternities from using gender as a criterion in admissions decisions, and (b) enjoining Defendant Fraternities from using gender as a criterion in housing decisions and from engaging in any further discrimination based on gender in offering units within Fraternity houses; (vii) an Order requiring Defendant Fraternities to initiate and implement programs and policies that remedy the gender

discrimination, sexual harassment, and hostile environment at Defendant Fraternities; (viii) an Order requiring Defendant Fraternities to prepare and submit to the Court for approval a plan to implement and enforce the requested relief and other appropriate relief; (ix) an award of damages to Plaintiffs and the Class under Title IX of the Education Amendments of 1972 and Connecticut law, including economic damages, compensatory damages, and punitive damages to deter Yale from engaging in similar discriminatory practices in the future; (x) an award of damages to Plaintiffs and the Class under the Fair Housing Act and Connecticut law, including economic damages, compensatory damages, and punitive damages to deter the Fraternities from engaging in similar discriminatory practices in the future; (xi) an award of litigation costs and expenses, including reasonable attorneys' fees.

### F.    Adequacy of Representation

214.    The Plaintiffs are adequate representatives of the proposed class.

215.    The Plaintiffs' interests are coextensive with those of the members of the proposed class that they seek to represent in this case. The Plaintiffs seek to remedy Yale's and the Fraternities' discrimination and hostile environment so female students will not suffer differential treatment, depriving them of educational, economic, and social opportunities and resources. Plaintiffs also seek to gain for themselves full and equal access to the opportunities at Yale and to the Fraternities, all of which are places of public accommodation under Connecticut law. Further, Plaintiffs seek redress for Yale's breach of contract and its unfair and deceptive trade practices.

216.    The Plaintiffs are willing and able to represent the proposed class fairly and vigorously as they pursue their similar individual claims in this action.

217.    The Plaintiffs have retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of

this size and complexity. The combined interests, experience, and resources of the Plaintiffs and their counsel to litigate competently the individual and class claims at issue in this case clearly satisfy the adequacy of representation requirement of Rule 23(a).

**G.    Requirements of Rule 23(b)(2)**

218.    Plaintiffs seek to certify a subclass under Rule 23(b)(2) of all current and prospective Yale female students from now until the date of judgment to seek declaratory, injunctive, and affirmative relief against Yale and the Fraternities.

219.    Yale and the Fraternities have acted or refused to act on grounds generally applicable to the Plaintiffs and the proposed class by facilitating a hostile environment and discriminating on the basis of gender. Yale has further acted or refused to act on ground generally applicable to Plaintiffs and the proposed class by failing to adequately prevent, investigate, or respond with appropriate corrective action to evidence and complaints of the discrimination, hostile environment, and sexual harassment that occur in connection with Fraternities. Yale's and the Fraternities' systemic discrimination and refusals to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief for the Class as a whole.

220.    Injunctive, declaratory, and affirmative relief are a predominant form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of Yale's and the Fraternities' systemic gender discrimination and from Yale's breaches of contract and unfair and deceptive practices. In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for recovery by the Plaintiffs and class members of monetary and non-monetary remedies for individual losses caused by the systemic discrimination, as well as their recovery of compensatory and punitive damages.

**H.    Requirements of Rule 23(b)(3)**

221.   The common issues of fact and law affecting the claims of the Plaintiffs and proposed class members—including, but not limited to, the common issues identified above—predominate over any issues affecting only individual claims. The common issues include whether Yale and Fraternities have engaged in sex discrimination and facilitated a hostile environment against female students, whether Yale has failed to appropriately handle evidence and complaints of harassment and discrimination in connection with Fraternities, and whether Yale breached its contract with undergraduates and engaged in unfair or deceptive practices.

222.   A class action is superior to other available means for fairly and efficiently adjudicating the claims of the Plaintiffs and members of the proposed class. The cost of proving Yale's and the Fraternities' hostile environment, Yale's unfair and deceptive conduct and breach of contract, and Yale's and the Fraternities' gender discrimination also makes it impracticable for the Plaintiffs and class members to pursue their claims individually.

223.   Yale's and the Fraternities' gender discrimination and hostile environments, and Yale's unfair and deceptive conduct and breaches of contract, make the Plaintiffs and class members eligible for monetary remedies for losses caused by this systemic discrimination, breaches of contract, and unfair and deceptive conduct, including economic damages, compensatory damages, and other relief.

**I.      Rule 23(c)(4) Certification**

224.   Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all class members.

## COUNTS

### COUNT I

**Violation of Title IX of the Education Amendments of 1972**

**Hostile Educational Environment**

***(On Behalf of All Plaintiffs and the Class Against Yale)***

225.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

226.    Plaintiffs bring this count individually and as a class action pursuant to Rule 23 on behalf of themselves and the Class.

227.    Upon information and belief, at all times relevant to this action, Yale has received, and continues to receive, federal financial assistance.

228.    Yale has subjected Plaintiffs and the members of the proposed class to a sexually hostile educational environment in violation of Title IX.

229.    Yale has discriminated against Plaintiffs and all members of the proposed class by subjecting them to a sexually hostile environment that was sufficiently severe, pervasive, and objectively offensive to interfere with the Plaintiffs' and the proposed class members' educational opportunities, undermining and detracting from their school experience. Because of Yale's failure to implement adequate procedures to detect, monitor, and correct this discrimination and hostile environment, Yale has denied Plaintiffs and members of the proposed class their personal right to work and learn in an environment free of sexual harassment.

230.    Yale was on actual notice of the sexual harassment committed by Yale's fraternities and the hostile environment that the Plaintiffs and class members endured at Yale during the relevant timeframe. Yale has demonstrated deliberate indifference by tolerating, condoning,

ratifying, and/or engaging in the hostile educational environment and failing to take remedial action.

231. Because of Yale's unlawful conduct, Plaintiffs and the proposed class members have suffered and will continue to suffer harm, including but not limited to loss of educational and employment opportunities, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

232. By reason of the continuous nature of Yale's unlawful conduct, Plaintiffs and the proposed class members are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

233. Plaintiffs and the proposed class members are entitled to all legal and equitable remedies available for violations of Title IX, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## COUNT II

### Violation of Title IX of the Education Amendments of 1972

### Gender Discrimination in Terms And Conditions Of Education

#### *(On Behalf of All Plaintiffs and the Class Against Yale)*

234. Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

235. Plaintiffs bring this count individually and as a class action pursuant to Rule 23 on behalf of themselves and the Class.

236. Upon information and belief, at all times relevant to this action, Yale has received, and continues to receive, federal financial assistance.

237.    Yale has discriminated against Plaintiffs and all members of the proposed class by subjecting them to different treatment on the basis of their gender. Plaintiffs and members of the proposed class were treated differently and less favorably than similar-situated male students. Yale subjected Plaintiffs and members of the proposed class to disparate terms and conditions of education in violation of Title IX. Yale maintains, supports, and fails to redress an educational environment in which female students are denied equal access as male students to social, professional, and economic resources and opportunities.

238.    Yale's differential treatment of Plaintiffs and members of the proposed class is a direct and proximate result of gender discrimination.

239.    Yale has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination.

240.    Yale had actual notice of this discrimination and failed to adequately respond, both before and after the discrimination against Plaintiffs and members of the proposed class occurred, amounting to deliberate indifference.

241.    Because of the continuous nature of Yale's unlawful conduct, Plaintiffs and members of the proposed class have suffered and will continue to suffer harm, including but not limited to loss of future educational opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

242.    Because of the continuous nature of Yale's unlawful conduct, Plaintiffs and members of the proposed class are entitled to the application of the continuing violation doctrine to the unlawful acts alleged herein.

243.     Plaintiffs and the proposed class are entitled to all legal and equitable remedies available for violations of Title IX, 20 U.S.C. § 1681 *et seq.*, including compensatory damages, attorneys' fees and costs, and other appropriate relief.

**COUNT III**

**Violation of the Fair Housing Act**

(*On behalf of All Plaintiffs and the Class Against All Fraternity Defendants*)

244.     Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

245.     Plaintiffs bring this count individually and as a class action pursuant to Rule 23 on behalf of themselves and the Class.

246.     Fraternity houses, including those listed or referred to above, are "dwellings" within the meaning of 42 U.S.C. § 3602(b).

247.     Pursuant to 42 U.S.C. § 3604(a), it is unlawful to refuse to rent or sell, refuse to negotiate for the rental or sale, or otherwise make unavailable or deny, a dwelling to any person "because of . . . sex."

248.     Pursuant to 42 U.S.C. § 3604(b), the FHA prohibits discrimination in the terms, conditions, or privileges of sale or rental of a dwelling, or in a provision of services or facilities in connection with such dwelling because of sex.

249.     Defendant Fraternities engaged in unlawful sex discrimination in violation of the FHA. Defendant Fraternities refused to rent, refused to negotiate for the rental of, and otherwise made unavailable or denied, dwellings to Plaintiffs and all members of the proposed class because of gender. Defendant Fraternities also discriminated against Plaintiffs and the members of the

proposed class based on their gender in the terms, conditions, or privileges of sale or rental of a dwelling, or in a provision of services or facilities in connection with such dwelling.

250.    Defendant Fraternities' actions were taken intentionally, willfully, and in disregard for the rights of others, and constituted a discriminatory housing practice, as defined in 42 U.S.C. § 3602(f).

251.    Plaintiffs McNeil, Singer, Walker and other female students who were prohibited, prevented, or deterred from applying for housing at the fraternity houses are "aggrieved persons" within the meaning of 42 U.S.C. § 3602(i) and have suffered harm and damages as a result of Defendant Fraternities' conduct.

252.    Accordingly, under 42 U.S.C. § 3613(c), Plaintiffs are entitled to and seek all legal and equitable remedies available for violations of the Fair Housing Act, including actual damages, punitive damages, injunctive relief, and reasonable attorneys' fees and costs.

## COUNT IV

### Discrimination in Places of Public Accommodation

### Conn. Gen. Stat. §§ 46a–63, 46a–64

### Denial of Membership in Fraternities

*(On Behalf of All Plaintiffs and the Class Against All Fraternity Local Chapter and National Organization Defendants)*

253.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

254.    Plaintiffs bring this count individually and as a class action pursuant to Rule 23 on behalf of themselves and the Class.

255.   Defendant Fraternities are public accommodations under Conn. Gen. Stat. § 46a–63 because they are establishments that cater or offer their services or facilities or goods to the general public.

256.   Defendant Fraternities open themselves up to the general public in numerous ways. They regularly host parties that are open to the general public and they allow a broad array of organizations and individuals to rent and use their spaces. Defendant Fraternities' primary admission criterion for membership is gender: upon information and belief, they admit the vast majority of men who apply while completely denying female students the opportunity to become members. The Fraternities depend upon, and have establish a symbiotic relationship with Yale, which provides the Fraternities with resources and allows the Fraternities to recruit Yale students.

257.   Defendant Fraternities have a policy and practice of discriminating against female students. Defendant Fraternities each refuse to admit women to their membership.

258.   Defendant Fraternities explicitly rejected Plaintiffs' requests to become members because of their gender and/or indicated that it would be futile for Plaintiffs to apply for membership.

259.   Because of the continuous nature of the Fraternities' unlawful conduct, Plaintiffs and members of the proposed class have suffered and will continue to suffer harm, including but not limited to loss of social, economic, and educational opportunities, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

260.   Plaintiffs filed a Complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO) on July 12, 2018 and amended their Complaint on September 12, 2018 and December 4, 2018. Plaintiffs received releases of jurisdiction from the CHRO for their claims against the national organizations and the local Yale chapters of the Fraternities between January

14, 2019 and January 16, 2019. Plaintiffs have not yet received releases of jurisdiction for the CHRO matter numbers associated with the housing corporations. Plaintiffs will inform the Court once it receives those releases of jurisdiction and amend the Complaint accordingly, including by adding the housing corporations as Defendants in this Count.

261.   Plaintiffs and the proposed class members are entitled to all legal and equitable remedies available for violations of Conn. Gen. Stat. §§ 46a–63, 46a–64, including actual damages, compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## COUNT V

### Discrimination in Places of Public Accommodation

### Conn. Gen. Stat. §§ 46a–63, 46a–64

### Hostile Environment

(*On Behalf of All Plaintiffs and the Class Against All Fraternity Local Chapter and National Organization Defendants*)

262.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

263.   Plaintiffs bring this count individually and as a class action pursuant to Rule 23 on behalf of themselves and the Class.

264.   Defendant Fraternities are public accommodations under Conn. Gen. Stat. § 46a–63 because they are establishments that cater or offer their services or facilities or goods to the general public.

265.   Defendant Fraternities open themselves up to the general public in numerous ways. They regularly host parties that are open to the Yale and New Haven communities and they allow

a broad array of organizations and individuals to rent and use their spaces. Defendant Fraternities'

primary admission criterion for membership is gender: upon information and belief, they admit

the vast majority of men who apply while completely denying women the opportunity to become

members. The Fraternities depend upon, and have establish a symbiotic relationship with, Yale,

which provides the Fraternities with resources and allows the Fraternities to recruit Yale students.

266.   Defendant Fraternities have a policy and practice of creating a hostile environment

at their houses and events and throughout Yale's campus. Plaintiffs McNeil, Singer, and Walker

were each subjected to sexual harassment or assault in fraternity houses and at fraternity parties.

The prevalence of sexual harassment at fraternities is so great that Plaintiffs McNeil, Singer, and

Walker no longer feel comfortable attending fraternity parties.

267.   Because of the continuous nature of the Fraternities' unlawful conduct, Plaintiffs

and members of the proposed class have suffered and will continue to suffer harm, including but

not limited to loss of social, economic, and educational opportunities, reputational harm, emotional

and physical distress, mental anguish, and other economic damages and non-economic damages.

268.   Plaintiffs filed a Complaint with the Connecticut Commission on Human Rights

and Opportunities (CHRO) on July 12, 2018 and amended their Complaint on September 12, 2018

and December 4, 2018. Plaintiffs received releases of jurisdiction from the CHRO for their claims

against the national organizations and the local Yale chapters of the Fraternities between January

14, 2019 and January 16, 2019. Plaintiffs have not yet received releases of jurisdiction for the

CHRO matter numbers associated with the housing corporations. Plaintiffs will inform the Court

once it receives those releases of jurisdiction and amend the Complaint accordingly, including by

adding the housing corporations as Defendants in this Count.

70

269.   Plaintiffs and the proposed class members are entitled to all legal and equitable remedies available for violations of Conn. Gen. Stat. §§ 46a–63, 46a–64, including actual damages, compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

**COUNT VI**

**Discrimination in Places of Public Accommodation**

**Conn. Gen. Stat. §§ 46a–63, 46a–64**

**Denial of Equal Opportunities in a Place of Public Accommodation**

***(On Behalf of All Plaintiffs and the Class Against Yale)***

270.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

271.   Plaintiffs bring this count individually and as a class action pursuant to Rule 23 on behalf of themselves and the Class.

272.   Defendant Yale is a public accommodation under Conn. Gen. Stat. § 46a–63 because it is an establishment that caters or offers services or facilities or goods to the general public.

273.   Defendant Yale opens itself up to the general public in a variety of ways. Much of Yale's campus is ungated and open to the general public. Yale advertises itself as a tourist attraction, open to visitors from around the world. Yale also invites the public in to its museums, theaters, clinics and sports stadiums. Yale depends upon, and has establish a symbiotic relationship with the Fraternities, which provide social space for Yale undergraduates.

274.   Yale has discriminated against Plaintiffs and all members of the proposed class by subjecting them to different treatment on the basis of their gender. Plaintiffs and members of the

proposed class were treated differently and less favorably than similar-situated male students. Yale condones and refuses to redress an environment in which female students are denied the same access to academic, economic and social resources and opportunities as male students. Specifically, Yale condones and permits the Fraternities to discriminatorily deny membership, and the corollary academic, economic and social benefits of membership, to female students. As a result of this ongoing gender discrimination, Yale female students have less access to academic, social and economic resources than their male peers. Furthermore, Yale's endorsement of gender-segregated Greek life creates a social environment at Yale that nurtures gendered norms, stereotypes, and prejudices, which can hinder cross-gender relationships, facilitate the objectification of people of other genders, and normalize sexual assault.

275.   Yale's differential treatment of Plaintiffs and members of the proposed class is a direct and proximate result of gender discrimination.

276.   Yale has failed to prevent, respond to, adequately investigate, and/or appropriately resolve instances of gender discrimination.

277.   Because of the continuous nature of Yale's unlawful conduct, Plaintiffs and members of the proposed class have suffered and will continue to suffer harm, including but not limited to loss of social, economic, and educational opportunities, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

278.   Plaintiffs filed a Complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO) on July 12, 2018 and amended their Complaint on September 12, 2018 and December 4, 2018. Plaintiffs received releases of jurisdiction from the CHRO for their claims against Yale on January 15, 2019 and January 16, 2019.

279.   Plaintiffs and the proposed class members are entitled to all legal and equitable remedies available for violations of Conn. Gen. Stat. §§ 46a–63, 46a–64, including actual damages, compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## COUNT VII

### Discrimination in Places of Public Accommodation

### Conn. Gen. Stat. §§ 46a–63, 46a–64

### Hostile Environment

### *(On Behalf of All Plaintiffs and the Class Against Yale)*

280.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

281.   Plaintiffs bring this count individually and as a class action pursuant to Rule 23 on behalf of themselves and the Class.

282.   Defendant Yale is a public accommodation under Conn. Gen. Stat. § 46a–63 because it is an establishment that caters or offers services or facilities or goods to the general public.

283.   Defendant Yale opens itself up to the general public in a variety of ways. Much of Yale's campus is ungated and open to the general public. Yale advertises itself as a tourist attraction, open to visitors from around the world. Yale also invites the public in to its museums, theaters, clinics and sports stadiums. Yale depends upon, and has establish a symbiotic relationship with, the Fraternities, which provide social space for Yale undergraduates.

284.   Defendant Yale is a hostile environment. According to the 2015 Association of American Universities report, 38.8 % of female undergraduate respondents reported being sexually assaulted while at Yale and 74% reported being sexually harassed.

285.   Numerous reports, news articles, and upon information and belief, Title IX complaints, have detailed the significant role that the Fraternities play in the sexual climate at Yale. Indeed, Plaintiffs have specifically complained to Yale administrators about the Fraternities' significant contribution to the sexual harassment and assault that female students face on and around Yale's campus. Yet Yale has failed to remedy the hostile environment.

286.   Plaintiffs McNeil, Singer, and Walker and class members have each been subjected to sexual harassment in fraternity houses and on Yale's campus. The prevalence of sexual harassment at Yale is so great that it restricts Plaintiffs' interaction with student organizations and their social activities. Plaintiffs McNeil, Singer, and Walker typically avoid attending fraternity events because they have been subjected to harassment and assault at fraternities and fear that they will suffer further harassment or assault if they return.

287.   Because of the continuous nature of Yale's unlawful conduct, Plaintiffs and members of the proposed class have suffered and will continue to suffer harm, including but not limited to loss of social, economic, and educational opportunities, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

288.   Plaintiffs filed a Complaint with the Connecticut Commission on Human Rights and Opportunities (CHRO) on July 12, 2018 and amended their Complaint on September 12, 2018 and December 4, 2018. Plaintiffs received releases of jurisdiction from the CHRO for their claims against Yale on January 15, 2019 and January 16, 2019.

289.   Plaintiffs and the proposed class members are entitled to all legal and equitable remedies available for violations of Conn. Gen. Stat. §§ 46a–63, 46a–64, including actual damages, compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## COUNT VIII

### Breach of Contract

#### (*On Behalf of All Plaintiffs and the Class Against Yale*)

290.   Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

291.   Plaintiffs bring this count individually and as a class action pursuant to Rule 23 on behalf of themselves and the Class.

292.   Yale's *Equal Opportunity Statement* states:

> Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression.

293.   Further, Yale's *Undergraduate Regulations* "require[] that all student organizations—whether registered or unregistered, operating on or off campus . . . must operate in accordance with Yale policies on equal opportunity."

294.   Yale also represents that it has a broad sexual misconduct policy and that it takes active measures to prevent and punish sexual harassment and assault. For example, the current version of the University's *Sexual Misconduct Policies* states:

> Yale University is committed to maintaining and strengthening educational, working, and living environments founded on mutual respect in which students, faculty, and staff are connected by strong bonds of intellectual dependence and trust. Sexual misconduct is antithetical to the standards and ideals of our community. Therefore, Yale University prohibits all forms of sexual misconduct. Yale aims to eradicate sexual misconduct through

education, training, clear definitions and policies, and serious consequences for policy violations. . . These policies apply to all members of the Yale community as well as to conduct by third parties (i.e., individuals who are not students, faculty, or staff, including but not limited to guests and consultants) directed toward university students, faculty, or staff members.

295.    In the 2017-2018 version of the *Sexual Misconduct Policies*, Yale also assured students that sexual misconduct "will not be tolerated."

296.    These promises are part of the contract that Yale makes with its students in exchange for their matriculation and tuition payments.

297.  Yale has breached these contractual promises. Specifically, Yale permits Fraternities and their members to discriminate on the basis of gender in their membership practices and thereby deprive female students equal access to housing, social, and economic opportunities based on gender. Yale also refuses to take effective measures to "eradicate sexual misconduct" that occurs in connection with the Fraternities or to remedy the hostile environment created by the Fraternities. Indeed, contrary to Yale's 2017-2018 policy, Yale in fact tolerates the rampant sexual misconduct occurring at the Fraternities. Yale's failures, *inter alia*, deny Plaintiffs the freedom from discrimination in "educational programs" to which they are entitled under Yale's policies.

298.    Plaintiffs and the class have been damaged by Yale's breach of its contractual obligations in an amount to be determined at trial.

### COUNT IX

### Violation of Connecticut Unfair Trade Practices Act

### (*On Behalf of All Plaintiffs and the Class Against Yale*)

299.    Plaintiffs re-allege and incorporate by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

300. Plaintiffs bring this count individually and as a class action pursuant to Rule 23 on behalf of themselves and the Class.

301. Yale is a person under Conn. Gen. Stat § 42-110a(3).

302. Yale represents that the University outlaws discrimination and sexual misconduct and that Yale aims to eradicate discrimination and sexual misconduct at the University. Yale also represents that the Fraternities play a minor role in undergraduate social life. Plaintiffs matriculated to Yale, and paid Yale tuition, based on the understanding that the University was making a concerted effort to eliminate discrimination and sexual misconduct among its students. Plaintiffs also believed that Fraternities were a relatively marginal component of Yale's social scene. Yet, in fact, the Fraternities have a large and influential role in the campus social climate. Furthermore, Yale condones the gender inequality and rampant sexual misconduct that occurs in connection with the Fraternities.

303. Defendant Yale is engaged in "trade" and "commerce," by offering education, housing, board, security, athletic facilities, access to student organizations, and economic opportunities, in exchange for tuition.

304. Yale's conduct as alleged in this Complaint constitutes unfair practices. Yale's *Equal Opportunity Statement*, which is included in many promotional materials, states that Yale does not discriminate based on gender in admissions or educational programs. Further, Yale's *Undergraduate Regulations* ostensibly require all student organizations to abide by the *Equal Opportunity Statement*. And Yale's *Sexual Misconduct Policies* make broad commitments to "eradicate sexual misconduct," assuring students that Yale "prohibits all forms of sexual misconduct" and that sexual misconduct "will not be tolerated." Yale also downplays the role of

the Fraternities in its admissions materials. Some admissions materials fail to mention the Fraternities. Others claim that only 10% of the student population is involved in Greek life.

305.   These policies and representations do not accurately reflect the University's anti-discrimination practices or Yale's social climate. In fact, Fraternities play a significant role in campus social life. Furthermore, Yale maintains, supports, and fails to redress an educational environment in which female students are denied equal access as male students to social, professional, and economic resources and opportunities. Yale also remains deliberately indifferent to the fact that Defendant Fraternities substantially contribute to the discrimination, sexual harassment, and sexual assault that Yale's female students suffer.

306.   Yale's acts and practices with regard to its misleading statements, its refusal to enforce anti-discrimination regulations, and its failure to protect undergraduates from sexual harassment and assault as alleged above are immoral, unethical, oppressive and unscrupulous.

307.   Yale's conduct is substantially injurious to consumers. Such conduct has caused, and continues to cause, substantial injury to consumers because Plaintiffs and members of the proposed class matriculated at Yale, forewent opportunities to apply to or attend other colleges that have made greater efforts to end the discrimination and sexual misconduct associated with Greek life, and paid Yale tuition based on Yale's representations that Yale would enforce its non-discrimination policies, that the Fraternities played a minimal role in campus social life, and that the University was making a concerted effort to prevent discrimination, sexual assault and sexual harassment of Yale students. Yale students have therefore not received the educational environment or college experience they paid for and such injury is not outweighed by any countervailing benefits to consumers or competition. No benefit to consumers or competition results from Yale's conduct, nor could consumers reasonably have avoided the injury.

308.   Yale's conduct as alleged above also constitutes deceptive acts or practices. Yale deceives consumers about its commitment to preventing discrimination, harassment, and assault. Yale's representations as set forth above were and are likely to mislead consumers, and Yale intended that consumers rely upon those representations. Plaintiffs and other reasonable consumers reasonably interpreted Yale's representations to mean that Yale would not permit undergraduate organizations to offer Yale students unequal opportunities because of gender, that Fraternities played only a marginal role in Yale's social climate, and that the Yale administration took seriously the problems of discrimination, sexual harassment, and sexual assault.  Yale's representations were material to a reasonable consumer and likely to affect consumer decisions and conduct. Prospective students, including Plaintiffs, would have applied to or attended other colleges if Yale made it clear that Greek life was a prominent component of campus social life, that Yale would not apply its *Equal Opportunity Statement* to its management of Greek life, and that Yale would decline to take effective action to curtail sexual harassment and assault that occurs in connection with the Fraternities.

309.   The foregoing unfair and deceptive practices directly, foreseeably and proximately caused Plaintiffs and the Class to suffer an ascertainable loss and substantial injury when they paid Yale tuition and when they forewent opportunities to apply to or attend other colleges that have made greater efforts to end the discrimination and sexual misconduct associated with Greek life.

310.   The foregoing actions constitute unfair and deceptive practices in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq*.

311.   Plaintiffs and the proposed class members are entitled to all legal and equitable remedies available for violations Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-

110a *et seq*, including actual damages, punitive damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on their own behalf and on behalf of the proposed class, pray that this Court grant the following relief:

A.     Certification of this case as a class action under Rule 23 on behalf of the proposed Class, designation of Plaintiffs as representatives of this Class, and designation of Plaintiffs' counsel as Class Counsel;

B.     A declaratory judgment that Yale's policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs and class members under, *inter alia*, Title IX and applicable Connecticut state laws;

C.     A permanent injunction against Yale and its officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein;

D.     An Order requiring Yale to initiate and implement programs and policies that remedy the gender discrimination, sexual harassment, and hostile environment at Yale, including by:

a.   Strictly prohibiting all student social organizations, whether registered or unregistered, operating on or off-campus, from engaging in discrimination or harassment based on sex, gender, or gender identity or expression;

b.   Creating transparent procedures for investigating complaints against student social organizations (including the Fraternities) and for punishing organizations that

engage in misconduct, including organizations whose members engage in discrimination or harassment on any of the aforementioned bases;

c.  Providing substantial assistance to all off-campus Greek organizations that cease operating on a discriminatory basis with obtaining adequate housing and insurance coverage;

d.  Creating a "Greek Council" or similar organization that includes representatives from all off-campus social organizations, as well as relevant University officials;

e.  Requiring off-campus social organizations to "register" as undergraduate organizations;

f.  Reinstituting required registration of off-campus parties;

g.   Requiring off-campus social organizations to adopt and implement standardized guidelines for party/event management, including:

   i.  Appointing mixed gender "sober monitors" for each off-campus event and party, who are clearly identified in advance and easily identified during parties, and who are responsible for ensuring safe levels of alcohol consumption and intervening to prevent sexual harassment and assault.

   ii.  Hiring paid bouncers for each fraternity event and party, who are responsible for ensuring crowd control and nondiscriminatory event admission.

   iii.  Providing equal amounts of alcoholic and non-alcoholic beverages at each party and food at each party at which alcohol is served.

h.  Requiring the members of off-campus social organizations to attend regular, live in-person trainings, including trainings that specifically address issues of safe party

management, fraternity-related sexual harassment and assault, gender roles and stereotypes, and diversity, equality and inclusion;

**E.** Order Yale to prepare and submit to the Court for approval a plan to implement and enforce the foregoing requested relief and any other appropriate relief;

**F.** A declaratory judgment that Defendant Fraternities' policies, practices and/or procedures challenged herein are illegal and in violation of the rights of Plaintiffs and class members under, *inter alia*, the Fair Housing Act and applicable Connecticut state laws;

**G.** A permanent injunction against Defendant Fraternities and their officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any further unlawful practices, policies, customs, and usages as set forth herein, including:

a. enjoining Defendant Fraternities from using gender as a criterion in admissions decisions;

b. enjoining Defendant Fraternities from using gender as a criterion in housing decisions and from engaging in any further discrimination based on gender in offering units within Fraternity houses;

**H.** An Order requiring Defendant Fraternities to initiate and implement programs and policies that remedy the gender discrimination, sexual harassment, and hostile environment at Defendant Fraternities, including:

a. Fully integrating women into the governance and all aspects of the operations of the Fraternity, including by offering women equal opportunities to assume leadership roles within the local chapters and to plan, organize, and oversee Fraternity parties;

     b.   Fully integrating women in the Fraternities' alumni and career networks.

     c.   Adopting transparent policies, practices and procedures for investigating complaints of sexual harassment and sexual assault, reporting sexual harassment and assault to the University, and punishing members who engage in sexual harassment and assault;

     d.   Instituting regular, live in-person trainings, including trainings that specifically address issues of safe party management, fraternity-related sexual harassment and assault, gender roles and stereotypes, and diversity, equality and inclusion;

     e.   Appointing mixed gender "sober monitors" for each Fraternity event and party, who are clearly identified in advance and easily identified during parties, and who are responsible for ensuring safe levels of alcohol consumption and intervening to prevent sexual harassment and assault;

     f.   Hiring paid bouncers for each Fraternity event and party, who are responsible for ensuring crowd control and nondiscriminatory event admission;

     g.   Providing equal amounts of alcoholic and non-alcoholic beverages at each party and food at each party at which alcohol is served;

**I.**     Order Defendant Fraternities to prepare and submit to the Court for approval a plan to implement and enforce the foregoing requested relief and other appropriate relief.

**J.**     An award of damages to Plaintiffs and the Class against Yale under Title IX of the Education Amendments of 1972, Connecticut's law against discrimination in places of public accommodation, Connecticut's Unfair Trade Practices Act, breach of contract, and common law, including compensatory damages and punitive damages, in an amount to be determined at trial.

**K.**     An award of damages to Plaintiffs and the Class against the Fraternities under the Fair Housing Act and Connecticut's law against discrimination in places of public accommodation, including compensatory damages and punitive damages, in an amount to be determined at trial.

**L.**     An award of litigation costs and expenses, including reasonable attorneys' fees to the Plaintiffs;

**M.**     An award of pre-judgment interest and post-judgment interest available under law; and

**N.**     Such additional and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all causes of action so triable.

Dated: February 12, 2019

Respectfully submitted,

Attorney Daniel H. Schneider
Fed. Bar No. ct13208
**Schneider Law Firm, LLC**
112 Broad Street North, First Floor
Milford, CT 06460
Telephone: (203) 874-0030
Facsimile: (203) 878-01117
Daniel@Schneider-Law-Firm.com

David Sanford (*pro hac vice forthcoming*)
David Tracey (*pro hac vice forthcoming*)
Albert Powell (*pro hac vice forthcoming*)
Scott Sullivan (*pro hac vice forthcoming*)
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
dtracey@sanfordheisler.com
apowell@sanfordheisler.com

*Attorneys for Plaintiffs and the Proposed
Class*