# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANNA MCNEIL, et al., | |
| Plaintiffs, | |
| v. | Case No. 3:19-cv-00209-VAB |
| YALE UNIVERSITY, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## YALE UNIVERSITY'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    I.      YALE'S TITLE IX SYSTEM ......................................................................... 2

    II.     YALE'S RESPONSES TO FRATERNITY-RELATED
            MISCONDUCT ................................................................................................. 5

    III.    PLAINTIFFS' PERSONAL EXPERIENCES .............................................. 11

LEGAL STANDARD FOR A MOTION TO DISMISS ....................................................... 13

ARGUMENT .......................................................................................................................... 14

    I.      PLAINTIFFS FAIL TO STATE CLAIMS UNDER TITLE IX ................................ 14

          A.     Plaintiffs' Gender Discrimination Claim Should Be Dismissed
                  Because Title IX Expressly Exempts Fraternities' Membership
                  Policies ........................................................................................... 14

          B.     Plaintiffs' Title IX Hostile Environment Claim Should Be
                  Dismissed Because They Do Not Plausibly Allege That Yale
                  Fails To Comply With Title IX ....................................................... 15

                 1.     To Make Out A Claim, Plaintiffs Must Show That Yale
                        Had Actual Knowledge Of Harassment Within Its
                        Control And That It Responded With Deliberate
                        Indifference ......................................................................... 15

                 2.     Plaintiffs Do Not Plausibly Allege That Yale Had
                        Control Over Activity At Off-Campus Fraternities ............................. 17

                 3.     Plaintiffs Do Not Plausibly Allege That Yale Was
                        Deliberately Indifferent To Actually Known
                        Harassment Within Its Control .................................................. 18

                 4.     Plaintiffs Do Not Plausibly Allege That Yale Is A
                        Hostile Education Environment Under Title IX ................................... 23

    II.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER CONNECTICUT
           PUBLIC ACCOMODATIONS LAW BECAUSE YALE IS NOT A
           PUBLIC ACCOMODATION ....................................................................... 25

i

**TABLE OF CONTENTS—Continued**

Page

III. PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF
CONTRACT BECAUSE THEY IDENTIFY NO AGREEMENT
YALE HAS BREACHED ...................................................................................28

    A.    Equal Opportunity Statement ..........................................................29

    B.    Undergraduate Regulations ............................................................31

    C.    Sexual Misconduct Policies.............................................................33

IV. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE
CONNECTICUT UNFAIR TRADE PRACTICES ACT ...........................................35

    A.    Plaintiffs' CUTPA Allegations About Yale's Policies Fail
Because They Are Redundant With The Invalid Breach-of-
Contract Claims ..............................................................................35

    B.    Plaintiffs Have Failed To Plausibly Allege That Any Supposed
Misrepresentations By Yale About The Role Of Fraternities
Were A Deceptive Trade Practice ...................................................36

CONCLUSION..................................................................................................................40

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

Page(s)

CASES:

*Alfano v. Costello,*
294 F.3d 365 (2d Cir. 2002) ...........................................................23, 24

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...........................................................13, 14, 30

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007)...........................................................13

*Biediger v. Quinnipiac Univ.,*
691 F.3d 85 (2d Cir. 2012) ...........................................................19

*Brass v. Am. Film Techs., Inc.,*
987 F.2d 142 (2d Cir. 1993) ...........................................................2

*Burns v. Quinnipiac Univ.,*
991 A.2d 666 (Conn. App. Ct. 2010) ...........................................................29

*Caldor, Inc. v. Heslin,*
577 A.2d 1009 (Conn. 1990) ...........................................................37, 38, 39

*CHRO ex rel. Alston v. East Haven Bd. of Educ.,*
CHRO No. 9830205, 2000 WL 35575668 (CHRO May 3, 2000) ...........................................................27

*CHRO ex rel. Ballard v. Cheshire Bd. of Educ.,*
CHRO No. 9830294, 1999 WL 34765993 (CHRO July 15, 1999)...........................................................27

*Corcoran v. German Soc. Soc'y Frohsinn, Inc.,*
916 A.2d 70 (Conn. App. 2007) ...........................................................26

*Corcoran v. German Soc. Soc'y Frohsinn, Inc.,*
No. CV020562775S, 2008 WL 642659 (Conn. Super. Ct. Feb. 21, 2008) ...........................................................26

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.,*
526 U.S. 629 (1999)...........................................................*passim*

*Egbarin v. Hoffmann & Assocs.,*
No. 3:18-cv-917 (VAB), 2019 WL 1129454 (D. Conn. Mar. 12, 2019)...........................................................2

*Figgie Int'l, Inc.,*
107 F.T.C. 313 (1986) ...........................................................37

TABLE OF AUTHORITIES—Continued

Page(s)

*Gazo v. City of Stamford*,
    765 A.2d 505 (Conn. 2001) ...................................................................................... 30, 31

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998)..................................................................................................*passim*

*Gregory v. Daly*,
    243 F.3d 687 (2d Cir. 2001) ..................................................................................... 25

*Gupta v. New Britain Gen. Hosp.*,
    687 A.2d 111 (1996)................................................................................................. 29

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993).................................................................................................... 23

*Hayut v. State Univ. of New York*,
    352 F.3d 733 (2d Cir. 2003) ..................................................................................... 17

*Hinchliffe v. Am. Motors Corp.*,
    440 A.2d 810 (Conn. 1981) ...................................................................................... 40

*Issler v. Issler*,
    737 A.2d 383 (Conn. 1999) ...................................................................................... 34

*Jacobs v. Ethel Walker Sch. Inc.*,
    No. CV020515279S, 2003 WL 22390051 (Conn. Super. Ct. Sept. 30, 2003)........ 29

*Kaplan v. Merberg Wrecking Corp.*,
    207 A.2d 732 (Conn. 1965) ...................................................................................... 30

*Kiwanis Int'l v. Ridgewood Kiwanis Club*,
    806 F.2d 468 (3d Cir. 1986) ..................................................................................... 28

*K.T. v. Culver-Stockton Coll.*,
    865 F.3d 1054 (8th Cir. 2017) .................................................................................. 24

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011) ..................................................................................... 2, 13

*Larsen Chelsey Realty Co. v. Larsen*,
    656 A.2d 1009 (Conn. 1995) .................................................................................... 39

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007) ..................................................................................... 2

TABLE OF AUTHORITIES—Continued

Page(s)

*Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.,*
    87 A.3d 534 (Conn. 2014) .................................................................28, 30

*Naples v. Keystone Bldg. & Dev. Corp.,*
    990 A.2d 326 (Conn. 2010) ........................................................................36

*Neiman v. Yale Univ.,*
    851 A.2d 1165 (Conn. 2004) ......................................................................34

*Ostrander v. Duggan,*
    341 F.3d 745 (8th Cir. 2003) ................................................................21, 22

*Packer v. Bd. of Educ. of Town of Thomaston,*
    717 A.2d 117 (Conn. 1998) ........................................................................29

*Papelino v. Albany Coll. of Pharmacy of Union Univ.,*
    633 F.3d 81 (2d Cir. 2011) ..................................................................23, 24

*Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v.*
    *Morgan Stanley Inv. Mgmt. Inc.,*
    712 F.3d 705 (2d Cir. 2013) ......................................................................14

*Quinnipiac Council, Boy Scouts of Am., Inc. v. Comm'n on Human Rights &*
    *Opportunities,*
    528 A.2d 352 (Conn. 1987) ............................................................26, 27, 28

*Richards v. Direct Energy Servs., LLC,*
    915 F.3d 88 (2d Cir. 2019) ........................................................................36

*Roe v. St. Louis Univ.,*
    746 F.3d 874 (8th Cir. 2014) ................................................................21, 22

*Simpson v. Univ. of Colorado Boulder,*
    500 F.3d 1170 (10th Cir. 2007) ............................................................22, 23

*United States v. Bari,*
    599 F.3d 176 (2d Cir. 2010) ......................................................................26

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio,*
    471 U.S. 626 (1985) ..................................................................................38

*Zeno v. Pine Plains Cent. Sch. Dist.,*
    702 F.3d 655 (2d Cir. 2012) ................................................................22, 23

TABLE OF AUTHORITIES—Continued

Page(s)

STATUTES:

Education Amendments of 1972,
   20 U.S.C. § 1681 *et seq.* ............................................................................*passim*

20 U.S.C. § 1681(a) ......................................................................................15, 17

20 U.S.C. § 1681(a)(6) .......................................................................................15

20 U.S.C. § 1681(a)(6)(A) ..................................................................................15

20 U.S.C. § 1687 ................................................................................................17

Conn. Gen. Stat. § 42-110b(a) ...........................................................................35

Conn. Gen. Stat. § 46a-63(1) ........................................................................25, 28

Conn. Gen. Stat. § 46a-64(a) ..............................................................................25

Connecticut Unfair Trade Practices Act ....................................................*passim*

RULES:

Fed. R. Civ. P. 8(a)(2) .........................................................................................14

Fed. R. Civ. P. 12(b)(6) ....................................................................................2, 13

Fed. R. Evid. 201(b) ...........................................................................................26

REGULATIONS:

29 C.F.R. § 36.215(a) ..........................................................................................15

Nondiscrimination on the Basis of Sex in Education Programs or Activities
   Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462
   (proposed Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106) .....................17

OTHER AUTHORITIES:

*Executive Committee*, Yale College,
   https://bit.ly/2Kx2pmu (last visited Apr. 22, 2019) ...............................12, 13

*First-Year Counselor Program*, Yale College, https://bit.ly/2I06nkJ
   (last visited Apr. 22, 2019) .............................................................................12

TABLE OF AUTHORITIES—Continued

Page(s)

Britton O'Daly, *DKE's open secret: Eight more women make accusations against fraternity*, Yale Daily News (Feb. 20, 2018), https://bit.ly/2CDSZPw ....................................24

Office for Civil Rights, U.S. Department of Education, *Dear Colleague Letter* (Jan. 25, 2006), *available at* https://bit.ly/2HDTM6l .................................................16

Office for Civil Rights, U.S. Department of Education, *Dear Colleague Letter* (Sep. 22, 2017), *available at* https://bit.ly/2wLSAFb ...............................................16

Office for Civil Rights, U.S. Department of Education, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, Or Third Parties* (Jan. 2001), *available at* https://bit.ly/2Wbv4yp........15, 16, 17, 19

Office of the Provost, *Title IX Coordinators*, Yale University, https://provost.yale.edu/title-ix/coordinators (last visited Apr. 22, 2019)................................4

Press Release, U.S. Department of Education, U.S. Department of Education Releases List of Higher Education Institutions With Open Title IX Sexual Violence Investigations (May 1, 2014), https://bit.ly/2ZjCstP....................................................4

Restatement (Second) of Contracts § 203(a) (1981) ......................................................34

*Sexual Harassment and Assault Response & Education Center*, Yale University, https://sharecenter.yale.edu/ (last visited Apr. 22, 2019) ...........................................4

*Sexual Misconduct Response & Prevention*, Yale University, https://smr.yale.edu/ (last visited Apr. 22, 2019)................................................................4

*Top 100 – Lowest Acceptance Rates*, U.S. News & World Report, https://bit.ly/2UdJIrC (last visited Apr. 22, 2019).....................................................26

Vivian Wang, *SAE banned from campus after violating sexual misconduct policies*, Yale Daily News (Feb. 13, 2015), https://bit.ly/2CFyySc ..........................................9

*Yale CCE Program*, Yale College, https://cce.yalecollege.yale.edu/ (last visited Apr. 22, 2019).....................................4

Yale University, *Yale: Facts and Statistics* (2017), *available at* https://bit.ly/2UdJIrC .................................................................................26

## INTRODUCTION

Yale University is deeply committed to gender equality and to preventing and eliminating sexual misconduct in its programs.  To that end, it has promulgated clear policies explaining that Yale will not discriminate on the basis of sex and strict rules against sexual misconduct by faculty, staff, and students.  Yale's Undergraduate Regulations make clear that students may be held accountable for sexual misconduct whether on or off campus, and Yale has developed a clear process to fairly and promptly adjudicate complaints of sexual misconduct brought to its attention.

The factual allegations in Plaintiffs' Complaint and the documents their Complaint relies on bear all of that out.  Plaintiffs—current Yale undergraduates seeking to represent a class of current and former students—believe that the Defendant Fraternities (private national organizations independent of Yale) should end their policies of admitting only men, and they demand that Yale punish students for participating in single-sex organizations that are off campus and unaffiliated with Yale.  They also want the Fraternities to do more to curb sexual misconduct occurring at the off-campus houses that are neither owned nor maintained by Yale, and they suggest that Yale has a legal duty to go beyond the comprehensive set of policies and initiatives it already has in place for addressing student sexual misconduct.

Yale is sympathetic to any student's concerns about behavior that is incongruous with the University's commitment to gender equality and a campus free from sexual harassment.  Yale also has a legitimate interest in allowing its students' freedom to craft lives for themselves separate from their academic programs.  More to the point, the law simply does not require what Plaintiffs seek.  Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, expressly exempts from its ambit the membership practices of fraternities, and it holds schools accountable for sexual harassment only when they exhibit deliberate indifference to sexual

misconduct that is actually known to the school and under its control. Yale has been anything but indifferent to sexual misconduct and has no direct control over the Fraternities' off-campus activities on their own property. And Plaintiffs' demands under the three bodies of state laws they invoke fall equally short: Yale is not a public accommodation under Connecticut law for purposes of this case, has made no contractual promises to do what Plaintiffs request, and has not engaged in any deception supporting an unfair trade practices claim.

All Plaintiffs' claims against Yale should therefore be dismissed, with prejudice, for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

### I.   YALE'S TITLE IX SYSTEM

"Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex . . . ." Ex. 1, Yale University's Equal Opportunity Statement at 1, *available at* https://equalopportunity.yale.edu/policies-and-programs (cited at Compl. ¶ 292).[1] "Sexual misconduct is antithetical to the standards and ideals of" the Yale community, and therefore, "Yale University prohibits all forms of sexual misconduct," which comprises "a range of behaviors," including sexual harassment, that are prohibited for "all members of the Yale community, regardless of their sex or gender." Ex. 2, Yale Sexual

---

[1] "A court considering a motion to dismiss under Rule 12(b)(6)" may consider "facts as asserted within the four corners of the complaint," "any documents incorporated in the complaint by reference," and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Egbarin v. Hoffmann & Assocs.*, No. 3:18-cv-917 (VAB), 2019 WL 1129454, at *3 (D. Conn. Mar. 12, 2019) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)). Plaintiffs' Complaint relies upon and incorporates by reference many such documents, often quoting directly from them. Those relevant to this motion are attached as exhibits. For purposes of this motion, Yale treats Plaintiffs' factual allegations as true so far as they are consistent with the underlying documents that Plaintiffs purport to be characterizing in the Complaint. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

Misconduct Policies and Related Definitions at 1-2, *available at* https://bit.ly/2CJmsHO (cited at Compl. ¶ 294). Yale achieves that goal through "education, training, clear definitions and policies, and serious consequences for policy violations." *Id.* at 1.

The centerpiece of that commitment is Yale's comprehensive Title IX system. "The University Title IX Coordinator has responsibility for ensuring compliance with Yale's policies regarding sexual misconduct," and the "University-Wide Committee on Sexual Misconduct (UWC) and the Title IX coordinators address allegations of sexual misconduct." *Id.* The UWC hears complaints of sexual misconduct by Yale faculty, staff, and students against other members of the Yale community. *See* Ex. 3, UWC Procedures at 1. It has a codified, detailed set of procedures protecting complainants' confidentiality and ensuring a prompt and fair resolution of complaints. *See id.* at 3-9. Notably, Plaintiffs do not allege that they ever sought to bring a complaint to the UWC or that Yale ever impeded them from doing so.

Yale's current Title IX program was already in development when it received outside validation from the Department of Education's Office for Civil Rights (OCR) after a 2011 complaint arising in part from offensive and sexist chants during a pledge event by one of the Fraternities. *See* Compl. ¶¶ 62-63, 67. The Voluntary Resolution Agreement that Yale entered into with OCR considered Yale's new University-wide Title IX coordinators and the UWC. Ex. 4, Voluntary Resolution Agreement at 1-2.[2] OCR determined that the "UWC provides for the prompt and equitable response to grievances of students and third party complainants alleging sexual misconduct" and that "the UWC procedures are consistent with Title IX requirements." Ex. 5, June 15, 2012 Letter from OCR to Yale at 8 (cited at Compl. ¶ 68).

---

[2] The Agreement noted that "OCR has not made a finding of noncompliance" and that the Agreement was "entered into voluntarily by the University and does not constitute an admission that the University is not in compliance with Title IX." Ex. 4 at 1.

In addition to the UWC, Yale has launched a variety of other programs to combat sexual harassment. It has established an extensive network of Title IX coordinators throughout Yale's various schools. *See* Office of the Provost, *Title IX Coordinators*, Yale University, https://provost.yale.edu/title-ix/coordinators (last visited Apr. 22, 2019). It created a comprehensive website as a central resource, collecting University policies and information about procedures and resources related to sexual misconduct. *See Sexual Misconduct Response & Prevention*, Yale University, https://smr.yale.edu/ (last visited Apr. 22, 2019). The Sexual Harassment and Assault Response & Education Center (SHARE) provides counseling services at "any time, day or night," to students with sexual misconduct concerns. *See Sexual Harassment and Assault Response & Education Center*, Yale University, https://sharecenter.yale.edu/ (last visited Apr. 22, 2019). And Yale offers numerous training programs on sexual misconduct, including mandatory annual trainings on preventing and responding to sexual misconduct and a program of peer Communication and Consent Educators in Yale College.[3] OCR praised this suite of services when it closed its monitoring under the Voluntary Resolution Agreement in December 2017 and concluded that Yale "welcomed all feedback and made changes based on the feedback," had "voluntarily and proactively made changes to its procedures and practices related to Title IX compliance," and "complied with Title IX in its processing of complaints." Ex. 6, Dec. 18, 2017 Letter from OCR to Yale at 1, 3, 6.[4]

---

[3] See the previously-referenced websites for information on training generally. For information on the Communication and Consent Educators, see *Yale CCE Program*, Yale College, https://cce.yalecollege.yale.edu/ (last visited Apr. 22, 2019).

[4] OCR also investigated dozens of other universities over the handling of sexual violence and harassment complaints. *See, e.g.*, Press Release, U.S. Department of Education, U.S. Department of Education Releases List of Higher Education Institutions With Open Title IX Sexual Violence Investigations (May 1, 2014), https://bit.ly/2ZjCstP (listing 55 colleges and universities nationwide with open investigations in May 2014).

Thus, despite Plaintiffs' conclusory statements to the contrary, Yale has a vigorous and OCR-approved set of policies, procedures, and programs to combat sexual misconduct by members of the Yale community. In fact, Yale has faced multiple "reverse Title IX suits" from plaintiffs who were respondents in the UWC process and alleged that Yale was overzealous in its efforts to punish sexual misconduct and to protect complainants.[5] Plaintiffs themselves point to specific examples of sanctions imposed on individual members of three Fraternities. Compl. ¶ 91.

## II.   YALE'S RESPONSES TO FRATERNITY-RELATED MISCONDUCT

As the Complaint acknowledges, the Fraternities are national organizations entirely independent of Yale, whose houses are owned by independent, private housing corporations affiliated with the Fraternities. *See* Compl. ¶¶ 28-57, 153-156, 249. As a report quoted repeatedly by Plaintiffs indicates, other colleges and universities are able to more pervasively hold their "Greek organizations to community standards because [those institutions] own the houses used by the fraternities and sororities," but that "is not the case at Yale." Ex. 7, Yale College Council Task Force on Greek Life Report at 9 (cited, *e.g.*, at Compl. ¶ 86). Indeed, Yale "plays no formal role in the operations of organizations not affiliated with the [U]niversity, including Greek organizations." Ex. 8, Jan. 14, 2019 Email from Dean Chun at 2 (cited at Compl. ¶ 97).

Although Yale has no direct control over the Fraternities' off-campus activities, as Plaintiffs recognize, it has responded to reports of misconduct committed by members of the

---

[5] *E.g.*, Ruling on Defendant's Motion for Summary Judgment, *Montague v. Yale Univ.*, No. 3:16-cv-00885-AVC (D. Conn. Mar. 29, 2019) (denying in part summary judgment to Yale in a suit based on Yale College's expulsion of a student in the UWC process); *see also* Complaint, *Doe v. Yale Univ.*, No. 3:18-cv-00110-JCH (D. Conn. Jan. 1, 2018); Amended Complaint, *Doe v. Yale Univ.*, No. 3:16-cv-01380-AWT (D. Conn. July 3, 2017).

Fraternities. Like all Yale students, fraternity members are held accountable for misconduct against fellow students, regardless of where the misconduct occurs, when it is brought to Yale's attention. The incidents recounted in Plaintiffs' Complaint, spanning the last decade, reflect that reality.

As Plaintiffs recount, in October 2010, members and pledges of the Delta Kappa Epsilon (DKE) fraternity marched outside the Yale Women's Center reciting patently offensive and sexist chants. Compl. ¶ 62. Yale promptly investigated, found that DKE and several of its members' intimidating conduct had violated Yale's Undergraduate Regulations, and imposed a five-year ban on DKE. *See id.*; Ex. 9, May 17, 2011 Letter from the Dean regarding the disciplinary charges against DKE at 2, *available at* https://bit.ly/2HWIBG2. Yale's sanctions on DKE "prohibit[ed] it from conducting any fraternity activities on campus (including recruiting) for a period of five years, prevent[ed] it from communicating with Yale students by means of Yale bulletin boards or Yale email, and severely limit[ed] its use of the Yale name in connection with the DKE organization"; and Yale requested that the DKE national organization suspend the chapter for five years. Ex. 9 at 2.

In March 2011, then-current and former Yale students filed a Title IX complaint with OCR based in part on the DKE incident. Compl. ¶ 63. Yale took the complaint seriously, as demonstrated by its overhaul of its Title IX programs—initiated before the OCR complaint—and its creation of the UWC and entering into the Voluntary Resolution Agreement with OCR. *See supra* pp. 3-5. In parallel, Yale convened an Advisory Committee on Campus Climate chaired by a former chief justice of the Supreme Judicial Court of Massachusetts and including a former Solicitor General of the United States. *See* Ex. 10, Report to the President and Fellows of Yale University of the Advisory Committee on Campus Climate (cited at Compl.¶ 64); Ex. 11,

President's Response to the Report of the Advisory Committee on Campus Climate at 1 (cited at

Compl. ¶ 66).[6] The committee reviewed "voluminous" written material and met with over 150

members of the Yale community, representing a broad cross-section of the faculty, staff, and

student body, as well as recent alumni in cities across the United States. *See* Ex. 10 at 6-7.  It

produced a report with detailed recommendations to improve campus climate with respect to

issues of sexual misconduct and sexual equality. *See id.* at 13-28.  Although the committee saw

avenues for constructive improvement, it prefaced its recommendations by emphasizing that:

> [F]or overwhelming numbers of students who spoke to us, the Yale experience is
> a very positive one.  The overall view in the community, especially among
> students, including those most critical of Yale's response to sexual misconduct or
> who expressed the greatest concern about the sexual atmosphere on the campus, is
> that Yale is "an amazing place," where its students receive an extraordinary
> education.

*Id.* at 7.

Yale's president at the time, Richard C. Levin, issued a public letter in response to the

report embracing many of its recommendations on behalf of the Yale Corporation, including

many the University had already undertaken. *See* Ex. 11 at 1.  In particular, President Levin

agreed that Yale must better communicate its values and that "sexual misconduct is not

tolerated"; create new and improved resources such as SHARE to better provide information

about sexual misconduct and resources to respond to it; implement the UWC as a transparent

central locus to handle formal complaints against alleged perpetrators; expand training resources

and better communicate the availability of those resources; promote discussions with students on

---

[6] The full committee consisted of Margaret H. Marshall '76 J.D., former chief justice of the
Supreme Judicial Court of Massachusetts, and other notable alumni Kimberly M. Goff-Crews
'83 B.A., '86 J.D., then Vice President for Campus Life and Dean of Students at the University
of Chicago (and now Secretary of Yale and Vice President for Student Life); Libby H. Smiley
'02 B.A., a former president of the Yale College Council; and Seth Waxman '77 J.D., former
Solicitor General of the United States. *See* Ex. 10; Ex. 11 at 1.

healthy relationships and appropriate behavior; better communicate and enforce Yale's

Undergraduate Regulations; promote responsible drinking and reduce high-risk drinking; and

"speak out in a timely fashion in response to troubling incidents of gender-offensive speech." *Id.*

at 2-7.  Where President Levin disagreed with the Advisory Committee's suggestions, he

provided reasoned explanations.  For instance, rather than requiring that off-campus

undergraduate organizations register with Yale College, President Levin thought that the better

approach for holding students "accountable for complying with the *Undergraduate Regulations*"

would be "improved communication, as well as enforcement." *Id.* at 6.  As he explained, "[t]he

*Undergraduate Regulations* already make clear that off-campus conduct that imperils the

integrity and values of the University—which certainly would include sexual misconduct—can

lead to University-imposed discipline." *Id.*  He further elaborated that "Yale College already has

in place incentives for organizations to register," such as funding and access to Yale events and

spaces, and that Yale "is actively enforcing these provisions, barring unregistered organizations

from availing themselves of these privileges." *Id.*

In the years after the Advisory Committee report, Yale undertook two additional

significant studies to further evaluate the sexual climate at the University.  The first study was a

campus sexual climate assessment in 2012-2013 headed by Stephanie S. Spangler, Yale's Title

IX Coordinator and Deputy Provost for Health Affairs & Academic Integrity.  *See* Ex. 12, Report

of the 2012-13 Campus Sexual Climate Assessment (cited at Compl. ¶ 71).  The study received

feedback from "more than 300 members of the Yale community" through emails, online

comments, one-on-one meetings, and over 30 group meetings.  *Id.* at 4.  The study revealed that

students understood the "key elements" of Yale's "broad" definition of sexual misconduct and

that undergraduates were "uniformly" familiar with SHARE as a resource for victims of sexual

misconduct. *See id.* at 6-7. Undergraduates expressed the view that "Yale is making substantial change, and progress, in addressing the sexual climate" and that students "feel Yale is more comfortable than many other campuses." *Id.* at 10. Rather than simply accept existing progress, the report proposed several future steps to further improve campus climate. *See id.* at 20-24. In the second study, Yale participated in the nationwide Association of American Universities' Campus Climate Survey on Sexual Assault and Sexual Misconduct. *See* Ex. 13, Westat-Yale Report on the AAU Campus Climate Survey (cited at Compl. ¶ 84). The survey provided detailed data on the rates at which students experienced sexual assault or harassment under Yale's broad definitions, concluding that the "findings clearly call for community engagement and action."[7] *Id.* at 1.

Yale's response to the 2010 DKE incident was hardly the only time it has taken action against fraternity-related misconduct. In 2014-2015, Yale twice sanctioned the fraternity Sigma Alpha Epsilon (SAE) in response to student complaints. First, in response to a student allegation that she had been subjected to sexual harassment from SAE members, Yale banned the fraternity for two years from conducting on-campus activities, using Yale's email or bulletin boards, and using the Yale name to promote SAE programming. *See* Compl. ¶ 74. The SAE national organization also imposed its own sanctions in response to the investigation and required sexual assault and harassment training for all chapter members. *See* Vivian Wang, *SAE banned from campus after violating sexual misconduct policies*, Yale Daily News (Feb. 13, 2015), https://bit.ly/2CFyySc. Second, when partygoers alleged that SAE members turned away women students of color from a party, saying they were looking for "white girls only," Compl. ¶ 80, Yale promptly conducted an investigation. *Id.* ¶ 83. Although SAE members denied making

---

[7] Under those broad definitions, sexual assault was defined as "any form of sexual contact that does not meet Yale's standard for consent." Ex. 13 at 2.

that statement, and of those witnesses interviewed only the complainants heard the offensive

remarks, the investigation nonetheless determined that "SAE created a chaotic environment, and

that members at times behaved disrespectfully and aggressively toward students seeking

admission." Ex. 14, Important updates on SAE and Buckley investigations at 1-2, *available at*

https://bit.ly/2UdVnqb.  To respond, then Dean of Yale College Jonathan Holloway instructed

Associate Dean Burgwell Howard to "work[] with SAE to develop a protocol for managing

crowds and hosting off-campus events safely and respectfully," announced that Yale would be

"providing expanded training and guidance to all student groups for hosting events," and stated

that he would "solicit suggestions from students, masters, and residential college deans for

hosting more parties on campus and to provide more opportunities to dance and socialize in a

variety of environments that are open and welcoming to all Yale College students." *Id.* at 3.

Plaintiffs also point to a series of press reports published in 2018 detailing allegations of

sexual misconduct at DKE.  *See* Compl. ¶¶ 92-93.  Just "two days after the *Yale Daily News*

published its article" on the subject, Yale College Dean Marvin Chun announced an investigation

into DKE and the creation of a Committee on Social Life and Community Values (SLCV) to

"review the adequacy of the College's processes for addressing concerns raised about student

groups." *Id.* ¶ 94.  The leaders of the investigation met with representatives of about 15 student

groups and 200 students.  *See* Ex. 15, Review of DKE and Campus Culture: Information

Gathered from Students at 1 (cited at Compl. ¶ 96).  The resulting report summarized student

perceptions of DKE, the role of Greek life on campus, and students' recommendations. *See id.* at

1-3.  In offering his view of the report, Dean Chun noted that students had shared accounts of

"poor crowd control," "unregulated access to alcohol," and "behavior such as ogling by DKE

brothers" that made some students "feel unwelcome" and demonstrated the hosts' "lack of self

awareness about their own behavior." Ex. 8 at 2.  His response was blunt: "I condemn the

culture described in these accounts; it runs counter to our community's values."  *Id.*  And he

"offer[ed] some plain advice about events like these: don't go to them."  *Id.*  He pointed out that

a survey conducted by SLCV revealed that "the vast majority of [students] reported that you

socialize at well-planned events that make you feel welcome," and he encouraged students "to

keep exploring those opportunities."  *Id.*  He also reminded all students that they "are subject to

the Undergraduate regulations."  *Id.*  Dean Chun declined to pursue a suggestion to create a

council on Greek life that would entangle Yale administrators with the Fraternities, observing

that Yale in general "plays no formal role in the operations of organizations not affiliated with

the university, including Greek organizations," although it "makes itself available informally to

fraternities and sororities," whose members may "take advantage of the training and resources

available to the entire student body."  *Id.*  On that front, Dean Chun noted several existing

resources and several new initiatives responsive to the report, including trainings available to all

students on preventing sexual misconduct, bartending, and alcohol and drug harm reduction for

hosting parties; as well as ongoing initiatives "to sponsor more opportunities to socialize on

campus."  *Id.* at 2-3.

## III.   PLAINTIFFS' PERSONAL EXPERIENCES

Plaintiffs are three current Yale undergraduates who matriculated in the fall of 2016 and

2017, Compl. ¶¶ 24-26, several years after Yale implemented its current Title IX program.  Their

Complaint describes sexist (and in one case racist) misconduct they suffered, observed, or heard

about when they attended several parties hosted by certain of the Fraternities at their off-campus

houses, including leering, groping, and grinding.  *Id.* ¶¶ 102-113.  Those allegations appear to

describe conduct that Yale condemns and proscribes in its written policies, in particular its

Undergraduate Regulations.  Plaintiffs do not allege, however, that they brought any of these

incidents to the attention of any Title IX coordinators, the UWC, or any other Yale faculty or staff.[8]  Plaintiffs do not allege that they personally witnessed or were directly affected by any of the on-campus incidents of misconduct related to the Fraternities discussed elsewhere in the Complaint, and in fact they matriculated after the on-campus incidents the Complaint focuses on.

Plaintiffs also describe their unsuccessful attempts to join the Fraternities and how they were rebuffed because of the Fraternities' single-sex admission policies.  *Id.* ¶¶ 122-139.  They sought to enlist Yale in inducing the Fraternities to end their single-sex admissions practices and to combat sexual misconduct related to the Fraternities' activities.  *See id.* ¶¶ 174-182.  And although Plaintiffs characterize Yale's responses as inadequate, their concrete factual allegations depict a Yale administration deeply committed to engaging with students on issues of gender equality and sexual misconduct.  When one of the Plaintiffs sent an initial email to Yale administrators, it resulted in a meeting only two weeks later with the Dean of Yale College to hear their concerns about the Fraternities.  *Id.* ¶¶ 174-175.  When Plaintiffs requested a meeting with Dean of Student Affairs Camille Lizarribar on February 17, 2018 (a Saturday), she made time to meet with them on Monday, two days later.  *Id.* ¶¶ 177-178.  Although Plaintiffs disagree with Dean Lizarribar's decision not to bring a complaint to Yale's Executive Committee about the Fraternities,[9] they acknowledge that she encouraged them to report a particular instance of

---

[8] The only allegation of reporting is that one of the Plaintiffs told her first-year counselor about an incident of sexual misconduct at one of the Fraternities. Compl. ¶ 104. First-year counselors are fellow students in the residential college whose purpose is "to help ease the transition of incoming first-years to the academic, social, and cultural life of Yale College." *See First-Year Counselor Program*, Yale College, https://bit.ly/2I06nkJ (last visited Apr. 22, 2019). Plaintiffs do not allege the incident was brought to the attention of the UWC or any Yale faculty member or administrator, or even that the involved Plaintiff wished to pursue a formal report.

[9] The Executive Committee "is responsible for the fair, consistent, and uniform enforcement of the Undergraduate Regulations." *Executive Committee*, Yale College, https://bit.ly/2Kx2pmu (last visited Apr. 22, 2019). It would not have been an appropriate body to consider Plaintiffs'

sexual misconduct to the appropriate authority and that she asked to "continue having conversations with Plaintiffs" about their concerns. *Id.* ¶ 178. When Plaintiffs emailed the President of Yale and the Dean of Yale College with concerns about the Fraternities in March 2018, the Dean responded and directed them to three administrators who could assist them. *Id.* ¶ 179. Plaintiffs report three additional in-person or email exchanges with Yale administrators between March and November 2018; although Plaintiffs wish that the administrators had attempted to compel the Fraternities to end their single-sex admissions policies, they note that the administrators affirmed that any students in those organizations were bound by the Undergraduate Regulations. *Id.* ¶¶ 180-182.

## LEGAL STANDARD FOR A MOTION TO DISMISS

"To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A "formulaic recitation of the elements of a cause of action will not do," "[n]or does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557) (alterations omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "Plausibility . . . depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

---

concerns because sexual misconduct is instead addressed by the UWC, *see id.*, and the Fraternities' membership practices do not themselves violate the Undergraduate Regulations, *see infra* pp. 31-33.

In short, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown "that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Pension Benefit Guar. Corp. ex rel. Saint Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717-718 (2d Cir. 2013).

## ARGUMENT

## I. PLAINTIFFS FAIL TO STATE CLAIMS UNDER TITLE IX.

Plaintiffs assert two Title IX claims against Yale based on their allegations that sexual misconduct occurs at parties at the Fraternities and that they want to join the Fraternities as members:  Count I alleges that Yale has created a hostile environment by failing to exercise authority over the off-campus organizations to curb sexual misconduct there, and Count II alleges that Yale has abetted gender discrimination by failing to ensure that Plaintiffs may join these Fraternities.  In light of the facts alleged, neither claim is cognizable under Title IX.

### A. Plaintiffs' Gender Discrimination Claim Should Be Dismissed Because Title IX Expressly Exempts Fraternities' Membership Policies.

Count II alleges that Yale deprives Plaintiffs of "social, professional, and economic resources and opportunities" on the basis of sex. Compl. ¶ 237.  The specific allegations of such opportunities all relate to the supposed social and professional opportunities offered by the Fraternities, which are allegedly denied to Plaintiffs because of the Fraternities' male-only membership policies. *See id.* ¶¶ 115-121.

Even if Yale could somehow be held responsible for the membership policies of those completely independent organizations, those policies could not support a Title IX claim because the statute expressly exempts the "membership practices" of "social fraternit[ies] . . . , the active membership of which consists primarily of students in attendance at an institution of higher

14

education." 20 U.S.C. § 1681(a)(6); *see also* 29 C.F.R. § 36.215(a) ("Title IX regulations do not apply to the membership practices of social fraternities . . . , the active membership of which consists primarily of students in attendance at institutions of higher education."). The Fraternities fit within that exemption: the Complaint alleges that these Fraternities' active memberships comprise Yale students, *see* Compl. ¶¶ 29-37, and Plaintiffs' effort to make Yale liable for the Fraternities' membership practices could make sense only on the ground that membership is tied to being a Yale student.[10]

Count II should therefore be dismissed because Title IX and its implementing regulations make plain that fraternities' membership practices fall outside the scope of the statute. Plaintiffs therefore cannot base a claim on such membership practices or the supposed benefits that flow directly from membership.

**B.      Plaintiffs' Title IX Hostile Environment Claim Should Be Dismissed Because They Do Not Plausibly Allege That Yale Fails To Comply With Title IX.**

**1.      To Make Out A Claim, Plaintiffs Must Show That Yale Had Actual Knowledge Of Harassment Within Its Control And That It Responded With Deliberate Indifference.**

Title IX provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). One form of proscribed discrimination that has been recognized by courts and by administrative guidance from OCR is student-on-student sexual harassment. *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999); Office for Civil Rights, U.S. Department of

---

[10] The statutory exemption also requires that the social fraternities be "exempt from taxation." 20 U.S.C. § 1681(a)(6)(A). To the extent the Complaint addresses that issue, it indicates that the Fraternities are non-profit entities, and nothing in the Complaint suggests they are not tax-exempt. *See* Compl. ¶¶ 40, 42-44, 47.

Education, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, Or Third Parties* (Jan. 2001) (OCR 2001 Guidance), *available at* https://bit.ly/2Wbv4yp.[11]  Although courts have "implied" a private right of action based on such harassment, *Davis*, 526 U.S. at 639, such claims are highly circumscribed, and there are several necessary elements of such a claim not plausibly pled in Plaintiffs' Complaint.

In a pair of landmark cases, *Gebser* and *Davis*, the Supreme Court made clear that because Title IX was "enacted pursuant to Congress' authority under the Spending Clause"—and hence acts as a contract with funding recipients—"recipients of federal funding" may only be liable where they "had adequate notice that they could be liable for the conduct at issue." *Davis*, 526 U.S. at 640; *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).  Such a recipient may therefore only be liable "for its own misconduct." *Davis*, 526 U.S. at 640.

When the school itself is not engaging in harassment—such as when an employee or a student is the alleged harasser—then a plaintiff must establish four elements to recover under Title IX.  *First*, the plaintiff must show that the school "exercises substantial control over both the harasser and the context in which the known harassment occurs" because it "cannot be directly liable for its indifference where it lacks authority to take remedial action." *Id.* at 644-645.  For that reason, "the harassment must take place in a context subject to the school['s] control." *Id.* at 645.  *Second*, the plaintiff must show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has *actual knowledge* of discrimination." *Gebser*, 524 U.S. at 290 (emphasis added).  *Third*, the school's

---

[11] OCR has disavowed all subsequent substantive guidance on this topic, pending new notice-and-comment rulemaking. *See* Office for Civil Rights, U.S. Department of Education, *Dear Colleague Letter* 2 (Sep. 22, 2017), *available at* https://bit.ly/2wLSAFb.  The 2001 guidance was also reaffirmed in a 2006 letter. *See* Office for Civil Rights, U.S. Department of Education, *Dear Colleague Letter* (Jan. 25, 2006), *available at* https://bit.ly/2HDTM6l.

"response must amount to *deliberate indifference* to discrimination," or "an official decision . . . not to remedy the violation." *Id.* (emphasis added). *Fourth*, the harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.

The *Gebser/Davis* standard applies where a plaintiff "seeks money damages as well as corrective action." *Hayut v. State Univ. of New York*, 352 F.3d 733, 750 (2d Cir. 2003).[12]  That is what Plaintiffs seek here, *see* Compl. ¶¶ 233, and because they fail to plausibly allege any of the four necessary elements of a Title IX harassment claim, the Court should dismiss Count I.

### 2.  Plaintiffs Do Not Plausibly Allege That Yale Had Control Over Activity At Off-Campus Fraternities.

As the Supreme Court has recognized, Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. "[B]ecause the harassment must occur 'under' 'the operations of' a funding recipient, . . . the harassment must take place in a context subject to the school['s] control." *Id.* at 645 (quoting 20 U.S.C. §§ 1681(a), 1687). Thus, the typical case of harassment giving rise to Title IX liability "occurs during school hours and on school grounds," where "the recipient retains substantial control over the context in which the harassment occurs." *Id.* at 646; *accord* OCR 2001 Guidance at 12, 33 n.70 (citing *Davis*, 526 U.S. at 646).

---

[12] The Department of Education has proposed new Title IX rules that would codify the *Gebser/Davis* standard in a formal regulation so that the Department would only deem a school out of compliance with Title IX if it had "actual knowledge of sexual harassment" and responded in a manner that was "deliberately indifferent." *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462, 61,497 (proposed Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106).

As Plaintiffs acknowledge in their Complaint, the Fraternities are organized independently of Yale and own their own property, and Yale has no formal role in their management. *See supra* pp. 5-6.[13]   Yale, then, has no control over their off-campus activity.  To the extent Plaintiffs' Title IX claims rely on any such activity—such as the manner in which the Fraternities admit people to off-campus parties or serve alcohol at those parties—they are legally invalid.

### 3.   Plaintiffs Do Not Plausibly Allege That Yale Was Deliberately Indifferent To Actually Known Harassment Within Its Control.

For those things alleged in the Complaint over which Yale may exercise some control— namely, the few incidents of on-campus fraternity-related misconduct or Yale's ability to impose punishments on Yale students for their off-campus conduct—Plaintiffs do not plausibly allege that Yale exhibited deliberate indifference to any misconduct of which it had actual knowledge. The deliberate indifference standard is high and only satisfied where a plaintiff can show "an official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290.  Schools may be "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light of the known circumstances." *Davis*, 526 U.S. at 648 (emphasis added).  Plaintiffs have no right "to make particular remedial demands," and "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.*  Mere procedural failures will not give rise to liability, as a school's "failure to comply with . . . regulations" or its "failure to promulgate a grievance procedure" do not themselves create liability under Title IX. *Gebser*, 524 U.S. at 291-292.  Importantly, the Court can decide whether the high threshold for deliberate

---

[13] This distinguishes Yale from other colleges and universities where fraternities are more dependent on the school, such as cases where the school itself owns their houses.

indifference has been met: "[T]here is no reason why courts, on a motion to dismiss," cannot

"identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Far from being "clearly unreasonable," Yale's Title IX compliance programs are robust

and consistent with OCR guidance, and OCR has in fact monitored and expressly approved of

Yale's programs.  The Second Circuit has recognized that OCR's interpretations of Title IX and

its implementing regulations are "entitled to substantial deference." *Biediger v. Quinnipiac*

*Univ.*, 691 F.3d 85, 97 (2d Cir. 2012); *see also Davis*, 526 U.S. at 647-648 (treating OCR

guidance as instructive in interpreting statutory Title IX obligations).  The operative guidance

instructs that, "[o]nce a school has notice of possible sexual harassment of students," "it should

take immediate and appropriate steps to investigate or otherwise determine what occurred and

take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile

environment if one has been created, and prevent harassment from occurring again."  OCR 2001

Guidance at 15.  Schools "are required by the Title IX regulations to adopt and publish a policy

against sex discrimination and grievance procedures providing for prompt and equitable

resolution of complaints of discrimination on the basis of sex." *Id.* at 19.  The grievance

procedures should provide notice of "where complaints may be filed," "impartial investigation of

complaints," "prompt timeframes for the major stages of the complaint process," and "[n]otice to

the parties of the outcome of the complaint." *Id.* at 20.  Yale's Title IX procedures satisfy all

those criteria. *See* Ex. 3 at 1, 3, 4-9 (detailing UWC procedures that meet all OCR-suggested

criteria); *supra* pp. 3-5.[14]

---

[14] Plaintiffs suggest that Yale was obligated to create a "Greek council" of leaders of fraternities
and sororities under the Voluntary Resolution Agreement with OCR. *See* Compl. ¶ 67.  The
Agreement merely contained hortatory language that Yale would "continue its efforts to expand
its student leadership councils to promote norms of responsible conduct, and including efforts to
create a council of fraternity and sorority leaders." Ex. 4 at 5.  Nothing in OCR's regulations or

Indeed, the facts alleged by Plaintiffs bear out that Yale's Title IX system works.  Each specific instance of reported Fraternity-member misconduct that Plaintiffs point to was investigated by Yale, resulting in disciplinary action where appropriate.  *See supra* pp. 6-11.  Yale administrators met with and responded to Plaintiffs when they raised the specific concerns giving rise to their Complaint.  *See supra* pp. 12-13.  Plaintiffs do not allege that they made Yale aware of the specific instances of inappropriate sexual behavior they experienced at fraternity parties or allege that the Title IX office or the UWC could not have adequately handled such allegations if they were brought to its attention.  In short, between its vigorous and OCR-approved Title IX procedures and its investigation of specific instances of fraternity-related misconduct, Yale has been anything but indifferent to sexual harassment on campus, and it has certainly not been "clearly unreasonable."  *Davis*, 526 U.S. at 648.

Instead, Plaintiffs' Title IX claims rely entirely on what the Supreme Court said is impermissible—demanding that Yale accede to "particular remedial demands." *Id.*  Plaintiffs demand a set of actions requiring Yale to assert a pervasive role in the off-campus Fraternities: among other things, that Yale enforce nondiscrimination policies on unregistered, off-campus student organizations; provide "housing and insurance coverage" for Greek organizations that end single-sex membership policies; create a Greek council with "representatives from all off-campus social organizations" and "relevant University officials"; require "registration of off-campus parties"; require "off-campus social organizations to adopt and implement standardized guidelines for party/event management"; and require "members of off-campus social

---

guidance, however, requires a "Greek council," nor has OCR objected to the decision not to create such a council in the years since the 2012 Voluntary Resolution Agreement. In fact, in its letter closing its monitoring, OCR determined that Yale "sufficiently complied with the terms of the Agreement" and noted approvingly that Yale SHARE staff had monthly Safety Net meetings that included fraternity and sorority leaders, without suggesting that a more formal Greek council was a requirement of OCR regulations or the Agreement. Ex. 6 at 6.

organizations to attend regular, live in-person trainings." Compl. pp. 80-81.  In short, Plaintiffs

insist that Yale go far beyond what anything in the Title IX regulations or OCR guidance

requires and to assume an *in loco parentis* role in students' off-campus activities.

Comparing the Complaint to case law on deliberate indifference makes plain how far

Plaintiffs are from alleging that Yale's supposed inaction rose to that high standard.  In one case

where a student was drugged and raped at an off-campus house rented by fraternity members, the

court found that the university's response was not "clearly unreasonable" as a matter of law

when the university personnel had "met personally with the [fraternity's] chapter advisor and

informed him of the allegations of sexual assault" and "wrote [the fraternity's] national

president, advising him [the university] considered [the] allegations of sexual assault to be very

serious, and informing him of [the university's] expectation that the local [fraternity] chapter

would thoroughly investigate the allegations and sponsor an educational program to be attended

by 75% of its membership," even though the university itself did not "impose sanctions" on the

fraternity.  *Ostrander v. Duggan*, 341 F.3d 745, 751 (8th Cir. 2003).  In another case, where a

student was raped at a party at an off-campus apartment, the court held that the university could

not be deliberately indifferent because it had no "control over the student conduct at the off

campus party" and that the university's response was not clearly unreasonable where a university

administrator "explained the process for reporting a rape, referred [the victim] to counseling,"

"informed Public Safety that a student might be filing a sexual assault report," and "contacted

[the victim's] counselor to discuss the need to support the young woman," and where the

university later "began an investigation into the assault and cooperated with the separate

investigation" by the police when the victim later reported the crime.  *Roe v. St. Louis Univ.*, 746

F.3d 874, 883-884 (8th Cir. 2014).  In *Gebser* itself, the Supreme Court held that a school district

was not deliberately indifferent when an employee teacher had a sexual relationship with a

teenage student because the district did not have actual knowledge of the relationship.  524 U.S.

at 291-292.

On the other hand, where courts have found deliberate indifference, the school's conduct

was conscience-shocking.  In *Simpson v. University of Colorado Boulder*, 500 F.3d 1170, 1184

(10th Cir. 2007), the university's football coach—"whose rank in the [university] hierarchy was

comparable to that of a police chief in a municipal government"—himself "maintained an

unsupervised player-host program to show high-school recruits 'a good time,'" even though the

coach knew that this program had already resulted in several instances of sexual assault, and it

ultimately resulted in the assault of the plaintiffs.  In *Zeno v. Pine Plains Cent. Sch. Dist.*, 702

F.3d 655, 669 (2d Cir. 2012), a public high school student was subjected to three years of

pervasive racial epithets and numerous racially-motivated assaults; the school knew of the

racially-motivated harassment, failed to stop the abuse even as it grew more severe, and in fact

turned down offers from the county and the local NAACP chapter to provide a free shadow to

the student and free racial sensitivity training to other students.  In *Davis*, the Supreme Court

held that the plaintiff had stated a claim of deliberate indifference in alleging that a fifth grade

girl was subjected to repeated sexually explicit statements and sexual touching from a fellow

student, where the school was aware of the harassment against that girl and others and took

absolutely no disciplinary action against the perpetrator.  526 U.S. at 633-635.

Yale's conduct here is at least as objectively reasonable as the schools' responses in

*Ostrander*, *St. Louis University*, and *Gebser*, and not at all comparable to the unconscionable

neglect in *Simpson*, *Zeno*, and *Davis*.  As even Plaintiffs' own un-supplemented allegations make

clear, Yale has a long record of responding to complaints of fraternity-related misconduct,

including suspending fraternities, punishing individual students accused of misconduct,

monitoring overall campus culture, and implementing programs and trainings to ameliorate

misconduct. *See supra* pp. 2-11. And unlike *Simpson*, *Zeno*, and *Davis*—which involved

actions by school personnel or took place in public primary or secondary schools—Yale has

taken these active steps when it has no direct control over the Fraternities or their houses.

Plaintiffs' factual allegations and the supporting documents demonstrate that, as a matter of law,

Yale has been anything but deliberately indifferent to Plaintiffs' concerns.

> **4.    Plaintiffs Do Not Plausibly Allege That Yale Is A Hostile Education Environment Under Title IX.**

A "Title IX hostile education environment claim is governed by traditional Title VII

'hostile environment' jurisprudence." *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633

F.3d 81, 89 (2d Cir. 2011) (internal quotation marks omitted). Under that standard, a "Title IX

plaintiff must show that . . . the environment objectively was hostile or abusive, that is, that it

was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or

pervasive to alter the conditions of [the plaintiff's] educational environment." *Id.*; *see also*

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive

enough to create an objectively hostile or abusive . . . environment—an environment that a

reasonable person would find hostile or abusive—is beyond [the statute's] purview."). "As a

general rule, incidents must be more than episodic; they must be sufficiently continuous and

concerted in order to be deemed pervasive. Isolated acts, unless very serious, do not meet the

threshold of severity or pervasiveness." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)

(internal quotation marks and citation omitted). "[W]hether an environment is 'hostile' or

'abusive' can be determined only by looking at all the circumstances. These may include the

frequency of the discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes with . . . performance." *Harris*, 510 U.S. at 23.

Plaintiffs' allegations here are a far cry from showing that Yale is "permeated" with abuse so "severe and pervasive" that it has altered the conditions of the educational environment. *Papelino*, 633 F.3d at 89. The Complaint attempts to paint a picture of the Fraternities' off-campus house parties as places of routine sexual harassment,[15] but those parties are neither affiliated with nor sanctioned by Yale and, if anything, are discouraged insofar as the College's dean expressly told students not to attend. *See supra* pp. 5-11. Plaintiffs do not allege that they suffered any harassment on Yale's campus, nor do they allege that any fraternity-related misconduct has occurred on campus since Plaintiffs matriculated.[16] Plaintiffs further do not allege that conduct at the Fraternities has deprived them of any of Yale's educational opportunities or interfered with their academic performance. The scattered on-campus misconduct mentioned in the Complaint occurred before Plaintiffs began attending Yale; even in a counterfactual world in which it occurred as they describe it and Yale was deliberately indifferent to it in the face of actual knowledge, that would amount to the sort of "episodic," "[i]solated acts" that cannot give rise to Title IX hostile-environment liability. *Alfano*, 294 F.3d at 374 (internal quotation marks omitted); *compare K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1059 (8th Cir. 2017) (high school junior who had been sexually assaulted at an on-campus

---

[15] Plaintiffs make specific allegations of sexual harassment against only a minority of the Defendant Fraternities, and most of the factual allegations are made against two: DKE and SAE.

[16] The closest the Complaint comes to supporting its allegation that a "hostile environment permeated Yale's campus" is by relaying a quotation from the *Yale Daily News* from an "undergraduate who lived on the same block as DKE" and was harassed when passing by the fraternity house. Compl. ¶ 93. But based on the article's description, that incident occurred off campus, "on Lake Place," a city street several blocks from the Yale campus. *See* Britton O'Daly, *DKE's open secret: Eight more women make accusations against fraternity*, Yale Daily News (Feb. 20, 2018), https://bit.ly/2CDSZPw.

fraternity party failed to allege hostile environment because, although "she has alleged opprobrious misconduct on the part of the fraternity member," the "singular grievance on its own does not plausibly allege pervasive discrimination" or the "systemic effect" "required to state a peer harassment claim"), *with Gregory v. Daly*, 243 F.3d 687, 692-693 (2d Cir. 2001) (valid hostile environment claim made where plaintiff alleged her supervisor routinely made demeaning and sexual comments about women, "initiated unwelcome physical conduct of a sexual nature," and would "verbal[ly] abuse" plaintiff with "ostentatious and graphic references to sexual assault").

*       *       *

In sum, Plaintiffs have failed plausibly to allege *any* of the four elements of a Title IX claim, and they were required to satisfy *all* of them. They have not plausibly alleged that Yale had actual control over the Fraternities' conduct, that Yale had actual knowledge over any particular harassment to which it did not respond, that Yale's responses to known conduct were deliberately indifferent and clearly unreasonable, or that the atmosphere on Yale's campus constitutes a hostile educational environment. Count I should therefore be dismissed.

## II. PLAINTIFFS FAIL TO STATE A CLAIM UNDER CONNECTICUT PUBLIC ACCOMODATIONS LAW BECAUSE YALE IS NOT A PUBLIC ACCOMODATION.

In relevant part, Connecticut's public accommodations law provides that "[i]t shall be a discriminatory practice . . . [t]o deny any person within the jurisdiction of this state full and equal accommodations in any place of public accommodation . . . because of . . . sex." Conn. Gen. Stat. § 46a-64(a). The statute defines "[p]lace of public accommodation" as "any establishment which caters or offers its services or facilities or goods to the general public." *Id.* § 46a-63(1). "[C]overage under the statute depends . . . upon the extent to which a particular establishment has maintained a private relationship with its own constituency or a general relationship with the

25

public at large." *Quinnipiac Council, Boy Scouts of Am., Inc. v. Comm'n on Human Rights & Opportunities*, 528 A.2d 352, 359 (Conn. 1987).  An organization has become a public accommodation only when it "has determined to eschew selectivity." *Id.*; *see also Corcoran v. German Soc. Soc'y Frohsinn, Inc.*, No. CV020562775S, 2008 WL 642659, at *4 (Conn. Super. Ct. Feb. 21, 2008) ("[T]he primary consideration in determining whether the defendant's club is a public accommodation is whether the club has eschewed selectivity in its membership." (citing *Corcoran v. German Soc. Soc'y Frohsinn, Inc.*, 916 A.2d 70, 73 (Conn. App. 2007))).

Yale has certainly not "determined to eschew selectivity."  It is, in fact, one of the most selective institutions of higher education in the world.[17]  *See, e.g.*, Yale University, *Yale: Facts and Statistics* 1 (2017), *available at* https://bit.ly/2HHOmrd (showing Yale College had an admissions rate of 6.3% for those matriculating in 2016, with 25th percentile SAT scores of 710 for verbal, math, and writing); *Top 100 – Lowest Acceptance Rates*, U.S. News & World Report, https://bit.ly/2UdJIrC (last visited Apr. 22, 2019) (Yale in top ten most selective national colleges and universities in 2017).

Plaintiffs seek to get around the fact that Yale has clearly maintained selectivity by pointing to Yale's open spaces, museums, and sporting venues that are more generally open to the public. *See* Compl. ¶¶ 192-194.  But the public accommodations analysis must be focused on the "particular establishment" alleged to be a public accommodation. *Quinnipiac Council*, 528 A.2d at 359.  As the Connecticut Supreme Court has explained, "a private university that opens its theater facilities for the entertainment of the general public cannot refuse admission for

---

[17] A court may take judicial notice of "matters of common knowledge." *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (per curiam) (internal quotation marks omitted); *see* Fed. R. Evid. 201(b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").  That Yale is a highly selective university falls within all these categories.

reasons of race or sex or other grounds made illegal by" the public accommodations law. *Id.*
The level of analysis is the specific theater facilities that are open to the general public, not the
entire private university. Plaintiffs do not allege that they have been denied access to any Yale
facilities open to the general public. Their claims have to do with their treatment as students, *see*
Compl. ¶¶ 274, 286—and Yale has definitively not eschewed selectivity in being a Yale student.

Further supporting that Yale is not a public accommodation, the Connecticut Commission
on Human Rights and Opportunities (CHRO)—which "has authority to interpret statutory law
through the adjudication process," *Quinnipiac Council*, 528 A.2d at 356 n.5—has repeatedly
determined that even public schools are not places of public accommodation. One CHRO
decision explained that "the plain language of the statute reveals that, on its face, the statute does
not apply to public schools" because their "educational services . . . are not offered to the
'general public,'" but "only to specific individuals . . . deemed eligible by the town's board of
education." *CHRO ex rel. Alston v. East Haven Bd. of Educ.*, CHRO No. 9830205, 2000 WL
35575668, at *2 (CHRO May 3, 2000). As the decision noted, "[i]n states where public
accommodations are not specifically defined as including public schools, the courts have
uniformly ruled that public schools are not public accommodations." *Id.* at *3; *see also CHRO
ex rel. Ballard v. Cheshire Bd. of Educ.*, CHRO No. 9830294, 1999 WL 34765993, at *4-5
(CHRO July 15, 1999) (collecting authorities). In reaching the same conclusion, another CHRO
decision explained that "public schools are not 'open to the public' as a public library, restaurant,
or other commercial establishment." *Ballard*, 1999 WL 34765993, at *5.

Plaintiffs' attempt to read into Connecticut's public accommodations law a Title IX-style
hostile environment claim is at odds with the text of the law and the purpose of public
accommodations laws generally. "The purpose of a public accommodations law . . . is to ensure

that publicly offered goods and services, such as those offered by a hotel or restaurant, are

available to all persons regardless of sex, race, or any other protected characteristic." *Kiwanis*

*Int'l v. Ridgewood Kiwanis Club*, 806 F.2d 468, 471 (3d Cir. 1986).  The wording of

Connecticut's public accommodations law is precisely in that mold.  *See* Conn. Gen. Stat. § 46a-

63(1) (applying only to an establishment that "caters or offers its services or facilities or goods to

the general public").  Its language is most plainly read to prevent a restaurant from refusing to

serve non-white customers or to prevent a grocery store from excluding women, not to delegate

to courts the role of fashioning pervasive regulation of sexual harassment in private institutions

of higher education.  Indeed, the Connecticut Supreme Court has explained that the State's

public accommodations law "addresses a discriminatory denial of *access* to goods and services,"

*Quinnipiac Council*, 528 A.2d at 360 (emphasis altered); it is not a detailed regulation of the

*manner* in which services are provided once access is given on a non-discriminatory basis.

Accordingly, the Connecticut Supreme Court has determined that "our General Statutes treat

employment discrimination separately from public accommodation discrimination." *Id.*  Just as

Connecticut has refused to stretch its public accommodation statute into a general employment

discrimination law, this Court should decline to make the public accommodations law a state

version of Title IX.

Therefore, this Court should dismiss Counts VI and VII for failure to state a claim.

## III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT BECAUSE THEY IDENTIFY NO AGREEMENT YALE HAS BREACHED.

"The elements of a breach of contract claim are the formation of an agreement,

performance by one party, breach of the agreement by the other party, and damages." *Meyers v.*

*Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 87 A.3d 534, 540 (Conn. 2014).  Here,

Plaintiffs' allegation that they had an "agreement" with Yale relies on three documents: Yale's

Equal Opportunity Statement, its Undergraduate Regulations, and its Sexual Misconduct

Policies. *See* Compl. ¶¶ 292-295; *cf. Burns v. Quinnipiac Univ.*, 991 A.2d 666, 673-674 (Conn.

App. Ct. 2010) (observing that the "basic legal relation between a student and a private

university or college is contractual in nature" and that there "seems to be no dissent from the

proposition that the catalogues, bulletins, circulars, and regulations of the institution determine

the contractual relationship between the student and the educational institution" (internal

quotation marks and alterations omitted)).  Even if those documents do constitute an agreement

between Yale and Plaintiffs, Plaintiffs do not plausibly allege any breach of those agreements.[18]

## A.    Equal Opportunity Statement

The first basis for Plaintiffs' breach-of-contract claim is Yale's Equal Opportunity

Statement, *see* Compl. ¶ 292, which provides:

> The University is committed to basing judgments concerning the admission,
> education, and employment of individuals upon their qualifications and abilities
> and affirmatively seeks to attract to its faculty, staff, and student body qualified
> persons of diverse backgrounds. In accordance with this policy and as delineated
> by federal and Connecticut law, Yale does not discriminate in admissions,
> educational programs, or employment against any individual on account of that
> individual's sex, race, color, religion, age, disability, status as a veteran, or

---

[18] As a threshold matter, Connecticut courts recognize the principle that "contract claims challenging the overall quality of educational programs have generally been rejected." *Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111, 119 (1996) (internal quotation marks omitted).  The only exceptions are where a plaintiff makes "a showing that the educational program failed in some fundamental respect, as by not offering any of the courses necessary to obtain certification in a particular field," or where "the educational institution failed to fulfil a *specific* contractual promise distinct from any overall obligation to offer a reasonable program." *Id.* at 120 (emphasis added).  Connecticut courts have extended *Gupta*'s principles to cover school disciplinary decisions. *See Jacobs v. Ethel Walker Sch. Inc.*, No. CV020515279S, 2003 WL 22390051, at *4-5 (Conn. Super. Ct. Sept. 30, 2003); *accord Packer v. Bd. of Educ. of Town of Thomaston*, 717 A.2d 117, 137 (Conn. 1998) (Norcott, J., concurring) ("It is a well established principle that courts should exercise caution in interfering with school discipline." (collecting cases)).  Thus, to the extent Plaintiffs' allegations are that Yale has failed to provide an appropriate educational environment or that it made incorrect disciplinary decisions in specific cases—as opposed to breaches of specific contractual promises—they are not cognizable as breach-of-contract claims under Connecticut law.

national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression.

Ex. 1 at 1.

The Statement only promises that *Yale* does not discriminate or base judgments on discriminatory grounds. Plaintiffs do not allege, however, that Yale itself has "discriminate[d]" against them in its "judgments concerning" their "admission" or "education." They allege instead that "Yale permits *Fraternities and their members* to discriminate on the basis of gender," that Yale has failed "to remedy the hostile environment created *by the Fraternities*," and that Yale "tolerates . . . sexual misconduct occurring *at the Fraternities*." Compl. ¶ 297 (emphases added). Nothing in the Equal Opportunity Statement promises to control off-campus, unregistered organizations like fraternities or to exercise control over off-campus, privately owned spaces like fraternity houses. Although Plaintiffs allege that "Yale's failures . . . deny Plaintiffs the freedom from discrimination in 'educational programs,'" *id.*, that is a "mere conclusory statement[]," *Iqbal*, 556 U.S. at 678; Plaintiffs do not point to any Yale educational program in which the University has discriminated against them.

To the extent Plaintiffs are seeking to smuggle federal and state statutory law claims into their breach-of-contract claim—based on the Equal Opportunity Statement's language that "as delineated by federal and Connecticut law, Yale does not discriminate"—that is not a separate claim for breach of contract, but rather, if anything, a claim under those laws. Where a suit is "for a breach of duty imposed by law," it is "an action in tort," not in contract. *Meyers*, 87 A.3d at 540 (quoting *Gazo v. City of Stamford*, 765 A.2d 505, 515 (Conn. 2001)); *accord Kaplan v. Merberg Wrecking Corp.*, 207 A.2d 732, 735-736 (Conn. 1965) (recognizing that the Connecticut Supreme Court has long "adopted the view that the modern tendency is to make the fundamental nature of the obligation the test as to whether the action is founded upon either tort

or contract" (internal quotation marks and alterations omitted)).  "[P]utting a contract tag on a

tort claim will not change its essential character." *Gazo*, 765 A.2d at 515.  And even if the Equal

Opportunity Statement could give rise to a separate breach-of-contract claim based on

compliance with federal and state antidiscrimination laws, it would fail because Plaintiffs have

not plausibly pled that Yale has violated those laws. *See supra* pp. 14-28.

### B.    Undergraduate Regulations

The next putative agreement that Plaintiffs invoke is Yale's Undergraduate Regulations.

*See* Compl. ¶ 293.  Plaintiffs use ellipses to omit more than two whole paragraphs, giving a

highly distorted sense of what the Regulations say.  The section that Plaintiffs cite is titled

"Responsibilities of Undergraduate Organizations." Ex. 16, Undergraduate Regulations 2018-

2019, at 55.  Its opening paragraph makes clear that it is imposing duties on organizations, not

assuming them for Yale:

> Yale University requires that all student organizations—whether registered or
> unregistered, operating on or off campus—abide by the *Undergraduate
> Regulations*.  Organizations and their officers and members assume
> responsibilities, including the responsibility to be aware of and abide by the
> *Undergraduate Regulations*, as set forth in this text and as they may be revised
> from time to time.

*Id*. at 55-56.

The next paragraph of the Regulations (omitted by Plaintiffs) spells out what happens in

the event of a violation:

> A student who is believed to have violated University policy or state or federal
> law (including but not limited to hazing, sexual misconduct, or theft) in the course
> of working for or participating in the activities of an undergraduate organization
> may be brought before the Yale College Executive Committee or the University-
> Wide Committee on Sexual Misconduct (UWC), as appropriate, for possible
> disciplinary action, and/or referred to appropriate civil authorities.

*Id*. at 56.  As OCR found, the UWC in fact works in just this way and fulfills Yale's Title IX

obligations. *See* Ex. 5 at 8; *supra* pp. 3-4.  Nowhere in the Complaint do Plaintiffs allege that

they brought any sexual misconduct to Yale's attention, much less that Yale did not follow its procedure for bringing that misconduct before the UWC.

The rest of that section of the Undergraduate Regulations plainly deals only with *registered* student organizations, not unregistered ones such as the Fraternities. The next paragraph provides: "Organizations must fulfill the training requirements set by the Yale College Dean's Once annually. Failure to comply with training requirements will *result in loss of registered status*." Ex. 16 at 56 (emphasis added). Tautologically, only a registered organization could be deprived of its registered status.

Only in the next paragraphs of the section, after the shift to a focus on registered organizations, does Plaintiffs' elision end. Those paragraphs read:

> Student organizations must operate in accordance with Yale policies on equal opportunity, which state, "...Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a protected veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression." . . .
>
> Undergraduate organizations must operate on a non-profit basis.

*Id.* Like the paragraph that precedes them, these provisions plainly apply only to *registered* undergraduate student organizations. Otherwise, these terms would prohibit Yale students from starting an off-campus business—because such an unregistered organization would not "operate on a non-profit basis." That reading is further supported by an earlier section of the Undergraduate Regulations, which explains that the section on "Undergraduate Organizations" is "particularly relevant to *registered* undergraduate organizations." *Id.* at 47 (emphasis added).

More generally, what Plaintiffs imply from their selective quotation of the Undergraduate Regulations would create absurd results. Under their reading, Yale has made a contractual promise to all students that it will pervasively monitor all off-campus, informal groups of Yale

undergraduates to bar them from distinguishing among each other based on any of the protected classifications that Yale itself observes for its academic programs. Under that reading, Yale has, for instance, promised to monitor all its students and to take proactive enforcement action against a group of female students who live together off-campus and put up a posting "looking for a fourth female roommate." Plaintiffs' fellow students would likely be quite surprised to learn that Yale has made such an overbearing contractual guarantee of omnipresent control over their lives.

Instead, the Undergraduate Regulations mean just what they say when the full context is included. Registered organizations must abide by Yale's nondiscrimination policies. Student members of unregistered organizations, like any Yale undergraduate, "may be brought before" the UWC, "as appropriate," if they are "believed to have violated University policy." *Id.* at 56. Plaintiffs do not allege that Yale has repudiated the UWC and that students may not be brought before it for sexual misconduct, so they have not alleged a breach of the Undergraduate Regulations.

### C.    Sexual Misconduct Policies

The last putative "agreement" Plaintiffs point to is Yale's Sexual Misconduct Policies. *See* Compl. ¶¶ 294-295. The current version provides, in its entirety:

> Yale University is committed to maintaining and strengthening educational, working, and living environments founded on mutual respect in which students, faculty, and staff are connected by strong bonds of intellectual dependence and trust. Sexual misconduct is antithetical to the standards and ideals of our community. Therefore, Yale University prohibits all forms of sexual misconduct. Yale aims to eradicate sexual misconduct through education, training, clear definitions and policies, and serious consequences for policy violations. The University Title IX Coordinator has responsibility for ensuring compliance with Yale's policies regarding sexual misconduct. The University-Wide Committee on Sexual Misconduct (UWC) and the Title IX coordinators address allegations of sexual misconduct.

Ex. 2 at 1; *see* Compl. ¶ 294.

33

Although the Policies do include the broad statement that "Yale University prohibits all forms of sexual misconduct,"[19] they also contain precise language about *how* Yale accomplishes that goal: through "education," "training," "clear definitions and policies," and "ensuring compliance" through the Title IX coordinators and the UWC. *Id.* It is those *specific* terms that govern any contractual obligations that Yale has assumed through the Sexual Misconduct Policies. *See Issler v. Issler*, 737 A.2d 383, 390 n.12 (Conn. 1999) ("For generations, it has been well settled that 'the particular language of a contract must prevail over the general.'" (citation omitted); Restatement (Second) of Contracts § 203(a) (1981) ("[S]pecific terms and exact terms are given greater weight than general language."). In fact, to the extent Plaintiffs could have brought claims of sexual misconduct to the Title IX coordinators or UWC and failed to do so, this Court lacks jurisdiction to consider breach-of-contract claims arising from the Sexual Misconduct Policies because the administrative remedies they provide have not been exhausted. *See Neiman v. Yale Univ.*, 851 A.2d 1165, 1172 (Conn. 2004) (explaining that exhaustion of remedies "applies to the internal grievance processes provided by academic institutions" and "is part of the contractual bargain and defines the rights themselves," such that allowing a plaintiff "to sidestep these procedures would undermine the internal grievance procedure that the parties had agreed to and encourage other litigants to ignore the available process as well" (internal quotation marks and citations omitted)).

Plaintiffs do not allege that the UWC or Title IX coordinators are not functioning or that Yale has no education or training on sexual misconduct as its Sexual Misconduct Policies indicate. Instead, Yale operates as the Policies say. Plaintiffs may wish that Yale pursued

---

[19] As Plaintiffs note, *see* Compl. ¶ 295, a prior version of the Sexual Misconduct Policies stated that "[s]exual misconduct . . . 'will not be tolerated.'" The only substantive difference between the two versions, however, is that the "will not be tolerated" language has been replaced with the more precise "Yale University prohibits all forms of sexual misconduct."

different policies to accomplish the goal of eliminating sexual misconduct, but that does not make for a breach-of-contract claim.

Count VIII should be dismissed for failure to state a claim.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE CONNECTICUT UNFAIR TRADE PRACTICES ACT.

The Connecticut Unfair Trade Practices Act (CUTPA) provides:  "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).  Plaintiffs' CUTPA claim against Yale rests on essentially two supposed unfair or deceptive practices: that Yale falsely (1) "represents that the University outlaws discrimination and sexual misconduct," and (2) "represents that the Fraternities play a minor role in undergraduate social life." Compl. ¶ 302. The first is effectively a recapitulation of Plaintiffs' invalid breach-of-contract claim, and the second lacks the necessary factual basis for falsity or materiality to support a CUTPA claim.

### A.   Plaintiffs' CUTPA Allegations About Yale's Policies Fail Because They Are Redundant With The Invalid Breach-of-Contract Claims.

Plaintiffs' first CUTPA theory relies on the same statements about sexual misconduct in the same documents underlying their breach-of-contract claim, namely Yale's Equal Opportunity Statement, Undergraduate Regulations, and Sexual Misconduct Policies. *See* Compl. ¶¶ 304, 308; *see also id.* ¶¶ 157, 158, 160, 163, 169, 172.  In alleging that those "policies and representations do not accurately reflect the University's anti-discrimination practices," *id.* ¶ 305, Plaintiffs continue to misconstrue those policies as blanket promises that Yale will pervasively monitor all students at all times in all places to ensure that no sexual misconduct takes place. Instead, as explained at length above, those policies provide that Yale will not itself discriminate based on sex and that it will provide a full Title IX process to address complaints of sexual misconduct.  Yale honors those promises, and so for the same reason Plaintiffs have not

plausibly alleged that Yale has breached any contracts with them, *see supra* pp. 28-35, they also

have not plausibly alleged that Yale has deceived them based on those same supposed

agreements.

Moreover, even if Plaintiffs *had* adequately alleged that Yale breached a contract by

failing to live up to its nondiscrimination policies, that would not alone support a CUTPA claim.

"[N]ot every contractual breach rises to the level of a CUTPA violation." *Naples v. Keystone*

*Bldg. & Dev. Corp.*, 990 A.2d 326, 337 (Conn. 2010) (internal quotation marks omitted); *see*

*also Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 102 (2d Cir. 2019) (A "simple contract

breach is not sufficient to establish a violation of CUTPA, particularly where the count alleging

CUTPA simply incorporates by reference the breach of contract claim." (internal quotation

marks omitted)).  Instead, the underlying conduct constituting the breach must itself be

"unlawful" or "unethical, unscrupulous, wil[l]ful or reckless." *Naples*, 990 A.2d at 337 (internal

quotation marks omitted).  In effect, then, this CUTPA theory also relies on the validity of the

Title IX claim because Plaintiffs must show not only that Yale breached its nondiscrimination

agreements, but also that Yale's actions were "unlawful" or "wil[l]ful or reckless" in responding

to sexual misconduct—akin to the "deliberate indifference" Title IX standard.  Because Plaintiffs

have also failed to plausibly allege Title IX claims, *see supra* pp. 14-25, that is an independent

reason that this CUTPA theory fails to support a claim.

     **B.**     **Plaintiffs Have Failed To Plausibly Allege That Any Supposed**
             **Misrepresentations By Yale About The Role Of Fraternities Were A**
             **Deceptive Trade Practice.**

Plaintiffs' only CUTPA allegation independent of the supposed breaches of contract is

the allegation that Yale "represents that the Fraternities play a minor role in undergraduate social

life" when, "in fact, the Fraternities have a large and influential role."  Compl. ¶ 302; *accord id.*

¶¶ 305, 308.  Plaintiffs' factual allegations to support this claim of deception are sparse.  They

allege that "Yale's admissions office claims that the Greek community comprises approximately 10% of the undergraduate population," citing a single Instagram post and recounting that one Plaintiff "remembers Yale citing the 10% statistic to her as a prospective student." *Id.* ¶ 164.

For a deceptive practice to be actionable under CUTPA, it must satisfy three elements: "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material—that is, likely to affect consumer decisions or conduct." *Caldor, Inc. v. Heslin*, 577 A.2d 1009, 1013 (Conn. 1990) (quoting *Figgie Int'l, Inc.*, 107 F.T.C. 313, 374 (1986)). Plaintiffs' scant allegations fail to plausibly allege any of these elements.

First, Plaintiffs do not plausibly allege that Yale made a representation that was untruthful or misleading. The only concrete statement that Plaintiffs' cite—made in a social media post principally about freshmen and sophomore women rushing Yale's four sororities—is that "about 10% of students participate in Greek life." Compl. ¶ 164; *see* Ex. 17 (Instagram post). The post is clearly about *membership* in Greek organizations, as it discusses rushing Greek organizations and the value of Greek organizations as "valuable social spaces on campus for those who pursue them." Ex. 17.[20] Plaintiffs do not meaningfully suggest, however, that the admissions office's representations were false. Instead, they cite a survey conducted before they matriculated by the Yale College Council (YCC), the undergraduate student government, in which a nonrandom sample of 1,800 students—only about a third of the undergraduate population—revealed that 38% attended an open fraternity event at least once a month. *See*

---

[20] The Yale College Council report on which Plaintiffs rely also interprets the 10% figure that way. The report explains that "Yale advertises, conservatively, that only 10% of its students are *members of Greek organizations*." Ex. 7 at 8 (emphasis added).

Compl. ¶ 165; Ex. 7 at 2-3, 8.  The only concrete evidence that Plaintiffs cite, then, does not

suggest that *membership* in the Fraternities is significantly higher than Yale represented in the

Instagram post.[21]  In fact, the YCC survey undermines Plaintiffs' theory of deception by

indicating that alternative social avenues are more popular among Yale students than fraternity

parties: it revealed that "Yale College students are more likely to regularly attend residential

college suite parties than open or closed Greek parties."  Ex. 7 at 4.

Second, Plaintiffs surely did not "interpret the message reasonably under the

circumstances" if they inferred from Yale's statements that no one other than the students

affiliated with a fraternity or sorority would ever attend an off-campus party associated with a

Greek house.  *Caldor*, 577 A.2d at 1013 (internal quotation marks omitted).  As the YCC report

indicates, fraternity parties are an important social outlet for a significant minority of the

undergraduate community, but they are less important than other social spaces.  Ex. 7 at 4, 8.

That is entirely consistent with Yale's representation that 10% of undergraduates are members of

Greek organizations.  It would be patently unreasonable for Plaintiffs to assume that the tenth of

their classmates who are members of Greek organizations would never invite other students to

attend events together.[22]

---

[21] Making a party liable for true statements, even in a commercial context, raises serious First
Amendment concerns because "[c]ommercial speech that is not false or deceptive and does not
concern unlawful activities . . . may be restricted only in the service of a substantial
governmental interest, and only through means that directly advance that interest."  *Zauderer v.
Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 638 (1985).

[22] Plaintiffs point out (at ¶ 165), that Yale's *Review of DKE and Campus Culture: Information
Gathered from Students* states that "[s]ome students felt that fraternities are the de facto social
environment for many students" and that "[m]any students expressed surprise about discovering
this when they arrived at Yale."  Ex. 15 at 3.  Nothing suggests that this impression from some
students in a non-representative sample of only 200 students, *see id.* at 1, is generalizable, and
nothing in the Review suggests that Yale made any specific representations during the
admissions process.  Even if some students felt that "Yale appears to minimize the role of Greek

38

Third, Plaintiffs do not plausibly allege that any supposed misrepresentations were "material," i.e. "likely to affect consumer decisions." *Caldor*, 577 A.2d at 1013 (internal quotation marks omitted). The harm that Plaintiffs allege is "fore[going] opportunities to apply to or attend other colleges" and paying Yale "tuition." Compl. ¶ 307; *see also id.* ¶ 309. They must therefore establish that Yale's allegedly underemphasizing the role of fraternities—through an Instagram post saying that 10% of students were fraternity or sorority members, instead of saying that a quarter of students attend fraternity parties—was "likely to affect" the decision of students to attend Yale. Yale offers a world-class education of such recognized value that it can only admit a small fraction of those who seek admission. *See supra* p. 26. Given the value of a Yale education and the tremendous importance of the decision of what college to attend, it simply is not plausible that if Yale slightly reconfigured the way it described the role of Greek life on campus that it was "likely to affect" high school seniors' decisions to attend Yale.

The sweeping implications of Plaintiffs' theory of CUTPA liability shows that it cannot be what the Connecticut legislature intended. In Plaintiffs' view, any student who later has a difference of opinion with how an admissions office social media post or college tour guide characterized a facet of university life would have a cause of action under CUTPA to recoup a portion of her tuition. Such an absurd result would require universities in Connecticut to deprive applicants of useful information by meticulously scripting every interaction between prospective students and the admissions office to include only vague generalities about college life, lest the prospective student's future experience not align precisely with how the school was represented. The intended target of CUTPA was "unscrupulous businessmen," *Larsen Chelsey Realty Co. v. Larsen*, 656 A.2d 1009, 1020 (Conn. 1995) (internal quotation marks and alterations omitted),

---

life in its official recruitment and admissions materials," *id.* at 3, that would reflect Yale's (accurate) view that Greek life should not be the motivating reason to attend Yale College.

but Plaintiffs would transform it into a statute imposing strict liability on a university for any statement, even if true, that future students later believe gives the wrong impression.  That is not a plausible reading of the statute, and this Court should reject it.  *See Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 814 (Conn. 1981) ("CUTPA is not designed to afford a remedy for trifles.").  Count IX should be dismissed.

## CONCLUSION

For the foregoing reasons, Yale respectfully requests that this Court dismiss with prejudice all claims against Yale, specifically Counts I, II, VI, VII, VIII, and IX.

DATED this 22nd day of April, 2019.

Respectfully submitted,

DEFENDANT YALE UNIVERSITY

By: */s/ James M. Sconzo*
    James M. Sconzo (ct04571)
    Brendan N. Gooley (ct30584)
    CARLTON FIELDS P.C.
    One State Street, Suite 1800
    Hartford, CT 06103
    Tel.:  (860) 392-5000
    Fax.:  (860) 392-5058
    Email:  jsconzo@carltonfields.com
          bgooley@carltonfields.com

    Jessica L. Ellsworth (*Pro Hac Vice Pending*)
    Benjamin A. Field (*Pro Hac Vice Pending*)
    HOGAN LOVELLS US LLP
    Columbia Square
    555 Thirteenth Street, NW
    Washington, D.C. 20004
    Tel.: (202) 637-5886
    Fax: (202) 637-5910
    Email:  jessica.ellsworth@hoganlovells.com
          benjamin.field@hoganlovells.com

    Its Attorneys

## CERTIFICATE OF SERVICE

I certify that on this 22nd day of April, 2019, the foregoing was electronically filed

through this Court's CM/ECF system, which will send a notice of filing to all counsel who are

registered users.  Notice of this filing will be sent to the following parties via first class mail:

402 Crown LLC
10 Middle St., 15th Floor
Bridgeport, CT 06604

Wallace H. Campbell & Company, Inc.
6212 York Road
Baltimore, MD 21212

                                        _____/s/ James M. Sconzo_____
                                        James M. Sconzo