**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| ANNA MCNEIL, et al., | |
| Plaintiffs, | |
| v. | Case No. 3:19-cv-00209-VAB |
| YALE UNIVERSITY, et al., | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**YALE UNIVERSITY'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    I.     YALE'S TITLE IX SYSTEM ........................................................................... 2

    II.    YALE'S RESPONSES TO FRATERNITY-RELATED
          MISCONDUCT ................................................................................................. 5

    III.   PLAINTIFFS' PERSONAL EXPERIENCES .................................................. 10

LEGAL STANDARD FOR A MOTION TO DISMISS .................................................. 12

ARGUMENT .................................................................................................................. 12

    I.     PLAINTIFFS FAIL TO STATE CLAIMS UNDER TITLE IX ................................. 12

          A.    Plaintiffs' Gender Discrimination Claim Should Be Dismissed
                Because Title IX Expressly Exempts Fraternities' Membership
                Policies ..................................................................................................... 13

          B.    Plaintiffs' Title IX Hostile Environment Claim Should Be
                Dismissed Because They Do Not Plausibly Allege That Yale
                Fails To Comply With Title IX ................................................................. 14

                1.    To Make Out A Claim, Plaintiffs Must Show That Yale
                       Had Actual Knowledge Of Harassment Within Its
                       Control And That It Responded With Deliberate
                       Indifference ............................................................................. 14

                2.    Plaintiffs Do Not Plausibly Allege That Yale Had
                       Control Over Activity At Off-Campus Fraternities ................. 16

                3.    Plaintiffs Do Not Plausibly Allege That Yale Was
                       Deliberately Indifferent To Actually Known
                       Harassment Within Its Control ............................................... 16

                  4.    Plaintiffs Do Not Plausibly Allege That Yale Is A
                       Hostile Education Environment Under Title IX ...................... 21

    II.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER CONNECTICUT
          PUBLIC ACCOMMODATIONS LAW BECAUSE YALE IS NOT A
          PLACE OF PUBLIC ACCOMMODATION ............................................. 23

## TABLE OF CONTENTS—Continued

Page

III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF
       CONTRACT BECAUSE THEY IDENTIFY NO AGREEMENT
       YALE HAS BREACHED .......................................................................26

       A.   Equal Opportunity Statement.........................................................27

       B.   Undergraduate Regulations............................................................28

       C.   Sexual Misconduct Policies ...........................................................31

       D.   Implied Covenant Of Good Faith And Fair Dealing .......................32

IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE
       CONNECTICUT UNFAIR TRADE PRACTICES ACT............................33

       A.   Plaintiffs' CUTPA Allegations About Yale's Policies Fail
            Because They Are Redundant With The Invalid Breach-of-
            Contract Claims .............................................................................34

       B.   Plaintiffs Have Failed To Plausibly Allege That Any Supposed
            Misrepresentations By Yale About The Role Of Fraternities
            Were A Deceptive Trade Practice....................................................35

V.     PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT
       MISREPRESENTATION..........................................................................39

CONCLUSION.......................................................................................................40

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Alfano v. Costello*,
   294 F.3d 365 (2d Cir. 2002).............................................................................21, 23

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).........................................................................................12, 28

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).................................................................................................12

*Biediger v. Quinnipiac Univ.*,
   691 F.3d 85 (2d Cir. 2012)......................................................................................17

*Brass v. Am. Film Techs., Inc.*,
   987 F.2d 142 (2d Cir. 1993)......................................................................................2

*Burns v. Quinnipiac Univ.*,
   991 A.2d 666 (Conn. App. Ct. 2010)......................................................................27

*Caldor, Inc. v. Heslin*,
   577 A.2d 1009 (Conn. 1990) .......................................................................35, 36, 37

*CHRO ex rel. Alston v. East Haven Bd. of Educ.*,
   CHRO No. 9830205, 2000 WL 35575668 (CHRO May 3, 2000) ..........................25

*CHRO ex rel. Ballard v. Cheshire Bd. of Educ.*,
   CHRO No. 9830294, 1999 WL 34765993 (CHRO July 15, 1999)........................25

*Coppola Const. Co. v. Hoffman Enter. Ltd. P'Ship*,
   71 A.3d 480 (Conn. 2013) ................................................................................39, 40

*Corteau v. Teachers Ins. Co.*,
   338 F. Supp. 3d 88 (D. Conn. 2018).......................................................................33

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999)....................................................................................... *passim*

*De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*,
   849 A.2d 382 (Conn. 2004) .....................................................................................33

*Egbarin v. Hoffmann & Assocs.*,
   No. 3:18-cv-917 (VAB), 2019 WL 1129454 (D. Conn. Mar. 12, 2019)..................2

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Figgie Int'l, Inc.*,
    107 F.T.C. 313 (1986)................................................................36

*Gazo v. City of Stamford*,
    765 A.2d 505 (Conn. 2001) ......................................................28

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998)........................................................... *passim*

*Geysen v. Securitas Sec. Servs. USA, Inc.*,
142 A.3d 227 (Conn. 2016) ......................................................32, 33

*Gregory v. Daly*,
    243 F.3d 687 (2d Cir. 2001)......................................................23

*Gupta v. New Britain Gen. Hosp.*,
    687 A.2d 111 (1996) ................................................................27

*Habetz v. Condon*,
    618 A.2d 501 (Conn. 1992) ......................................................33

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993)..............................................................21, 22

*Hayut v. State Univ. of New York*,
    352 F.3d 733 (2d Cir. 2003)......................................................15

*Hinchliffe v. Am. Motors Corp.*,
    440 A.2d 810 (Conn. 1981) ......................................................38

*Hurlburt v. Massachusetts Homeland Ins. Co.*,
    310 F. Supp. 3d 333 (D. Conn. 2018)....................................32, 33

*Issler v. Issler*,
    737 A.2d 383 (Conn. 1999) ......................................................31

*J. Frederick Scholes Agency v. Mitchell*,
    464 A.2d 795 (Conn. 1983) ......................................................40

*Jacobs v. Ethel Walker Sch. Inc.*,
    No. CV020515279S, 2003 WL 22390051 (Conn. Super. Ct. Sept. 30, 2003) ......................27

*Kiwanis Int'l v. Ridgewood Kiwanis Club*,
    806 F.2d 468 (3d Cir. 1986)......................................................25

iv

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*K.T. v. Culver-Stockton Coll.*,
    865 F.3d 1054 (8th Cir. 2017) ...............................................................23

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011)...............................................................2, 12

*Larsen Chelsey Realty Co. v. Larsen*,
    656 A.2d 1009 (Conn. 1995) ...............................................................38

*Magnan v. Anaconda Indus., Inc.*,
479 A.2d 781 (Conn. 1984) ...............................................................32

*McCarthy v. Dun & Bradstreet Corp.*,
    482 F.3d 184 (2d Cir. 2007)...............................................................2

*Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*,
    87 A.3d 534 (Conn. 2014) ...............................................................26, 28

*Montague v. Yale Univ.*,
    No. 3:16-cv-00885-AVC (D. Conn. Mar. 29, 2019) ...............................5

*Naples v. Keystone Bldg. & Dev. Corp.*,
    990 A.2d 326 (Conn. 2010) ...............................................................34, 35

*Neiman v. Yale Univ.*,
    851 A.2d 1165 (Conn. 2004) ...............................................................32

*Ostrander v. Duggan*,
    341 F.3d 745 (8th Cir. 2003) ...............................................................19, 21

*Packer v. Bd. of Educ. of Town of Thomaston*,
    717 A.2d 117 (Conn. 1998) ...............................................................27

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
    633 F.3d 81 (2d Cir. 2011)...............................................................21, 22

*Quinnipiac Council, Boy Scouts of Am., Inc. v. Comm'n on Human Rights &
    Opportunities*,
    528 A.2d 352 (Conn. 1987) ...............................................................24, 25, 26

*Richards v. Direct Energy Servs., LLC*,
    915 F.3d 88 (2d Cir. 2019)...............................................................33, 34

*Roe v. St. Louis Univ.*,
    746 F.3d 874 (8th Cir. 2014) ...............................................................20, 21

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Simpson v. Univ. of Colorado Boulder*,
    500 F.3d 1170 (10th Cir. 2007) ......................................................................20, 21

*United States v. Bari*,
    599 F.3d 176 (2d Cir. 2010)...........................................................................24

*Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*,
    51 F. Supp. 2d 144 (D. Conn 1999)...........................................................39, 40

*Zeno v. Pine Plains Cent. Sch. Dist.*,
    702 F.3d 655 (2d Cir. 2012)...........................................................................20, 21

STATUTES:

Education Amendments of 1972,
    20 U.S.C. § 1681 *et seq.*..................................................................... *passim*

20 U.S.C. § 1681(a) ....................................................................................14, 16

20 U.S.C. § 1681(a)(6)...............................................................................13

20 U.S.C. § 1681(a)(6)(A) ..........................................................................13

20 U.S.C. § 1687.........................................................................................16

Conn. Gen. Stat. § 42-110b(a) ...................................................................33

Conn. Gen. Stat. § 46a-63(1) ...............................................................23, 26

Conn. Gen. Stat. § 46a-64(a) ......................................................................23

Connecticut Unfair Trade Practices Act ............................................ *passim*

RULES:

Fed. R. Civ. P. 8(a)(2)................................................................................12

Fed. R. Civ. P. 9(b) ....................................................................................40

Fed. R. Civ. P. 12(b)(6)..........................................................................2, 12

REGULATIONS:

29 C.F.R. § 36.215(a).................................................................................13

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

Nondiscrimination on the Basis of Sex in Education Programs or Activities
Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462
(proposed Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106) .............................................15

**OTHER AUTHORITIES:**

*Executive Committee*, Yale College,
https://bit.ly/2Kx2pmu ......................................................................................................11

*First-Year Counselor Program*, Yale College, https://bit.ly/2I06nkJ ...........................................10

Britton O'Daly, *DKE's open secret: Eight more women make accusations against
fraternity*, Yale Daily News (Feb. 20, 2018), https://bit.ly/2CDSZPw ..................................22

Office for Civil Rights, U.S. Department of Education, *Dear Colleague Letter*
(Sep. 22, 2017), https://bit.ly/2wLSAFb..................................................................................14

Office for Civil Rights, U.S. Department of Education, *Revised Sexual
Harassment Guidance: Harassment of Students by School Employees, Other
Students, Or Third Parties* (Jan. 2001), https://bit.ly/2Wbv4yp...........................14, 16, 17, 18

Office of the Provost, *Title IX Coordinators*, Yale University,
https://provost.yale.edu/title-ix/coordinators .........................................................................3

Press Release, U.S. Department of Education, U.S. Department of Education
Releases List of Higher Education Institutions With Open Title IX Sexual
Violence Investigations (May 1, 2014), https://bit.ly/2ZjCstP .................................................4

Restatement (Second) of Contracts § 203(c) (1981)......................................................................31

Restatement (Second) of Torts § 552(2)(b) (1977)........................................................................40

*Sexual Harassment and Assault Response & Education Center*, Yale University,
https://sharecenter.yale.edu/..................................................................................................4

*Sexual Misconduct Response & Prevention*, Yale University,
https://smr.yale.edu/...............................................................................................................4

*Top 100 – Lowest Acceptance Rates*, U.S. News & World Report,
https://bit.ly/2UdJIrC ...........................................................................................................24

Vivian Wang, *SAE banned from campus after violating sexual misconduct
policies*, Yale Daily News (Feb. 13, 2015), https://bit.ly/2CFyySc .........................................8

**TABLE OF AUTHORITIES—Continued**

**Page(s)**

*Yale CCE Program*, Yale College,
    https://cce.yalecollege.yale.edu/ ............................................................................4

Yale University, *Yale: Facts and Statistics* (2017), https://bit.ly/2UdJIrC ..................................24

## INTRODUCTION

Yale University is deeply committed to gender equality and to preventing and eliminating sexual misconduct in its programs.  It has promulgated clear policies explaining that Yale will not discriminate on the basis of sex and strict rules against sexual misconduct by faculty, staff, and students.  Its Undergraduate Regulations make clear that students are accountable for sexual misconduct whether on or off campus.  And it has developed a clear process to fairly and promptly adjudicate complaints of sexual misconduct brought to its attention.

Plaintiffs' factual allegations and the documents they rely on bear that out.  Plaintiffs are current Yale undergraduates and an unincorporated student organization they formed who filed this putative class action because they believe that the Defendant Fraternities (private national organizations independent of Yale) should end their policies of admitting only men and that Yale should punish students for participating in these single-sex, off-campus organizations that are unaffiliated with Yale.  They also want the Fraternities to do more to curb sexual misconduct occurring at the off-campus houses that are neither owned nor maintained by Yale, and they suggest that Yale has a legal duty to go beyond the comprehensive set of policies and initiatives it already has in place for addressing student sexual misconduct.

Yale is sympathetic to any student's concerns about behavior that is incongruous with the University's commitment to gender equality and a campus free from sexual harassment.  Yale also has a legitimate interest in allowing its students freedom to craft lives separate from their academic programs.  More to the point, the law simply does not require what Plaintiffs seek. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, expressly exempts from its ambit the membership practices of fraternities, and it holds schools accountable for sexual harassment only when they exhibit deliberate indifference to sexual misconduct that is actually known to the school and under its control.  Yale has been anything but indifferent to

sexual misconduct and has no direct control over the Fraternities' off-campus activities on their own property. And Plaintiffs' demands under state law fall equally short: Yale is not a public accommodation under Connecticut law for purposes of this case, has made no contractual promises (express or implied) to do what Plaintiffs demand, and has not engaged in any deception that could support an unfair trade practices or negligent misrepresentation claim.

All Plaintiffs' claims against Yale should be dismissed, with prejudice, for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

## BACKGROUND

## I.    YALE'S TITLE IX SYSTEM

"Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex . . . ." Ex. 1, Yale University's Equal Opportunity Statement at 1, https://equalopportunity.yale.edu/policies-and-programs (cited at Am. Compl. ("Compl.") ¶ 165).[1]  "Sexual misconduct is antithetical to the standards and ideals of" the Yale community, and so Yale "prohibits all forms of sexual misconduct," including sexual harassment, by "all members of the Yale community, regardless of their sex or gender." Ex. 2, Yale Sexual Misconduct Policies and Related Definitions at 1-2, https://bit.ly/2CJmsHO (cited at Compl. ¶ 168).  Yale uses "education, training, clear definitions and policies, and serious consequences for policy violations" to pursue its goal.  *Id.* at 1.

---

[1] In addition to facts asserted in the Complaint, the Court may consider "documents incorporated in the complaint by reference" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Egbarin v. Hoffmann & Assocs.*, No. 3:18-cv-917 (VAB), 2019 WL 1129454, at *3 (D. Conn. Mar. 12, 2019) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007); *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).  Plaintiffs' Complaint relies upon and incorporates by reference many documents, often quoting directly from them.  Those relevant to this motion are attached as exhibits.  For purposes of this motion, Yale treats Plaintiffs' factual allegations as true so far as they are consistent with the underlying documents that Plaintiffs purport to be characterizing. *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011).

The centerpiece of Yale's commitment is its comprehensive Title IX system.  "The University Title IX Coordinator has responsibility for ensuring compliance with Yale's policies regarding sexual misconduct," and the "University-Wide Committee on Sexual Misconduct (UWC) and the Title IX coordinators address allegations of sexual misconduct."  *Id.*  The UWC hears complaints of sexual misconduct by Yale faculty, staff, and students against other members of the Yale community.  *See* Ex. 3, UWC Procedures at 1, https://bit.ly/2YGYpC0.  Its codified, detailed procedures protect complainants' confidentiality and ensure a prompt and fair resolution of complaints.  *See id.* at 3-9.  Notably, Plaintiffs do not allege that they ever sought to bring a complaint to the UWC or that Yale ever impeded them from doing so.

Yale's current Title IX program was already in development when it received outside validation from the Department of Education's Office for Civil Rights (OCR) after a 2011 complaint arising in part from offensive and sexist chants during a pledge event by one of the Fraternities.  *See* Compl. ¶¶ 64-65, 69.  The Voluntary Resolution Agreement that Yale entered into with OCR considered Yale's new University-wide Title IX coordinators and the UWC.  Ex. 4, Voluntary Resolution Agreement at 1-2 (cited at Compl. ¶ 69).[2]  OCR determined that the "UWC provides for the prompt and equitable response to grievances . . . alleging sexual misconduct" and that "the UWC procedures are consistent with Title IX requirements."  Ex. 5, June 15, 2012 Letter from OCR to Yale at 8 (cited at Compl. ¶ 70).

Yale seeks to combat sexual harassment in other ways too.  It has an extensive network of Title IX coordinators throughout Yale's various schools.  *See* Office of the Provost, *Title IX Coordinators*, Yale University, https://provost.yale.edu/title-ix/coordinators.  A comprehensive

---

[2] The Agreement noted that "OCR has not made a finding of noncompliance" and that the Agreement was "entered into voluntarily by the University and does not constitute an admission that the University is not in compliance with Title IX."  Ex. 4 at 1.

website serves as a central repository for information on University policies, procedures, and

resources related to sexual misconduct.  *See Sexual Misconduct Response & Prevention*, Yale

University, https://smr.yale.edu/.  The Sexual Harassment and Assault Response & Education

Center (SHARE) provides counseling services at "any time, day or night," to students with

sexual misconduct concerns.  *See Sexual Harassment and Assault Response & Education Center*,

Yale University, https://sharecenter.yale.edu/.  And Yale offers numerous training programs on

sexual misconduct, including mandatory annual trainings on preventing and responding to sexual

misconduct and a program of peer Communication and Consent Educators in Yale College.[3]

OCR praised this suite of services when it closed its monitoring under the Voluntary Resolution

Agreement in December 2017 and concluded that Yale "welcomed all feedback and made

changes based on the feedback," had "voluntarily and proactively made changes to its procedures

and practices related to Title IX compliance," and "complied with Title IX in its processing of

complaints."  Ex. 6, Dec. 18, 2017 Letter from OCR to Yale at 1, 3, 6.[4]

　　　Thus, despite Plaintiffs' conclusory statements to the contrary, Yale has a vigorous and

OCR-approved set of policies, procedures, and programs to combat sexual misconduct.  In fact,

Yale has faced multiple "reverse Title IX suits" brought by plaintiffs who were respondents in

the UWC process, alleging that Yale overzealously sought to punish sexual misconduct and

---

[3] See the previously-referenced websites for information on training generally.  For information
on the Communication and Consent Educators, *see Yale CCE Program*, Yale College,
https://cce.yalecollege.yale.edu/.

[4] OCR also investigated dozens of other universities at the time over the handling of sexual
violence and harassment complaints.  *See, e.g.*, Press Release, U.S. Department of Education,
U.S. Department of Education Releases List of Higher Education Institutions With Open Title IX
Sexual Violence Investigations (May 1, 2014), https://bit.ly/2ZjCstP (listing 55 colleges and
universities nationwide with open investigations in May 2014).

protect complainants.[5]  Plaintiffs themselves point to specific examples of sanctions imposed on individual members of three Fraternities.  Compl. ¶ 93.

## II.  YALE'S RESPONSES TO FRATERNITY-RELATED MISCONDUCT

The Complaint acknowledges that the Fraternities are national organizations entirely independent of Yale, whose houses are owned by independent housing corporations affiliated with the Fraternities.  *See* Compl. ¶¶ 31-59, 158-162, 261.  As a report quoted repeatedly by Plaintiffs indicates, other colleges and universities are able to more pervasively hold their "Greek organizations to community standards because [those institutions] own the houses used by the fraternities and sororities," but that "is not the case at Yale."  Ex. 7, Yale College Council Task Force on Greek Life Report at 9 (cited, *e.g.*, at Compl. ¶ 88).  Indeed, Yale "plays no formal role in the operations of organizations not affiliated with the [U]niversity, including Greek organizations."  Ex. 8, Jan. 14, 2019 Email from Dean Chun at 2 (cited at Compl. ¶ 99).

Although Yale has no direct control over the Fraternities' off-campus activities, as Plaintiffs recognize, it has responded to reports of misconduct committed by members of the Fraternities.  Like all Yale students, fraternity members are held accountable for misconduct against fellow students, regardless of where it occurs, when it is brought to Yale's attention.  The incidents recounted in Plaintiffs' Complaint, spanning the last decade, reflect that reality.

As Plaintiffs recount, in October 2010, members and pledges of the Delta Kappa Epsilon (DKE) fraternity marched outside the Yale Women's Center reciting patently offensive and sexist chants.  Compl.  ¶ 64.  Yale promptly investigated, found that DKE and several of its

---

[5] *E.g.*, Ruling on Defendant's Motion for Summary Judgment, *Montague v. Yale Univ.*, No. 3:16-cv-00885-AVC (D. Conn. Mar. 29, 2019) (denying in part summary judgment to Yale in a suit based on Yale College's expulsion of a student through the UWC process); *see also* Complaint, *Doe v. Yale Univ.*, No. 3:18-cv-00110-JCH (D. Conn. Jan. 1, 2018); Amended Complaint, *Doe v. Yale Univ.*, No. 3:16-cv-01380-AWT (D. Conn. July 3, 2017).

members' intimidating conduct had violated Yale's Undergraduate Regulations, and imposed a five-year ban on DKE.  *See id.*; Ex. 9, May 17, 2011 Letter from the Dean regarding the disciplinary charges against DKE at 2, https://bit.ly/2HWIBG2.  Yale thus "prohibit[ed] [DKE] from conducting any fraternity activities on campus (including recruiting) for a period of five years, prevent[ed] it from communicating with Yale students by means of Yale bulletin boards or Yale email, and severely limit[ed] its use of the Yale name"; and Yale requested that the DKE national organization suspend the chapter for five years. Ex. 9 at 2.

In March 2011, then-current and former Yale students filed a Title IX complaint with OCR based in part on the DKE incident.  Compl. ¶ 65.  Yale took the issue seriously:  It began its overhaul of its Title IX programs even before the complaint, and it created the UWC and entered into the Voluntary Resolution Agreement with OCR.  *See supra* pp. 2-4.  In parallel, Yale convened an Advisory Committee on Campus Climate chaired by a former chief justice of the Supreme Judicial Court of Massachusetts and including a former Solicitor General of the United States.  *See* Ex. 10, Report to the President and Fellows of Yale University of the Advisory Committee on Campus Climate (cited at Compl. ¶ 66); Ex. 11, President's Response to the Report of the Advisory Committee on Campus Climate at 1 (cited at Compl. ¶ 68).  The committee reviewed "voluminous" written material and met with over 150 members of the Yale community, including faculty, staff, current students, and alumni. Ex. 10 at 6-7.  Its report offered detailed recommendations to improve campus climate with respect to issues of sexual misconduct and sexual equality.  *See id.* at 13-28.  The recommendations were prefaced:

> [F]or overwhelming numbers of students who spoke to us, the Yale experience is a very positive one.  The overall view in the community, especially among students, including those most critical of Yale's response to sexual misconduct or who expressed the greatest concern about the sexual atmosphere on the campus, is that Yale is "an amazing place," where its students receive an extraordinary education.

*Id.* at 7.

Yale's then-president Richard C. Levin publicly responded to the report by embracing many of its recommendations on behalf of the Yale Corporation, including many the University had already undertaken.  *See* Ex. 11 at 1.  Among other things, he agreed that Yale should better communicate that "sexual misconduct is not tolerated"; improve resources for information and training about sexual misconduct; implement the UWC; reduce high-risk drinking; and "speak out in a timely fashion in response to troubling incidents of gender-offensive speech."  *Id.* at 2-7. Where President Levin disagreed with the Advisory Committee's suggestions, he provided reasoned explanations.  For instance, rather than requiring off-campus undergraduate organizations to register with Yale College, President Levin thought that the better approach for holding students "accountable for complying with the *Undergraduate Regulations*" would be "improved communication, as well as enforcement."  *Id.* at 6.  He further elaborated that "Yale College already has in place incentives for organizations to register," including funding and access to Yale events and spaces.  *Id.*

In the years after the Advisory Committee report, Yale undertook two additional significant studies to further evaluate the sexual climate at the University.  The first study was a campus sexual climate assessment in 2012-2013 headed by Stephanie S. Spangler, Yale's Title IX Coordinator and Deputy Provost for Health Affairs & Academic Integrity.  *See* Ex. 12, Report of the 2012-13 Campus Sexual Climate Assessment (cited at Compl. ¶ 73).  The study received feedback from "more than 300 members of the Yale community."  *Id.* at 4.  It revealed that students understood the "key elements" of Yale's "broad" definition of sexual misconduct and that undergraduates were "uniformly" familiar with SHARE as a resource for victims of sexual misconduct.  *See id.* at 6-7.  Undergraduates expressed the view that "Yale is making substantial

change, and progress, in addressing the sexual climate" and that students "feel Yale is more comfortable than many other campuses." *Id.* at 10.  Rather than accepting existing progress, the report proposed future steps to further improve campus climate.  *See id.* at 20-24.  In the second study, Yale participated in the nationwide Association of American Universities' Campus Climate Survey on Sexual Assault and Sexual Misconduct.  *See* Ex. 13, Westat-Yale Report on the AAU Campus Climate Survey (cited at Compl. ¶ 86).  The survey provided detailed data on rates at which students experienced sexual assault or harassment under Yale's broad definitions, concluding that the "findings clearly call for community engagement and action."[6]  *Id.* at 1.

Yale's response to the 2010 DKE incident was hardly the only time it has taken action against fraternity-related misconduct.  In 2014-2015, Yale twice sanctioned Sigma Alpha Epsilon (SAE) in response to student complaints.  First, in response to a student's allegation that she had been sexually harassed by SAE members, Yale banned the fraternity for two years from conducting on-campus activities, using Yale's email or bulletin boards, and using the Yale name.  *See* Compl. ¶ 76.  The SAE national organization also imposed its own sanctions in response to the investigation and required sexual assault and harassment training for all chapter members.  *See* Vivian Wang, *SAE banned from campus after violating sexual misconduct policies*, Yale Daily News (Feb. 13, 2015), https://bit.ly/2CFyySc.  Second, when partygoers alleged that SAE members turned away women students of color from a party, saying they were looking for "white girls only," Compl. ¶ 82, Yale promptly investigated, *id.* ¶ 85.  Although SAE members denied making that statement, and of those witnesses interviewed only the complainants heard the offensive remarks, the investigation nonetheless determined that "SAE created a chaotic environment, and that members at times behaved disrespectfully and aggressively toward

---

[6] Under those broad definitions, sexual assault was defined as "any form of sexual contact that does not meet Yale's standard for consent."  Ex. 13 at 2.

students seeking admission."  Ex. 14, Important updates on SAE and Buckley investigations at 1-2, https://bit.ly/2UdVnqb.  In response, then Dean of Yale College Jonathan Holloway instructed Associate Dean Burgwell Howard to "work[] with SAE to develop a protocol for managing crowds and hosting off-campus events safely and respectfully," announced "expanded training and guidance to all student groups for hosting events," and "solicit[ed] suggestions . . . for hosting more parties on campus and to provide more opportunities to dance and socialize in a variety of environments that are open and welcoming to all Yale College students."  *Id.* at 3.

Plaintiffs also point to press reports in 2018 of alleged sexual misconduct at DKE.  *See* Compl. ¶¶ 94-96.  Just "two days after the *Yale Daily News* published its article" on the subject, Yale College Dean Marvin Chun announced an investigation into DKE and the creation of a Committee on Social Life and Community Values (SLCV) to "review the adequacy of the College's processes for addressing concerns raised about student groups."  *Id.* ¶ 96.  The leaders of the investigation met with representatives of about 15 student groups and 200 students.  *See* Ex. 15, Review of DKE and Campus Culture: Information Gathered from Students at 1 (cited at Compl. ¶ 98).  The resulting report summarized student perceptions of DKE, the role of Greek life, and students' recommendations.  *See id.* at 1-3.  Dean Chun's response to the report—which he noted included student accounts of "poor crowd control," "unregulated access to alcohol," and behaviors that made some students "feel unwelcome" and demonstrated a "lack of self awareness"—was blunt:  "I condemn the culture described in these accounts; it runs counter to our community's values."   Ex. 8 at 2.  He "offer[ed] some plain advice about events like these: don't go to them."  *Id.*  He pointed out that a survey conducted by SLCV revealed that "the vast majority of [students] reported that you socialize at well-planned events that make you feel welcome," and he encouraged students "to keep exploring those opportunities."  *Id.*  He also

reminded all students that they "are subject to the Undergraduate Regulations." *Id.* Dean Chun opted not to pursue creation of a council on Greek life that would entangle Yale administrators with the Fraternities, observing that Yale "plays no formal role in the operations of organizations not affiliated with the university, including Greek organizations," although their members may "take advantage of the training and resources available to the entire student body." *Id.* He noted several existing resources and new initiatives, including trainings available to all students on preventing sexual misconduct, bartending, and alcohol and drug harm reduction for party hosts, as well as initiatives "to sponsor more opportunities to socialize on campus." *Id.* at 2-3.

## III.   PLAINTIFFS' PERSONAL EXPERIENCES

Plaintiffs are three Yale undergraduates who matriculated in the fall of 2016 and 2017, Compl. ¶¶ 25-27, and an unincorporated student organization, Engender, founded in 2016, *id.* ¶ 28. The student Plaintiffs came to Yale years after the University implemented its current Title IX program. Their Complaint alleges that they suffered, observed, or heard about sexist (and in one case racist) misconduct when they attended several parties at certain off-campus fraternity houses, including leering, groping, and grinding. *Id.* ¶¶ 104-116. Those allegations describe conduct that Yale condemns and proscribes in its written policies, in particular its Undergraduate Regulations. Plaintiffs do not allege, however, that they brought any of these incidents to the attention of any Title IX coordinators, the UWC, or any other Yale faculty or staff.[7] Plaintiffs do not allege that they personally witnessed or were directly affected by any of the on-campus

---

[7] The only allegation of reporting is that one of the Plaintiffs told her first-year counselor about an incident of sexual misconduct at one of the Fraternities. Compl. ¶ 106. First-year counselors are fellow students in the residential college whose purpose is "to help ease the transition of incoming first-years to the academic, social, and cultural life of Yale College." *See First-Year Counselor Program*, Yale College, https://bit.ly/2I06nkJ. Plaintiffs do not allege the incident was brought to the attention of the UWC or any Yale faculty member or administrator, or even that the involved Plaintiff wished to pursue a formal report.

10

incidents of misconduct related to the Fraternities discussed elsewhere in the Complaint, and in fact they matriculated after those on-campus incidents occurred.

Plaintiffs describe their unsuccessful attempts to join the Fraternities as a result of the Fraternities' single-sex admission policies. *Id.* ¶¶ 125-144. They describe efforts to enlist Yale in inducing the Fraternities to end their single-sex admissions practices and to combat sexual misconduct related to the Fraternities' activities. *See id.* ¶¶ 182-191. Although Plaintiffs characterize Yale's responses as inadequate, their concrete factual allegations depict a Yale administration deeply committed to engaging with students on issues of gender equality and sexual misconduct. When one Plaintiff sent an initial email to Yale administrators, the Dean of Yale College met with them just two weeks later to hear their concerns. *Id.* ¶¶ 183-184. When Plaintiffs requested a meeting with Dean of Student Affairs Camille Lizarribar on February 17, 2018 (a Saturday), she made time to meet with them on Monday, two days later. *Id.* ¶¶ 186-187. Plaintiffs disagree with her decision not to bring a complaint to Yale's Executive Committee about the Fraternities,[8] but they acknowledge that she encouraged them to report a particular instance of sexual misconduct to the appropriate authority and asked them to "continue having conversations" with her about their concerns. *Id.* ¶ 187. When Plaintiffs emailed the President of Yale and the Dean of Yale College with concerns about the Fraternities in March 2018, the Dean responded and directed them to administrators who could assist them and did in fact meet with them. *Id.* ¶¶ 188-190. Plaintiffs report three specific in-person or email exchanges with Yale administrators from March to November 2018; although Plaintiffs wish that the

---

[8] The Executive Committee "is responsible for the fair, consistent, and uniform enforcement of the Undergraduate Regulations." *Executive Committee*, Yale College, https://bit.ly/2Kx2pmu. It would not have been an appropriate body to consider Plaintiffs' concerns because sexual misconduct is instead addressed by the UWC, *see id.*, and the Fraternities' membership practices do not themselves violate the Undergraduate Regulations, *see infra* pp. 28-30.

administrators had attempted to compel the Fraternities to end their single-sex admissions

policies, they note that the administrators affirmed that students in fraternities are bound by the

Undergraduate Regulations.  *Id.* ¶¶ 189-191.

## LEGAL STANDARD FOR A MOTION TO DISMISS

To survive dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A "formulaic recitation of the elements of a cause of action will not do," "[n]or does a complaint

suffice if it tenders 'naked assertions' devoid of 'further factual enhancement.' "  *Id.* (quoting

*Twombly*, 550 U.S. at 555, 557) (alterations omitted).  "Threadbare recitals of the elements of a

cause of action, supported by mere conclusory statements, do not suffice."  *Id.* "Plausibility . . .

depends on a host of considerations:  the full factual picture presented by the complaint, the

particular cause of action and its elements, and the existence of alternative explanations so

obvious that they render plaintiff's inferences unreasonable."  *L-7 Designs, Inc. v. Old Navy,*

*LLC*, 647 F.3d 419, 430 (2d Cir. 2011).  In short, "where the well-pleaded facts do not permit the

court to infer more than the mere possibility of misconduct," the complaint has not shown "that

the pleader is entitled to relief."  *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## ARGUMENT

## I.    PLAINTIFFS FAIL TO STATE CLAIMS UNDER TITLE IX.

Plaintiffs assert two Title IX claims against Yale based on their allegations that sexual

misconduct occurs at parties at the Fraternities and that they want to join the Fraternities as

members:  Count I alleges that Yale has created a hostile environment by failing to exercise

authority over the off-campus organizations to curb sexual misconduct there, and Count II

alleges that Yale has abetted gender discrimination by failing to ensure that Plaintiffs may join

these Fraternities.  In light of the facts alleged, neither claim is cognizable under Title IX.

> **A.**     **Plaintiffs' Gender Discrimination Claim Should Be Dismissed Because Title IX Expressly Exempts Fraternities' Membership Policies.**

Count II alleges that Yale deprives Plaintiffs of "social, professional, and economic

resources and opportunities" on the basis of sex.  Compl. ¶ 249.  The specific allegations all

relate to the supposed opportunities offered by the Fraternities, which are allegedly denied to

Plaintiffs because of the Fraternities' male-only membership policies.  *See id.* ¶¶ 118-122.

Even if Yale could somehow be held responsible for the membership policies of those

completely independent organizations, those policies could not support a Title IX claim because

the statute expressly exempts the "membership practices" of "social fraternit[ies] . . . , the active

membership of which consists primarily of students in attendance at an institution of higher

education."  20 U.S.C. § 1681(a)(6); *accord* 29 C.F.R. § 36.215(a).  The Fraternities fit within

that exemption:  the Complaint alleges that these Fraternities' active memberships comprise Yale

students, *see* Compl. ¶¶ 31-39, and Plaintiffs' effort to make Yale liable for the Fraternities'

membership practices could make sense only if membership is tied to being a Yale student.[9]

Count II should therefore be dismissed because Title IX and its implementing regulations

make plain that fraternities' membership practices fall outside the scope of the statute.  Plaintiffs

therefore cannot base a claim on such membership practices or the supposed benefits that flow

directly from membership.

---

[9] The statutory exemption also requires that the social fraternities be "exempt from taxation."  20 U.S.C. § 1681(a)(6)(A).  To the extent the Complaint addresses that issue, it indicates that the Fraternities are non-profit entities, and nothing in the Complaint suggests they are not tax-exempt.  *See* Compl. ¶¶ 42, 44-46, 49.

**B.      Plaintiffs' Title IX Hostile Environment Claim Should Be Dismissed Because They Do Not Plausibly Allege That Yale Fails To Comply With Title IX.**

**1.      To Make Out A Claim, Plaintiffs Must Show That Yale Had Actual Knowledge Of Harassment Within Its Control And That It Responded With Deliberate Indifference.**

Title IX provides that:  "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). One form of proscribed discrimination that has been recognized by courts and by administrative guidance from OCR is student-on-student sexual harassment.  *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999); Office for Civil Rights, U.S. Department of Education, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, Or Third Parties* (Jan. 2001) (OCR 2001 Guidance), https://bit.ly/2Wbv4yp.[10] Although courts have "implied" a private right of action based on such harassment, *Davis*, 526 U.S. at 639, such claims are highly circumscribed, and there are several necessary elements of such a claim not plausibly pled in Plaintiffs' Complaint.

In a pair of landmark cases, *Gebser* and *Davis*, the Supreme Court made clear that because Title IX was "enacted pursuant to Congress' authority under the Spending Clause"—and hence acts as a contract with funding recipients—"recipients of federal funding" may only be liable where they "had adequate notice that they could be liable for the conduct at issue."  *Davis*, 526 U.S. at 640; *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286 (1998).  Such a recipient may therefore only be liable "for its own misconduct."  *Davis*, 526 U.S. at 640.

---

[10] OCR has disavowed all subsequent substantive guidance on this topic, pending new notice-and-comment rulemaking.  *See* Office for Civil Rights, U.S. Department of Education, *Dear Colleague Letter* 2 (Sep. 22, 2017), https://bit.ly/2wLSAFb.

When the school itself is not engaging in harassment—such as when an employee or a student is the alleged harasser—then a plaintiff must establish four elements to recover under Title IX. *First*, the plaintiff must show that the school "exercises substantial control over both the harasser and the context in which the known harassment occurs" because it "cannot be directly liable for its indifference where it lacks the authority to take remedial action." *Id.* at 644-645. For that reason, "the harassment must take place in a context subject to the school['s] control." *Id.* at 645. *Second*, the plaintiff must show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has *actual knowledge* of discrimination." *Gebser*, 524 U.S. at 290 (emphasis added). *Third*, the school's "response must amount to *deliberate indifference* to discrimination," or "an official decision . . . not to remedy the violation." *Id.* (emphasis added). *Fourth*, the harassment must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650.

The *Gebser/Davis* standard applies where a plaintiff "seeks money damages as well as corrective action." *Hayut v. State Univ. of New York*, 352 F.3d 733, 750 (2d Cir. 2003).[11] That is what Plaintiffs seek here, *see* Compl. ¶ 245, and because they fail to plausibly allege any of the four necessary elements of a Title IX harassment claim, the Court should dismiss Count I.

---

[11] The Department of Education has proposed new Title IX rules that would codify the *Gebser/Davis* standard in a formal regulation so that the Department would only deem a school out of compliance with Title IX if it had "actual knowledge of sexual harassment" and responded in a manner that was "deliberately indifferent." *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462, 61,497 (proposed Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106).

2.     **Plaintiffs Do Not Plausibly Allege That Yale Had Control Over Activity At Off-Campus Fraternities.**

As the Supreme Court has recognized, Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644.  "[T]he harassment must take place in a context subject to the school['s] control." *Id.* at 645 (citing 20 U.S.C. §§ 1681(a), 1687).  Thus, the typical case giving rise to liability "occurs during school hours and on school grounds," where "the recipient retains substantial control over the context in which the harassment occurs." *Id.* at 646; *accord* OCR 2001 Guidance at 12, 33 n.70.

As Plaintiffs acknowledge in their Complaint, the Fraternities are organized independently of Yale and own their own property, and Yale has no formal role in their management. *See supra* p. 5.   Yale, then, has no control over their off-campus activity.  To the extent Plaintiffs' Title IX claims rely on any such activity—such as the manner in which the Fraternities admit people to or serve alcohol at off-campus parties—they are legally invalid.

3.     **Plaintiffs Do Not Plausibly Allege That Yale Was Deliberately Indifferent To Actually Known Harassment Within Its Control.**

For those things alleged in the Complaint over which Yale may exercise some control—namely, the few incidents of on-campus fraternity-related misconduct or Yale's ability to impose punishments on Yale students for their off-campus conduct—Plaintiffs do not plausibly allege that Yale exhibited deliberate indifference to any misconduct of which it had actual knowledge. The deliberate indifference standard is high and only satisfied where a plaintiff can show "an official decision by the recipient not to remedy the violation." *Gebser*, 524 U.S. at 290.  Schools may be "deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is *clearly unreasonable* in light of the known circumstances." *Davis*, 526 U.S. at 648 (emphasis added).  Plaintiffs have no right "to

16

make particular remedial demands," and "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* Mere procedural failures will not give rise to liability, as a school's "failure to comply with . . . regulations" or its "failure to promulgate a grievance procedure" do not themselves create liability under Title IX. *Gebser*, 524 U.S. at 291-292. Importantly, the Court can decide whether the high threshold for deliberate indifference has been met: "[T]here is no reason why courts, on a motion to dismiss," cannot "identify a response as not 'clearly unreasonable' as a matter of law." *Davis*, 526 U.S. at 649.

Far from being "clearly unreasonable," Yale's Title IX compliance programs are robust and consistent with OCR guidance, and OCR has in fact monitored and expressly approved of Yale's programs. The Second Circuit has recognized that OCR's interpretations of Title IX and its implementing regulations are "entitled to substantial deference." *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97 (2d Cir. 2012); *see also Davis*, 526 U.S. at 647-648 (treating OCR guidance as instructive in interpreting statutory Title IX obligations). The operative guidance instructs that, "[o]nce a school has notice of possible sexual harassment of students," "it should take immediate and appropriate steps to investigate or otherwise determine what occurred and take prompt and effective steps reasonably calculated to end any harassment, eliminate a hostile environment if one has been created, and prevent harassment from occurring again." OCR 2001 Guidance at 15. Schools "are required by the Title IX regulations to adopt and publish a policy against sex discrimination and grievance procedures providing for prompt and equitable resolution of complaints of discrimination on the basis of sex." *Id.* at 19. Those procedures should provide for "where complaints may be filed," "impartial investigation of complaints," "prompt timeframes for the major stages of the complaint process," and "[n]otice to the parties of

the outcome of the complaint." *Id.* at 20.  Yale's Title IX procedures satisfy all those criteria. *See* Ex. 3 at 1, 3, 4-9 (detailing UWC procedures that meet OCR criteria); *supra* pp. 2-5.[13]

Indeed, the facts alleged by Plaintiffs bear out that Yale's Title IX system works.  Each specific instance of reported Fraternity-member misconduct that Plaintiffs point to was investigated by Yale, resulting in disciplinary action where appropriate.  *See supra* pp. 5-10. Yale administrators met with and responded to Plaintiffs when they raised the specific concerns giving rise to their Complaint.  *See supra* pp. 10-12.  Plaintiffs do not allege that they made Yale aware of the specific instances of inappropriate sexual behavior they experienced at fraternity parties or allege that the Title IX office or the UWC could not have adequately handled such allegations if they were brought to its attention.  In short, between its vigorous and OCR-approved Title IX procedures and its investigation of specific instances of fraternity-related misconduct, Yale has been anything but indifferent to sexual harassment on campus, and it has certainly not been "clearly unreasonable."  *Davis*, 526 U.S. at 648.

Instead, Plaintiffs' Title IX claims rely entirely on what the Supreme Court said is impermissible—demanding that Yale accede to "particular remedial demands."  *Id.*  Plaintiffs demand a set of actions requiring Yale to assert a pervasive role in the off-campus Fraternities: among other things, that Yale enforce nondiscrimination policies on unregistered, off-campus

---

[13] Plaintiffs suggest that Yale was obligated to create a "Greek council" of leaders of fraternities and sororities under the Voluntary Resolution Agreement with OCR.  *See* Compl. ¶¶ 69, 90, 170, 209.  The Agreement merely contained hortatory language that Yale would "continue its efforts to expand its student leadership councils to promote norms of responsible conduct, and including efforts to create a council of fraternity and sorority leaders."  Ex. 4 at 5.  Nothing in OCR's regulations or guidance, however, requires a "Greek council," nor has OCR objected to the decision not to create such a council in the years since the 2012 Voluntary Resolution Agreement.  In fact, in its letter closing its monitoring, OCR determined that Yale "sufficiently complied with the terms of the Agreement" and noted approvingly that Yale SHARE staff had monthly Safety Net meetings that included fraternity and sorority leaders, without suggesting that a formal Greek council was a requirement of OCR regulations or the Agreement.  Ex. 6 at 6.

student organizations; provide "housing and insurance coverage" for Greek organizations that end single-sex membership policies; create a Greek council with "representatives from all off-campus social organizations" and "relevant University officials"; require "registration of off-campus parties"; require "off-campus social organizations to adopt and implement standardized guidelines for party/event management"; and require "members of off-campus social organizations to attend regular, live in-person trainings."  Compl. pp. 104-105.  In short, Plaintiffs insist that Yale go far beyond anything the Title IX regulations or OCR guidance requires and to assume an *in loco parentis* role in students' off-campus activities.

Comparing the Complaint to case law on deliberate indifference makes plain how far Plaintiffs are from alleging that Yale's supposed inaction rose to that high standard.  In one case where a student was drugged and raped at an off-campus house rented by fraternity members, the court found that the university's response was not "clearly unreasonable" as a matter of law when university personnel had "informed" the fraternity's chapter advisor "of the allegations of sexual assault" and "wrote [the fraternity's] national president, advising him [the university] considered [the] allegations of sexual assault to be very serious, and informing him of [the university's] expectation that the local [fraternity] chapter would thoroughly investigate the allegations and sponsor an educational program to be attended by 75% of its membership," even though the university itself did not "impose sanctions" on the fraternity.  *Ostrander v. Duggan*, 341 F.3d 745, 751 (8th Cir. 2003).  In another case, where a student was raped at a party at an off-campus apartment, the court held that the university could not be deliberately indifferent because it had no "control over the student conduct at the off campus party" and that the university's response was not clearly unreasonable where a university administrator "explained the process for reporting a rape, referred [the victim] to counseling," "informed Public Safety

that a student might be filing a sexual assault report," and "contacted [the victim's] counselor to discuss the need to support the young woman," and where the university later "began an investigation into the assault and cooperated with the separate investigation" by the police when the victim later reported the crime.  *Roe v. St. Louis Univ.*, 746 F.3d 874, 883-884 (8th Cir. 2014).  In *Gebser* itself, the Supreme Court held that a school district was not deliberately indifferent when an employee teacher had a sexual relationship with a teenage student because the district did not have actual knowledge of the relationship.  524 U.S. at 291-292.

On the other hand, where courts have found deliberate indifference, the school's conduct was conscience-shocking.  In *Simpson v. University of Colorado Boulder*, 500 F.3d 1170, 1184 (10th Cir. 2007), the university's football coach—"whose rank in the [university] hierarchy was comparable to that of a police chief in a municipal government"—himself "maintained an unsupervised player-host program to show high-school recruits 'a good time,' " even though the coach knew that this program had already resulted in several instances of sexual assault, and it ultimately resulted in the assault of the plaintiffs.  In *Zeno v. Pine Plains Central School District*, 702 F.3d 655, 669 (2d Cir. 2012), a public high school student was subjected to three years of pervasive racial epithets and numerous racially-motivated assaults; the school knew of the racially-motivated harassment, failed to stop the abuse even as it grew more severe, and in fact turned down offers from the county and the local NAACP chapter to provide a free shadow to the student and free racial sensitivity training to other students.  In *Davis*, the Supreme Court held that the plaintiff had stated a claim of deliberate indifference in alleging that a fifth grade girl was subjected to repeated sexually explicit statements and sexual touching from a fellow student, where the school was aware of the harassment against that girl and others and took absolutely no disciplinary action against the perpetrator.  526 U.S. at 633-635.

20

Yale's conduct here is at least as objectively reasonable as the schools' responses in *Ostrander*, *St. Louis University*, and *Gebser*, and not at all comparable to the unconscionable neglect in *Simpson*, *Zeno*, and *Davis*.  As even Plaintiffs' own un-supplemented allegations make clear, Yale has a long record of responding to complaints of fraternity-related misconduct, including suspending fraternities, punishing individual students accused of misconduct, monitoring overall campus culture, and implementing programs and trainings to ameliorate misconduct.  *See supra* pp. 5-10.  And unlike *Simpson*, *Zeno*, and *Davis*—which involved actions by school personnel or took place in public primary or secondary schools—Yale has taken these active steps when it has no direct control over the Fraternities or their houses.  Plaintiffs' factual allegations and the supporting documents demonstrate that, as a matter of law, Yale has been anything but deliberately indifferent to Plaintiffs' concerns.

### 4.    Plaintiffs Do Not Plausibly Allege That Yale Is A Hostile Education Environment Under Title IX.

A "Title IX hostile education environment claim is governed by traditional Title VII 'hostile environment' jurisprudence."  *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011) (internal quotation marks and citation omitted).  Under that standard, a "Title IX plaintiff must show that . . . the environment objectively was hostile or abusive, that is, that it was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of [the plaintiff's] educational environment."  *Id.*; *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive . . . environment—an environment that a reasonable person would find hostile or abusive—is beyond [the statute's] purview.").  This standard is not met by "episodic" incidents; to be deemed pervasive, the misconduct "must be sufficiently continuous and concerted."  *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002)

(internal quotation marks and citation omitted) ("Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness.").  And "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances," including its frequency and severity, "whether it is physically threatening or humiliating, or a mere offensive utterance[,] and whether it unreasonably interferes with . . . performance."  *Harris*, 510 U.S. at 23.

Plaintiffs' allegations here are a far cry from showing that Yale is "permeated" with abuse so "severe and pervasive" that it has altered the conditions of the educational environment. *Papelino*, 633 F.3d at 89.  The Complaint attempts to paint a picture of some Fraternities' off-campus house parties as places of routine sexual harassment,[14] but those parties are neither affiliated with nor sanctioned by Yale and, if anything, are discouraged insofar as the College's dean expressly told students not to attend.  *See supra* pp. 9-10.  Plaintiffs do not allege that they suffered any harassment on Yale's campus, nor do they allege that any fraternity-related misconduct has occurred on campus since Plaintiffs matriculated.[15]  Plaintiffs further do not allege that conduct at the Fraternities has deprived them of any of Yale's educational opportunities or interfered with their academic performance.  The scattered on-campus misconduct mentioned in the Complaint occurred before Plaintiffs began attending Yale; even in a counterfactual world in which it occurred as they describe it and Yale was deliberately indifferent to it in the face of actual knowledge, that would amount to the sort of "episodic,"

---

[14] Plaintiffs make specific allegations of sexual harassment against only a minority of the Defendant Fraternities, and most of the factual allegations are made against two: DKE and SAE.

[15] The closest the Complaint comes to supporting its allegation that a "hostile environment permeated Yale's campus" is by relaying a quotation from the *Yale Daily News* from an "undergraduate who lived on the same block as DKE" and was harassed when passing by the fraternity house. Compl. ¶ 95.  But based on the article's description, that incident occurred off campus.  *See* Britton O'Daly, *DKE's open secret: Eight more women make accusations against fraternity*, Yale Daily News (Feb. 20, 2018), https://bit.ly/2CDSZPw.

"[i]solated acts" that cannot give rise to Title IX hostile-environment liability.  *Alfano*, 294 F.3d at 374 (internal quotation marks omitted); *compare K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1059 (8th Cir. 2017) (high school junior who was sexually assaulted at an on-campus fraternity party failed to allege hostile environment because, although "she has alleged opprobrious misconduct on the part of the fraternity member," the "singular grievance on its own does not plausibly allege pervasive discrimination" or the "systemic effect" "required to state a peer harassment claim"), *with Gregory v. Daly*, 243 F.3d 687, 692-693 (2d Cir. 2001) (valid hostile environment claim made where plaintiff alleged her supervisor routinely made demeaning and sexual comments about women, "initiated unwelcome physical conduct of a sexual nature," and would "verbal[ly] abuse" plaintiff with "ostentatious and graphic references to sexual assault").

*      *      *

In sum, Plaintiffs have failed plausibly to allege *any* of the four elements of a Title IX claim, and they were required to satisfy *all* of them.  They have not plausibly alleged that Yale had actual control over the Fraternities' conduct, that Yale had actual knowledge over any particular harassment to which it did not respond, that Yale's responses to known conduct were deliberately indifferent and clearly unreasonable, or that the atmosphere on Yale's campus constitutes a hostile educational environment.  Count I should therefore be dismissed.

## II.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER CONNECTICUT PUBLIC ACCOMMODATIONS LAW BECAUSE YALE IS NOT A PLACE OF PUBLIC ACCOMMODATION.

In relevant part, Connecticut's public accommodations law provides that "[i]t shall be a discriminatory practice . . . [t]o deny any person within the jurisdiction of this state full and equal accommodations in any place of public accommodation . . . because of . . . sex."  Conn. Gen. Stat. § 46a-64(a).  The statute defines "[p]lace of public accommodation" as "any establishment which caters or offers its services or facilities or goods to the general public."  *Id*. § 46a-63(1).

23

"[C]overage under the statute depends . . . upon the extent to which a particular establishment has maintained a private relationship with its own constituency or a general relationship with the public at large." *Quinnipiac Council, Boy Scouts of Am., Inc. v. Comm'n on Human Rights & Opportunities*, 528 A.2d 352, 359 (Conn. 1987). An organization has become a place of public accommodation only when it "has determined to eschew selectivity." *Id.*

Yale has certainly not "determined to eschew selectivity." It is, in fact, one of the most selective institutions of higher education in the world. *See, e.g.*, Yale University, *Yale: Facts and Statistics* 1 (2017), https://bit.ly/2HHOmrd (Yale College had an admissions rate of 6.3% for those matriculating in 2016, with 25th percentile SAT scores of 710 for verbal, math, and writing); *Top 100 – Lowest Acceptance Rates*, U.S. News & World Report, https://bit.ly/2UdJIrC (Yale in top ten most selective colleges and universities in 2017).[16]

Plaintiffs seek to get around the fact that Yale has clearly maintained selectivity by pointing to Yale's open spaces, museums, sporting venues, and buildings it owns commercially that are more generally open to the public. *See* Compl. ¶¶ 202-206. But the public accommodations analysis must be focused on the "particular establishment" alleged to be a public accommodation. *Quinnipiac Council*, 528 A.2d at 359. As the Connecticut Supreme Court has explained, "a private university that opens its theater facilities for the entertainment of the general public cannot refuse admission for reasons of race or sex or other grounds made illegal by" the public accommodations law. *Id.* The level of analysis is the specific theater facilities that are open to the general public, not the entire private university. Plaintiffs do not allege that they have been denied access to any Yale facilities open to the general public. Their

---

[16] A court may take judicial notice of "matters of common knowledge." *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (per curiam) (internal quotation marks and citation omitted).

claims have to do with their treatment as students, *see* Compl. ¶¶ 314, 330—and Yale has definitively not eschewed selectivity in being a Yale College student.

Further supporting that Yale is not a place of public accommodation, the Connecticut Commission on Human Rights and Opportunities (CHRO)—which "has authority to interpret statutory law through the adjudication process," *Quinnipiac Council*, 528 A.2d at 356 n.5—has repeatedly determined that even public schools are not places of public accommodation. One CHRO decision explained that "the plain language of the statute reveals that, on its face, the statute does not apply to public schools" because their "educational services . . . are not offered to the 'general public,' " but "only to specific individuals . . . deemed eligible by the town's board of education." *CHRO ex rel. Alston v. East Haven Bd. of Educ.*, CHRO No. 9830205, 2000 WL 35575668, at *2 (CHRO May 3, 2000). As the decision noted, "[i]n states where public accommodations are not specifically defined as including public schools, the courts have uniformly ruled that public schools are not public accommodations." *Id.* at *3; *see also CHRO ex rel. Ballard v. Cheshire Bd. of Educ.*, CHRO No. 9830294, 1999 WL 34765993, at *4-5 (CHRO July 15, 1999) (collecting authorities). In reaching the same conclusion, another CHRO decision explained that "public schools are not 'open to the public' as a public library, restaurant, or other commercial establishment." *Ballard*, 1999 WL 34765993, at *5.

Plaintiffs' attempt to read into Connecticut's public accommodations law a Title IX-style hostile environment claim is at odds with the text of the law and the purpose of public accommodations laws generally. "The purpose of a public accommodations law . . . is to ensure that publicly offered goods and services, such as those offered by a hotel or restaurant, are available to all persons regardless of sex, race, or any other protected characteristic." *Kiwanis Int'l v. Ridgewood Kiwanis Club*, 806 F.2d 468, 471 (3d Cir. 1986). The wording of

25

Connecticut's public accommodations law is precisely in that mold.  *See* Conn. Gen. Stat. § 46a-63(1) (applying only to an establishment that "caters or offers its services or facilities or goods to the general public").  Its language is most plainly read to prevent a restaurant from refusing to serve non-white customers or to prevent a grocery store from excluding women, not to delegate to courts the role of fashioning pervasive regulation of sexual harassment in private institutions of higher education.  Indeed, the Connecticut Supreme Court has explained that the public accommodations law "addresses a discriminatory denial of *access* to goods and services," *Quinnipiac Council*, 528 A.2d at 360 (emphasis altered); it is not a detailed regulation of the *manner* in which services are provided once access is given on a non-discriminatory basis.  Accordingly, the Connecticut Supreme Court has determined that "our General Statutes treat employment discrimination separately from public accommodation discrimination."  *Id.*  Just as Connecticut has refused to stretch its public accommodation statute into a general employment discrimination law, this Court should decline to stretch it into a state version of Title IX.

Therefore, this Court should dismiss Counts VIII and IX for failure to state a claim.

## III.     PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT BECAUSE THEY IDENTIFY NO AGREEMENT YALE HAS BREACHED.

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages."  *Meyers v. Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 87 A.3d 534, 540 (Conn. 2014).  Here, Plaintiffs' allegation that they had an express "agreement" with Yale relies on three documents: Yale's Equal Opportunity Statement, its Undergraduate Regulations, and its Sexual Misconduct Policies.  *See* Compl. ¶¶ 338-342.  Even assuming for purposes of this motion that those

documents constitute an agreement between Yale and Plaintiffs, *cf. Burns v. Quinnipiac Univ.*, 991 A.2d 666, 673-674 (Conn. App. Ct. 2010), Plaintiffs do not plausibly allege any breach.[17]

### A.    Equal Opportunity Statement

The first basis for Plaintiffs' breach-of-contract claim is Yale's Equal Opportunity Statement, *see* Compl. ¶ 338, which provides:

> The University is committed to basing judgments concerning the admission, education, and employment of individuals upon their qualifications and abilities and affirmatively seeks to attract to its faculty, staff, and student body qualified persons of diverse backgrounds. In accordance with this policy and as delineated by federal and Connecticut law, Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression.

Ex. 1 at 1.

The Statement only promises that *Yale* does not discriminate in admissions, educational programs, or employment based on sex (and other characteristics).  Plaintiffs do not allege, however, that Yale itself has discriminated against them in admitting them, offering them educational programs, or employing them.  They allege instead that "Yale permits *Fraternities and their members* to discriminate on the basis of gender," that Yale has failed "to remedy the

---

[17] As a threshold matter, Connecticut courts recognize the principle that "contract claims challenging the overall quality of educational programs have generally been rejected."  *Gupta v. New Britain Gen. Hosp.*, 687 A.2d 111, 119 (Conn.1996) (internal quotation marks and citation omitted).  The only exceptions are where a plaintiff makes "a showing that the educational program failed in some fundamental respect," or where "the educational institution failed to fulfil a *specific* contractual promise."  *Id.* at 120 (emphasis added).  Connecticut courts have extended *Gupta*'s principles to cover school disciplinary decisions. *See Jacobs v. Ethel Walker Sch. Inc.*, No. CV020515279S, 2003 WL 22390051, at *4-5 (Conn. Super. Ct. Sept. 30, 2003); *accord Packer v. Bd. of Educ. of Town of Thomaston*, 717 A.2d 117, 137 (Conn. 1998) (Norcott, J., concurring) ("[C]ourts should exercise caution in interfering with school discipline." (collecting cases)).  Thus, to the extent Plaintiffs' allegations are that Yale has failed to provide an appropriate educational environment or that it made incorrect disciplinary decisions in specific cases, they are not cognizable as breach-of-contract claims under Connecticut law.

hostile environment created *by the Fraternities*," and that Yale "tolerates . . . sexual misconduct

occurring *at the Fraternities*."  Compl. ¶ 343 (emphases added).  Nothing in the Equal

Opportunity Statement promises to control off-campus, unregistered organizations like

fraternities or to exercise control over off-campus, privately owned spaces like fraternity houses.

Although Plaintiffs allege that "Yale's failures . . . deny Plaintiffs . . . the freedom from

discrimination in 'educational programs,' " *id.*, that is a "mere conclusory statement[]."  *Iqbal*,

556 U.S. at 678.  Plaintiffs do not point to any Yale educational program in which the University

has discriminated against them.

       To the extent Plaintiffs are seeking to smuggle federal and state statutory law claims into

their breach-of-contract claim—based on the Equal Opportunity Statement's language that "as

delineated by federal and Connecticut law, Yale does not discriminate"—that is not a separate

claim for breach of contract, but rather, if anything, a claim under those laws.  Where a suit is

"for a breach of duty imposed by law," it is "an action in tort," not in contract.  *Meyers*, 87 A.3d

at 540 (quoting *Gazo v. City of Stamford*, 765 A.2d 505, 515 (Conn. 2001)).  "[P]utting a

contract tag on a tort claim will not change its essential character."  *Gazo*, 765 A.2d at 515.  And

even if the Equal Opportunity Statement could give rise to a separate breach-of-contract claim

based on compliance with federal and state antidiscrimination laws, it would fail because

Plaintiffs have not plausibly pled that Yale has violated those laws.  *See supra* pp. 12-26.

       **B.**    **Undergraduate Regulations**

       The next putative agreement Plaintiffs invoke is Yale's Undergraduate Regulations.  *See*

Compl. ¶ 339.  Plaintiffs use ellipses to omit more than two whole paragraphs, giving a distorted

sense of what the Regulations say.  Plaintiffs cite a section titled "Responsibilities of

Undergraduate Organizations."  Ex. 16, Undergraduate Regulations 2018-2019, at 55.  Its

opening paragraph is clear that it imposes duties *on* organizations, not assumes them *for* Yale:

> Yale University requires that all student organizations—whether registered or unregistered, operating on or off campus—abide by the *Undergraduate Regulations*. Organizations and their officers and members assume responsibilities, including the responsibility to be aware of and abide by the *Undergraduate Regulations*, as set forth in this text and as they may be revised from time to time.

*Id*. at 55-56.

The next paragraph of the Regulations (omitted by Plaintiffs) spells out what happens in the event of a violation:

> A student who is believed to have violated University policy or state or federal law (including but not limited to hazing, sexual misconduct, or theft) in the course of working for or participating in the activities of an undergraduate organization may be brought before the Yale College Executive Committee or the University-Wide Committee on Sexual Misconduct (UWC), as appropriate, for possible disciplinary action, and/or referred to appropriate civil authorities.

*Id.* at 56.  As OCR found, the UWC in fact works in just this way and fulfills Yale's Title IX obligations.  *See* Ex. 5 at 8; *supra* pp. 2-5.  Nowhere in the Complaint do Plaintiffs allege that they brought any specific sexual misconduct to Yale's attention, much less that Yale did not follow its procedure for bringing that misconduct before the UWC.

The rest of that section of the Undergraduate Regulations plainly deals only with *registered* student organizations, not unregistered ones such as the Fraternities.  The next paragraph provides:  "Organizations must fulfill the training requirements set by the Yale College Dean's Office annually. Failure to comply with training requirements will *result in loss of registered status*."  Ex. 16 at 56 (emphasis added).  Tautologically, only a registered organization could be deprived of its registered status.

Only in the next paragraphs of the section, after the shift to a focus on registered organizations, does Plaintiffs' elision end.  Those paragraphs provide that "[s]tudent organizations must operate in accordance with Yale policies on equal opportunity" and that

"[u]ndergraduate organizations must operate on a non-profit basis." *Id.* Like the paragraph that precedes them, these provisions plainly apply only to *registered* undergraduate student organizations. Otherwise, these terms would prohibit Yale students from starting an off-campus business—because such an unregistered organization would not "operate on a non-profit basis." That reading is further supported by an earlier section of the Undergraduate Regulations, which explains that the section on "Undergraduate Organizations" is "particularly relevant to *registered* undergraduate organizations." *Id.* at 47 (emphasis added).

More generally, what Plaintiffs imply from their selective quotation of the Undergraduate Regulations would create absurd results. Under their reading, Yale has made a contractual promise to all students that it will pervasively monitor all off-campus, informal groups of Yale undergraduates to bar them from distinguishing among each other based on any of the protected classifications that Yale itself observes for its academic programs. Under that reading, Yale has, for instance, promised to monitor all its students and to take proactive enforcement action against a group of female students who live together off-campus and put up a posting "looking for a fourth female roommate." Plaintiffs' fellow students would likely be quite surprised to learn that Yale has made such an overbearing contractual guarantee of omnipresent control over their lives.

Instead, the Undergraduate Regulations mean just what they say. Registered organizations must abide by Yale's nondiscrimination policies. Student members of unregistered organizations, like any Yale undergraduate, "may be brought before" the UWC, "as appropriate," if they are "believed to have violated University policy." *Id.* at 56. Plaintiffs do not allege that Yale has repudiated the UWC and that students may not be brought before it for sexual misconduct, so they have not alleged a breach of the Undergraduate Regulations.

30

###### C.      Sexual Misconduct Policies

The last putative "agreement" Plaintiffs point to is Yale's Sexual Misconduct Policies.

*See* Compl. ¶¶ 340-341.  The current version provides, in its entirety:

> Yale University is committed to maintaining and strengthening educational,
> working, and living environments founded on mutual respect in which students,
> faculty, and staff are connected by strong bonds of intellectual dependence and
> trust. Sexual misconduct is antithetical to the standards and ideals of our
> community. Therefore, Yale University prohibits all forms of sexual misconduct.
> Yale aims to eradicate sexual misconduct through education, training, clear
> definitions and policies, and serious consequences for policy violations. The
> University Title IX Coordinator has responsibility for ensuring compliance with
> Yale's policies regarding sexual misconduct. The University-Wide Committee on
> Sexual Misconduct (UWC) and the Title IX coordinators address allegations of
> sexual misconduct.

Ex. 2 at 1; *see* Compl. ¶ 340.  Thus, although the Policies do include the broad statement that

"Yale University prohibits all forms of sexual misconduct,"[18] they also contain precise language

about *how* Yale accomplishes that goal: through "education," "training," "clear definitions and

policies," and "ensuring compliance" through the Title IX coordinators and the UWC.  *Id.*

It is those *specific* terms that govern any contractual obligations that Yale has assumed

through the Sexual Misconduct Policies.  *See Issler v. Issler*, 737 A.2d 383, 390 n.12 (Conn.

1999) ("For generations, it has been well settled that 'the particular language of a contract must

prevail over the general.' " (citation omitted)); Restatement (Second) of Contracts § 203(c)

(1981) ("[S]pecific terms and exact terms are given greater weight than general language.").  In

fact, to the extent Plaintiffs could have brought claims of sexual misconduct to the Title IX

coordinators or UWC and failed to do so, this Court lacks jurisdiction to consider breach-of-

contract claims arising from the Sexual Misconduct Policies because the administrative remedies

---

[18] As Plaintiffs note, *see* Compl. ¶ 341, a prior version of the Sexual Misconduct Policies stated
that "[s]exual misconduct . . . 'will not be tolerated.' "  The only substantive difference between
the two versions, however, is that the "will not be tolerated" language has been replaced with the
more precise "Yale University prohibits all forms of sexual misconduct."

they provide have not been exhausted.  *See Neiman v. Yale Univ.*, 851 A.2d 1165, 1172 (Conn. 2004) (explaining that exhaustion of remedies "applies to the internal grievance processes provided by academic institutions" and "is part of the contractual bargain and defines the rights themselves" (internal quotation marks and citations omitted)).

Plaintiffs do not allege that the UWC or Title IX coordinators are not functioning or that Yale has no education or training on sexual misconduct as its Sexual Misconduct Policies indicate.  Instead, Yale operates as the Policies say.  Plaintiffs may wish that Yale pursued different policies, but that does not make for a breach-of-contract claim.

### D.    Implied Covenant Of Good Faith And Fair Dealing

Recognizing the weakness of a claim based on any express written terms, Plaintiffs invoke the implied covenant of good faith and fair dealing.  But the implied covenant is not a free-floating tort duty.  It is "an implied duty" that "presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term."  *Geysen v. Securitas Sec. Servs. USA, Inc.*, 142 A.3d 227, 237 (Conn. 2016) (internal quotation marks and citation omitted).  Because it is "designed to fulfill the reasonable expectations of the contracting parties," it "cannot be applied to achieve a result contrary to the clearly expressed terms of a contract."  *Id.* at 237 n.11 (quoting *Magnan v. Anaconda Indus., Inc.*, 479 A.2d 781, 786 (Conn. 1984)).  "Stated otherwise, the claim that the covenant has been breached must be tied to *an alleged breach of a specific contract term*."  *Id.* at 237 (citation and alterations omitted and emphasis added).

As a result, Plaintiffs cannot make a freestanding claim of "bad faith"; they must tie any allegation of bad faith to a specific contract term that Yale has supposedly improperly interpreted or applied.  This Court has noted that "Connecticut law requires a breach of contract in order to plead bad faith."  *Hurlburt v. Massachusetts Homeland Ins. Co.*, 310 F. Supp. 3d 333, 345 (D.

Conn. 2018) (collecting cases); *see also Corteau v. Teachers Ins. Co.*, 338 F. Supp. 3d 88, 102

(D. Conn. 2018) ("[T]he failure of the plaintiffs' breach of contract claim dooms their good faith

and fair dealing claim.").  Having not plausibly pled a breach of contract, *see supra* pp. 26-32,

Plaintiffs' claim for breach of the implied covenant of good faith and fair dealing also fails.

The problems with Plaintiffs' claim do not end there.  Even if Plaintiffs *had* plausibly

alleged that Yale had breached some express agreement, they have not plausibly alleged any bad

faith—a required element when asserting breach of the implied covenant of good faith and fair

dealing.  *See Geysen*, 142 A.3d at 237-238.  Bad faith is not "an honest mistake"; it entails

"actual or constructive fraud, or a design to mislead or deceive another," and is motivated by

"some interested or sinister motive."  *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849

A.2d 382, 388 (Conn. 2004) (quoting *Habetz v. Condon*, 618 A.2d 501, 504 (Conn. 1992)).

"Because this is a high bar, the covenant will be breached only in a narrow range of cases."

*Richards v. Direct Energy Servs., LLC*, 915 F.3d 88, 97 (2d Cir. 2019) (internal quotation marks,

citation and alterations omitted).  Far from reaching that high bar, all Plaintiffs allege is that Yale

"turn[ed] a blind eye" to the Fraternities' single-sex membership policies, declined to "tak[e] the

steps necessary to combat" sexual misconduct occurring at the Fraternities, and "maintain[ed] a

'hands off' approach to regulating Fraternities."  Compl. ¶¶ 348-350.  Nothing in those

allegations suggest fraud, nor do Plaintiffs proffer a "sinister motive" for why Yale would seek

to subject its students to unequal treatment or sexual misconduct.  Count XI fails to state a claim.

## IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE CONNECTICUT UNFAIR TRADE PRACTICES ACT.

The Connecticut Unfair Trade Practices Act (CUTPA) provides:  "No person shall

engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct

of any trade or commerce."  Conn. Gen. Stat. § 42-110b(a).  Plaintiffs' CUTPA claim against

Yale rests on essentially two supposed unfair or deceptive practices: that Yale falsely

(1) "represents that the University outlaws discrimination and sexual misconduct," and

(2) "represents that the Fraternities play a minor role in undergraduate social life."  Compl.

¶ 356.  The first is effectively a recapitulation of Plaintiffs' invalid breach-of-contract claim, and

the second lacks the necessary factual basis for falsity or materiality to support a CUTPA claim.

### A.   Plaintiffs' CUTPA Allegations About Yale's Policies Fail Because They Are Redundant With The Invalid Breach-of-Contract Claims.

Plaintiffs' first CUTPA theory relies on the same statements about sexual misconduct in

the same documents underlying their breach-of-contract claim, namely Yale's Equal Opportunity

Statement, Undergraduate Regulations, and Sexual Misconduct Policies.  *See* Compl. ¶¶ 358,

362, 308; *see also id.* ¶¶ 165-166, 168-169, 171, 178, 181.  In alleging that those "policies and

representations do not accurately reflect the University's anti-discrimination practices," *id.* ¶ 359,

Plaintiffs continue to misconstrue those policies as blanket promises that Yale will pervasively

monitor all students at all times in all places to ensure no sexual misconduct takes place.  Instead,

as explained at length above, those policies provide that Yale will not itself discriminate based

on sex and that it will provide a full Title IX process to address complaints of sexual misconduct.

Yale honors those promises, and so for the same reason Plaintiffs have not plausibly alleged that

Yale has breached any contracts with them, *see supra* pp. 26-32, they also have not plausibly

alleged that Yale has deceived them based on those same supposed agreements.

Moreover, even if Plaintiffs *had* adequately alleged that Yale breached a contract by

failing to live up to its nondiscrimination policies, that would not alone support a CUTPA claim.

"[N]ot every contractual breach rises to the level of a CUTPA violation."  *Naples v. Keystone*

*Bldg. & Dev. Corp.*, 990 A.2d 326, 337 (Conn. 2010) (internal quotation marks and citation

omitted); *accord Richards*, 915 F.3d at 102.  Instead, the underlying conduct constituting the

34

breach must itself be "unlawful" or "unethical, unscrupulous, wil[l]ful or reckless." *Naples*, 990

A.2d at 337 (internal quotation marks and citation omitted).  This CUTPA theory thus effectively

relies on the validity of the Title IX claim because Plaintiffs must show not only that Yale

breached its nondiscrimination agreements, but also that Yale's actions were "unlawful" or

"wil[l]ful or reckless" in responding to sexual misconduct—akin to Title IX's "deliberate

indifference" standard.  Because Plaintiffs have failed to plausibly allege Title IX claims, *see

supra* pp. 12-23, that is an independent reason this CUTPA theory fails.

> **B.      Plaintiffs Have Failed To Plausibly Allege That Any Supposed
> Misrepresentations By Yale About The Role Of Fraternities Were A
> Deceptive Trade Practice.**

Plaintiffs' only CUTPA allegation independent of its other claims is the allegation that

Yale "represents that the Fraternities play a minor role in undergraduate social life" when, "in

fact, the Fraternities have a large and influential role."  Compl. ¶ 356.  Plaintiffs' factual

allegations to support this claim of deception are sparse.  They allege vaguely that "Yale's

promotional materials . . . give prospective students the impression that the Fraternities play a

minor part in the campus social life" and somewhat more specifically that "Yale's admissions

office claims that the Greek community comprises approximately 10% of the undergraduate

population," citing a single Instagram post and recounting that one Plaintiff "remembers Yale

citing the 10% statistic to her as a prospective student."  *Id.* ¶ 172.

For a deceptive practice to be actionable under CUTPA, it must satisfy three elements:

"First, there must be a representation, omission, or other practice likely to mislead consumers.

Second, the consumers must interpret the message reasonably under the circumstances.  Third,

the misleading representation, omission, or practice must be material—that is, likely to affect

consumer decisions or conduct."  *Caldor, Inc. v. Heslin*, 577 A.2d 1009, 1013 (Conn. 1990)

(quoting *Figgie Int'l, Inc.*, 107 F.T.C. 313, 374 (1986)).  Plaintiffs' scant allegations fail to plausibly allege any of these elements.

First, Plaintiffs do not plausibly allege that Yale made a representation that was untruthful or misleading in any way relevant to Plaintiffs' allegations.  The only concrete statement by Yale that Plaintiffs cite is an Instagram post saying "about 10% of students participate in Greek life."  Compl. ¶ 172; *see* Ex. 17 (Instagram post).  Plaintiffs assert that was untruthful or misleading because the true number is in fact "at least 18%."  Compl. ¶¶ 173, 359.  For support, Plaintiffs note that the Yale College Council (YCC), the undergraduate student government, reported before the Instagram post that the 10% number is too low because approximately 10% of undergraduates are *sorority* members.  *See* Compl. ¶ 173; Ex. 7 at 2.  That hurts Plaintiffs' claim, by offering at best competing public information from Yale about the exact minority percentage of students affiliated with a fraternity or sorority.

Plaintiffs also note that the YCC survey, conducted before they matriculated and based on a nonrandom sample of 1,800 students (about a third of the undergraduate population) revealed that 38% attended an open fraternity event at least once a month.  *See* Compl. ¶ 173; Ex. 7 at 2-3, 8.  But the Instagram post never offered any concrete statistic from Yale about party attendance.  Ex. 17.  And the percentage of non-random survey respondents who attended fraternity events says nothing about whether Yale made false and misleading representations to Plaintiffs about *membership* in fraternities.  If anything, the YCC survey undermines Plaintiffs' theory of deception by indicating that alternative social avenues are more popular among Yale students than fraternity parties: it revealed that "Yale College students are more likely to regularly attend residential college suite parties than open or closed Greek parties."  Ex. 7 at 4.

36

Second, Plaintiffs surely did not "interpret the message reasonably under the circumstances" if they inferred from the Instagram post or other (undescribed) statements by Yale that no one other than the students affiliated with a fraternity or sorority would ever attend an off-campus party associated with a Greek house or that the Fraternities would have *no* visible presence in campus life. *Caldor*, 577 A.2d at 1013 (internal quotation marks and citation omitted). As the YCC report indicates, fraternity parties are an important social outlet for a significant minority of the undergraduate community, but they are less important than other social spaces. Ex. 7 at 4, 8. That is entirely consistent with Yale's alleged representation that a small minority of students are members of Greek organizations. It would be patently unreasonable for Plaintiffs to assume that their classmates who are members of Greek organizations would never invite other students to attend events together.[19]

Third, Plaintiffs do not plausibly allege that any supposed misrepresentations were "material," i.e. "likely to affect consumer decisions." *Caldor*, 577 A.2d at 1013 (internal quotation marks and citation omitted). The harm that Plaintiffs allege is "fore[going] opportunities to apply to or attend other colleges" and paying Yale "tuition." Compl. ¶ 361; *see also id.* ¶ 363. They must therefore establish that Yale's allegedly underemphasizing the role of fraternities—through an Instagram post saying that 10% of students were fraternity or sorority members, instead of saying that more were members of sororities or that a third of students

---

[19] Plaintiffs point out (at ¶ 174), that Yale's *Review of DKE and Campus Culture: Information Gathered from Students* states that "[s]ome students felt that fraternities are the de facto social environment for many students" and that "[m]any students expressed surprise about discovering this when they arrived at Yale." Ex. 15 at 3. Nothing suggests that this impression from some students in a non-representative sample of only 200 students, *see id.* at 1, is generalizable, and nothing in the Review suggests that Yale made any specific representations during the admissions process. Even if some students felt that "Yale appears to minimize the role of Greek life in its official recruitment and admissions materials," *id.* at 3, that would reflect Yale's (accurate) view that Greek life should not be the motivating reason to attend Yale College.

attend fraternity parties—was "likely to affect" their decision to attend Yale.  For starters, two of

the Plaintiffs matriculated before the Instagram post.  And in any event, Yale offers a world-class

education of such recognized value that it can only admit a small fraction of those who seek

admission.  *See supra* p. 24.  Given the value of a Yale education and the tremendous importance

of the decision of what college to attend, Plaintiffs have not offered sufficient facts to render

plausible the notion that it would have been "likely to affect" their choice as high school seniors

to attend Yale if Yale had slightly reconfigured the way it described the role of Greek life on

campus to refer to a marginally higher minority percentage of the undergraduate population

being in a fraternity or sorority.

      The sweeping implications of Plaintiffs' theory of CUTPA liability shows that it cannot

be what the Connecticut legislature intended.  In Plaintiffs' view, any student who later has a

difference of opinion with how an admissions office social media post or college tour guide

characterized a facet of university life would have a cause of action under CUTPA to recoup a

portion of her tuition.  Such an absurd result would require Connecticut universities to deprive

applicants of useful information by scripting every interaction with prospective students to

include only vague generalities about college life, lest the prospective student's future experience

not align precisely with how the school was represented.  The intended target of CUTPA was

"unscrupulous businessmen," *Larsen Chelsey Realty Co. v. Larsen*, 656 A.2d 1009, 1020 (Conn.

1995) (internal quotation marks and alterations omitted), but Plaintiffs would transform it into a

statute imposing strict liability on a university for any statement, even if true, that future students

later believe gives the wrong impression.  That is not a plausible reading of the statute, and this

Court should reject it.  *See Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 814 (Conn. 1981)

("CUTPA is not designed to afford a remedy for trifles.").  Count XII should be dismissed.

V.    **PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT
      MISREPRESENTATION.**

Plaintiffs' claim of negligent misrepresentation is largely a rehash of their earlier

(deficient) claims.  They again accuse Yale of failing to honor contractual promises it made to

students, *see* Compl. ¶ 368, but that is wrong for the same reasons explained *supra* pp. 26-33.

And they re-assert their Title IX allegations by accusing Yale of being "deliberately indifferent"

to sexual misconduct, Compl. ¶ 371, but Yale has been far from indifferent, *see supra* pp. 16-21.

The only concrete supposed misrepresentation Plaintiffs point to is that "Yale downplays

the role of the Fraternities in its admissions materials" and "claim[s] that only 10% of the student

population is involved in Greek life."  Compl. ¶ 369.  Their negligent misrepresentation claim on

this basis fails for much the same reason as the CUTPA deception claim.  The tort of negligent

misrepresentation requires "that the plaintiff reasonably relied on the misrepresentation."

*Coppola Constr. Co. v. Hoffman Enter. Ltd. P'ship*, 71 A.3d 480, 487 (Conn. 2013).  The

"misrepresentation must consist of a statement of a material past or present fact"; "[s]tatements

of opinion are not actionable" because "opinions, unlike facts, do not purport to be

incontrovertible."  *Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*, 51 F. Supp. 2d 144,

152 (D. Conn. 1999) (internal quotation marks, citation and alterations omitted).  Any subjective

impression Yale conveyed about the "role of the Fraternities" in student life is opinion.  And, as

explained above in discussing the CUTPA claim, the fact relevant to prospective students is that

a relatively small minority of students are members of Greek organizations, which is true even if

the large sororities make the correct number about 18% rather than about 10%.[20]  Plaintiffs have

_____

[20] A negligent misrepresentation must be one "the defendant knew or should have known was
false."  *Coppola Constr.,* 71 A.3d at 487 (internal quotation marks and citation omitted).  Even if
the 10% number is incorrect, Plaintiffs have not alleged that Yale actually knew it was false, nor
why Yale should know precise membership numbers for the unregistered Greek organizations.

not pled sufficient facts to render it plausible that the small difference would be a material fact that would have reasonably driven their decisions to take advantage of Yale's world-class educational opportunities.  *See supra* pp. 37-38.

Three specific characteristics of negligent misrepresentation independently undermine this claim.  *First*, "[a]n actionable misrepresentation . . . must be made for the purpose of inducing action upon it."  *J. Frederick Scholes Agency v. Mitchell*, 464 A.2d 795, 799 (Conn. 1983); *accord* Restatement (Second) of Torts § 552(2)(b) (1977).  Plaintiffs have alleged no plausible reason why Yale—a school which can offer admission to only a small fraction of those who apply, *see supra* p. 24—would misrepresent the role of the Fraternities to purposefully induce Plaintiffs to matriculate under false pretenses.  *Second*, negligent misrepresentation claims premised on fraud or mistake are subject to the heightened pleading requirement of Rule 9(b), requiring a plaintiff to "(1) specify the statement he contends was fraudulent; (2) identify the speaker; (3) identify where and when the statement was made, and (4) explain why the statement was fraudulent."  *Yurevich*, 51 F. Supp. 2d at 152.  Plaintiffs' generalized allegations are a far cry from that level of specificity.  *See* Compl. ¶¶ 369-371.  *Third*, a claim for negligent misrepresentation requires a plaintiff to suffer pecuniary harm.  *Coppola Constr.*, 71 A.3d at 487.  Plaintiffs make a conclusory allegation that they "paid Yale tuition based on Yale's" alleged misrepresentations but do not allege they would have otherwise foregone post-secondary education, nor do they provide specifics about alternative colleges they may have attended or their cost compared to Yale.  They have failed to plausibly allege a pecuniary harm.

Count XIII should be dismissed.

## CONCLUSION

For the foregoing reasons, Yale respectfully requests that this Court dismiss with prejudice all claims against Yale, specifically Counts I, II, VIII, IX, X, XI, XII, and XIII.

DATED this 29th day of May, 2019.

DEFENDANT YALE UNIVERSITY

By: */s/ Jessica L. Ellsworth*
    Jessica L. Ellsworth (*Pro Hac Vice*)
    Benjamin A. Field (*Pro Hac Vice*)
    HOGAN LOVELLS US LLP
    Columbia Square
    555 Thirteenth Street, NW
    Washington, D.C. 20004
    Tel.: (202) 637-5886
    Fax: (202) 637-5910
    Email:  jessica.ellsworth@hoganlovells.com
           benjamin.field@hoganlovells.com


    James M. Sconzo (ct04571)
    Brendan N. Gooley (ct30584)
    CARLTON FIELDS P.C.
    One State Street, Suite 1800
    Hartford, CT 06103
    Tel.:  (860) 392-5000
    Fax.:  (860) 392-5058
    Email:  jsconzo@carltonfields.com
           bgooley@carltonfields.com

    Its Attorneys

## CERTIFICATE OF SERVICE

I certify that on this 29th day of May, 2019, the foregoing was electronically filed

through this Court's CM/ECF system, which will send a notice of filing to all counsel who are

registered users.  Copies of this filing will be sent to the following parties via first class mail:

Wallace H. Campbell & Company, Inc.
6212 York Road
Baltimore, MD 21212

Edward J. Donahue, III
The Municipal & Financial Services Group, LLC
911-A Commerce Road
Annapolis, MD 21401

                                                        /s/ Jessica L. Ellsworth