**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ANNA MCNEIL, ELIANA SINGER, RY WALKER, on behalf of themselves and all others similarly situated, and ENGENDER on behalf of itself and its members** | ) ) ) ) ) | **No. 3:19-cv-00209-VAB** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| **Yale University; Yale Chapter of Alpha Delta Phi International, Inc.; Alpha Epsilon Pi, Epsilon Upsilon; Alpha Kappa Delta of Chi Psi; Delta Kappa Epsilon, Phi Chapter; Leo; Sigma Chi, Theta Upsilon Chapter; Sigma Nu Fraternity Beta Alpha Chapter; Sigma Phi Epsilon, Connecticut Delta Chapter; Zeta Psi, ETA Chapter; Alpha Delta Phi International Inc.; Alpha Epsilon Pi Fraternity, Inc.; Chi Psi Fraternity; Delta Kappa Epsilon Fraternity; Sigma Alpha Epsilon Fraternity; Sigma Chi International Fraternity; Sigma Nu Fraternity, Inc.; Sigma Phi Epsilon Fraternity; Zeta Psi Fraternity, Inc.; Sig Ep Housing of Connecticut Delta LLC; Edward J. Donahue III; 402 Crown LLC; 340 Elm, LLC; Mother Phi Foundation, Inc.; Connecticut Omega of Sigma Alpha Epsilon House Corporation; House Corporation of Sigma Chi at Yale, Inc.; High Street Housing Corporation; ZP Nutmeg Associates Inc.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | **JULY 3, 2019** |

**PLAINTIFFS' OPPOSITION TO DEFENDANT YALE UNIVERSITY'S**
**MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

INTRODUCTION ...............................................................................................................1

FACTUAL BACKGROUND ...............................................................................................3

LEGAL STANDARD..........................................................................................................6

ARGUMENT .....................................................................................................................6

I.      PLAINTIFFS PLAUSIBLY ALLEGE HOSTILE
        ENVIRONMENT CLAIMS UNDER TITLE IX ...................................................6

        A.  Plaintiffs Allege a Plausible Title IX Claim for Damages.................................7

            1.  Plaintiffs allege that harassment took place in
                contexts subject to Yale's control ..........................................................8

            2.  Senior University officials had actual knowledge of
                the hostile environment..........................................................................10

            3.  Yale officials acted with deliberate indifference to
                the hostile environment..........................................................................12

            4.  Plaintiffs adequately allege a hostile environment at
                Yale ......................................................................................................15

        B.  Plaintiffs State A Viable Claim for Injunctive Relief .........................................18

            1.  Injunctive relief claims do not require "deliberate
                indifference" ...........................................................................................18

            2.  Plaintiffs' claims easily survive the lesser "knew or
                should have known" standard ..................................................................20

II.     IN COUNT II, PLAINTIFFS PLAUSIBLY ALLEGE THAT
        YALE HAS DENIED THEM EQUAL SOCIAL AND
        ECONOMIC OPPORTUNITIES AS THEIR MALE PEERS ................................20

III.    PLAINTIFFS ADEQUATELY STATE PUBLIC
        ACCOMMODATIONS CLAIMS UNDER CONNECTICUT
        LAW ......................................................................................................................23

A.  Plaintiffs Plausibly Allege that Yale is a Public
Accommodation ......................................................................23

B.  Hostile Environment Claims are Available Under Public
Accommodation Statutes .......................................................25

IV.    PLAINTIFFS STATE A CLAIM FOR BREACH OF
CONTRACTS.................................................................................27

A.  Plaintiffs Plausibly Allege that Yale Has Assumed
Contractual Duties to its Students ........................................27

B.  Plaintiffs Plausibly Alleged that Yale Breached these
Obligations ............................................................................30

C.  Plaintiffs State a Claim for Breach of the Covenant of Good
Faith and Fair Dealing .........................................................35

V.     PLAINTIFFS STATE AN UNFAIR TRADE PRACTICES
CLAIM...........................................................................................37

A.  Plaintiffs' Complaint Satisfies the Unfairness Standard at
the Pleadings Stage ...............................................................38

B.  Plaintiffs also Plausibly Plead a Deceptive Practices Claim ..............................40

VI.    PLAINTIFFS PLAUSIBLY PLEAD A CLAIM OF
NEGLIGENT MISREPRESENTATION ...................................43

CONCLUSION.................................................................................45

## TABLE OF AUTHORITIES

**CASES:**

*Alexandru v. Strong*,
    837 A.2d 875 (Conn. App. Ct. 2004) ............................................................................. 35

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ............................................................................................................ 6

*Bartold v. Wells Fargo Bank, N.A.*,
    No. 14-cv-00865, 2015 WL 7458504 (D. Conn. Nov. 24, 2015) ............................................. 39

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................ 6

*Biediger v. Quinnipiac Univ.*,
    691 F.3d 85 (2d Cir. 2012) .................................................................................................. 23

*Blackwell v. Mahmood*,
    992 A.2d 1219 (Conn. 2010) ............................................................................................... 38

*Burns v. Quinnipiac Univ.*,
    991 A.2d 666 (Conn. App. 2010) ......................................................................................... 27

*Caldor, Inc. v. Heslin*,
    577 A.2d 1009 (Conn. 1990) ............................................................................................... 40

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979) ...................................................................................................... 2, 18

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002) ............................................................................................... 11

*Chem-Tek, Inc. v. General Motors Corp.*,
    816 F. Supp. 123 (D. Conn. 1993) ...................................................................................... 27

*City of Ansonia v. Stanley*,
    854 A.2d 101 (Conn. Super. Ct. 2004) ................................................................................. 39

*Colombo v. Bd. of Educ. for the Clifton Sch. Dist.*,
    No. 11-CV-785, 2016 WL 6471013 (D.N.J. Oct. 31, 2016) .................................................... 26

*D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.*,
    520 A.2d 217 (Conn. 1987) ....................................................................... 43

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
    526 U.S. 629 (1999) ....................................................................... passim

*Day v. Yale Univ. Sch. of Drama*,
    No. CV 970400876S, 2000 WL 295612 (Conn. Super. Ct. Mar. 7, 2000) ........................ 38, 40

*Demoulas v. Quinnipiac Univ.*,
    No. CV155006283S, 2015 WL 1427951 (Conn. Super. Ct. Mar. 5, 2015) ........................ 29

*Doe 12 v. Baylor Univ.*,
    336 F. Supp. 3d 763, 781 (W.D. Tex. 2018) .......................................................... 10

*Doe v. E. Haven Bd. of Educ.*,
    200 F. App'x 46 (2d Cir. 2006) ........................................................................ 18

*Doe v. Schwerzler*,
    No. CIV A 06-3529, 2008 WL 4066338 (D.N.J. Aug. 27, 2008) ................................. 26

*Doe v. Univ. of Tenn.*,
    186 F. Supp. 3d 788 (M.D. Tenn. 2016) .............................................................. 14

*Duch v. Jakubek*,
    588 F.3d 757 (2d Cir. 2009) ........................................................................... 31

*E & F Construction Co. v. Rissil Construction Assocs., Inc.*,
    435 A.2d 343 (Conn. 1980) ............................................................................. 28

*Farmer v. Kansas State Univ.*,
    No. 16-CV-2256, 2017 WL 980460 (D. Kan. Mar. 14, 2017) .................................... 10

*Feliciano v. Autozone, Inc.*,
    111 A.3d 453 (Conn. 2015) ............................................................................. 26

*Frank v. Ivy Club*,
    576 A.2d 241 (N.J. 1990) ............................................................................... 25

*Gebser v. Lago Vista Indep. Sch. Dist.*,
    524 U.S. 274 (1998) ....................................................................... passim

*Greene v. Orsini*,
  926 A.2d 708 (Conn. Super. Ct. 2007) ................................................................. 38

*Guardians Ass'n v. Civil Serv. Comm'n of City of New York*,
  463 U.S. 582 (1983) ................................................................................................. 19

*Gupta v. New Britain General Hosp.*,
  687 A.2d 111 (Conn. 1996) ..................................................................................... 27

*Hayut v. State Univ. of N.Y.*,
  352 F.3d 733 (2d Cir. 2003) ............................................................... 16, 17, 18, 20

*Hernandez v. Baylor Univ.*,
  274 F. Supp. 3d 602 (W.D. Tex. 2017) ................................................................. 14

*Hinchliffe v. Am. Motors Corp.*,
  471 A.2d 980 (Conn. Super. Ct. 1982) ................................................................. 39

*Hoskins v. Titan Value Equities Group, Inc.*,
  749 A.2d 1144 (Conn. 2000) ................................................................................... 35

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005) ................................................................................................. 21

*Johnson v. Schmitz*,
  119 F. Supp. 2d 90 (D. Conn. 2000) ............................................................... 29, 32

*Lamotte v. Lamotte Landscaping, LLC*,
  No. FSTCV075003090, 2009 WL 2872799 (Conn. Super. Ct. Aug. 5, 2009) ........................ 38

*Landry v. Spitz*,
  925 A.2d 334 (Conn. App. 2007) ........................................................................... 36

*Langan v. Johnson & Johnson Consumer Cos., Inc.*,
  95 F. Supp. 3d 284 (D. Conn. 2015) ..................................................................... 38

*Longen v. Fed. Express Corp.*,
  113 F. Supp. 2d 1367 (D. Minn. 2000) ................................................................. 26

*Morris v. Yale Univ. Sch. of Med.*,
  No. 05CV848, 2006 WL 908155 (D. Conn. Apr. 4, 2006) ................................... 30

v

*Muniz v. Kravis,*
  757 A.2d 1207 (Conn. App. Ct. 2000) ....................................................................... 40

*Nazami v. Patrons Mut. Ins. Co.,*
  910 A.2d 209 (Conn. 2006) ........................................................................................ 43

*North Haven Bd. of Ed. v. Bell,*
  456 U.S. 512 (1982) .................................................................................................. 21

*Omega Eng'g, Inc. v. Eastman Kodak Co.,*
  908 F. Supp. 1084 (D. Conn. 1995) ..................................................................... 1, 44

*Osberg v. Yale Univ.,*
  No. CV085021879S, 2009 WL 659072 (Conn. Super. Ct. Feb. 11, 2009) ............... 30

*Ostrander v. Duggan,*
  341 F.3d 745 (8th Cir. 2003) .................................................................................... 14

*Pani v. Empire Blue Cross Blue Shield,*
  152 F.3d 67 (2d Cir. 1998) ....................................................................................... 11

*Pollock v. Panjabi,*
  781 A.2d 518 (Conn. Super. Ct. 2000) ..................................................................... 38

*PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.,*
  838 A.2d 135 (Conn. 2004) ................................................................................. 28, 29

*Quinnipiac Council, Boy Scouts of Am., Inc. v. Comm'n on Human Rights & Opportunities,*
  528 A.2d 352 (Conn. 1987) .......................................................................... 3, 24, 25, 26

*Ramsey v. Network Installation Servs., Inc.,*
  No. 3:08-CV-00259, 2008 WL 4447091 (D. Conn. Sept. 3, 2008) .......................... 26

*Retrofit Partners I, L.P., v. Lucas Indus. Inc.,*
  47 F. Supp. 2d 256 (D. Conn. 1999) ........................................................................ 38

*Roe v. St. Louis Univ.,*
  746 F.3d 874 (8th Cir. 2014) .................................................................................... 14

*Roth v. Jennings,*
  489 F.3d 499 (2d Cir. 2007) ................................................................................. 11, 24

*Sartor v. Town of Manchester,*
  312 F. Supp. 2d 238 (D. Conn. 2004) ................................................. 32

*Sawka v. ADP, Inc.,*
  No. 3:13-CV-754, 2015 WL 5708571 (D. Conn. Sept. 29, 2015) ........................................ 26

*Simpson v. Univ. of Colorado Boulder,*
  500 F.3d 1170 (10th Cir. 2007) ................................................. 13

*State ex rel. Washington Univ. v. Richardson,*
  396 S.W.3d 387 (Mo. App. 2013) ................................................. 25

*Sweatt v. Painter,*
  339 U.S. 629 (1950) ................................................. 22

*Thibodeau v. Design Grp. One Architects, LLC,*
  802 A.2d 731 (Conn. 2002) ................................................. 38

*Tubbs v. Stony Brook Univ.,*
  No. 15 CIV. 0517, 2016 WL 8650463 (S.D.N.Y. Mar. 4, 2016) ........................................ 11

*Tyson Roller Bearing, Inc. v. Accuride Corp.,*
  No. X3CV065009721S, 2008 WL 2168916 (Conn. Super. Ct. May 7, 2008) ........................ 38

*U.S. v. Elton,*
  429 F. Supp. 2d 561 (E.D.N.Y. 2006) ................................................. 20

*U.S. v. Virginia,*
  518 U.S. 515 (1996) ................................................. 22

*Vellali v. Yale Univ.,*
  308 F. Supp. 3d 673 (D. Conn. 2018) ................................................. 6

*Wetzel v. Glen St. Andrew Living Cmty., LLC,*
  901 F.3d 856 (7th Cir. 2018) ................................................. 31

*Wilkins v. Yale Univ.,*
  No. CV106014646S, 2011 WL 1087144 (Conn. Super Ct. Feb. 25, 2011) ...................... 39, 41

*Williams Ford, Inc. v. Hartford Courant Co.,*
  657 A.2d 212 (Conn. 1995) ................................................. 45

*Woodling v. Garrett Corp.*,
   813 F.2d 543 (2d Cir.1987) ................................................................................ 43

*Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*,
   51 F. Supp. 2d 144 (D. Conn. 1999) ................................................................. 44

*Zamora v. N. Salem Cent. Sch. Dist.*,
   414 F. Supp. 2d 418 (S.D.N.Y. 2006) ................................................................ 11

*Zeno v. Pine Plains Cent. Sch. Dist.*,
   702 F.3d 655 (2d Cir. 2012) ............................................................... 12, 13, 15, 18

## STATUTES:

20 U.S.C. § 1681(a) ............................................................................................. 6, 20

42 U.S.C. § 1983 ....................................................................................................... 13

Conn. Gen. Stat. § 46a-63 ............................................................................. 23, 24, 25

Conn. Gen. Stat. § 46a-64 ............................................................................... 2, 23, 25

Conn. Gen. Stat. §§ 42-110a *et seq.* ................................................................... 3, 37

## OTHER AUTHORITIES:

Civil Rights Div., U.S. Dep't of Justice, Title VI Manual VI.C.3 – Intentional Discrimination by
   a Third Party, 2017 WL 1712157 ................................................................... 19, 31

Merriam-Webster,
   https://www.merriam-webster.com/dictionary/establishment (last visited July 3, 2019) ......... 24

Office for Civil Rights, Dep't of Educ., Revised Sexual Harassment Guidance: Harassment of
   Students by School Employees, Other Students, or Third Parties ................................... passim

Restatement (Second) of Contracts § 203(a) (1981) ...................................................... 34

**RULES:**

24 C.F.R. § 100.7(a)(1)(iii) ........................................................................................... 31

83 FR 61462-01, 61466-67 (proposed Nov. 29, 2018) ................................................. 20

Fed. R. Civ. P. 9(b) ...................................................................................................... 45

**INTRODUCTION**

Defendant Yale University has shirked its obligations to protect students from sexual misconduct and gender discrimination. Over a third of female undergraduates (38.8%) suffer sexual assault while at Yale. Almost three quarters (74%) suffer sexual harassment. Amended Complaint ("AC") ¶¶ 86, 327. Incident after incident (in 2008, 2009, 2010, 2014, 2015, 2018) and report after report (in 2011, 2012, 2015, 2016, 2019) have pointed to the fraternities' outsized role in Yale's alarming rate of sexual misconduct. *Id.* ¶¶ 61-103. Fraternities are Yale's "de facto social environment for many students"; yet, because the University has long abdicated its role in policing their behavior, "[m]any Yale students now accept and assume that female undergraduates risk sexual harassment and assault by attending fraternity events." *Id.* ¶ 4. For years, students have blown the whistle, and described the hostile fraternity environment in an extensive body of op-eds, college news articles, campus forums, and formal and informal Title IX complaints. *Id.* ¶¶ 83-84, 101.

Still, Yale stands idly by. Yale has only twice imposed sanctions on fraternities, both times acknowledging that they were ineffective. The Yale administration has repeatedly rebuffed calls for greater regulation of Greek life. *E.g.* AC ¶¶ 13-14, 68, 79-81, 99-103, 170-71, 184. Worse yet, in an attempt to pass the buck, Yale has outsourced liability for student misconduct. Yale intentionally phased out many campus social events—ceding those activities to the fraternities while refusing to regulate Greek life or enforce safety standards. In late 2018, after Plaintiffs filed discrimination complaints with the Connecticut Commission for Human Rights and Opportunities ("CHRO"), Yale still further reduced its ability to supervise fraternities by ending a six-year-old policy that required fraternities to register their parties with the University. *Id.* ¶ 100. Ultimately,

in this Faustian bargain, Yale has washed its hands, given the fraternities free rein, and turned a blind eye to sexual misconduct.

Not only does the status quo put female students at risk, but it also privileges Yale's men at the expense of their female classmates. Yale men join prestigious boys' clubs (the fraternities), some of which predate the Civil War. In addition to controlling Yale's social spaces, fraternity brothers gain instant access to vast, nationwide alumni networks; these powerful connections generate coveted job and career opportunities. Women and non-binary students are shut out.

By burying its head in the sand, Yale hopes to evade its obligations to protect its female students. But the law prohibits this artifice. Forty years ago, the Supreme Court held that Title IX supports private actions for injunctive relief to correct discriminatory educational practices. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979). And over twenty years ago, the Court attached monetary liability in situations in which schools are deliberately indifferent to known acts of harassment. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

Plaintiffs seek to vindicate these rights. Plaintiffs Anna McNeil, Eliana Singer and Ry Walker each suffered sexual assault at Yale fraternity events. In an effort to reform Yale's Greek life, these Plaintiffs and other members of Plaintiff Engender (a student organization) repeatedly attempted to join the fraternities—only to be repeatedly rejected because of their gender. Plaintiffs complained to Yale's most senior officials about the hostile environment and about the fraternities' openly discriminatory practices. Yet they got no traction from Yale. Senior administrators effectively told them the University would not act to address the fraternities' conduct, even though the fraternities are comprised of Yale students.

In so doing, Yale not only violated Title IX, but also contravened state law that bars discrimination in places of public accommodation, Conn. Gen. Stat. § 46a-64. Yale, furthermore,

breached its contract with students, a contract which promised equal opportunity irrespective of gender and that sexual misconduct "will not be tolerated." Since Yale intentionally evaded these obligations, it likewise breached the implied covenant of good faith and fair dealing. Finally, by making misrepresentations about Greek life and its commitments towards female students, Yale ran afoul of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. §§ 42-110a *et seq.*, and committed the tort of negligent misrepresentation.

Yale's arguments to the contrary fall flat. On the Title IX claims, Yale simultaneously states that it "has no direct control" over the fraternities *and* has a supposedly "long record of responding to complaints of fraternity-related conduct." Dkt. No. 71 ("Mot.") at 3, 21. Not only are these positions inherently in tension, but the complaint alleges just the opposite: Yale *can* control the fraternities, but has repeatedly refused to do so. Nor can Yale evade the reach of the public accommodations statute. Whether Yale is a public accommodation "is a question not of law but of fact" that cannot be resolved at this stage of litigation. *Quinnipiac Council, Boy Scouts of Am., Inc. v. Comm'n on Human Rights & Opportunities*, 528 A.2d 352, 359 (Conn. 1987). Yale also elides the plain language of the statute and the myriad ways the University opens its doors to the public. Yale's contract arguments are likewise unavailing and rest on implausibly narrow interpretations of Yale policies. As for CUTPA and negligent misrepresentation, Yale's cursory arguments ignore Plaintiffs' allegations. Thus, the Court should deny Yale's Motion to Dismiss.

## FACTUAL BACKGROUND

As detailed in the Amended Complaint, Plaintiffs Anna McNeil, Eliana Singer, Ry Walker and other Engender members matriculated at Yale with the understanding that the University would provide them with an educational environment free of "discriminat[ion] . . . against any individual on account of that individual's sex." Yale also claimed that "sexual misconduct" was

"antithetical to the standards and ideals of our community." AC ¶ 1. But when Plaintiffs arrived at Yale as first-year students, they were faced with a thriving all-male fraternity scene that dominates students' social life and regularly subjects female students to sexual misconduct. *Id.* ¶ 2.

Plaintiffs McNeil, Singer, and Walker were all groped at fraternity parties during their first semesters at Yale. *Id.* at ¶¶ 3-4, 105, 107, 110, 115. They know of other female and non-binary students (including members of Engender) who have suffered sexual harassment and assault committed during fraternity parties, after fraternity parties, and by fraternity members. *Id.* at ¶ 4, 105, 109-11, 114, 116. The risk of being sexually assaulted or harassed at Yale fraternity events is so high that many female students—including Plaintiffs McNeil, Singer, and Walker—no longer feel comfortable attending fraternity parties. *Id.* at ¶¶ 4, 117.

The hostile environment that greeted Plaintiffs at Yale fraternities has thrived for well over a decade. In 2008, pledges of Zeta Psi posed for a photograph outside the Yale Women's Center with a sign proclaiming, "We Love Yale Sluts." *Id.* ¶ 62. In 2010, pledges of Delta Kappa Epsilon ("DKE") paraded around campus chanting, "No means yes! Yes means anal!" *Id.* ¶ 64. In 2011, a group of Yale students filed a Title IX complaint with the Department of Education's Office of Civil Rights (OCR) accusing Yale of being deliberately indifferent to a hostile environment for women; despite a Voluntary Resolution Agreement in 2012, the sexual misconduct continued. *Id.* ¶¶ 65-74. In 2014, another Yale student filed a complaint against Yale's chapter of Defendant Sigma Alpha Epsilon ("SAE") for sexual harassment. *Id.* ¶ 76. In 2015, SAE turned away women of color at a party because it wanted "white girls only." *Id.* ¶ 82. And, in 2018, ten additional women alleged that they were assaulted by members of DKE. *Id.* ¶ 94.

Not only do the Fraternities control the social scene at Yale, they also offer their members economic and social opportunities that female and gender non-binary students cannot access, including coveted job offers, alumni contacts, and prime off-campus housing. *Id.* at ¶¶ 7, 122.

In the fall of 2016, Plaintiffs McNeil, Walker, and other students founded Engender to promote the values of equity and inclusion at Yale. *Id.* ¶¶ 10, 28. Plaintiffs and their colleagues in Engender believe that Yale's fraternities disproportionately contribute to the high levels of gender inequality, sexual harassment, and sexual assault on and around Yale's campus. *Id.* ¶ 126. To combat sexual harassment and to take advantage of the social and economic opportunities fraternities offer to Yale men, Engender has dedicated itself to integrating Yale's fraternities by gender. *Id.* ¶¶ 10-11, 128, 135-36, 141. In three consecutive years, Plaintiffs McNeil and Walker were denied membership to the fraternities, and on each occasion, the fraternities explicitly cited Plaintiffs' gender. *Id*. at ¶¶ 11, 128, 130, 136, 138-43. Plaintiff Singer was effectively denied admission in two consecutive years for the same discriminatory reason. *Id.*

Despite knowing about the discrimination and rampant sexual misconduct perpetrated by Yale fraternities, the University has done little to correct it. As described in the Complaint, Yale has the authority to control and discipline fraternities and their members: it allows fraternities to use Yale resources and recruit Yale students, and the school's *Undergraduates Regulation* apply to fraternities and their members. *Id.* ¶¶ 166, 171, 191, 207-09. But instead of exercising its control to end the fraternities' discriminatory admissions policies and curb sexual assault on female students, Yale turns a blind eye. Time and again, Yale imposed negligible "sanctions" against fraternities; failed to implement recommendations made to or by the University; and ignored student complaints. *Id.* ¶¶ 61-101, 182-92. This "hands off" approach is perhaps best exemplified by Yale's most recent attempt to distance itself from its fraternities: in February 2018, Yale

appointed the Deputy Title IX Coordinator to conduct a review of the hostile sexual environments within student groups, but *before* completing the review, Yale ended a six-year-old policy that required students to register off-campus fraternity events with Yale administrators. *Id.* ¶¶ 96-100.

Plaintiffs have repeatedly petitioned Yale to intervene on their behalf and end the discriminatory admission practices and hostile environment of the fraternities. *Id.* ¶¶ 12, 182-92. But Yale has deliberately failed to take meaningful steps in response to their complaints. *Id.*

## LEGAL STANDARD

"[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "The issue on a motion to dismiss is not whether the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." *Vellali v. Yale Univ.*, 308 F. Supp. 3d 673, 682 (D. Conn. 2018) (citation omitted).

## ARGUMENT

## I.   PLAINTIFFS PLAUSIBLY ALLEGE HOSTILE ENVIRONMENT CLAIMS UNDER TITLE IX

Title IX's broad prohibition on sex-based discrimination provides: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Sexual harassment, including "student-on-student" harassment, "is a form of discrimination for Title IX purposes." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649-50 (1999). Title IX supports private actions for money damages where a covered institution "acts with deliberate indifference to known acts of harassment in its programs or

6

activities." *Id.* at 633. And injunctive relief is proper if the school merely "knows or reasonably should know" about a hostile environment. Office for Civil Rights, Dep't of Educ., Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (hereinafter "2001 Guidance") at 12;[1] *see id.* at iv n.2 ("It is the position of the United States that the standards set out in OCR's guidance for finding a violation and seeking voluntary corrective action also would apply to private actions for injunctive and other equitable relief.").

Here, Plaintiffs adequately allege claims for monetary damages and injunctive relief.

### A. Plaintiffs Allege a Plausible Title IX Claim for Damages

Title IX's "deliberate indifference" paradigm consists of four elements. First, "the harassment must take place in a context subject to the school district's control"—*i.e.*, where "the harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 645, 647. Second, appropriate school officials must have "actual knowledge of discrimination in the recipient's programs." *Gebser*, 524 U.S. at 290. Third, the school must respond with "deliberate indifference" to the known acts of discrimination. *Id.* Finally, the harassment at issue must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633.

Here, Plaintiffs allege that Yale's most senior officials have known—for over a decade— that the school's fraternities perpetrate alarming rates of sexual harassment and assault. AC ¶¶ 61-103. Yale has the authority to control and discipline the fraternities and their members, *e.g.*, AC ¶¶ 64, 76, 93, 100, 166; yet, it has refused to adequately regulate them and failed to prevent further acts of misconduct, *id.* ¶¶ 68, 92, 99. Indeed, the former Dean of Yale College has admitted that

---

[1] *Available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.html.

Yale's past sanctions against fraternities were ineffective and that the University has failed to adopt a coherent approach to regulating fraternities. *Id.* ¶¶ 78, 102. Plaintiffs are direct victims of these profound failures. Because of Yale's protracted course of inaction, Plaintiffs McNeil, Singer, and Walker, along with other Engender members, were subjected to sexual assaults and harassment at fraternity events or at the hands of fraternity brothers. *Id.* ¶¶ 104-17. Plaintiffs have suffered a disparately hostile environment based on their gender and no longer feel comfortable attending fraternity events, which are principal venues for social interaction at Yale. *Id.* ¶ 117.

## 1. Plaintiffs allege that harassment took place in contexts subject to Yale's control

Schools must respond to known sexual harassment if they have "substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645. "Substantial control" exists where schools have the power to make "regulation[s]," give "guidance or instruction" or impose their "authority, direction, and supervision." *Id.* (quoting Webster's Third New International Dictionary of the English Language 2487 (1961) and Random House Dictionary of the English Language 1543 (1966)). In cases of student-on-student sexual harassment, this standard is satisfied when "the harasser is under the school's disciplinary authority." *Davis*, 526 U.S. at 646-47.

Fraternities are "a context subject to [Yale's] control," *id.* at 645, because they are "under the school's disciplinary authority," *id.* at 647. Yale fraternity chapters are principally composed of Yale students and are "undergraduate organizations" within the meaning of governing Yale regulations. Mot. Ex. 16 at 55 ("Any group in which a majority of participants are undergraduates is considered to be an undergraduate organization."). Therefore, they must "abide by the *Undergraduate Regulations*," *id.* at 55, and their events "must comply" with those regulations, *see*

*id.* at 49.[2] As Yale readily admits, it has twice (ineffectively) "banned" fraternities for engaging in sexual misconduct in violation of the *Undergraduate Regulations*. Mot. at 5-6, 8; *see also* AC ¶¶ 64, 77-83. Yale also permits fraternities to use the Yale name, Yale email addresses, Yale bulletin boards, and campus facilities for recruitment. AC ¶ 208. Furthermore, for six years between September 2012 and September 2018, Yale required undergraduates to register off-campus parties attended by more than fifty people (i.e. a fraternity party). *Id.* ¶¶ 100, 208. Under the former policy, the Dean's Office, Residential Colleges, and the Yale Police were aware of— and exercised jurisdiction over—almost all of the fraternities' parties or events. *Id.*[3]

As Yale students, fraternity members are also clearly "under the school's disciplinary authority"—a fact that senior administrators admit. *Davis*, 526 U.S. at 647; *e.g.* AC ¶¶ 171, 191. Indeed, at least on paper, Yale prohibits fraternity members from engaging in sexual misconduct, regardless of where that misconduct occurs. *See e.g.*, AC ¶ 171; Yale Mot. Ex. 16 (defining prohibited "sexual harassment" as unwelcomed sexual conduct occurring "on *or* off campus.") (emphasis added); *id.* at 69 ("Conduct occurring off campus is a violation of these regulations if the conduct, had it occurred on campus, would be a violation of . . . [Yale's policy on] 'Sexual misconduct, including sexual harassment.'"). Even in its Motion, Yale claims it has a "long record" of "punishing individual students accused of misconduct." Mot. at 21.

Nevertheless, Yale disclaims control over the fraternities because it says, they are "organized independently of Yale and own their own property." Mot. at 16. But that argument is

---

[2] In its Voluntary Resolution Agreement with the Department of Education, Yale also "committed to strengthening students' understanding, through education and enforcement, that they are subject to the *Undergraduate Regulations* both on and off campus." AC ¶ 69.

[3] Notably, Yale only abandoned this policy *after* the Plaintiffs filed discrimination complaints with the CHRO in July 2018. This sequence of events supports an inference that Yale simply sought to disclaim its fraternities for litigation purposes.

pretextual and falls flat. "[N]othing in *Davis* requires an alleged assault to occur on campus in order for a defendant university to have 'substantial control.'" *Doe 12 v. Baylor Univ.*, 336 F. Supp. 3d 763, 781 (W.D. Tex. 2018) (citation omitted); *see also Farmer v. Kansas State Univ.*, No. 16-CV-2256, 2017 WL 980460, at *9 (D. Kan. Mar. 14, 2017) (finding that university plausibly had control over off-campus fraternity house in light of its alleged authority to regulate the fraternity and punish misconduct occurring at fraternity events). Yale asserts sweeping authority to regulate fraternities, fraternity events, and fraternity members, irrespective of whether the fraternities are organized independently or own their own property. Plaintiffs' allegations—and Yale's own exhibits—raise a plausible inference that Yale "exercises substantial control over both the harasser and the context in which the known harassment occurs." *Davis*, 526 U.S. at 645.

## 2. Senior University officials had actual knowledge of the hostile environment

Plaintiffs plausibly allege—and Yale does not dispute—that appropriate University officials had "actual knowledge" of the hostile environment at Yale. *Gebser*, 524 U.S. at 290. For over a decade, numerous incidents of fraternity-related sexual harassment and assault have come to public light, including the 2008 Zeta Psi "We Love Yale Sluts" photograph; the 2010 DKE "No Mean Yes!" chant; the 2015 SAE "white girls only" party; and the 2018 reports in *Business Insider* and *Yale Daily News* that ten women suffered sexual misconduct at the hands of DKE brothers. AC ¶¶ 61-64, 82, 94-95. Over the same time period, Yale has regularly received warnings about the dangerous influence of fraternities on campus life, including in reports issued in 2011, 2012, 2013, 2015, 2016, and 2019. *Id.* ¶¶ 66-67, 70, 73, 85, 97-99.

As if these reports were not enough to raise red flags, Yale students have published an extensive body of op-eds and college news reports on sexual misconduct at Yale's fraternities, AC ¶¶ 84, 101; Yale administrators have attended forums on campus about sexual misconduct, *id.*

¶¶ 83, 101; and Yale has received formal and informal Title IX complaints concerning sexual misconduct at fraternities, *id.* ¶¶ 101. Moreover, Plaintiffs made specific complaints to Yale administrators, including President Peter Salovey, Yale College Dean Marvin Chun, Associate Dean Burgwell Howard, Associate Dean Camille Lizaribar, and Deputy Title IX Coordinator Jason Killheffer in emails and in-person meetings between August 2017 and April 2018. *Id.* ¶¶ 182-92.[4]

Accordingly, Plaintiffs' allegations raise a plausible inference that Yale officials with "authority to address the alleged discrimination" had "actual knowledge" of the hostile environment. *Gebser*, 524 U.S. at 290; *see Tubbs v. Stony Brook Univ.*, No. 15 CIV. 0517, 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016) (collecting cases; finding "actual knowledge" where there was "actual knowledge of sexual assault(s) committed in a particular context or program or by a particular perpetrator or perpetrators"); *see also Zamora v. N. Salem Cent. Sch. Dist.*, 414 F. Supp. 2d 418, 424 (S.D.N.Y. 2006) (holding that the actual knowledge standard may be satisfied by knowledge of a "substantial risk of serious harm" where there have been multiple prior allegations of the same or similar conduct that is at issue). *Cf. Davis*, 526 U.S. at 650-51 (noting that deliberate indifference to male students preventing female students from "using a particular

---

[4] Yale impermissibly seeks to introduce a December 18, 2017 letter from OCR that allegedly closed OCR's monitoring of Yale under the Voluntary Resolution Agreement. *See* Mot. at 3, 18 n. 13; Mot. at Ex. 6. Because Plaintiffs did not reference the document in their Complaint, nor attach it as an exhibit, it is extrinsic to the pleadings and should be stricken. *See, e.g.*, *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 71 (2d Cir. 1998) (explaining that on a 12(b)(6) motion, the court is generally confined to "the allegations contained within the four corners of [the] complaint"); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) ("Consideration of extraneous material in judging the sufficiency of a complaint is at odds with the liberal pleading standard of [Rule] 8(a)(2)."). To the extent Yale asks the Court to take judicial notice of the document, it cannot do so "for the truth of matters asserted [therein]." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citations omitted). Likewise, Yale's attempt to deflect blame by pointing to other universities that have been investigated by OCR must be disregarded. *See* Mot. at 4 n.4. Not only is the list of OCR investigations extrinsic and therefore improper, but it is also irrelevant. Plaintiffs' Complaint is about Yale.

school resource" [*i.e.*, harassment in a particular context] is the "most obvious example" of a violation).

### 3. Yale officials acted with deliberate indifference to the hostile environment

"A finding of deliberate indifference depends on the adequacy of a school['s] response to the harassment." *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 666 (2d Cir. 2012). A school's response will be inadequate where it is "clearly unreasonable in light of the known circumstances," including where a school: (1) "fail[s] to respond" to the alleged harassment; (2) responds only "after a lengthy and unjustified delay," *or* (3) otherwise responds in a manner that "amount[s] to deliberate indifference to discrimination." *Id.* (citation omitted). At bottom, "[r]esponses that are not reasonably calculated to end harassment are inadequate." *Id.* at 669 (citations omitted).

Here, despite the decade-long history of fraternity-related misconduct, Yale has failed to take action "reasonably calculated to end" the hostile environment associated with the fraternities. *Id.* To the contrary, Yale has intentionally taken a *laissez faire* approach and repeatedly rebuffed recommendations to regulate fraternities in response to their history of sexual misconduct. *E.g.* AC ¶¶ 13-14, 68, 79-81, 99-103, 170-71, 184. In 2011, Yale President Richard Levin explicitly rejected the recommendations of Yale's own Advisory Committee on Campus Climate to exercise greater control over fraternities. *Id.* ¶ 68. In 2015, Former Dean Jonathan Holloway admitted that Yale had failed to formulate *any* policy about regulating the fraternities. *Id.* ¶ 102. In 2018, Dean Burgwell Howard compared Yale's approach to fraternities to a squirrel "dancing in the middle of the road." *Id.* ¶ 103. Later in September 2018, Yale actually took steps *to reduce* its ability to supervise fraternity parties by ending its requirement that students register off-campus parties. *Id.* ¶ 100. Notably, Yale took this step a mere six months after fresh reports of widespread misconduct at DKE and *before* the Deputy Title IX Coordinator had completed his *Review of DKE and Campus*

*Culture*. *Id.* ¶¶ 94-100. Predictably, when Yale published the *Review* in January 2019, Dean Marvin Chun expressly disavowed student recommendations to exercise control over fraternities. *Id.* ¶ 99.[5]

Contrary to Yale's assertions, there are strong similarities between *Simpson v. University of Colorado* and Plaintiffs' claims.[6] In *Simpson*, the University's football coach had "general knowledge of the serious risk of sexual harassment and assault during college-football recruiting efforts," "knew that such assaults had indeed occurred during CU recruiting visits," and "nevertheless maintained an unsupervised player-host program to show high-school recruits a 'good time.'" *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170, 1184 (10th Cir. 2007). Similarly, Yale's most senior officers have known about the sexual harassment associated with fraternities for over a decade. AC ¶¶ 61-103. During this same period, Yale has deliberately phased out many on-campus social gatherings, ceding those activities to the objectively more dangerous environment at fraternities. *Id.* ¶¶ 6, 91, 207, 351. Yet the University has rebuffed multiple calls to exercise supervision or oversight over the fraternities to put a stop to their patterns of sexual harassment and assault.[7] *E.g.* AC ¶¶ 13-14, 68, 79-81, 99-103, 170-71, 184.

---

[5] Contrary to Yale's assertions, Plaintiffs' claim is not based on Yale's mere failure to accede to "particular remedial demands." Mot. at 18-19. It is based on Yale's decade-long failure to respond to a known hostile environment. Yale's pattern of behavior was not "reasonably calculated to end harassment." *Zeno*, 702 F.3d at 669.

[6] In asserting that courts have found deliberate indifference when "the school's conduct was conscience-shocking," Mot. at 20, Yale tries to impose an inapplicable legal standard. Courts such as *Zeno* and *Simpson* have not considered whether the deliberate indifference claims before them "shocked the conscience," evaluating instead whether the school's conduct was reasonably calculated to end harassment.

[7] In *Simpson*, the Tenth Circuit implied that the University of Colorado had an "official policy of deliberate indifference" because it refused to adequately train its player-hosts despite the history of sexual misconduct associated with the program. 500 F.3d at 1178. In reaching this conclusion, the Tenth Circuit borrowed the analysis that courts employ in "failure to train" cases for municipal liability under § 1983. *See id.* (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-90 (1989)). In § 1983 cases, the municipality is held liable where there is an "obvious" risk of constitutional violations arising from a failure to train. *Id.* The risk is said to be "obvious" where the municipality had knowledge of prior violations or where general knowledge of the circumstances makes the need for training "obvious." *Id.* at 1178-79. Yale too, can be

Case 3:19-cv-00209-VAB    Document 86    Filed 07/03/19    Page 24 of 56

In light of the decade-long pattern of fraternity-related misconduct, Yale's stubborn refusal to take remedial action is "clearly unreasonable." *Davis*, 526 U.S. at 648. Indeed, courts throughout the country have found plausible claims for deliberate indifference where Universities have failed to remedy known contexts in which campus sexual misconduct thrives. *See e.g.*, *Doe v. Univ. of Tenn.*, 186 F. Supp. 3d 788, 807 (M.D. Tenn. 2016) (upholding allegations of deliberate indifference where plaintiffs alleged University "faile[ed] to acknowledge and address the acute risks to female students by a certain segment of its student body[, football and basketball players,] that are well above and beyond the general risks of student-on-student harassment."); *Hernandez v. Baylor Univ.*, 274 F. Supp. 3d 602, 615 (W.D. Tex. 2017) (finding Title IX claims plausible where university failed to address and actively concealed the history of sexual violence committed by its football players, including the plaintiff's assailant).[8]

Yale's cases are inapposite; none entail comparable claims of years of inaction in response to a known pattern of misconduct by a specific segment of the school population. *Ostranger* involved only two prior instances of fraternity-related assault, not the kind of decade-long pattern of problems at issue here. *Ostrander v. Duggan*, 341 F.3d 745, 748 (8th Cir. 2003). *Gebser* involved a sexual relationship between a teacher and his student, and the only evidence of the teacher's prior misconduct was *one* complaint about comments he had made in class. *Gebser*, 524 U.S. at 278, 291. *Roe* did not involve *any* evidence of prior sexual misconduct—much less the systemic pattern alleged here. *Roe v. St. Louis Univ.*, 746 F.3d 874, 881 (8th Cir. 2014) (Title IX

---

said to have a "policy of deliberate indifference." It maintained an official "hands off" policy toward fraternities, *e.g.*, AC ¶¶ 13-14, 68, 79-81, 99-103, 170-71, 184, despite its knowledge of fraternity-related misconduct and its authority to regulate fraternities and their members.

[8] Courts sometimes refer to claims like these as "before" claims or "heightened risk" claims because the school's deliberate indifference exposed plaintiffs and other students to a heightened risk of sexual assault. *See e.g.*, *Doe*, 186 F. Supp. 3d at 806-07; *Hernandez*, 274 F. Supp. 3d at 614.

claim based on university's response to plaintiff's report of rape). Moreover, each of these cases was decided on summary judgment, not a motion to dismiss.

Nor can Yale's "Title IX procedures" and "investigation of specific instances of fraternity-related misconduct" insulate the University from liability. Mot. at 18. Simply put, despite the purportedly "vigorous" Title IX process, which Yale claims it instituted in 2011, Mot. at 4, sexual misconduct at the fraternities continues to thrive through the present. *E.g.* AC ¶¶ 3-4, 61-117. Indeed, Yale College Dean Jonathan Holloway specifically acknowledged that the so-called "bans" on DKE and SAE were ineffective. AC ¶ 78. "[O]nce [Yale] was aware of its ineffective response," it should have promptly implemented "further remedial action." *Zeno*, 702 F.3d at 670. Nevertheless, Yale has "dragged its feet [on] implementing any non-disciplinary remedial action," *id.* at 669, and has explicitly rejected reforms proposed by the 2011 *Advisory Committee on Campus Climate*, the 2016 YCC Task Force on Greek Life, and the 2019 *Review of DKE and Campus Culture*. AC ¶¶ 68, 92, 99, 170. Worse still, Yale has taken steps to *reduce* its ability to monitor fraternity parties and events by terminating its event registration policy. *Id.* ¶ 100.

Given the steady march of fraternity-related misconduct over the past ten years, Yale "ignored the many signals that greater, more directed action was needed." *Zeno*, 702 F.3d at 671. All told, Yale's "investigations" and Title IX procedures—however, "vigorous" Yale claims they are on paper—could not have "plausibly changed the culture of bias at [Yale] or stopped the harassment." *Zeno*, 702 F.3d at 670.[9] Plaintiffs thus adequately allege deliberate indifference.

**4. Plaintiffs Adequately Allege a Hostile Environment at Yale**

A hostile environment must be "so severe, pervasive, and objectively offensive that it

---

[9] Yale tries to distinguish *Zeno* on its facts, Mot. at 20, but this Court is bound to apply its principles: "responses that are not reasonably calculated to end harassment are inadequate." *Zeno*, 702 F.3d at 669.

effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. "Making a 'hostility' determination in the educational context . . . entails examining the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with' the victim's academic performance." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 745 (2d Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Generally speaking, this analysis is fact-specific and, therefore . . . is best left for trial." *Id.*

Here, Plaintiffs sufficiently allege all the hallmarks of hostile environment. Fraternity-related sexual misconduct at Yale is severe, pervasive, and objectively offensive. Yale's fraternities are "the de facto social environment for many students." AC ¶ 174. Well over a third of students attend fraternity parties on a regular basis. *Id.* ¶ 173. This means that "[m]ale students routinely control[] the admission, alcohol, lighting, and music for many Yale social gatherings." *Id.* ¶ 2. "Fraternity brothers and other male attendees regularly deny female students admission to parties based on their appearance, verbally harass them, grind up against them, grab them, and grope them." *Id.* ¶ 4. These weekly rituals significantly contribute to the alarming rates of sexual harassment (74%) and assault (38.8%) at Yale. *Id.* ¶¶ 86, 328; *see generally* ¶¶ 61-117; *cf.* 2001 Guidance at 7 ("A series of incidents at the school, not involving the same students, could—taken together—create a hostile environment, even if each by itself would not be sufficient.").

Plaintiffs McNeil, Singer, and Walker have each suffered sexual assaults at fraternity events. AC ¶¶ 104-17. Plaintiff McNeil was groped at Zeta Psi fraternity parties twice during her first semester in 2016. *Id.* ¶¶ 105-07. She was later groped at a Sigma Phi Epsilon party in 2018. *Id.* ¶ 108. Plaintiff Walker was also groped at a Zeta Psi fraternity party during her first semester: A large man grabbed her from behind, lifted up her skirt, and grabbed her crotch. *Id.* ¶ 110. She

also witnessed and experienced harassment at other parties hosted by Zeta Psi, Sigma Alpha Epsilon, and Delta Kappa Epsilon. *Id.* ¶¶ 111-14. Plaintiff Singer too was groped at a Zeta Psi party—she had to forcibly push her assailant away to escape his grasp.[10] *Id.* at ¶ 115. Other members of Engender have similarly witnessed or experienced sexual harassment or assault at a Yale fraternity house or committed by a Yale fraternity member. Many other victims stand behind them. *E.g. id.* ¶¶ 109, 114, 116.

The misconduct described in the complaint is "physically threatening" and "humiliating." *Hayut*, 352 F.3d at 745; *cf.* 2001 Guidance at 6 ("[I]f the conduct is more severe, e.g., attempts to grab a female student's breasts or attempts to grab any student's genital area or buttocks, it need not be as persistent to create a hostile environment. Indeed, a single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment."). Women at Yale, including Plaintiffs, frequently find themselves physically violated and demeaned as "sexual objects" simply by attending fraternity-sponsored events—a central aspect of social life at Yale.[11] *Id.* ¶¶ 2-4, 119.

Yale's misconduct also deprives Plaintiffs of educational benefits. Unlike their male peers, Plaintiffs suffered sexual assaults at school, and they face the threat of further sexual violence in a way that their male peers do not. Male students attend fraternity events—which are principal venues for social interaction—without being subjected to the same risk of sexual harassment or assault. *Id.* ¶¶ 2-4, 104-17. Indeed, Plaintiffs no longer feel comfortable attending such events. *Id.*

---

[10] Yale faults the Plaintiffs for not filing formal UWC complaints, but this type of criticism cannot be resolved on the pleadings. Moreover, it ignores the fact that Plaintiffs didn't know and couldn't see their assailants. AC ¶¶ 110, 115. Further, Yale completely elides that Plaintiffs *did complain on numerous occasions* to senior university administrators about the hostile environment. AC ¶¶ 182-92. And Yale had many prior warnings about the dangerous nature of fraternity events but failed to take meaningful action.

[11] Even a cursory review of the complaint belies Yale's conclusory argument that Plaintiffs allege only "episodic" and "isolated acts." Mot. at 21-22. Plaintiffs describe a male-dominated social environment that has given rise to numerous instances of regular sexual misconduct over a ten-year period and that significantly contributes to the alarming rates of sexual harassment and assault at Yale.

¶ 117. These gender disparities in safety and access to social opportunities "creat[e] a disparately hostile educational environment [for Plaintiffs] relative to [their male] peers," which in and of itself "depriv[es] [them] of the benefits and educational opportunities available at [Yale]." *Hayut*, 352 F.3d at 750; *Doe v. E. Haven Bd. of Educ.*, 200 F. App'x 46, 48 (2d Cir. 2006) ("We have found that, even where a Title IX plaintiff's 'academic performance does not appear to have suffered' during the alleged sexual harassment but the harassment 'simply created a disparately hostile educational environment relative to her peers,' the issue of whether the harassment deprived the plaintiff of educational opportunities and benefits is one for the trier of fact." (citation omitted)). Indeed, the hostile environment described in the Complaint deprives Plaintiffs of the important educational benefit "of a supportive, scholastic environment free of [sexism] and harassment." *Zeno*, 702 F.3d at 667.[12] Plaintiffs' allegations are plausible and survive the pleadings stage.

### B. Plaintiffs State a Viable Claim for Injunctive Relief

#### 1. *Injunctive relief claims do not require "deliberate indifference"*

Title IX authorizes private causes of action for injunctive and declaratory relief. *Cannon*, 441 U.S. at 709. In *Gebser* and *Davis*, the Supreme Court made clear that the "deliberate indifference" standard applies only to monetary damages claims. *Gebser*, 524 U.S. at 290-91; *Davis*, 526 U.S. at 633; *see also* 2001 Guidance at iv ("Commenters uniformly agreed with OCR that the Court limited the liability standards established in *Gebser* and *Davis* to private actions for monetary damages."). By contrast, under Title IX, a claim for injunctive relief lies if the "school *knows or reasonably should know*" about student-on-student harassment that creates a hostile

---

[12] Yale's arguments on "hostility" are largely a reprise of its position on "control," Mot. at 22, but as explained in Section I.A.1 *supra*, Yale exercises the requisite level of control over the fraternities to be held liable for the hostile environment that the fraternities perpetuate for female students.

environment. 2001 Guidance at 12 (emphasis added); *cf.* Civil Rights Div., U.S. Dep't of Justice, Title VI Manual VI.C.3 – Intentional Discrimination by a Third Party, 2017 WL 1712157 (same standard under Title VI).

The difference is clear from the rationale of *Gebser*. The Supreme Court imposed the "deliberate indifference" standard for damages actions because Title IX was enacted pursuant to Congress's spending power. Under Congress's exercise of this power, a funding recipient must be able to choose whether to accept the funds with full knowledge of the consequences—including potential liability for monetary damages. *Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 596 (1983) (White, J.); *accord Gebser* 524 U.S. at 288 (citing *Guardians*, 463 U.S. at 598 (White, J.)). *Gebser* held that Congress failed to signal that Title IX recipients would be liable for monetary damages absent an opportunity to correct known violations. 524 U.S. at 289-90.

But the same notice concerns are not present in an action for injunctive relief to put an end to ongoing violations. In such cases, there is no risk of "diverting education funding from beneficial uses" because the only relief sought is injunctive: i.e., to eliminate discrimination from the educational program. *Id.* at 289. And unlike a monetary judgment, a school can avoid the force of a court-ordered injunction under Title IX: if the school does not wish to comply, it can simply terminate its receipt of federal funds. *See Guardians*, 463 U.S. at 596-97.

Thus, if a plaintiff seeking injunctive relief shows the school "knew or should have known" of a hostile environment, it remains "responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence." 2001 Guidance at 12. After all, "sexual harassment is a form of discrimination for Title IX purposes," *Davis*, 526 U.S. at 650, and Congress has unequivocally put Title IX funding recipients on notice that their students may not

19

be subjected to any form of discrimination on the basis of sex. 20 U.S.C. § 1681(a).

Contrary to Yale's contention, the Second Circuit's *Hayut* opinion does not ratchet up the standard for Plaintiffs' injunctive relief claim. While the Second Circuit obliquely refers to "corrective action," there were no injunctive relief claims on appeal in that case. Indeed, the district court's dismissal of the injunctive claim was not subject to the appeal. *See Hayut v. State Univ. of N.Y.,* 127 F. Supp. 2d 333, 336 n. 4 (N.D.N.Y. 2000) (dismissing claim for injunctive relief); *Hayut*, 352 F.3d at 742 ("Those of Hayut's original claims that were dismissed in *Hayut I* are not the subject of this appeal."). Accordingly, *Hayut* did not involve claims for prospective injunctive relief to remedy ongoing violations of Title IX. *See id.* at 749 ("Hayut does not claim that she suffered any harm as a result of the official policies or procedures of SUNY or SUNY New Paltz.").[13]

>    2. *Plaintiffs' claims easily survive the lesser "knew or should have known" standard*

As argued in Section I.A.2 *supra*, Plaintiffs adequately allege that Yale knows about the hostile environment perpetuated at its fraternities. *See* AC ¶¶ 61-103. Based on these allegations alone, Plaintiffs' injunctive relief claim withstands dismissal. *See* 2001 Guidance at 12.

## II.   IN COUNT II, PLAINTIFFS PLAUSIBLY ALLEGE THAT YALE HAS DENIED THEM EQUAL SOCIAL AND ECONOMIC OPPORTUNITIES AS THEIR MALE PEERS

Title IX broadly prohibits "discrimination" based on sex. *See* 20 U.S.C. § 1681(a). "'Discrimination' is a term that covers a wide range of intentional unequal treatment; by using

---

[13] While Yale suggests that proposed Department of Education regulations would require "actual knowledge" and "deliberate indifference" for administrative enforcement of Title IX, the proposed regulations do not purport to set forth the standard for seeking injunctive relief in a private action. *See* 83 FR 61462-01, 61466-67 (proposed Nov. 29, 2018). Moreover, "proposed regulations are not entitled to judicial deference, and carry no more weight than a position advanced on a brief." *U.S. v. Elton*, 429 F. Supp. 2d 561, 575 n.6 (E.D.N.Y. 2006) (citation omitted).

such a broad term, Congress gave the statute a broad reach." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). Consistent with the statute's "broad reach," in *Gebser* and *Davis* the Supreme Court held that Title IX "encompasses intentional sex discrimination in the form of a recipient's deliberate indifference to" sexual harassment. *Id*. at 173. But "sexual harassment is" only one discrete "form of discrimination for Title IX purposes," *Davis*, 526 U.S. at 649-50; hence, Title IX also provides a remedy for deliberate indifference to other forms of discrimination. *See North Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 521 (1982) (holding that Courts "must accord [Title IX] a sweep as broad as its language" (citation omitted)). *Cf. Jackson*, 544 U.S. at 173 (describing the Supreme Court's history of broadly construing Title IX and concluding that retaliation is discrimination for Title IX purposes).

In Count II, Plaintiffs allege that Yale stands idly by as the fraternities deny them social and economic opportunities that are solely available to male students. Unlike their female cohorts, men can join fraternities (prototypical "boys' clubs") that have been a part of Yale since before the Civil War. The fraternities' array of powerful and connected alumni includes former presidents, a current Supreme Court Justice, governors, senators, and billionaire CEOs. AC ¶ 121. Fraternity alumni networks provide male students valuable economic and professional opportunities, such as connections to prestigious banking and consulting firms. *Id.* ¶ 122. Indeed, "many Fraternity members receive summer internships and job offers thanks to their fraternity alumni networks and contacts." *Id.* Yale women never have the chance to tap into these Yale-affiliated networks.

The fraternities also confer on men significant social standing on campus. Yale made the deliberate decision to phase out campus social activities, ceding them instead to the male-dominated environments at the fraternities. *Id.* ¶¶ 6, 91, 207, 351. With fraternities as the "de facto social environment," male students have substantial control over Yale social gatherings—

including whom to admit. *Id.* ¶ 2. Not only does this dynamic contribute to the hostile environment on campus, *see* Section I.A.4 *supra*, but it also "elevate[s] men to social gatekeepers." *Id*. ¶ 119. Female students may be excluded at the fraternities' whim, including based on their appearance.

Yale knows that fraternities offer men social and economic privileges that are denied to female students. *E.g. id.* ¶¶ 5-7, 207-10 (describing Yale's symbiotic relationship with fraternities). Indeed, Plaintiffs have specifically pointed out these disparities in their communications with senior Yale administrators. *E.g. id*. ¶¶ 182-90. Yet Yale has failed to counteract the inequality associated with its Greek life, even though doing so is well within the University's power. *See e.g.*, *id.* at ¶ 85 (discussing bringing social life back on campus), ¶ 91 (imploring Yale to move social life back on campus). Yale's sororities, for instance, still fail to rival the social, professional, and economic clout of the fraternities. *Id.* ¶ 9. And to date, Yale has failed to adequately support mixed-gender social spaces that enable female students to assume positions of equal status and control over Yale's social environment. *Id.* ¶¶ 1-2, 174.

The Supreme Court has long acknowledged the important role that social capital plays in higher education. In *Sweatt v. Painter*, the Court struck down the racially discriminatory admissions practices of the University of Texas Law School. 339 U.S. 629, 635-36 (1950). The Court found that Texas's segregated law schools denied black students access to important educational resources that were "incapable of objective measurement," including the "position and influence of the alumni, standing in the community, traditions and prestige." *Id.* at 634. Forty-six years later, in *U.S. v. Virginia*, the Supreme Court invalidated sex segregation in Virginia's military academies, again pointing to inequalities in prestige, alumni networks, and career opportunities. 518 U.S. 515, 557, (1996). At Yale, the fraternity system denies female students equal access to the social and economic opportunities that the Supreme Court found so crucial in these precedents.

And, Yale has knowingly and deliberately elevated the fraternities to a place of prominence on campus while declining to place any meaningful checks on their behavior and practices.

Yale's only defense to Count II is that Title IX exempts the "membership practices" of "social fraternities" Mot. at 13 (citing 20 U.S.C. § 1681(a) (6)). But Plaintiffs do not directly challenge the fraternities' discriminatory "membership practices" in this Count. Rather, Plaintiffs' claim is based on the unequal social and economic opportunities that *result from* Yale's Greek system. These gender disparities are striking and remain unremedied. While Title IX may arguably allow for gender segregation in certain aspects of university life, it demands substantial equality of opportunity. *Cf. Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 98 (2d Cir. 2012*)* ("A choice to allocate specific athletic opportunities on the basis of sex will not violate Title IX provided that, in general, the participation opportunities afforded the two sexes are 'equal.'").

Accordingly, Plaintiffs have plausibly alleged that Yale is deliberately indifferent to the disparities in social and economic opportunities that the fraternities perpetuate.

## III.   PLAINTIFFS ADEQUATELY STATE PUBLIC ACCOMMODATIONS CLAIMS UNDER CONNECTICUT LAW

### A.   Plaintiffs Plausibly Allege That Yale is a Public Accommodation

Plaintiffs allege that Yale is a "public accommodation" that denies them accommodations equal to their male peers in violation of Conn. Gen. Stat. § 46a-64. Specifically, the University: a) offers its female students unequal social and economic opportunities as compared to their male peers (Count VIII); and b) subjects them to a hostile environment (Count IX).

Yale's principal defense to these charges is that it is not a "public accommodation" under Conn. Gen. Stat. § 46a-63. The statute defines a "public accommodation" as "any establishment which caters or offers its services or facilities or goods to the general public." "[C]overage . . . depends, in each case, upon the extent to which a particular establishment has maintained a private

relationship with its own constituency or a general relationship with the public at large." *Quinnipiac Council*, 528 A.2d at 359. Thus, "the question of coverage is a question not of law but of fact," and these factual disputes are inappropriate for resolution on a motion to dismiss. *Id.*

Further, the plain language of the statute dictates that Yale is a public accommodation. First, Yale is plainly an "establishment," within the ordinary meaning of the term—a "public or private institution" or "a place of business or residence with its furnishings and staff."[14] Second, Plaintiffs allege in detail the many ways in which Yale "offers its services or facilities" to the general public. Yale opens its campus, lawns, museums, shopping districts, stadiums, clinics, gymnasium, and other properties to the general public and to visitors from around the world. AC ¶¶ 202-06. It is not selective in who may access these spaces. *Id.* Indeed, it boasts that "Reader's Digest recently named Yale University as The Best Free Tourist Attraction for Connecticut!" *Id.* ¶ 202. Yale's open campus engulfs swaths of downtown New Haven, *id.*¶ 204, and the school's facilities serve as a significant social and economic resource for the public. *Id.* ¶¶ 202-06.

Yale's undergraduate admissions statistics, Mot. at 24, concern only one aspect of Yale's overall operations, and therefore do not negate all the ways this establishment opens itself up to the public.[15] Indeed, "other courts in our sister states construing similar legislation," *Quinnipiac*

---

[14] *Establishment*, Merriam-Webster, https://www.merriam-webster.com/dictionary/establishment (last visited July 3, 2019).

[15] These statistics fall outside of the Complaint, and thus should not be considered on a motion to dismiss. *E.g. Roth*, 489 F.3d at 509. The Complaint raises plausible factual issues about the extent to which Yale opens itself up to the public. *See Quinnipiac Council*, 528 A.2d at 359. Further, even if Yale does not admit a large percentage of applicants, it in fact "*offers*" its educational services to the general public; it invites students around the globe to apply. Conn. Gen. Stat. § 46a-63. *See State ex rel. Washington Univ. v. Richardson*, 396 S.W.3d 387, at 394 (Mo. App. 2013) ("It is not disputed that the University, the Fox School, and its MFA Program, invite the public to apply to their programs. Consequently, they 'offer or hold out to the general public,' by the plain language of the provision. Although the University argues that it does not 'offer' or 'hold out' because selective criteria are used for admission, we believe, contrary to the trial court's reasoning, that the University is describing the services *delivered* rather than *offered*." (emphasis in original)).

*Council*, 528 A.2d at 359, have held that universities are places of public accommodation. *Frank v. Ivy Club*, 576 A.2d 241, 256 (N.J. 1990) ("There no longer is any question that Princeton is a place of public accommodation."); *State ex rel. Washington Univ. v. Richardson*, 396 S.W.3d 387, 396 (Mo. App. 2013) (holding Washington University is a public accommodation).

Instead of hewing to the statute's language, Yale argues that the statute only applies to certain bits and pieces of the University (like its theaters), but not the entire establishment. Mot. at 24. This argument rests entirely on vague dicta from *Quinnipiac* in which the Court opines, hypothetically: "[A] private university that opens its theater facilities for the entertainment of the general public cannot refuse admission for reasons of race or sex or other grounds made illegal by § 53-35(a)." 528 A.2d at 359. Nothing in the sentence suggests that such a public-facing institution need only open the theater, as opposed to the university, to non-discriminatory admissions. Once the organization "has determined to eschew selectivity," "it may not discriminate among the general public." *Id*. Moreover, Yale occupies a unique status as a dominant (if not *the* dominant) social and cultural institution in the City of New Haven and a global university that widely opens itself to the public in myriad ways. AC ¶¶ 203-06.[16] Yale's motion only serves to highlight that Plaintiffs' claims are not subject to dismissal.

**B. Hostile Environment Claims are Available Under Public Accommodation Statutes**

Connecticut's law against discrimination in places of public accommodations makes it unlawful to "discriminate . . . on account of . . . sex." Conn. Gen. Stat. § 46a-64. Connecticut Courts have long held that sexual harassment is a form of illegal sex discrimination. *See Ramsey v. Network Installation Servs., Inc.*, No. 3:08-CV-00259, 2008 WL 4447091, at *3 (D. Conn. Sept.

---

[16] For this same reason, Yale cannot avail itself of the administrative decisions involving local primary and secondary schools. Mot. at 25. There is no indication that these schools offer even a fraction of "services or facilities" that Yale opens to the general public. Conn. Gen. Stat. § 46a-63.

3, 2008) (ruling that plaintiff alleged sufficient facts to establish prima facie elements of sexual harassment under Conn. Gen. Stat. § 46a-60(a)(1)); *Feliciano v. Autozone, Inc*., 111 A.3d 453, 467-68 (Conn. 2015) (finding genuine issue of material fact to preclude summary judgment on sexual harassment claim under Fair Employment Practices Act); *Sawka v. ADP, Inc*., No. 3:13-CV-754, 2015 WL 5708571, at *20 (D. Conn. Sept. 29, 2015) (denying summary judgment on a sexual harassment claim under Fair Employment Practices Act). Thus, the plain language of the statute bans sexual harassment in places of public accommodations.

Yale's argument to the contrary ignores the "unconditional language of the statute, the history of its steadily expanded coverage, and the compelling interest in eliminating discriminatory public accommodation practices." *Quinnipiac Council*, 528 A.2d at 358.[17] Indeed, courts have found cognizable claims for sexual harassment under similar public accommodation laws, including claims for sexual harassment occurring at schools. *See e.g.*, *Longen v. Fed. Express Corp.*, 113 F. Supp. 2d 1367, 1376 (D. Minn. 2000) (finding cause of action); *Colombo v. Bd. of Educ. for the Clifton Sch. Dist.*, No. 11-CV-785, 2016 WL 6471013, at *8 (D.N.J. Oct. 31, 2016) (finding parent had claim based on principal's sexual harassment); *Doe v. Schwerzler*, No. CIV A 06-3529, 2008 WL 4066338, at *4 (D.N.J. Aug. 27, 2008) ("[T]he NJLAD's broad remedial goal to prevent sexual harassment in places of public accommodation appears to encompass" a claim by a student against another school's swim coach).[18]

---

[17] Yale's argument that the "General Statutes treat employment discrimination separately from public accommodation discrimination" is immaterial. Mot. at 26 (quoting *Quinnipiac Council,* 528 A.2d at 260). Both statutes ban "discrimination" (including sexual harassment). They differ in that they are designed for different social contexts: employment versus public accommodations. Sexual harassment results in a denial of equal access to goods and services just as it results in a denial of equal access to employment.

[18] Notably, the Courts in *Colombo* and *Doe* interpreted the same statute at issue in *Kiwanis Int'l v. Ridgewood Kiwanis Club*, 806 F.2d 468, 471 (3d. Cir. 1986). Yale admits that "Connecticut's public accommodations statute is precisely in th[e] mold" of the statute at issue in *Kiwanis*. Mot. at 26.

## IV.     PLAINTIFFS STATE A CLAIM FOR BREACH OF CONTRACT

To prove a claim for breach of contract under Connecticut law, a plaintiff must establish: "(1) the existence of a contract or agreement; (2) the defendant's breach of the contract or agreement; and (3) damages resulting from the breach." *Chem-Tek, Inc. v. General Motors Corp.*, 816 F. Supp. 123, 131 (D. Conn. 1993) (*citing O'Hara v. State*, 590 A.2d 948 (Conn. 1991)). Connecticut law further provides that universities and its students have a relationship that is based in contract. All "the catalogues, bulletins, circulars, and regulations of the institution determine" this contractual relationship, along with "other express or implied promises." *Burns v. Quinnipiac Univ.*, 991 A.2d 666, 673-74 (Conn. App. 2010) (citation omitted). Courts "examine the oral and written expressions of the parties in light of the policies and customs of the particular institution." *Id.* (citation omitted). Here, Plaintiffs state a claim so long as they allege that "the educational institution failed to fulfill a specific contractual promise"; such a promise must be "distinct from [the school's] overall obligation to offer a reasonable program." *Gupta v. New Britain General Hosp.*, 687 A.2d 111, 120 (Conn. 1996).

### A.  Plaintiffs Plausibly Allege that Yale Has Assumed Contractual Duties to its Students

Here, Plaintiffs identify a number of agreements between the University and its students that contain specific contractual promises that Yale has failed to honor:  in particular, obligations contained in Yale's *Equal Opportunity Statement*, its *Undergraduate Regulations*, and its *Sexual Misconduct Policies*. *See* AC ¶¶ 338-42.[19]

Yale's *Equal Opportunity Statement* states that:

Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability,

---

[19] Indeed, the *Undergraduate Regulations* makes clear that "[e]ach student in Yale College is required as a condition of enrollment" to abide by the regulations. Dkt. 78-18 at 3.

27

status as a veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression.

Dkt. No. 71-3 at 1. In addition, Yale's *Sexual Misconduct Policies* states:

Yale University is committed to maintaining and strengthening educational, working, and living environments founded on mutual respect in which students, faculty, and staff are connected by strong bonds of intellectual dependence and trust. Sexual misconduct is antithetical to the standards and ideals of our community. Therefore, Yale [] prohibits all forms of sexual misconduct. Yale aims to eradicate sexual misconduct through education, training, clear definitions and policies, and serious consequences for policy violations . . . These policies apply to all members of the Yale community as well as to conduct by third parties (i.e., individuals who are not students, faculty, or staff, including but not limited to guests and consultants) directed toward university students, faculty, or staff members.

Dkt. No. 71-4 at 1. In the 2017-2018 version of the *Sexual Misconduct Policies*, Yale also assured students that sexual misconduct "will not be tolerated." AC ¶ 169.

These clear and definitive promises to not discriminate, to prohibit sexual misconduct, and to aim to eradicate sexual misconduct, also extend to all undergraduate organizations—whether registered or unregistered—by virtue of the incorporation of the *Equal Opportunity Statement* and the *Sexual Misconduct Policies* into Yale's *Undergraduate Regulations. See* Dkt. 71-18 at 7 ("Sexual Misconduct Policies at Yale"); *id.* at 55-56 ("All student organizations—whether registered or unregistered, operating on or off campus . . . must operate in accordance with Yale policies on equal opportunity . . ."). These documents should therefore be interpreted together. *See E & F Construction Co. v. Rissil Construction Assocs., Inc.,* 435 A.2d 343, 344 (Conn. 1980) ("Where . . . the signatories execute a contract which refers to another instrument in such a manner as to establish that they intended to make the terms and conditions of that other instrument a part of their understanding, the two may be interpreted together as the agreement of the parties.").

In reading and interpreting these documents together, the Court should be guided by Connecticut's "well established principles of contract interpretation." *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 838 A.2d 135, 144-45 (Conn. 2004). Under these principles:

> [A] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms.

*Id.* (citations omitted) (alternations in original).

The contracts between Yale and its students contain unambiguous language setting forth distinct promises regarding equal opportunities at the University. Yale plainly stated that there was no place for sexual misconduct and discrimination in its midst. Based on the "common, natural, and ordinary meaning" of the words in these documents, Yale has specifically promised to students to maintain an educational environment and educational programs that are free of discrimination, to require student organizations to comply with the *Regulations* and *Equal Opportunity Statement*, to prohibit all forms of sexual misconduct, and to use all reasonable means within its power to eradicate sexual misconduct.

These obligations are the kinds of "specific contractual promises" that Connecticut courts have held form the basis for a valid breach of contract claim against a university. For example, in *Johnson v. Schmitz*, the court determined that plaintiff's allegations that Yale failed to deliver on its "express and implied contractual duties to safeguard students from academic misconduct, to investigate and deal with charges of academic misconduct, and to address charges of academic misconduct in accordance with its own procedures" to be specific, identifiable contractual promises that did not require the court to evaluate "subjective aspects of the quality of Yale's [academic program]." 119 F. Supp. 2d 90, 96-97 (D. Conn. 2000).[20] Being subject to unchecked

---

[20] *See also Demoulas v. Quinnipiac Univ.*, No. CV155006283S, 2015 WL 1427951, at *5 (Conn. Super. Ct. Mar. 5, 2015) (where plaintiff alleged that the university failed to follow its own procedures in disciplinary proceedings, the court "conclude[d] that a trier of fact could find that QU breached its contract with the plaintiff. Here, the Student Handbook states that the plaintiff is to be granted 'fundamental

sexual misconduct off and on campus is certainly no better in kind than being the victim of academic plagiarism. And, students who leave their childhood homes for the University's nest are equally entitled to rely upon the school's strong affirmative promises of protection and redress.

Plaintiffs have adequately identified definite and particular contractual obligations set forth in the *Undergraduate Regulations*, Yale's *Sexual Misconduct Policies*, and Yale's *Equal Opportunity Statement* that similarly would not require the Court to wade into subjective assessments of the reasonableness of Yale's academic program.[21]

## B. Plaintiffs Plausibly Alleged that Yale Breached these Obligations

In an attempt to free itself from its contractual obligations, Yale reverts to unsupportable interpretations of its *Equal Opportunity Statement*, *Undergraduate Regulations*, and *Sexual Misconduct Policies*. First, Yale argues that Plaintiffs have not alleged that it has directly discriminated against them in violation of the *Equal Opportunity Statement*, asserting that the complaint only speaks to discrimination at the hands of the fraternities and their members. This interpretation requires an illogical narrowing of the ordinary meaning of "discriminate," which encompasses a refusal to protect students from the discriminatory acts of other students, thereby

---

fairness'"); *Osberg v. Yale Univ.*, No. CV085021879S, 2009 WL 659072, at *3 (Conn. Super. Ct. Feb. 11, 2009) (finding plaintiff's allegation that Yale breached express promise concerning the procedures around academic warnings in a bulletin stated a cognizable claim for breach of contract); *Morris v. Yale Univ. Sch. of Med.*, No. 05CV848, 2006 WL 908155, at *5 (D. Conn. Apr. 4, 2006) (denying Yale's motion to dismiss a breach of contract claim brought by a former medical student who alleged that a particular provision of the student handbook concerning licensing exams was breached).

[21] Yale's motion to dismiss in fact confirms the specificity of these promises, noting that the *Sexual Misconduct Policies* contains "precise language" and "specific terms" that reflect the University's purported goal of prohibiting and eradicating sexual misconduct. Mot. at 31. But, in an attempt to obfuscate Plaintiffs' contentions, Yale erects a straw man overstating the nature of Plaintiffs' claims. Contrary to Defendant's assertions, Plaintiffs do not allege that Yale has promised to "pervasively monitor all off-campus, informal groups"; nor do they argue that Yale has made a "contractual guarantee of omnipresent control over [students'] lives." *Id.* at 30. Simply put, the promise contained in these contracts is to have educational programs and student organizations that are free of discrimination on the basis of sex; to prohibit sexual misconduct; and to seek to eradicate sexual misconduct at the University. Yale did none of these things.

treating certain groups of students—namely, female and gender non-binary students—less well than their peers. Notably, failure to prevent acts of discrimination is understood to itself constitute discrimination under most discrimination statutes. *See, e.g.*, *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (noting that Title VII liability is imputed to employer for co-worker harassment where "it knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action").[22] Indeed, the *Equal Opportunity Statement* notes that Yale does not discriminate "in accordance with this policy as delineated by federal and Connecticut law," Dkt. No. 71-3 at 1, explicitly acknowledging that Yale understands what the word "discrimination" means as it is regularly applied by various statutory authorities. There is no question that Plaintiffs have adequately alleged that Yale has fundamentally failed to address discrimination, and as a result, breached its contractual obligation to its students, as set forth in the *Equal Opportunity Statement.*

Yale also contends that Plaintiffs have misconstrued its *Undergraduate Regulations* and asserts that the requirement to comply with the *Equal Opportunity Statement* only applies to *registered* organizations, and not unregistered student organizations like fraternities. Yale thus asks the Court to adopt a tortured reading of the *Regulations*. As an initial matter, all relevant portions of the *Regulations* fall under an umbrella heading entitled "Undergraduate Organizations." Section B of that section, entitled "Types of Student Organizations," actually defines the term "student/undergraduate organization": "Any group in which a majority of

---

[22] *See also Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 863-64 (7th Cir. 2018) (FHA liability where landlord knew or should have known about harassment and failed to correct it); 24 C.F.R. § 100.7(a)(1)(iii) (same); 2001 Guidance at 12 (finding that school violates Title IX where it knew or should have known about harassment but failed to correct it); Title VI Manual VI.C.3 - Intentional Discrimination by a Third Party, 2017 WL 1712157 (explaining that Title VI liability extends to inadequate responses to discrimination by a third party).

participants are undergraduates is considered to be an undergraduate organization." Dkt. 78-18 at 55. Registration is not a prerequisite. As a result, section C—entitled "Responsibilities of Undergraduate Organizations"—logically incorporates and applies the preceding definition of the term "student organization." Thus, when the *Regulations* state, "Yale University requires that all student organizations—whether registered or unregistered, operating on or off campus—abide by the *Undergraduate Regulations*" and "[s]tudent organizations must operate in accordance with Yale policies on equal opportunity," it is clear that these statements apply to all student organizations, regardless of registration status. And, Yale impliedly undertakes obligations to ensure their compliance and to adequately discipline them for non-compliance. *See Johnson*, 119 F. Supp. 2d at 96-97. This is the only way that Yale can carry out its duties to ensure that all students share the benefit of a safe, discrimination-free social and educational environment.

This common-sense reading is bolstered by the fact that the very next section of the contract, section D, concerns "Registration of Undergraduate Organizations" and is particular to registered organizations. Reading the contract as a whole, it is clear that when the *Regulations* concern requirements for registered organizations, to the exclusion of unregistered organizations, it makes that distinction clear. *See Sartor v. Town of Manchester*, 312 F. Supp. 2d 238, 243 (D. Conn. 2004) (explaining that one of the basic tenets of contract interpretation under Connecticut law is that "the [contract] must be construed as a whole and in such manner as to give effect to every provision, if reasonably possible" (quoting *Peter-Michael, Inc. v. Sea Shell Assoc.*, 709 A.2d 558, 561 (Conn. 1998)). Yale's strained reading of the Regulations is particularly unpersuasive considering that Yale itself acknowledges that it found DKE and SAE—both unregistered student organizations—in violation of these *Undergraduate Regulations*. *See* Mot. at 5-8. If these

contractual obligations were truly limited to only *registered* organizations, Yale would not have been able to find these *unregistered* organizations in violation of the Regulations.[23]

Defendant's other half-hearted attempts to distort and diminish its obligations to its students fare no better. The *Regulations* impose an obligation on Yale itself to bring students who are believed to have violated University policy before authorities such as the Executive Committee or the University-Wide Committee on Sexual Misconduct ("UWC") to face disciplinary consequences. Yale cannot plausibly fulfill this explicit obligation by relying solely on others to bring complaints; the plain language of the contract states that when a violation is believed to have occurred, the individual "may be brought" to Yale's disciplinary bodies. The obvious implication is that *Yale* would be able and required to bring students in front of these disciplinary committees. Moreover, despite Defendant's assertion to the contrary, Plaintiffs clearly allege that they *did* bring incidents of sexual misconduct to Yale's attention. Specifically, these students tried to bring a complaint with the Executive Committee; Yale told them that they could not do so. AC ¶¶ 185-189 ("Although the deans agreed the Fraternities' admissions practices were discriminatory, they told the students that there was no formal way for them to raise their complaints of discrimination."). Plaintiffs McNeil, Walker, and other Engender members also met with Yale's Deputy Title IX Coordinator, Jason Killheffer, to discuss the ways in which the fraternities were violating Yale's policies on sexual misconduct and equal opportunity. *Id.* ¶ 190. Yale's administration failed to take action in response to these complaints—and the decade of fraternity-

---

[23] Yale's contention that unregistered organizations are not bound by the *Regulations* is further undermined by a separate section entitled "Special Provisions Concerning Student Organizations." Dkt. 78-18 at 69. That section explicitly explains that "[c]onduct occurring off campus is a violation of these regulations if the conduct, had it occurred on campus, would be a violation of . . . Section D, 'Sexual misconduct, including sexual harassment.'" *Id.* Yale's argument that the regulations could only logically apply to registered organizations, and not unregistered, therefore contradicts the plain language of the contract itself.

related misconduct—thereby not following its own procedures. *Id.* Plaintiffs thus allege particularized ways in which Yale has violated its own *Undergraduate Regulations*.

Finally, Yale's attempt to interpret its *Sexual Misconduct Policies* to require the University to address sexual misconduct only through "education, training, clear definitions and policies, and serious consequences for policy violations" is unavailing. The policy states both that "Yale University prohibits all forms of sexual misconduct," *and* that "Yale aims to eradicate sexual misconduct" through particular means. Dkt. No. 71-4 at 1. These examples do not change the overall obligation that Yale contractually owes its students to prohibit sexual misconduct. The very rule of construction on which Yale relies necessitates that "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms" is preferred over "an interpretation which leaves a part unreasonable, unlawful, or of no effect." *See* Restatement (Second) of Contracts § 203(a) (1981). To adopt Yale's limited construction would render meaningless most of the language in the *Sexual Misconduct Policies*, including the promises to "aim to eradicate sexual misconduct," which "will not be tolerated." AC ¶¶ 168-69.

But, Plaintiffs' allegations would pass muster even under Yale's limited rubric. Plaintiffs plausibly allege that Yale did not satisfy its conceded obligations to set forth clear rules and policies, provide adequate education and training, and "impose serious consequences" for fraternity related misconduct. Yale has admitted its failures in this regard. AC ¶ 78. Plaintiffs further claim that Yale's trainings are ineffective, as Yale refuses to identify the known risks associated with the fraternities. *Id.* ¶¶ 175-76. And as noted above, Plaintiffs did exhaust their administrative remedies, as they attempted to bring an Executive Committee complaint, *id.* ¶ 189, and they also made complaints to the Title IX coordinator, *id.* ¶ 190. Even entertaining Yale's

34

incorrect and narrow reading of the *Sexual Misconduct Policies*, Plaintiffs have stated sufficient facts to support a claim that Yale has breached its contractual obligations.

As set forth in the Complaint, Yale fails to deliver on its contractual promises. Yale freely permits fraternities and their members to discriminate on the basis of gender in their membership practices, thereby depriving female students of equal access to housing, social, and economic opportunities. Yale refuses to take effective measures to "eradicate sexual misconduct" that pervades the fraternity system or to remedy the hostile environment created by the fraternities. Yale in fact tolerates the rampant sexual misconduct occurring at the fraternities. These actions and omissions amount to a breach of the contractual obligations contained in the agreements between Yale and its students, and Plaintiffs have therefore stated a claim for breach of contract.

### C.  Plaintiffs State a Claim for Breach of the Covenant of Good Faith and Fair Dealing

Plaintiffs also adequately state a claim for breach of the covenant of good faith and fair dealing. "It is axiomatic that the . . . duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship." *Hoskins v. Titan Value Equities Group, Inc.*, 749 A.2d 1144, 1146 (Conn. 2000). "The covenant . . . presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term." *Id.* (quoting *Neiditz v. Hous. Auth.*, 654 A.2d 812, 819 (Conn. Super. Ct. 1994)). A defendant is liable where it acts in bad faith to deprive plaintiff of the benefit of the bargain. *Alexandru v. Strong*, 837 A.2d 875, 883 (Conn. App. Ct. 2004), *cert. denied*, 845 A.2d 406 (Conn. 2004). "Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." *Id.* (citing *Habetz v. Condon*, 618 A.2d 501 (Conn. 1992)). Bad faith

encompasses a "wide range of dishonest behavior," and "may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain." *Landry v. Spitz*, 925 A.2d 334, 342-43 (Conn. App. 2007) (citation omitted). "[W]hether particular conduct violates . . . the duty of good faith and fair dealing necessarily depends upon the facts of the particular case, and is ordinarily a question of fact to be determined by the . . . finder of fact." *Id.* at 344 (citing 23 Williston, Contracts § 63:22 (4th ed. 2002)).

Plaintiffs adequately allege that Yale's actions and omissions in preventing and addressing sex-based discrimination and sexual misconduct at the University were taken in bad faith. Yale has a "symbiotic relationship" with the fraternities. AC ¶¶ 6, 207-10. In a gambit to evade its contractual responsibilities to prevent and punish student misconduct, Yale moved opportunities for social interaction off campus, even though it knows these are objectively more dangerous environments for its students and is well aware of the ways in which these environments foment discriminatory behavior and sexual misconduct. *Id.* Now, "the Fraternities provide party venues (and alcohol) to Yale students, and in exchange, Yale allows the Fraternities to use Yale resources (and recruit Yale students), and largely turns a blind eye to the sexual harassment and assault occurring in connection with the Fraternities." *Id.* ¶ 207. This is quite explicitly an effort by Yale to dodge its contractual obligations to protect students from discrimination and sexual misconduct.

Yale has adopted a policy and practice of deliberate indifference to the fraternities' discriminatory membership policies and incidents of sexual misconduct at the fraternities, all while deliberately phasing out on-campus social gatherings with no other purpose but to sidestep its own potential liability. Together, Yale's actions and inactions have "evaded the spirit" of its contractual obligations, and are fundamentally driven by a dishonest motive.

Plaintiffs therefore state a claim for breach of the covenant of good faith and fair dealing. *See Landry*, 925 A.2d at 345 (finding sufficient facts in the record to place at issue the question of bad faith, explaining that defendants' discretionary interpretation of the contract "amounted to a dereliction of their duty to deal with the plaintiff in good faith"). Fact development is necessary to determine the extent of Yale's conduct, and the extent to which it evinces bad faith.

## V.    PLAINTIFFS STATE AN UNFAIR TRADE PRACTICES CLAIM

The Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b(a), provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Yale represents to potential and incoming students that the University outlaws discrimination in its educational programs, including discrimination committed by student organizations. AC ¶ 165-67, 356; *see also* Section IV *supra*. Moreover, in its *Sexual Misconduct Policies*, Yale represents that the University "aims to eradicate" sexual misconduct and that sexual misconduct "will not be tolerated." AC ¶¶ 168-69. Yale also represents that fraternities play a minor role in undergraduate social life, specifically noting that only 10% of undergraduates participate in Greek life. *Id.* ¶¶ 172-74. Plaintiffs matriculated at Yale based on the understanding that the University would ensure a discrimination-free environment and thereby secure their safety and well-being. Plaintiffs accordingly relied on the University's extensive representations regarding its commitment to gender equity and preventing sexual misconduct. But, after arriving at Yale, Plaintiffs learned that the institution in fact condones male-only organizations that provide vast social and economic benefits to men to the exclusion of women, and overlooks rampant sexual misconduct perpetrated at events hosted by such organizations. Plaintiffs plead facts indicating that Yale's statements caused them injury and damages, and therefore state a claim under CUTPA.

Yale's cursory arguments that Plaintiffs do not meet either the unfairness or the deceptive practices standard of the law are not persuasive.

## A. Plaintiffs' Complaint Satisfies the Unfairness Standard at the Pleadings Stage

To determine whether a practice is "unfair" under CUTPA, Connecticut courts follow the Federal Trade Commission's cigarette rule:

> [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise- in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons] . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.

*Blackwell v. Mahmood*, 992 A.2d 1219, 1229 (Conn. 2010). The facts underlying a breach of contract may be sufficient to state a claim under CUTPA. *E.g. Day v. Yale Univ. Sch. of Drama*, No. CV 970400876S, 2000 WL 295612, at *7 (Conn. Super. Ct. Mar. 7, 2000).[24] "It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA is a question of fact." *Langan v. Johnson & Johnson Consumer Cos., Inc.*, 95 F. Supp. 3d 284, 288-89 (D. Conn. 2015) (quoting *Naples v. Keystone Bldg. & Dev. Corp.*, 990 A.2d 326 (Conn. 2010)).

Yale states—without much elaboration—that its alleged breach of its contractual obligations to students does not satisfy the cigarette rule. Mot. at 35. There is no doubt, however,

---

[24] *See also Retrofit Partners I, L.P., v. Lucas Indus. Inc.*, 47 F. Supp. 2d 256, 271 (D. Conn. 1999) ("Some Connecticut courts have allowed a CUTPA claim to stand when a plaintiff also establishes claims for misrepresentation or breach of the implied covenant of good faith and fair dealing.") (collecting cases); *Greene v. Orsini*, 926 A.2d 708, 711 (Conn. Super. Ct. 2007) ("[W]hen the aggravating factors present constitute more than a failure to deliver on a promise," "the same facts that establish a breach of contract claim may be sufficient to establish a CUTPA violation.") (citations omitted); *Tyson Roller Bearing, Inc. v. Accuride Corp.*, No. X3CV065009721S, 2008 WL 2168916, at *2 (Conn. Super. Ct. May 7, 2008) (same); *Pollock v. Panjabi*, 781 A.2d 518, 531 (Conn. Super. Ct. 2000) (same); *Lamotte v. Lamotte Landscaping, LLC*, No. FSTCV075003090, 2009 WL 2872799, at *3 (Conn. Super. Ct. Aug. 5, 2009) ("method" of entering contract and representations made can establish CUTPA violation).

that the results of Defendant's breach offends public policy. "[T]here exists a general public policy in this state to eliminate all forms of invidious discrimination, including sex discrimination." *Thibodeau v. Design Grp. One Architects, LLC*, 802 A.2d 731, 740 (Conn. 2002); *see also City of Ansonia v. Stanley*, 854 A.2d 101, 113 (Conn. Super. Ct. 2004), *aff'd* 92 Conn. App. 723, 887 A.2d 394 (Conn. App. Ct. 2005) ("[T]his court finds that state and federal statutes [and] case law . . . clearly evidence a well defined and dominant public policy against sexual harassment and sexual misconduct."). Moreover, Plaintiffs' allegations compel the conclusion that Yale acted recklessly because it willfully distanced itself from the epicenter of gender discrimination and sexual misconduct impacting and harming its students. AC ¶¶ 6, 207, 351. Thus, Yale's misrepresentations amount to a violation of public policy. Yale did not merely fail to discharge its contractual duties. For more than a decade, it falsely reaffirmed the same obligations to successive classes of students even as it knew it did not intend to actually honor its promises.[25]

In addition, Plaintiffs have alleged that Yale failed to disclose information to prospective students about the prevalence of Greek life and the dangers of fraternities at the University. AC ¶¶ 172-78. Plaintiffs only realized the crucial role the fraternities play in undergraduate life after matriculating, paying tuition, and entering into a contractual relationship with the school. *Id.* ¶ 173. In light of the circumstances—a renowned college's representation to teenage high school students concerning the realities of attending the University—Yale took it upon itself to inform prospective students of relevant information to aid in their choice of college. The University nevertheless failed

---

[25] In addition, Yale's practices "offend[] public policy as established by the common-law tort of negligent misrepresentation." *Wilkins v. Yale Univ.*, No. CV106014646S, 2011 WL 1087144, at *6 (Conn. Super Ct. Feb. 25, 2011). As explained further below, "because [P]laintiffs' negligent misrepresentation claim is legally sufficient . . . [Plaintiffs'] CUTPA claim is sufficient . . . under the first prong of the cigarette rule." *Id. See Bartold v. Wells Fargo Bank, N.A.*, No. 14-cv-00865, 2015 WL 7458504, at *6 (D. Conn. Nov. 24, 2015) ("Negligent misrepresentation suffices . . . as an aggravating factor making a breach of contract action also the basis of a CUTPA claim." (citation omitted)).

to disclose crucial information about these serious issues. *See, e.g.*, *Hinchliffe v. Am. Motors Corp.*, 471 A.2d 980, 987 (Conn. Super. Ct. 1982), *aff'd* 470 A.2d 1216 (1984) ("The standard utilized by the court for determining whether the defendants' [promotional statement] would have a deceptive impact on a consumer, is the standard applicable to an unthinking, ignorant and credulous person.").

Plaintiffs have undoubtedly suffered a substantial injury because of Yale's misstatements and omissions. *Cf. Day*, 2000 WL 295612, at *8 ("The plaintiff alleges that he incurred significant debt and expense in paying the tuition and that the school's willful failure [to disclose important information] deprived him of the ability to determine whether it was economically prudent for him to continue his studies."). Plaintiffs' allegations easily meet CUTPA's unfairness standard.

### B. Plaintiffs also Plausibly Plead a Deceptive Practices Claim

Plaintiffs also state a claim for a deceptive trade practice. A practice is deceptive under CUTPA when three elements are met: "First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material—that is, likely to affect consumer decisions or conduct." *Caldor, Inc. v. Heslin*, 577 A.2d 1009, 1013 (Conn. 1990). "CUTPA embraces a broader standard of conduct more flexible than traditional common-law claims and does not require proof of intent to deceive, to mislead or to defraud." *Muniz v. Kravis*, 757 A.2d 1207, 1214 (Conn. App. Ct. 2000).

The Amended Complaint sets forth Yale's assertions that the University and its undergraduate organizations do not discriminate based on gender, that it seeks to eliminate sexual misconduct, and that the fraternities played a limited role in Yale's social life. Indeed, Yale's admissions office claims that a mere 10% of undergraduates participates in Greek life. AC ¶ 172.

40

Plaintiffs also plausibly plead that these representations are not accurate. Plaintiffs reasonably interpreted these statements under the circumstances and relied on them in making decisions on which college to attend. Yale's misrepresentations about Greek life and the University's commitment to battling discrimination and sexual misconduct were material, particularly given the alarming risk that female matriculants will experience sexual assault (38.8%) and sexual harassment (74%) during their time at Yale. AC ¶ 86. Indeed, Plaintiff McNeil even recalls speaking to the Vice President for Student Life when she was a junior in high school, specifically asking about the University's efforts to create a supportive and inclusive educational environment. *Id.* at ¶¶ 179-80. Plaintiffs adequately allege all the elements of a deceptive practices claim.

Yale's Motion focuses solely on the representation that 10% of students participate in Greek life. Yale argues that this representation cannot be untruthful because there are competing reports regarding this statistic. Mot. at 36. Even considering this so-called "competing information," Yale's argument still results in the same conclusion, that is, that the 10% representation is *not correct*, and that the percentage is undoubtedly higher. *Id.* While discovery will help the parties determine exactly *how* inaccurate this representation is, there is no doubt that Plaintiffs have alleged that it was false and misleading, and therefore satisfies the first element of a deceptive trade practice claim under CUTPA. *See Wilkins v. Yale Univ.*, No. CV106014646S, 2011 WL 1087144, at *5 (Conn. Super Ct. Feb. 25, 2011) (holding allegation that Yale "failed to exercise reasonable care or competence in its [] communications to the plaintiff, knowing that the plaintiff would reasonably rely upon them to his detriment" sufficient for the first element).

Plaintiffs have also sufficiently pled that under the circumstances, they interpreted the representation reasonably. Yale stated that 10% of the campus "participate[s]" in Greek life. It is only logical that potential students would interpret Yale's public promotional materials as accurate

statements about the University, particularly when they give the impression that some sort of survey or statistical analysis has been conducted. A reasonable consumer—here, high school students—could interpret the word "participate" to mean "participation" in any form and not just being an admitted member. Accordingly, it was reasonable for them to understand that only 10% of Yale's students took part, engaged in, or joined fraternity activities, and that the fraternities played only a minor role in the campus' social life. Yale's attempt to split hairs between "party attendance" and "membership" is unpersuasive. In making such a sweeping statement concerning "participation," Yale misled prospective students like Plaintiffs. *See* AC ¶ 174 (Yale's *Review of DKE and Campus Culture* admitted that students were deceived by Yale's portrayal of Greek life.)

Finally, Plaintiffs allege that the representation was material. As the complaint states, Plaintiffs McNeil, Singer, and Walker enrolled in Yale expecting that fraternities would be a negligible presence, and that the University would actively promote gender equality on campus and aim to eradicate sexual misconduct. AC ¶ 181. The Complaint states that Plaintiffs decided to matriculate at Yale, in part, because of these representations. *Id.* Indeed, the University's social environment is fundamental to students' college experiences, as evidenced by the numerous reports that have focused on Yale's Greek life and social climate. *See e.g.*, *id.* ¶¶ 66-67, 73, 88-91, 173-74. Moreover, accurate information on Greek life is particularly relevant to matriculation decisions given the close association between Greek life and sexual misconduct. *Id.* ¶¶ 3-5, 61-117. Yale simply ignores these facts. Mot. at 37-38. Despite Yale's "world-class education," *id.* at 30, many admitted students could and would plausibly choose to go to another school—such as Harvard, which has cracked down on single-gender fraternities for nearly three years. AC ¶ 16.

Accordingly, Plaintiffs have stated a claim under CUTPA. They plausibly allege that they reasonably relied on Yale's promotional materials and paid tuition based upon Yale's misrepresentations about its Greek life and nondiscrimination policies.

## VI.   PLAINTIFFS   PLAUSIBLY   PLEAD   A   CLAIM   OF   NEGLIGENT MISREPRESENTATION

Plaintiffs also state a claim for negligent representation, based on the same facts underlying their CUTPA claim. "Traditionally, an action for negligent misrepresentation requires the plaintiff to establish (1) that the defendant made a misrepresentation of fact, (2) that the defendant knew or should have known was false, and (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Nazami v. Patrons Mut. Ins. Co.*, 910 A.2d 209, 213 (Conn. 2006) (citation omitted). "[E]ven an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth." *D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.*, 520 A.2d 217, 223 (Conn. 1987).

Yale first contends that Yale's representation about the role of fraternities in student life— namely, that only 10% of the student population is involved in Greek life—constitutes an opinion, not a fact, and therefore is not actionable.[26] "The test for whether a statement is one of opinion or fact is whether 'under the circumstances surrounding the statement, the representation was intended and understood as one of fact as distinguished from one of opinion.'" *Woodling v. Garrett Corp.*, 813 F.2d 543, 552 (2d Cir.1987) (quoting *Crowther v. Guidone*, 441 A.2d 11, 13 (Conn. 1981)). Although the 10% figure may be an approximation, an ordinary reader could conclude that

---

[26] To be clear, Plaintiffs claim for negligent misrepresentation is not solely based on the single representation that Yale focuses on in its motion to dismiss. Plaintiffs' claim relates to all the misrepresentations identified in the CUTPA claim. AC ¶¶ 366-74. It would strain credulity for Yale to argue, for instance, that the representation that "Yale does not discriminate" is an opinion. Yale did not purport to state that it *believed* it didn't discriminate; instead, it promised that it *actually* didn't discriminate.

it was based on concrete, objective information in the University's possession. This was a statement made by Yale itself, in an official University publication, to the public—including potential applicants to the undergraduate college. Under these circumstances, a reasonable person would read the representation as a fact—particularly because it is presented as the result of some kind of data analysis and that it is therefore at least close to accurate. *See Omega Eng'g, Inc. v. Eastman Kodak Co.*, 908 F. Supp. 1084, 1097-98 (D. Conn. 1995) (holding that Kodak's statements about battery shelf life, while estimates, were represented to be conclusions drawn from product research and therefore must be considered statements of fact). These representations are not at all akin to the vague "opinions" that courts have found not actionable—such as the statement from one individual to another that he "shouldn't worry." *Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*, 51 F. Supp. 2d 144, 152 (D. Conn. 1999). Yale made these representations as statements of fact, not mere "puffery," and Plaintiffs reasonably interpreted them in this light.

There is also no doubt that Yale knew that representation to be false, or at least should have known of its falsity. Yale would not be able to make a statement about participation in Greek life without having a process for taking account of its student population. Moreover, Yale should be able to speak accurately about its student organizations, particularly because its policies and procedures extend to all students and all organizations, regardless of registration status. Yale also asserts that its misrepresentations are not actionable because there is no plausible reason why Yale would induce Plaintiffs to attend the University, but that is undoubtedly the point of promotional materials.[27] Regardless, the third element of negligent misrepresentation has nothing to do with whether the defendant intended to induce reliance, but whether the plaintiff was justified in relying

---

[27] Indeed, Plaintiff Walker recalls receiving promotional materials that highlighted Yale's commitment to diversity. *Id.* ¶ 178. The University endeavors to recruit the best students from diverse backgrounds and bring them to Yale. These representations were intended to induce students to apply to Yale.

upon an inaccurate statement. There is no question that Plaintiffs, as prospective Yale students, were justified in relying upon the statements that the University made about its educational programs and about undergraduate campus life. *See Williams Ford, Inc. v. Hartford Courant Co.*, 657 A.2d 212, 222 (Conn. 1995) (noting that the question of reasonableness is a question of fact, and that "[i]n making this determination, the fact finder certainly could take into account the casualness of the allegedly false statements and the context in which they were made").

Moreover, Plaintiffs have alleged specific facts that meet the heightened pleading standard of Fed. R. Civ. P. 9(b). Yale cites only to the section of the complaint that lists the causes of action and ignores dozens of pages of factual allegations concerning various misrepresentations, when those representations were made, and why they were fraudulent. *See* AC ¶¶ 165-81.

Finally, Plaintiffs allege a pecuniary harm. Plaintiffs state that they paid tuition based in part on this alleged misrepresentation. AC ¶ 373. Yale's contention that there was no pecuniary harm if Plaintiffs would have attended another college relies on facts outside the pleadings and is not relevant to the elements of this tort. Plaintiffs paid Yale a substantial amount of money based in part of the school's misrepresentations concerning the role of fraternities on campus and the University's efforts to maintain an inclusive and equal educational environment. *Id.* As a result, these well-pleaded factual allegations state a claim for negligent misrepresentation.

## CONCLUSION

Yale cannot bury its head in the sand to avoid having to remedy sexual misconduct and gender discrimination on its campus. Title IX, Connecticut law, and Yale's own contracts prohibit such behavior. The Court should therefore deny Yale's Motion to Dismiss in full.

Dated: July 3, 2019

Respectfully submitted,

  /s/ David Tracey____

David Sanford*
David Tracey*
Albert Powell*
Scott Sullivan*
Meredith Firetog**
Carolin Guentert**
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
dtracey@sanfordheisler.com
apowell@sanfordheisler.com
ssullivan@sanfordheisler.com
mfiretog@sanfordheisler.com
cguentert@sanfordheisler.com
*admitted *pro hac vice*
***pro hac vice* forthcoming

Attorney Daniel H. Schneider
Fed. Bar No. ct13208
**Schneider Law Firm, LLC**
112 Broad Street North, First Floor
Milford, CT 06460
Telephone: (203) 874-0030
Facsimile: (203) 878-01117
Daniel@Schneider-Law-Firm.com

*Attorneys for Plaintiffs and the Proposed Class*

46