**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ANNA MCNEIL, ELIANA SINGER, RY WALKER, on behalf of themselves and all others similarly situated, and ENGENDER on behalf of itself and its members** | ) ) ) ) ) | **No. 3:19-cv-00209-VAB** |
| **Plaintiffs,** | ) ) | |
| **v.** | ) | |
| **Yale University; Yale Chapter of Alpha Delta Phi International, Inc.; Alpha Epsilon Pi, Epsilon Upsilon; Alpha Kappa Delta of Chi Psi; Delta Kappa Epsilon, Phi Chapter; Leo; Sigma Chi, Theta Upsilon Chapter; Sigma Nu Fraternity Beta Alpha Chapter; Sigma Phi Epsilon, Connecticut Delta Chapter; Zeta Psi, ETA Chapter; Alpha Delta Phi International Inc.; Alpha Epsilon Pi Fraternity, Inc.; Chi Psi Fraternity; Delta Kappa Epsilon Fraternity; Sigma Alpha Epsilon Fraternity; Sigma Chi International Fraternity; Sigma Nu Fraternity, Inc.; Sigma Phi Epsilon Fraternity; Zeta Psi Fraternity, Inc.; Sig Ep Housing of Connecticut Delta LLC; Edward J. Donahue III; 402 Crown LLC; 340 Elm, LLC; Mother Phi Foundation, Inc.; Connecticut Omega of Sigma Alpha Epsilon House Corporation; House Corporation of Sigma Chi at Yale, Inc.; High Street Housing Corporation; ZP Nutmeg Associates Inc.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Defendants.** | ) | **JULY 3, 2019** |

**PLAINTIFFS' OPPOSITION TO DEFENDANT FRATERNITIES'**
**MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................iii

INTRODUCTION ............................................................................................1

FACTUAL BACKGROUND ................................................................................4

LEGAL STANDARD..........................................................................................6

ARGUMENT ..................................................................................................7

    I.      PLAINTIFFS STATE VALID CLAIMS UNDER THE FAIR
           HOUSING ACT.......................................................................................7

          A. Plaintiffs Are "Aggrieved Persons" Under the Fair Housing
             Act.............................................................................................7

          B. The FHA "Private Club" Exemption is an Affirmative
             Defense Inappropriate for Determination on a Motion to
             Dismiss, and, in Any Case, Does Not Apply ....................................12

                1.   The "private club" exemption is an affirmative defense
                     that cannot be resolved in the context of a Motion to
                       Dismiss.............................................................................13

                2.   The Fraternities do not qualify for the "Private Club"
                     Exemption .........................................................................14

                        a.   The Fraternity Defendants offer "dwellings"
                            and not "lodgings" as required under the
                            "private club" exemption. ..........................................14

                        b.   Fraternity houses are not "incidental" to the
                            Fraternity Defendants' purpose and are
                              operated for commercial gain .....................................16

                        c.   The Fraternities Fail the exemption because
                            they are open to the public ..........................................17

    II.     PLAINTIFFS STATE A VALID CLAIM UNDER THE
           CONNECTICUT DISCRIMINATORY HOUSING PRACTICES
           ACT....................................................................................................18

    III.    PLAINTIFFS STATE A VALID CLAIM FOR CIVIL
           CONSPIRACY .......................................................................................19

i

IV.   PLAINTIFFS STATE A VALID CLAIM OF PUBLIC
      ACCOMMODATIONS DISCRIMINATION UNDER
      CONNECTICUT LAW ....................................................................................20

      A.  The Public Accommodations Analysis is Unsuited for a
          Motion to Dismiss...............................................................................21

      B.  Fraternities Are Places of Public Accommodation ..............................21

          1.  The Fraternities open their facilities to the public ...................22

          2.  Fraternities are not truly selective............................................24

          3.  The Fraternities are also public accommodations
              through their symbiotic relationship with Yale; Yale
              empowers the Fraternities to control campus social life..........28

      C.  The Court Should Not Consider the Connecticut Human
          Rights and Opportunities ("CHRO") Case Assessment Review .........28

      D.  The First Amendment Does Not Give Defendants the Green
          Light to Violate Connecticut Antidiscrimination Law .......................30

V.    PLAINTIFFS' CLAIMS AGAINST SIGMA ALPHA EPSILON
      ARE NOT MOOT.......................................................................................34

CONCLUSION.....................................................................................................34

# TABLE OF AUTHORITIES

**CASES:**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................................... 6

*Aurecchione v. Schoolman Transp. Sys., Inc.*,
   426 F.3d 635 (2d Cir. 2005) ..................................................................................... 7

*AvalonBay Cmtys., Inc. v. Town of Orange*,
   775 A.2d 284 (Conn. 2001) ..................................................................................... 18

*Bank of Am. Corp. v. City of Miami*,
   137 S. Ct. 1296 (2017) ..................................................................................... 2, 8, 12

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
   481 U.S. 537 (1987) ............................................................................... 1, 30, 31, 32

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ................................................................................................. 6

*Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*,
   502 F.3d 136 (2d Cir. 2007) ....................................................................... 30, 31, 32, 33

*Conn. Hosp. v. City of New London*,
   129 F. Supp. 2d 123 (D. Conn. 2001) ............................................................... 15, 16

*Corcoran v. German Social Soc. Forhsinn, Inc.*,
   No. CV020562775S, 2008 WL 642659 (Conn. Super. Ct. Feb. 21, 2008) ................. 22, 23, 24

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016) ................................................................................... 6, 29

*Erickson v. Pardus*,
   551 U.S. 89 (2007) ................................................................................................... 6

*Foman v. Davis*,
   371 U.S. 178 (1962) ................................................................................................. 9

*Frank v. Ivy Club*,
   576 A.2d 241 (N.J. 1990) ..................................................................................... 21, 28

*Franklin Lodge of Elks v. Marcoux*,
   825 A.2d 480 (N.H. 2003) ................................................................................... 23, 25

*Fraternal Order of Eagles, Inc., Tucson Aerie No. 180 v. City of Tucson*,
  816 P.2d 255 (Ariz. App. 1991) ............................................................... 23

*Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*,
  59 P.3d 655 (Wash. 2002) ............................................................... 23, 26

*Gladstone Realtors v. Village of Bellwood*,
  441 U.S. 91 (1979) ............................................................... 11, 12

*Goel v. Bunge, Ltd.*,
  820 F.3d 554 (2d Cir. 2016) ............................................................... 6, 28

*Gomez v. Toledo*,
  446 U.S. 635 (1980) ............................................................... 13

*Hack v. President and Fellows of Yale Coll.*,
  16 F. Supp. 2d 183 (D. Conn. 1998) ............................................................... 11

*Harp v. King*,
  835 A.2d 953 (Conn. 2003) ............................................................... 19, 20

*Harris v. Itzhaki*,
  183 F.3d 1043 (9th Cir. 1999) ............................................................... 8

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ............................................................... 11, 12

*Hogar Agua y Vida en el Desierto, Inc. v. Suarez-Medina*,
  36 F.3d 177 (1st Cir. 1994) ............................................................... 13

*Home Quest Mortgage LLC v. Am. Family Mut. Ins. Co.*,
  340 F. Supp. 2d 1177 (D. Kan. 2004) ............................................................... 16

*Hunt v. Aimco Properties, L.P.*,
  814 F.3d 1213 (11th Cir. 2016) ............................................................... 13

*Jones v. Bock*,
  549 U.S. 199 (2007) ............................................................... 13

*Kiwanis International v. Ridgewood Kiwanis Club*,
  806 F.2d 468 (3d Cir. 1986) ............................................................... 26

*Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.*,
  455 F.3d 154 (3d Cir. 2006) ............................................................... 15, 16

*Lamberty v. Conn. State Police Union*,

iv

No. 3:15-CV-378, 2018 WL 5115559 (D. Conn. Oct. 19, 2018) ............................................ 34

*Lloyd Lions Club of Portland v. Int'l Ass'n of Lions Clubs*,
    724 P.2d 887 (Or. App. 1986) .................................................................................... 25

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015) ................................................................................ 7, 29

*Obergefell v. Hodges*,
    135 S. Ct. 2584 (2015) ............................................................................................... 10

*Patel v. Holley House Motels*,
    483 F. Supp. 374 (S.D. Ala. 1979) ............................................................................ 15

*Quinnipiac Council, Boy Scouts of Am., Inc. v. Comm'n on Human Rights & Opportunities*,
    528 A.2d 352 (Conn. 1987) ............................................................................... passim

*Ragin v. Harry Macklowe Real Estate Co.*,
    6 F.3d 898 (2d Cir. 1993) ....................................................................................... 9, 10

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ................................................................................................... 30

*Rosen v. Brookhaven*,
    194 F. Supp. 2d 224 (S.D.N.Y. 2002) ....................................................................... 13

*Rotary Club of Duarte v. Bd. of Dirs. of Rotary Int'l*,
    178 Cal. App. 3d 1035 (1986) ......................................................................... 1, 23, 24

*Roth v. Jennings*,
    489 F.3d 499 (2d Cir. 2007) ...................................................................................... 29

*San Pedro Hotel Co., Inc. v. City of Los Angeles*,
    159 F.3d 470 (9th Cir. 1998) ..................................................................................... 12

*Schellenberg v. Rochester Mich. Lodge No. 2225, of Benev. & Protective Order of Elks of U.S.A.*,
    577 N.W.2d 163 (Mich. App. 1998) .......................................................................... 25

*Schneider v. Cty. of Will*,
    190 F. Supp. 2d 1082 (N.D. Ill. 2002) ...................................................................... 15

*Silver v. Kuehlbeck*,
    217 F. App'x 18 (2d Cir. 2007) ................................................................................. 13

*Thompson v. N. Am. Stainless, LP*,
    562 U.S. 170 (2011) ..................................................................................................... 8

*Tice v. Southington Bd. of Educ.*,
  2 F. App'x 152 (2d Cir. 2001) ................................................................. 9

*Trafficante v. Metro. Life Ins. Co.*,
  409 U.S. 205 (1972) ...................................................................... 8, 10

*U.S. Jaycees v. McClure*,
  305 N.W.2d 764 (Minn. 1981) .......................................................... 27

*U.S. v. Columbus Country Club*,
  915 F.2d 877 (3d Cir. 1990) ......................................................... 14, 15

*U.S. v. Lansdowne Swim Club*,
  894 F.2d 83 (3d Cir. 1990) ........................................................... 17, 25

*U.S. v. Space Hunters, Inc.*,
  429 F.3d 416 (2d Cir. 2005) ............................................................ 13

*U.S. v. Trs. of Fraternal Order of Eagles, Milwaukee Aerie No. 137*,
  472 F. Supp. 1174 (E.D. Wis. 1979) ................................................. 26

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
  113 F. Supp. 3d 555 (D. Conn. 2015) ............................................. 18, 19

*Vill. of Bellwood v. Dwivedi*,
  895 F.2d 1521 (7th Cir. 1990) ........................................................... 8

*Xechem, Inc. v. Bristol-Myers Squibb Co.*,
  372 F.3d 899 (7th Cir. 2004) ........................................................... 13

**STATUTES:**

42 U.S.C. § 3602 ...................................................................... 8, 14

42 U.S.C. § 3604 ....................................................................... 9, 11

42 U.S.C. § 3607(a) .......................................................... 12, 14, 16, 17

42 U.S.C. § 3613(a) ....................................................................... 8

42 U.S.C. § 2000a(e) .................................................................... 17

Conn. Gen. Stat. § 46a-63 ...................................................... 20, 21, 22

Conn. Gen. Stat. § 46a-64 ...................................................... 17, 20, 33

Conn. Gen. Stat. § 46a-83 ............................................................................................................. 29

Conn. Gen. Stat. § 46a-100 ........................................................................................................... 29

**RULES**

Fed. R. Civ. P. 8 .................................................................................................................... 6, 13

Fed. R. Civ. P 12 ......................................................................................................................... 7

Fed. R. Civ. P. 15(a)(1)(B) ........................................................................................................ 9

## INTRODUCTION

*Incredibly, 14 years before the start of the 21st century and 210 years after the signing of the Declaration of Independence we still find ourselves having to write an opinion defending the right of American women to equal opportunity in a secular organization of approximately 20,000 clubs with more than 900,000 members.*

   —*Rotary Club of Duarte v. Bd. of Dirs. of Rotary Int'l*, 178 Cal. App. 3d 1035, 1043 (1986), *aff'd*, 481 U.S. 537 (1987)

Nineteen years into the twenty-first century, this Court faces a similar case in which entrenched secular institutions bar their doors to women and deprive them of the important and extensive benefits of membership. Defendant Fraternities—nationwide organizations with tens of thousands of members each—promulgate and rigorously enforce blanket exclusionary policies shutting out all women.[1] Female candidates who would otherwise satisfy the criteria for admission are denied membership in the Fraternities. Being a woman is an automatic and fatal disqualifier.

Plaintiffs are victims of Defendants' discriminatory policies and practices and seek redress in this action. For three straight years, Plaintiffs petitioned Defendant Fraternities for the opportunity to become members, and thereby gain access to the Fraternities' housing, professional networks, and social capital. For three straight years, the Fraternities denied them admission based upon their gender alone, responding with one voice: women need not apply. Plaintiffs do not seek

---

[1] For purposes of this brief, "Defendant Fraternities," "Fraternity Defendants," or "the Fraternities" refers to the Defendants who jointly filed their Motion to Dismiss on May 31, 2019. Dkt. No. 76 ("Mot. to Dismiss"). Those Defendants include the national organizations and local Yale chapters of fraternal organizations known as: Alpha Epsilon Pi, Alpha Delta Phi, Chi Psi, Delta Kappa Epsilon, Sigma Alpha Epsilon/Leo, Sigma Chi, Sigma Nu, Sigma Phi Epsilon, and Zeta Psi. They also include housing entities that own the fraternity houses for six of the aforementioned fraternities.

  Additionally, Defendant Edward J. Donahue III filed a letter three days after his deadline to respond to the Amended Complaint, stating that he joins in the above-listed Defendants' Motion. Dkt. No 83. Defendant Donahue is therefore also considered one of "Defendant Fraternities" for purposes of this brief.

to eradicate the Fraternities or change their basic purpose; they only seek the opportunity to become equal members.

The Fraternities' explicit discriminatory acts and practices violate the federal Fair Housing Act ("FHA") and the Connecticut Discriminatory Housing Practices Act ("CDHPA"), which prohibit discrimination in housing based on gender. The Fraternities also collaborated with the housing corporations that own the fraternity houses to perpetuate facially discriminatory housing decisions, thereby engaging in a civil conspiracy under Connecticut law. Moreover, since the Fraternities broadly open their organizations to the public, they are "public accommodations" under Connecticut law—and are prohibited from discriminating against women in their membership practices. Just as longstanding fraternal organizations such as the Rotary Club, Elks, and Lions Club expanded—often under compulsion of law—to admit women in the late twentieth century, so too must the all-male Fraternities in the twenty-first. There is no legal justification for keeping women out of the clubhouse.

The Fraternities' Motion fails to raise any valid basis for dismissal. In their principal attack, the Fraternities argue that Plaintiffs failed to apply for housing with their organizations and therefore are not "aggrieved persons" under the FHA and CDHPA. But this contention simply ignores Plaintiffs' actual allegations. Housing in the Fraternities is often exclusively available to members, *i.e.*, men. Plaintiffs accordingly allege that by denying them membership, the Fraternities also denied them housing. *E.g.* Amended Complaint ("AC") ¶¶ 163, 164, 261, 270, 280-82. Thus, Plaintiffs' claims reside at the heart of the "zone of interests" protected by the FHA. *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1303 (2017) (citation omitted). Plaintiffs are not required to perform the futile act of separately applying for housing after being rejected as members. In the alternative, Defendants argue that they are shielded by the FHA's "private club"

exemption. But the exemption is an affirmative defense, and thus inappropriate for consideration on a motion to dismiss. Moreover, Plaintiffs' allegations thoroughly refute the elements of the "private club" exemption. Among other holes in Defendants' argument, the exemption only applies to temporary "*lodgings*" (*i.e.*, hotels or motels) and not "*dwellings*," like the fraternity houses here, where people live for fixed periods of time.

The Fraternities' attacks on Plaintiffs' public accommodations claims fare no better. Again ignoring Plaintiffs' actual allegations, the Fraternities insist that they are selective organizations that do not open themselves to the public. But the Amended Complaint states just the opposite. At Yale, the Fraternities open up their facilities to the broader community. Not only are all Yale students regularly welcomed, but the Fraternities invite students from other schools and from the community at large and admit guests without even checking identification. When they are not staging their own parties and events, the Fraternities rent out their houses for concerts, birthday parties, and other happenings. Except for engaging in express gender discrimination, they are also unselective in their membership practices. The principal criterion is being a man, and the Fraternities freely admit the majority of men who apply. Across the country, each of the Fraternities has tens of thousands of male members. Not only do these facts raise a plausible inference at the pleadings stage that they are "public accommodations," but Plaintiffs' allegations also undermine the Fraternities' argument that the application of anti-discrimination law would infringe upon their right of intimate association. Where an organization opens its doors to the public and confers valuable social and economic benefits, there is no First Amendment right to intimate association only with men.

Consequently, the Court should deny Defendant Fraternities' Motion in all respects.

## **FACTUAL BACKGROUND**

As detailed in the Complaint, Plaintiffs McNeil, Singer, Walker, and other members of Engender have fought over the past three years to become members of Defendant Fraternities. In early 2017, Plaintiffs McNeil and Walker and other members of Engender sought admission to the Fraternities but were denied. AC ¶¶ 11, 128-31. Plaintiffs tried again in January 2018, and again they were denied admission. *Id*. ¶¶ 11, 133-39. Plaintiffs tried for a third time in December 2018, but alas the third time was not the charm. *Id*. ¶¶ 11, 140-43. On each occasion, the Fraternities explicitly stated that they denied Plaintiffs the opportunity to join solely because of their gender. Indeed, the Fraternities' local chapters and national organizations have explicit policies limiting admission to only men. *Id.* ¶¶ 128-29, 131, 136, 138-39, 141-42, 151. The Fraternities have steadfastly and adamantly applied these rules to the detriment of Plaintiffs and many other women like them. *Id.*

By denying Plaintiffs the opportunity to become members, Defendants also deprived them of the many benefits that flow to fraternity members at Yale. For example, Defendants cut them off from access to "prime off-campus housing." *Id*. ¶ 122. Defendants "give priority to fraternity members—i.e. to men—in renting residential units in the fraternity houses." *Id*. ¶ 163. In practice, during the academic year, housing is limited to fraternity brothers. *Id.* ¶¶ 159, 199. Another key benefit is the social capital associated with Yale fraternities: vast networks of alumni and professional connections. *Id*. ¶ 122. Access to these networks and connections can lead to summer internships and coveted employment and career opportunities. *Id.* The discriminatory behavior practiced by the Fraternity Defendants has prevented Plaintiffs from realizing the economic, associational, and social benefits that come hand in hand with belonging to a fraternity at Yale University. *Id*. ¶¶ 118-24.

4

Apart from their refusal to admit women, the Fraternities are otherwise open organizations. Their national organizations consist of tens of thousands of members admitted without distinction. *Id.* ¶¶ 193-94. Defendants' local Yale chapters serve as the "de facto social environment" for many students at the University, and they regularly open their parties to members of the New Haven public and individuals from out of state. *Id.* ¶¶ 2, 174, 197. Indeed, they often admit guests without checking their identification. *Id.* ¶ 197. They also rent out their houses for concerts, birthday parties, and to other groups who seek a space to host social events. *Id.* ¶ 198.

Unfortunately, the Fraternity-run social events are hotbeds of sexual misconduct. As alleged throughout the Complaint, Plaintiffs have been the victims of sexual harassment and assaults at fraternity parties and events since enrolling at the University. *Id.* ¶¶ 104-117. From their initial experiences at Yale, Plaintiffs realized "that, as women, their admission to fraternity parties was contingent on their [physical] appearance[, and b]rothers who were at the door would look them up and down before agreeing to admit them to a party." *Id.* ¶ 104.

Plaintiff McNeil was groped without consent by male attendees at Yale fraternity parties during her first semester at the University. *Id.* ¶¶ 105, 107. Ms. McNeil was again the victim of sexual assault in December 2018 when an unknown "male attendee persistently grinded against [her] from behind without her consent." *Id.* ¶ 108. Ms. McNeil also witnessed other female attendees being groped without consent at a Fraternity party during the Fall 2016 semester. *Id.* ¶ 105.

Plaintiff Walker has also experienced sexual assault and witnessed sexual harassment since matriculating at Yale. During her first semester as a Yale student in 2016, Ms. Walker was sexually assaulted on the dance floor at a fraternity party when "a large man began grinding on her from behind [and] then lifted her skirt and grabbed her crotch." *Id.* ¶ 110. In August 2016, Plaintiff

5

Walker witnessed fraternity brothers groping women without their consent and ogling dancing female students from above. *Id*. ¶ 111. Ms. Walker was also denied admission to a fraternity party because she is an African American woman. *Id*. ¶ 112.

Plaintiff Singer was also the victim of a sexual assault during her first semester as a Yale student when she was groped from behind without consent during a fraternity party. *Id*. ¶ 115. Other members of Engender have also experienced episodes of sexual misconduct at Yale fraternity parties and events. *Id*. ¶ 116.

## LEGAL STANDARD

The "liberal pleading standard[]" of Fed. R. Civ. P. 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (citations omitted).

A court should deny a motion to dismiss if a complaint states "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). As the Supreme Court stated in *Twombly*, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." 550 U.S. at 556 (citation omitted).

On a 12(b)(6) motion, a "court . . . is not engaged in an effort to determine the true facts," *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016); that comes later—"[t]he test of a claim's 'substantive merits' is 'reserved for . . . summary judgment,'" *Goel v. Bunge, Ltd.*, 820 F.3d 554, 558-59 (2d Cir. 2016) (citation omitted). The Court must take a complaint "as a whole," "accepting

all factual allegations . . . as true and drawing all reasonable inferences in Plaintiffs' favor." *Loreley*

*Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 169, 171 (2d Cir. 2015).

A Rule 12(b)(1) motion concerns the court's "statutory or constitutional power to adjudicate" the plaintiff's claims. *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). On a 12(b)(1) motion, the court must also "constru[e] all ambiguities and draw[ ] all inferences in a plaintiff's favor." *Id.* (internal quotation marks and citations omitted).[2]

## ARGUMENT

## I.   PLAINTIFFS STATE VALID CLAIMS UNDER THE FAIR HOUSING ACT

Defendant Fraternities assert, with virtually no support, that Plaintiffs fail to qualify as "aggrieved persons" under the FHA and, in the alternative, that Defendants are shielded from liability as "private clubs." Both arguments betray a fundamental misunderstanding of the law and the facts as alleged in the Amended Complaint.

### A.   Plaintiffs Are "Aggrieved Persons" Under the Fair Housing Act

Plaintiffs allege that Defendant Fraternities repeatedly rejected their requests to become members—explicitly citing their gender. AC ¶¶ 125-44. This effectively deprived them of the opportunity to live in Defendants' fraternity houses. *Id*. ¶ 163. Despite these clear allegations, the Fraternities argue that Plaintiffs are not "aggrieved persons" unless they went through the empty formality of submitting additional, separate applications "for *housing* with the Fraternity Defendants."[3] Mot. to Dismiss at 13. This is a distinction without a difference. As the Fraternities

---

[2] Although Defendant Fraternities style their Motion as coming under both Rules 12(b)(1) and 12(b)(6), they do not clearly identify which arguments are made pursuant to Rule 12(b)(1) and which arguments are pursuant to Rule 12(b)(6). For the avoidance of doubt, Plaintiffs' arguments are intended to respond in full to Defendants' arguments.

[3] Notably, the Fraternities do not contest the organizational standing of Plaintiff Engender. In addition to the damages suffered by Engender members, the Complaint describes how "Plaintiff Engender has had to focus much of its time, effort, and resources in seeking equal access for female and non-binary students to

readily admit, one must generally be a "member[] of the Local Chapter[]" *to be eligible for* housing in a fraternity house. *Id.* at 8 (housing exclusively for fraternity members); *see also* AC ¶ 163 (same). Housing is one of the primary benefits of membership, and denial of membership is essentially synonymous with denying housing. AC ¶ 163. The Fraternities' formalistic argument is out of step with the "broad reach" of the FHA's "aggrieved persons" requirement. *Bank of Am.*, 137 S. Ct. at 1304.

The FHA empowers any "aggrieved person" to bring a housing discrimination action. 42 U.S.C. § 3613(a). Under the statute, an "aggrieved person" includes "any person who" either "claims to have been injured by a discriminatory housing practice" or believes that such a practice "is about to occur." 42 U.S.C. § 3602(i). The statute's language demonstrates "a congressional intention to define standing as broadly as is permitted by Article III of the Constitution." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (citation omitted); *see also Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176 (2011). The FHA's "very liberal standing" standard means that "the sole requirement for standing under the Act is the 'Article III minima of injury in fact.'" *Harris v. Itzhaki*, 183 F.3d 1043, 1050 (9th Cir. 1999) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372 (1982)). A plaintiff need only identify an injury "arguably within the zone of interests" protected by the FHA and "fairly traceable" to the defendant. *See Bank of Am.*, 137 S. Ct. at 1302 (citation omitted).

---

the privileges of fraternity membership, including equal access to housing." AC ¶ 263. Recently, the Supreme Court has explicitly recognized that organizations suffering such harms qualify as "aggrieved persons" under the FHA. *See Bank of Am.*, 137 S. Ct. at 1303-04 (an "organization that spent money to combat housing discrimination" is "aggrieved person" under FHA) (citations omitted); *see also Vill. of Bellwood v. Dwivedi*, 895 F.2d 1521, 1526 (7th Cir. 1990).

The "aggrieved person" standard must be applied in accordance with the expansive scope of the substantive provisions of 42 U.S.C. § 3604. Subsection (a) prohibits a defendant from "*otherwise mak[ing] unavailable* or deny[ing] a dwelling to *any person* because of . . . sex."(emphasis added).[4]  Similarly, subsection (b) proscribes gender-based discrimination "against *any person* in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith." (emphasis added).

Subsection (c) prohibits parties from making or causing to be made any notice or statement with respect to the sale or rental of a dwelling "that indicates any preference, limitation, or discrimination based on . . . sex . . . or an intention to make any such preference, limitation, or discrimination." Just being subjected to such a statement or advertisement is sufficient to confer standing, even if one is not in the market for housing. *Ragin v. Harry Macklowe Real Estate Co*., 6 F.3d 898, 903-04 (2d Cir. 1993) (applying *Havens Realty*, 455 U.S. at 373-74). Here, Defendants proclaimed that women as a class would be precluded from fraternity membership and thus excluded or disfavored from eligibility for housing. AC ¶¶ 128-29, 131, 136, 138-39, 141-42, 151. And the Fraternities repeated this clear message to Plaintiffs when informing them that they could not be members because of their sex. *Id*. ¶¶ 128-29, 131, 136, 139, 141-42.[5]

---

[4] Notably, section 3604(a) is framed in the disjunctive, with only one provision—not applicable here—requiring a *bona fide* offer. *See* 42 U.S.C. § 3604(a) ("[I]t shall be unlawful . . . to refuse to sell or rent after the making of a bona fide offer, *or* to refuse to negotiate for the sale or rental of, *or* otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.") (emphasis added). Defendants effectively ask the Court to improperly read the "*bona fide* offer" language into each provision of the statute.

[5] The Amended Complaint pleads sufficient allegations to put Defendants on notice of a claim under § 3604(c). *See Tice v. Southington Bd. of Educ.*, 2 F. App'x 152, 153 (2d Cir. 2001) ("The principal function of pleadings under the Federal Rules is to give fair notice of the claim asserted . . . There is no requirement in the Federal Rules that a plaintiff cite statutory sections in the complaint."). To the extent there is any ambiguity, Plaintiffs request leave to amend to more clearly cite this subsection of the statute in Count III. *See generally* Fed. R. Civ. P. 15(a)(1)(B) ("The court should freely give leave when justice so requires."); *Foman v. Davis*, 371 U.S. 178, 182 (1962) (describing the liberal standard for amendment).

There can be no doubt that Plaintiffs' claims reside squarely at the heart of the "zone of interests" protected by the FHA and that their injuries are the immediate and direct result of Defendants' discriminatory acts. Plaintiffs were not only denied access to prime off-campus housing based on the Fraternities' discriminatory practices, but also deprived of a variety of other social, associational, and economic benefits that confer standing under the FHA. *See, e.g.*, *Trafficante*, 409 U.S. at 210 (finding FHA allows suits by tenants claiming that they were deprived benefits from interracial associations). Moreover, being subjected to the denial of housing (or even the prospect thereof) because of one's gender itself inflicts distinct dignitary and emotional harm. *See, e.g.*, *Ragin*, 6 F.3d at 904, 907; *cf. Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015) (noting that invidious sex-based classifications deny "the equal dignity of men and women").

As the Amended Complaint sets out, Plaintiffs repeatedly sought membership in the Fraternities, which would have entitled them to housing benefits. AC ¶¶ 126-44. Plaintiffs' requests for admission were rejected for explicitly discriminatory reasons. *See, e.g.*, *id.* ¶¶ 128-29, 131, 139 (rejections citing national bylaws mandating gender discrimination); ¶ 136 (one Fraternity rejecting Plaintiffs because it is an "all-male organization" while another states that to be eligible for membership "a person must be a man"); ¶ 141 (rejections stating that chapters "offer[] membership only to male undergraduate students"); ¶ 142 (rejections stating that Fraternities only "offer bids to those who self-identify as male").

By denying Plaintiffs membership, Defendant Fraternities effectively denied them housing rights that would have been available to them but for their gender. The Amended Complaint explicitly ties the Fraternities' discriminatory acts to the availability of housing, stating that by "denying women admission as members, Defendant Fraternities also deny women the opportunity to rent units in the fraternity houses because of their gender." *Id.* ¶ 163. In addition to desirable

10

dwelling units, Defendants' discriminatory acts deprived Plaintiffs of a variety of associated services and facilities. *Id*. ¶ 122. These discriminatory acts are expressly prohibited under the FHA. *Id*. ¶¶ 256-64; 42 U.S.C. § 3604.[6]

Further, Defendants' discriminatory acts deprived Plaintiffs of a host of specific economic and social benefits associated with living in a fraternity—including association with its members. AC ¶¶ 118-24. The Supreme Court has recognized that individuals and communities denied such "social, professional, and economic" benefits as "aggrieved persons" possessing actionable FHA claims, even when supported by only general allegations. *See, e.g.*, *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 110, 114 & n.30 (1979) (upholding standing of plaintiffs alleging that discriminatory "racial steering" practices deprived them of "social and professional advantages" and thus caused economic and non-pecuniary harms); *Havens Realty*, 455 U.S. at 375-77.

Established precedent emphatically rejects the Fraternities' position that the "aggrieved person" provision requires a plaintiff to formally "apply for housing" and then be "denied such housing." Mot. to Dismiss at 6.[7] In actuality, "any person harmed by discrimination, whether or not the target of the discrimination, can sue to recover for his or her own injury." *San Pedro Hotel Co., Inc. v. City of Los Angeles*, 159 F.3d 470, 475 (9th Cir. 1998) (citing *Trafficante*, 409 U.S. at

---

[6] Contrary to Defendants' arguments, Mot. to Dismiss at 5-6, Plaintiffs plausibly allege that local chapters, national organizations, and housing entities each acted to deprive them of housing. The local chapters denied them the opportunity to become members, thereby precluding them from dwelling in the fraternity houses. AC ¶¶ 128-29, 131, 136, 138-39, 141-42, 163. The chapters were guided and driven by discriminatory policies, practices, and rules of the national organizations. *Id*. ¶¶ 151-52. And the housing corporations knowingly furnished the dwellings to the fraternities despite their openly discriminatory policies, directly enabling discrimination against women. *Id*. ¶ 159.

[7] The only precedent Defendants offer, *Hack v. President and Fellows of Yale Coll.*, did not hold that the plaintiffs' claim was undermined by a failure to apply for housing. Rather, Yale did not deny the plaintiffs access or entitlement to housing in any sense; Yale affirmatively provided housing for them on an equal basis with other students, regardless of any protected status they might hold, and even kept designated dorm rooms vacant for their return. In that case, the plaintiffs simply chose not to accept the housing that was offered and furnished to them. 16 F. Supp. 2d 183, 193 (D. Conn. 1998).

208). "This is true, for example, even when no housing has actually been denied to persons protected under the Act." *San Pedro Hotel*, 159 F.3d at 475 (citation omitted). Similarly, while the link between the denial of fraternity membership and housing is manifest, it is clear that indirect and secondary injuries are sufficient for standing under the FHA. *See Gladstone Realtors,* 441 U.S. at 111; *Havens Realty*, 455 U.S. at 376.

Most recently, in 2017, the Supreme Court again rejected the type of narrow, begrudging interpretation the Fraternities now advocate. In *Bank of America,* the Court held that the City of Miami was an "aggrieved party" with standing to challenge banks' discriminatory lending practices towards minority home buyers. The City's claims of indirect harm through increased segregation, reduced tax revenue, and heightened public spending were sufficient. The Court unequivocally rejected the banks' standing argument and emphasized that the "aggrieved persons" standard reaches "as broadly as is permitted by Article III of the Constitution." 137 S. Ct. at 1303 (citation omitted). Emphasizing the breadth of diverse interests protected under the FHA, the Court stated:

> [W]e have held that the Act allows suits by white tenants claiming that they were deprived benefits from interracial associations when discriminatory rental practices kept minorities out of their apartment complex, *Trafficante*, 409 U.S. at 209-212[]; a village alleging that it lost tax revenue and had the racial balance of its community undermined by racial-steering practices, *Gladstone*, 441 U.S. at 110-111[]; and a nonprofit organization that spent money to combat housing discrimination, *Havens Realty*, 455 U.S. at 379[].

*Id*. at 1304. So too, here, Plaintiffs are within the expansive "zone of interests" protected by the FHA. *Id.* Their injuries are precisely the type of harm the FHA was designed to guard against.

## B. The FHA "Private Club" Exemption is an Affirmative Defense Inappropriate for Determination on a Motion to Dismiss, and, in Any Case, Does Not Apply

Defendant Fraternities' invocation of the FHA "private club" exemption also fails. This exemption, 42 U.S.C. § 3607(a), states:

Nor shall anything in this subchapter prohibit a private club not in fact open to the public, which as an incident to its primary purpose or purposes provides lodgings which it owns or operates for other than a commercial purpose, from limiting the rental or occupancy of such lodgings to its members or from giving preference to its members.

As a threshold matter, the "private club" exemption is an affirmative defense not amenable to a motion to dismiss. Moreover, as made plain in the Amended Complaint, the Defendants do not qualify for this exceedingly narrow exception.

### 1. The "private club" exemption is an affirmative defense that cannot be resolved in the context of a Motion to Dismiss

Defendants cannot avail themselves of the "private club" exemption on a 12(b)(6) motion. The exemption is a narrow, fact-driven affirmative defense unsuitable for a motion to dismiss. *U.S. v. Space Hunters, Inc.*, 429 F.3d 416, 426 (2d Cir. 2005) ("Courts have consistently characterized exemptions to the FHA as affirmative defenses."); *see also Hogar Agua y Vida en el Desierto, Inc. v. Suarez-Medina*, 36 F.3d 177, 181 (1st Cir. 1994) (finding that "exemptions from FHA liability are to be *narrowly* construed") (emphasis in original). Because Defendants bear the burden of proof, invoking an FHA exemption affirmative defense "does not aid [them] at the motion to dismiss stage." *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1225 (11th Cir. 2016).

This accords with the basic rule that plaintiffs generally have "no obligation to anticipate and refute potential affirmative defenses" in a complaint. *Rosen v. Brookhaven Capital Mgmt., Co., Ltd.*, 194 F. Supp. 2d 224, 227 (S.D.N.Y. 2002); *see Jones v. Bock*, 549 U.S. 199, 211-12 (2007) (plaintiff need not plead absence of even a "mandatory" affirmative defense such as administrative exhaustion); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) (defendant has burden to plead qualified immunity defense); Fed. R. Civ. P. 8(c). Only in the extraordinary circumstances where a plaintiff's complaint on its face "admits all the ingredients of an impenetrable defense [ ] may a complaint that otherwise states a claim" be dismissed. *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004); *see also Silver v. Kuehlbeck*, 217 F. App'x 18, 22 (2d Cir. 2007).

13

For this reason alone, Defendants' bid for dismissal based on the exemption fails.[8]

### 2.   The Fraternities do not qualify for the "Private Club" Exemption

A defendant seeking to shield itself through the "private club" exemption of the FHA must establish *all five* of the following elements: it must (1) be a "private club not in fact open to the public"; (2) provide "*lodgings*" (as opposed to "dwellings"); (3) limit the "rental or occupancy of such lodgings"; (4) provide those "lodgings" "as an incident to [its] primary purpose or purposes"; and (5) own or operate the lodgings "for other than a commercial purpose." *U.S. v. Columbus Country Club*, 915 F.2d 877, 884 (3d Cir. 1990). Legislative history demonstrates Congress's intent to "carefully limit the exemption." *Id*. The elements should be narrowly construed.

### a.   The Fraternity Defendants offer "dwellings" and not "lodgings" as required under the "private club" exemption

The "private club" exemption applies only to a private club's "lodgings." 42 U.S.C. § 3607(a). Under the FHA, "lodgings," like hotels and motels, service transient guests. By contrast, Defendants' fraternity houses serve as stable residences for their members during the academic year and sometimes in the summer. In the language of the FHA, they are therefore "dwellings." 42 U.S.C. § 3602(b). Since the fraternity houses are "dwellings"—not "lodgings"—the Fraternity Defendants fail the "private club" exemption.[9]

The FHA defines a "dwelling" as "any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence." 42 U.S.C. 3602(b). While the

---

[8] At one point, the Defendant Fraternities rely on the idea that "Plaintiffs provide nothing to contradict" Defendants' unsupported assertion that they are entitled to the "private club" exemption. Mot. to Dismiss at 8. But Plaintiffs are not obligated to make any such showing. By definition, reliance on Plaintiffs' supposed failure to plead around the affirmative defense renders dismissal on grounds of the exemption improper.

[9] In fact, while the Fraternity Defendants initially suggest that they "provide lodgings," in the very same paragraph they state that they limit "the rental and occupancy" of "dwellings." Mot. to Dismiss at 8-9.

definition of "residence" is not statutorily defined, courts have typically looked to (1) whether the occupants intend to remain for "any significant amount of time" and (2) whether occupants viewed the space "as a place to return to during that period." *Columbus Country Club*, 915 F.2d at 881; *see also Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Twp.*, 455 F.3d 154, 160 (3d Cir. 2006) (finding a drug and alcohol facility a "place to return to"). Under this analysis, courts have found that drug and alcohol rehabilitation centers, an orphanage, hospices, and homeless shelters all constitute "dwellings" covered by the FHA. *See, e.g.*, *Conn. Hosp. v. City of New London*, 129 F. Supp. 2d 123, 135-36 (D. Conn. 2001) (collecting cases; finding that group home for recovering substance abusers is a "dwelling" under the FHA). In contrast, "lodgings" are of a transient nature (*e.g.*, a hotel or motel), and do not offer the stability of a residence associated with "dwellings." *See, e.g.*, *id.* at 134 (noting that the "FHA does not cover lodgings for transient guests, such as hotels."); *Patel v. Holley House Motels*, 483 F. Supp. 374, 381 (S.D. Ala. 1979) (holding that a motel is not intended for use or occupancy as a residence and thus is not a "dwelling" under the FHA); *Schneider v. Cty. of Will*, 190 F. Supp. 2d 1082, 1087 (N.D. Ill. 2002) (bed and breakfast not a dwelling).

Beyond question, the Fraternity Defendants offer "dwellings" covered by the FHA rather than the "lodgings" falling within the exemption. Members do not stay in the fraternity houses for a few days at a time while traveling away from their homes. Rather, the fraternity houses *are* their homes. They reside in the houses throughout the academic year, and sometimes during the summer. AC ¶ 150. Courts have found significantly less permanent housing arrangements to qualify as "dwellings" as opposed to "lodgings." Indeed, *Columbus Country Club*, relied upon by the Fraternity Defendants, held that summer bungalows constituted "dwellings" and as such did not qualify as "lodgings" under the "private club" exemption. 915 F.2d at 884-85. Similarly, courts

have found migrant worker cabins, battered women's shelters, and nursing facilities to be "dwellings" rather than "lodgings." *See, e.g.*, *Conn. Hosp.*, 129 F. Supp. 2d at 135-36 (finding that group home for recovering substance abusers, where the average stay was six weeks, was a "dwelling" under the FHA); *Home Quest Mortgage LLC v. Am. Family Mut. Ins. Co.*, 340 F. Supp. 2d 1177, 1184 (D. Kan. 2004) (collecting cases). Courts have recognized an average stay as short as 14.8 days to constitute a sufficiently significant amount of time to make a housing arrangement a "dwelling" rather than a "lodging." *See Lakeside*, 455 F.3d at 159-60. Occupants' activities such as eating meals together, returning to their rooms in the evening, receiving mail, and hanging pictures on the wall indicated that they considered the place their "residence" while living there. *Id.* Fraternity members engage in all of these indicia of residence and more.

In sum, nothing in the Amended Complaint even remotely suggests that fraternity houses are transient "lodgings" for the purposes of the FHA's private club exemption. They are "dwellings" and therefore outside the scope of the exemption.

### b. Fraternity houses are not "incidental" to the Fraternity Defendants' purpose and are operated for commercial gain

Under the "private club" exemption, the "lodging" provided by a defendant must be "incident to its primary purpose or purposes." 42 U.S.C. § 3607(a). But fraternity houses are called "houses" for a reason: they are primarily places of residence. Fraternities are organized as an alternative to on-campus living. Thus, as Plaintiffs' Amended Complaint suggests, the housing owned and/or operated by Defendants is fundamental, not incidental, to the Fraternities' purpose. The "fraternity houses are integral to the operations of Defendant Fraternities: they serve as the Fraternities' principal party venues, as residences for many fraternity members, and as bases of operations for the Fraternities at Yale." AC ¶ 158.

16

Defendants attempt to turn common sense on its head, essentially arguing that Fraternities exist to throw parties and that members incidentally decide they really ought to live at the venues for those parties. Of course, the reality is the opposite: the social events "hosted" by the Defendants are held at fraternity houses because that is where fraternity members live.

Moreover, the housing provided by Defendant Fraternities is the lifeblood of revenue for these organizations. The Fraternities are very much in the business of furnishing housing for a commercial purpose. Not only does each fraternity member sign a "separate rental contract," but the housing owned and operated by Fraternities is also critical to their ability "to attract new members and therefore garner a steady stream of dues." AC ¶ 158. Fraternity houses also offer additional revenue streams as the Fraternities rent out their houses to other individuals and organizations. *Id.* ¶¶ 198-99. In fact, several of the housing corporations were primarily formed for the purpose of owning houses for their respective fraternities. *Id.* ¶ 160.

In short, the housing provided by the Defendant Fraternities is a fundamental part of their mission, not incidental to it, and is utilized to realize commercial benefits.

### c.  The Fraternities fail the exemption because they are open to the public

The "private club" exemption only applies to "private club[s] not in fact open to the public." 42 U.S.C. § 3607(a). This element of the exemption is identical to the "private club" exemption of Title II of the Civil Rights Act. 42 U.S.C. § 2000a(e). Under Title II, courts look to a variety of factors to determine whether an entity is "in fact open to the public." *U.S. v. Lansdowne Swim Club*, 894 F.2d 83, 85 (3d Cir. 1990). If an entity has relatively unselective membership practices and regularly allows non-members to use its facilities, then courts are more likely to find the entity "open to the public" and therefore outside the FHA's "private club" exemption. *Id.* Thus, the inquiry overlaps with Plaintiffs' public accommodations claim under Conn. Gen. Stat. § 46a-64.

As detailed further in Section IV below, the Fraternities are "open to the public" because they employ unselective membership practices and regularly invite non-members to use their facilities.

For example, apart from imposing rigid gender exclusion, the Defendant Fraternities "are not selective organizations" and "admit the majority of men who request membership." AC ¶¶ 193, 195. They even admit non-students. *Id*. ¶¶ 194-95. The Fraternities regularly host social events attended by "hundreds (or even thousands)" of people. *Id*. ¶ 196. No special invitation is needed: "[F]raternity events are frequently open to the general public" and advertised as such. *Id*. ¶ 197. When not hosting their own events, the Fraternity Defendants "allow individual students, sororities, and other student groups to host events in their houses." *Id*. ¶ 198. For these reasons, and those stated further in Section IV below, Plaintiffs plausibly allege that the Fraternities are open to the public.

Rather than grapple with Plaintiffs' allegations, Defendants offer bare, unsupported factual assertions that the Local Chapters are "small, selective, private groups" that represent a "fraction of the Yale student population" and offer housing to members via a selection process. Mot. to Dismiss at 8. Not only are such self-serving proclamations irrelevant on a motion to dismiss, the same could be said of housing facilities at universities across the nation. Thus, Defendants' assertions are manifestly insufficient to satisfy the narrow boundaries of the FHA "private club" exemption. In short, nothing on the face of the Amended Complaint suggests that Fraternity Defendants meet the exemption's "not in fact open to the public" requirement.

## II. PLAINTIFFS STATE A VALID CLAIM UNDER THE CONNECTICUT DISCRIMINATORY HOUSING PRACTICES ACT

When analyzing housing discrimination claims under the CDHPA, Connecticut courts "are guided by the cases interpreting federal fair housing laws." *AvalonBay Cmtys., Inc. v. Town of Orange*, 775 A.2d 284, 307 (Conn. 2001); *see also Viens v. Am. Empire Surplus Lines Ins. Co.*,

113 F. Supp. 3d 555, 561 n.3 (D. Conn. 2015) (stating that housing discrimination claims under the Connecticut statute are "generally interpreted . . . in tandem with federal law").

Because the Amended Complaint alleges a violation of the FHA, Plaintiffs have necessarily stated a claim for violation of the CDHPA. The Defendant Fraternities' arguments fail for the same reasons outlined in Section I.A. above. The Complaint describes in detail the Fraternities' unlawful discriminatory acts and the injuries Plaintiffs have suffered as a result. As Defendants concede, any such injury clothes a plaintiff with Article III standing for a claim under the CDHPA. Mot. to Dismiss at 10. *See Viens*, 113 F. Supp. 3d at 561 (CDHPA confers standing as broadly as is permitted under Article III).

## III.   PLAINTIFFS STATE A VALID CLAIM FOR CIVIL CONSPIRACY

Plaintiffs allege that the local fraternity chapters, the national organizations, and the entities that own the fraternity houses acted together to further violations of the FHA and CDHPA. Accordingly, Plaintiffs allege that these Defendants engaged in a civil conspiracy under Connecticut law.

"The elements of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Harp v. King*, 835 A.2d 953, 972 (Conn. 2003) (citation omitted). There is no independent claim; "[r]ather, the action is for damages caused *by acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself. Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Id.* at 972 n.37 (citations omitted).

As described above and in the Amended Complaint, the national fraternal organizations, the local Yale chapters of these organizations, and the corporations that own the fraternity houses

19

entered into agreements to use certain properties as fraternity houses ("a combination"). AC ¶¶ 160, 161, 162, 280. They thereby agreed to violate the FHA and CDHPA by making dwellings in the properties unavailable to women ("unlawful acts"). AC ¶¶ 163, 280. Pursuant to this unlawful scheme, Plaintiffs allege that Defendant Fraternities repeatedly denied them membership based on their gender, and thus barred them from renting units in the fraternity houses ("act[s] done . . . in furtherance" and "damage"). *Id.* ¶¶ 128, 135-36, 141, 163, 281, 291. These allegations are sufficient to support an inference that the local chapters, national organizations and housing entities engaged in a civil conspiracy to violate the FHA and CDHPA. *See generally Harp,* 835 A.2d at 972 (reciting elements of civil conspiracy claim).

The Fraternities do not suggest that Plaintiffs' Amended Complaint fails to set out any particular element of civil conspiracy. Instead, they again resort to the disingenuous suggestion that denying Plaintiffs fraternity membership was unrelated to denying them fraternity housing. Mot. to Dismiss at 11. But the former is the predicate to the latter, and the latter the corollary to the former; they are inextricably intertwined. This argument therefore fails, as set forth above.

## IV.   PLAINTIFFS STATE A VALID CLAIM OF PUBLIC ACCOMMODATIONS DISCRIMINATION UNDER CONNECTICUT LAW[10]

Defendant Fraternities argue that they are not "public accommodations" and therefore outside the reach of Conn. Gen. Stat. § 46a-63 & 46a-64. Mot. to Dismiss at 12. They also claim

---

[10] Fraternity Defendants note, Mot. to Dismiss at 3 n.8, that as of the filing of their Motion, Plaintiffs had not yet received releases of jurisdiction for their public accommodations claims against the following housing entities: Defendants Mother Phi Foundation Inc.; Connecticut Omega of Sigma Alpha Epsilon House Corporation; Housing Corporation of Sigma Chi at Yale I; SigEp Housing of Connecticut Delta LLC; High Street Housing Corporation; ZP Nutmeg Associates Inc; and Edward J Donahue III. Plaintiffs received all releases of jurisdiction for these housing entities on July 1, 2019. As set forth in the Amended Complaint, AC ¶¶ 293, 305, Plaintiffs will seek to amend the Complaint to allege their claims against the housing entities under Conn. Gen. Stat. § 46a-64.

the First Amendment shields them from Connecticut's antidiscrimination law. Mot. to Dismiss at 16-17. Both positions are meritless.

### A.      The Public Accommodations Analysis is Unsuited for a Motion to Dismiss

As an initial matter, the Fraternities' contention that they are not "public accommodations" is inappropriate for resolution on a motion to dismiss. Connecticut law defines a "public accommodation" as "any establishment which caters or offers its services or facilities or goods to the general public." Conn. Gen. Stat. § 46a-63. "[C]overage under the statute depends, in each case, upon the extent to which a particular establishment has maintained a private relationship with its own constituency or a general relationship with the public at large." *Quinnipiac Council*, *Boy Scouts of Am., Inc. v. Comm'n on Human Rights & Opportunities*, 528 A.2d 352, 359 (Conn. 1987). Accordingly, "the question of coverage is a question not of law but of fact," *id.*, which cannot be resolved at this early stage. For this reason alone, Defendants' Motion should be denied.

### B.      Fraternities Are Places of Public Accommodation

Putting aside the premature nature of the Fraternities' position, Plaintiffs plausibly allege the Fraternity Defendants are public accommodations for three reasons. First, they maintain a "general relationship with the public at large," by opening their facilities and events to all comers, acting like bars or clubs. *Quinnipiac Council*, 528 A.2d at 359. Second, they "eschew selectivity" in their membership practices by having few membership criteria other than being male. *Id.* Third, in the alternative, the Fraternities act as extensions of Yale, which is itself a public accommodation, and therefore assume the status and obligations of public accommodations. *See Frank v. Ivy Club*, 576 A.2d 241, 257 (N.J. 1990) (holding that Princeton University's eating clubs have a symbiotic relationship with Princeton and are therefore public accommodations).

21

### 1.   The Fraternities open their facilities to the public

The Fraternities regularly open their facilities to non-members and thereby maintain a "general relationship with the public at large." *Quinnipiac Council*, 528 A.2d at 359. This alone raises a plausible inference that the Fraternities are "public accommodations" under Conn. Gen. Stat. § 46a-63.

The Fraternities' parties and events occur on a weekly basis and are regular venues for social interaction—no different from a bar or club (except that Fraternities do not check identification). AC ¶¶ 196-97. The Amended Complaint abounds with examples of the Fraternities' regular events: "weekly late night Zeta parties"; parties "to celebrate a huge win" by Yale sports teams; and, larger parties such as Alpha Delta Phi's "Jammy Jams" and Delta Kappa Epsilon's "Tang." *Id.* These parties are not restricted to Yale students; members of the wider New Haven public and even visitors from out of state regularly attend. *Id.* ¶ 197. In fact, "[t]he Fraternities regularly advertise their parties on Facebook as 'public events,'" and partygoers obtain admission without presenting a Yale identification. *Id.*

The Fraternities also open their spaces to the public in other ways. Again, much like a bar or a club, they rent their houses to a wide range of individuals and organizations—all for non-Fraternity related activities. *Id.* ¶ 198. The houses are made available for individual birthday parties and for larger student groups, including a cappella groups, sororities, and sports clubs. *Id.*

Contrary to Defendants' arguments, the Fraternities are far more like the German Society at issue in *Corcoran* than the cheerleading squad in *State v. State.* Mot. to Dismiss at 14. As in *Corcoran*, the Fraternities open themselves up for "birthday parties and other functions," and non-members can show up to events without "any specific invitation." *Corcoran v. German Social Soc. Frohsinn, Inc.*, No. CV020562775S, 2008 WL 642659, at *1 (Conn. Super. Ct. Feb. 21, 2008). By

contrast, the cheerleading squad in *State v. State* engaged in *one* activity—cheerleading—and no aspect of the cheerleading squad was open to all comers. *State v. State*, No. CV9557527S, 1996 WL 737513, at *9 (Conn. Super. Ct. Dec. 16, 1996).

Like *Corcoran*, other decisions find that organizations like the Fraternity Defendants are public accommodations when they invite the public into their space. *See, e.g.*, *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 59 P.3d 655, 658 (Wash. 2002) (noting that "[m]embers . . . are permitted to use local Aerie facilities when available, and bring nonmember guests of either gender to the local chapter's club or social room. On occasion, local Aeries rent their facilities to the public for special events . . . [S]ome local chapters serve lunch to members and non-members willing to pay, and hold public dances . . . Local Aeries also host weekly and monthly dinners, holiday celebrations, evening activities, and civic events— some of which are open to members, their families, guests, and, on occasion, to the public"); *Fraternal Order of Eagles, Inc., Tucson Aerie No. 180 v. City of Tucson*, 816 P.2d 255, 257 (Ariz. App. 1991) (noting that the organization regularly held events that were open to the public, such as bingo games, dances, and meals, and that it was a public accommodation despite hosting a "mixture of public and private activities").[11] Plainly, the Defendants' practices of holding open parties, allowing members and non-members to use and rent their space, and hosting public social activities are analogous. In the words of the *Rotary Club* court, the Fraternity Defendants keep their "windows and doors open to the whole world." *Rotary Club*, 178 Cal. App. 3d at 1058-59.

---

[11] *See also Franklin Lodge of Elks v. Marcoux*, 825 A.2d 480, 487 (N.H. 2003) (finding that even though the organization held some members-only activities, "the public's regular access to the Lodge's facility, goods and services during social and fundraising events and its substantial financial dependency upon commercial interaction with the public demonstrate the Lodge's public nature").

Fraternity Defendants seek to minimize the extent to which they open themselves up to the general public. They claim that they only host open events "on rare occasions"; that they "infrequently rent their spaces"; and that other "exclusive benefits" of membership are more characteristic of the Fraternities than their open social events. Mot. to Dismiss at 13-15. All of these arguments, however, raise factual disputes that are inappropriate for resolution on a motion to dismiss. *See Quinnipiac Council*, 528 A.2d at 359. Taken together, Plaintiffs' allegations create a plausible inference that the Fraternities maintain a relationship with the general public.

### 2.   Fraternities are not truly selective

The Fraternities are also public accommodations because they "eschew selectivity" in their membership practices. *Quinnipiac Council*, 528 A.2d at 359. They admit the majority of men who apply for membership and expend significant resources recruiting new members.

Under the national organizations' policies, the "principal admission requirement is that applicants are men." AC ¶ 193. There are no "official policies that limit recruitment to specific cohorts of students." *Id.* In fact, Plaintiffs allege that "many fraternities admit the majority of men who request membership." *Id.* This is the opposite of a "highly selective" environment. Mot. to Dismiss at 16.

The Yale chapters follow the lead of their national organizations. The rush process to recruit new members is held every year, AC ¶ 127, and "[m]ost chapters offer admission to the majority of men who apply," *id.* ¶ 195. "Indeed, in or about the 2017-2018 academic year, Defendant Zeta Psi released a Google form on its Facebook page, opening its rush process to all interested male undergraduates." *Id.* ¶ 195. Members do not even have to be matriculated at Yale in order to join a local chapter *Id.* ¶ 194. All comers are welcome, as long as they are men.

These allegations raise a plausible inference that Defendant Fraternities are public accommodations. *See, e.g.*, *Corcoran*, 2008 WL 642659, at *6 (finding defendant a public accommodation where "almost all males are admitted to membership and all women are excluded from membership"); *Rotary Club*, 178 Cal. App. 3d at 1058-59 (indicators of Rotary's status as a public accommodation included the large size of its membership and the fact that local clubs were expected to maintain a specific level of membership and attendance).[12]

The Fraternities rely heavily on the fact that they have certain "recruitment requirements" and follow national policies for chapter structure, branding, and membership dues. Mot. to Dismiss at 16. But "membership criteria are insufficient to establish selectivity where they do not function as true limits on admission." *Franklin Lodge of Elks v. Marcoux*, 825 A.2d 480, 486 (N.H. 2003); *see Lansdowne Swim Club*, 894 F.2d at 83, 86 (membership requirements have little meaning when club does not follow selective policy). Indeed, even where defendants follow certain recruitment requirements and national regulations, they are still public accommodations if they widely open their organizations to the public. *Franklin Lodge*, 825 A.2d at 486 (finding that "the sheer size of the Lodge's membership discredits any claim of selectivity"; although the organization had "an apparently formal procedure for screening and accepting applicants seeking membership[,] [i]n reality, however, virtually all men who apply and satisfy minimum standards are admitted"); *Lloyd Lions Club of Portland v. Int'l Ass'n of Lions Clubs*, 724 P.2d 887, 889 (Or. App. 1986) (finding a public accommodation where the "membership application process has the appearance of being elaborate, formal and structured [but] . . . is not selective and almost all men who apply are

---

[12] *Schellenberg v. Rochester Mich. Lodge No. 2225, of Benev. & Protective Order of Elks of U.S.A.*, 577 N.W.2d. 163, 166 (Mich. App. 1998) (affirming finding that the Elks were "a place of public accommodation and public service and lacked the selectivity necessary to be considered a private club exempt from the act"; and that defendant discriminated against plaintiff because of her sex when it denied her membership).

admitted to membership . . . Although there is no public advertising for new members, there is constant encouragement of members to solicit and recruit new members. Membership 'kits' are provided to assist in the process. There are constant recruiting drives, the emphases of which are to add more and more new members").[13]

*Kiwanis International v. Ridgewood Kiwanis Club*, 806 F.2d 468 (3d Cir. 1986), is inapposite. The procedural posture is entirely different: the case involved findings of fact and an evidentiary record. Based on the evidence, the court concluded that the local club was not a public accommodation because it was "small, comprised of only twenty-eight members. Ten individuals have been members for over twenty years. Indeed, Kiwanis Ridgewood has admitted no more than twenty members over the course of the past decade." *Id.* at 475. Those facts do not reflect the fraternity rush process described in the Amended Complaint. Defendants invest heavily in recruitment, recruit new members every year, broadly open their rush process to male students (and even male non-students), and regularly offer membership to new classes of brothers. AC ¶¶ 127, 147-49, 158, 193-95. This is completely unlike *Kiwanis*, where "[t]he scope of [the] membership drives was limited." 806 F.2d at 475.

In fact, both the national organization and the local chapters of Defendant Fraternities expend significant time and resources on recruitment. AC ¶¶ 147-49. One of the hallmarks of a public accommodation is a national organization encouraging—and in some cases, assisting—local chapters to grow their membership. *Human Rights Comm'n v. Benevolent & Protective Order of Elks of U.S.*, 839 A.2d 576, 585-86 (Vt. 2003) (national organization's involvement in actively

---

[13] *See also U.S. v. Trs. of Fraternal Order of Eagles, Milwaukee Aerie No. 137*, 472 F. Supp. 1174, 1176 (E.D. Wis. 1979) (denying summary judgment because "[t]he selective admission process which is ostensibly provided by . . . the Eagles Club . . . stands in stark contrast to the admission process that the government claims the Eagles Club actually uses").

encouraging chapters to set goals for "membership procurement" created a triable issue of fact as to whether the local lodge was genuinely selective in its membership); *Fraternal Order of Eagles*, 59 P.3d at 670 (national chapter explicitly encouraged each local member to recruit a new member every year; issued an "open invitation" to the public to become dues paying members; and had a membership department that "created recruitment and incentive programs to increase membership rolls"—all practices that "undermine[d] the contention that the Eagles is a selective social club only"); *U.S. Jaycees v. McClure*, 305 N.W.2d 764, 771 (Minn. 1981) ("The record before us reveals a national organization that strives for growth, especially in 'individual memberships'; it is unselective in those to whom it sells its memberships; selectiveness occurs only in the privileges and benefits it accords to those holding one kind of membership rather than another.").

Similarly, the national chapters of Defendant Fraternities "exercise control over recruitment activities," including by "provid[ing] detailed recruitment instructions to their local chapters"; having "handbooks and/or manuals that include recruitment tactics . . . and general advice on how to 'sell' the fraternity to new members"; "provid[ing] recruitment trainings to their local chapters"; and "retain[ing] the ultimate authority over candidate selection." AC ¶¶ 145-50. It is "this kind of continuous concern for growth [that] undercuts [a] national organization's claim to be a private organization." *Human Rights Comm'n*, 839 A.2d at 585 (citations omitted).

Plaintiff plausibly allege that Fraternity Defendants have "eschewed" selectivity in membership. *Quinnipiac Council*, 528 A.2d at 359. They therefore "may not discriminate among the general public." *Id*. Defendants' Motion to Dismiss should be denied.

**3. The Fraternities are also public accommodations through their symbiotic relationship with Yale; Yale empowers the Fraternities to control campus social life**

Alternatively, the Fraternities are public accommodations through their symbiotic relationship with Yale, which is itself a public accommodation. AC ¶¶ 202-207, 288, 301, 312, 313, 325, 326.[14] In *Frank v. Ivy Club*, the New Jersey Supreme Court held that Princeton's exclusive eating clubs were public accommodations because they drew their membership from Princeton's student body and provided dining facilities to the University's upperclassmen. 576 A.2d at 256-57. Here, the Fraternities provide much needed social spaces for Yale's undergraduates. AC ¶¶ 2, 184, 207, 210. The Fraternities also provide career and alumni networks for male students, often resulting in coveted job offers. *Id.* ¶ 122. Yale depends on these Fraternity networks to develop the next generation of alumni who sustain the University's prestigious brand. Yale in turn permits the Fraternities "to use the Yale name, Yale email addresses, Yale bulletin boards, and campus facilities for recruitment." *Id*. ¶ 208. It also agrees to leave the Fraternities to their own devices and turns a blind eye to sexual misconduct at Fraternity parties or events. *Id.* ¶ 207. Here, as in *Frank*, Plaintiffs plausibly allege the Fraternities and Yale have an "integral and symbiotic relationship"—"the [Fraternities] need the University and the University needs the [Fraternities]." 576 A.2d at 257. "Because of this, the [Fraternities] lack the distinctly private nature that would exempt them from [Conn. Gen. St. § 46a-63]." *Id.* at 257.

**C. The Court Should Not Consider the Connecticut Human Rights and Opportunities ("CHRO") Case Assessment Review**

The Defendants go to great lengths to have the Court adopt the position of the CHRO's "case assessment review" ("CAR"). *See* Mot. to Dismiss at 15-16. But the CAR is of minimal

---

[14] For a complete explanation of why Yale is itself a public accommodation under Connecticut law, *see* Pls.' Opp'n to Yale Mot. to Dismiss at Section III.

relevance. As an initial matter, the CAR is not incorporated by reference in the Amended Complaint. The Complaint does not rely on the CAR or even mention it. *See generally Goel*, 820 F.3d at 559 (describing materials that are impermissible for consideration on a 12(b)(6) motion). The Complaint refers to the CHRO's releases of jurisdiction (distinct documents from the CAR), but only for purposes of showing administrative exhaustion, not to support substantive factual allegations. AC ¶¶ 304-09, 318-22. Further, even if the Court takes judicial notice of the CAR, it cannot do so "for the truth of the matters asserted [therein]." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (citations omitted). But that is exactly how Defendants ask the Court to use it. *See, e.g.*, Mot. to Dismiss at 15-16. Defendants' arguments are therefore inappropriate for consideration on a motion to dismiss.

The CAR's content further highlights just how improper it is for Defendants to rely on it at this stage of the proceedings. The CAR was a preliminary assessment of testimonial *evidence*— the CHRO weighed Plaintiff Singer's sworn, verified complaint against Defendant Zeta Psi's verified answer. *See* Mot. to Dismiss Ex. A, at 1-2.[15] That is decidedly *not* what happens on a dismissal motion in federal court. On a 12(b)(6) motion, the Court takes Plaintiffs' complaint as true and ignores Defendants' factual assertions. *Loreley Fin.*, 797 F.3d at 169. Unlike the CHRO process, evidence is not assessed until after the parties have a full opportunity to conduct discovery.

---

[15] Defendants also mischaracterize the scope of the CAR. The CHRO separated Plaintiffs' claims into 112 distinct "matters"—with the claim of each Plaintiff against each Defendant receiving a separate "matter number." The CAR addresses only one "matter": Plaintiff Singer's claim against the local chapter of Zeta Psi. It does not address Plaintiff Walker's, Plaintiff McNeil's, or Engender's claims against any of the Fraternity Defendants. Moreover, the CAR does not concern Plaintiff Singer's claims against any Defendant other than the local chapter of Zeta Psi. It is an extremely limited document.

*Doe v. Columbia Univ.*, 831 F.3d at 48. Thus, Defendants' argument is little more than a back-door attempt to have the Court impermissibly consider their factual assertions.[16]

### D.    The First Amendment Does Not Give Defendants the Green Light to Violate Connecticut Antidiscrimination Law

Contrary to Defendants' argument, the First Amendment's protection of intimate associational rights does not insulate them from Connecticut anti-discrimination law. For over thirty years, public accommodation statutes have withstood similar challenges. *See Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 547 (1987). The result should be no different here.

"To determine whether a governmental rule unconstitutionally infringes on an associational freedom, courts balance the strength of the associational interest in resisting governmental interference with the state's justification for the interference." *Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*, 502 F.3d 136, 143 (2d Cir. 2007). This requires "an assessment of: (1) the strength of the associational interests asserted and their importance to the plaintiff; (2) the degree to which the rule interferes with those interests; (3) the public interests or policies served by the rule imposed; and (4) the tailoring of the rule to effectuate those interests or policies." *Id.* Nevertheless, when an organization has a weak associational interest, a Court need not engage in extensive balancing of all the factors to find that the right of intimate association hasn't been infringed. *See Roberts*, 468 U.S. at 620-21 (focusing the intimate association analysis on the Jaycees' weak associational interest); *Bd. of Dirs. of Rotary Club Int'l*, 481 U.S. at 547 (same for the Rotary Club).

---

[16] Defendants truly strain credulity by depicting this lawsuit as a "second bite at the apple." Mot. to Dismiss at 2. Plaintiffs went to the CHRO to exhaust their administrative remedies precisely so that they could bring their claims in court. This is the procedure authorized by Connecticut law. Conn. Gen. Stat. §§46a-83, 46a-100.

The Second Circuit has ruled that the balance of these factors weighs against a fraternity's associational interest. In *Chi Iota*, the Court held that a local chapter of Alpha Epsilon Pi— a Defendant here—did not possess intimate association interests that were strong enough to prevent the College of Staten Island from enforcing its non-discrimination policy against the fraternity. 502 F.3d at 139. Here too, the balance weighs heavily against Defendants.

***Strength of Associational Interest***. The Fraternities' associational interests are weak. The "[c]riteria used to measure the strength of an association's interest in intimacy include 'size, purpose, selectivity, and whether others are excluded from critical aspects of the relationship.'" *Id.* at 145 (quoting *Rotary Club Int'l*, 481 U.S. at 546). As alleged, the size of each Local Chapter ranges from at least 27 to 69 members. AC ¶¶ 31-39. *See Chi Iota*, 502 F.3d at 145 (noting that the fraternity had nineteen members). Furthermore, there is no indication that the Fraternities have an upper limit on the number of brothers admitted in "a desire to maintain intimacy." *Id*. To the contrary, the Fraternities invest heavily in recruiting new members every year. AC ¶¶ 146-49. "These characteristics render [the Fraternities] similar to other groups whose intimate-association interests were held to be weak," like the Rotary Clubs, whose local membership "ranges from *fewer than 20* to more than 900." *Id.* (quoting *Rotary Club Int'l* at 474).[17]

As for selectivity, "upon each year's graduation, the Fraternit[ies] presumably [cease] to associate regularly with a quarter of [their] members and seek[] to replace them with new members." *Chi Iota*, 502 F.3d at 145; *see, e.g.*, AC ¶ 127 (describing annual rush process). The Fraternities must therefore "keep a flow of prospects coming" *Id.* (quoting *Bd. of Dirs. of Rotary Club Int'l* at 546). They also "aggressively recruit[] new members" and admit the majority of men who apply.

---

[17] Further, the national organizations consist of tens of thousands of members, AC ¶ 103, and can therefore "claim no constitutionally protected right of private association." *Bd. of Dirs. of Rotary Club Int'l*, 481 U.S. at 545 n.4.

AC ¶¶ 146-49 (describing extensive resources for recruitment); *id.* ¶¶ 193, 195 (open admissions). The selectivity displayed "in choosing new members thus compares unfavorably with that employed in creating the strongest associational interests, as in the cases of marriage or adoption." *Chi Iota Colony*, 502 F.3d at 146.

There is also nothing in the Amended Complaint that suggests the Fraternities have purposes or goals that are characteristic of truly intimate associations. *See id.* at 145 (finding fraternity's purpose not characteristic of intimate associations). Nor do they exclude non-members from many social events. Indeed, the Fraternities throw parties "at which non-members—including women—are encouraged to attend." *Id. See* AC ¶¶ 193, 195. They are even considered the "de facto social environment" for many students at Yale. *Id.* ¶¶ 2, 174.

In sum, as in *Chi Iota*, "[b]ased on [their] size, level of selectivity, purpose, and inclusion of non-members, [the Fraternities] lack the characteristics that typify groups with strong claims to intimate association." 502 F.3d at 147.

***Interference with Those Interests***. Application of the public accommodations laws would impose minimal interference on the Fraternities' associational interests. The Fraternities can continue hosting open social events, building career networks, and housing members. Plaintiffs do not seek to eradicate the Fraternities or change their basic purpose; they only seek the opportunity to become equal members. AC ¶ 10. In similar circumstances, Courts have upheld the application of public accommodation laws to all-male organizations. *See, e.g.*, *Bd. of Dirs. of Rotary Club Int'l*, 481 U.S. at 547.

***The State's Interest***. In contrast to the Fraternities' weak associational interest, Connecticut's law against discrimination in places of public accommodation "serve[s] compelling state interests of the highest order," including "the state's interest in eliminating discrimination

against women." *Quinnipiac Council*, 528 A.2d at 358 (quoting *Bd. of Dirs. of Rotary Club Int'l*, 481 U.S. at 549); *accord Chi IotaColony*, 502 F.3d at 148 (noting that the state "undoubtedly" has "a compelling interest in eradicating discrimination based on gender") (same).

While Defendants acknowledge this compelling interest in general, they dispute that it applies to fraternities. But in *Chi Iota Colony*, the Second Circuit reversed a District Court that adopted logic similar to the rationale raised by the Fraternities here. 502 F.3d at 148. The Fraternities point to the Connecticut statute's exemption for "the rental of sleeping accommodation provided by associations and organizations which rent all sleeping accommodations on temporary or permanent basis for the exclusive use of persons of the same sex." Conn Gen. Stat § 46a-64. But the exemption only concerns *sleeping accommodations*; not membership in the organizations. *Id.* Even more to the point, the Fraternities do not argue that this exemption actually applies to them. *See* Mot. to Dismiss at 12-19. Indeed, nothing in the Amended Complaint suggests that the Fraternities provide sleeping accommodations for the "exclusive use" of persons of the same sex— *i.e.*, that fraternity members are barred from having female overnight guests (in the manner of a traditional single-sex boarding house). In sum, the state has a compelling interest in eliminating gender discrimination in places of public accommodations, including the Fraternities.

*The Tailoring of the Statute*. The state statute is well-tailored to promote the state's interest in eliminating discrimination: it bans discrimination by "places of public accommodation" and does not seek to regulate the intimate life decisions of its citizens. The Fraternities' argument that "the State did not intend to target gender discrimination in private organizations," Mot. to Dismiss at 19, is simply wrong. As the Connecticut Supreme Court explained, the "statute does not expressly limit its coverage to 'business enterprises' nor does it expressly exclude private clubs or organizations." *Quinnipiac Council*, 528 A.2d at 358. "The purpose of antidiscrimination

legislation is to afford access to opportunity on the basis of individual abilities rather than on the basis of stereotypical generalizations." *Id.* at 359. Here, women such as Plaintiffs are amply-qualified for the benefits and responsibilities of membership; yet, Defendants exclude them solely based on their gender.

Accordingly, the Court should reject Defendants' threadbare First Amendment argument.

## V.   PLAINTIFFS' CLAIMS AGAINST SIGMA ALPHA EPSILON ARE NOT MOOT

While the national organization of Sigma Alpha Epsilon ("SAE") disaffiliated from its local Yale chapter ("Leo") as of August 9, 2018, this does not absolve SAE from the fact that prior to the date of disaffiliation, it "had the right to exercise control over the activities, assets, policies, and members of" the local chapter. AC ¶ 35. In consequence, Plaintiffs have standing to seek monetary damages against SAE for its earlier violations of federal and state laws. *See* Counts III-VII, AC ¶¶ 256-309. Here, "[p]laintiffs must show that they continue to possess legally cognizable interests in spite of the change in circumstances. . . . In other words, they must be able to demonstrate that the judicial relief they are still seeking would actually redress past, ongoing or future injuries." *Lamberty v. Conn. State Police Union*, No. 3:15-CV-378, 2018 WL 5115559, at *6 (D. Conn. Oct. 19, 2018). Plaintiffs plausibly allege throughout the Complaint that the relief they seek will redress past injuries they suffered at the hands of Defendant SAE.

<u>CONCLUSION</u>

Defendants propound a policy of barring women from their membership ranks and from corresponding housing benefits. As a result, Plaintiffs—who are aggrieved by the Fraternities' practices—have viable claims under the FHA and Connecticut law. Factual issues abound, and there is no basis to dispose of Plaintiffs' claims at the pleadings stage. Defendants' Motion to Dismiss should be denied.

Dated: July 3, 2019

Respectfully submitted,


  /s/ David Tracey_____


David Sanford*
David Tracey*
Albert Powell*
Scott Sullivan*
Meredith Firetog**
Carolin Guentert**
**SANFORD HEISLER SHARP, LLP**
1350 Avenue of the Americas, 31st Floor
New York, New York 10019
Telephone: (646) 402-5650
Facsimile: (646) 402-5651
dsanford@sanfordheisler.com
dtracey@sanfordheisler.com
apowell@sanfordheisler.com
ssullivan@sanfordheisler.com
mfiretog@sanfordheisler.com
cguentert@sanfordheisler.com
*admitted *pro hac vice*
***pro hac vice* forthcoming

Attorney Daniel H. Schneider
Fed. Bar No. ct13208
**Schneider Law Firm, LLC**
112 Broad Street North, First Floor
Milford, CT 06460
Telephone: (203) 874-0030
Facsimile: (203) 878-01117
Daniel@Schneider-Law-Firm.com


*Attorneys for Plaintiffs and the Proposed
Class*

35