**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| ANNA MCNEIL, et al., | | |
| Plaintiffs, | | |
| v. | | Case No. 3:19-cv-00209-VAB |
| YALE UNIVERSITY, et al., | | |
| Defendants. | | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
YALE UNIVERSITY'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................2

    I.      PLAINTIFFS' TITLE IX CLAIMS SHOULD BE DISMISSED ...............................2

           A.     Fraternity Membership Practices Are Exempted From Title IX ......................2

           B.     Plaintiffs Meet None Of The Elements Of A Title IX Hostile
                  Environment Claim Under *Davis* And *Gebser* ...................................................3

           C.     Plaintiffs' Claim For Injunctive Relief Under Title IX Fares No
                  Better ..............................................................................................................9

    II.     PLAINTIFFS FAIL TO STATE A CLAIM UNDER CONNECTICUT
          PUBLIC ACCOMMODATIONS LAW......................................................................11

    III.    PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF
          CONTRACT .............................................................................................................13

           A.     Plaintiffs Have Not Plausibly Alleged That Yale Breached Any
                  Agreements ....................................................................................................13

           B.     Plaintiffs Do Not Plausibly Allege A Breach Of The Implied
                  Covenant Of Good Faith And Fair Dealing....................................................16

    IV.    PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE
          CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA)..........................17

    V.     PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT
          MISREPRESENTATION...........................................................................................19

CONCLUSION.......................................................................................................................20

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>:

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................................17

*Caldor, Inc. v. Heslin*,
   577 A.2d 1009 (Conn. 1990) ........................................................................................18

*Corteau v. Teachers Ins. Co.*,
   338 F. Supp. 3d 88 (D. Conn. 2018)............................................................................16

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629 (1999)................................................................................................ *passim*

*Doe v. East Haven Bd. of Educ.*,
   200 F. App'x 46 (2d Cir. 2006) ......................................................................................9

*Doe v. Univ. of Tennessee*,
   186 F. Supp. 3d 788 (M.D. Tenn. 2016)....................................................................7, 8

*Doe 12 v. Baylor Univ.*,
   336 F. Supp. 3d 763 (W.D. Tex. 2018)..........................................................................4

*Farmer v. Kansas State Univ.*,
   No. 16-CV-2256-JAR-GEB, 2017 WL 980460 (D. Kan. Mar. 14, 2017)......................4

*Gebser v. Lago Vista Indep. Sch. Dist.*,
   524 U.S. 274 (1998)..............................................................................................3, 5, 10

*Hayut v. State Univ. of New York*,
   352 F.3d 733 (2d Cir. 2003)......................................................................................9, 10

*Hernandez v. Baylor Univ.*,
   274 F. Supp. 3d 602 (W.D. Tex. 2017).......................................................................7, 8

*Papelino v. Albany Coll. of Pharmacy of Union Univ.*,
   633 F.3d 81 (2d Cir. 2011)..............................................................................................8

*Peper v. Princeton Univ. Bd. of Trs.*,
   389 A.2d 465 (N.J. 1978)..............................................................................................12

*Quinnipiac Council, Boy Scouts of Am., Inc. v. Comm'n on Human Rights & Opportunities*,
   528 A.2d 352 (Conn. 1987) ..........................................................................................11

## TABLE OF AUTHORITIES—Continued

**Page(s)**

*Seven Oaks Enters., L.P. v. DeVito*,
  198 A.3d 88 (Conn. App. Ct. 2018) .......................................................................15

*Simpson v. Univ. of Colorado Boulder*,
  500 F.3d 1170 (10th Cir. 2007) ........................................................................7, 8

*State ex rel. Washington Univ. v. Richardson*,
  396 S.W.3d 387 (Mo. Ct. App. 2013) .................................................................12

*Trichilo v. Sec'y of Health & Human Servs.*,
  823 F.2d 702 (2d Cir. 1987) ..................................................................................3

*Tubbs v. Stony Brook Univ.*,
  No. 15 Civ. 0517 (NSR), 2016 WL 8650463 (S.D.N.Y. Mar. 4, 2016) ...................5

*United States v. Bari*,
  599 F.3d 176 (2d Cir. 2010) ................................................................................12

*Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*,
  51 F. Supp. 2d 144 (D. Conn 1999) ....................................................................20

*Zamora v. North Salem Cent. Sch. Dist.*,
  414 F. Supp. 2d 418 (S.D.N.Y. 2006) ...............................................................5, 6

*Zeno v. Pine Plains Cent. Sch. Dist.*,
  702 F.3d 655 (2d Cir. 2012) ..................................................................................8

STATUTES:

20 U.S.C. § 1681(a) .................................................................................................9, 10

20 U.S.C. § 1681(a)(6) ..................................................................................................2

Conn. Gen. Stat. § 46a-63(1) ................................................................................11, 12

Conn. Gen. Stat. § 46a-64(a) ...............................................................................11, 12

Connecticut Unfair Trade Practices Act ........................................................17, 18, 19

RULES:

Fed. R. Civ. P. 9(b) ................................................................................................19, 20

Fed. R. Evid. 201(b) .....................................................................................................6

## TABLE OF AUTHORITIES—Continued

**Page(s)**

**REGULATION:**

Nondiscrimination on the Basis of Sex in Education Programs or Activities
   Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462
   (proposed Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106) ..............................................10

**OTHER AUTHORITY:**

Office for Civil Rights, U.S. Department of Education, *Revised Sexual
   Harassment Guidance: Harassment of Students by School Employees, Other
   Students, Or Third Parties* (Jan. 2001), https://bit.ly/2Wbv4yp.........................................9, 10

## INTRODUCTION

The central argument of Plaintiffs' opposition[1] is that Yale is liable under Title IX for failing to accede to their specific demands for how the University should regulate students' private associational choices and how it should remedy student sexual misconduct at off-campus parties hosted by organizations unaffiliated with Yale.  Plaintiffs are wrong three times over. Title IX *exempts* fraternity membership policies; Title IX gives plaintiffs *no* right to make "particular remedial demands"; and the actions Plaintiffs insist Yale must take—(1) asserting jurisdiction and direct control over off-campus properties owned or rented by private fraternities that are not registered student organizations in order to police party logistics and (2) punishing students for joining a single-sex organization—reach *far beyond* Title IX's requirements.

Yale has a robust Title IX system that follows the guidance of the U.S. Department of Education's Office for Civil Rights (OCR).  Plaintiffs do not argue otherwise.  They present no instance where Yale's University-Wide Committee on Sexual Misconduct (UWC) did not respond effectively when specific incidents of student sexual misconduct were brought to its attention.  They do not base their arguments on on-campus misconduct at all, perhaps because all such misconduct alleged in the Complaint was thoroughly addressed by Yale and anyway occurred well before Plaintiffs matriculated.  Instead, Plaintiffs argue that because, in their view, Yale *could* take certain actions beyond the comprehensive set of policies and initiatives that it has in place, then the law *must* require Yale to do so.  Plaintiffs are incorrect.

As Yale's opening brief made clear, Yale is sympathetic to any student's concerns about behavior incongruous with the University's commitment to gender equality and a campus free

---

[1] This reply refers to Plaintiffs' opposition, ECF No. 86, as "Opp."; Yale's memorandum in support of its motion to dismiss, ECF No. 71-1, as "Mot."; and Plaintiffs' Second Amended Complaint, ECF No. 93, as "Compl."  The Second Amended Complaint makes no substantive changes to the Amended Complaint.  *See* ECF No. 91.

from sexual harassment.  That is why Yale has in place a comprehensive—and OCR-approved—Title IX program.  But no law supports Plaintiffs' extraordinary demand that Yale assume an *in loco parentis* role over off-campus social activities in the way that Plaintiffs envision.  No court has applied Title IX or Connecticut's public accommodations law as Plaintiffs demand, and no administrative agency guidance supports their far-reaching, novel interpretations either.

Perhaps recognizing how unprecedented their arguments are under those laws, Plaintiffs also assert that Connecticut consumer protection and contract law obligate Yale to do what they want.  They seek to avoid dismissal by arguing that contract and consumer protection claims often involve fact-intensive inquiries.  But when, as here, claims lack facial plausibility or are based on nonexistent contractual obligations, courts have no trouble dismissing them.

Yale takes gender equality and combatting sexual misconduct seriously.  The University is committed to promoting equality, regularly investigates allegations of student sexual misconduct brought to its notice, and punishes students when it finds a violation.  Mot. 4-5 & n.5.  Plaintiffs' request that the Court mandate that Yale pervasively both monitor its students' choices of whom to associate with and regulate off-campus social events hosted by private entities—and pay Plaintiffs money damages—is a drastic one with no basis in law.  This Court should grant Yale's motion to dismiss all claims against the University.

## ARGUMENT

## I.   PLAINTIFFS' TITLE IX CLAIMS SHOULD BE DISMISSED.

### A.   Fraternity Membership Practices Are Exempted From Title IX.

Yale's motion (at 13) pointed out that fraternities' membership policies are specifically exempted from Title IX.  Plaintiffs acknowledge as much.  *See* Opp. 23; 20 U.S.C. § 1681(a)(6).  They try to save their Title IX gender discrimination claim by contending that even if they cannot "directly challenge" fraternity membership policies, they can seek to hold Yale liable for

differences in "social and economic opportunities that *result from*" those membership policies. Opp. 23.  Their argument would render the statutory exemption a nullity.  But courts interpret statutes to avoid precisely that outcome.  *Trichilo v. Sec'y of Health & Human Servs.*, 823 F.2d 702, 706 (2d Cir. 1987).  Count II should be dismissed.

B.   **Plaintiffs Meet None Of The Elements Of A Title IX Hostile Environment Claim Under *Davis* And *Gebser*.**

The parties agree on the four elements of a Title IX hostile environment claim: that (1) the school has *substantial control* over the context in which the harassment occurs, (2) the school has *actual knowledge* of the discrimination, (3) the school acts with *deliberate indifference*, and (4) the harassment is so severe as to bar access to an *educational opportunity*.  *Compare* Opp. 7-8, *with* Mot. 15.  Plaintiffs' allegations fail on all four.

**Substantial Control.**  Plaintiffs' Complaint is most deficient in alleging that Yale has substantial control over what happens at off-campus fraternity parties.  Plaintiffs say Yale has control over these venues (at 8-9) because it can subject individual Yale students to disciplinary authority and it can deprive fraternities of the use of Yale email addresses and the like.[2]

That is not substantial control under Title IX.  Instead, as Plaintiffs acknowledge, the statute imposes liability only where the school has "*substantial* control over both the harasser *and the context* in which the known harassment occurs."  Opp. 8 (emphases added) (quoting *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 645 (1999)).  Plaintiffs attempt to read out the "context" requirement by saying that "substantial control" is met if "the harasser is under the school's disciplinary authority."  *Id.* (quoting *Davis*, 526 U.S. at 646-647).  But that language from *Davis* was describing harassment in a public elementary school "during

---

[2] Plaintiffs are correct that Yale stopped requesting registration of off-campus parties—not limited to fraternity parties—but that was *because* Yale lacked effective authority over them.

school hours and on school grounds," where the school exercised "custodial and tutelary" power over students. 526 U.S. at 646 (internal quotation marks omitted). That an elementary school exercises substantial control over a ten-year-old student who is at school during the school day says nothing about whether a university exercises substantial control over private parties, *not* on school grounds, *unaffiliated* with any university program, that *adult* students attend.

The cases that Plaintiffs cite (at 10) do not suggest otherwise. In *Doe 12 v. Baylor University*, the plaintiffs brought specific assaults by specific students to the attention of the university. 336 F. Supp. 3d 763, 769 (W.D. Tex. 2018). They plausibly pled that the *university* "discouraged them from reporting their assaults," "misled and lied to Plaintiffs about their options for reporting," "obstructed Plaintiffs' access to medical and mental health treatment," and "manipulated" the plaintiffs "into not pursuing [their] rights" in order to protect athletes. *Id.* at 768, 771-772. Title IX liability, then, was plausible based on the defendant university's affirmative misconduct and its unwillingness to punish specific students for reported assaults.

*Farmer v. Kansas State University*, No. 16-CV-2256-JAR-GEB, 2017 WL 980460 (D. Kan. Mar. 14, 2017), is even farther afield. As in the Baylor case, the plaintiff alleged that she brought a sexual assault by a specific student at a fraternity to the university's attention, and the university both misled her about available options and failed to take any disciplinary action. *See id.* at *3-4. She also plausibly alleged that, unlike Yale, Kansas State *did* have a deep, official relationship with its fraternities: it promoted them as "Kansas State University Organizations," the director of the fraternity at issue was a university instructor, the university had an Office of Greek Affairs that provided services to the fraternities specifically, and the university directly regulated the fraternities and their parties. *See id.* at *8. Plaintiffs make no similar allegations. Instead, they ask this Court to impute control by Yale of all students at all times in all places

merely because Yale could later punish them.  That invitation would eviscerate the "substantial control" element of Title IX.

**Actual Knowledge.**  Plaintiffs argue (at 10-11) that actual knowledge of a hostile environment should be imputed to Yale because it had indications that harassment sometimes occurred at off-campus fraternity parties.  That is a far cry from the actual knowledge necessary to support a Title IX claim.  Title IX requires that "an official . . . with *authority to take corrective action* to end the discrimination" knows about "discrimination *in the [school's] programs.*"  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) (emphases added).  Fraternity parties are not Yale's "programs," and no Yale official has the ability to shut down fraternity parties or the Fraternities.  When fraternity-related misconduct took place on campus and Yale became aware of it, the University *did* take appropriate remedial action.  *See* Mot. 5-10.

The cases cited by Plaintiffs as support (at 11) underscore how novel their theory is.  In *Tubbs v. Stony Brook University*, for example, the court expressly observed that "something more than general knowledge of assaults campus-wide . . . is required to satisfy the actual knowledge requirement."  No. 15 Civ. 0517 (NSR), 2016 WL 8650463, at *9 (S.D.N.Y. Mar. 4, 2016).  The plaintiff in that case was assaulted in a university dorm, the university knew about a "significant increase" in similar assaults on campus and had failed to remedy them, and OCR had found the university's Title IX procedures deficient.  *Id.* at *1, *9 (internal quotation marks omitted).  Here, in contrast, Plaintiffs do not allege that Yale failed to investigate any specific assaults that were reported to it, the assaults they allege they experienced took place off campus and involved unidentified individuals, and Yale's Title IX procedures have been found by OCR to comply with Title IX.[3]  *See also Zamora v. North Salem Cent. Sch. Dist.*, 414 F. Supp. 2d 418,

---

[3] In 2017, OCR closed its monitoring of Yale in recognition of the University's long-running

421, 425 (S.D.N.Y. 2006) (fifth-grade plaintiff molested by her elementary school teacher plausibly pled the school's actual knowledge by alleging it knew that this employee had a "propensity or proclivity to sexually harass children"); *Davis*, 526 U.S. at 650-651 (offering, as hypothetical example of actual knowledge, a situation in which "male students physically threaten their female peers every day, successfully preventing the female students *from using a particular school resource*," and "administrators are well aware of the daily ritual" (emphasis added)).  Unlike these cases, Plaintiffs' allegations do not involve harassment by an individual whom Yale knew had repeatedly been accused of sexual harassment in the past, or a "school resource" that they were deprived of by misconduct at parties unaffiliated with Yale.

**Deliberate Indifference.**  In *Davis*, the Supreme Court made clear that the standard for deliberate indifference was high: a school must act in a manner that is "*clearly* unreasonable." 526 U.S. at 648-649 (emphasis added).  It expressly instructed that "courts should refrain from second-guessing" schools' choices and that Title IX does not give plaintiffs a "right to make particular remedial demands."  *Id.* at 648.  The Court explained that the deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." *Id.*  Plaintiffs' argument violates those principles.

As Yale explained at length, it has in place an extensive Title IX system that OCR found complies with the statute, and Yale has dedicated significant resources to monitoring sexual climate on campus.  *See* Mot. 2-10, 17-18.  Plaintiffs do not dispute that.  Instead (at 12-13) they do what Title IX does not permit: they make "particular remedial demands" and insist

---

compliance.  *See* Mot. Ex. 6.  Plaintiffs object (at 11 n.4) to the Court taking notice of the closing letter, but the letter's contents are "not subject to reasonable dispute," and its "accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).

unrealistically that Yale not only "purg[e] the[ ] school[ ] of actionable peer harassment," but also expunge harassment from off-campus parties unaffiliated with the University.  *Davis*, 526 U.S. at 648.  They suggest that anything short of "register[ing] off-campus parties," hosting more "on-campus social gatherings," and affirmatively "exercis[ing] control over fraternities" is clearly unreasonable.  Opp. 12-13.[4]  But other than offering dramatic rhetoric, they do not explain why Yale's actual Title IX system is, legally, "clearly unreasonable."

The cases Plaintiffs invoke (at 13-15) underscore that Yale's reliance on its robust Title IX system is not remotely like the conduct courts have found to be clearly unreasonable.  In *Simpson v. University of Colorado Boulder*, the university itself ran an athletic recruiting program that it knew resulted in sexual assaults.  500 F.3d 1170, 1184 (10th Cir. 2007).  In *Doe v. University of Tennessee*, the defendant university was alleged to actively foster a culture of sexual misconduct by student athletes by, among other things, covering up and failing to report known assaults, failing to punish known offenders, condoning misconduct in the presence of coaches, favoring athletes over victims in disciplinary proceedings, denying victims procedural rights, encouraging parties with underage drinking to recruit players, replacing female administrators with male ones to favor athletes, housing female freshmen with upper-class male athletes, and permitting a former football player to remain a dormitory resident assistant even though he encouraged underage drinking and "sex parties."  186 F. Supp. 3d 788, 792-794 (M.D. Tenn. 2016).  In *Hernandez v. Baylor University*, the defendant university lacked a Title IX coordinator and "did not take any action whatsoever" when the plaintiff reported her sexual assault and the identity of the perpetrator; the university's own internal investigation found that its "student conduct processes were wholly inadequate to consistently provide a prompt and

---

[4] Yale notes the inconsistency with Plaintiffs' contention that Yale *does* exercise substantial control over off-campus fraternity parties.

equitable response under Title IX"; and that the university had "actively concealed sexual violence committed by its football players for several years."  274 F. Supp. 3d 602, 610-611 (W.D. Tex. 2017) (internal quotation marks omitted).  And in *Zeno v. Pine Plains Central School District*, the plaintiff was a high school student who suffered severe, racially-motivated verbal abuse and assaults *on school grounds* for years; his mother informed school administrators about the abuse "between thirty and fifty times," faculty and staff reported the incidents, and local government agencies and even the police raised the problems with the school, which then "dragged its feet" in taking remedial action.  702 F.3d 655, 659-663, 668-669 (2d Cir. 2012).

All four cases involve either affirmative steps by the defendant school to foster sexual misconduct or failures to tackle specific instances of known harassment on school grounds. Plaintiffs make no such allegations against Yale.  The notion that it is analogous for Plaintiffs to say (at 13) that Yale has "phased out many on-campus social gatherings" or (at 15) ended a policy of requesting registration of off-campus parties is misguided and wrong.  Those changes are wholly different in kind from the active abetting of harassment alleged in *Simpson*, *Doe*, *Hernandez*, and *Zeno*.  Requests that Yale host more social events or have a registry of off-campus parties are simply "particular remedial demands"; nothing more.  *Davis*, 526 U.S. at 648. They do not show any affirmative choice by Yale to encourage or condone harassment.

**Hostile Environment.**  Yale explained that the episodic on-campus events included in the Complaint—which occurred before Plaintiffs matriculated—did not rise to the level of an educational environment "permeated" with "pervasive" discriminatory abuse necessary to establish a Title IX hostile environment.  *See* Mot. 21-23 (quoting *Papelino v. Albany Coll. of Pharmacy of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011)).  Plaintiffs do not contest that, and their opposition focuses *exclusively* (at 15-18) on off-campus fraternity parties.

That dooms their Title IX claim outright.  A Title IX hostile environment claim is limited to situations in which the pervasive discriminatory abuse "effectively bars the victim's access to an *educational* opportunity or benefit."  *Davis*, 526 U.S. at 633 (emphasis added).  That limitation makes sense:  Title IX bars discrimination "under any *education* program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a) (emphasis added).  Students may enjoy all of Yale's educational programs without ever setting foot in a fraternity, and Plaintiffs offer no explanation for how off-campus, private parties are an "educational opportunity" of Yale's.  Private parties that are neither affiliated with nor sanctioned by Yale cannot be a basis for a Title IX suit against Yale.[5]

### C.    Plaintiffs' Claim For Injunctive Relief Under Title IX Fares No Better.

Plaintiffs argue (at 18-20) that actual knowledge is not required for a private plaintiff to demand injunctive relief under Title IX.  Citing OCR guidance, they say that constructive knowledge—that a school "knows or reasonably should know" about harassment—is sufficient. *See* Office for Civil Rights, U.S. Department of Education, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, Or Third Parties* 12 (Jan. 2001) (OCR 2001 Guidance), https://bit.ly/2Wbv4yp.

Even if that were so, it would not help Plaintiffs because they have not satisfied the other three elements of a Title IX claim.  The OCR guidance Plaintiffs cite for their standard also says a school is required to take action only when "the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program," that a school satisfies its Title IX obligations "[a]s long as the school, upon notice of the harassment, responds

---

[5] *Hayut v. State University of New York*, 352 F.3d 733, 750 (2d Cir. 2003), and *Doe v. East Haven Board of Education*, 200 F. App'x 46, 48 (2d Cir. 2006), are not to the contrary.  Both involved harassment *in* the defendant schools.

by taking prompt and effective action," and that "[t]he type of appropriate steps that the school should take will differ depending on the level of control that the school has." *Id*. That guidance is given force by the other three Title IX elements, all of which Plaintiffs failed to satisfy.

In fact, though, Plaintiffs are not correct that a lower knowledge standard applies in this case. The Second Circuit said expressly in *Hayut* that the plaintiff there "s[ought] money damages as well as corrective action," and the court applied the complete *Davis/Gebser* standard without distinguishing between damages and corrective action. 352 F.3d at 750. Plaintiffs (at 20) plumb earlier lower-court decisions to complain that injunctive relief was no longer at issue, but that does not change the Second Circuit's statement of the law on appeal.

The Second Circuit's rule makes sense, especially in a case like this. The OCR guidance that Plaintiffs rely on for their preferred standard is focused on responding to known, specific instances of harassment and setting up a Title IX system to promptly and equitably resolve grievances. OCR 2001 Guidance at 15-21. Yale has such a system in place, which OCR itself has said complies with Title IX. *See* Mot. 2-4. Plaintiffs demand far more: that Yale pervasively involve itself in its students' off-campus activities. *See* Compl. pp. 103-105. Plaintiffs present no case where a plaintiff was permitted to demand such extraordinary remedies, much less one where the plaintiff did so without meeting the *Davis/Gebser* standard. Moreover, OCR's latest thinking clearly disagrees with Plaintiffs' proposed standard, and the Department has proposed regulations that would conclusively define "sexual harassment" for purposes of 20 U.S.C. § 1681(a) so as to require actual knowledge to trigger any liability. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 83 Fed. Reg. 61,462, 61,497 (proposed Nov. 29, 2018) (to be codified at 34 C.F.R. pt. 106).[6]

---

[6] Plaintiffs point out (at 20 n.13) that proposed regulations are not entitled to dispositive

## II.      PLAINTIFFS FAIL TO STATE A CLAIM UNDER CONNECTICUT PUBLIC ACCOMMODATIONS LAW.

Plaintiffs contend (at 24-25) that Yale is a public accommodation for undergraduate education with an audacious argument: that Connecticut public accommodations law makes the University a public accommodation in *every* way if it is open to the public in *any* way.  Both the law and common sense belie that argument.  The Supreme Court of Connecticut has explained that in evaluating whether something is a public accommodation, "the focus is . . . on the particular opportunity . . . rather than on access to an organization . . . as a whole."  *Quinnipiac Council, Boy Scouts of Am., Inc. v. Comm'n on Human Rights & Opportunities*, 528 A.2d 352, 359 (Conn. 1987).  It explained that when "a private university . . . opens its theater facilities for the entertainment of the general public," it "cannot refuse admission for reasons of race or sex," with the clear implication being that the university's other activities—not open to the general public—remain private.  *Id.*

The public accommodations statute forbids discrimination in a specific "*place* of public accommodation," not whole organizations or entities that happen to open some places to the public.  Conn. Gen. Stat. § 46a-64(a) (emphasis added).  And it defines "[p]lace of public accommodation" to mean "any establishment which caters or offers its services or facilities or goods to the general public," Conn. Gen. Stat. § 46a-63(1), including a "commercial property or building lot," *id.*, such as a Yale museum or stadium.  Common sense confirms that the analysis must be focused on a particular offering; otherwise, the fact that the Catholic Church opens the

---

deference.  True, but neither is the interpretive guidance that Plaintiffs rely on.  To the extent OCR's considered view is persuasive, the proposed regulations are OCR's current view of the scope of Title IX.  Once OCR has finalized its regulations—which is expected to happen this fall—they will carry the force of law and may be entitled to *Chevron* deference.

Vatican museum or St. Augustine's Cathedral in Bridgeport to the public would mean that, under Connecticut law, it must offer admission to seminaries irrespective of creed or sex.[7]

Yale is plainly a highly selective institution when it comes to the opportunities associated with being an undergraduate student.[8]  Although it invites many to apply, Yale College "offers its services" as a school to only a small fraction of those who seek admission.  Conn. Gen. Stat. § 46a-63(1).  Its undergraduate educational experience is therefore not a public accommodation.

Moreover, the University is not the proper defendant for Plaintiffs' claim.  Plaintiffs' opposition makes clear that they are not concerned with what happens *on* Yale's campus or *in* its programs.  Their complaint is about membership policies of unaffiliated organizations and off-campus parties held in unaffiliated locations.  As relevant, the Connecticut public accommodations law makes it unlawful to "deny . . . accommodations in any place of public accommodation," or to "discriminate, segregate or separate," because of sex.  Conn. Gen. Stat. § 46a-64(a).  Yale is doing none of those things.  If Plaintiffs have a claim, it is against the entities with legal responsibility for those off-campus, unaffiliated places and organizations.[9]

---

[7] Plaintiffs cite decisions (at 24-25) interpreting other States' public accommodations laws, which vary dramatically from Connecticut's.  *See Peper v. Princeton Univ. Bd. of Trs.*, 389 A.2d 465, 471 (N.J. 1978) (New Jersey statute defines public accommodation to include "a college and university"); *State ex rel. Washington Univ. v. Richardson*, 396 S.W.3d 387, 391-392 (Mo. Ct. App. 2013) (Missouri statute defines public accommodation far more broadly).  Those other statutes have exceptions to avoid the absurd results that would follow by interpreting Connecticut law as broadly as Plaintiffs suggest.

[8] Plaintiffs suggest (at 24 & n.15) that the Court cannot consider Yale's admissions statistics because they are "outside of the Complaint."  But Yale's selectivity is a "matter[ ] of common knowledge"; it is thus subject to judicial notice.  *United States v. Bari*, 599 F.3d 176, 180 (2d Cir. 2010) (per curiam) (internal quotation marks and citation omitted).

[9] The cases that Plaintiffs cite (at 25-26) do not suggest otherwise.  The Connecticut cases all involve employment discrimination, not public accommodations law.  The cases based on other States' laws all involve misconduct by the defendant or its employees, not liability based on the actions of persons who are not agents of the defendant in places outside the defendant's control.

### III.     PLAINTIFFS FAIL TO STATE A CLAIM FOR BREACH OF CONTRACT.

#### A.     Plaintiffs Have Not Plausibly Alleged That Yale Breached Any Agreements.

The parties agree that Yale's Equal Opportunity Statement provides that Yale does not itself discriminate based on sex, that Yale's Sexual Misconduct Policies prohibit sexual misconduct, and that the Undergraduate Regulations deem sexual misconduct by Yale College students an offense.  Mot. 27-32.  Plaintiffs do not allege sexual harassment by Yale or its agents, or even recently on Yale's campus.  Instead, they want Yale to police the membership practices of unaffiliated organizations located off-campus and to prevent any sexual misconduct from occurring at off-campus parties that Yale does not organize or endorse.  At bottom, Plaintiffs' theory is that Yale made two extraordinary contractual promises to them: (1) to police the associational choices of groups of Yale students in their private lives, and (2) to eliminate all circumstances in which sexual misconduct by students could occur, on and off campus. Plaintiffs' three bases for asserting that Yale has made such breathtaking promises fall short.

First, Plaintiffs suggest (at 30) that Yale itself "discriminate[s]," in contravention of the Equal Opportunity Statement, when it "refuse[s] to protect students from the discriminatory acts of other students."  But Yale has not "refused" to protect students.  Yale's Title IX program investigates and punishes sexual misconduct; Plaintiffs do not identify any instance in which an allegation of sexual misconduct by a specific student was made to Yale and Yale declined to take any action.  Moreover, Plaintiffs' argument about what "discrimination" means imports federal and state statutory law.  Opp. 31.  As Yale explained, federal- and state-law discrimination claims cannot be repackaged as contract claims.  *See* Mot. 28.  And because Plaintiffs' separate Title IX and public accommodations claims fail, neither could support a contract claim anyway.

Second, Plaintiffs suggest (at 34) that when the Sexual Misconduct Policies "prohibit[ ] all forms of sexual misconduct," they necessarily promise to proactively eliminate all sexual

misconduct by students anywhere.  But Plaintiffs acknowledge (at 34) that the Policies promise to accomplish their aims "through particular means," and Plaintiffs offer no response to Yale's detailed argument that those means do not encompass the duty Plaintiffs imply.  *See* Mot. 31-32.

Third, Plaintiffs contend (at 31-32) that the Undergraduate Regulations mandate that any group of Yale students, irrespective of whether the group is recognized by Yale, are bound to honor Yale's own non-discrimination commitments.  Their argument combines two separate statements from the Undergraduate Regulations—(1) that "[a]ny group in which a majority of the participants are undergraduates is considered to be an undergraduate organization," Mot. Ex. 16 at 55; and (2) that "[s]tudent organizations must operate in accordance with Yale policies on equal opportunity," *id.* at 56—to assert that *any* group of students that is majority Yale undergraduates is forbidden from distinguishing among people based on any of the protected categories that Yale observes.  What's more, Plaintiffs say (at 32) that Yale has "impliedly" agreed to "discipline" any such groups "for non-compliance."  Yale has done no such thing, and the consequences of accepting Plaintiffs' argument would be breathtaking.

Plaintiffs respond to none of Yale's arguments that the structure of the relevant section makes clear that the equal opportunity duty applies only to *registered* student organizations.  *See* Mot. 28-30.  Plaintiffs point out (at 32) that another provision of the Undergraduate Regulations is specifically addressed to registered student organizations, but that does not mean it is the only part of the document that distinguishes between registered and unregistered organizations.  And Plaintiffs offer nothing to substantiate that Yale has "impliedly" agreed to police all off-campus misconduct.  The Regulations provide that "[s]exual misconduct violations shall be addressed by the [UWC] and governed by its procedures."  Mot. Ex. 16 at 66; *accord id.* at 4 ("Violations of sexual misconduct will be addressed by the [UWC] . . . .").  Plaintiffs do not allege that Yale has

14

repudiated the UWC or its procedures and offer no support that the Regulations envision another process.  Moreover, the provision saying "[s]tudent organizations must operate in accordance with Yale policies on equal opportunity" immediately follows a paragraph providing that "[f]ailure to comply with training requirements will result in the loss of registered status," *id.* at 56—suggesting that failure to follow the equity policies carries only a consequence of losing registered status and further suggesting that the rule only applies to registered organizations.[10]

Plaintiffs also ignore that their reading of the Undergraduate Regulations would create absurd results and dramatically alter the relationship most Yale students believe they have with the University.  *See* Mot. 30; *Seven Oaks Enters., L.P. v. DeVito*, 198 A.3d 88, 93 (Conn. App. Ct. 2018) ("In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent . . . . [W]e presume that the parties did not intend to create an absurd result." (internal quotation marks and citations omitted)).  The necessary conclusion of Plaintiff's argument that Yale has promised to "discipline" *any* group that is majority-Yale-undergraduate and does not follow Yale's equal opportunity policies, both "off and on campus," Opp. 30, is that their proffered interpretation of the Undergraduate Regulations requires Yale "to 'pervasively monitor all off-campus, informal groups,' " *id.* at 30 n.21.  Yale's example of  "a group of female students who live together off-campus and put up a posting 'looking for a fourth female roommate' " clearly fits that bill, Mot. 30, and Plaintiffs offer no response.  Plaintiffs' theory would also require Yale to pervasively monitor and "discipline" a prayer group of undergraduates that includes only co-religionists, an informal support group for undergraduate

---

[10] Plaintiffs imply (at 32) that Yale must agree with Plaintiffs' reading of the Undergraduate Regulations because Yale previously punished two Fraternities whose members engaged in misconduct.  But there is no dispute that Yale defines sexual misconduct as an "offense that [is] subject to disciplinary action."  Mot. Ex. 16 at 66.  That Yale has taken disciplinary action against a group of students to discourage misconduct does not mean that Yale has promised it always *will* do so, and Plaintiffs point to nothing in Yale's written policies that says it will.

veterans, or a series of speed-dating events organized by and for a group of LGBT

undergraduates.  Such absurd results confirm Yale's interpretation is correct.

> **B.     Plaintiffs Do Not Plausibly Allege A Breach Of The Implied Covenant Of Good Faith And Fair Dealing.**

Plaintiffs do not contest that, under Connecticut law, "the failure of the plaintiffs' breach

of contract claim dooms their good faith and fair dealing claim."  *Corteau v. Teachers Ins. Co.*,

338 F. Supp. 3d 88, 102 (D. Conn. 2018); *see* Mot. 32-33.  Because Plaintiffs' breach-of-contract

claim fails, so too does their implied-covenant claim.

Independently, Plaintiffs agree with Yale that a breach of the implied covenant of good

faith and fair dealing requires "bad faith," which involves some "fraud" or "design to mislead"

that is prompted by "some interested or sinister motive."  *Compare* Opp. 35, *with* Mot. 33.  To

meet that high bar, Plaintiffs make a stunning assertion: that Yale has intentionally "moved

opportunities for social interaction off campus" in a manner that is "quite *explicitly* an effort by

Yale to dodge its contractual obligations to protect students from discrimination and sexual

misconduct"; and that Yale has "deliberately phas[ed] out on-campus social gatherings *with no

other purpose* but to sidestep its own potential liability."  Opp. 36 (emphases added).  The actual

passages in the Complaint that Plaintiffs cite, however, fail to support such serious allegations.

There are no factual allegations at all in the Complaint plausibly supporting the notion that Yale

has reduced on-campus social events "explicitly" "to dodge its contractual obligations."  In

reality, the passages Plaintiffs cite allege only two concrete facts: that "Yale made deliberate

decisions to phase out many on-campus events" and that there was an "increase [in] the number

of students . . . attending fraternity parties."  Compl. ¶ 207; *accord id.* ¶ 6.  The inference that

Yale intentionally pushed students into the Fraternities is entirely implausible—especially when

Yale officials have told students *not* to attend the parties, and Plaintiffs have themselves cited a

study showing that on-campus "residential college suite parties" are more popular than "Greek parties."  Mot. Ex. 8 at 2; Mot. Ex. 7 at 4.  It is akin to implying a conspiracy from parallel business conduct, the very impermissible inference that gave rise to the *Twombly* plausibility standard.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA).

Plaintiffs' opposition puts forth the two theories of CUTPA liability that Yale anticipated: (1) that Yale "condones male-only organizations" and "overlooks rampant sexual misconduct perpetrated at events hosted by such organizations" and (2) that Yale falsely "represents that fraternities play a minor role in undergraduate social life."  Opp. 37.  Yale already conclusively rebutted both theories, *see* Mot. 33-38, and Plaintiffs' responses are unpersuasive.

Plaintiffs acknowledge that the first theory recapitulates their contract claim by citing the breach-of-contract section of their brief as its basis and by quoting anew the Sexual Misconduct Policies.  *See* Opp. 37.  Because Plaintiffs misinterpret Yale's policies, their CUTPA claim based on breaches of those policies fails.  Independently, Plaintiffs acknowledge that a breach of contract does not itself violate CUTPA, but they allege that breach supports a CUTPA claim here because Connecticut has a "general public policy" to eliminate "invidious discrimination."  *Id.* at 39 (internal quotation marks omitted); *see also* Mot. 34-35.  If Yale itself invidiously discriminated by breaching a contract, that may support a CUTPA claim; but Plaintiffs cite no law for the idea that a breach violates CUTPA when a *third* party is the one discriminating.

As Yale originally identified, the only concrete allegation supporting the second theory (deception) is Plaintiffs' allegation that Yale deceived them into believing that "the Greek community comprises approximately 10% of the undergraduate population" when the true number is higher.  Mot. 35 (quoting Compl. ¶ 172).  Plaintiffs' opposition accordingly focuses

17

on that statistic, *see* Opp. 40-42, but the supposed misrepresentation satisfies none of the three elements of a CUTPA deception claim: it is not likely to mislead, is not reasonably interpreted by Plaintiffs, and is not material.  *See Caldor, Inc. v. Heslin*, 577 A.2d 1009, 1013 (Conn. 1990).

*First*, it is not likely to mislead in context.  Yale has never hidden that fraternities are unaffiliated with the University.  The supposed representations were couched as estimates— "*approximately* 10% of the undergraduate population," or "*about* 10% of students."  Compl. ¶ 172 (emphases added).  And, as Plaintiffs acknowledge, there was competing information available.  They cite that very information to argue the 10% figure is misleading.  But that only shows that a student concerned about fraternity membership numbers would know Yale's figures were imprecise.  *See* Mot. 36; Opp. 41.  Moreover, that a Yale College Council report discussed the size of Yale's *sororities* does not suggest the 10% statistic misleads about the *fraternities*.

*Second*, Plaintiffs offer little defense of how it is reasonable to infer from the 10% statistic that only a tenth of students would attend fraternity parties.  The Complaint alleges that "Yale's admissions office claims that the Greek community comprises approximately 10% of the undergraduate population," Compl. ¶ 172, and the Instagram post with the 10% statistic is about *rushing* sororities.  Plaintiffs infer from those statements that only 10% of Yale students would ever attend a party at the Fraternities, *see* Opp. 41-42, but that inference is plainly unreasonable: if students are members of social organizations known for throwing parties, it stands to reason that they will invite their non-member classmates to at least some of their social events.

*Third*, Plaintiffs offer virtually no explanation of why the supposed misrepresentation was material other than to say (at 42) that, but for the 10% figure in some promotional material, "many admitted students could and would plausibly choose to go to another school."  They offer no more detail for why students would turn down Yale's world-class education because slightly

more students were members of Greek organizations than they expected or because those

members hosted parties that a minority of Yale students attend (and which are in fact less

popular than other social venues like residential college parties, *see* Mot. Ex. 7 at 4).[11]  Plaintiffs

do not even substantiate that the figure mattered *to them*: they do not allege that they read the

Instagram post (it postdated two of them matriculating), and they allege nothing about other

schools they were admitted to or the Greek life at those schools.[12]  Instead, Plaintiffs' opposition

bears out the slippery slope Yale raised in its motion:  If their claim is allowed to proceed, then

Connecticut colleges and universities will face strict liability for any information they provide to

prospective students that those students later decide gave the wrong impression.  *See* Mot. 38.

## V.     PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT MISREPRESENTATION.

Plaintiffs' negligent misrepresentation claim relies on the same supposed misstatements

as the CUTPA claim and is deficient for largely the same reasons.  *See* Mot. 39-40.  That said,

two claim-specific issues bear elaboration in light of Plaintiffs' opposition.

*First*, Plaintiffs do not contest that their negligent misrepresentation claim is subject to

the heightened pleading standard of Rule 9(b).  *See* Opp. 45.  Under that standard they must

---

[11] As a red herring, Plaintiffs cite (at 41) statistics about high rates of sexual misconduct encountered by Yale students.  The study Plaintiffs cite used a very broad definition of sexual assault, Mot. Ex. 13 at 2; it did not analyze Greek life; and it was published (by Yale) in September 2015 so that it was available to Plaintiffs before any of them applied or matriculated. *See* Compl. ¶ 86.  Plaintiffs also assert (at 42) that "Yale's *Review of DKE and Campus Culture* admitted that students were deceived by Yale."  But the *Review* did no such thing: it merely said that some students felt that "Yale appears to minimize the role of Greek life."  *See* Mot. 37 n.19.

[12] Plaintiffs suggest (at 42) that admitted students could instead go to Harvard—one of the few colleges as selective as Yale—but do not allege that they were admitted (or applied).  The comparison makes plain that Plaintiffs do not want Yale simply to change its promotional materials, but rather to adopt Harvard's policy of punishing students who associate in off-campus single-sex organizations.  Harvard is facing its own Title IX suit alleging that Plaintiffs' preferred policy is itself unlawful sex discrimination.  *See* Complaint, *Kappa Alpha Theta Fraternity, Inc. v. Harvard Univ.*, No. 1:18-cv-12485-NMG (D. Mass. Dec. 3, 2018), ECF No. 1.

"(1) specify the statement [they] contend[ ] was fraudulent; (2) identify the speaker; (3) identify where and when the statement was made, and (4) explain why the statement was fraudulent." *Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*, 51 F. Supp. 2d 144, 152 (D. Conn. 1999).  Plaintiffs say that they satisfied that standard, citing generally to seventeen paragraphs of the Complaint without further explanation.  Opp. 45 (citing Compl. ¶¶ 165-181).  Those paragraphs are noticeably light on specific statements.  Some of them reference the Yale policies that underlie the breach-of-contract claim, but because Yale has honored those policies, they do not support a negligent misrepresentation claim.  One paragraph says that "Plaintiff Walker remembers Yale citing the 10% statistic [for Greek membership] to her as a prospective student," Compl. ¶ 172, but it does not identify the specific statement, the speaker, or where and when the statement was made.  The *only* specific statement mentioned in the Complaint is the January 31, 2017 Instagram post, *id.*, but Plaintiffs do not even allege that any of them read it; and two matriculated before the post.  Plaintiffs fail to satisfy Rule 9(b).

*Second*, Plaintiffs offer little defense (at 45) against Yale's argument that they did not plead a pecuniary harm, which was necessary to state a negligent misrepresentation claim. Plaintiffs' supposed harm is paying Yale tuition, but they did not allege that they would have failed to do so but for the 10% statement.  *See* Mot. 40.  Plaintiffs fault Yale (at 45) for asking for "facts outside the pleadings," but the Plaintiffs are responsible for the operative pleading, and they did not plead the necessary pecuniary loss caused by the alleged misrepresentation.

## CONCLUSION

For the foregoing reasons and those in its initial memorandum, Yale respectfully requests that this Court dismiss with prejudice all claims against Yale.

DATED this 24th day of July, 2019.

DEFENDANT YALE UNIVERSITY

By: */s/ Jessica L. Ellsworth*
    Jessica L. Ellsworth (*Pro Hac Vice*)
    Benjamin A. Field (*Pro Hac Vice*)
    HOGAN LOVELLS US LLP
    Columbia Square
    555 Thirteenth Street, NW
    Washington, D.C. 20004
    Tel.: (202) 637-5886
    Fax: (202) 637-5910
    Email:  jessica.ellsworth@hoganlovells.com
           benjamin.field@hoganlovells.com


    James M. Sconzo (ct04571)
    Brendan N. Gooley (ct30584)
    CARLTON FIELDS P.C.
    One State Street, Suite 1800
    Hartford, CT 06103
    Tel.:  (860) 392-5000
    Fax.:  (860) 392-5058
    Email:  jsconzo@carltonfields.com
           bgooley@carltonfields.com

    Its Attorneys

**CERTIFICATE OF SERVICE**

I certify that on this 24th day of July, 2019, the foregoing was electronically filed through this Court's CM/ECF system, which will send a notice of filing to all counsel who are registered users.  Notice of this filing will be sent to the following parties via first class mail:

Wallace H. Campbell & Company, Inc.
6212 York Road
Baltimore, MD 21212

/s/ Jessica L. Ellsworth