1

1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF CONNECTICUT

3    - - - - - - - - - - - - - -  x
                                  :  Case No.
4    ANNA MCNEIL, ELIANA SINGER,  :  19CV209(VAB)
     and RY WALKER, on behalf of  :
5    themselves and all others    :
     similarly situated,          :
6                                 :
                   Plaintiffs,    :
7         vs.                     :  915 Lafayette Blvd
                                  :  Bridgeport, CT
8    YALE UNIVERSITY, ET AL,      :  October 15, 2019
                                  :
9                   Defendants.   :
     - - - - - - - - - - - - - -  X

10

                TRANSCRIPT OF MOTIONS HEARING
11

     BEFORE:  THE HONORABLE VICTOR A. BOLDEN, U.S.D.J.
12

     APPEARANCES:
13   FOR THE PLAINTIFFS:       DAVID TRACEY, ESQ.
                               ANDREW MELZER, ESQ.
14                             CAROLIN GUENTERT, ESQ.
                               Sanford Heisler, LLP-NY
15                             1350 Avenue of the Americas
                               New York, NY 10019
16
     FOR THE DEFENDANT YALE    JESSICA LYNN ELLSWORTH, ESQ.
17   UNIVERSITY:               BENJAMIN FIELD, ESQ.
                               Hogan Lovells US LLP
18                             555 Thirteenth Street NW
                               Washington, DC 20004
19
                               JAMES M. SCONZO, ESQ.
20                             Carlton Fields Jorden Burt
                               One State St., Suite 1800
21                             Hartford, CT 06103

22

23              Sharon Montini, RMR, FCRR
                    915 Lafayette Blvd
24                 Bridgeport, CT 06604
                 Official Court Reporter

25

```
 1                     APPEARANCES CONTINUED

 2

 3   FOR THE DEFENDANT          JOAN M. GILBRIDE, ESQ
     FRATERNITIES:              Kaufman, Borgeest & Ryan
 4                              120 Broadway, 14th Floor
                                New York, NY 10271
 5

 6   FOR THE DEFENDANT          DAVID C. YALE, ESQ.
     402 CROWN, LLC:            Hassett & George, PC
 7                              915 Hopmeadow St.
                                Simsbury, CT 06070
 8

 9
     FOR THE DEFENDANT          LIZA M. FLETCHER, ESQ.
10   340 ELM, LLC:             Milano & Wanat LLC
                                471 East Main Street
11                              Branford, CT 06405

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    THE COURT:  Good morning.  Please be
2       seated.  We're here in McNeil et al v. Yale
3       University, et al.  If I listed up all of the
4       parties, it would take up a good portion of our
5       time.  So we won't do that.  Why don't we have
6       counsel enter their appearances.  I know there are a
7       lot of questions about how we will proceed.  I am
8       sure we'll figure it out.
9                    Why don't we start with counsel.
10                   MR. TRACEY:  Thank you, your Honor.  For
11      the plaintiffs, David Tracey of Sanford Heisler
12      Sharp.
13                   MR. MELZER:  Good morning, your Honor.
14      Andrew Melzer from Sanford Heisler Sharp for the
15      plaintiffs in the class.
16                   MS. GUENTERT:  Good morning, your Honor.
17      Carolin Guentert for plaintiffs from Sanford Heisler
18      Sharp.
19                   MR. SCONZO:  Good morning, your Honor.
20      James Sconzo on behalf of Yale, and my colleagues.
21                   MS. ELLSWORTH:  Good morning.  Jessica
22      Ellsworth from Hogan Lovells.
23                   MR. FIELD:  And Benjamin Field from
24      Hogan Lovells.
25                   MS. GILBRIDE:  Joan Gilbride from
```

```
1    Kaufman, Borgeest & Ryan on behalf of the fraternity
2    defendants with two exceptions.
3              THE COURT:  Okay.
4              MS. FLETCHER:  Good morning, your Honor.
5    Liza Fletcher on behalf of 340 Elm from Milano &
6    Wanat.
7              MR. YALE:  And, your Honor, David Yale
8    from Hassett & George for 402 Crown.
9              THE COURT:  Are there any other counsel
10   who need to enter an appearance?  That's fine.
11             So here's what we'll do.  Well, I guess
12   the reasonable way is -- it sounds like the case is
13   divided into at least three or four different
14   pockets.  One is there are claims against Yale, the
15   other there is claims against fraternity defendants,
16   and then we also have these other two entities as
17   well.  I think it's going to make the most sense,
18   why don't we start with the Yale piece.
19             So I guess -- is it Ms. Ellsworth?  I
20   guess you are up first.  And then what I will do is,
21   we'll do the Yale piece, and then I will allow the
22   plaintiffs to respond to that, because otherwise the
23   plaintiffs will sit there for a while and then be
24   responding to a whole range of things.  So I think
25   it's going to make more sense to divide it into
```

1    three tranches.

2              Does that work for everyone?  I will say

3    this:  Does anyone have any concerns about that way

4    of proceeding?  I will take that as a no.

5              All right.  Ms. Ellsworth, whenever you

6    are ready.

7              MS. ELLSWORTH:  Good morning, your

8    Honor.

9              THE COURT:  Good morning.

10             MS. ELLSWORTH:  May it please the Court,

11   Jessica Ellsworth on behalf of Yale.  I want to

12   address with you the two Title IX causes of action

13   and --

14             THE COURT REPORTER:  I'm sorry, the

15   what?

16             THE COURTROOM DEPUTY:  The microphones

17   are not working.

18             MS. ELLSWORTH:  The two Title IX causes

19   of action --

20             THE COURT:  Hold it, the mics aren't

21   working?

22             Okay, everyone is going to need to speak

23   up, including me.  I realized I wasn't getting as

24   much volume as I usually get.  I just thought it was

25   me.  I thought I had become more low-key.

1                Go ahead, ma'am.

2                MS. ELLSWORTH:  I am going to address

3      the two Title IX and two public accommodation causes

4      of action, and then my colleague Ben Field is going

5      to address the breach of contract, the negligent

6      representation, and CUTPA claim.

7                If I could, your Honor, I would like to

8      start with Count II, which is where our brief

9      started, because Count II is a very straightforward

10     claim for dismissal.

11               The plaintiffs' claim that Yale has

12     violated Title IX because certain private

13     fraternities have single-sex membership policies and

14     they could not join those fraternities.  The claim

15     is legally deficient for a very straightforward

16     reason, which is the Title IX statute does not apply

17     to membership policies of fraternities.  It's a

18     specific statutory exemption found at 20 U.S.C.

19     1681(a)(6), and it's repeated in the regulations at

20     29 C.F.R. 36.215(a).

21               The plaintiffs don't dispute that these

22     are fraternities that fall within the exception.

23     Instead, they propose a workaround where they say

24     they are not actually trying to challenge the

25     membership policies, they are trying to challenge

1   consequences that flow from those membership

2   policies.

3           No court has ever condoned such a

4   workaround with the statutory exception to Title IX

5   like this, and this Court should not be the first

6   because, among other things, it would make the

7   statutory exception for membership policies a

8   nullity if you could challenge them any other way.

9   So we think that's a very straightforward argument

10   on Count II.

11           Count I is the other Title IX cause of

12   action, and it's the hostile environment claim.  It

13   offers a different theory.  The theory is that they

14   have a private right of action against Yale under

15   Title IX because Yale has created a hostile sexual

16   environment on campus by being deliberately

17   indifferent to sexual misconduct occurring at

18   fraternities that the university knows about.

19           This claim fails, too, and again I think

20   it's for a series of straightforward reasons.  The

21   Supreme Court has made clear that the implied cause

22   of action under Title IX is "highly circumscribed,"

23   and it has four necessary elements.  First, the

24   school must have substantial control over both the

25   harasser and the context in which the misconduct

8

1    occurs.  That's from the *Davis* Supreme Court case.

2              Second, the school must have actual

3    knowledge of the misconduct.

4              Third, the school's response must amount

5    to deliberate indifference to the Title IX

6    violation, which the Supreme Court has said means

7    the actions are clearly unreasonable in *Davis,* and

8    in *Gebser* said that the school has engaged in an

9    official decision not to remedy a Title IX

10   violation.

11             And, fourth, the misconduct must be so

12   severe, pervasive, and objectively offensive that it

13   deprives the victims of access to educational

14   opportunities and benefits provided by the school.

15             The plaintiffs would have to run the

16   board and allege allegations that fit all of those

17   elements, and they fall short on each of them.

18   Starting with the first element --

19             THE COURT:  Let me ask you this:  To

20   some extent the way you have sort of framed the

21   standard -- actually, I shouldn't say the way you

22   framed the standard.  The way the standard is

23   framed, doesn't it lend itself more to a

24   fact-intensive inquiry than it is trying to address

25   it at the pleading stage?

```
 1              MS. ELLSWORTH:  So among other things --
 2     well, the answer is no, but among other things --
 3              THE COURT:  I assumed it would be no
 4     because otherwise we wouldn't be here.
 5              MS. ELLSWORTH:  In Davis one of the
 6     things that the Supreme Court made clear was that
 7     whether conduct by a university or school was
 8     objectively unreasonable could be resolved on a
 9     motion to dismiss; that if there were not sufficient
10     allegations, it could be clear that you could --
11     there is no plausible allegation that what the
12     school did was objectively unreasonable under the
13     circumstances.  And here I think the facts that are
14     the basis for the plaintiffs' cause of action show
15     that there is no objective unreasonableness upon
16     Yale, which there would need to be for deliberate
17     indifference.
18              They show that Yale has a school-wide
19     policy that is well published for how to deal with
20     formal and informal complaints.  That's the UWC.
21     And in -- that was put in place in conjunction with
22     a review by the Department of Education's Office of
23     Civil Rights which had looked at Yale's Title IX
24     program and blessed it.  The facts that are --
25              THE COURT:  But that seems like that's
```

1    quintessentially factual, though.  The question of

2    whether or not someone has blessed it, doesn't that

3    make it factual rather than legal?

4                MS. ELLSWORTH:  I don't think it does

5    because the documents we attached to our complaint,

6    Exhibits 1 through 17, with one exception are all

7    referred to in the complaint.  So they are

8    incorporated by reference.  The Court can,

9    therefore, look at those documents to see what they

10   say and whether plaintiffs' portrayal of them is

11   consistent with the documents themselves.

12               And what all of those documents show,

13   which are the basis for their claims, are that Yale

14   has been consistently engaged with this issue.  It

15   has in place systems for dealing with sexual

16   misconduct.  It has in place -- and it worked with

17   the Office of Civil Rights to make sure that the

18   Office of Civil Rights had signed off on this

19   procedure that Yale has in place.  It reinvigorated

20   its Title IX coordinator in light of some earlier

21   misconduct that occurred in 2008 and 2010.

22               The documents discuss the semiannual

23   reports that Yale makes available to websites, where

24   Yale makes available to students to come and access

25   these procedures.  In fact, plaintiffs' own

1    allegations show that every time they have gone to

2    someone at the university and raised a complaint,

3    they've gotten a prompt response.

4              And that's really what Title IX requires

5    a university to do.  It gives universities

6    flexibility to deal with things, it prevents

7    plaintiffs from pursuing particular remedial

8    demands, and it ensures that there is a system in

9    place for navigating this sort of misconduct.

10             And that is what Yale has.  I don't

11   think there is any dispute.  The plaintiffs are not

12   alleging -- and I think this would be important --

13   they're not alleging they made a complaint and Yale

14   didn't investigate it.  They are not alleging they

15   said here is something that occurred and someone at

16   Yale tried to dissuade them from reporting it.

17   Those are the types of things that courts have found

18   to be objectively unreasonable or exhibit deliberate

19   indifference.

20             THE COURT:  And I guess putting the best

21   gloss on it, as I have to do at this stage, I guess

22   what essentially their complaint is saying is, look,

23   there are a host of circumstances which have not

24   changed, and even though -- if reported or not

25   reported, the circumstances haven't changed, and

1    that's the essence of the Title IX claim, whether or

2    not they've been deliberately indifferent in terms

3    of not figuring out how to address an environment

4    that has not changed.   And your notion is that even

5    if that -- even if one describes the allegations

6    that way, it's legally insufficient?

7                MS. ELLSWORTH:   So we would take issue

8    with the suggestion that things have not changed.

9    One of the things that their complaint notes is that

10   there was some on-campus misconduct that occurred a

11   decade ago.   There are no allegations that continued

12   since any of them have matriculated or there has

13   been any on-campus misconduct.

14                There is -- in fact, the UWC was put in

15   place in 2011 after some of that early conduct

16   occurred.   And so all of the procedures and all of

17   the punishments that have been meted out by the UWC

18   are, in fact, a difference.

19                THE COURT:   But it seems like when I

20   start asking questions about whether or not there is

21   a difference, aren't I sort of bleeding into sort of

22   factual territory that is really best done at a

23   later stage?   Meaning, that doesn't mean that the

24   claim ultimately goes to trial, it means perhaps --

25   and this is all in the context of a hypothetical,

13

1    and I think I should let all of the parties know,

2    part of it is I spent time reading through all of

3    this stuff and I am just really trying to make sure

4    I understand exactly where all of the parties are.

5    So I don't think anyone should take anything I say

6    as anything other than I am trying to make sure I

7    understand what is going on.

8              But I guess the question is that on the

9    -- if I've got to determine whether or not something

10   addressed something and made a difference, am I in

11   more of a posture to be able to deal with it at

12   summary judgment as opposed to a motion to dismiss?

13             MS. ELLSWORTH:  So, your Honor, I don't

14   think you really have to determine whether something

15   made a difference.  I think what you have to

16   determine is whether they have plausibly alleged

17   that what Yale has done was objectively

18   unreasonable.  In *Davis* the Supreme Court

19   specifically said "courts can determine that a

20   response was not clearly unreasonable on a motion to

21   dismiss."

22             Here, that's clearly the territory that

23   we're in.  Yale has -- there is no dispute about the

24   fact that Yale has a Title IX compliance program.

25   It has a Title IX coordinator.  It has enhanced

1   resource availability for its website.  They're not

2   complaining about any of that.

3           Their complaint is that Yale has not

4   chosen to monitor fraternity party structure in a

5   particular way, and that puts them squarely in the

6   bucket of improper uses of Title IX that the Supreme

7   Court has explained in *Davis* and the Second Circuit

8   has explained in other cases that plaintiffs have no

9   right to make particular remedial demands.

10          And you can see, if you look at their

11  complaint in pages 104 and 105, what they are asking

12  for are very specific remedial demands, the things

13  that they think Yale needs to do, but the question

14  is not whether there are other things Yale might be

15  able to do in addition, the question is what Yale

16  has done, is it plausible that that's objectively or

17  clearly unreasonable.

18          THE COURT:  Now, I mean, in essence, is

19  part of your response to Count I a corollary of your

20  response to Count II in that to the extent you are

21  saying that Title IX has exempted out for coverage

22  sort of membership policies and so forth,

23  fraternities, to the extent that you are now talking

24  about dealing with the atmosphere of fraternities

25  and so forth, to the extent that issue also

1    encompasses addressing membership and so forth, it

2    doesn't provide a valid Title IX claim, so to some

3    extent your response to Count II perhaps carries

4    over to some extent to Count I?

5              MS. ELLSWORTH:  I think there is some

6    overlap, your Honor.  The one case that plaintiffs

7    rely on that involves an off-campus fraternity

8    system is the *Farmer* case from Kansas, and there the

9    court concluded that a plaintiff's Title IX action

10   could go forward where two things were very

11   different from this case.  One, the university had

12   specifically misled the student about her options.

13   When she was reporting a sexual assault they gave

14   her incorrect information and tried to dissuade her

15   from pursuing that complaint.  And the second thing

16   that was different was that the university had a

17   very deep official relationship with the fraternity.

18   That is very different from the context at Yale.

19              At Yale fraternities operate

20   independently as unregistered student organizations.

21   Yale does not participate in how they are managed.

22   They own their own property.  Yale does not

23   participate in how they assign housing.  It is all

24   handled separate from the university.  That relates

25   to the first element of the *Davis* standard here,

1   which is whether the school exercises control over

2   the harasser and the context in which discrimination

3   is said to occur.

4            THE COURT:  So in that sense is the

5   fraternity -- leaving aside the question of whether

6   your argument on Count I is a corollary to Count II,

7   your argument on Count I, would it be any different

8   if, in essence, this didn't involve a fraternity but

9   involved otherwise off-campus housing?

10            Let's say, for example, that students of

11  Yale consistently would rent a particular house

12  off-campus, and at that particular house there had

13  been a going concern of allegations of sexual

14  harassment, abuse, and perhaps even sexual assault,

15  in essence the students -- and the same claim was

16  brought that Yale has not done enough to address the

17  issues that students experience in the context of

18  this off-campus housing.  Would your claim be the

19  same?

20            MS. ELLSWORTH:  I think in many ways it

21  would be the same.  Certainly on the control aspect.

22            THE COURT:  So would it be the same if

23  that -- if in that particular context students had

24  come to the university, complained about this in

25  terms of actually had made a very specific complaint

1  about, say, the inhabitants of this particular

2  house, and Yale decided for whatever reason not to

3  pursue the matter, would that in and of itself --

4  let's leave aside the class allegations in this

5  context.  Would that complaint in and of itself give

6  rise to a valid Title IX claim?

7            MS. ELLSWORTH:  So there are cases that

8  have found that the failure to pursue, the failure

9  to investigate when someone comes forward with a

10  complaint about a particular incident that occurred,

11  if the university turns a blind eye to it, that that

12  can amount to deliberate indifference.  There are a

13  couple of cases that have found that.  Importantly,

14  in one of them, which is the *Tubbs* case, the court

15  went out of its way to say that -- this is a quote,

16  "something more than a generalized knowledge of

17  assaults campus-wide is required to satisfy actual

18  knowledge."  In that case the university had

19  specific facts about similar assaults that had

20  occurred and it had a deficient Title IX program.

21  So in that context the failure to take any action

22  could amount to a Title IX claim.

23            These cases are very different from the

24  situation here.  The plaintiffs are not alleging

25  that they made a complaint about a particular

 1    instance to any -- to the UWC, that they went to the

 2    Title IX coordinator.  It's much more of a

 3    generalized grievance.

 4              And I think it's notable that their

 5    allegations are, in fact, really only specific at

 6    all as to two of the fraternities.  So they want to

 7    speak in these sort of broad generalized terms, but

 8    in terms of actually raising a specific complaint

 9    about a specific instance that they wanted Yale to

10    investigate or that they had reported, there just

11    aren't allegations like that in the complaint.

12              They also are not alleging any

13    fraternity-related conduct occurred on campus since

14    they matriculated, and I think this is also

15    critical.  They aren't alleging that any conduct in

16    the fraternities has deprived them of a Yale

17    educational opportunity or interfered with their

18    academic performance, which isn't that surprising

19    because the educational benefits that Yale offers

20    really don't turn on or depend on attendance at

21    off-campus private parties hosted by anyone.

22              THE COURT:  But I guess one could read

23    -- like I said, in the way I am supposed to sort of

24    take the allegations, wouldn't -- to the extent that

25    one -- yes, maybe it doesn't change the classroom

1    offerings, but I guess what the students are saying

2    is that this changes the nature of the experience,

3    it makes me more uncomfortable, and, therefore, it

4    makes what appears to be the quintessential Yale

5    experience less available if you aren't able to

6    successfully participate in these activities and

7    come out unscathed.  So you are saying that's not

8    actionable as well?

9              MS. ELLSWORTH:  So, your Honor, I think

10   if you look at *Davis,* again the Supreme Court was

11   very clear that peer-to-peer harassment is less

12   likely to create a hostile environment than, for

13   example, a teacher or a professor, because it is

14   less likely to prevent access to an educational

15   opportunity or benefit.  And the *Papelino* case from

16   the Second Circuit made that same point.

17             THE COURT:  But less likely doesn't mean

18   it's unlikely.

19             MS. ELLSWORTH:  It doesn't mean it's

20   impossible, I agree, but it's less likely.  So I

21   think you have to think about it with that guidance

22   from the court in mind.  And in *Papelino* the way the

23   Second Circuit described it was that the environment

24   at the school must be permeated with discriminatory

25   intimidation and insult that is sufficiently severe

1    and pervasive to alter the conditions of the

2    education environment.

3              In other cases -- and, again, we can

4    only do so much by analogy, but in other cases, for

5    example, a plaintiff has alleged that they reported

6    an assault that occurred, the school tried to

7    dissuade them from investigating it, refused to put

8    in place protections so that they wouldn't run into

9    the assailant.  They ended up being unable to attend

10   classes, they ended up having to withdraw from

11   programs, they ended up taking the action that

12   showed that they were actually barred from accessing

13   an educational opportunity.

14             These plaintiffs here are offering a

15   kind of generalized grievance that maybe has some

16   connection in the ether to this overall Yale

17   experience, but is not related to the educational

18   programs and benefits that Yale is offering its

19   students.  It's off-campus private conduct and Yale

20   -- Title IX does not put Yale in the position of

21   having to police every aspect of a student's

22   off-campus experience.  I mean, really, that would

23   create an untenable situation for universities.

24             THE COURT:  But if the notion is that if

25   -- because it involves students, then if the student

```
 1    could then report the actions of another student
 2    that Yale did have some control over, it does
 3    suggest that the off-campus activity could be within
 4    the realm of possibility.  I understand, as is here,
 5    what we're saying on these allegations is -- the
 6    institution is essentially saying, well, wait a
 7    minute, the particular incidents weren't brought and
 8    then sort of ignored.  I guess there is someone who
 9    said they talked to a resident advisor and they may
10    have put them off.
11           So the off-campus activity in and of
12    itself doesn't exempt the university from a Title IX
13    action, it's obviously more, and I understand you
14    are saying in *Davis* there are a variety of
15    characteristics.
16           MS. ELLSWORTH:  It doesn't exempt it,
17    but I think it makes it much more difficult because
18    they have to show the control and then they also
19    have to show deliberate indifference.  And here,
20    too, I think it's worth noting that Yale does have a
21    series of undergraduate regulations that make
22    binding on the student an obligation, whether on his
23    or her own behalf or whether participating through a
24    registered or unregistered student organization, to
25    comply with certain Yale community values.
```

1          So Yale has chosen to put that

2     obligation on the students.  You can see that on

3     page 56 of the undergraduate regulations, which are

4     Exhibit 16 to our motion to dismiss.  If a student,

5     whether on campus, off campus, in New York City, in

6     California, engages in conduct with another Yale

7     student that violates the terms of the undergraduate

8     regulations, that student can face punishment, and,

9     in fact, often does.  That is a significant part of

10    what the UWC investigates and metes out punishment

11    for.

12          So, for all of those reasons, I think

13    Count I is equally deficient as Count II.  If I can

14    turn to the public accommodation --

15          THE COURT:  Sure.

16          MS. ELLSWORTH:  -- causes of action,

17    which are Counts VIII and IX against Yale.  They

18    both fail at the threshold because Yale is not a

19    public accommodation when it comes to enrolling

20    undergrads and offering them opportunities to

21    participate in registered or unregistered

22    organizations.

23          THE COURT:  As I understand your

24    argument, essentially what you are saying is to the

25    extent Yale could be considered a public

```
 1   accommodation, it is not something that would be at

 2   issue here, which would be, say, at some sporting

 3   event or something.  This is a much different

 4   context and the law requires the Court to look at it

 5   in terms of the particular context rather than

 6   broadly saying because they could be a public

 7   accommodation in one context that it simply carries

 8   over to another, correct?

 9            MS. ELLSWORTH:  That's exactly right.

10   Anyone can go to a Yale museum, we agree.  Anyone

11   can walk across Yale's campus, we agree.  But not

12   everyone can be a Yale student.  That's where their

13   cases fall short on these causes of action.  If you

14   look at the Quinnipiac Council, Boy Scouts of

15   America case from the Connecticut Supreme Court, the

16   Connecticut Supreme Court explained that the focus

17   of the statute has to be on the "particular

18   opportunity, not access to the organization as a

19   whole."  And in that case the court was looking at

20   whether the Boy Scouts were a public accommodation

21   solely for purposes of the opportunity to become a

22   scout master.

23            So comparing that to what we have here,

24   the question is whether Yale is a public

25   accommodation solely for the purposes of the
```

1   opportunity to become a fraternity member.  The

2   answer to that is clearly no.  So for that reason

3   alone both of their public accommodation claims

4   fail.

5           They also fail in addition -- I will

6   take each of them and give you the reasons on each

7   of them.  On Count VIII Yale does not set the

8   membership policies in these kinds of unaffiliated

9   fraternities.  So it certainly can't be a public

10  accommodation as to fraternity membership.

11          And on Count IX, the plaintiffs are

12  asking you to read into the public -- excuse me --

13  the Connecticut public accommodation statute a

14  hostile environment claim, but you can tell just

15  from looking at the cases that they cite in their

16  opposition that there is no Connecticut case that

17  has ever done this.  The statute is about ensuring

18  the access to goods and to services.  That's what

19  the *Quinnipiac Council* case makes clear.  And in

20  Title IX the statute borrows hostile environment

21  from Title VII employment law, but Connecticut

22  treats them as separate, and *Quinnipiac Council*

23  walks through that.  The employment statutes are

24  separate and apart from --  employment

25  discrimination is separate and apart from sort of

```
1    access that the public accommodation law is speaking
2    to.
3              THE COURT:  But if the Court were to
4    reach the position where it believed that Yale was
5    correct on Counts 1 and II, which is the only
6    federal claim against Yale, the Court might decide
7    to not exercise supplemental jurisdiction over the
8    state law claims.
9              MS. ELLSWORTH:  That is correct, your
10   Honor.
11             THE COURT:  Okay.
12             MS. ELLSWORTH:  If you have any other
13   questions --
14             THE COURT:  No, I'm fine.
15             MS. ELLSWORTH:  I will let my colleague
16   address the remaining state law claims.
17             THE COURT:  Just for the record -- no,
18   no, you are fine.
19             You may want to reintroduce yourself.
20             Just other counsel, not you.
21             Yes, whenever you are ready.
22             MR. FIELD:  Thank you, your Honor.
23   Benjamin Field for Yale University.  As Ms.
24   Ellsworth said, I will be addressing the breach of
25   contract claim, the CUTPA, and negligent
```

1    representation claim.

2              So to start with the breach of contract,

3    this is an unusual claim where plaintiffs are

4    alleging that they have an agreement between them

5    and Yale University, and yet the conduct that they

6    are alleging is causing the breach is all conduct

7    attributable to a third party.  So they need to

8    point to specific contractual language where Yale

9    has promised to be held accountable for a

10   third-party's actions, and all of the statements

11   that they make are very general and not tied to any

12   specific text of any of these alleged agreements.

13   So let's dig into that text.

14             I would like to start with the equal

15   opportunity statement.  What it says is that Yale

16   does not discriminate in admissions, educational

17   programs, or employment.  There is nothing at all in

18   the complaint about admissions or employment, and

19   the only things in the complaint about educational

20   opportunities are conclusory allegations that Yale

21   is somehow depriving students of access, but in

22   reality there are no allegations that Yale -- and

23   again Yale is the subject of that guarantee -- that

24   Yale is discriminating against anybody in any

25   classroom or in any formal educational program.

1                   So what they are doing is arguing --

2       they are attempting to impute out of that that Yale

3       has somehow made a guarantee that no student will

4       ever be subject to any discrimination on the basis

5       of the different traits in the equal opportunity

6       statement by any other party anywhere in the world,

7       and there is simply no language in the equal

8       opportunity statement that says that.

9                   THE COURT:  Anywhere in the world seems

10      a little strong.  I think they basically are saying

11      within the context of the experience of going to

12      Yale.  While it is the fraternities may be off

13      campus, it clearly is a part of the experience of

14      the student going to Yale, correct?

15                  MR. FIELD:  I'm not sure that you can

16      cabin it that way, your Honor.  What they are saying

17      is that when Yale says that Yale does not

18      discriminate on the basis of sex, but if any Yale

19      student is treated by an independent organization in

20      a way that deprives them of social and professional

21      opportunities, that that can be attributable to

22      Yale.

23                  So I don't think it's possible, for

24      instance, to distinguish between, say, a synagogue

25      in New Haven that offers certain benefits, social

1  benefits to Jewish students of Yale.  According to

2  them that kind of religious discrimination would be

3  attributable to Yale and there is no way to

4  distinguish the two under --

5          THE COURT:  I guess pushing back a

6  little bit, I guess what they are essentially saying

7  is, look, there is an institution, these

8  fraternities which involve Yale students, and so

9  therefore there is a sense where this is affecting

10 the opportunities that they are having there, and

11 that as a result Yale has some responsibility in

12 terms of how these student-versus-student

13 interactions affect them.  And I don't think anyone

14 -- I don't think Yale disagrees with the notion that

15 to the extent that -- at least some of the specific

16 concerns that are being raised by the plaintiffs,

17 that Yale has some obligation to make sure students

18 aren't, you know, sort of sexually harassed, abused,

19 or assaulted in any way.

20          So I am not sure -- I guess I am not

21 sure I understand exactly the notion that it's

22 outside the scope of what they expect.  It may be a

23 question of how specifically the contractual

24 obligations lend themselves and how one measures it

25 accordingly, but I guess I am a little baffled in

```
1    terms of how the relationship is entirely outside

2    the scope of the contractual relationship or the

3    expectation of either party in the relationship.

4              MR. FIELD:  So to your Honor's point,

5    documents like the undergraduate regulations

6    obviously address those kinds of things, like sexual

7    misconduct, but in terms of the actual -- the equal

8    opportunity statement, it is making simply

9    statements about how Yale would treat students in

10   educational programs.  So they need to point to

11   specific contractual language that adopts this kind

12   of obligation.

13             And the other thing I would like to just

14   point out to you is that they're invoking the equal

15   opportunity statement for a different theory than

16   the sexual misconduct theory, for this theory that

17   Yale can be held responsible because fraternities

18   don't offer their professional or their social

19   benefits to women.  And, again, that can't be

20   distinguished from any other organization which

21   distinguishes among potential members in ways that

22   Yale has promised that it will not.  So I think you

23   need to take that language specifically, and it's

24   just binding Yale, not every organization in New

25   Haven.
```

1              But to get to your Honor's concerns

2      about the sexual misconduct theories, those are tied

3      to two other documents, the sexual misconduct

4      policies and the undergraduate regulations.

5              So we'll start with the sexual

6      misconduct policies.  They provide that Yale

7      prohibits all forms of sexual misconduct and that

8      Yale aims to eradicate sexual misconduct through

9      education, training, clear definitions and policies,

10     and serious consequences for policy violations.  It

11     is also explained in the UWC that the Title IX

12     coordinator will address allegations of sexual

13     misconduct.  This is Exhibit 2.  As those pages 3

14     and 4 of Yale's opening brief point out, all of

15     those statements are true.  The UWC does, in fact,

16     pursue and aggressively punish violations brought to

17     its attention, as Ms. Ellsworth explained, and OCR

18     has blessed them.

19             The Sexual Harassment and Assault

20     Response & Education Center, known as SHARE, does in

21     fact centrally locate all of these clear policies

22     and procedures.  That is where plaintiffs were able

23     to find all of them to quote in their complaint.

24     And it offers students counseling.  And Yale

25     provides annual training, including mandatory

1    training for new students on sexual misconduct.  OCR

2    has praised all of these policies.  So Yale does all

3    of the specific things it says it's going to do in

4    that document.

5           Instead, what plaintiffs are trying to

6    do is to take the objective language that -- Yale's

7    statements about its objective that it aims to

8    eradicate sexual misconduct and impute from that a

9    guarantee that Yale is saying that it can

10   prospectively prevent all aspects of sexual

11   misconduct anywhere on campus, in New Haven,

12   potentially in the world.  There is no limitation to

13   their theory.  And that's simply not what the

14   document says.  It would be unreasonable to impute

15   such an extraordinary promise from Yale, because

16   what Yale actually has is a UWC program, these

17   training programs, which are meant to -- the

18   training programs are meant to do what they can to

19   prospectively address things, but the UWC program is

20   expressly retroactive about punishing offenders.

21           So I don't think Yale has made the kind

22   of dramatic promises that they attribute to it.

23   There is nothing in the text of the sexual

24   misconduct policies that would suggests that it

25   does.

1          So the last document that they point to

2    is the undergraduate regulations, and the first

3    thing that's important to emphasize about them is

4    that they place obligations running from students to

5    Yale, not the other way around.  So the very first

6    paragraph of the introduction explains that the

7    undergraduates have responsibilities placed upon

8    them.  So all of the obligations in the

9    undergraduate regulations are running from the

10   students to Yale.  There is nothing in them that

11   suggests that a third party, like another student,

12   has the authority to step in and enforce them as a

13   third-party beneficiary or anything like that.

14          And so, again, I would like to separate

15   out there are two different theories.  One would be

16   the unequal access to social opportunities and one

17   is sexual misconduct.

18          To start with the sexual misconduct part

19   of their theory, the regulations are crystal clear

20   about how sexual misconduct will be dealt with.

21   Page 56 and 66 say they will be dealt with by the

22   UWC.  Page 86 says the UWC has sole disciplinary

23   authority over Yale College students charged with

24   sexual misconduct.  And so because Yale has the UWC

25   in place.  It is functioning as promised.  And

33

1    plaintiffs have not alleged that they brought any

2    complaints to the UWC and that the UWC didn't follow

3    its procedures.  Yale is honoring everything it said

4    in the undergraduate regulations.

5            Now, with respect to this social

6    opportunity argument, I think that plaintiffs may

7    have dramatically overstepped here.  What they are

8    saying is that Yale somehow impliedly promised that

9    it will take actions against independent groups of

10   students without any geographic limitations if they

11   don't observe the same nondiscrimination policy that

12   Yale does.  There is nothing in the regulations that

13   suggest that.  In fact, the regulations at page 4

14   say that in general they're concerned with conduct

15   on campus and that off-campus misconduct will not

16   normally be the basis for disciplinary action by the

17   university.

18           And this isn't just about the

19   fraternities.  Yale also doesn't police bars or

20   private parties all around New Haven.  It would be

21   unreasonable to expect them to do so, and there is

22   no specific text in the undergraduate regulations

23   that promises to.

24           I would just like to point out as the

25   last thing, that not only, as we point out, that the

1    structure of the undergraduate regulations make

2    clear that that nondiscrimination duty only applies

3    to registered organizations, but plaintiffs' theory

4    would have absurd consequences.  What they are

5    saying is that any group that is a majority of Yale

6    undergraduates is an undergraduate organization and,

7    therefore, may not treat people differently based on

8    any of these protected traits.  So they're in a

9    situation where they have to say if an off-campus

10   group of Muslim students meets at a mosque that only

11   invites Muslim students, that Yale has to take some

12   implied punishment against them, or a group of LGBT

13   students goes to CJs (ph) and only opens it to LGBT

14   students, that Yale has promised to take some

15   punishment against them.

16            There is nothing in the regulations that

17   say that, and to the extent you think there is any

18   ambiguity, the standard contractual canon against

19   absurdity would caution you against reaching that

20   interpretation.

21            So moving on to the CUTPA claim, I

22   think, first of all, it's incredibly important to

23   understand how closely tied the breach of contract

24   claim is to the CUTPA claim.  When plaintiffs

25   introduced their CUTPA theory at paragraphs 356 and

1    358 of their complaint, they start out by

2    reiterating their contract theory and the idea that

3    Yale has made these extraordinary pervasive promises

4    to them.  Only then do they pivot to the secondary

5    claim that Yale also downplays the role of

6    fraternities in admissions material.  And only as a

7    subsidiary to pointing that out, do they point to

8    the 10 percent figure.

9            So I think it's incredibly important to

10   point out that because Yale does not promise --

11   essentially because the -- if you strip those

12   contract claims out, most of what they are saying

13   just isn't there to establish materiality for a

14   CUTPA violation.  And if you have a realistic and

15   accurate interpretation of plaintiffs' policies,

16   they're just left with this vague sense that they

17   wish that there had been more information in

18   brochures or things like that about fraternities,

19   and that's a huge step down from what is in their

20   pleading.  If you look at where they actually have

21   materiality pleadings, they're all involved with

22   breach of contract allegations.  So when they are

23   out, the materiality for the CUTPA claim fails as

24   well.

25            So what remains I don't think can be

reasonably classified as a CUTPA violation.  A

college experience is incredibly multifaceted.  A

Yale experience for a drama student who mostly

engages in theater can be very different from a

biology student who does debate.  Again, lots of the

Yale College experience obviously is not directly --

it's much more multifaceted.  It's not just the

formal programming that Yale offers.

          So if you allow a CUTPA theory,

essentially that Yale should have more about -- you

know, say X in their brochure or that they don't

have enough about thing Y in their brochure, then

any university is going to be liable to CUTPA claims

at all points if a student after the fact decides

what they heard from the university does not exactly

match up to their experience, and that would get --

they don't have any cases from any state law courts

that suggests CUTPA is meant to work that way.  And,

ironically, it would have the perverse effect of

requiring the university be an advertiser for the

fraternity in order to satisfy what plaintiffs are

asking for, or it would require universities to

provide only the most cut and dry information, like

the number of students in a particular class, to

avoid students coming back with a CUTPA claim

saying, well, actually my subjective experience was

slightly different.

Lastly, there is a materiality component

to CUTPA that they simply haven't alleged.  This is

a 108-page complaint.  It's their third complaint,

the second amended complaint after a motion to

dismiss was already filed, and there is nothing in

there that would suggest if Yale had slightly

changed the way it characterized the rule of

fraternities on campus that these plaintiffs would

have gone elsewhere.  No information about what

other schools they were considering or what the

fraternity life was like there, how they advertised.

Everything is tied to these breach of contract

claims to develop materiality.

And just as a last point, I would like

to say if you stepped away from the breach of

contract, you stepped away from the general

allegations that they wished that Yale had said

something slightly differently about fraternities,

all you are left with is the 10 percent number,

which is in one Instagram post.  And they have

nothing in the complaint to substantiate that

students would make a decision as dramatic as what

university to attend based off a single Instagram

1    post statement about 10 percent of students

2    participate in a Greek organization.

3              The last thing I would like to address,

4    your Honor, is the negligent representation claim.

5    It fails for all of the same reasons as the CUTPA

6    claim because they haven't shown that there has been

7    any misrepresentation that was reasonably

8    interpreted by them, but it fails for the

9    independent reason that, as both sides agree, they

10   have to plead with particularity per Rule 9(b).  As

11   to two of the plaintiffs there is nothing remotely

12   like that because they matriculated before the

13   Instagram post.  As to the first plaintiff, the only

14   thing that gets close to the particularity standard

15   in the pleading, who, what, where, when, is that

16   Instagram post, but even she does not allege that

17   she actually read it or it had any impact on her

18   decision.  So they have not pled particularity

19   there.

20             So if the Court has no questions, I move

21   to dismiss the claims against Yale University.

22             THE COURT:  All right.  Thank you.

23             MR. TRACEY:  Thank you, your Honor.

24   David Tracey for the plaintiffs.

25             May it please the Court.  Your Honor,

1   plaintiffs' claims against Yale University are

2   primarily based on Yale's failure to address a

3   decades-long pattern of harassment and

4   discrimination associated with its fraternities.

5   Since 2008, the university has known that the

6   fraternities play an outsized role in sexual

7   misconduct occurring on its campus, and since then

8   almost every year there has been major scandals,

9   reports, complaints, student news reporting, all

10  pointing to the fraternities as a central locus of

11  sexual misconduct on campus.  Yet rather than honing

12  in on the problem and trying to regulate the

13  fraternities, Yale has stepped away.  Yale has

14  intentionally withdrawn from its traditional role of

15  hosting social gatherings on campus and, instead, it

16  has totally outsourced that function to the

17  fraternities.

18          Yale has, therefore, built up its

19  fraternities as an integral part of the university's

20  life.  Instead, in a recent report from 2019, Yale

21  admits that the fraternities are "now the de facto

22  social environment for many students."  Yet Yale has

23  attempted to divorce itself and extricate itself

24  from its role in overseeing and monitoring

25  fraternity behavior.

 1                 And the university has failed to take

 2     any meaningful steps to prevent sexual harassment

 3     and assault from occurring and recurring at its

 4     fraternities.  Indeed, after the plaintiffs in this

 5     case filed their charges with the Connecticut

 6     Commission on Human Rights and Opportunities, Yale

 7     stepped away even further.  It ended its

 8     six-year-old policy requiring the fraternities to

 9     register their parties.  That allowed the Yale

10     dean's office, the Yale police to know about

11     fraternities and intervene if necessary.  Yale ended

12     that.

13                 What Yale is doing is it's abdicating.

14     It's abdicating its role to monitor student

15     behavior, and the results have been devastating.

16     The data suggests that almost three-quarters of

17     female undergraduates at Yale suffer sexual

18     harassment before they graduate.  Almost 40 percent

19     suffer sexual assault.  Indeed, each of our three

20     individual plaintiffs suffered sexual harassment and

21     assault at fraternity events.

22                 In addition to creating a hostile

23     environment, also the fraternities also perpetuate

24     inequality based on gender among Yale students.

25     Yale men have the opportunity to join prestigious

```
1   boys clubs and receive all of the associational and

2   economic benefits from membership in these Yale

3   affiliated clubs, including job opportunities.

4   Women are shut out entirely because of their gender.

5   In fact, this relegates them to a second class

6   status.  The status quo at Yale is unacceptable and

7   illegal.

8                THE COURT:  Just sort of moving to the

9   Title IX aspect of this, Title IX comes in how?

10  We've got this challenge in terms of this exemption

11  under Title IX itself with respect to the membership

12  policies of fraternities.  So that creates some

13  issue, correct?

14               MR. TRACEY:  Well, it doesn't create an

15  issue, your Honor.

16               THE COURT:  Okay.

17               MR. TRACEY:  And I will explain for two

18  reasons.  We have two Title IX counts.  The first

19  count is a hostile environment count.  The second

20  count has to do with the inequalities that -- the

21  inequalities in social and economic opportunities

22  that women have at Yale.

23               So on the first count, hostile

24  environment --

25               THE COURT:  Just deal with the second
```

```
1    count.

2              MR. TRACEY:  Sure.

3              THE COURT:  On the second count, are you

4    seeking damages related to the second count or

5    suggesting really injunctive relief?

6              MR. TRACEY:  We're seeking damages.

7    Damages is part of our complaint, but the primary

8    focus is injunctive relief.

9              THE COURT:  So what would be -- under

10   Count II under Title IX, what would be the

11   injunctive relief that the Court could properly

12   order regarding fraternities -- regarding Yale and

13   its relationship to the fraternities?

14             MR. TRACEY:  How that -- I think it

15   would help in terms of framing the damages to let me

16   explain the problem, and then I can explain the

17   damages.

18             The problem here associated with the

19   fraternities is that women have unequal social

20   opportunities and social agency on campus.  Men are

21   controlling the social environment.  Right?  This is

22   all happening at male-based clubs.  Well, Yale could

23   have support for mixed-gender clubs where women have

24   equal agency over the social environment.

25             THE COURT:  I'm sorry, that would be
```

43

1    relief -- you are saying that would be relief that

2    the Court could order Yale as a consequence of there

3    being unequal opportunities for females as a

4    consequence to fraternities having -- playing such a

5    dominant role in opportunities?

6            MR. TRACEY:  Right.  There are unequal

7    opportunities, so create equal opportunities.

8    Right?  What Yale fraternities do, Yale fraternities

9    are male social institutions on campus.  They

10   provide two primary things here that women do not

11   have access to.  One is the social agency over the

12   campus culture and the campus climate, meaning men

13   are in the dominant position over the social climate

14   at Yale.  Two is access to economic opportunities,

15   alumni networks, prestige.  So you can tackle both

16   of those problems.  First of all --

17           THE COURT:  So, to be clear, what you

18   are saying is that the plaintiffs at least -- just

19   focussing on Count II for now, you are saying that

20   given the opportunity in which -- what you are

21   saying is the Court should allow the opportunity

22   that plaintiffs will be able to prove that women

23   students at Yale are at a distinct disadvantage as a

24   result of these fraternities and, as a result, that

25   Yale would need to have to provide opportunities to

```
1    sort of deal with this fundamental disadvantage?

2              MR. TRACEY:  Right.  Or create a method

3    -- put methods in place to prevent the inequalities

4    that are caused.  Let me give you an example.

5              THE COURT:  Just -- you can push for an

6    example, and obviously you are at a preliminary

7    stage, but you are saying that there is a basis to

8    say that right now women graduates of Yale are now

9    fundamentally disadvantaged vis-a-vis males and that

10   disadvantage is sufficiently correlated with the

11   existence of fraternities?

12             MR. TRACEY:  I think what we'll find in

13   discovery is the men in fraternities do have

14   distinct advantages of getting jobs at prestigious

15   organizations like --

16             THE COURT:  I understand they can get

17   jobs.  You are saying that women -- Yale women

18   graduates don't also have those opportunities?

19             MR. TRACEY:  They don't have equal

20   opportunities.  They have the opportunities, but

21   when an on-campus recruiter comes, holds an

22   on-campus recruiting event and then takes the men in

23   the fraternities out to drinks, who gets the job?

24   Is it the men in the fraternities that went out to

25   drinks with the on-campus recruiter or is it the
```

1    women who sat for the interview on campus and went

2    through the on-campus procedures but didn't have

3    that social network connected to the economic

4    opportunity that gave them the upper hand?  So --

5            THE COURT:  Hang on.  So you are saying

6    -- hang on.  I just want to just sort of make sure

7    we're linking that in terms of back to Title IX and

8    the statutory language of Title IX where this

9    particular right flows from.  And walk me through

10   that.

11           MR. TRACEY:  Absolutely.  So I believe

12   you are referring to the membership practices

13   exemption under Title IX.

14           THE COURT:  Well, no.  Actually right

15   now it sounds like you are making -- well, you are

16   saying membership.  If I understand what you've

17   articulated in the last few minutes, it is that your

18   Count II claim is slightly different in that

19   essentially you are not basically trying to address

20   the membership policy per se, but what you are

21   saying is that as a result of the existence of the

22   fraternities there is this unequal environment that

23   exists at Yale on the basis of gender, and that

24   under Title IX the obligation would then be for Yale

25   to somehow equalize the opportunities that are

1    provided which you say suggests right now are

2    unequal on the basis of gender.

3            I guess what I want to do right now is

4    relate back the essence of that claim back to the

5    statutory language of Title IX.

6            MR. TRACEY:  Absolutely.  Title IX

7    broadly states "No person in the United States

8    shall, on the basis of sex, be excluded from

9    participation in, be denied the benefits of, or be

10   subjected to discrimination under any education

11   program or activity receiving federal financial

12   assistance."

13           THE COURT:  Okay, hang on.  Hang on.  So

14   now -- but the inequality you are talking about

15   doesn't necessarily flow from Yale, it's sort of

16   indirectly related to Yale because there are these

17   institutions.

18           Let me sort of give you an example to be

19   sure I understand the contours of your argument.

20   Let's leave it out of the context of fraternities.

21   Let's assume that there was some off-campus housing

22   that was regularly rented by Yale students, and this

23   off-campus housing that was rented by Yale students,

24   over time men seemed to rent this particular

25   apartment there and there was some sort of informal

```
 1   relationship developed where job opportunities and
 2   other things flowed from it as a result of people
 3   renting this particular house.
 4             So are you saying that as a result of
 5   that housing existing, which is off-campus housing
 6   which is not related to Yale, that Yale now has an
 7   obligation to figure out how to equalize
 8   opportunities for women who didn't live there?
 9             MR. TRACEY:  I would say if there is a
10   systemic, long-established institution directly
11   adjacent to Yale's campus which is constituted of
12   Yale students and Yale alums, if that's what this
13   house is, and year after year, decade after decade
14   Yale men are getting opportunities that are not
15   available to Yale women at that house, then yes, I
16   would say Yale does have an obligation to step in.
17             And going back to the language of Title
18   IX --
19             THE COURT:  Hang on.  So other than --
20   well, then are there other cases around the country
21   where such similar issues have -- well, are there
22   other Title IX cases where courts have recognized
23   this same scope of unequal opportunities as it
24   relates to off-campus activities or housing?
25             MR. TRACEY:  I am not aware of a Title
```

1    IX case related to off-campus activities or housing

2    in the sense of fraternities -- the unequal

3    opportunities afforded by fraternities.  Of course

4    courts and the United States Supreme Court have long

5    recognized the kinds of social capital that we're

6    talking about here is a very important part of

7    education.  If you look -- if you go back to *Sweatt*

8    *v. Painter*, that was essential to the *Sweatt v.*

9    *Painter* decision.  And *United States v. Virginia* as

10   well.  Both of those cases --

11            THE COURT:  But, though, both of those

12   cases, both *Sweatt* and *United States v. Virginia*,

13   flowed from a direct policy where they were denying

14   admission to women -- or in the context of *Sweatt v.*

15   *Painter,* they were denying admission specifically on

16   the basis of race and the institution was involved.

17            Here what we have is an institution or

18   group not affiliated directly with the university,

19   but maybe providing benefits to those who attend the

20   university, and then now we're sort of suggesting

21   the institution now is responsible for equalizing

22   opportunities for an institution that the university

23   doesn't control.

24            MR. TRACEY:  This I think goes to the

25   question of control under Title IX and the element

```
 1    of control.  Title IX says that no student shall be

 2    subject to discrimination under any educational

 3    program.  Any educational program or activity.

 4    Program or activity is defined in the statute as all

 5    the operations of.  All the operations of a college

 6    or university.

 7               THE COURT:  Okay, but aren't these --

 8    just leaving aside fraternity, going back to my

 9    hypothetical about this house, that's not an

10    educational program or activity of Yale, correct?

11               MR. TRACEY:  But it is under the -- it

12    is under the operations --

13               THE COURT:  How?

14               MR. TRACEY:  -- of Yale.

15               THE COURT:  How?  If someone is running

16    an off-campus house, how is that under the control

17    of Yale?

18               MR. TRACEY:  Because the Supreme Court

19    has defined "under" for us as "subject to the

20    authority or regulation of."

21               THE COURT:  But how is the house -- how

22    is the off-campus house that is owned by a private

23    entity subject to Yale?

24               MR. TRACEY:  That -- I can give you

25    eight different ways --
```

1              THE COURT:  Okay.

2              MR. TRACEY:  -- these houses are subject

3    to Yale.

4              THE COURT:  Sure.

5              MR. TRACEY:  So, first off -- first off,

6    they're composed principally of Yale students and

7    run by Yale students.  Yale does not deny that it

8    has authority over its students.

9              Two, they are undergraduate

10   organizations within the meaning of Yale's

11   regulations.  Those regulations say any group in

12   which a majority of participants are undergraduates

13   is considered to be an undergraduate organization,

14   and, therefore, they are required to abide by the

15   undergraduate regulations which have an equal

16   opportunity statement and requirement in them.

17             Three, as Yale readily admits, it has

18   twice ineffectively banned fraternities for engaging

19   -- in those cases for engaging in sexual misconduct.

20             Four, Yale permits the fraternities to

21   use the Yale name, Yale email addresses, Yale

22   bulletin boards, and campus facilities for

23   recruitment.

24             Five, Dean Burgwell Howard provides

25   advice to the fraternities.

```
1            Six, Yale and the fraternities have, as
2    we allege, a symbiotic relationship where Yale is
3    relying on fraternities to provide important social
4    functions to the students which it used to provide
5    but then outsourced.
6            Seven, the party registration policy.
7    Yale actually required these fraternities to
8    register their parties for a majority of the past
9    decade, and they only stepped away after our clients
10   filed the CHRO charges.
11           Together these raise a plausible --
12   together all of these facts raise a plausible
13   inference of control over the fraternities.  We
14   show --
15           THE COURT:  What's the eighth?  You
16   promised me eight.
17           MR. TRACEY:  Sorry.  Eight.  I
18   apologize.  Eight is -- my eighth factor is the
19   totality.
20           THE COURT:  Ah.
21           MR. TRACEY:  It's important to look at
22   the situation in the totality.
23           THE COURT:  I missed it.  So you blew
24   right by me.  I've got it.
25           MR. TRACEY:  Sorry.  I should have said
```

 1   that.

 2              THE COURT:  I am caught up now.  Go

 3   ahead.

 4              MR. TRACEY:  You have to look at the

 5   totality.  What I want to emphasize here as well,

 6   your Honor, we're getting into a very factually

 7   intensive area.  We've alleged all of these

 8   different ways that Yale has the authority to

 9   control these places and these spaces, and I don't

10   think that Title IX simply allows you to outsource

11   discrimination to organizations that are full of

12   your students, adjacent to campus, that have existed

13   on your campus or adjacent to your campus for

14   150 years.

15              So Title IX says that the university --

16   well, I should go back to the Supreme Court.  The

17   Supreme Court has said that Title IX must be

18   accorded a sweep as broad as its language.  Title

19   IX's language is very broad.  Its guarantee of

20   equality is very broad.  It was designed to uproot a

21   long traditional system of unequal opportunities in

22   our -- in education in the United States, and there

23   is no reason why a university shouldn't be liable if

24   its male students get a special Yale plus and its

25   female students only get Yale, even if the Yale plus

53

1    is caused by organizations that are primarily Yale

2    students but are not officially Yale organizations

3    but in fact are essentially Yale organizations.

4              Now, I would like to address very

5    briefly, your Honor, on Count II the membership

6    practices exemption.  Our argument is not -- under

7    this count our argument is not that Yale is liable

8    because the fraternities only accept men.  Our

9    argument is that Yale is liable because of unequal

10   opportunities that are occasioned by these

11   discriminatory practices.

12             THE COURT:  But there is where you run

13   into the notion that Title IX has actually permitted

14   -- or suggested it's not going to forbid it.  How

15   then do you allow -- this may go to the other

16   unequal opportunities argument.  To the extent that

17   you are sort of like circling around the membership

18   policy as the basis for the unequal opportunities,

19   and Title IX itself has said we're not going down

20   that road, why are we going down that road?

21             MR. TRACEY:  Well, Title IX doesn't

22   say -- what Title IX says --

23             THE COURT:  It doesn't say it in those

24   exact words.

25             MR. TRACEY:  Right.  Title IX says --

1   unfortunately, and I am not saying that I -- I am

2   not making a comment about the policy behind Title

3   IX, but this -- we can assume for purposes of

4   argument that Title IX says separation is okay --

5   that segregation is okay in this context.  That's

6   what Title IX may say, but it doesn't say that

7   inequality is okay.  And while it's very --

8                THE COURT:  But the inequality -- but

9   based on the arguments that we have talked about the

10  last several minutes, the inequality flows from the

11  membership, correct?

12               MR. TRACEY:  The same is true in *Sweatt*

13  *v. Painter*.  The same is true in *United States v.*

14  *Virginia*.

15               THE COURT:  I know, but those were also

16  in a constitutional context that then directly

17  related to the universities.  Here we have -- and

18  also the particular claim that you are bringing -- I

19  mean there there was a Fourteenth Amendment argument

20  that was being brought.  Here you have a statutory

21  argument and you are trying to pursue relief under

22  this particular statute, and the challenge we have

23  is that this particular statute seems to exempt, you

24  know, the membership policy.  So it seems to me hard

25  to then structure a remedy that is largely, if not

1    wholly, dependent on membership policies.

2              MR. TRACEY:  Well, the same is true in

3    Title IX sports.  Sports are allowed to be separate

4    under Title IX, but if the women's team is highly

5    underfunded, has worse facilities than the men's

6    team, well, then something needs to change, the

7    university needs to do something.  Your Honor, I

8    will say you are asking important --

9              THE COURT:  Are you alleging that?  I

10   mean because -- I guess the question then would be

11   isn't -- because then your claim then would not seem

12   to me -- why would it have to rely on the fraternity

13   issue?  Correct?  In essence, if your claim is, in

14   essence, that Yale has provided unequal

15   opportunities to women who attend Yale, then why is

16   your argument contingent on the fraternity

17   membership?  Why isn't your argument simply being

18   that there are unequal opportunities and we want to

19   address those unequal opportunities?

20             MR. TRACEY:  Well, we think this is a

21   specific mechanism by which unequal opportunities

22   are being created.

23             THE COURT:  But the problem, though, is

24   you then run into the issue of a specific mechanism

25   that Title IX seems to not be interested in, or at

1    the very least seems to be exempting from review.

2    So then why wouldn't the basis for your claim be

3    something that is separate and apart from that

4    claim, which wouldn't mean necessarily that evidence

5    about opportunities that are available to male

6    students in the context of fraternities might not be

7    probative, but it seems to me your claim seems to be

8    wholly contingent on the notion of the unequal

9    opportunity that flowed from a membership policy

10   that Title IX doesn't appear to address.

11                MR. TRACEY:  Well, I think you are right

12   that it can be framed in the broader context.  Look,

13   if you just step back and --

14                THE COURT:  But your law firm framed the

15   context.  I guess the question is, did your law firm

16   frame the broader context.

17                MR. TRACEY:  Our law --

18                THE COURT:  It seems to be premised on

19   the membership in the fraternity.

20                MR. TRACEY:  Our lawsuit against the

21   fraternities is as a driver of inequality, but I

22   think your Honor's questions are really focused on

23   the remedy.  We don't have to decide remedy at this

24   stage.  There are many different ways in which to

25   create equality.  One of them might be requiring

```
1   integration, but that doesn't mean that -- Title IX
2   says the membership practices are exempt.  At
3   another university you could have fraternities and
4   sororities with the same social class, the same
5   networking opportunities, the same economic
6   opportunities.  That can exist, but what we're
7   saying is that's not the case at Yale.
8              THE COURT:  No, I understand.  And just
9   so the record is clear, I think my discussion is
10  trying to understand the context of the remedy,
11  which is to sort of understand the contours of what
12  you believe to be the right that is at issue here,
13  and to me that is informative of how one understands
14  what the nature of the claim is so I can understand
15  whether or not there is a basis to allow the claim
16  to go forward.  That's really what we are sort of
17  grappling with.
18             MR. TRACEY:  Right.  Our position is
19  that the nature of the right here is Title IX's
20  broad demands of equality.  There is a narrow
21  exemption for membership practices, but that doesn't
22  mean membership practices can create inequality.  We
23  would be letting the exemption swallow the rule.
24             THE COURT:  Okay.  Moving from Count II
25  to Count I.  Now, Count I is the broader notion that
```

1    there is a sort of environment of sort of gender

2    inequality that flows from harassment and other

3    activities, and that in and of itself, even apart

4    from this question of membership, is a distinct

5    Title IX claim, correct?

6              MR. TRACEY:  Correct, your Honor.

7              THE COURT:  So in understanding that,

8    how is that claim, which seems to be somewhat -- you

9    know, there are corollaries to Count II, which some

10   of it does flow from membership, and indeed part of

11   what the complaint is about is about membership,

12   correct?

13             MR. TRACEY:  Correct.  However, this

14   claim is not about the membership practices of the

15   fraternities.  This claim is trained on Yale's

16   deliberate indifference and its decades-long

17   deliberate indifference of sexual misconduct

18   occurring at the fraternities.

19             THE COURT:  Okay.  So in terms of

20   understanding and measuring that particular claim,

21   we're looking at what you consider the failure -- is

22   it merely the failure of the institution to remedy

23   the problem in its entirety?

24             MR. TRACEY:  No.

25             THE COURT:  Because -- and, again, the

59

1    notion of understanding remedy is important to

2    understanding exactly what the scope of the claim

3    is.  And so the question then becomes -- because we

4    have -- there are individual plaintiffs here who

5    have alleged issues of sexual harassment or assault

6    in the context of some of the fraternities, and, as

7    I understand it, those particular allegations are

8    really background to this larger claim rather than

9    them being the claim in and of themselves, correct?

10             MR. TRACEY:  That is correct.

11             THE COURT:  One of the challenges is

12   *Davis* involved this particular claim that was not

13   effectively addressed and we're in this sort of no

14   person's land where I guess -- are there Title IX

15   claims which have raised this sort of broader class

16   atmospheric notion that is not necessarily dependent

17   on the individual claims but reflective of this

18   broader sort of atmospheric --

19             MR. TRACEY:  Yes, your Honor.

20   Absolutely.  There are numerous Title IX claims that

21   have raised this.  The courts sometimes refer to

22   this as before claims because it's about the

23   environment before an assault occurs.  Other courts

24   have referred to these as heightened risk claims.

25             THE COURT:  What are the cases that you

1  think are most instructive for this Court on that?

2          MR. TRACEY:  *Tubbs v Stony Brook*

3  *University* describes the claim as being based on

4  actual knowledge of sexual assault committed in a

5  particular context or program by a particular

6  perpetrator or perpetrators.  You have in other

7  cases -- and we cite that in our brief.  It's 2016

8  WL 8650463.

9          Other cases that are similar include *Doe*

10  *v. University of Tennessee*, 186 F.Supp 3d 788, which

11  again is decided in part under this heightened risk

12  theory.

13          You also have *Hernandez v. Baylor*

14  *University,* which is again also decided -- a

15  decision under this heightened risk theory.

16          And even if you look at *Simpson v.*

17  *University of Colorado*, that in essence is also a

18  heightened risk case.  In that case you had the

19  university knew -- first of all, the court cites

20  general -- general knowledge about the risk of

21  assault in a college football recruiting program.

22  General knowledge.  It even cites, I believe, a

23  Sports Illustrated article about the problem.  Plus

24  past knowledge of assaults committed at the

25  University of Colorado Boulder in connection with

1   the recruiting program.  And that gave the

2   university actual knowledge of the problem and the

3   university was deliberately indifferent because it

4   failed to address that problem.

5          THE COURT:  Putting it in the context of

6   this case, is this both -- where it is both seeking

7   monetary and injunctive relief, so in terms of

8   measuring monetary relief, it's the notion that the

9   schools didn't do enough?  I guess what I am really

10  trying -- well, actually, rather than talking about

11  it in the context of relief, I am actually trying to

12  understand the liability.

13         Now, is it the notion that the schools

14  didn't do enough or they didn't eliminate the

15  problem in its entirety?  What exactly is someone

16  finding in order to find liability in this

17  particular theory?

18         MR. TRACEY:  Absolutely.  Thank you,

19  your Honor.  And I think your question is really

20  about the deliberate indifference standard, and the

21  Second Circuit relatively recently addressed it very

22  clearly in *Zeno v. Pine Plains Central School*

23  *District*, 702 F.3d 655.  In that case, the Second

24  Circuit said responses that are not reasonably

25  calculated to end harassment are inadequate.  And

1    some examples of inadequate responses are -- include

2    where a university fails -- or a school fails to

3    respond, responds only after a lengthy and

4    unjustified delay, or otherwise responds in a manner

5    that amounts to discrimination.

6                Now, if we look at the facts of *Zeno*,

7    they actually match really well onto our case.  In

8    *Zeno* it was -- I will say *Zeno* was a Title VI case,

9    but Title IX standards apply.  There was racial

10   harassment of an individual student for 3.5 years.

11   The school district in that case punished each

12   student that Zeno reported -- that the plaintiff,

13   the student Zeno, reported.  The school even moved

14   one student to another school.  It suspended another

15   student for 45 days.  The school district in that

16   case also, in response to the racial harassment,

17   posted bullying training, revamped its after-school

18   programs, focused on combating prejudice, and

19   eventually conducted what was admittedly a

20   halfhearted sensitivity training.  Notably, the

21   school district rejected proposed reforms from a

22   human rights commission and the NAACP.  And the

23   Second Circuit said, great, you did all of these

24   things, but guess what, the harassment continued.

25   None of your measures were really doing anything to

63

1  prevent the culture of bias.

2              THE COURT:  And that relates to a

3  particular individual, correct?

4              MR. TRACEY:  That's right.

5              THE COURT:  So the question is now when

6  you have this -- now you magnify this now into this

7  broader claim.  So the question is, is it the notion

8  that if any woman is subjected to anything that the

9  school has failed?  That's what I am trying to

10 understand.  Now -- because when you bring it down

11 to the individual plaintiff level, it's easier to

12 understand.  When you elevate it to the broader

13 level, while at the same time it raises a broader

14 question of whether or not something could be done,

15 it also raises a broader question of exactly how

16 does one define liability in that particular

17 context.

18             MR. TRACEY:  The school has failed

19 because it rests on -- even in its brief it rests on

20 its Title IX procedures and individual reports of

21 complaints, but if you get a decade of individual

22 reports and complaints and other reports pointing to

23 the fraternities as the central locus of sexual

24 harassment, and it continues to be a central locus

25 of sexual harassment, just waiting for people to

```
 1   report and then punishing that individual doesn't do
 2   enough.
 3             In Zeno, while the individual was being
 4   subject -- there was an individual who was being
 5   subjected to harassment, the problem was the
 6   context, the school, and what the Second Circuit
 7   says there is punishing the individual is not enough
 8   because, guess what, another individual came in and
 9   did the same thing.  The same is true here.  And
10   Title IX has always --
11             THE COURT:  And the other -- I guess
12   what I am really just trying to figure out in this
13   particular context is, we have an individual
14   plaintiff who complained about something, issues,
15   and I think perhaps -- you know, I may be getting
16   the record incorrect -- with one exception there
17   wasn't something brought to the administration to
18   investigate and someone didn't do anything about it,
19   correct?  There was one where she talked to a
20   resident advisor, but other than that, are there
21   examples where plaintiffs talked to X and X said,
22   oh, we're not going to do anything about it?
23             MR. TRACEY:  Well, the plaintiffs have
24   repeatedly complained to the top administrator of
25   the school about the context, the problem with
```

1    context.

2              THE COURT:  Yeah, but I guess the

3    question is, don't you have to sort of lay the

4    foundation in terms of having sort of provided the

5    complaint, them not addressing it in order to get to

6    the broader question?  I understand someone saying,

7    gosh, do you know what, I think you are not doing

8    enough about X, and maybe they're not doing enough

9    about X, but the question we're dealing with here is

10   when does that become actionable?  If, in the

11   context of the deliberate indifference standard,

12   there isn't the opportunity to have X complaint and

13   then have the institution respond to the complaint,

14   then I guess I am trying to figure out how do you

15   then get to the level of -- well, then there are

16   just complaints out there and you feel the response

17   overall is not enough?

18             MR. TRACEY:  Well, you don't have -- so

19   under the before -- before theory of Title IX or the

20   heightened risk theory, the individual plaintiffs do

21   not have to have complained.  That's the whole point

22   of the heightened risk theory, that there was this

23   context that the university knew about, the

24   plaintiff then entered into that context and

25   suffered an assault.  The university already had

1    actual knowledge and already was deliberately

2    indifferent to that context, and that deliberate

3    indifference caused -- effectively caused the

4    assault.

5              THE COURT:  So then let me fast forward

6    to remedy because, like I said, it helps me

7    understand exactly the scope of the right.  So when

8    do you know whether or not the school has acted

9    appropriately then?

10             MR. TRACEY:  Well, I don't know that we

11   can judge that based on the pleadings.  The point

12   is --

13             THE COURT:  I am not asking you to judge

14   it based on the pleadings.  I am just trying to

15   understand it in terms of understanding the scope of

16   the right, which is, is it the case that if the

17   students felt not enough was done and the school was

18   deliberately indifferent, that they hadn't addressed

19   the problem that they knew existed, in essence they

20   are -- is the school then liable if any incident

21   happens?  Or is the school -- what's the context in

22   which the continuation of Title IX liability -- when

23   is the institution in the crosshairs of Title IX?

24   Is it when there continues to be any incident even

25   if the school has taken corrective action?  I just

1   want to make sure I understand.

2           MR. TRACEY:  No, it's not -- the school

3   has to take meaningful corrective action, and as

4   long as the school is not taking meaningful

5   corrective action, then it is liable.

6           THE COURT:  What does that mean?  Let me

7   see if I can concretize this a little bit.  Let's

8   suppose that the incident -- let's use this.  Let's

9   say that the incidents that the individual

10  plaintiffs have complained about was reported to the

11  school and they took corrective action to address

12  it, and let's suppose then a year later that at an

13  incident at a fraternity -- another incident happens

14  where, let's say, someone is inappropriately touched

15  or something else.  Is the fact that the school may

16  have corrected the two incidents but another

17  incident happened mean that the school is

18  deliberately indifferent to the problem?

19          MR. TRACEY:  Well, it depends on whether

20  we are talking about the school's response to two

21  isolated incidents or whether the school -- we're

22  talking about a decades-long pattern of sexual

23  misconduct associated with particular context.

24          THE COURT:  Is your claim -- as I

25  understand your claim, is it your claim that there

1   has been no response or the response has been

2   ineffective?  And is it that the same things are

3   happening and the school has done nothing?  I just

4   want to make sure I understand.

5           MR. TRACEY:  To the extent there has

6   been a response, it's been ineffective.  Yale says

7   its response has been we've got Title IX procedures,

8   students come report to us about sexual assault and

9   we'll investigate.  That has not done anything.

10          THE COURT:  You are saying Title IX

11  requires -- you are saying that students are

12  reporting things and the school -- wait.  Students

13  have reported things, the school has investigated

14  them, and, what, the investigations were

15  insufficient or the fact that incidents still

16  happened means that you still are giving rise to

17  Title IX liability even though you -- you haven't

18  sufficiently investigated that incident?  Meaning

19  that -- let's take it out of this context and see if

20  that will sort of help.

21          Let's suppose that there is a statute

22  that basically says, look, outside of the context of

23  gender, that students should not be attacked on

24  campus, and suppose students were attacked on campus

25  and the school started responding to it.  Suppose

1   then some other student is attacked on campus.   Does

2   that mean -- but the school would investigate.   Does

3   that simply mean because another incident happened

4   that the school response to incidents are

5   insufficient?

6           MR. TRACEY:   If there is a particular

7   context where those attacks are always occurring,

8   frequently occurring, and all the university does is

9   respond to complaints about attacks in that context,

10  but the context is still generating the attacks, the

11  attacks are still happening year after year, and

12  there are independent reports saying, hey, you need

13  to look at this context, it's really dangerous for

14  people, in fact 40 percent of your people are

15  suffering assaults in this context, 40 percent of

16  your women are suffering assault in this context,

17  then, do you know what, yes, they do need to do more

18  than to respond to individual complaints.   That's

19  what *Zeno* says.   In *Zeno* we have a school district

20  responding to the individual complaints, sending

21  students to other schools.

22           THE COURT:   But the problem I am

23  struggling with with *Zeno,* again, is because it's an

24  individual plaintiff.   Because, to me, the way you

25  framed it is essentially now if any woman student at

1    Yale suffers an experience, isn't then the school

2    continuing on the hook for Title IX liability?

3              MR. TRACEY:  Well --

4              THE COURT:  I am not saying it's wrong

5    or right.  I am just trying to make sure I

6    understand, A, what your position is, and then we

7    can get to the position of what the law requires.

8              MR. TRACEY:  Until there is a meaningful

9    response by the university, yes.

10             THE COURT:  I don't understand what

11   "meaningful" means.  I guess I am asking a simple

12   question.  If the school responded, yet another

13   incident occurs, in your view does that mean that

14   whatever -- however the school responded is not

15   meaningful?

16             MR. TRACEY:  No, the school -- whether

17   or not the school's response is meaningful depends

18   on what the school is doing.  Now --

19             THE COURT:  Okay.  And then where -- how

20   does Title IX help us understand whether that

21   response is meaningful?  If the mere fact that

22   another incident occurs after they've addressed an

23   incident in and of itself does not constitute the

24   absence of a meaningful response, then I need to

25   understand exactly -- how does the law help us

1    understand what a meaningful response is?  Or is

2    your answer essentially that, wait a minute, that

3    then becomes fact specific and then the jury or

4    someone else -- or at least not at this stage do we

5    determine whether or not the response is meaningful?

6           MR. TRACEY:  That's absolutely my

7    answer, your Honor.  Absolutely.  And if you look at

8    defendants' cases, all of the cases that they cited

9    in their motion were -- on deliberate indifference

10   were summary judgment cases.  So, yes, absolutely.

11   That's a classic factual question, the classic

12   question for the trier of fact.

13          But what the Second Circuit says in

14   *Zeno*, though, still applies broadly.  Responses that

15   are not reasonably calculated to end harassment are

16   inadequate.  That standard there, that is a

17   fact-intensive question.  That is a question for a

18   trier of fact.  That is not a question to decide on

19   a motion to dismiss.

20          What the question is here is have we

21   plausibly alleged that there is an ongoing problem

22   that hasn't been adequately addressed, and we

23   clearly have.  We cite literally a decades worth of

24   reports showing ongoing problems.  We cite

25   statistics suggesting that almost 40 percent of

```
1   women at Yale suffer sexual assault before they
2   graduate.  75 percent suffer sexual harassment.
3   This is quintessential --
4              THE COURT:  But you are not suggesting
5   they suffered it in the context of fraternities.
6              MR. TRACEY:  What reports have said is
7   fraternities make a tremendous contribution to the
8   campus social climate.  Indeed, in 2011 the advisory
9   committee specifically says that in their report,
10  that the fraternities have a disproportionate effect
11  on the social climate at Yale.  And the Office of
12  Civil Rights noted the same thing, that the DKE
13  horrific event where they were chanting on campus
14  was part of a chain of events.  And since that time
15  Yale has really stepped away and continues stepping
16  away to this date.
17             THE COURT:  All right.  We're going to
18  do this in terms of timing.  I will let you go on.
19  We're going to take a short break in about five
20  minutes.  I have to do a short call at 11:30 and
21  then I have to do a short call at 12:00.  I don't
22  know how long we're going to go.  I am not trying to
23  shortchange anyone.
24             But why don't you move on to another
25  argument.
```

```
 1              MR. TRACEY:  Thank you.  I want to move
 2   on to the question, really briefly, of hostile
 3   environment.  You know, Yale's -- I would say that
 4   Yale's arguments really on hostile environment,
 5   control, and actual knowledge all really mostly boil
 6   down to control, whether or not the university has
 7   control over these spaces.  They say you've only
 8   alleged hostile environment happening at the
 9   fraternities, only a few incidents on campus, but of
10   course what happens at the fraternities bleeds into
11   campus.
12              THE COURT:  Doesn't the control argument
13   go back to your eight points from before, or are
14   there new points?
15              MR. TRACEY:  No, those -- my eight
16   points are my -- those are the eight points on
17   control, the various ways that they exercise
18   authority over the context.
19              THE COURT:  Got it.
20              MR. TRACEY:  But the question under
21   hostile environment that Yale raises is whether they
22   have been deprived -- whether our plaintiffs have
23   been deprived of educational benefits, but what the
24   Second Circuit says is that a disparately hostile
25   environment relative to one's peers in and of itself
```

1   deprives plaintiffs of the benefits in educational

2   opportunities at the school.  Similarly -- that was

3   in *Hayut*, 352 F.3d 750.

4            Similarly, in *Zeno* the court says just

5   alone, standing alone, deprivation of a supportive

6   scholastic environment free of -- in that case

7   racism, in this case sexism -- and harassment in and

8   of itself is a deprivation to the educational

9   experience.  And it makes sense.  If you are

10  sexually assaulted at a fraternity across the street

11  from Yale's campus, when you walk back onto Yale's

12  campus that comes with you, that affects your

13  educational experience.

14           In our case our clients don't -- some of

15  them didn't -- couldn't see the person who had

16  sexually assaulted them.  Is that person going to

17  show up in your class on Monday?  Is that person

18  going to show up in the dining hall later in the

19  day?  That all affects your educational experience

20  and no one should have to be subjected to sexual

21  assault as a condition of attending a college or

22  university.

23           Unless your Honor has other questions

24  concerning Count II, I believe I have made all of

25  the points that I wanted to -- sorry, on Count I, I

1   believe I have made all of the points we wanted to

2   address on the hostile environment.

3          THE COURT:  Okay.

4          MR. TRACEY:  I can move on to public

5   accommodations.

6          THE COURT:  Okay.

7          MR. TRACEY:  So Yale's approach to

8   public accommodation, really they want to make a

9   Swiss cheese public accommodation out of Yale, you

10  step on one slab of pavement and you are in a public

11  accommodation, you step on the other slab of

12  pavement and all of a sudden you not in a public

13  accommodation.

14         THE COURT:  I guess it may be Swiss

15  cheese, but I guess is that -- there does seem to be

16  some case law that suggests that you are looking at

17  it within the context of the particular thing.  So I

18  guess what I am trying to figure out is, is the

19  public accommodation the fraternity?  What's the

20  public accommodation you're talking about here?

21         MR. TRACEY:  The public accommodation in

22  this count -- in this count --

23         THE COURT:  As it relates to Yale.

24         MR. TRACEY:  As it relates to Yale, the

25  public accommodation is Yale.

```
 1                 THE COURT:  Okay.  And tell me where is
 2      the denial -- how does this fall into Yale?  Because
 3      at the end of the day doesn't this flow back to
 4      fraternities which isn't controlled by Yale?
 5                 MR. TRACEY:  It's about the Yale
 6      experience.  It's about the experience of being at
 7      Yale.  And what the statute says -- to be clear,
 8      what the statute says is that it shall be
 9      discriminatory practice in violation of this
10      section, one, to deny any person a full and equal
11      accommodation in any place of public accommodation,
12      but, two, to discriminate, segregate, or separate on
13      account of race, creed, color, national origin, sex,
14      gender identity.  To discriminate is a separate
15      section.
16                 So what we've alleged is that the
17      students are at Yale, which is a public
18      accommodation, and have suffered discrimination.
19      And then, indeed, Yale has caused discrimination.
20      Throughout discrimination law there is a principle
21      that if you are -- if discrimination is happening
22      under your control, then you have an obligation to
23      correct it.  You see that in Title VII, you see that
24      --
25                 THE COURT:  Hang on just one second.
```

 1   We're going to break in a minute.  I just want to

 2   make sure I understand.  I mean is this really no

 3   different, quite frankly, than the Title IX

 4   argument, that in essence what the discrimination in

 5   terms of the accommodations you are talking about is

 6   because there are these off-campus facilities in

 7   terms of the fraternities which are denying

 8   opportunities and -- which flow from a lot of these

 9   change in opportunities, or is there something

10   different?

11             MR. TRACEY:  No, I think the factual

12   basis is essentially the same.  The legal standard,

13   however, is different.  Deliberate indifference is

14   not the standard under --

15             THE COURT:  I understand.  I just want

16   to make sure we're operating from the same nucleus

17   of facts which flows from that.

18             MR. TRACEY:  Yes.  It is, yes.

19             THE COURT:  All right.  Let's just take

20   this break.  I will be back in just a few minutes.

21             (Recess.)

22             THE COURT:  All right.  You can

23   continue, Mr. Tracey.

24             MR. TRACEY:  Thank you, your Honor.

25   Your Honor, before I begin on the breach of contract

```
 1   section, I just want to raise one point on Title IX

 2   that I neglected to raise, but I think is very

 3   important.  It's that to remind the Court that,

 4   contrary to what the defendants say in their brief,

 5   the standard is deliberate indifference.  It's not

 6   active interference, it's not active discouragement,

 7   it's not, as they say in their moving papers, shocks

 8   the conscience.

 9               They'll point to our cases, cases that

10   we cite, and say that conduct there shocked the

11   conscience.  In that case there was active

12   interference by the university.  That's obviously

13   not the standard.  It is deliberate indifference,

14   which comes from Section 1983 which has a very clear

15   meaning of failure to act in light of known

16   circumstances.  So I wanted to make that point

17   clear.

18               THE COURT:  Actually during the brief

19   break I actually had someone pull up Zeno just to

20   make sure I was understanding Zeno correctly.  One

21   of the things the court in Zeno seems to talk about,

22   and Davis, it talks about substantial control.  And

23   then it also talks about substantial control in the

24   context of when the harassment occurs "during school

25   hours and on school grounds."
```

79

```
1              I guess the question is -- obviously

2    that's in the sort of public and secondary school

3    context, and I guess the question is, how does one

4    now analogize that to the college and university

5    context?

6              MR. TRACEY:  Well, I think the Court --

7    well, first of all, the standard is not obviously

8    that it happens during school hours, on school

9    grounds.  That's not --

10             THE COURT:  I understand, but the court

11   said in Zeno that it exercised substantial control

12   over the circumstances of harassment when it occurs

13   during school hours and on school grounds.

14             MR. TRACEY:  Right -- sorry, your Honor.

15             THE COURT:  Yes.

16             MR. TRACEY:  Yes, that is what the court

17   says there.  It's clear in that case, sure, there is

18   substantial control when it happens on school

19   grounds.  No one -- I don't think Yale is disputing

20   that.  But that's not the only time that the school

21   has substantial control over an incident.  That's

22   just -- that's a floor and not a ceiling.

23             THE COURT:  Why do you say that?  Based

24   on what?

25             MR. TRACEY:  Well, based on the fact
```

1    that the standard here is substantial control,

2    meaning under the school's disciplinary authority.

3    Under the "subject to" the school's disciplinary

4    authority.  That's what it's based on.  If you look

5    at *Farmer*, *Farmer* is a case of a fraternity

6    off-campus private house and the court said that

7    there was substantial control in that case because

8    of the various ways that the school regulated the

9    fraternity.

10             Now, Yale will say, oh, there was

11   differences.  In *Farmer* there was a little -- maybe

12   there was more involvement.  There was an official

13   Greek life center at the University of Kansas in

14   that case.

15             But we need to go back to the standard,

16   and the standard is subject to the regulation of,

17   subject to the authority of, and we've shown that

18   Yale has exercised authority over these contexts and

19   over the schools in these contexts.

20             THE COURT:  Okay.  Just -- I think I

21   have not made this clarification before.  There will

22   be occasions when I will say "okay," and that

23   doesn't necessarily mean I agree or disagree, it

24   just means I've got it, we can go on to the next

25   argument.  So, okay.

1          MR. TRACEY:  Understood.  Thank you,

2     your Honor.  Understood.

3          I will go to breach of contract now.

4     The breach of contract is based on a Connecticut law

5     which says that all of the catalogs, bulletins,

6     circulars, and regulations of an institution

7     determine the contractual relationship between the

8     students and the institution, along with other

9     express and implied promises.  That's from *Burns v.*

10    *Quinnipiac*.

11         So it's important here off the bat that

12    we read these contractual promises as a whole.  What

13    *Burns* says, and what the Connecticut standard is,

14    you look at everything as a whole.  And that's

15    obviously a basic principle of contract

16    interpretation.

17         THE COURT:  One of the things -- I sort

18    of get all of that.  One of the real challenges

19    here, and it's similar to what I was talking about

20    in the Title IX context, although it seems to me

21    even more appropriate in the contract context, is

22    that when you have these cases where they've allowed

23    claims to proceed on a breach of contract it relates

24    to educational performance or something of that

25    nature, there has been a somewhat very specific

1    aspect, in essence, that sort of allows one to sort

2    of understand exactly what is the nature of the

3    contractual right there and also allows one to

4    understand what constitutes a breach.

5         One of the things I am actually

6    struggling with, even if one gets to the notion that

7    the various language in these documents constitutes

8    a contract between the plaintiffs and Yale, how do

9    we begin to meaningfully measure breach?  Because as

10   I understand the Connecticut cases, they really are

11   concerned with that question, and that begins to

12   raise a question about whether or not it really is a

13   contractual obligation that could be properly

14   enforced.

15        MR. TRACEY:  Well, I think, first of

16   all, the question of breach is obviously typically a

17   factual question for the trier of fact.

18        THE COURT:  But I guess the question is,

19   we have to be able to define what the breach is.

20   That's what I am talking about.  If the contractual

21   obligation is sufficiently specific, then we can

22   understand exactly that the contractual obligation

23   is breached.  If we go into sort of the classic

24   contract thing, if one contracts with someone to

25   provide 100 widgets on this Friday, we know if they

1  don't -- if Monday comes and they haven't provided

2  100 widgets, we know that there has been perhaps a

3  breach.

4          So here we've got all of this language

5  that talks about what Yale has to do, and how do we

6  define what then constitutes a breach to these

7  students with respect to that obligation?

8          MR. TRACEY:  I think we can look at the

9  language -- here I think we can look at the plain

10 language of the contract and evaluate whether or not

11 Yale has actually done the things that it promises

12 it's going to do.  I think we can pretty clearly see

13 based on our allegations that Yale has not done what

14 it promised to do in its contract.

15         I can start with the equal opportunity

16 statement.  The equal opportunity statement says

17 Yale does not discriminate in admissions,

18 educational programs, or employment against any

19 individual on account of an individual's sex.  And

20 we can go -- and then it goes on with another list.

21 But "does not discriminate."  "Does not

22 discriminate."  Discriminate has a particular

23 meaning, and the meaning of discriminate under the

24 body of antidiscrimination law includes a refusal to

25 stop discrimination that occurs under their control.

 1          THE COURT:  If it's a contractual

 2    obligation, why would you be defining what

 3    discrimination means in that contractual context by

 4    reference to statutes which aren't necessarily

 5    embodied in the context of the statute -- I mean the

 6    body of the contract?  I mean, wouldn't you

 7    ordinarily be looking at the contract as a whole

 8    document to sort of understand its terms and to make

 9    sure each party is clear about those terms and how

10    those terms should be enforced?

11          MR. TRACEY:  Yes.  I have two answers to

12    that question.  First off, in the clause before what

13    I just read it says "In accordance with this policy,

14    and as delineated by federal and Connecticut law,

15    Yale does not discriminate."  It's an explicit

16    reference to antidiscrimination law right there.

17          And, second, reading the contract as a

18    whole -- remember, the contract here is all of the

19    circulars, all of the bulletins, all of the

20    regulations.  You look to Yale's undergraduate

21    regulations.  Yale's undergraduate regulations say

22    explicitly Yale University requires that all student

23    organizations, whether registered or unregistered,

24    operating on or off campus, are to abide by the

25    undergraduate regulations, and it defines student

1  organizations as any group of students in which a

2  majority of participants are undergraduates.

3          It then says that student organizations

4  must operate in accordance with Yale's policies on

5  equal opportunity.  If Yale cannot discriminate, the

6  organization cannot discriminate.

7          THE COURT:  So what does that mean here?

8          MR. TRACEY:  That means student

9  organizations under Yale policies are not allowed to

10  discriminate.

11          THE COURT:  I guess I am asking very,

12  very specifically.  Does that mean then that we know

13  that there is a breach of the contractual obligation

14  because the fraternities don't allow women?

15          MR. TRACEY:  That appears to be a

16  breach, yes, of the plain language of the contract.

17  Yale says these organizations cannot discriminate.

18  The fraternities are student organizations as

19  defined by this contact.

20          THE COURT:  But then you also said, as

21  you correctly pointed out to me, it also

22  incorporates some of the antidiscrimination

23  principles, which I presume would also incorporate

24  Title IX which does seem to expressly exclude the

25  question about the membership relating to

1    fraternities.  So why don't we incorporate that back

2    into the contract?

3         MR. TRACEY:  Well, I think the point

4    that you are raising, your Honor, is that the

5    contract -- on this point the contract is really

6    vague.  That's not a question that we can decide

7    here on a motion to dismiss.

8         THE COURT:  Wait.  If the contract is

9    vague, then how do we know, A, whether it's been

10   breached, and then, B, what do we do about it?

11        MR. TRACEY:  Well, number one, no, the

12   contract -- the contract is clear enough here that

13   we know that there is a plausible claim of breach.

14   The contract does not say anywhere that it

15   incorporates all the exemptions to

16   antidiscrimination law.  I mean, that is definitely

17   an elephant in a mouse hole here.  There is no

18   reference to any kind of exemption for the -- Title

19   IX exemption in the language that we cite in our

20   complaint.

21        THE COURT:  I think I should ask the

22   question more simply.  What does this breach of

23   contract claim actually provide you that your other

24   claims don't?

25        MR. TRACEY:  Well, first of all, the

```
 1    standard here is different from the standard of
 2    Title IX.  The Title IX standard, as we say -- for
 3    damages the Title IX standard requires deliberate
 4    indifference.  Not for injunctive relief.  We make
 5    that point in our papers.  But here the standard is
 6    a breach of contract standard, whether or not Yale
 7    has abided by the promises that it makes to its
 8    students.  That alone is the difference on the
 9    breach of contract claim.
10             And Yale -- additionally, I would say
11    that Yale's undergraduate regulations say that
12    student organizations cannot discriminate.  There is
13    no exemption -- in our reading of the undergraduate
14    regulations, there is no exemption here.
15             THE COURT:  So any time a student feels
16    differently on the basis of gender or some other
17    characteristic they would then have a viable
18    contract claim against Yale?
19             MR. TRACEY:  If Yale doesn't enforce the
20    regulation against that group that is doing the
21    discriminating, then yes, they would have a breach
22    of contract claim against Yale.
23             And if I can respond to Yale's argument
24    that, oh, this is going to regulate students going
25    out to coffee at Starbucks, if two students go out
```

1    to coffee at Starbucks and if they're the same

2    gender, then they are a student group and they can't

3    discriminate and they're discriminating because

4    they're of the same gender getting coffee.  That's

5    not what the regulations say.  The regulations refer

6    to organizations.  We're talking about student

7    organizations.

8              And if there is a line to draw, it's,

9    you know, the fraternities fall on the very clear

10    side of the line that this is a student

11    organization.  The two students at Starbucks is sort

12    of a red herring here.

13              So we look to the undergraduate

14    regulations.  That's what they say.  If you look at

15    the sexual misconduct policy, it says Yale will deem

16    to eradicate sexual misconduct.  It says -- the

17    prior version of the policy says sexual misconduct

18    will not be tolerated.  And, by the way, sexual

19    misconduct policies are incorporated into the

20    undergraduate regulations.

21              THE COURT:  So, again, going back to the

22    same concern I raised in the Title IX context, is it

23    the case that it's also going to be a breach any

24    time there is any instance of sexual misconduct that

25    happens on Yale campus?

89

1          MR. TRACEY:  No.  The breach will be if

2     Yale doesn't aim to eradicate that and actually

3     taken -- actually taken steps to aim to eradicate

4     the problem.  The context --

5          THE COURT:  Hang on.  So it happens --

6     when you say doesn't take steps, it takes some

7     steps, but the steps don't actually eradicate it.

8     Then is there a breach then?

9          MR. TRACEY:  If you know the steps are

10    inadequate and you have not --

11         THE COURT:  Wait.  You are incorporating

12    things that aren't in the question.  I will let you

13    answer that question, but I just want to make sure I

14    understand this question.  I just want to make sure

15    I understand exactly where the breach is.  So

16    someone raises an issue of sexual misconduct, Yale

17    addresses the problem, two months later another

18    incident of sexual misconduct happens, does that

19    then constitute a breach of the contract that Yale

20    has made not to tolerate this?

21         MR. TRACEY:  If those two assaults

22    happened in a context where Yale knows -- in a

23    particular context or place that Yale knows there is

24    a heightened risk of sexual assault, and in fact, in

25    addition to those two assaults, Yale has a ten-year

1    history of assaults, of similar types of assaults

2    occurring in that particular context, then, yes,

3    that would be a breach.

4              Here's another element.  Let's say there

5    is a dark alley and Yale knows sexual assaults are

6    happening in that dark alley and they respond to the

7    complaints and they investigate that assaults

8    happened in the dark alley, but they keep happening

9    in the dark alley and Yale never thinks to install a

10   light, install a security camera in that dark alley,

11   do something else to prevent the assaults from

12   recurring because there is something about that

13   environment that is causing it.

14             THE COURT:  What's the judicially

15   manageable standard for determining what else needs

16   to be done in order not to have the breach of that

17   obligation?

18             MR. TRACEY:  I apologize, I didn't hear

19   the question.

20             THE COURT:  I am trying to figure out

21   what is the judicially manageable standard to figure

22   out what else must be done.  You have given your

23   dark alley example, things happen in the dark alley,

24   they address them, but you are suggesting that

25   perhaps there might be a more systemic approach,

```
1    such as adding lighting to the dark alley that Yale

2    has not done.  So I guess based on the analogy you

3    have provided to the Court, that would constitute a

4    breach of the obligation to sort of -- to address

5    that claim.

6              So I guess, you know -- and I guess what

7    I am saying is that if as long as the incidents

8    happen and Yale refuses to put a light, then we have

9    a breach?

10             MR. TRACEY:  As long as the incidents

11   happen and Yale fails to do something other than

12   simply respond to complaints from a context where

13   they know things are happening all the time, then

14   yes.  There is --

15             THE COURT:  So, in essence, you are

16   referring that implicit within that there is --

17   implicit with the notion to respond is a more -- is

18   an obligation to respond more systemically to the

19   issue at hand.

20             MR. TRACEY:  Absolutely.  Absolutely.

21             THE COURT:  All right.  We're going to

22   take another short break.  I apologize for this, but

23   I want to deal with another call, and then we'll be

24   back on.

25             (Recess.)
```

```
 1                    THE COURT:  All right.  Please be

 2      seated.

 3                    All right.  Mr. Tracey, I will let you

 4      finish.

 5                    MR. TRACEY:  Thank you, your Honor.

 6                    THE COURT:  Or at least on this one.

 7                    MR. TRACEY:  Thank you, your Honor.  I

 8      want to make something clear on the breach of

 9      contract claim that I think may have not been fully

10      clear in my argument before.  The claim for the

11      breach of contract here is not simply about the

12      membership of the organization, whether or not women

13      get admitted to the fraternities, but of course it's

14      also about the important social, economic, and

15      housing opportunities that are associated with the

16      fraternity membership and the unequal fraternity

17      system.

18                    So similar to our Count II under Title

19      IX, the claim is not dependent on the membership

20      practices, it's about -- what it's about as well is

21      the unequal opportunities that are afforded to women

22      at Yale by virtue of the fraternity system.  And

23      there are ways that -- obviously we discussed

24      before, there are ways that Yale could remedy that

25      that don't necessarily involve or require
```

1    elimination of the fraternities.  So I wanted to

2    make that point clear.

3            The other point that I wanted to make

4    clear in response to some of Yale's arguments is

5    that Yale's position in its brief -- and this runs

6    also throughout its claims -- is simply that all

7    it's required to do under its policies, similar to

8    -- similar to its position that all it's required to

9    do under Title IX, is respond to complaints, that

10   that's all it's required to do.

11           But that's not actually what the

12   language of the contract says here.  In the

13   undergraduate regulations the plain language says "A

14   student who is believed to have violated a

15   university policy or state or federal law, including

16   but not limited to, hazing, sexual misconduct, or

17   theft, in the course of working for or participating

18   in the activities of an undergraduate organization,

19   may be brought before the Yale College executive

20   committee or university-wide committee on sexual

21   misconduct."

22           It doesn't say -- it doesn't say who is

23   required to bring these complaints.  It says "may be

24   brought."  And, in fact, the university is allowed

25   to -- our interpretation of the rules, and I believe

1    the university's past practice, the university is

2    allowed to initiate these proceedings itself.  It

3    doesn't have to rely on student complaints to do so.

4    So even under the plain language of the contract

5    Yale's position that it only responds to complaints

6    is not valid.

7              THE COURT:  But just consistent with

8    what we're talking about in basic contract law, the

9    question isn't whether or not Yale can do something,

10   but the question is whether or not if Yale doesn't

11   do something it constitutes a breach.  I guess the

12   question is, in order to determine that wouldn't we

13   have to rely on the language itself?

14             MR. TRACEY:  Well, yes, you do have to

15   rely on the language, but you also have to rely

16   obviously on the facts and circumstances of whether

17   or not a breach has occurred.  Whether or not it

18   wasn't --

19             THE COURT:  No, but meaning that -- I

20   guess what I am saying -- sometimes I am clear,

21   sometimes I am not.  I guess what I am saying,

22   doesn't the underlying contractual language have to

23   give rise to the question of liability which would

24   then constitute a breach, in that if it's the case

25   that beyond the express contractual obligation that

1   Yale has undertaken that there are additional things

2   that Yale should do, wouldn't we have to sort of

3   rely on language in the contract itself in order to

4   give rise to that particular right?

5         MR. TRACEY:  Absolutely.  If you look

6   holistically at all of the different provisions that

7   we cite -- for instance, the provision I just cited

8   references sexual misconduct.  In the sexual

9   misconduct policy it says that Yale aims to

10  eradicate it.  "Aims to eradicate it."  That's

11  strong language.  And they say, well, there is a

12  specific mechanism for doing that, and they say that

13  mechanism is student complaints, but that's not

14  true.  That's not what the undergraduate regulations

15  say.  The mechanism is not simply student

16  complaints.  In fact, the undergraduate regulations

17  say that Yale can initiate a complaint.

18        THE COURT:  Okay.

19        MR. TRACEY:  So if you look at the

20  policies and practices of the university together,

21  all of these promises of the university together,

22  Yale does not discriminate, Yale aims to eradicate

23  sexual misconduct, sexual misconduct will not be

24  tolerated, as it said in its prior version of the

25  sexual misconduct policies, and you combine that

1    with the mechanisms of the undergraduate

2    regulations, you have what is effectively an

3    obligation on the university to do something about

4    discrimination and sexual misconduct occurring on

5    its campus.  Our allegation is obviously that they

6    have not over a ten-year period with respect to the

7    fraternities.

8              I also want to raise another point that

9    Yale makes.  They say that, well, the sexual

10   misconduct policies, you know, we're only promising

11   to do things like provide education, training, clear

12   definitions and policies, and serious consequences

13   for policy violations.

14             First, I'll say that there are policy

15   violations that are going unremedied.  That's

16   essentially the nature of our complaint on this

17   count.  And there have not been serious

18   consequences.  Indeed, Yale's own administrators

19   have admitted that their past sanctions of

20   fraternities have been ineffective, a slap on the

21   wrist.

22             Second, we do allege that Yale has

23   ineffective training.  We specifically allege that,

24   that its education and trainings are not, are not,

25   appropriate.  We allege in paragraph 176 that Yale's

97

```
 1   trainings are inadequate because it intentionally --

 2   that Yale intentionally refuses to focus on

 3   fraternities or mention them in its training.  We

 4   cite a student advocate who had her own group who

 5   was doing independent trainings at Yale because Yale

 6   training was too inadequate, and she met with

 7   administrators and asked them to incorporate some --

 8   some aspect of -- or some warning about fraternities

 9   into their trainings on sexual misconduct, and the

10   university said no.  And, in fact, they discouraged

11   her from bringing up that issue in her own

12   independent trainings.  That's in 176 of the

13   complaint.  Finally --

14             THE COURT:  So that would be a breach of

15   the contractual obligation?

16             MR. TRACEY:  Beg your pardon?

17             THE COURT:  That would be a breach of

18   the contractual obligation?

19             MR. TRACEY:  Yes.

20             THE COURT:  What's the remedy?

21             MR. TRACEY:  The remedy is to have

22   better training, trainings about the dangers of

23   fraternity life.

24             THE COURT:  So that remedies it?

25             MR. TRACEY:  That particular breach
```

1    about the training?

2                    THE COURT:  Yeah.

3                    MR. TRACEY:  That narrow breach could be

4    remedied by having a more realistic training about

5    the dangers associated with fraternities.

6                    THE COURT:  And if it does that training

7    and there are still issues, then is that then a

8    breach?

9                    MR. TRACEY:  If it turns out that

10   training is ineffective and you are not looking --

11   if you are not looking at whether those trainings

12   are effective and if -- frankly, I think we're

13   really getting off into factual territory here.

14                   THE COURT:  I know you've said that, Mr.

15   Tracey, but it can't be factual.  And the reason it

16   can't be factual is that if -- I am basically trying

17   to understand when do we have a situation where

18   liability exists.  That's all I am asking, is when

19   does liability exist.  And because -- I think that

20   the Connecticut case law is fairly clear that, A,

21   there are only limited circumstances -- as I sort of

22   read the cases, and I may be wrong, and I will

23   always reread things before I decide on anything,

24   but it seems to me that there are very limited

25   circumstances when we are going to sort of take the

```
 1    language in these sort of education bulletins and so
 2    forth and then create a contractual right.
 3              So then once we do that, we then have to
 4    figure out when we have liability.  As I also
 5    understand the cases, not only are there limited
 6    circumstances, but it seems to me we ought to be
 7    able to have some very specific contractual
 8    obligations that are going to be enforced.
 9              So part of what I am asking, when I am
10    asking the question is there a breach, is whether or
11    not there are specific obligations that we're clear
12    on that have been breached that would, therefore,
13    give rise to the breach of contract claim.
14              So it seems -- maybe it's factual in the
15    sense that you then have to point to allegations
16    that would provide it, but what I am trying to do is
17    step back and look at a hypothetical that allows me
18    to understand when we know whether or not the
19    standard under the law has been violated.
20              MR. TRACEY:  Right.
21              THE COURT:  Or there is sufficient
22    allegations that the standard under the law had been
23    violated.
24              MR. TRACEY:  Absolutely.  I think the
25    allegations about Yale's intentional -- remember,
```

 1   Yale says we're not doing -- we're not going to

 2   incorporate fraternities into our training after a

 3   decades-long period in which they have warning and

 4   notice about the problems associated with

 5   fraternities.  So, yes, I think that's a violation.

 6   That's a clear violation.

 7             THE COURT:  I know, and my follow-up

 8   question was, okay, they then put the training in

 9   there, but another incident happens.  And so I am

10   asking whether that then gives rise to liability,

11   and you are saying it depends.  I am just trying to

12   figure out because -- and this really goes to the

13   question of whether or not the claim is amorphous,

14   which then suggests is there sufficient clarity in

15   the context of the contract to suggest that there

16   are specific contractual obligations that we can say

17   are breached, which is if we don't know exactly what

18   constitutes a breach, and if it's not clear from

19   either the contractual language or the circumstance

20   under which the contract would be violated, it then

21   begins to raise the question of whether or not there

22   is a viable breach of contract claim.

23             Because if it's the case -- and this is

24   what I have been addressing sort of in the context

25   of Title IX is, I have to understand in terms of

1    judicially manageable standards when this right is

2    actually breached, because if it's the case -- and

3    let me be clear.  This is also in the context of the

4    case that you have brought.  If you brought a case

5    brought by a single individual against the

6    institution, then we can clearly understand this,

7    but you have brought this class action claim that

8    suggests that any time a woman who falls within the

9    purview of the class, something happens, you may

10   have a breach.  That becomes a situation where you

11   will always -- you know, absent, you know, the

12   elimination of any of these incidents, then you have

13   to have a situation where the Court is continually

14   dealing with a breach of circumstances or

15   continually supervising whether or not Yale is

16   meeting its obligations.

17          MR. TRACEY:  Well, I think -- first off,

18   we are talking about the specific facts of this case

19   here.  Right?  This is -- we're talking about a

20   history, a ten-year history at Yale with this

21   particular problem of fraternity-related sexual

22   misconduct.  I understand the Court's concern

23   about -- you know, in the hypothetical case if they

24   do something and there is another assault.  To be

25   frank, we need to look at what -- in the next case

1    we would need to look at what has Yale done and have

2    they done enough.  Those are standards, though, that

3    juries -- those are judgments juries make all of the

4    time, triers of fact make all of the time.  That's

5    the point of the jury system.

6              THE COURT:  I guess what I am saying is,

7    in the context of your case wouldn't -- if we follow

8    what your theory would be, it is that there would be

9    liability, and, therefore -- well, actually let me

10   leave aside the question of monetary liability.  But

11   I am assuming you are saying there would be some

12   injunctive relief.  Correct?

13             MR. TRACEY:  Right.

14             THE COURT:  There would be some

15   injunctive relief, which would leave the Court then

16   having to monitor whether or not the school has

17   sufficiently met their obligations in terms of

18   injunctive relief.

19             So what I am dealing with is the

20   instance of another example happens after the case

21   has gone and after the Court has entered injunctive

22   relief, and I am trying to figure out, well, is this

23   then another violation which then continues the

24   injunctive relief and then requires the Court to

25   consider whether additional relief is appropriate?

1   It would seem to me -- I am having a hard time

2   understanding doctrinally what's a distinction

3   between every instance that happens then gives rise

4   to perhaps another violation which -- or at the very

5   least would give rise to continued court supervision

6   to figure out how Yale resolves the problem,

7   because -- and, to be frank, is there a clear answer

8   there?

9            There may be things that the university

10  could do or perhaps should do, but the question is,

11  in the absence of it being a clear answer -- and

12  this is putting it back more clearly in the context

13  of a breach of contract claim, going back to my

14  earlier example of the widget example, which is they

15  didn't provide the 100 widgets by Friday, we know

16  what that looks like and how we can remedy that.

17           The question is, do we know what it

18  looks like to resolve this problem and remedy it so

19  we're not here again and again and again if the

20  situation arises?  I mean, right now you haven't

21  answered the question.  Maybe it is unanswerable,

22  and maybe the answer is the law doesn't require that

23  answer, but then I would need you to refer me back

24  to some language in the way the Connecticut courts

25  have looked at this problem that suggests, yes, I

1   understand it may be unanswerable, but that's really

2   part of what we deal with here.

3             And that's the thing I am struggling

4   with.  I haven't seen that in the case law because

5   it's been more X individual claims at X institution

6   has failed to live up to a specific promise and the

7   court has measured that specific promise.

8             MR. TRACEY:  To your point, your Honor,

9   first off, I -- first off, on continuing violations,

10  let's think about this problem, continuing

11  violations.  We make distinctions in the law all the

12  time, in tort law, in sexual harassment law.  We

13  have a concept of continuing violations and we can

14  determine when the violation is continuing and at

15  what point we're at a new violation, a different

16  violation.

17            Now, I will say standing here right now

18  hypothetically imagining what Yale might do to

19  correct the problem and whether the next assault

20  that happens would make Yale liable, it is hard to

21  do as a hypothetical standing here at the motion to

22  dismiss phase -- stage.  It doesn't mean that the

23  Court can't -- that the Court can't fashion relief

24  that is clear for the plaintiffs and clear for Yale

25  in terms of the standards and --

```
1              THE COURT:  But my point is -
2              MR. TRACEY:  -- to comply with --
3              THE COURT:  My point is actually
4    slightly more specific, which is doesn't the failure
5    to understand exactly what constitutes a breach
6    raise the fundamental question about whether or not
7    this particular cause of action -- leaving aside the
8    others, whether or not this particular cause of
9    action, the breach of contract claim, breach of
10   contract exists?
11             MR. TRACEY:  No.  First of all, I think
12   the question here is a question of what is Yale
13   promising to do.
14             THE COURT:  Right.
15             MR. TRACEY:  And Yale is not promising
16   to provide 100 widgets, but what Yale is promising
17   to do, they are promising things that are not
18   necessarily as 100 percent concrete as 100 widgets.
19   What they are promising to do is -- they are
20   effectively promising people an equal educational
21   experience, an educational experience where the
22   university is going to aim to eradicate sexual
23   misconduct, where sexual misconduct will not be
24   tolerated.
25             Now, to the extent that those have
```

106

1    meanings that -- first of all, I don't think those

2    -- the meanings of those things are that unclear.  I

3    think we know what it means and a jury would know

4    what it means to aim to eradicate sexual misconduct

5    or not.  I think a jury would know what it is to --

6    whether or not sexual misconduct is tolerated.

7             But to the extent that there is any

8    ambiguity there -- first off, that's not something

9    we can resolve on a motion to dismiss.  Second off,

10   a motion to dismiss, obviously all inferences are in

11   plaintiffs' favor.  And, third, Yale drafted this

12   contract.  The contract should be construed against

13   the drafter.  Plaintiffs didn't draft this language,

14   Yale drafted this language.  If Yale is assuming

15   these obligations, then surely it must be held to

16   the obligations that it has assumed.

17            THE COURT:  Hang on.  So you are saying

18   -- hang on.  So you are saying Yale has assumed an

19   obligation that they will prevent any and all sexual

20   misconduct -- that they will prevent any Yale

21   student from having to undergo any sort of issue of

22   sexual misconduct?

23            MR. TRACEY:  No, that's not --

24            THE COURT:  So then what's -- then help

25   me.  Then beyond that -- because that would

1  obviously -- if that is the actual -- that is what

2  Yale has agreed to, that would be consistent with a

3  formulation that any time there was an act of sexual

4  misconduct, then there might be liability.  So short

5  of that, then what exactly is the contractual --

6  what has Yale agreed to?  What has Yale agreed to

7  protect their students from -- against with respect

8  to sexual misconduct?

9           MR. TRACEY:  Yale has agreed that if

10  there is a systematic problem of sexual misconduct,

11  that it's going to address that problem

12  systematically.  That's effectively what Yale has

13  agreed.  If you are saying sexual misconduct will

14  not be tolerated and there is a systematic problem

15  of sexual misconduct and you don't address the

16  systemic problem, you just wait for people to report

17  to you, then you are tolerating sexual misconduct.

18           THE COURT:  I guess one question would

19  be, if the Court decides that perhaps there isn't a

20  sufficient basis for the Title IX claim, isn't the

21  wisest thing, given there is a whole question of

22  what the scope is, and the contract law and state

23  law, isn't the best thing for the Court to do if it

24  reaches that question on Title IX to decline to

25  exercise supplemental jurisdiction?

```
 1              MR. TRACEY:  No, your Honor.  I don't
 2   think so.  There are numerous federal claims in this
 3   case.
 4              THE COURT:  I understand, but I am just
 5   talking about Yale.  With Yale right now, and that's
 6   all we're dealing with, with Yale the only federal
 7   claim is Title IX, correct?
 8              MR. TRACEY:  That's right, your Honor.
 9              THE COURT:  And if the Court declines to
10   exercise supplemental jurisdiction, given all of the
11   -- given, quite frankly, the novelty of the state
12   law claims, because there isn't directly a
13   Connecticut Supreme Court case that is on point
14   that, at least from my view, provides sufficient
15   guidance, aren't I better off allowing the
16   Connecticut courts to figure out exactly what the
17   contours of this right is rather than me trying --
18   as a federal court sitting in diversity jurisdiction
19   trying to decide it?  Not really diversity, really
20   in this case the possibility of supplemental
21   jurisdiction.
22              MR. TRACEY:  Well, I do believe, your
23   Honor, as a matter of fact we have alleged that the
24   Court has jurisdiction under 1332(d) because it's a
25   class action, the amount in controversy exceeds
```

1    $5 million, and plaintiffs -- at least one member of

2    the proposed class --

3            THE COURT:  But that would only give me

4    jurisdiction if there weren't otherwise -- that

5    would only give me jurisdiction if there also were

6    federal claims.  That wouldn't individually give me

7    jurisdiction if there were only state law claims

8    left.

9            MR. TRACEY:  No, I believe it would.  I

10   believe it would under the Class Action Fairness

11   Act.

12           THE COURT:  Okay.  And what's the Second

13   Circuit case you think would best stand for that

14   proposition?

15           MR. TRACEY:  I have -- jurisdiction has

16   not been raised in the briefs and I don't have case

17   law at hand.

18           THE COURT:  Okay.

19           MR. TRACEY:  I apologize for that.

20           THE COURT:  All right.  That's fine.

21   Okay, why don't we move off the breach of contract

22   argument.  What else do you want to raise with

23   respect to Yale?

24           MR. TRACEY:  One other point briefly on

25   the breach of contract argument is that the

1    plaintiffs -- Yale claims the plaintiffs didn't make

2    any complaints, and that's not true.  The plaintiffs

3    made, in fact, numerous complaints to the university

4    about the problem associated with sexual misconduct

5    of the fraternities.  Yale tried to bring -- Yale --

6    they met with the deputy Title IX coordinator,

7    actually met with the Title IX Coordinator Jason

8    Killheffer, and we allege that in paragraph 190, and

9    raised concerns about sexual misconduct.

10              Of course they also met with senior

11   administrators, Dean Burgwell Howard, Dean Marvin

12   Chun, and raised the problem of sexual misconduct.

13   They also tried to bring a complaint with the

14   executive committee, we allege this in paragraphs

15   185 to 189, and they were rebuffed.

16              Finally, as you pointed out earlier,

17   plaintiff McNeil also complained to her first year

18   counselor, which is part of -- which is a mandatory

19   reporter, we believe, under Yale's policies, and she

20   was again rebuffed there.  Paragraph 106 we've

21   alleged that.

22              And in terms of the nature of the

23   university's obligations, I would suggest the Court

24   look at *Johnson v. Schmidt*, 119 F.Supp 2d 90,

25   District of Connecticut case from 2000 concerning

1    Yale, and in that case what the court said was that

2    it was able to find a breach of the contractual

3    duties to safeguard students from academic

4    misconduct.  I should actually be more clear.  It

5    said Yale failed to deliver on its express and

6    implied contractual duties to safeguard students

7    from academic misconduct.

8              Well, I think Yale's obligations to

9    safeguard students from sexual assault are no more

10   vague and undefined than the duties to safeguard

11   students from academic misconduct, and I think that

12   case can provide the Court some guidance on how to

13   deal with these -- some of these issues that the

14   Court has raised.

15             THE COURT:  Yeah, I know.  I am looking

16   at *Johnson* now.  They also talk about where the

17   breach of the specific identifiable promise has been

18   alleged courts have found such a claim actionable,

19   and that is really this question of whether this

20   promise is specific and identifiable enough.

21             Let's do this.  Let's move off of

22   contract.  Do you want to talk about CUTPA, at least

23   with respect to Yale?

24             MR. TRACEY:  Sure.

25             THE COURT:  I guess there is also a

1   negligent misrepresentation claim.

2               MR. TRACEY:  Yes.  Thank you, your

3   Honor.

4               So the CUTPA claim, obviously we have

5   claims under both the unfairness standard of CUTPA

6   and the deceptive practices standard, the two

7   standards under CUTPA.

8               The unfairness standard uses the

9   cigarette rule, which basically looks at whether a

10  defendant's practices offend public policy or

11  whether they are immoral, and a breach of contract

12  can of course give rise to a CUTPA violation when

13  the breach offends public policies.  Here, a breach

14  of contract claim and the representations contained

15  in those contracts, the breach of those

16  representations gives rise to and offends public

17  policy, particularly Connecticut's longstanding and

18  zealously enforced public policy against invidious

19  discrimination, including sex discrimination.

20              Moreover, plaintiffs allege that Yale

21  willfully distanced itself from the epicenter of

22  gender discrimination and sexual misconduct in

23  acting and harming its students.  We allege that

24  very clearly throughout the complaint.

25              Those together, the willful withdrawal

```
 1    from the epicenter, plus the Connecticut public

 2    policy against discrimination, together bring that

 3    breach of contract to the level of unfair trade

 4    practice.

 5            We say also the negligent

 6    misrepresentations that Yale has made that we allege

 7    in our negligent misrepresentation claim can also be

 8    the basis of a CUTPA claim under the unfairness

 9    statute.

10            I am going to move on to the deceptive

11    practices claim now.  For the deceptive practice

12    there must be a representation likely to mislead,

13    the consumer must interpret the representation

14    reasonably, and the representation must be material.

15            Now, it's important to note that it does

16    not require proof of intent to deceive.  The

17    misrepresentations that we have here are:  One, that

18    the university's undergraduate organizations do not

19    discriminate based on gender; two, that the

20    university seeks to eliminate sexual misconduct, and

21    says that not only in its policies but also in its

22    marketing materials, and we cite plaintiff Walker

23    remembers receiving these marketing materials that

24    said that when she was looking to apply to college;

25    three, Yale misrepresents that fraternities play a
```

1  minor role in undergraduate social life.

2          All of these representations are,

3  indeed, material.  Certainly whether or not your

4  university will discriminate and whether or not the

5  university will allow its students to discriminate

6  against you is understandably a material aspect of

7  whether or not you want to go to that institution.

8          Similarly, whether or not the university

9  is actually seeking to eliminate sexual misconduct,

10  whether it's really tolerating sexual misconduct

11  could obviously affect your decision to go to the

12  university.  I don't think there is -- there would

13  be much argument on that.

14          Instead, Yale focusses on whether

15  fraternities play a minor role in undergraduate

16  social life.  And clearly we have alleged that that

17  was material to our clients.  One of the clients

18  remembers very clearly hearing about that.  And, in

19  fact, in Yale's own 2019 Review of DKE and Campus

20  Culture it admits that students felt that Yale

21  misled them about the nature of Greek life.  Yale

22  specifically says -- this at 174 of our complaint.

23  In its own reports it says that students were

24  misled.  And of course this is important.  I will

25  say whether or not it rises to the level of

1    importance is obviously going to be a factual

2    question, but it's certainly plausible it's

3    important.  Whether or not the school has Greek life

4    is often a major part of a student deciding whether

5    or not they want to go to that school.

6              Now, there are students who want to be

7    involved with Greek life and they go to schools with

8    big Greek life.  There are students that don't want

9    anything to do with Greek life, and so they choose

10   schools that don't have anything to do with Greek

11   life.  Just because Yale is an elite institution, as

12   they allege in their motion, doesn't mean that there

13   aren't other alternatives out there that provide

14   equally elite educations that don't have the same

15   presence of fraternities on them.  So it is, indeed,

16   material, and we have plausibly alleged it is

17   material.  And, of course, that's a quintessential

18   factual question.

19             Moving on, I will move on to the

20   negligent misrepresentation claim.  Here the

21   elements are that the defendants made a

22   misrepresentation of fact, the defendant knew or

23   should have known it was false, the plaintiffs

24   reasonably relied on the misrepresentation, and they

25   suffered pecuniary harm as a result.  Notably even

```
1    an innocent misrepresentation may be actionable if
2    the declarant has the means of knowing, ought to
3    know, or has the duty of knowing the truth.
4            Here, again, the misrepresentations are
5    the same ones that we identify in our CUTPA claim.
6    Yale should have known these were false.  They are
7    Yale statements about its own university, Yale
8    statements about its own Greek life.  Some of those
9    statements, the 10 percent statement, was presented
10   as if it were a study that was conducted.  And, of
11   course, plaintiffs reasonably relied.  McNeil spoke
12   with Yale administrators about Yale's promotion of
13   equality when she was applying to the school.
14   Walker remembers distinctly the 10 percent.  And, of
15   course, the pecuniary harm, they are paying Yale
16   tuition as a result of their decision to attend the
17   school, which of course was related to Yale's
18   representations about what student life would be
19   like there.
20           If your Honor has no further questions,
21   I have stated our argument, and I thank you for the
22   time.
23           THE COURT:  All right.  Thank you.
24           Ms. Ellsworth, let's do this.  We've got
25   some other defendants.  Let me hear from them and
```

1    then we may have to sort of take them out of order,

2    any other responses you may have to Mr. Tracey's

3    arguments.

4              MS. ELLSWORTH:  That's fine, your Honor.

5              THE COURT:  All right.  You are up next?

6              MS. GILBRIDE:  Good afternoon, your

7    Honor.

8              THE COURT:  Good afternoon.  I know we

9    started in the morning.

10             MS. GILBRIDE:  Joan Gilbride.  Good

11   afternoon, your Honor.

12             I am here representing the fraternity

13   defendants with the exception of two, 302 Elm and

14   409 Crown.  Or I might have gotten that backwards.

15   I apologize.

16             Your Honor, our arguments are fairly

17   straightforward.  There are two counts against us,

18   one under the federal Fair Housing Act and the other

19   under the state Fair Housing Act.  Our argument with

20   respect to those two claims, simply, is that

21   plaintiffs have not plausibly alleged that they are

22   aggrieved individuals.  For that premise we would

23   refer the Court to *Hack v. Yale*, which is the

24   Connecticut case dealing with plaintiffs who alleged

25   that they were denied fair housing against Yale.  In

```
 1   fact, what happened in that case was that -- the

 2   court emphasized the fact that there was no refusal

 3   to provide housing to the plaintiffs.  There

 4   actually was housing available.  So it's slightly

 5   different than our case.

 6            But here there is nowhere pled in the

 7   complaint that the plaintiffs interacted in any way,

 8   shape or form with the entities that offer housing

 9   on behalf of the fraternities.  There is really just

10   no -- no interaction is alleged, no argument that

11   these entities took any action that was wrongful or

12   constituted discriminatory practice under federal

13   law, or state law for that matter.

14            THE COURT:  I guess, if I understand the

15   plaintiffs' argument, essentially what they are

16   saying is because the fraternities have gender

17   exclusive policies and because they also provide

18   housing, that in effect these institutions have made

19   unavailable to women housing and that would be what

20   would fall classically under the rubric of the Fair

21   Housing Act.  That in essence -- that, in essence,

22   is their argument.

23            MS. GILBRIDE:  That is their argument,

24   your Honor, but I think that there are several flaws

25   in that argument.  Number one, the entities that
```

 1   they are suing are all separate entities.  So there

 2   is -- you know, I don't know how you can argue that

 3   a national fraternity that's located in Minneapolis,

 4   Minnesota somehow denied housing to somebody on the

 5   Yale campus.  But putting that aside, with respect

 6   to the housing entities, they never even applied for

 7   housing.

 8          THE COURT:  Wait.  Let's sort of

 9   analogize it.  Let's suppose -- let's take it out of

10   this particular context.  Let's suppose that the

11   defendants here were providing housing, just

12   generally providing housing to people, and they

13   decided to provide housing on a gender

14   discrimination basis, and the local entity was

15   actually an entity that was controlled or influenced

16   by a national entity.  Is it your point that, in

17   essence, the plaintiffs who felt that they were

18   being denied housing on the basis of this allegedly

19   impermissible criteria would not be able to bring a

20   claim both against the local institution as well as

21   the national institution which, in essence,

22   fortifies the local policy?

23          MS. GILBRIDE:  Yes, your Honor.  I think

24   the claim has to be alleged against the actual

25   entity that provides the housing.  They're separate

 1   entities.

 2             THE COURT:  What do you think is the

 3   strongest case law for your position on that?

 4             MS. GILBRIDE:  I think the *Hack v. Yale*

 5   case, your Honor, is the strongest.  There is not an

 6   awful lot of case law on this issue, believe it or

 7   not.  Particularly there is not much in Connecticut

 8   or the Second Circuit.  There is cases across the

 9   country that deal with standing, of course, but not

10   in this context.

11             That's another thing I would like to

12   just notice for the Court, that this a very novel

13   theory that is alleged here.  It's really a domino

14   theory.  It's a theory that, you know, because there

15   is this policy that the fraternities have, that

16   somehow that translates into these housing entities

17   automatically denying housing when they haven't even

18   alleged that they tried.  In fact, your Honor, they

19   might be surprised if they did apply for housing at

20   these entities that, in fact, they might have a

21   room.  You know, the damages that the plaintiffs are

22   alleging don't flow from the fact that they didn't

23   get housing, they flow from the fact that they

24   allege they didn't get membership in the

25   fraternities.

1          So, you know, under the fair housing --

2    I don't believe they stated a cause of action under

3    the Fair Housing Act.  In essence, that's our

4    argument, your Honor.

5               THE COURT:  All right.  Thank you.

6               MS. GILBRIDE:  The second argument that

7    we raise has to do with the public accommodation

8    issue, your Honor.  There are two counts against us

9    under the Connecticut statutes of public

10   accommodation, and there, your Honor, our argument

11   is -- as you know, this preceded -- this litigation

12   was preceded with an administrative proceeding

13   before the CHRO.  There was a lot of factual

14   information given to the CHRO, and after a thorough

15   review of the factual allegations, the CHRO

16   dismissed at a very early stage the complaint

17   against the plaintiffs.

18          Now, that is not binding on this Court,

19   of course, but we think it's instructional, to say

20   the least, and *Quinnipiac*, which is really the case

21   -- you know, the essential case in Connecticut,

22   which is different than our case, pointed to the

23   *Kiwanis Club* case, which is a Third Circuit case,

24   and I think, you know, in the *Kiwanis Club* case what

25   the court there focused on was whether or not the

```
1    membership criteria that the organization used was

2    driven to its members, or potential members, or the

3    community at large.  Here we don't have any

4    allegation that these fraternities were seeking

5    members from the community at large; you know, at

6    best talking about other Yale students and

7    particular silos of, you know, different

8    fraternities, but there is no allegation of

9    membership activities being driven at the public at

10   large.

11            Really, what the plaintiffs are alleging

12   is that they would -- there would be parties hosted

13   that were open to the public, and I think here if

14   you look at the complaint and you look at each

15   fraternity by fraternity, you know, at best you are

16   talking about maybe one or two a month, maybe some

17   only once a year, and that level of activity is just

18   not enough to conclude on the pleadings plausibly

19   that these are public accommodations.

20            And, you know, your Honor, unless your

21   Honor has any further questions, that's really

22   essentially our argument.

23            THE COURT:  All right.  Thank you very

24   much.

25            MS. GILBRIDE:  You're welcome.
```

```
1              THE COURT:  Just a question.  For the

2   other two entities, are the arguments different in

3   terms of the fair housing and the public

4   accommodations that you all are facing?

5              MR. YALE:  Your Honor --

6              THE COURT:  I might want to just hear

7   them all before --

8              MR. YALE:  Some amplification.  I don't

9   know if there is fundamental differences.

10             THE COURT:  Why don't you amplify and

11  respond.

12             And then I will let you respond in kind

13  to everything.  It might be simpler.

14             Go ahead, Mr. Yale.  And I only remember

15  your name because it coincides with an institution

16  that's also in the case.

17             MR. YALE:  Yes, your Honor.  They are

18  suing my name sake.  David Yale for 402 Crown, your

19  Honor.

20             The case against my client is basically

21  two emails, two unanswered emails that were sent to

22  someone who is not identified by name nor email

23  address, with no allegations that they were not

24  caught by a spam filter or somehow sent to an old

25  email account, no indication or allegation that they
```

1    were received or acted on.  And based on those two

2    unanswered emails, which assuming the person was the

3    president of a fraternity, were not even sent to my

4    client, they were sent to someone else, from that we

5    have a fair housing claim against my client.

6            Very briefly, 402 Crown, there is a lot

7    of allegations about the benefits that you can

8    derive from belonging to a fraternity; however,

9    there is only a fair housing claim against my

10   client.  So it would be only the benefit of housing

11   that might be involved in a claim against my client

12   under fair housing.

13           There is no allegation that any

14   plaintiff or any member of the class ever

15   communicated directly with my client.  There is no

16   allegation that they had a group of people that

17   wanted to rent this multiperson living unit.  There

18   is no allegation that my client even knows who these

19   plaintiffs are.  And, because they lack those kind

20   of facts, it makes it implausible that they could

21   succeed on a fair housing claim against my client.

22           When you go further into their

23   complaint, it's basically that my client knowingly

24   allowed a group of people -- and it gets confusing

25   in the complaint because they say that there are

1   contracts with the individuals, but then they talk

2   about the fraternity quite a lot.  It appears the

3   contractual relationship in the case for my client

4   is actually with certain select members of the

5   fraternity.  So there is a lack of a factual basis

6   to go from there to being responsible for the

7   fraternity's actions.

8          THE COURT:  But as I understand their

9   claim, essentially what they are saying is what your

10  client did was knowingly facilitated the denial of

11  housing to women in that you all contracted with

12  people who don't provide housing to women because of

13  their membership policies.

14         So the question is, leaving aside the

15  issue of whether the fraternity should be liable,

16  they are saying perhaps your client should be

17  separately liable because you are a housing provider

18  and your obligations under the Fair Housing Act

19  would extend to you not being discriminatory in

20  allowing housing to be provided.  That's I think, in

21  essence, the claim.

22         MR. YALE:  I think that is the essence

23  of the claim, but they don't have any facts to make

24  those connections.  They make a bald allegation that

25  there is some type of conspiracy or concerted

1    action, but there is nothing to flush it out.  There

2    is no more facts to add to the legal conclusion.

3    And that's what it is, is a conclusion that there

4    was a conspiracy.

5              The situation really isn't any different

6    than if a group of seven female intramural

7    volleyball players from Yale decided they wanted to

8    live together and they approached my client and

9    rented this seven-unit facility.  Apparently what

10   they are saying is that my client would have an

11   obligation to tell these women that if a male wanted

12   to rent one of those rooms and be their roommate,

13   they would have to allow it, otherwise he would be

14   allowing them to discriminate against a potential

15   roommate -- and that's what we have here is a

16   potential roommate -- on the basis of the person's

17   gender.  That's not what the Fair Housing Act says,

18   and it's a long, long stretch to get there.

19             A couple of other quick thoughts, your

20   Honor.  The public accommodation claim, there is a

21   public accommodation claim apparently against my

22   client.  It's hard to delineate the extent of it.

23   It appears that there are two public accommodations

24   in general they complain of.  One is open house

25   parties that various fraternities have thrown.

1          There is an allegation in paragraph 110

2    and 115 that two plaintiffs went to a party at this

3    property, which I am assuming is 45 Howe Street,

4    although it's never actually been identified in the

5    complaint.  There is no allegation that anything bad

6    happened there.  There is allegations some things

7    bad happened at other fraternity parties, but not at

8    this particular fraternity, Alpha Epsilon Pi.  So

9    how can they claim they are discriminated against at

10   this open party when apparently they went and they

11   were allowed in and nothing bad happened?  If there

12   is a public accommodation at all, that would appear

13   to be providing it without discriminatory intent.

14          The other thing is, apparently there is

15   a claim about allowing places to rent the facilities

16   to have functions, and there is not an allegation,

17   first of all, that this particular address was used

18   in any way by anyone in that manner, but even

19   further, there is no allegation that any group ever

20   tried to rent space at this location and was denied.

21          So part of what I complain about is the

22   lack of facts alleging specific acts by my client.

23   There is a -- I think it's a 108-page or 103-page

24   complaint, and as it's drafted it would require

25   counsel for my client to go through each and every

```
1   paragraph to determine which facts relate to my

2   client, which facts don't, and I don't think that's

3   a fair way for someone who decides to sue almost 30

4   defendants to draft the complaint, to lump them all

5   together in one group that is so large and talk

6   about them collectively without telling the

7   individual defendant what it is he or it, if it's a

8   corporation, what it's accused of doing.

9            Your Honor, I believe that summarizes my

10  argument, unless you have any questions.

11           THE COURT:  I don't have any.  Thank

12  you, Mr. Yale.

13           MR. YALE:  Thank you.

14           THE COURT:  And you are again?  You

15  don't have the benefit of having a last name the

16  same as one of the defendants.

17           MS. FLETCHER:  That's okay, your Honor.

18  I am Liza Fletcher.  I am from Milano & Wanat.  I am

19  here on behalf of 340 Elm.

20           So as your Honor is aware, 340 Elm is

21  one of the housing corporations that the plaintiff

22  has brought claims against, but as your Honor may

23  also be aware, 340 Elm and 402 Crown are distinct

24  entities from the others that are relating to these

25  fraternity organizations.
```

1          Plaintiffs' claims against 340 Elm, as

2     best I can tell by reading of the plaintiffs'

3     complaint, include purported Fair Housing Act

4     violations, Connecticut discriminatory housing

5     violations, civil conspiracy, discrimination in

6     places of public accommodation, hostile environment

7     claims.  There is no legitimate basis for my client

8     to be in this suit under any of these counts.

9          Plaintiffs crafted their pleadings to

10    appear to define defendant fraternities to include

11    housing corporations, national and local chapters of

12    fraternities, and in some instances the names of the

13    fraternities also refer to these housing

14    corporations.  I am sure I am not the only one who

15    was a little bit confused while they were reviewing

16    the complaint.

17          To further confuse things, in some

18    instances the phrase "defendant fraternities" is

19    used in lower case and/or capitalized and stated as

20    "Fraternity Defendants," capitalized, or

21    "Fraternities" with a capital F, and essentially

22    it's unclear what is being referred to during any

23    given reference.

24          When dissected, however, it's apparent

25    that there is no basis for 340 Elm to be involved in

1   this case.  Basically I think the best way to go

2   through and point out the confusion of this

3   complaint is to go through the different allegations

4   that are based on these defendant fraternities.

5           So on page 2, plaintiffs' introduction,

6   paragraph 2 refers to defendant fraternities or

7   fraternities, and cites to footnote 1, which states

8   "As detailed in paragraphs 29 through 59 below,

9   plaintiffs bring claims against the national

10  organizations, local chapters, and housing

11  corporations of the fraternities known as:  Alpha

12  Epsilon Pi, Alpha Delta Phi, Chi Psi, Delta Kappa

13  Epsilon, Sigma Alpha Epsilon/Leo, Sigma Chi, Sigma

14  Nu, Sigma Phi Epsilon, and Zeta Psi."  It's unclear

15  if these definitions are also supposed to be

16  including housing corporations.

17          Then on page 15, paragraph 50 of the

18  complaint, reads "The following defendants are the

19  housing corporations that own the fraternity houses

20  occupied by the local chapters of Defendant

21  Fraternities," capital.

22          While based on the pleadings it appears

23  that some of the housing corporations listed may in

24  fact have a clear relationship with the underlying

25  fraternities involved in this case, it's not the

1    case with 340 Elm.  For instance, we've got Mother

2    Phi Foundation, Connecticut Omega of Sigma Alpha

3    Epsilon House Corporation, and House Corporation of

4    Sigma Chi at Yale.  Then we have page 16, paragraph

5    54, only that defendant 340 Elm is the owner and

6    landlord of what they are referring to as the Kappa

7    Delta House and that it somehow manages the house

8    for it and Kappa Delta's and Chi Psi's Fraternity's

9    mutual benefit.

10              Plaintiffs don't plausible allege, nor

11   can they, that 340 Elm entered into a lease with a

12   fraternity.  Plaintiffs do not allege any factual

13   underpinning sufficient to show that 340 Elm had a

14   relationship with any of the fraternities, let alone

15   why 340 Elm would be working for it and the national

16   and local fraternity's mutual benefit.

17              Paragraph 60 alleges "Each Defendant

18   Fraternity's," capital Defendant Fraternity's,

19   "local chapter, national organization, and housing

20   corporation operated in concert to engage in the

21   discriminatory and unlawful practices alleged in the

22   complaint.  Accordingly, each local chapter,

23   national organization, and housing corporation are

24   referred to collectively under the common name of

25   the fraternity."

1              There is no relationship between 340 Elm

2    and a fraternity plausibly alleged anywhere in the

3    complaint and, indeed, it cannot be alleged.

4              Obviously this presents issues for each

5    organization and housing corporation have a distinct

6    relationship.  Some may be more appropriate to

7    allege concerted actions with fraternities than

8    others.

9              THE COURT:  Just so I am clear, is it

10   the position of 340 Elm that there is not a

11   contractual relationship between it and any of the

12   other fraternity defendants?

13             MS. FLETCHER:  Yes, your Honor.  And

14   also that it's not alleged plausibly in the

15   complaint.

16             THE COURT:  So let me just -- leaving

17   out the last part.  So you are basically saying,

18   look, we have no -- 340 Elm has no contractual

19   obligation to any of the fraternity defendants?

20   That's what you are saying?

21             MS. FLETCHER:  Yes, your Honor.

22             THE COURT:  But you do rent houses to

23   people who are members of one of these fraternities.

24             MS. FLETCHER:  Yes, we rent houses to

25   nine individuals.  I know the way that we formulated

1    our motion to dismiss also includes factual

2    allegations, and we stated that the Court is welcome

3    to convert it to a motion for summary judgment,

4    which I understand would be a separate hearing, but

5    the reason I did that is because we have got a

6    single-owner entity and there is no insurance

7    coverage for this, so we are trying to be cost

8    effective.

9              THE COURT:  I understand.  So your issue

10   is, look, we don't have any contractual relationship

11   with a fraternity, either national or local.  What

12   we do is we have contractual relationships with

13   several individuals.  The fact that these several

14   individuals may be part of a fraternity doesn't

15   necessarily mean it should impute liability.

16             MS. FLETCHER:  Yes.

17             THE COURT:  As I understand what the

18   plaintiffs' argument is, it is essentially, look --

19   and this probably goes to Mr. Yale's hypothetical --

20   which is that, look, these separate individuals are

21   renting there, but the fair housing violation comes

22   about because these individuals are renting there

23   and they are part of an exclusive organization that

24   excludes women who are covered under the Fair

25   Housing Act, and because you are renting there, that

1   makes you liable under the Fair Housing Act.

2                 MS. FLETCHER:  Right.

3                 THE COURT:  And your argument is no,

4   that's not correct.

5                 MS. FLETCHER:  Yes.

6                 THE COURT:  Because --

7                 MS. FLETCHER:  And my other argument is

8   just that plaintiffs haven't alleged that anyone --

9   any of the individual plaintiffs or anyone in the

10  class has approached my client.

11                THE COURT:  I see.  It's the notion that

12  there isn't the identifiable injury because none of

13  the plaintiffs have actually come and applied to 340

14  Elm for housing as these individuals have and there

15  hasn't been a denial in that sense.

16                MS. FLETCHER:  Yes, your Honor.

17                THE COURT:  Okay.

18                MS. FLETCHER:  Okay.  And then if we go

19  to paragraph 158 --

20                THE COURT:  Hang on.  In terms of the

21  resolution, I guess there's the recitation of the

22  various complaints.  So then the other claims that

23  exist is this question of -- well, why don't we do

24  this, because it may be more efficient, at least

25  from my perspective to making sure I understand the

135

```
1   various legal arguments that relate to what you

2   claim -- the deficiencies with respect to the

3   complaint.  So then the same arguments that you

4   would apply for the Fair Housing Act would also

5   apply to Connecticut's fair housing analog, correct?

6             MS. FLETCHER:  Yes, your Honor.

7             THE COURT:  And then with respect to the

8   civil conspiracy, as I understand your arguments

9   there, it is, well, wait a minute, there isn't some

10  sort of conspiracy, A, because there is a question

11  of whether we violated these underlying acts, and

12  then, B, there is this question -- you know, what

13  you have left is this renting which in and of itself

14  does not constitute a basis for civil conspiracy.

15  Is that a fair --

16            MS. FLETCHER:  Yes, your Honor.

17            THE COURT:  -- articulation of the

18  argument there?

19            MS. FLETCHER:  Yes, your Honor.

20            THE COURT:  And then I think you also

21  have public accommodation claims.

22            MS. FLETCHER:  Yes, your Honor.  We

23  couldn't really tell.  We briefed it just in an

24  abundance of caution, but our argument on -- under

25  that ground is just that the legislature
```

1    specifically enacted separate housing claims in 1990

2    and plaintiffs have not cited case law showing that

3    this original public accommodation statute gives

4    rise to fair housing claims.

5              THE COURT:  All right.  Okay.  Are there

6    any other particular claims against your client that

7    we need to address?

8              MS. FLETCHER:  Not that I am aware of,

9    your Honor.

10              THE COURT:  Anything further you wanted

11    to address?

12              MS. FLETCHER:  No.

13              THE COURT:  Sorry, I've held you back.

14    You go next?

15              MR. MELZER:  Thank you, your Honor.

16              THE COURT:  You just have to restate

17    your name again for the record.  Actually, for me

18    because I am not going to remember.

19              MR. MELZER:  Your Honor, Andrew Melzer

20    for the plaintiffs.  And I will be addressing Ms.

21    Gilbride's arguments on behalf of the fraternities,

22    as well as any questions that your Honor may have

23    about the fraternities' motion, and my colleague

24    will be addressing the arguments of 340 Elm and 402

25    Crown.

```
1              THE COURT:  All right.  That's fine.

2              MR. MELZER:  Plaintiffs have adequately

3   pled claims against the fraternities under the Fair

4   Housing Act and Connecticut public accommodations

5   law.  Defendants' arguments do not warrant dismissal

6   at the pleading stage.

7              So first there is the issue that Ms.

8   Gilbride raised about standing under the FHA.

9   Aggrieved persons status under the FHA is extremely

10  broad.  For example under the case law it has been

11  deemed to cover housing testers with no intent to

12  rent or purchase a residence; individuals deprived

13  of the association with others or the benefits of

14  living in an integrated neighborhood; individuals

15  subjected to discriminatory statements or

16  advertisements, even just in a newspaper;

17  organizations which have spent money or resources to

18  combat housing discrimination; municipalities

19  indirectly affected by discriminatory housing or

20  lending practices; and, in the Viens case from this

21  district specifically addressing the Connecticut

22  statute, landlords who are penalized by their

23  insurers for renting to Section 8 tenants.

24              And in terms of liable defendants, it is

25  not only limited to organizations that are directly
```

1    involved with housing, but has covered banks,

2    insurers, advertising agency, and the New York

3    Times.

4              So this is an extremely broad provision

5    that covers all sorts of interactions and

6    relationships that touch upon housing.

7              THE COURT:  And that is the case that

8    consistently, since the passage of the Fair Housing

9    Act in 1968, that the courts have applied the

10   language very generously in terms of what "make

11   unavailable" means, but I guess the question of

12   standing really relates to the issue that I think

13   was raised by the Supreme Court in the *Bank of*

14   *America Corp v. City of Miami* case.  In there they

15   talk about this question of sort of proximate cause,

16   and the court talks about proximate cause -- it says

17   proximate cause -- and I am paraphrasing just a

18   little bit -- under the Fair Housing Act -- it used

19   FHA, that is the paraphrase -- requires "some direct

20   relation between the injury asserted and the

21   injurious conduct alleged," which seems to me to

22   suggest a direct injury.

23              Isn't -- with respect to the fraternity

24   defendants, isn't it an indirect injury in that, in

25   essence, as I understand it -- you will certainly

1    correct me if I have got this wrong -- the

2    fraternities themselves aren't basically in the

3    housing business.  Although they may have access to

4    housing, they are not directly providing housing,

5    it's really other entities that sort of have or hold

6    the housing.

7              So is there really a direct injury

8    between the injury asserted and the injurious

9    conduct alleged?

10             MR. MELZER:  Well, there is really two

11   different issues here, and the only issue that the

12   fraternities raised is one of standing.

13             THE COURT:  Yes.

14             MR. MELZER:  Whether our plaintiffs,

15   including both the individual plaintiffs and the

16   organizational plaintiff, have suffered an injury of

17   fact.  That was decided in the *Bank of America* case,

18   that the plaintiffs there did have standing because

19   they came within the zone of interest covered by the

20   act.  The proximate cause was a separate issue that

21   the court remanded for further consideration, but it

22   did resolve the standing question in the plaintiff's

23   favor.

24             THE COURT:  But I guess didn't it really

25   sort of remand this whole question of what the

1    contours of the proximate injury is?  So, in

2    essence, the proximate cause?  So, in essence, they

3    suggested there certainly could be standing, but

4    really remanded the matter back to the lower court

5    to determine whether or not in that particular

6    context there would be a sufficient basis to suggest

7    there is proximate cause between the City of Miami

8    and the damages caused by the foreclosures.

9             And in this context what we have are

10   fraternity defendants -- because it is somewhat

11   indirect, which is, if I understand the argument, it

12   is that because the fraternities don't provide

13   membership to women the fraternities -- and the

14   fraternities also provide housing, women are denied

15   housing because they're denied membership to the

16   fraternity.  So isn't that an indirect injury, that

17   in essence what your issue really is is the

18   membership in the fraternity?  Correct?

19            MR. MELZER:  Well, in some sense, but

20   not exactly.  The Fair Housing Act does create

21   standing for these kind of indirect injuries.

22   Causation is a -- proximate caution is a separate

23   issue that has not been raised as a ground for

24   relief.  As plaintiff -- what we have here is a

25   combination between local chapters of the

1    fraternity, national chapters of the fraternity, the

2    national organizations, and the fraternities have

3    their own housing corporations that are set up to

4    administer the housing as an adjunct to the

5    fraternity.  This all goes hand-in-hand.

6           We've alleged that the fraternity houses

7    are an integral part of what it means to have a

8    fraternity and be a fraternity.  It's the locus of

9    activity, and people who want to -- who come to the

10   fraternity to be -- to gain the benefits of the

11   fraternity and be, you know, in the inner core of

12   its membership want to live there and reside there.

13          THE COURT:  But it would be the case,

14   though, that your client would not have a fair

15   housing claim if the fraternity defendants admitted

16   women, correct?

17          MR. MELZER:  That is correct, because as

18   we allege --

19          THE COURT:  Then doesn't that mean that

20   any alleged housing injury then becomes an indirect

21   injury rather than a direct injury?

22          MR. MELZER:  No, it's not an indirect

23   injury because there are two things that are

24   happening.  There is denial of membership, but there

25   is also denial of housing, and we've alleged that

142

```
 1   the denial of membership is tantamount to denial of

 2   housing.

 3              THE COURT:  But, to be clear, they've

 4   not applied for housing because they have not

 5   necessarily applied for membership because they are

 6   not allowed membership, correct?

 7              MR. MELZER:  Well, these fraternities

 8   have established policies, as we have alleged, that

 9   housing is only available to members.  So if housing

10   -- so there -- and if housing is only available to

11   members and only men can be members, housing is only

12   available to men.  The plaintiffs have repeatedly

13   sought access and entry into the fraternities but

14   have been denied because of their gender.  That

15   decision blocks them from fraternity housing for all

16   intents and purposes.

17              By seeking membership the plaintiffs

18   were seeking access to housing benefits.  They

19   sought to secure housing.  That's one of the primary

20   benefits of being part of a fraternity.  While not

21   all fraternity members reside in the house, one

22   needs to be a member to gain access to the

23   organization's housing stock.  The fraternities shut

24   out the plaintiffs from their housing.  That's part

25   and parcel of the package of access to the
```

1   fraternities.

2           And it's really not feasible here and

3   the act wouldn't countenance making a formalistic

4   hairsplitting distinction about separately applying

5   for housing when you already have been denied --

6   when you have already been told that you are not

7   welcome, that you can't have this.  What would --

8   that be a futile act, to separately apply for

9   housing just to be told no just to be able to bring

10  a claim.  Our clients' goal here was not to bring a

11  claim.  Their goal was to gain access to the

12  fraternities and the housing, and they were denied.

13          So the Court has to read the complaint

14  in the light most favorable to the plaintiffs with

15  all inferences drawn in their favor, and if it does

16  that the plaintiffs clearly allege that they

17  effectively sought and were denied housing.  And the

18  denial of housing is recognized -- the denial of

19  housing and the denial of equal access and equal

20  opportunity to housing is itself an injury

21  recognized by the Fair Housing Act.

22          In terms of the allegations, I would

23  direct the Court specifically to a few paragraphs of

24  the complaint.  Paragraphs 163 and 164.  In many

25  cases fraternities only allow members to rent units

1    in the houses.  By denying women admission as

2    members, the defendant fraternities also deny women

3    the opportunity to rent units in the fraternity

4    houses because of their gender.

5           Going further, defendant fraternities,

6    therefore, have a policy or practice of denying

7    women, including plaintiffs McNeil, Singer, Walker,

8    other members of Engender, and members of the

9    proposed class, an equal opportunity to rent units

10   because of their gender, and otherwise made housing

11   unavailable to plaintiffs McNeil, Singer, Walker,

12   other members of Engender, and members of the

13   proposed class because of their gender.

14           By precluding them from joining and

15   precluding them from getting access to housing, it's

16   making housing, the benefits that the fraternities

17   and their adjuncts provide, unavailable to women.

18           THE COURT:  So to remedy the problem

19   that you all have alleged, in order to prevail with

20   the Court, I guess the Court has to -- well, the

21   Court could do one of two things.  It could order

22   that women be admitted to the fraternity or it could

23   order women be admitted to housing wherever the

24   fraternity is.  Is that, in essence, where we end

25   up?

1          MR. MELZER:  I think that's right,

2     ordering that the fraternities open to women and

3     allow women to reside there.

4          THE COURT:  Well, we wouldn't

5     necessarily -- we could do the latter without doing

6     the former, correct?  In essence, I mean because --

7     couldn't we?

8          MR. MELZER:  Potentially.  So, you

9     know --

10          THE COURT:  To the extent that there is

11     a viable claim.

12          MR. MELZER:  Citing another few other

13     allegations of the complaint in terms of how the

14     plaintiffs have been denied housing and affected by

15     the denial of housing, 261, the fraternities refused

16     to rent or refused to negotiate for the rental of,

17     and otherwise made unavailable or denied, dwellings

18     to plaintiffs, other members of Engender, and class

19     members because of gender.

20          We've alleged that the plaintiffs are

21     aggrieved persons who have suffered injury and harm,

22     that the fraternities and their housing

23     organizations agreed that units in the house would

24     be solely available to men or that men would get

25     priority.  Plaintiffs were prevented from becoming

members and, thereby, gaining equal opportunity to
rent housing units.  That's 280 and 281.  And the
organizations conspired to refuse to rent to the
plaintiffs, 282.  They suffered harm as a result.

THE COURT:  Let me ask you this.
Suppose there was a -- similar to Mr. Yale's
example, suppose there is some apartment -- I'll use
the same example.  So there is off-campus housing at
Yale that is rented out by the women's volleyball
team, and generally they rent that place out, and
historically women are the ones who stay there,
would there -- if a man decided they wanted to stay
there, they would then have an action against --
would they have an action against the people that
provided the housing as well as the volleyball team
to basically make sure that they had housing there?

MR. MELZER:  Well, to begin with, I
think it's important to note that the fraternities
are not making the argument that there is no
violation.  They are making the argument that there
is no standing.  That's the only ground for relief
that the fraternities have espoused here.

THE COURT:  Okay.  So would there be
standing under that hypothetical then to bring that
claim?

1          MR. MELZER:  If someone is denied

2    housing -- here what we've alleged is that these

3    fraternities are an integral part of Yale and that

4    they've been rented exclusively to men.

5          THE COURT:  No, I got that.  I got all

6    of that.

7          MR. MELZER:  Year after year after year.

8          THE COURT:  The question is the

9    volleyball example.  Would that then be a violation

10   of the Fair Housing Act?

11         MR. MELZER:  If the volleyball team had

12   their own house where members lived?  It would be a

13   hypothetical that may potentially implicate fair

14   housing interests and it would have to be considered

15   as it came up.  There may be exceptions that might

16   apply to that situation.  There has been no

17   exemption identified that would apply to the

18   fraternities.

19         THE COURT:  All right.  You can go on.

20         MR. MELZER:  So the -- well, first of

21   all, the fraternities rely almost exclusively on a

22   case called *Hack v. Yale*, and they address the --

23   they cite the district court's opinion, but that

24   portion of the opinion about standing was actually

25   reversed by the Second Circuit.  And that is at 237

1  F.3d 81 at 87 to 88.  The Second Circuit reversed

2  the standing determination, found that the

3  plaintiffs had claimed a tangible economic injury

4  because they had alleged that Yale was requiring to

5  pay for rooms that the plaintiffs contend were

6  effectively made unavailable to them.  So that

7  district court decision is no longer valid

8  authority.

9          THE COURT:  Well, I am less worried

10  about *Hack* than I am about the Supreme Court's

11  decision in *Bank of America* in terms of how we

12  understand standing.

13          MR. MELZER:  We understand standing in

14  terms of the zone of interest, so -- protected by

15  the Fair Housing Act.  So these --

16          THE COURT:  In terms of the zone of

17  interest, what do you think is the best analogy to

18  what you are asking for here, which is that -- it

19  seems to me the entity in and of itself is not

20  directly denying housing, but -- let me not load the

21  question up.

22          What's the best analogy in terms of the

23  case law to this case that there is standing under

24  the Fair Housing Act in your view?

25          MR. MELZER:  I think the best analogy is

1    that there is an actual denial of housing here, a

2    denial of access.

3              THE COURT:  Well, it's not actual

4    because no one has actually applied, correct?

5              MR. MELZER:  Well, that's not

6    necessarily the case.  We've alleged, and the

7    pleadings need to be taken in the light most

8    favorable to us, that by seeking membership our

9    plaintiffs were also seeking access to housing.

10             THE COURT:  I know, but they --

11             MR. MELZER:  And they were denied that

12   access.

13             THE COURT:  I see what you are saying.

14   You are saying because the plaintiffs actually

15   sought membership and that membership was denied --

16   well, actually stepping back, is it your allegation

17   that everyone who is granted membership to one of

18   the fraternity defendants is guaranteed housing?

19             MR. MELZER:  They're not guaranteed

20   housing, but they're guaranteed the opportunity, the

21   access to housing.

22             THE COURT:  But then don't you have

23   another problem, which is it then becomes somewhat

24   speculative, which is that even if they were

25   admitted to a fraternity it becomes speculative

1    about whether they would be provided housing?

2              MR. MELZER:  It's a denial of access to

3    housing, making housing unavailable under the terms

4    of the statute.

5              THE COURT:  No, no --

6              MR. MELZER:  They can't even get in the

7    door.  They can't even apply.  They're effectively

8    prevented from applying, which is an injury under

9    the Fair Housing Act.  Putting in an application

10   would be futile because applications are only

11   available to men.

12             THE COURT:  And, again, what's the best

13   case for this scenario that you would analogize it

14   to?

15             MR. MELZER:  There are a number of cases

16   where there have been indirect injuries recognized,

17   and I don't -- including cases against advertisers,

18   cases against insurers, cases against banks.  But

19   here we have not something on the outskirts of the

20   housing market, we have an actual denial of housing,

21   denial of an opportunity to apply for housing on an

22   equal basis.

23             THE COURT:  I guess the question,

24   though, is that in those contexts, insurers and

25   advertisers and everything, as I understand what the

1    courts have interpreted the Fair Housing Act to mean

2    is that the "to make unavailable" language is

3    meaning that what's going to have an impact on the

4    housing market such that it's going to be -- using

5    the language from 1968, we're going to have -- you

6    know, you are going to maintain sort of segregated

7    environments as opposed to having truly integrated

8    living environments, and so, therefore, you are

9    getting everyone who is in the housing chain.  And

10   so --

11             MR. MELZER:  So this is part of the

12   housing chain.

13             THE COURT:  This is part of the housing

14   chain because fraternities are renting from --

15             MR. MELZER:  They're in the business of

16   renting housing.  They are in the business of

17   providing housing, and these particular houses --

18             THE COURT:  Hang on.  Hang on.  I will

19   try to be better off in not cutting you off because

20   I am going to get in trouble with my court reporter.

21   Because when you all leave I have to deal with her,

22   I would prefer not to be in any trouble.

23             So, I mean, I guess the thing I am

24   having the difficulty with is that what's indirect

25   here is that you are one step removed from the

1    denial of housing because, as it seems like you have

2    to concede, if they remedy -- well, I guess there

3    are two ways, I guess, because if they remedy the

4    membership problem then you don't have a housing

5    problem, right?

6              MR. MELZER:  That could be correct.

7              THE COURT:  Or, alternatively, if they

8    simply, you know, maintain their membership policy

9    as is but allow anyone regardless of anything to

10   have housing, then that also remedies your problem,

11   correct?

12             MR. MELZER:  It could.

13             THE COURT:  All right.  Go on.  What

14   other issues do you wish to raise?

15             MR. MELZER:  So I think another ground

16   for liability or theory is 3604(c), the making of

17   statements that express a discriminatory --

18   statements indicating a discriminatory preference or

19   limitation based on sex or an intention to make such

20   a preference, discrimination, or limitation.

21             So by telling -- communicating the

22   message that you are not welcome because of your

23   gender and, therefore, you can't live here, that is

24   communicating a discriminatory preference or

25   limitation based on sex.  And I would again direct

1   the Court to the *Viens* case cited in the parties'

2   briefs, 113 F.Supp 555 at 564, which says that

3   3604(c) relating to the making of these kind of

4   statements can be violated even if it does not

5   result in the denial of housing and even if the

6   statements are not targeted at a specific

7   individual.  What matters is whether the statements

8   convey a discriminatory preference to the ordinary

9   listener.  And that is an issue of fact, but I think

10  our pleadings support an inference that when people

11  are told you can't be here, you have no access to

12  this space and this housing because of your gender,

13  that would convey a discriminatory preference or

14  limitation to the ordinary listener.

15          And people are harmed as a result of

16  being denied -- being told that they can't -- you

17  know, don't come here because of your gender.  That

18  creates a dignity and emotional harm as recognized

19  in the case law, including the *Roberts v. Jaycees*

20  case, 468 U.S. 609 at 625.  It indicates -- relating

21  specifically to the Jaycees organization,

22  discrimination based on archaic sex stereotypes

23  "deprives persons of their individual dignity."  And

24  going further "also denies society the benefits of

25  wide participation in political, economic, and

1   cultural life."

2              So being turned aside and being -- you

3   know, being the recipient of that message is an

4   injury specifically recognized under the Fair

5   Housing Act even in the case of people just reading

6   a newspaper, and the injuries here are a lot more

7   direct.

8              Ultimately plaintiffs were affected by

9   defendants' gender housing practices, and they're

10  well within the zone of interest protected by the

11  act.

12             I can also address the organizational

13  standing of Engender, if you have any questions

14  about that.

15             THE COURT:  No, it's in your brief.

16             MR. MELZER:  Thank you, your Honor.

17             THE COURT:  Thank you.

18             MR. MELZER:  Going back to the 3604(c),

19  it's very broad.  It's not only making or publishing

20  a statement, but causing -- indirectly causing a

21  statement to be made or published.  So it applies to

22  a large variety of actors who have a role in the

23  process.

24             Turning to the public accommodations

25  claim, we believe that this is premature to resolve

issues on a motion to dismiss as to whether the

fraternities are public accommodations.  It presents

quintessential issues of fact according to the

leading *Quinnipiac* case, and I would direct the

Court specifically to, for example, paragraphs 193

to 201, 288 and 301 of our complaint for some of the

allegations relating to why the fraternities qualify

as public accommodations.

          The argument about the CHRO findings is

a red herring.  The fact that the CHRO has dismissed

the claim is not dispositive and doesn't preclude a

claim.  It's simply a part of the legal process and

a predicate to coming to court.  Cases proceed all

of the time where the CHRO or another agency has

denied the claim because it's a completely different

inquiry.

          Here the Court considers only whether

the complaint is adequate to plead a claim.  In that

case the CHRO actually did a preliminary assessment

of limited evidence before there had been any

discovery undertaken, which is sort of an

intermediate step going beyond the pleadings but

short of summary judgment on a developed record.

It's really a no man's land when it comes to

judicial proceedings under the federal rules.  In

1   fact, a CHRO finding and those of comparable

2   agencies are typically deemed inadmissible in

3   federal cases because they are more prejudicial than

4   probative.  The Court and the jury are supposed to

5   make their own determinations on a motion to dismiss

6   based on the pleadings and later on the merits based

7   on the evidence developed through discovery.  And I

8   would direct the Court, for example, to *Doe v.*

9   *University of Connecticut*, 2013 WL, that's Westlaw,

10  454299, at pages 16 to 19, from 2013.  That

11  specifically excluded the CHRO's dismissal of a case

12  and a finding of no probable cause.

13          Defendants simply make too big an issue

14  over the CHRO's findings.  In reality, it's only

15  dismissed one out of 112 claims before the agency,

16  plaintiff Singer's claim against the single local

17  chapter of Zeta Psi.  The CHRO has made no general

18  determination or legal conclusion on whether a

19  fraternity can be a public accommodation, and it's

20  effectively accepted that it can be a public

21  accommodation.  It looked specifically at the facts

22  on the ground.

23          But it would be premature for the Court

24  to hold that plaintiffs would be able -- will be

25  unable to pursue a public accommodations claim

1    against Zeta Psi, much less any other fraternity.

2    It's very dependent on the facts to be developed

3    through discovery.  We've alleged enough to be able

4    to demonstrate to a plausible level that they could

5    be deemed public accommodations after factual

6    development.

7              Going to the factors, first of all,

8    we've alleged that they're open to the general

9    public.  Parties are widely advertised and open to

10   all comers, including nonstudents, people from out

11   of state, hundreds and thousands of participants

12   from the public from all walks of life.  You don't

13   need to be guests of members.  And the houses are

14   also frequently rented out for all sorts of

15   functions, birthday parties, other organizations,

16   things that the public is participating in and

17   helping to run.

18             The membership -- we've alleged that the

19   membership practices are not selective.  The

20   membership is generally open to all men, including

21   even to nonstudents.  We have alleged that the

22   fraternities accept the majority of male applicants

23   and turn few, if any, away.  There are no selective

24   criteria other than being a man.  As in *Corcoran,* we

25   intend to prove that almost all men are admitted,

1    but all women are excluded.

2              This is very different and distinct from

3    *Kiwanis Club*, the Third Circuit case that the

4    defendants have cited.  There the membership was

5    limited to 28 individuals.  It was actually a very

6    stable organization that had only, I think, 20 new

7    members over the previous ten years.  It wasn't

8    involved in active recruiting.

9              The fraternities couldn't be more

10   different.  They have dozens of members, active

11   members of their local chapters, and they are

12   continually recruiting new people year after year

13   on, you know, a "whoever comes is served" basis.

14   And they're part of, you know, national

15   organizations that have tens of thousands of

16   members, which also supports an idea that these are

17   large public accommodations that provide a

18   significant service to the public that women

19   shouldn't be excluded from.

20             If you have no further questions.

21             THE COURT:  I have nothing further.

22             MR. MELZER:  Thank you.

23             MS. GUENTERT:  Good afternoon, your

24   Honor.  Carolin Guentert.  I will be responding to

25   the arguments of 340 Elm and 402 Crown.  I will keep

 1    it brief because a lot of my arguments will overlap

 2    with what my colleague Mr. Melzer just explained.

 3              So, just briefly, of course they are

 4    separate organizations, but I will respond together

 5    and then can address individual arguments.

 6              So it's our belief that both the

 7    arguments of both 340 Elm and 402 Crown essentially

 8    boil down to two arguments, that the plaintiffs

 9    didn't directly apply to the housing organization

10    and that there is no relationship between the

11    housing organization and the fraternity itself.

12    It's our belief that a landlord can't distance

13    itself this way from its tenants when it knows that

14    the organization it's renting to is a discriminatory

15    organization, and that this is what brings it under

16    the ambit of the extremely broad Fair Housing Act,

17    the Connecticut equivalent, and the public

18    accommodation statute.

19              They knowingly facilitated denials of

20    housing.  We allege that these landlords knew

21    exactly who they were renting to for use as a

22    fraternity house.  Yes, the leases were to

23    individual members, but they were renting to an

24    organization for use as a fraternity house in that

25    house, and that that is what brings it under both

 1   the Fair Housing Act and the public accommodation

 2   statute.

 3            To address your Honor's earlier question

 4   regarding proximate cause, there is a case -- we do

 5   believe that there is a direct relationship between

 6   the injury and the denial of housing here because

 7   what we're arguing is that the housing corporations

 8   are ceding the decision of who will live in the

 9   house to the tenants, that year after year they are

10   renting to an organization that picks its own

11   members, and that that is the direct injury

12   resulting directly from the landlord.

13            But if your Honor is not convinced by

14   that, I would like to point you to a case coming out

15   of the District of Connecticut called *CoreLogic*

16   wherein the court found a screening company, a

17   housing screening company liable, that the fair

18   housing -- excuse me -- that a screening company of

19   a housing provider could come within the ambit of

20   the Fair Housing Act.  And the court says "These are

21   logical extensions which effectuate the purpose of

22   the FHA.  As explained above, without them a housing

23   provider could simply use an intermediary to take

24   discriminatory and prohibited actions on its behalf

25   and defeat the purpose of the FHA."

1          That, in a nutshell, is our argument,

2     that those landlords can't get around the

3     requirements of the FHA by renting to an

4     organization that it knows to be discriminatory.

5          THE COURT:  And what's the extent of

6     that obligation?  Let's say, for example, a landlord

7     -- say there is an owner of a building and they

8     basically -- as I understand your point, an owner of

9     a building has someone who is serving as sort of the

10    agent who then rents out the place, and clearly the

11    owner -- if the agent decides to sort of engage in

12    discrimination in terms of who they hire, the owner

13    can't sort of isolate themselves from that.

14          But here, leaving aside principles of

15    agency, what we have is a situation where you are

16    suggesting that perhaps the owner has sort of ceded

17    to the tenant the obligation to make the

18    determinations about who will have the housing and

19    that tenant is making discriminatory decisions.  So

20    the question then is -- what you are suggesting is

21    that the law certainly allows to impute on the owner

22    the actions of the tenant to the extent that they

23    ceded that ground, and I think you are saying that

24    *CoreLogic* states -- stands for that principle.

25          MS. GUENTERT:  Correct, your Honor, and

1    to the extent that they knew what was going on in

2    their house.  We allege that they knowingly rented

3    to an organization that they knew did not admit

4    women.  There was not a chance that women would be

5    admitted to this housing.  We believe that questions

6    about exactly what the landlord knew, what the

7    leases say, what the negotiations were like about

8    how this house would be used, who would be applying

9    to it, who else potentially applied, and what all of

10   those considerations were will be borne out in

11   discovery, which is why at this point of the

12   proceedings it would not be appropriate to dismiss.

13            THE COURT:  So if it turned out -- so

14   what you are saying is if it turned out that the

15   owners knew that they intended to use their housing

16   in a flatly discriminatory way, that that would be

17   then imputed, for liability purposes, to the owner

18   for Fair Housing Act purposes.

19            MS. GUENTERT:  We believe so, your

20   Honor, yes.

21            THE COURT:  And other than this

22   *CoreLogic* case, what other cases do you have that

23   essentially would support that principle?

24            MS. GUENTERT:  We believe the *Wetzel*

25   case out of the Seventh Circuit supports that

1    conclusion.  In that case a -- it's of course

2    different facts and it's a relatively recent case,

3    but in the *Wetzel* case the court concluded that when

4    a landlord knew of the discriminatory actions of its

5    tenants and it had remedies that it could have taken

6    against that tenant, including eviction, for

7    example, but also lesser remedies, tools that it had

8    available, it needed to use those tools.

9              THE COURT:  And I guess the question is,

10   what does that extend to?  Does that mean you are

11   always -- does it mean you have to make sure that

12   you know exactly what the purpose of your

13   tenants is?  I am just trying to figure out what is

14   the scope of this obligation that the Fair Housing

15   Act is imposing.  In essence, obviously clearly the

16   landlord or owner can't directly say, do you know

17   what, we're not going to provide housing on the

18   basis of race, we're not going to provide housing on

19   the basis of gender, but then if you know that an

20   institution is going to do that, you can't rent to

21   them or you have got to impose an obligation that

22   they do so on a nondiscriminatory basis?  What's the

23   extent of that particular obligation?

24             MS. GUENTERT:  I understand your

25   concern, your Honor, and I believe this was raised

 1    in the briefs.  An example was given, is a landlord

 2    required to inquire into every extracurricular

 3    activity of every student that it rents to.  We

 4    think the answer is of course not.  This is a

 5    specific case in which a landlord -- we believe

 6    discovery will show that this landlord knew it was

 7    renting to an organization that only rents to men --

 8    that only admits men, and, therefore, women couldn't

 9    possibly have lived in the house, and that the house

10    would be used as a base of operations, the

11    fraternity house, of that specific organization,

12    and, therefore, women wouldn't be able to rent this

13    house.

14              THE COURT:  And that sort of goes back

15    to this sort of directness issue, which I also am

16    trying to make sure I understand in the context of

17    *Bank of America,* which is, isn't it really indirect,

18    which is that the landlord only knows that they may

19    only end up renting to men because they have a

20    membership policy that's limited to men and -- well,

21    because isn't the real harm, in essence, that you

22    have articulated, to the extent it's a legal harm,

23    the discrimination -- the alleged discrimination of

24    the fraternity in not allowing women?  Meaning,

25    isn't that really the direct injury?  Isn't that

1    really the direct injury your clients are alleging,

2    which is we can't get into this fraternity?  As a

3    consequence of not getting into this fraternity, we

4    may also be denied housing, which may be somewhat

5    amorphus, but isn't that really -- as the old notion

6    of the shortest distance between two points, the

7    shortest distance between that point really isn't

8    the Fair Housing Act, it really is something that

9    suggests what they are doing with the membership of

10   the fraternity is illegal?

11          MS. GUENTERT:  Your Honor, it is related

12   to the membership, but we do believe it is more

13   direct than that because we've alleged one of the

14   primary benefits of being a member of a fraternity

15   is access to preferred housing in the community,

16   that one of the benefits of being a fraternity

17   member that flows from that is housing, and it's

18   entirely possible that members of Engender or

19   members of the proposed class applied to

20   fraternities wishing to live in the fraternity

21   house, to take part in everything that occurs in a

22   fraternity house, including attendant social and

23   economic benefits that we allege in the complaint.

24          THE COURT:  Okay.

25          MS. GUENTERT:  I can briefly move on to

1    the public accommodations.  Largely I will rest on

2    what my colleague Mr. Melzer was arguing because I

3    believe the arguments are very similar, but here

4    again, 340 Elm and 402 Crown largely rest on the

5    arguments that plaintiffs didn't directly apply and

6    that the housing corporations couldn't have known

7    and didn't in fact know what exactly was going on in

8    their house.

9           Again, our arguments are very similar in

10   that -- as to the Fair Housing Act in that we

11   believe that -- or we've alleged in the complaint

12   that this housing organization has authority over

13   its house.  It owns the house and it made the

14   decision to rent to an organization that it knew

15   wouldn't admit women and would create a hostile

16   environment for women in that house.

17          The way in which the fraternity

18   organization uses the house makes it -- renders it a

19   public accommodation, and, therefore, 340 Elm and

20   402 Crown are liable for denial of membership

21   practices and allowing a hostile environment to

22   persist in their houses.

23          Specifically, just briefly with respect

24   to our pleading, we believe that we've met the

25   pleading requirements under Rule 8.  It's perfectly

permissible for plaintiffs to allege multiple claims

against multiple different defendants, and I think

the strongest argument in our favor here is that

both 402 Crown and 340 Elm responded articulately to

exactly the arguments -- the counts that we were

alleging against them.

So I will rest on that, but I do believe

we've pleaded adequately in that way and it's

permissible to bring multiple claims against

multiple different defendants.

And just briefly to respond to Mr.

Yale's argument about this case coming down to

essentially two unanswered emails, we would strongly

disagree with that.  Our entire case is about many

fraternities at Yale consistently, on a consistent

basis denying women the ability to become members

and, therefore, to have access to their housing.  So

it's much larger than two unanswered emails, it's

consistent applications that they were denied over

and over again.

Just briefly, with respect to civil

conspiracy, again we believe both with respect to

402 Crown and 340 Elm that we have pleaded

sufficiently, that because the housing corporations

and the fraternities entered into an illegal

1    contract, which in this case we believe is the

2    lease, and violated the Fair Housing Act --

3              THE COURT:  Just simply because they

4    entered into the lease -- because you are saying

5    it's not the lease itself, it's the circumstances

6    surrounding the lease that in your view -- that it

7    is in furtherance of excluding women from this

8    particular housing opportunity that becomes the

9    civil conspiracy.

10             MS. GUENTERT:  Correct.  I should have

11   clarified.  I apologize.

12             THE COURT:  No, that's fine.  I just

13   want to make sure I understand the argument.

14             MS. GUENTERT:  You are understanding it

15   correctly.

16             Unless your Honor has any further

17   questions, I rest on our briefing.

18             THE COURT:  Thank you very much.

19             MS. GUENTERT:  Thank you.

20             THE COURT:  Just one moment.

21             Yes, Ms. Ellsworth.

22             MS. ELLSWORTH:  Thank you, your Honor.

23   And I appreciate your patience wading through all of

24   this this morning.  I won't take much of your time

25   on rebuttal.

1          When Mr. Tracey stood up to talk about

2     the claims against Yale, he began by saying that

3     Yale -- and I think this is a theme of his

4     presentation, that Yale has abdicated its role to

5     try to prevent sexual misconduct.

6          THE COURT:  Actually, hold on one

7     second, Ms. Ellsworth.

8          I'm sorry.  Go ahead.

9          MS. ELLSWORTH:  He began by telling you,

10    it was the theme, that Yale has abdicated its role

11    to try to prevent sexual misconduct.  I think all

12    you need to do to see that that is not plausible is

13    to look at Exhibit 6, which is the United States

14    Department of Education, Office of Civil Rights

15    closeout letter discussing everything Yale did

16    between 2011 and 2017.  And I will just give you

17    some select excerpts.  The university voluntarily

18    and proactively made changes to its procedures and

19    practices related to Title IX compliance.  It

20    instituted a new Title IX grievance procedure called

21    the UWC to provide for prompt and equitable

22    responses.  It implemented a new structure of

23    training Title IX coordinators.  It widely

24    publicized information regarding those procedures.

25    It developed a protocol for use between the Yale

1  police department and coordinators.  It launched a

2  comprehensive website outlining all of the

3  university's policies.  It provided information

4  about policies, procedures, and resources through

5  trainings for staff and students.  It appointed a

6  vice president for student life.  It added an

7  additional student affairs fellow to work with

8  students to prevent high-risk drinking and sexual

9  misconduct.  It employed students trained as

10 undergraduate consent and communication educators

11 who provided education on a wide range of issues,

12 including sexual misconduct.  It formed a

13 committee --

14          THE COURT:  The date of that letter is

15 again?

16          MS. ELLSWORTH:  Yes.  And that letter I

17 think encapsulates everything that is in many of the

18 other exhibits that are underlying materials that

19 Yale provided to OCR and --

20          THE COURT:  And the date?

21          MS. ELLSWORTH:  The date of that is

22 December 18, 2017.

23          THE COURT:  So your point here --

24 because to some extent what you are saying is this

25 isn't necessarily us getting into the weeds

1   regarding factual matters that could be dealt with

2   at other stages, you are saying that this actually

3   goes to the real question of whether you can

4   plausibly allege deliberate indifference given this,

5   and that in essence in order to sort of make the

6   claim you least have to make some suggestion that

7   this is -- that this is sort of insufficient in

8   order for us to sort of deal with that.

9           MS. ELLSWORTH:  That's exactly right.

10          THE COURT:  I am not -- like I said, I

11   am not saying I agree or disagree.  I just want to

12   make sure I am capturing the argument.

13          MS. ELLSWORTH:  That is the argument.  I

14   would like to note that I heard Mr. Tracey tell you

15   there were eight things that he says means that Yale

16   fraternity parties are under Yale's control.  What

17   you didn't hear I think was particularly important.

18   None of those eight were that Yale has any right to

19   determine party logistics, that Yale is allowed to

20   enter private residences to monitor a party, that

21   Yale can prevent an off-campus private residence

22   from hosting a party or set the terms of that party.

23   You didn't hear him say that in any of the eight

24   things.

25          The plaintiffs are here defining

```
1    deliberate indifference as a failure to take over

2    planning and running fraternity parties that are

3    hosted by private organizations.  That is not the

4    test.  That is a remedy that they want.  That is not

5    the test.  They can't meet the test, and Title IX is

6    clear that plaintiffs can't come in asking for

7    particular remedies.

8               I want to briefly touch on the

9    heightened risk cases that they mentioned.  Your

10   Honor, I think their complaint and their opposition

11   brief were not crystal clear on whether they were

12   alleging a heightened risk case, but if you look at

13   those heightened risk cases, they are nothing like

14   the situation for Yale.

15              Just to give you a couple of the

16   examples.  The *Hernandez v. Baylor* case, the court

17   found there was a plausible heightened risk case

18   because in that case the university "actively

19   concealed sexual violence committed by its football

20   players for several years."  It "neither reported

21   the misconduct nor conducted appropriate

22   investigations."  It "encouraged a culture of no

23   accountability for misconduct."  And it "failed to

24   address and actively concealed sexual violence

25   committed by its football players."  That may be a
```

1    heightened risk case, but that's not this case.

2              THE COURT:  Given some interest in time,

3    and I don't think I have been stingy at all with

4    time, you might want to sort of tick off the cases

5    and I can certainly go back.

6              MS. ELLSWORTH:  Sure.  I think all four

7    of the ones they mentioned, which is that *Hernandez*

8    *v. Baylor*, *Doe 12 v. Baylor*, *Tubbs v. Stony Brook*,

9    and *Doe v. University of Tennessee,* you are going to

10   find very similar allegations to those I just read

11   you and they are very different from the case that

12   we have here.

13             THE COURT:  Okay.

14             MS. ELLSWORTH:  And the other thing I

15   think you will see in reading those cases, no court

16   has ever interpreted Title IX to impose some sort of

17   prospective obligations to take the sort of actions

18   that they want here.  The question has always been,

19   if you know of a problem, are you taking reasonable

20   responses.  And there is flexibility in determining

21   what that is.

22             The last point I want to make on this is

23   on the educational benefits and programs point,

24   because I think your Honor suggested that maybe

25   objectively someone who has encountered some sort of

1  sexual misconduct might have -- might see an issue

2  in pursuing the educational programs.  There is an

3  objective and a subjective component to the

4  pervasiveness test in the fourth prong here, and if

5  you look at the two cases that I think touch on this

6  most clearly, the *Zeno* case from the Second Circuit

7  where they talk specifically about the plaintiff

8  taking a different kind of diploma, not the Regents

9  diploma, having to leave a school, and in the *Hayut*

10  case a plaintiff who was unable to concentrate on

11  her studies, had poor academic performance, didn't

12  want to go to classes, was unable to sleep, those

13  are the types of subjective obligations that are

14  entirely missing from this complaint.

15          Very briefly on Count II, which is the

16  membership policies, plaintiffs' counsel gave you

17  largely policy reasons why they think discrimination

18  can flow from membership and that Congress shouldn't

19  have put that exception in, but the fact of the

20  matter is Congress did.

21          They also offered for the first time

22  this notion that Yale could or should be required to

23  form mixed-gender social organizations.  That is not

24  mentioned in the complaint, and I don't understand

25  how that would plausibly remedy their allegation

1  that the problem with fraternities is they have

2  alumni networks.  Creating some new mixed-gender

3  social organization now doesn't even address the

4  problem that their complaint alleges they are trying

5  to get at.

6          And, lastly, on public accommodation,

7  the one thing that you didn't hear from plaintiffs'

8  counsel was any way that Yale has eschewed

9  selectively in admitting students and inviting them

10  to participate in its undergraduate program.  That

11  is the theme that runs through every public

12  accommodation case under Connecticut law.  Because

13  Yale did not eschew selectively in the particular

14  opportunity here, which is the inviting someone to

15  be an undergraduate student, it is not a public

16  accommodation.

17          THE COURT:  All right.  Any of the other

18  defendants want to make any closing?

19          MR. YALE:  Briefly, your Honor.  After

20  listening -- again, David Yale for 402 Crown.  After

21  listening to plaintiffs' arguments, I've got to be

22  honest with the Court, I am not sure what the public

23  accommodation claim is against 402.  It seems to me

24  they are arguing it's the fraternity itself that is

25  the public accommodation.  To be quite honest, up to

1    this point I thought it was the events the

2    fraternity was providing, the parties and the rental

3    space.  If it is, in fact, the fraternity itself

4    that is the public accommodation, I don't see how

5    402 could be said to be providing the fraternity.

6    It goes back to my arguments about the pleading

7    being confusing and not telling 402 what it's

8    actually accused of doing.  So I am not sure how to

9    respond to that because --

10            THE COURT:  I guess it seems to me the

11   best way to characterize it is that it sounds like

12   there are public accommodations arguments that are

13   made against each of the entities that are the

14   defendants here, and I guess the argument that I

15   assume would apply most to yours is that separate

16   and apart from whatever Yale is doing, whatever the

17   fraternities themselves are doing, the fact that you

18   all provide housing in a particular way and the way

19   you all provide it suggests that perhaps you are a

20   public accommodation which would be subject to the

21   law.

22            So to the extent you wish to respond to

23   that, I think that's how I would characterize it.

24            MR. YALE:  I think my co-counsel made

25   the argument that providing housing is not a public

1   accommodation under Connecticut law, and I don't

2   think I need to repeat on that if that is their

3   claim.

4            And also the thing I would like to point

5   out to the Court, too, is that the factual situation

6   we have here is not -- taking their argument, as I

7   understand it, a tenant saying another tenant can't

8   live in this building, what we have are seven people

9   who rent a common living unit that has elements that

10  are shared by everyone, and they have apparently

11  separate bedrooms.  What this claim is is that those

12  people have to allow other -- they can't

13  discriminate in choosing who their roommate is.  And

14  I think that's an important distinction because I

15  don't think there is any fair housing case that

16  talks about a situation like this when it's internal

17  to the living unit as opposed to separate living

18  units that we're talking about.

19            THE COURT:  Well, just to provide one

20  example.  I presume if one -- even if they didn't

21  rent the housing directly, suppose there was a

22  roommate, they wanted to sort of advertise for a

23  room, which was fine with the owner, and they

24  basically put in an advertisement that said

25  basically we're looking for roommates, but we only

1   want roommates of one gender.  That arguably could

2   be within the scope of the Fair Housing Act.  I

3   think that is the essence of what their claim is.

4   Whether or not it's a valid argument is a different

5   question, but I think that's the essence of the

6   argument.

7                  MR. YALE:  It could be, your Honor.

8   Like I said their complaint --

9                  THE COURT:  I am not asking you to

10  accept it or reject it.  I am just saying that could

11  be one argument one is making.

12                 MR. YALE:  They said in my objection I

13  was able to discern what the claims were against my

14  client.  I got lucky.  Apparently I got it right.

15  When I was doing it, I had no idea if I had it right

16  or not.

17                 THE COURT:  You are better than I guess

18  you give yourself credit for, Mr. Yale.  I guess

19  that's one way to describe it.

20                 Yes?

21                 MS. FLETCHER:  I just have a few points,

22  your Honor.

23                 THE COURT:  Just identify yourself

24  again.

25                 MS. FLETCHER:  Liza Fletcher for 340

1    Elm.  So plaintiffs' cited no case law that imposes

2    liability on a landlord in this very situation.

3    They mentioned these ceding arguments on rebuttal,

4    and they haven't mentioned those in their complaint

5    and they won't be able to show that if they're

6    allowed to go on to discovery.

7            All the cases plaintiffs' cite,

8    including the *Wetzel* case, those involve

9    tenant-versus-tenant discrimination where obviously

10   a landlord or a property manager is going to have

11   more reason to know about discrimination because

12   someone is complaining about it to them or they have

13   paperwork reporting it.

14           Discovery may show that the landlords

15   knew they were renting to students who were a part

16   of a fraternity, but it won't show that 340 Elm, or

17   probably 402 Crown, would only rent to fraternities

18   or that our client had any relationship to the

19   fraternities, Yale or the plaintiffs.

20           In terms of plaintiffs' ability to

21   allege counts against multiple defendants under one

22   definition, we're not worried about the pleading

23   standard, we're just worried that this may be a way

24   to hide behind generalized allegations and, in doing

25   so, obscure claims that may actually be against our

1   clients stand.  That's all.

2              THE COURT:  Thank you very much.

3              All right.  Yes.

4              MS. GILBRIDE:  Just very briefly.

5              THE COURT:  That's fine.  Everyone else

6   got to say something, why wouldn't you get to say

7   something.

8              MS. GILBRIDE:  It is absolutely true

9   that the Fair Housing Act has been construed broadly

10  by the courts with very good reason, but I think the

11  Court is correct, in *Bank of America* there were some

12  limits placed on that.

13             THE COURT:  This is Ms. Gilbride.

14             MS. GILBRIDE:  Yes, sorry.  Joan

15  Gilbride.

16             But basically this case is really like

17  one of those cases with a tester, but there is no

18  tester.  And that's just not a pleading

19  technicality, that's really an element of the claim.

20  So none of plaintiffs have ever sought housing in

21  any of these entities, so how can there be an

22  allegation that they were refused or that we failed

23  to negotiate with them or any of those elements that

24  are absolutely necessary under the Fair Housing Act?

25  I would just submit that.

1           Thank you, your Honor.

2           THE COURT:  All right.  I mean -- yes,

3     that's right, I forgot.  Yes, I left you aside.  Ms.

4     Ellsworth didn't bring you up when she came.

5           MR. FIELD:  It's Benjamin Field.

6           THE COURT:  Yes, exactly.  Despite my

7     seeming endurance, I am also begging the indulgence

8     of my staff to continue with this marathon session.

9           MR. FIELD:  Breach of contract, I just

10    want to make three very general points to respond to

11    Mr. Tracey's arguments.  First, Mr. Tracey

12    repeatedly talked about this being a fact-intensive

13    inquiry.  That's not true.  Their failings are core

14    legal failings in the pleading.  On a breach of a

15    contract claim you have to point to a specific

16    contractual provision and the conduct that you

17    allege breached it.  They haven't done that here.

18    You'll notice Mr. Tracey repeatedly used words like

19    "holistically."  He ultimately said that there was

20    some obligation that Yale said that it would take

21    systematic responses to systemic problems.  The word

22    "systemic" doesn't appear in any of the provisions

23    that he cited.

24           Second, none of the cases that he cited

25    or the plaintiffs' cite at all allege these kind of

 1    vague atmospheric things.  So, for example, he

 2    relies principally on *Johnson*.  As your Honor

 3    pointed out, in *Johnson v. Schmidt* there is language

 4    about specific contractual provisions.  And just

 5    consider the facts of it.  The alleged facts there

 6    were that professors at Yale misappropriated and

 7    stole a graduate student's ideas, and then when he

 8    reported those professors, the university didn't do

 9    anything in contravention of specific promises.

10           You have another case, *Morris v. Yale,*

11    where the university promised you get to take an

12    exam three times to try to pass before they kick you

13    out, and yet they kicked the student out after two.

14    That is a very specific contractual promise.  All of

15    the cases they cite are in that vein.

16           And the last point I would point out is,

17    in response to your Honor's concerns about if you

18    certified a class and now have to monitor injunctive

19    relief, you are going to be pervasively regulating

20    Yale under a breach of contract theory.  And that

21    completely contravenes the *Gupta* line of cases that

22    we cited in page 27 of our opening brief where

23    Connecticut courts have adopted a strong policy

24    against allowing contract law to be used to

25    interfere and allow courts to regulate educational

programs for the specific provisions I think that
our brief addresses and rebuts Mr. Tracey's points.
Unless you have any specific questions about that --

THE COURT:  No, nothing further.

MR. FIELD:  And then on CUTPA, the only
thing I would say is I would urge your Honor to read
paragraph 361 of their complaint where it's clear
that the materiality allegations that they have are
the full sweep of breach of contract and -- claims,
along with then the statements about fraternities.
If you take away those breach of contract claims,
they're only left with these very vague allegations
that they might have applied to other schools if
they had known that -- if Yale had slightly
differently characterized the role of fraternities.
They had 108 pages, they got to see our motion to
dismiss first, and still have no specific concrete
allegations to show that these statements, which in
some cases are simply not saying anything about
fraternities in these brochures, materially affected
their decisions.

And lastly on negligent
misrepresentation, you didn't hear anything from Mr.
Tracey suggesting that he pled that with
particularity, and so Rule 9(b) would eliminate

1    that.

2                    THE COURT:  All right.  Thank you.

3                    All right.  I think we've heard from

4    everyone.  Ordinarily I might allow some more going

5    back to the plaintiffs, but we have actually gone

6    quite a while, and I have tried to be as generous as

7    possible to make sure everyone was heard.  I will

8    take everything into consideration.  So anything you

9    haven't had a chance to sort of argue again or

10   expressly argue, obviously I have reviewed the

11   pleadings, I will go back and look over it again, I

12   will go back and look over the cases again, and try

13   to issue a decision as expeditiously as possible.

14                   MR. SCONZO:  Your Honor, may I raise a

15   practical point?

16                   THE COURT:  Sure.  And you are?

17                   MR. SCONZO:  James Sconzo representing

18   Yale.

19                   THE COURT:  Yes.

20                   MR. SCONZO:  All of the parties have an

21   obligation looming on November 1st to submit a 26(f)

22   report.

23                   THE COURT:  Sure.

24                   MR. SCONZO:  And your Honor may recall,

25   we had a phone argument over this issue months ago,

1   and I think when the current schedule was put into

2   place it anticipated this argument would have been

3   held previously and potentially an order issue.  The

4   defendants would request that the order be held in

5   abeyance and that the parties' 26(f) report not be

6   required until ten days or two weeks after your

7   Honor's order.

8            THE COURT:  Mr. Tracey, does the

9   plaintiff have any view on that?

10           MR. TRACEY:  Our view is that we should

11  proceed forward, your Honor.  We did schedule this

12  hearing a month ago.  For a variety of reasons we

13  had to delay it, but we shouldn't -- you know, we

14  believe discovery should proceed.

15           THE COURT:  Why don't I do this.  Hold

16  on a second, see if I can read a calendar.

17           Let me do this.  I will move the

18  deadline.  The Court will move the deadline for the

19  Rule 26(f) report from November 1st to December 6th,

20  and then we'll see what happens from there.

21           All right.  Anything further from anyone

22  else?

23           All right.  Thank you all very much.  We

24  are adjourned.

25           (Proceeding concluded 2:10.)

1

2          I certify that the foregoing is a correct

3    transcript from the record of proceedings in the

4    above-entitled matter.

5

6                                    11/5/19

7                                     Date

8

9                      /S/   Sharon Montini

10                       Official Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25