| | |
|---|---|
| ANNA MCNEIL, et al.,<br>        *Plaintiffs,*<br><br>              v.<br><br>YALE UNIVERSITY, et al.,<br>        *Defendants.* | No. 3:19-CV-00209 (VAB) |

## RULING AND ORDER ON MOTIONS TO DISMISS

Anna McNeil, Eliana Singer, Ry Walker, and Engender ("Plaintiffs") have sued three

different sets of defendants: their undergraduate institution, Yale University ("Yale"), a group of

fraternities and related housing companies (collectively referred to as the "Fraternity

Defendants" or "Defendant Fraternities")[1], and two housing companies, 402 Crown, LLC, and

340 Elm, LLC, which rent housing to members of two of the Fraternity Defendants.

Yale, the Fraternity Defendants, 402 Crown, LLC, and 340 Elm, LLC, have all moved to

have the claims against them dismissed.

For the following reasons, the motions to dismiss of the Fraternity Defendants, 402

Crown, LLC, and 340 Elm, LLC are **GRANTED** in their entirety and the motion to dismiss of

Yale is **GRANTED** in part and **DENIED** in part.

---

[1] Yale Chapter of Alpha Delta Phi International, Inc.; Alpha Epsilon Pi, Epsilon Upsilon; Alpha Kappa Delta of Chi Psi; Delta Kappa Epsilon, Phi Chapter; Leo; Sigma Chi, Theta Upsilon Chapter; Sigma Nu Fraternity Beta Alpha Chapter; Sigma Phi Epsilon, Connecticut Delta Chapter; Zeta Psi, ETA Chapter; Alpha Delta Phi International Inc.; Alpha Epsilon Pi Fraternity, Inc.; Chi Psi Fraternity; Delta Kappa Epsilon Fraternity; Sigma Alpha Epsilon Fraternity; Sigma Chi International Fraternity; Sigma Nu Fraternity, Inc.; Sigma Phi Epsilon Fraternity; Zeta Psi Fraternity, Inc.; Sig Ep Housing of Connecticut Delta LLC; Edward J. Donahue III; 402 Crown LLC; 340 Elm, LLC; Mother Phi Foundation, Inc.; Connecticut Omega of Sigma Alpha Epsilon House Corporation; House Corporation of Sigma Chi at Yale, Inc.; High Street Housing Corporation; ZP Nutmeg Associates Inc.

Although limited in scope, only the Title IX claim of Anna McNeil remains. All other claims are dismissed **WITH PREJUDICE**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Factual Allegations

Anna McNeil, Eliana Singer, and Ry Walker are undergraduate students at Yale and co-directors of a student group, Engender. Second Am. Compl., ECF No. 93 ¶ 1 (July 18, 2019) ("Second Am. Compl."). Engender allegedly promotes equity and inclusion within the Yale community. *Id.*

While at Yale, Ms. McNeil, Ms. Singer, and Ms. Walker all allegedly suffered sexual harassment and assault "during fraternity parties, after fraternity parties, and by fraternity members[.]" *Id.* ¶ 3. [2] They allege an "openly hostile and aggressive culture at fraternity events." *Id.* ¶ 104. They also allege that admission to parties depended on their appearance and "that women were routinely and openly harassed and assaulted at the hands of male partygoers." *Id.*

Ms. McNeil alleges three instances of sexual assault experienced at fraternity parties. At a Zeta Psi party in August or September of 2016, Ms. McNeil allegedly "was groped without consent by numerous male attendees" and allegedly witnessed similar behavior against other women. *Id.* ¶ 105. When she allegedly informed her first-year counselor of the incident, the counselor allegedly shrugged of Ms. McNeil's account and did not report the misconduct, as required by Yale's policies. *Id.* ¶ 106. In December 2016, Ms. McNeil allegedly was groped again at a Zeta Psi party without her consent. *Id.* ¶ 107. Finally, in December 2018, a male

---

[2] In their Second Amended Complaint, Plaintiffs allege on-campus incidents of sexual discrimination and violence; Yale's response to these incidents, policies, sanctions, or bans made as a part of Yale's response to those incidents, the allegedly persistent culture of sexual misconduct that allegedly began over a decade ago, continues today, which creates the allegedly hostile environment that currently exists. Second Am. Compl. ¶¶ 62-103.

attendee at a Sigma Phi Epsilon party allegedly "grinded against [her] from behind without her consent." *Id.* ¶ 108.

Ms. Walker also alleges instances and experiences of sexual assault. She allegedly "has attended fraternity parties at Alpha Epsilon Pi, Delta Kappa Epsilon, Sigma Chi, Sigma Phi Epsilon, and Zeta Psi." *Id.* ¶ 110. In August or September of 2016, allegedly while dancing, "a large man began grinding on her from behind[,] [h]e then lifted her skirt and grabbed her crotch." *Id.* ¶ 110. In August of the same year, at a Sigma Alpha Epsilon party, Ms. Walker allegedly saw several fraternity members approach "women from behind and grope[] them without consent." *Id.* ¶ 111. At the same party, she allegedly witnessed other fraternity members "ogl[ing] at dancing female students[.]" *Id.* ¶ 111.

In September 2016, Ms. Walker alleges further misconduct. Ms. Walker allegedly planned to attend a party at Delta Kappa Epsilon, a fraternity, *id.* ¶ 112, even though she allegedly was warned "that she would not be admitted because she is an African American woman." *Id.* She allegedly went to the party and attempted to go inside. *Id.* She was allegedly looked up and down and then denied entrance, while "several white women behind her" were admitted. *Id.* Only after allegedly noting this unfair treatment was Ms. Walker permitted to enter the party. *Id.* She allegedly recalls being looked "up and down" before being allowed to enter a different party in December 2016. *Id.* ¶ 113.

About a year later, at a Zeta Psi party, a male partygoer allegedly grabbed a female friend of Ms. Walker's hair and body violently during a Zeta Psi party. *Id.* ¶ 114.

About a month later, at another Zeta Psi party, Ms. Singer alleges another sexual assault. *Id.* ¶ 115. She allegedly "was groped from behind without consent[,] . . . [and] pushed away the man groping her, saying 'no' very clearly." *Id.*

Other members of Engender and the class of plaintiffs allegedly "have also experienced sexual misconduct at a Yale fraternity or committed by a Yale fraternity member." *Id.* at 116.

Plaintiffs allege that fraternities are the "dominant social institutions on campus[,]" that "[w]omen and non-binary students at Yale lack comparable spaces [to] host events and socialize,]" and that men then "control most large student-run parties" which ultimately "relegate[s] women and non-binary students to sexual objects." *Id.* ¶¶ 118-19. In addition to controlling social life on campus, fraternities allegedly "offer male students economic, associational, and social privileges" unavailable to female and non-binary students. *Id.* ¶ 120.

These privileges allegedly stem from the influential networks available to members of fraternities from the organizations' alumni and professional connections. *Id.* ¶ 121-22. Plaintiffs allege that "many Fraternity members receive summer internships and job offers thanks to their fraternity alumni networks and contacts." *Id.* ¶ 122. Because of Yale's history and its relatively recent shift from all-male to coeducational, "sorority networks [allegedly] do not reach as broadly and deeply…as those of the Fraternities." *Id.* ¶ 124.

As a response to the culture and privileges the Fraternity Defendants allegedly permeate and enjoy, Ms. McNeil and Ms. Walker allegedly helped "to create Engender to combat discrimination and harassment among Yale students." *Id.* ¶ 125. In early 2018, Ms. Singer allegedly joined Engender during the second semester of her first year. *Id.* ¶ 126. All plaintiffs allegedly believe that "Yale's fraternities disproportionately contribute to high levels of gender inequality, sexual harassment, and sexual assault on and around Yale's campus." *Id.* To combat the alleged inequalities, discrimination, and sexual assault, Ms. McNeil, Ms. Singer, and Ms. Walker, along with other members of Engender, allegedly "decided to apply to become members of the Fraternities." *Id.* ¶ 126.

The Fraternity Defendants allegedly maintain similar application processes. *Id.* ¶ 127. In late January or early February of each year, "the Fraternities commence 'rush[.]'" *Id.* Rush allegedly consists of "a series of events open to potential applicants." *Id.* The rush requirements "which applicants must meet in order to request a bid (i.e. apply) to the fraternity[,]" allegedly vary slightly between each Yale chapter. *Id.* Once requests for bids allegedly are placed, "fraternities select new brothers." *Id.*

In January and February of 2017, a group of female students organized by Engender allegedly requested access to the Fraternity Defendants' rush processes. *Id.* ¶ 128. Ms. McNeil and Ms. Walker allegedly were among these women. *Id.* Engender allegedly contacted all but two of the Fraternity Defendants' chapter presidents "requesting access to the fraternity rush process." *Id.* The presidents of Alpha Delta Phi, Chi Psi, Delta Kappa Epsilon, Sigma Alpha Epsilon, and Sigma Nu allegedly denied their requests, "citing instructions from their national organizations" and the national organization bylaws which limit membership to men. *Id.* The presidents of Sigma Chi and Zeta Psi allegedly did not respond. *Id.*

Sigma Phi Epsilon allegedly allowed female and non-binary students to participate in the rush process, but "Sigma Phi Epsilon's leadership [allegedly] made it clear from the start that the fraternity would deny all women and non-binary students membership based on its national bylaws," and would only admit men. *Id.* ¶ 129.

Sigma Phi Epsilon allegedly requires potential applicants "to attend five meals with current brothers" and allegedly encourages attendance at fraternity-sorority social events. *Id.* ¶ 130. Ms. McNeil and Ms. Walker allegedly attended some rush events at Sigma Phi Epsilon in 2017, but allegedly felt uncomfortable and unwelcomed. *Id.* They allegedly felt that the fraternity members "were uninterested in engaging with Engender members" and other male applicants

ignored them. *Id.* Ms. McNeil and Ms. Walker allegedly did not fulfill all the rush requirements nor request bids for membership because they felt their efforts were futile. *Id.*

Although Ms. McNeil and Ms. Walker did not complete the rush process, other members of Engender allegedly did. *Id.* ¶ 131. On or around February 10, 2017, Sigma Phi Epsilon allegedly told all the female applicants "they would not be admitted based on the national bylaws, which mandate gender discrimination in membership." *Id.* Plaintiffs allege that "a significant number of male rush candidates" were admitted. *Id.* ¶ 132.

Ms. McNeil, Ms. Walker, and Engender allegedly again sought to join the Fraternity Defendants in the 2017-2018 school year. *Id.* ¶¶ 133-34. On January 16, 2018, Ms. McNeil allegedly sent an e-mail to all Yale Fraternity chapter presidents, except for Alpha Delta Phi, on behalf of Engender. *Id.* ¶ 135. They allegedly received various responses, all relying on the same requirement – being a man. *Id.* ¶ 136. Plaintiffs allege they "would have rushed fraternities if given the opportunity[.]" *Id.* ¶ 138.

Sigma Chi Epsilon again allegedly permitted Engender members to rush. *Id.* ¶ 139. Ms. Singer allegedly did not participate, thinking it would be futile. *Id.* Ms. McNeil, Ms. Walker, and other members of Engender allegedly decided to rush. *Id.* They allegedly completed all of the rush requirements and submitted requests for bids. *Id.* On or around February 9, 2018, they allegedly were denied admission, based on Sigma Phi Epsilon's national bylaws. *Id.* Plaintiffs allege that "Sigma Phi Epsilon admitted a significant number of male rush candidates . . . ." *Id.*

Ms. McNeil, Ms. Walker, and Engender members allegedly sought to rush the Fraternity Defendants a third time in the 2018-2019 academic year. *Id.* ¶ 140. On December 12, 2018, Ms. Singer sent an e-mail to the presidents of the Defendant Fraternities' local chapters "requesting access to their upcoming rush process" and the schedule of rush events. *Id.* ¶ 141. The Presidents

of Sigma Alpha Epsilon/Leo, Alpha Delta Phi, Sigma Nu, Sigma Chi, and Delta Kappa Epsilon allegedly all responded and rejected Ms. Singer's request. *Id.* Alpha Epsilon Pi, Chi Psi, and Zeta Psi allegedly did not respond. *Id.*

On January 15, 2019, Ms. Singer allegedly received an e-mail from Sigma Phi Epsilon's rush chairs, informing her that rush would be open to first-years of all gender identities. *Id.* ¶ 142. The rush chairs also allegedly specified that Sigma Phi Epsilon would only "offer bids to those who self-identify as male." *Id.*

Plaintiffs allege that the national organizations "are deeply entwined with the management and operations" of Yale chapters by controlling recruitment, supplying resources to local chapters and members, and setting boundaries for appropriate behavior. *Id.* ¶ 145. The national organizations assist with recruitment by providing promotional materials, instructions, and advice. *Id.* ¶¶ 147-48. Importantly, national organizations allegedly "retain the ultimate authority over candidate selection" and some can veto the induction of a candidate. *Id.* ¶ 150.

Plaintiffs allege that the national organizations maintain authority and control over the conduct of their members, but rarely "exercise their disciplinary powers to punish sexual misconduct." *Id.* ¶ 153-54. Plaintiffs allege that the national organizations could require "zero tolerance policies for sexual harassment or assault at fraternity events." *Id.* ¶ 155 The national organizations allegedly do not do this currently, *id.*, and allegedly have done the opposite, preventing some local Yale chapters "from sanctioning members who engage in sexual misconduct[,]" *id.* ¶ 156. Plaintiffs allege that the authority and control of local chapters' membership practices and ability to discipline members makes national organizations "responsible for subjecting Plaintiffs to a hostile environment at fraternity events and on and around Yale's campus." *Id.* ¶ 157.

Plaintiffs allege that "fraternity houses are integral to the operations of Defendant Fraternities[.]" *Id.* ¶ 158. The houses allegedly serve as party venues, residences for many fraternity members, and are central to attracting new members. *Id.* The housing corporations allegedly sign separate rental contracts with each fraternity member. *Id.* ¶ 159. Plaintiffs allege that housing corporations, Sig Ep housing of Connecticut Delta LLC, Mother Phi Foundation Inc., Connecticut Omega of Sigma Alpha Epsilon House Corporation, House Corporation of Sigma Chi at Yale, Inc., High Street Housing Corporation, and ZP Nutmeg Associates Inc., are substantially controlled by the Fraternities' local chapter and/or national organizations "and were primarily formed for the purposes of owning houses for their respective fraternities." *Id.* ¶ 160. The housing corporations, 340 Elm, LLC and 402 Crown LLC, allegedly "knowingly rent their houses to Chi Psi and Alpha Epsilon Pi, respectively, for use as fraternity houses." *Id.* ¶ 161. And Defendant Edward J. Donahue III allegedly "is affiliated with the Alpha Delta Phi fraternity" and rents the house knowing its use as a fraternity house. *Id.* ¶ 162.

Because the Fraternity Defendants allegedly only allow men to join and because fraternity members are given priority in renting the residential units, the Fraternity Defendants allegedly are "also deny[ing] women the opportunity to rent units in the fraternity houses because of their gender." *Id.* ¶ 163.

Plaintiffs further allege that Yale misleads students and prospective students about the role of the Fraternity Defendants on campus and the University's commitment to ban discrimination and sexual violence on campus. Through its Equal Opportunity Statement, Undergraduate Regulations, and Sexual Misconduct Policies, Yale allegedly commits itself to ending discrimination and sexual misconduct on campus. *Id.* ¶ 167-68. Ms. Walker allegedly received Yale's admissions pamphlet as a prospective student, which included Yale's

commitment to gender equality and cited the Equal Opportunity Statement. *Id.* ¶ 178. She allegedly was under the impression that Yale "would, in fact, be committed to promoting equal social, educational, and career opportunities for all students, regardless of gender." *Id.* Ms. McNeil allegedly recalls an event in the fall of 2014, where Yale administrators "spoke positively about Yale's efforts to promote gender equality and inclusion[,]" especially after an incident four years earlier.[3] *Id.* ¶ 179. Ms. McNeil allegedly spoke with Yale's Vice President for Student Life, Kimberly Goff-Crews, who allegedly gave her "the impression that Yale would be an inclusive and supportive educational environment." *Id.* ¶ 180.

Through its alleged lack or forfeited control of local chapters of the Fraternity Defendants, Yale allegedly allows gender inequity, denying women and non-binary students "equal status" within the student body and "the social and economic privileges of fraternity membership[,]" and allowing "rampant sexual harassment and assault" to occur at the fraternities. *Id.* ¶¶ 167, 170. Plaintiffs allege that Yale refused to follow recommendations intended to curb sexual violence at fraternities, and attempted "to exercise *less* supervision over fraternities[.]" *Id.* ¶ 170 (emphasis in the original).

Yale allegedly claims that it has limited power over the Fraternity Defendants and describe them as "unregistered, off-campus organizations." *Id.* ¶ 171. Plaintiffs allege that the Undergraduate Regulations, "which specifically impose non-discrimination requirements on unregistered and off-campus organizations," grants Yale power over Fraternity members, a power Yale allegedly refuses to act on. *Id.*

Yale allegedly misleads prospective students by underreporting "the number of students in Greek organizations, [and] downplaying fraternities' important social role" on campus. *Id.* ¶

---

[3] During this alleged incident, members of Delta Kappa Epsilon pledges allegedly chanted "No means Yes! Yes means anal!" outside of the Yale Women's Center. *Id*. ¶ 179. *See also* Second Am. Compl. ¶ 64.

172. Yale's admissions office also allegedly claims "that the Greek community comprises approximately 10% of the undergraduate population," *id.*, a statistic allegedly cited to Ms. Walker, then a prospective student. *Id.*

Ms. McNeil, Ms. Singer, Ms. Walker, and members of Engender all allege that fraternity life is more of a presence on Yale's campus than they were led to believe. *Id.* ¶ 173. Plaintiffs allegedly refer to the Yale College Counsel Task Force on Greek Life's report, which allegedly estimates Greek Life as a much larger campus presence. *Id.* When including sororities and students who are not members, 38% of the students allegedly "attend open fraternity events at least once or twice a month." *Id.* During the fall of 2016, Ms. McNeil's and Ms. Walker's first semester, allegedly 18% of students "were members of single-gender Greek organizations." *Id.* ¶ 173. Plaintiffs rely on the 2019 Review of Delta Kappa Epsilon and Campus Culture to support their allegations. *Id.* ¶ 174.

Plaintiffs also allege that Yale "fails to warn its students about the specific dangers of fraternities." *Id.* ¶ 175. Trainings about sexual misconduct given to undergraduate students allegedly "are ineffective and ignore the prevalence of sexual harassment and assault at fraternities." *Id.* ¶ 175. Ms. McNeil allegedly served on the board of a student organization dedicated to filling the gaps in Yale's training program. *Id.* ¶ 176. Plaintiffs allege that two separate Yale administrators the group met with "did not want to focus on [Yale's] sexual misconduct prevention efforts on fraternities" and "actively discouraged [the group] from concentrating its efforts on fraternities." *Id.* ¶ 176. Plaintiffs allege that these actions or inactions to address "fraternity-related discrimination and sexual misconduct" contradicts representations made to them as prospective students. *Id.* ¶ 177.

In deciding on whether to matriculate at Yale, Plaintiffs allegedly relied on the representations made regarding Yale's commitment to gender equality and eliminating sexual misconduct on campus. *Id.* ¶ 181. Plaintiffs expected fraternities to play a less significant role in campus social life and expected Yale to adhere to its own policies. *Id.*

Plaintiffs allegedly have taken many steps to ensure Yale's compliance with its own policies. For over a year, "Plaintiffs have petitioned Defendant Yale University to end the discriminatory admission practices of Defendant Fraternities and the hostile environment that exists at Defendant Fraternities and at Yale." *Id.* ¶ 182. On August 17, 2017, Ms. McNeil allegedly sent an e-mail to administrators raising concerns about the Fraternity Defendants' admission policies and the hostile environment perpetuated at their parties. *Id.* ¶ 183. On August 31, 2017, Ms. Walker and Ms. McNeil allegedly met with Deans Marvin Chun and Burgwell Howard to speak of the same concerns. *Id.* ¶ 184. Plaintiffs allege both deans "declined to take any steps to require the Fraternities to admit female or non-binary students as members" and failed to follow up regarding "steps the University was prepared to take to address sexual misconduct" at the Fraternities. *Id.* ¶ 184.

On January 26, 2019, Ms. McNeil, on behalf of Engender, allegedly sent another e-mail to Deans Chun and Howard. *Id.* ¶ 185. She allegedly explained that "the Yale chapter of Sigma Phi Epsilon [and Engender] were exploring the possibility of opening the chapter to women and non-binary students." *Id.* She allegedly requested a meeting with both deans to "explore options to assist the Yale chapter in efforts to disaffiliate." *Id.* She allegedly never met with either of them. *Id.*

On February 17, 2018, Ms. McNeil and Ms. Walker allegedly reached out to the Yale administration. *Id.* ¶ 186. They allegedly contacted Yale's Dean of Student Affairs, Camille

Lizarribar, "to request assistance filing a complaint with the Yale Executive Committee regarding Defendant Fraternities' discriminatory admissions policies," allegedly in accordance with Yale's Undergraduate Regulations, which requires "the support of certain faculty or staff members . . . to file a complaint with the Executive Committee." *Id.*

Two days later, on February 18, 2018, Ms. McNeil, Ms. Walker, and another member of Engender met with Dean Lizarribar. *Id.* ¶ 187. Dean Lizarribar allegedly expressed surprise that Plaintiffs wanted "to discuss the Defendant Fraternities' discriminatory admissions policies." *Id.* She allegedly expressed concern that "something bad had happened," which Plaintiffs allege means "she did not take [their] complaint seriously." *Id.* When a member of Engender cited an example of sexual misconduct, Dean Lizarriabar allegedly asked whether the "incident had been reported." *Id.* Plaintiffs allegedly raised their concerns of the Fraternity Defendants's discriminatory policies and Yale's refusal to enforce their non-discrimination policies within the Fraternities. *Id.* Dean Lizarribar allegedly declined to support Plaintiffs' complaint before the Yale Executive Committee, but "asked for time to consider ways that she could continue having conversations" with Plaintiffs and Engender. *Id.*

On March 5, 2018, Engender, including Ms. McNeil and Ms. Walker, allegedly again reached out to the Yale administration. *Id.* They allegedly sent an e-mail to Yale President, Peter Salovey, Dean Chun, and Dean Howard "to raise further concerns about the negative effects of fraternity discrimination and harassment on their educational experiences." *Id.* ¶ 188. The e-mail allegedly described the Fraternity Defendants' "refusal to admit Engender members", reports of sexual harassment and assault in the *Yale Daily News* that related to Delta Kappa Epsilon, and recruitment violations of Delta Kappa Epsilon and Sigma Nu that violated Yale's Undergraduate Regulations. *Id.* Dean Chun allegedly replied and instructed "them to work with Dean Howard,

Dean Lizarribar, and Gregg Peeples, Assistant Dean of Student Conduct & Community Standards and Secretary of the Executive Committee." *Id.*

On March 29, 2018, Ms. McNeil, Ms. Walker, and another member of Engender allegedly met with Dean Lizarribar and Dean Peeples. *Id.* ¶ 189. During the meeting, Plaintiffs allegedly "explained that Defendant Fraternities' admissions practices were discriminatory and against Yale policy." *Id.* They allegedly asked if Yale "had any formal avenues for filing a complaint of gender discrimination against the Fraternities." *Id.* The Deans allegedly agreed the admission practices were discriminatory and also allegedly told Plaintiffs "that there was no formal way for them to raise their complaints[.]" *Id.*

Plaintiffs allegedly continued to meet with members of Yale's administration. On or about April 5, 2018, Ms. McNeil, Ms. Walker, and members of Engender allegedly met with Yale's Deputy Title IX Coordinator and Labor Relations Director. *Id.* ¶ 190. They allegedly researched and presented the connection between the Fraternity Defendants' gender discrimination and "disproportionately high occurrences of sexism, sexual harassment and assault, LGBTQ [Lesbian Gay Bisexual Transgender Queer/Questioning] discrimination, and professional disparities among Yale students." *Id.* They allege that Yale again failed to take action. *Id.*

On November 15, 2018, Ms. McNeil allegedly wrote an e-mail to Dean Howard, informing him that "Leo had officially disaffiliated from Sigma Alpha Epsilon's national organization." *Id.* ¶ 191. The e-mail allegedly reiterated that Leo was an undergraduate organization and in violation of the Undergraduate Regulations because of its admissions practices. *Id.* On November 26, 2018, Dean Howard allegedly responded to Ms. McNeil. *Id.* He acknowledged that "'membership is seemingly composed of Yale students,'" but reiterated

Yale's inability to control the membership criteria of "'any unregistered or unaffiliated group . . . in New Haven[.]'" *Id.* He also allegedly reiterated that individuals of Leo who were also Yale Students must adhere to the Undergraduate Regulations, but allegedly "gave no indication that Yale would sanction them for discriminating on the basis of gender." *Id.*

With the exception of Leo, the Fraternity Defendants are local chapters of national organizations. *Id* ¶ 193. Plaintiffs allege that the only criteria for membership is that the "applicants are men." *Id.* Plaintiffs allege that enrollment at a university is not even a requirement for some local chapters. *Id.* Plaintiffs allege that a majority of men who request a bid are admitted and that "local chapters have no official policies restricting recruitment to a specific cohort of students (other than men)." *Id.* As an example, Plaintiffs allege that, in the 2017-2018 academic year, Zeta Psi "released a Google form" on Facebook which opened "its rush process to all interested male undergraduates." *Id.*

Beyond being unselective, the Fraternity Defendants allegedly "open [themselves'] up to the general Yale public" through voluminous Facebook invites to parties. *Id.* ¶ 196. Plaintiffs allege several annual or recurring events that are known within the Yale community. *Id.* The events allegedly are advertised as "public events" on Facebook and female students from neighboring schools are often invited to events. *Id.* ¶ 197. Plaintiffs specifically allege that Alpha Delta Phi, Sigma Alpha Epsilon/Leo, Sigma Nu, and Zeta Psi routinely open their house to the general public. *Id.*

The Fraternity Defendants allegedly not only host public events, but allegedly allow "other student groups to host events" or rent their house. *Id.* ¶ 198. Sigma Nu allegedly makes "extensive efforts to profit from its space by opening it to the broader community." *Id.* ¶ 199. Sigma Nu also allegedly rents rooms in the fraternity house during the academic year and in the

summer, if room are unoccupied, although, fraternity members allegedly get priority during the summer. *Id.*

Plaintiffs allege that Yale is similarly public. Many areas of campus, including places where fraternities recruit and publish their events, are "ungated and open to the general public." *Id.* ¶ 203. Indeed, areas where allegedly hostile incidents have occurred allegedly are public.[4] Yale allegedly owns property throughout New Haven, including properties that "abut and surround many of the fraternity houses." *Id.* ¶ 204. Plaintiffs also alleges that the museums, theaters, and sporting arenas are available to the public. *Id.* ¶ 205.

Plaintiffs allege that there is a close tie between the Fraternity Defendants and Yale. "Yale University has a drastic shortage of sufficient spaces to hold parties and relies on Defendant Fraternities to offer students party venues." *Id.* ¶ 207. They allege that decisions to discontinue certain on-campus events were made with knowledge that the number of students attending fraternity parties would increase. *Id.* The Fraternity Defendants allegedly provide parties for Yale students and, "in exchange, Yale allows the Fraternities to use Yale resources . . . and largely turns a blind eye to the sexual harassment and assault" that occurs "in connection with the Fraternities." *Id.*

Yale allegedly disclaims control, but allegedly permits use of its resources, i.e., e-mail addresses, bulletin boards, and campus facilities. *Id.* ¶ 208. Allegedly, under an earlier policy, which required registering all off-campus events with fifty or more attendees, Yale knew or and could control almost every fraternity party or event. *Id.* Plaintiffs further allege Yale's failure to

---

[4] Plaintiffs refer to two alleged incidents involving Zeta Psi recruits in front of the Yale Women's Center with the sign "We Love Yale Sluts" and Delta Kappa Epsilon pledges chanting "no means yes." *Id*. ¶¶ 13, 62, 203.

take recommendations aimed at curbing the gender discrimination and sexual misconduct. *Id.* ¶ 209.

For example, Yale allegedly failed "to create a formal and transparent Greek council," as agreed upon in the 2012 Voluntary Resolution Agreement with the Department of Education. *Id.* Dean Burgwell Howard, however, allegedly maintains contact with the heads of the Defendant Fraternities and, allegedly has warned the fraternities that their admissions practices would come under scrutiny and advised the Fraternities "to be clear and transparent" in the process and suggested a list of "do's and don't's" in recruiting practices. *Id.* The Fraternities then allegedly "act as extensions of Yale, providing much needed locations where Yale students can socialize with one another and members of the general public." *Id.* ¶ 210.

Plaintiffs allegedly seek class certification under Fed. R. Civ. Pro. 23 "on behalf of every current and former female undergraduate student who has matriculated and/or will matriculate from the beginning of the applicable statute of limitations of each claim asserted on behalf of the class through the date of judgment[.]" *Id.* ¶ 211. Class certification allegedly is "the most efficient and economical means of resolving the questions of law and fact[.]" *Id.* ¶ 213. Plaintiffs allege numerous common questions[5] concerning Yale, Fraternity Defendants' discrimination against female students and the subjection of the female students to a sexually hostile environment. *Id.* ¶ 214.

Plaintiffs allege class certification is proper because the prospective class is "too numerous to make joinder practicable[,]" *id.* ¶ 218-19, there are many common questions of law

---

[5] These common questions allegedly include "whether Yale engaged in negligent misrepresentation or unfair and deceptive practices by . . . misleading prospective students about the University's commitment to non-discrimination and addressing sexual misconduct and whether Yale breached its contract (and the implied covenant of good faith and fair dealing) with the students by permitting undergraduate organizations to perpetuate gender inequality and sexual misconduct." *Id.* ¶ 214.

and fact, *id.* ¶ 221, there is typicality because Ms. McNeil, Ms. Singer, and Ms. Walker "are female undergraduate students who matriculated at Yale" during the relevant period and who advance "each of the claims they assert on behalf of the proposed class[,]" *id.* ¶ 222-23, and the Plaintiffs are "adequate representatives of the proposed class" as their "interests are coextensive with those of the members of the proposed class that they seek to represent in this case." *Id.* ¶ 226-27.

### B.    Procedural Background

On February 12, 2019, Anna McNeil, Eliana Singer, Ry Walker, and Engender filed this lawsuit, alleging violations of federal law, Title IX and the Fair Housing Act, and raising various Connecticut statutory and common law claims. Complaint, ECF No. 1 (Feb. 12, 2019).

On May 13, 2019, Plaintiffs filed an Amended Complaint. Amended Compl., ECF No. 63 (May 13, 2019).

On May 29, 2019, Yale University, 340 Elm, LLC, and 402 Crown LLC all filed timely motions to dismiss. *See* Yale University's Motion to Dismiss, ECF No. 71 (May 29, 2019); 340 Elm, LLC's Mot. to Dismiss, ECF No. 72 (May 29, 2019); 402 Crown LLC's Mot. to Dismiss, ECF No. 73 (May 29, 2019).

On May 31, 2019, Alpha Delta Phi International, Inc., Alpha Epsilon Pi Fraternity, Inc., Alpha Epsilon Pi, Epsilon Upsilon, Alpha Kappa Delta of Chi Psi, Chi Psi Fraternity, Connecticut Omega of Sigma Alpha Epsilon House Corporation, Phi Chapter Delta Kappa Epsilon, Delta Kappa Epsilon Fraternity, Edward J. Donahue, III, High Street Housing Corporation, House Corporation of Sigma Chi at Yale I, Leo, Mother Phi Foundation, Inc., Sig Ep Housing of Connecticut Delta, LLC, Sigma Alpha Epsilon Fraternity, Sigma Chi International Fraternity, Sigma Chi, Theta Upsilon Chapter, Sigma Nu Fraternity Beta Alpha

Chapter, Sigma Nu Fraternity, Inc., Sigma Phi Epsilon Fraternity, Inc., Sigma Phi Epsilon, Connecticut Delta Chapter, Yale Chapter of Alpha Delta Phi International, Inc, ZP Nutmeg Associates Inc., Zeta Psi Fraternity, Inc., Zeta Psi, Eta Chapter (the "Fraternity Defendants") filed a motion to dismiss. *See* Fraternities' Mot. to Dismiss, ECF No. 76 (May 31, 2019).

On June 6, 2019, the Court granted this motion. Order Granting Mot. for Extension of Time, ECF No. 78 (June 6, 2019).

On July 3, 2019, Plaintiffs filed a memorandum in opposition to Yale University's, 340 Elm LLC,'s 402 Crown LLC's, and the Fraternity Defendants' motion to dismiss. Plaintiffs; Opposition to 340 Elm, LLC, ECF No. 84 (July 3, 2019) ("Pls.' Opp'n to 340 Elm"); Plaintiffs' Opposition to 402 Crown, LLC, ECF No. 85 (July 3, 2019) ("Pls.' Opp'n to 402 Crown"); Plaintiffs' Opposition to Yale, ECF No. 86 (July 3, 2019) ("Pls.' Opp'n to Yale"); Plaintiff's Opposition to Fraternity Defendants, ECF No. 87 (July 3, 2019) ("Pls. Opp'n to Frat.").

On July 17, 2019, the parties filed a joint stipulation to file a Second Amended Complaint. Joint Stipulation for a Second Am. Compl., ECF No. 91 (July 17, 2019).

On July 18, 2019, the Court granted this motion. Order on Mot. for Leave to File Second Am. Compl., ECF No. 92 (July 18, 2019). That same day, Plaintiffs filed the Second Amended Complaint. Second Am. Compl.

Between July 22, 2019 and July 24, 2019, 402 Crown LLC, 340 Elm, LLC, the Fraternity Defendants, and Yale filed timely replies to Plaintiffs' opposition memoranda. *See* 402 Crown LLC's Reply, ECF No. 95 (July 22, 2019) ("402 Crown LLC's Reply"); 340 Elm LLC's Reply, ECF No. 96 (July 23, 2019) ("340 Elm LLC's Reply"); Fraternity Defendants' Reply, ECF No. 97 (July 24, 2019) ("Fraternity Defs.' Reply"); Yale University's Reply, ECF No. 98 (July 24, 2019) ("Yale's Reply").

On July 26, 2019, Plaintiffs moved for leave to file a sur-reply. Mot. to File Sur Reply, ECF No. 99 (July 26, 2019).

On July 29, 2019, the Court granted that motion. Order, ECF No. 100 (July 29, 2019), and, on July 30, 2019, Plaintiffs filed their reply. Plaintiffs' Sur Reply, ECF No. 101 (July 30, 2019).

On October 15, 2019, the Court held a motion hearing on all pending motions to dismiss. Minute Entry, ECF No. 120 (Oct. 15, 2019).

On October 24, 2019, Plaintiffs moved to file a supplemental briefing on the issue of proximate cause and the Fair Housing Act. Mot., ECF No. 121 (Oct. 24, 2019). The Court granted the motion and allowed Defendants to file a response by November 8, 2019. Order, ECF No. 122 (Oct. 25, 2019).

On October 25, 2019, Plaintiffs filed a supplemental memorandum in opposition to Fraternity Defendants' motion to dismiss. Supplemental Mem., ECF No. 123 (Oct. 25, 2019) ("Pls.' Supplemental Mem.").

On November 8, 2019, Fraternity Defendants filed a reply. Reply, ECF No. 125 (Nov. 8, 2019) ("Fraternity Defs.' Supplemental Reply").

## II.   STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility standard" guided by "two working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *see also York v. Ass'n of the Bar of the City of New York*, 286 F.3d 122, 125 (2d Cir.) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true."), *cert. denied*, 537 U.S. 1089 (2002).

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs.,*

*Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

## III. DISCUSSION

### A. Title IX – the Hostile Educational Environment Claim

Title IX protects against gender discrimination, including sexual harassment. *See Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 649-50 (1999) ("We have elsewhere concluded that sexual harassment is a form of discrimination for Title IX purposes[.]") To recover under Title IX for money damages, a plaintiff must prove an educational program, activity, or institution receiving Federal financial assistance acted "with deliberate indifference to known acts of harassment[.]" *Id.* at 633.

Demonstrating deliberate indifference requires a plaintiff to show that "the harassment [takes place] in the context subject to the school district's control." *Id.* at 647. The plaintiff also must show that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination." *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 290 (1998). In addition, the school must be deliberately indifferent, or there must be "an official decision by the recipient not to remedy the violation." *Id.* Finally, the harassment, of which funding recipients have actual knowledge of, must be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Davis*, 526 U.S. at 650. Depending on the circumstances, "courts view actions of a third party as intentional violations by a funding recipient." *Zeno v. Pine Plains Cent. School Dist.*, 702 F.3d 655, 664-65 (2d Cir. 2012) ("For example, in the educational setting, a school district is liable for intentional

discrimination when it has been 'deliberately indifferent' to teacher or peer harassment of a student.").

Yale argues that Plaintiffs' claim fails in three ways.

First, the Fraternity Defendants "are organized independently of Yale[,]" maintain their own property, and Yale "has no formal role in their management." *Id.* 18. Second, Yale did not exhibit "deliberate indifference to any misconduct over which it had actual knowledge," maintains robust and OCR compliant programs, including procedures to respond to claims of sexual misconduct or harassment. *Id.* Finally, the locations of the alleged sexual harassment are not affiliated with Yale and Yale discourages students from attending these events. *Id.* at 24. In Yale's view, Plaintiffs also have not adequately alleged instances of sexual harassment or fraternity-related misconduct since they have attended, or interference with the educational opportunities available or their academic performance. *Id.* Yale argues that both the claim for damages and injunctive relief should be dismissed because Plaintiffs have failed to allege any of the four elements of a viable Title IX claim. *Id.* at 25; Yale's Reply at 9-10.

Plaintiffs claim they adequately allege claims for monetary damages and injunctive relief because Yale has exhibited deliberate indifference to the harassment. Pls.' Opp'n to Yale at 7. In their view, the harassment has allegedly taken place in a context subject to Yale's control (the Fraternity Defendants), Yale has known of the harassment, and Yale has ignored years of alleged abuse and could control the fraternities and their members but has refused to do so. *Id.*

Plaintiffs' claims for injunctive relief survive because Plaintiffs have adequately alleged "that Yale knows about the hostile environment perpetuated at its fraternities," thus satisfying the "knew or should have known" standard required by Title IX. *Id.* at 20.

The Court disagrees, except with respect to the Title IX claim of Anna McNeil.

The scope of Title IX forecloses nearly all of the Plaintiffs' Title IX claim. Accepting their allegations as true, as the Court must at this stage of the case, the gender exclusive nature of the Fraternity Defendants is at the root of the Plaintiffs' alleged hostile educational environment claim. But as discussed further below, Congress has expressly limited Title IX and made the membership practices of the Fraternity Defendants beyond Title IX's scope. *See* 20 U.S.C. § 1681(a)(6)(A) (Title IX "shall not apply to membership practices – (A) of a social fraternity or social sorority . . . the active membership of which consists primarily of students in attendance at an institution of higher education[.]"). As a result, to the extent that their membership practices create or help maintain a hostile educational environment for the Plaintiffs, Title IX cannot be used to remedy them.

Title IX's express exemption of the Fraternity Defendants' membership practices and the inability of this Court to address them has other consequences for Plaintiffs' Title IX claim as well. As the Supreme Court made clear in *Davis*, Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. The Supreme Court's use of the conjunctive in defining control over both "the harasser and the environment in which the harassment occurs" means that, at least for Title IX purposes, liability for Yale cannot result solely because a Yale student has been sexually harassed, even if by another Yale student.

Yale also must have sufficient control over the "environment in which the harassment occurs" for liability to be possible. *See also id.* at 645 ("[B]ecause the harassment must occur 'under' 'the operations of' a funding recipient, the harassment must take place in a context subject to the school district's control." (citation omitted)). Congress expressly limited Title IX's reach and prevented the law from addressing the membership of the Fraternity Defendants,

which means that, as a matter of law, Yale does not have complete control over this environment.

While the absence of complete control is not the same as a lack of "substantial control," in this case, it is a distinction without a difference. In *Davis*, the Supreme Court recognized that "[w]here, as here, the misconduct occurs during school hours and on school grounds . . . the misconduct is taking place 'under' an 'operation' of the funding recipient." 526 U.S. at 646. It is "[i]n these circumstances, the recipient retains substantial control over the context in which harassment occurs." *Id.* And "in this setting the [educational institution] exercises substantial control over the harasser." *Id.*

Here, the alleged misconduct took place off-campus and outside of school hours, in space and time not definitively under Yale's control. Indeed, the parties here are not school-sponsored events nor educational programs nor educational activities, and, most importantly, do not receive federal funding. *See Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999) ("Entities that receive federal assistance, whether directly or through an intermediary, are recipients within the meaning of Title IX[.]"); *see also O'Connor v. Davis*, 126 F.3d 112, 117 (2d Cir. 1997) (by keeping the modifier "education" with "program or activity" Congress intended Title IX to apply to entities that that promote, at least in part, educational missions).

Thus, to the extent Plaintiffs' Title IX claim is predicated on the environment at fraternity parties, these allegations also fail to state a viable Title IX claim because the allegedly discriminatory actions occurred off-campus, outside of school hours, and in space and time not under Yale's control.

In addition, Plaintiffs' factual allegations that they have lost educational benefits and opportunities to access "a vast, nationwide alumni network, which often results in coveted job

opportunities," Second Am. Compl. ¶ 7, are simply another manifestation of their ill-fated membership-based Title IX claim and similarly cannot support a viable Title IX claim. There is nothing in the plain language of Title IX or any case interpreting its scope to support holding Yale responsible for not providing employment opportunities post-matriculation. Any post-matriculation opportunities offered to students outside of Yale's academic offerings cannot constitute a denial of educational benefits or opportunities. *See Gebser*, 524 U.S. at 291 (referring to "educational programs or activities" which funding recipients operate); *see also O'Connor*, 126 F.3d at 119 (recognizing that institution did not become subject to Title IX liability even though it employed a college intern and that intern alleged sexual harassment, noting that "it is for Congress, if it should choose to do so, and not this court, to provide a remedy under either Title VII or Title IX for plaintiffs in [the college intern's] position.").

But Yale may have substantial control over individual Yale students who are a member of one of the Fraternity Defendants or attend a party at one of the Fraternity Defendants in off-campus locations and engage in sexually harassing behavior to this extent: the extent to which the allegedly offending student can be subject to Yale's disciplinary authority. In other words, if a currently enrolled Yale student sexually harasses another currently enrolled Yale student, and the alleged sexual harassment has been properly reported to Yale for discipline, Yale may have substantial control over the circumstances in which that student can remain enrolled at Yale, whether the underlying conduct occurred on Yale's campus or off of it. *See* Yale's Ex. 16 – Undergraduate Regulations 2018 – 2019, ECF No. 71-18 at 3 (May 29, 2019) ("In general, these regulations are concerned with conduct on campus. While off-campus misconduct will not normally be the basis for disciplinary action by the University, it may result in disciplinary action under the circumstances specified below . . ."); *id.* at 69 ("Conduct occurring off campus is a

violation of these regulations if the conduct, had it occurred on campus, would be a violation of" Yale's policies, including its policies regarding sexual misconduct. Furthermore, "any conduct occurring off campus that imperils the integrity and values of the University community may result in disciplinary action."); Yale's Ex. 2 – Yale Sexual Misconduct Policies and Related Definitions, ECF No. 71-4 at 2 (May 29, 2019) (Yale's sexual misconduct policies "apply to all members of the Yale community as well as to conduct by third parties . . . directed toward university students, faculty, or staff members.").

As a result, if Plaintiffs have adequately alleged Yale's deliberate indifference to sexual harassment occurring between and among Yale students, then Plaintiffs may have a viable Title IX claim, even if the harassment occurred at one of the Fraternity Defendants' off-campus locations. *See Davis*, 526 U.S. at 646-47 ("We thus conclude that recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority.").

Because none of the Plaintiffs are alleging that Yale or one of its officials or even an employee "engage[d] in harassment directly, however, Yale may not be liable for damages unless its deliberate indifference 'subject[s] its students to harassment." *Id.* This "deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." *Id.* at 645 (quoting Random House Dictionary of the English Language 1415 (1966)).

In addition, as a matter of law, Title IX does not provide for the scope of injunctive relief sought by Plaintiffs here, such as the appointment of school monitors for off-campus events. *See* Second Am. Compl.¶¶ 103-104 ("An Order requiring Yale to initiate and implement programs

and policies that remedy the gender discrimination, sexual harassment, and hostile environment at Yale, including . . . [a]ppointing mixed gender 'sober monitors' for each off-campus event and party[.]"). Because Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs," *Davis*, 526 U.S. at 644, any such relief would have to be limited to the disciplinary process at Yale for its students, something within Yale's control.

In any event, for even this claim – one of Yale's alleged liability for its deliberate indifference to allegations of sexual misconduct made by Yale students against other Yale students and reported to Yale's established disciplinary process – Plaintiffs "must establish that a school official with authority to address the alleged discrimination and to institute corrective measures had actual knowledge of the discrimination and failed to adequately respond." *Papelino v. Albany Coll. of Pharm. of Union Univ.*, 633 F.3d 81, 89 (2d Cir. 2011). Deliberate indifference "does not depend on whether one can plausibly second guess the disciplinary decisions made by school administrators." *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 145 (2d Cir. 1999) (citations omitted). "A school fails to adequately respond if it provides no response or if it provides a response that amount[s] to deliberate indifference to discrimination." *Papelino*, 633 F.3d at 89.

In analyzing a Title IX hostile education environment claim, Title VII hostile environment jurisprudence is instructive. *Papelino*, 633 F.3d at 89. "A finding of deliberate indifference depends on the adequacy of a school district's response to the harassment. A failure to respond, a response that only follows after a lengthy and unjustified delay, and a response that amounts to deliberate indifference to discrimination, have all been found inadequate [responses]." *Zeno*, 702 F.3d at 666(citations and internal quotation marks omitted). "The

sufficiency of a response, however, must be considered in light of the known circumstances, and as the known circumstances change, the sufficiency of a response may also have to evolve." *Id.* at 668 (citations and internal quotation marks omitted).

Eliana Singer, Ry Walker, and Engender, however, have not adequately alleged deliberate indifference and this theory of liability does not result in a viable Title IX claim for them. For example, Plaintiffs have alleged that Yale failed to stop sexual harassment prospectively. *See* Second Am. Compl. ¶ 101 ("Yale has failed to formulate any policy to prevent the sexual misconduct that occurs in connection with the Fraternities."); *id.* ¶ 17 ("Plaintiffs must now assert their rights in a Court of law to make Yale and the Fraternities safer, more equitable organizations for female students."). But they have identified no case where Title IX has been applied to an institution's failure to anticipate and prevent sexual harassment, misconduct, or discrimination prospectively.

Plaintiffs repeatedly and vaguely reference the hostile environment of fraternities and the "negligible sanctions" the organizations received. Second Am. Compl. ¶ 77. They interpret action and response as insufficient or an unwillingness to change, while simultaneously recognizing that Yale did respond. *See id.* ¶ 68 (stating that a former president agreed "that all students be held accountable" in complying with the Undergraduate Regulations, but his preference to implement change through improved communication and enforcement meant "Yale would not change its fraternities policies."); *id.* ¶ 72 (When Yale began issuing summaries of reported sexual misconduct and the summaries did "not disclose whether reported incidents took place at fraternity houses or in connection with fraternity events[,]" Plaintiffs claims this data ignored "primary drivers of the hostile environment on campus.").

Plaintiffs also repeatedly refer to Yale's decisions to ignore recommendations from committees or reports. *See* Second Am. Compl. ¶ 68 ("Yet Yale refused to adopt the [Advisory Committee on Campus Climate's] recommendations . . . ."); *Id.* ¶ 73 (a 2012-13 report "studiously ignores the relationship between fraternities and sexual misconduct, even when the link is plainly obvious"); *id.* ¶ 88-92 (In the fall of 2016, the Yale College Council Task Force on Greek Life, "[u]pon information and belief, the Yale administration reviewed the [task force's] report, yet failed to take any action in response.").

But these allegations do not create the plausible "entitlement to relief," required after the Supreme Court's decisions in *Iqbal* and *Twombly*. *See Iqbal*, 566 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" (quoting *Twombly*, 550 U.S. at 557)); *Twombly*, 550 U.S. at 559 ("[I]t is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the [discovery] process will reveal relevant evidence . . . ." (internal quotation marks and citation omitted)). In 2017, the Office of Civil Rights closed its monitoring of Yale and stated that:

> Throughout our monitoring, OCR provided the University with feedback on the information gathered and discussed concerns, including those raised to OCR by students. The University welcomed all feedback and made changes based on the feedback received. Based on all of the information reviewed, OCR has concluded that the University sufficiently complied with the terms of the Agreement and as of the date of its last monitoring report on May 30, 2014. OCR deems the monitoring of this complaint to be complete, and therefore, the complaint is closed.

Yale Motion to Dismiss – Exhibit 6, ECF No. 38-8 at 7 (Apr. 22, 2019) ("OCR Letter").

Significantly, nearly all of the allegations of sexual assault raised by Plaintiffs and allegedly not properly addressed by Yale preceded the OCR's letter. *See, e.g.,* Second Am. Compl. ¶ 62 (In 2008, Zeta Psi pledges allegedly "posed for photographs outside the Yale University Women's Center with a sign stating, 'We Love Yale Sluts.'"); *id.* ¶ 63 (Fraternities and Yale athletics teams allegedly circulated an email ranking 53 first-year women "based on attractiveness and the number of drinks it would take to have sex with them."); *id.* ¶ 64 (In October 2010, members and pledges of Delta Kappa Epsilon allegedly "marched outside the Yale Women's Center on Yale's Old Campus . . . with pledges shouting, 'No means yes! Yes means anal!' while members responded, 'Louder!'"); *id.* ¶ 112-14 (detailing an alleged sexual assault against Ms. Walker occurring in 2016).

While Plaintiffs argue that the OCR letter is beyond the scope of the Second Amended Complaint, on a motion to dismiss, this Court can – and in this instance, should – consider a document critically related to Plaintiffs' factual allegations and underlying legal theory: that Yale fails to comply with the dictates of Title IX. *See Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 2011) ("Moreover, 'when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss. . . ." (citation omitted)); *see also Smith v. Hogan*, 794 F.3d 249, 254 (2d Cir. 2015) (courts are permitted, at the motion to dismiss stage, to consider "'documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit'" (quoting *City of Pontiac Policemen's & Fireman's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014)).

As a result, to have the plausible "entitlement to relief," Plaintiffs cannot simply allege that a variety of incidents occurred, but also must allege how, despite the OCR's conclusions finding no further need to investigate Yale's Title IX compliance, that Yale nevertheless failed to respond to reports of sexual assault or that Yale only responded after a lengthy delay, sufficient to provide a viable Title IX claim. *See Zeno*, 702 F.3d at 699 (finding undue delay where students were disciplined promptly, but it took over a year to implement non-disciplinary remedial action); *Papelino*, 644 F.3d at 90 (finding that the Dean's decision to "keep quiet" about a student's complaint of quid pro quo harassment and not to follow procedures for processing complaints of sexual harassment could be found by a reasonable jury to be deliberate indifference); *cf. Hayut v. State Univ. of New York*, 352 F.3d 733, 752 (2d Cir. 2003) (rejecting a Title IX claim at the summary judgment stage with "purely conclusory allegations, suggesting that the matter should have been addressed more swiftly.").

Just as importantly, unlike Ms. McNeil's factual allegations – discussed further below – Eliana Singer, Ry Walker, and Engender do not allege having contemporaneously reported an incident of sexual assault through Yale's established channels for addressing these matters, and Yale declining or refusing to investigate it, much less delay responding to any such complaints. Instead, these Plaintiffs argue that their specific instances of sexual assault could not be properly reported. *See* Pls. Opp'n at 17 n.10 (arguing that the absence of formal complaints "ignores the fact that Plaintiffs didn't know and couldn't see their assailants." (citations omitted)).

This argument and the factual allegations in support thereof, however, beg rather than answer the ultimate legal question: whether, as a matter of law, an educational institution can be deliberately indifferent in responding to off-campus, off-hours issues where the alleged harassers cannot be adequately identified by those allegedly harassed, and the educational institution

received no formal complaint. Based on the current law, the answer is no. *See Davis,* 526 U.S. at 644 (recognizing that Title IX's "plain language confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs."); *Id.* at 645 ("[B]ecause the harassment must occur 'under' 'the operations of' a funding recipient, the harassment must take place in a context subject to the school district's control." (citations omitted)).

In contrast, Anna McNeil alleges both having experienced a sexual assault and having witnessed others being sexually assaulted at a single event. Second Am. Compl. ¶ 105. (At a Zeta Psi party in August or September of 2016, she allegedly "was groped without consent by numerous male attendees" and allegedly witnessed similar behavior against other women.). Moreover, when she allegedly informed her first-year counselor of the incident, an alleged "mandatory reporter of sexual misconduct," the counselor allegedly shrugged off Ms. McNeil's account and did not report the misconduct, as required by Yale's policies. *Id.* ¶ 106. Although these factual allegations are insufficient as a matter of law to support the far broader claim brought by her and the other Plaintiffs and occurred before the 2017 OCR letter, these factual allegations are sufficient to support a viable Title IX claim by Ms. McNeil regarding Yale's alleged deliberate indifference for this incident, at least at this stage of the case: an alleged sexual assault not just against her but others on the same evening and allegedly reported to but not acted upon by Yale.

Significantly, other Second Circuit decisions probative of viable Title IX claims, ones involving the claim of a single plaintiff of deliberate indifference to allegations of a hostile educational environment, have been resolved at the summary judgment stage, at the earliest. *See, e.g., Zeno*, 702 F.3d at 671 (affirming after trial that "there was sufficient evidence in the record

to support the jury's finding that the District's responses to student harassment of Anthony 'amount[ed] to deliberate indifference to discrimination.'" (quoting *Gebser*, 524 U.S. at 290)); *Papelino*, 633 F.3d at 91 (on a Title IX hostile environment claim, recognizing at the summary judgment stage that "[a] reasonable jury could find that Nowak engaged in this conduct because Papelino rejected her sexual advances, and that these actions were part of a pattern of pervasive conduct that was sufficiently hostile or abusive to alter the conditions of Papelino's educational environment."); *Hayut*, 352 F.3d at 752 ("All told, the uncontroverted evidence indicates that SUNY, by and through the actions of its officials (the individual defendants), acted expeditiously and reasonably, and exhibited no indifference at all to Hayut's allegations.").

Anna McNeil's factual allegations here in support of her Title IX claim, while limited, plausibly suggest that a Yale official may have been indifferent to the allegedly hostile educational environment she experienced. While the single event alleged here ultimately may not be "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school," *Davis*, 526 U.S. at 650, that determination can be better made with a more developed record. *See Dietz v. Bouldin*, 136 S.Ct. 1885, 1888-89 (2018) (a district court maintains "inherent power to modify or rescind its orders before final judgment in a civil case, or to manage its docket and courtroom with a view toward the efficient and expedient resolution of cases" (citations omitted)). Moreover, given the limited nature of this claim, in comparison to the far broader Title IX sought by Anna McNeil and the other Plaintiffs, discovery of this claim should be rather limited.

Accordingly, because the factual allegations of all of the Plaintiffs, except Anna McNeil, fail to provide the plausibile "entitlement to relief" necessary to continue, and Anna McNeil may have a viable Title IX claim as it relates only to her and only arising out of the alleged Zeta Psi

party incident in 2016, the Court will dismiss the Title IX claims brought by all of the Plaintiffs, except for Anna McNeil, as limited above.

### B. Title IX – the Gender Discrimination in Terms and Conditions of Education Claim

20 U.S.C. § 1681(a)(6) explicitly exempts "[s]ocial fraternities or sororities…the active membership of which consists primarily of students in attendance at an institution of higher education" from the policies of Title IX.

As a result, Yale argues that it cannot be held responsible for the membership policies of Fraternities, and, even if it could be held responsible, Title IX expressly exempts membership policies of Fraternities. Yale's Mem. at 14. Because of this exception, Yale argues that the claim of gender discrimination under Title IX should be dismissed. *Id.* at 15.

Plaintiffs, however, allege that the "fraternities' array of powerful and connected alumni" networks "provide male students [with] valuable economic and professional opportunities[.]" Pls.' Opp'n to Yale at 21. In their view, the lost opportunities combined with the elevated social standing fraternities enjoy and the elevated control over Yale's social environment provides male students at Yale "social and economic privileges that are denied to female students." *Id.* at 21-22. Yale allegedly has the power to act to correct the gender imbalances, but does not do so, ceding social, professional, and economic privileges to the all-male Fraternities. *Id.* at 21.

The Court disagrees.

Plaintiffs seek to differentiate this exemption by basing their claim "on the unequal social and economic opportunities that *result from* Yale's Greek system." Pls.' Opp'n to Yale at 23 (emphasis in original). In their view, gender discrimination persists through Yale's deliberate indifference "to the disparities in social and economic opportunities that the fraternities perpetuate." *Id.* at 23. In making their argument, Plaintiffs rely on case law that considered

discriminatory admission policies and practices of institutions of higher education, which is distinct from differences in opportunity among all students already admitted. *See* Pls.' Opp'n to Yale at 22 (relying on *Sweatt v. Painter*, 539 U.S. 629 (1950) and *U.S. v. Virginia*, 518 U.S. 515 (1996)). Plaintiffs, however, do not allege discrimination by Yale or in its educational programs. More importantly, Plaintiffs have targeted entities, fraternities, expressly excluded from Title IX's reach.

Because Plaintiffs fail to plead facts that describe discrimination in Yale's educational environment and because the fraternities are explicitly exempted in Title IX, Plaintiffs' Title IX claim fails.

Accordingly, the Court will dismiss this Title IX claim.

## C. The Federal Fair Housing Act Claim

The Fair Housing Act makes it unlawful "[t]o refuse to sell or rent , . . or otherwise make unavailable or deny, a dwelling to any person because of . . . sex . . . ." 42 U.S.C. §3604(a). "A plaintiff can make out a claim of discrimination either on a theory of disparate impact or on one of disparate treatment." *Fair Hous. in Huntington Comm., Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 366 (2d Cir. 2003) (citing *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995)). After a prima facie case of discrimination has been established, "the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Mitchell v. Shane*, 350 F.3d 39, 47 (2d. Cir. 2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03(1973)).

To bring a claim under a theory of disparate impact, "a plaintiff must demonstrate that an outwardly neutral practice actually or predictably has a discriminatory effect . . . .The plaintiff need not make any showing of discriminatory intent." *Fair Hous. in Huntington Comm., Inc.*,

316 F.3d at 366. A prima facie case is established by demonstrating "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by defendant's facially neutral acts or practices." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (citations omitted). As alleged, the facts supporting a claim of discrimination "need only give plausible support to a minimal inference of discriminatory motivation." *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015).

To bring a claim under a theory of disparate treatment, "a plaintiff must plausibly allege that an 'outwardly neutral practice has a significantly adverse or disproportionate impact' on persons in the protected class." *Mill Street Partners, LLC v. City of Newburgh*, 2019 WL 4274212 (S.D.N.Y. Sept. 10, 2019) (citations omitted). Here, a plaintiff "need not show discriminatory intent but must show that the practice 'actually or predictably results in discrimination.'" *Id.* Evidence of disparate treatment can be either facial or circumstantial.

A facially discriminatory policy explicitly classifies based on one's gender. *Int'l Union, UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 197 (1991). Under this framework, the motive is immaterial, whether disparate treatment exists depends on "the explicit terms of discrimination" not the motive. *Id.* at 199. Fair Housing Act claims brought on circumstantial evidence require Plaintiffs to establish "(1) that they are members of a protected class; (2) that they sought and were qualified to rent or purchase the housing; (3) that they were rejected; and (4) that the housing opportunity remained available to other renters or purchasers." *Mitchell*, 350 F.3d at 47.

To have standing for either claim, a plaintiff must satisfy constitutional standing requirements and constitute an "aggrieved person," or "'any person who' either 'claims to have been injured by a discriminatory housing practice' or believes that such injury 'is about to

occur[.]" *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S.Ct. 1296, 1302 (2017) (citing 42 U.S.C. § 3602(i)). To satisfy constitutional standing requirements, a plaintiff must have suffered an "injury in fact" that is concrete and particularized, as well as actual and imminent, the injury must be fairly traceable to the conduct complained of, and it must be likely that the injury will be addressed by a favorable judicial decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Claims of injury must fall within, at least, the "zone of interests" that a statute seeks to protect. *Bank of Am. Corp.*, 137 S.Ct. at 1303.

Plaintiffs bring claims against 402 Crown, LLC, 340 Elm, LLC, and the Fraternity Defendants for violations of the federal Fair Housing Act.

402 Crown, LLC and 340 Elm, LLC are housing corporations, which lease property to members of the local chapters of the Fraternity Defendants. Plaintiffs' arguments as to both corporations are similar. In their view, both defendants impermissibly rely on extrinsic evidence to support dismissal. Pls.' Opp'n to 402 Crown at 5; Pls.' Opp'n to 340 Elm at 5.

Plaintiffs also argue that their allegations against 402 Crown, LLC survive under a theory of disparate impact or disparate treatment. Pls.' Opp'n to 402 Crown at 7. They note Defendants' misplaced reliance on *McDonnell-Douglas* as a pleading standard and assert that facial discrimination on gender is attributed to Defendant's conduct providing Alpha Epsilon Pi a property for use as a male-only fraternity house. *Id.* at 8. 402. In their view, Crown LLC "has an independent duty not to engage in or facilitate housing discrimination; its intent may be inferred through its acquiescence in [Alpha Epsilon Pi's] open, notorious, and long standing policy." *Id.* at 10.

Plaintiffs argue that 402 Crown, LLC can be "directly liable for the discriminatory actions of their tenants." *Id.* at 12. They argue that the knowledge of the property's use as a

fraternity, the gender discrimination inherent to that society, and the permitted use of the property as an instrument of discrimination speak to 402 Crown, LLC's implicit adoption and endorsement of the discrimination. *Id.* at 13.

In Plaintiffs' view, 340 Elm, LLC is no different. "By renting to an organization that explicitly discriminates against women," 340 Elm, LLC violates the Fair Housing Act and Connecticut state law by making property unavailable based on gender, Pls.' Opp'n to 340 Elm at 8, and Plaintiffs' claims arguably survive under either a disparate impact or disparate treatment theory for similar reasons. *Id.* at 8. As owner and landlord, "by knowingly and deliberately furnishing the property to a discriminatory organization (Chi Psi) that refuses to admit women[,]" Plaintiffs argue that 340 Elm, LLC adopts and promulgates the policies of its tenant. *Id.* Even if examined under the circumstantial evidence of disparate treatment requirements of *McDonnell Douglas*, Plaintiffs argue that they are members of a protected class, experienced adverse treatment, and sustained a minimal showing of an inference of discriminatory motivation. *Id.* at 9-10. In their view, 340 Elm, LLC knew that it rented the property to the fraternity, knew the fraternity was a discriminatory organization, knew that preclusion from applying to the fraternity precluded residing at the property, and so violated federal and state fair housing laws "by acquiescing in or failing to remedy discrimination that it knew or should have known reigned at its property." *Id.* at 11-12.

Under the disparate impact theory, Plaintiffs argue that they have adequately alleged their claim and that the extrinsic evidence relied upon by 340 Elm, LLC should be disregarded. *Id.* at 15. 340 Elm, LLC does not dispute that it is the "owner and landlord of the Kappa Delta house, and manages the house for its, Kappa Delta's, and Chi Psi Fraternity's mutual benefit." *Id.* at 16.

Any reference of rental decisions based on ability to pay goes beyond the Second Amended Complaint. *Id.*

Plaintiffs argue their claims are valid under the Fair Housing Act because "[h]ousing is one of the primary benefits of membership, and denial of membership is essentially synonymous with denying housing." Pls.' Opp'n Frat. at 7-8. Because 42 U.S.C. § 3602(i) allows "'any person who' either 'claims to have been injured by a discriminatory housing practice' or believes that such a practice 'is about to occur'" to bring a claim, *id.* at 8, the injury pled, denial of housing, in the Amended Complaint arguably falls within the "zone of interests" protected by the Fair Housing Acts and is the "immediate and direct" cause of Plaintiffs' injuries. *Id.* at 10. Plaintiffs believe that the denial of membership "effectively denied them housing rights that would have been available to them but for their gender." *Id.*

In supplemental briefing, Plaintiffs further argued that they had standing to pursue these claims. They first point out that *Bank of America* places limitations on damages remedies, Pls.' Suppl. Mem. at 1, and that *Bank of America* does not indicate that a proximate cause limitation applies to claims for injunctive relief under the Fair Housing Act, *id.* at 2. In their view, the Fraternity Defendants "denied them access to housing, making that housing 'unavailable' under [S]ection 3604(a); and, [Fraternity] Defendants conveyed a sex-based 'preference, limitation, or discrimination' 'in connection with the housing market' under [S]ection 3604(c)." *Id.* at 4. "Plaintiffs' claims are directly and immediately about housing transactions affecting them personally, and there are no third-party victims standing between Defendant[ ] [Fraternities] acts and Plaintiffs' injuries." *Id.* at 6. It was the "male-only policies and practices" that "made housing 'unavailable' to Plaintiffs as an immediate result." *Id.* at 8.

Plaintiffs further argue that the Fraternity Defendants' invocation of the private club exemption is improper at this stage in proceedings: because Defendants do not meet this "exceedingly narrow exception." *Id.* Plaintiffs characterize the housing available to Fraternity Defendants as distinguishable from places that "service transient guests[,]" like hotels or motels, in that the properties house members for at least the academic year and occasionally the summer. *Id.* at 14. Housing is "fundamental, not incidental, to the Fraternities' purpose[]" because housing is furnished for commercial reasons: to generate alternative revenue streams and to attract new members and dues. *Id.* at 16-17. Plaintiffs lastly argue that admission of most men who request membership, including non-students, and the invitation to the general public while hosting events demonstrate that "Fraternities are open to the public." *Id.* at 17. As a result, in Plaintiffs' view, the Fraternity Defendants cannot rely on the Fair Housing Act exemption. *Id.* at 15.

402 Crown, LLC argues that the Second Amended Complaint should be dismissed because it lacks specificity, 402 Crown, LLC's Mot. to Dismiss at 5, because there is no affiliation between 402 Crown LLC and any fraternal organization, *id.* at 6, because there are no factual allegations any plaintiff tried to rent from or was qualified to rent from 402 Crown, LLC, *id.* at 8, and because, even if 402 Crown, LLC was the legal equivalent of Alpha Epsilon Pi, Epsilon Upsilon, "there are no facts supporting an allegation of a violation of the [Fair Housing Act] against that entity[,]" *id.* at 9.

340 Elm, LLC further argues that Plaintiffs fail "to make out a prima facie case of disparate treatment under 42 U.S.C. § 3604(a) or (b)" and fail "to satisfy the second and third elements" required, that Plaintiffs ever sought to rent the property and were refused. 340 Elm,

LLC's Mot. to Dismiss at 11. For that reason, 340 Elm, LLC contends the claim should be dismissed.

The Fraternity Defendants argue that Plaintiffs' Fair Housing Act claim must fail because there is no allegation in the Second Amended Complaint "that any Plaintiff ever applied or attempted to apply for housing with any of the Fraternity Defendants" and that, even had they been denied housing, "such denial is permissible under the [Fair Housing Act's] private club exemption" in 41 U.S.C. § 3507(a). Frat. Defs.' Mot. to Dismiss at 6. Without any asserted injury and without ever having applied for housing, Plaintiffs claim cannot proceed. *Id.* at 7. Finally, Fraternity Defendants maintain that the private club exception applies—they are small, selective private groups, they provide housing to members during the academic year and occasionally during summer months, and the space is used for "the primary purpose of developing a social structure" and not owned "primarily for a commercial purpose[.]" *Id.* at 7-8.

In their supplemental reply brief, Defendant Fraternities argue that Plaintiffs do not provide "any allegations as to what housing opportunities they sought, from whom they sought them, when they sought them, or how they sought them[,]" meaning that Plaintiffs "have not pled how the denial of fraternity membership caused the deprivation of housing opportunities . . . ." and so, do not have standing. Fraternity Defs.' Suppl. Reply at 2. In their view, Plaintiffs fail the Fair Housing Act's proximate cause requirement because they "have not adequately pled an express denial of a housing opportunity, the unavailability of a specific housing opportunity, or statements affecting housing transactions." *Id.* at 3.

The Court agrees with the Defendants.

The Court first considers whether Plaintiffs have standing to bring a Fair Housing Act claim. For the following reasons, the Court concludes that they do not.

Plaintiffs must satisfy both statutory and Article III standing requirements. To have statutory standing, "courts must: 1) decide 'whether the statute grants the plaintiff the cause of action that [she] asserts,' and 2) presume a statute provides a cause of action 'only to plaintiffs whose interests fall within the zone of interests protected by the law invoked.'" *Aparicio v. Christian Union, Inc.*, 18-CV-0592 (ALC), 2019 WL 1437618, at *10 (S.D.N.Y. Mar. 29, 2019) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014)).

"The definition of 'person aggrieved' contained in s 810(a) is in terms broad, as it is defined as '(a)ny person who claims to have been injured by a discriminatory housing practice.'" *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 208 (1972); *see also Fair Hous. Justice Center, Inc. v. Cuomo*, 18-CV-3196 (VSB), 2019 WL 4805550, at *6 (S.D.N.Y. Sept. 30, 2019) ("The [FHA] permits any 'aggrieved person' to bring a suit challenging . . . discriminatory housing practices' and defines 'aggrieved person' to include 'any individual' who either 'claims to have been injured by a discriminatory housing practice' or believes that such an injury is about to occur.'" (quoting *Anderson Grp., LLC v. City of Saratoga Springs*, 805 F.3d 34, 44 (2d Cir. 2015)).

Under Article III, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Most relevant to the inquiry at hand, is the injury in fact prong.

Injury in fact distinguishes "a person with a direct stake in the outcome of a litigation— even though small—from a person with a mere interest in the problem." *Citizens for Responsibility and Ethics in Washington v. Trump*, 939 F.3d 131, 143-43 (2d Cir. 2019) (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669,

690 n. 14 (1968)). A plaintiff must "allege distinct and palpable injuries that are fairly traceable to [defendants'] actions.'" *LeBlanc-Sternberg,* 67 F.3d at 424 (internal quotation marks omitted) (quoting *Haves Realty Corp. v. Coleman*, 455 U.S. 363, 375-76 (1982)). "[T]he 'zone of interests' requirement asks 'whether the statute grants the plaintiff the cause of action that he asserts.'" *Jawk Enterprises, LLC v. Greenlight Energy, Inc.*, 19-CV-4212-ARR-SJB, 2019 WL 5881752, at *1 (E.D.N.Y. Nov. 5, 2019) (quoting *Bank of Am.*, 137 S. Ct. at 1302)). "The *City of Miami* majority . . . reinforced *Lexmark*'s essential point that the zone of interests question is 'whether the statute grants the plaintiff the cause of action that [she] asserts.'" *Citizens for Responsibility and Ethics in Washington*, 939 F.3d at 154 (quoting *Bank of Am.*, 137 S. Ct. at 1302)). While proximate cause is not a requirement under Article III, "it is an element of the cause of action under the statute [and] . . . it must be adequately alleged at the pleading stage in order for the case to proceed. If a plaintiff's allegations, taken as true, are insufficient to establish proximate causation, then the complaint must be dismissed . . ." *Lexmark Int'l, Inc.*, 572 U.S. at 134 n.6.

At its core, Plaintiffs' Fair Housing Act claim revolves around the denial of membership by fraternities. Under Plaintiffs' construction, a landlord would be responsible for addressing housing discrimination based on a rental agreement with tenants, tenants who belong to an organization with allegedly discriminatory membership practices. The predicate act for discrimination, therefore, is denial of membership; the separate act of denial of housing does not necessarily follow, because other factors could create the same circumstances. *Cf. Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 143 (2d Cir. 2018) ("'[T]he predicate act of [smuggling] and the separate act of [not buying Empire's liquor] do not *necessarily* follow from one another,' . . . Empire's 'lost sales could [thus] have resulted from factors other than

petitioners' alleged acts of fraud." (emphasis in the original) (citations omitted)). As they admit, "Plaintiffs repeatedly sought membership in the Fraternities, which would have entitled them to housing benefits . . . [b]y denying Plaintiffs membership, Defendant fraternities effectively denied them housing rights that would have been available to them but for their gender." Pls.' Opp'n to Frat. at 10. At no point do Plaintiffs allege they sought to rent the same properties as the fraternities and were denied based on their gender.

The alleged injury here, the denial of housing, thus is not fairly traceable to the conduct of the landlords, but instead to the failure of the Fraternity Defendants to admit women. Here, the converse also is true. That is, the alleged denial of housing by the Fraternity Defendants is not linked to a policy regarding housing, which the landlords—not the Fraternity Defendants—control, but rather to the Fraternity Defendants' decision not to admit women. In other words, there is no direct effort to make housing unavailable to women. *See Citizens for Responsibility and Ethics in Washington,* 939 F.3d at 144 ("To satisfy the 'traceability' or 'causation' prong of Article III standing test, allegations must provide more than 'unadorned speculation' to 'connect their injury to the challenged actions.'" (citations omitted)). Indeed, no Plaintiff has applied directly or otherwise for housing, but instead Plaintiffs have sought housing as an incidental benefit of membership in one of the Fraternity Defendants. But this is not a housing discrimination problem; it is a discrimination problem related to the membership of the Fraternity Defendants, which Plaintiffs cannot challenge through Title IX, as noted above.

Accordingly, Plaintiffs' Fair Housing Act claim will be dismissed.

### D. The Connecticut Discriminatory Housing Practices Act Claim

Connecticut law, in relevant part, provides:

> (a) It shall be a discriminatory practice in violation of this section:

> (1) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate   for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . sex, gender identity or expression . . . .
>
> (2) To discriminate against any person in the term, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . sex, gender identity or expression . . . .

Conn. Gen. Stat. § 46a-64c(a)(1)-(2).

Plaintiffs argue that they sufficiently allege violations of the Fair Housing Act, which means they "have necessarily stated a claim for violation of the [Connecticut Discriminatory Housing Practices Act]." Pls.' Opp'n Frat. at 19. The injury stemming from the Fraternity Defendants' unlawful discriminatory acts gives them standing for a claim under state law. *Id*; Pls.' Opp'n to 402 Crown at 15; Pls.' Opp'n to 340 Elm at 6.

402 Crown, LLC argues that the claim under the Connecticut Discriminatory Housing Practices Act should be dismissed for the same reasons as the claim under the Fair Housing Act – because there are no factual allegations that any plaintiff tried to rent from or was qualified to rent from 402 Crown, LLC, and again, because there are insufficient facts supporting allegations of housing discrimination against Alpha Epsilon Pi, Epsilon Upsilon. *Id.* at 11.

Because Connecticut courts use federal fair housing law interpretations as a guide, 340 Elm, LLC argues the claims under the Connecticut Discriminatory Housing Practices Act should be dismissed for the same reasons as the claims under the Fair Housing Act. 340 Elm, LLC's Mot. to Dismiss at 8, 11-12.

The Fraternity Defendants also rely on their previous arguments related to the Fair Housing Act claim, Frat. Defs.' Mot. to Dismiss at 10, that Plaintiffs have inadequately pled an

injury because "they never applied for or attempted to secure housing in ay of the facilities owned by" the housing corporations and occupied by local chapter members. *Id.*

The Court agrees.

Connecticut courts use cases interpreting federal fair housing laws as guidance when analyzing state law housing discrimination claims. *AvalonBay Comm., Inc. v. Town of Orange*, 256 Conn. 557, 591 (2001) ("[I]n addressing claims brought under both federal and state housing laws, 'we are guided by the cases interpreting federal fair housing laws . . . despite differences between the state and federal statutes.'" (quoting *Zlokower v. Comm'n on Human Rights & Opportunities*, 200 Conn. 261, 264 (1986)). Because the Court determines Plaintiffs do not have a claim under the Fair Housing Act, their allegations are insufficient under Connecticut law for the same reasons.

Accordingly, the Court will dismiss Plaintiffs' Connecticut Discriminatory Housing Practices claim.

### E. The Civil Conspiracy Claim

To maintain a civil action for conspiracy a plaintiff must prove: "(1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirator pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Macomber v. Travelers Property and Cas. Corp.*, 277 Conn. 617, 635-36 (2006) (citing *Harp v. King*, 266 Conn. 747, 799 (2003)). There is no independent claim for civil conspiracy, rather "[t]he action is for damages caused *by acts committed pursuant to a formed conspiracy* rather than by the conspiracy itself . . . a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Id.* at 636 (citing *Harp*, 266 Conn. at 779 n. 37) (emphasis in the original). A

co-conspirator is not liable for damages caused by an actual wrongdoer prior to the coconspirator joining the conspiracy. *Id.* at 636.

Liability requires finding that a party "was actuated in what he did by the same fraudulent intent, and that he had substantially the same knowledge of the fraudulent means and purposes as other participants." *Master-Halco, Inc. v. Scillia, Dowling & Natarelli, LLC*, 739 F. Supp. 2d 104, 107 (D. Conn. 2010) (citing *Williams v. Maislen*, 116 Conn. 433, 438 (1933)). Association or knowledge of wrongdoing, "without more, is insufficient to support a civil conspiracy claim." *Id.* If plaintiffs fail to allege "an actionable underlying tort or wrong that serves as the basis for their civil conspiracy claim[,]" the claim fails. *Beckworth v. Bizier*, 48 F. Supp. 3d 186, 204 (D. Conn. 2014).

Plaintiffs' civil conspiracy claims against Defendants 402 Crown, LLC and 340 Elm, LLC are similar. Plaintiffs alleges that Defendant 340 Elm, LLC acknowledged their relationship with the Fraternity Chi Psi and knew that Chi Psi denied women membership, which barred women from renting the property. The relationship between Chi Psi and 340 Elm, and 340 Elm's knowledge satisfies "the elements of a civil conspiracy claim at the pleading stage." Pls.' Opp'n to 340 Elm at 17-18. 402 Crown, LLC also agreed to "rent and operate the subject property as a male only fraternity house." Pls.' Opp'n to 402 Crown at 16. In their view, the property was fundamental for use by male members and for attracting new male members, *id.*, thus, Plaintiffs sufficiently have alleged an "injury."

Plaintiffs also argue that they have successfully pled the coordinated violations of the Fair Housing Act and Connecticut Discriminatory Housing Practices Act between local fraternity chapters, national organizations, and entities that own fraternity houses. Pls.' Opp'n at 19. In

their view, the unlawful scheme led to the repeated denial of membership based on gender and the subsequent inability to rent units in the fraternity houses. *Id.* at 20.

In response, 402 Crown, LLC argues that Plaintiffs fail to provide dates, names, communications or acts in furtherance of the alleged conspiracy. 402 Crown, LLC's Mot. to Dismiss at 11-12. In its view, because there is no independent claim of civil conspiracy and the underlying action, the alleged violation of fair housing laws should be dismissed, and the civil conspiracy claim should be dismissed as well. *Id.* at 12.

340 Elm, LLC similarly argues that, because "there must be an underlying tort for the viability of a civil conspiracy claim" for which a conspirator would "be liable for the damages flowing from the underlying tortious conduct[]" and because Plaintiffs fail to allege they attempted to rent the property and were refused, the civil conspiracy claim must fail. 340 Elm, LLC's Mot. to Dismiss at 13, 15.

The Fraternity Defendants again rely on Plaintiffs' failure to allege they tried to rent rooms or negotiated to rent rooms. In their view, as there is no scheme which denies Plaintiffs housing, nor is there any deprivation of housing, there is no injury, thus, there can be no claim. Frat. Defs.' Mot. to Dismiss at 9.

The Court agrees.

Without any viable fair housing claims, which have been discussed above, and without any other viable claim sounding in tort or contract, as discussed below, Plaintiffs' civil conspiracy claim fails. *Macomber*, 277 Conn. at 636 ("[T]o state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort."); *see id.* ("[T]he purpose of a civil conspiracy claim is to impose civil liability for damages for those who agree to join in a

tortfeasor's conduct and thereby, become liable for the ensuing damage, simply by virtue of their

agreement to engage in the wrongdoing.")

Accordingly, the Court will dismiss the civil conspiracy claim.

**F. Discrimination in Places of Public Accommodation – the Denial of Membership in Fraternities and Hostile Environment Claim**

A public accommodation consists of "any establishment which caters or offers its services or

facilities or goods to the general public." Conn. Gen. Stat. Ann. § 46a-63. It includes "'any

establishment which caters or offers its services or facilities or goods to the general public,

including, but not limited to, any commercial property or building lot, on which it is intended

that a commercial building will be constructed or offered for sale or rent.'" *Collins v. Univ. of

Bridgeport*, 781 F. Supp. 2d 59, 66 (D. Conn. 2011). Coverage extends beyond simple "business

enterprises" but does not explicitly preclude private clubs. *Quinnipiac Council, Boy Scouts of

Am., Inc. v. Comm'n on Human Rights & Opportunities*, 204 Conn. 287, 297 (1987); Conn. Gen.

Stat. § 46a-63(1) (the definition includes "commercial property or building lot, on which it is

intended that a commercial building will be constructed or offered for sale or rent").

"'[C]overage under [§ 46a-64(a)] depends, in each case, upon the extent to which a particular

establishment has maintained a private relationship with its own constituency or a general

relationship with the public at large.'" *Corcoran v. German Soc. Soc'y Frohsinn, Inc.*, 99 Conn.

App. 839, 844 (2007) (quoting *Quinnipiac Council*, 204 Conn. at 300)). "[T]he determinative

issue is whether an 'establishment' that serves 'the general public' has denied access to its good

and services to a member of a protected class." *Quinnipiac Council*, 204 Conn. at 298.

Connecticut courts have interpreted Connecticut law to include a private club exemption. *See

Quinnipiac Council*, 204 Conn. at 299 (if a private enterprise does, however, decide to offer its

services or facilities to all "it may not discriminate among the general public") Application of the

law, then, depends upon the extent to which a group eschews selectivity and "upon the extent to which a particular establishment has maintained a private relationship with its own constituency or general relationship with the public at large." *Id.* at 300. It appears unlikely that public accommodation statutes were intended to apply to housing discrimination claims. *See Torrey Terrial Townsend v. Molina*, 2019 WL 2602563, at *4 (Conn. Super. Ct. May 21, 2019) ("[A] plain reading of our public accommodation statutes, when read in conjunction with our state fair housing act, demonstrates that our public accommodation statutes do not apply to discrimination claims related to housing matters.")

The Fraternity Defendants argue that, under both state and federal law, the local chapters are not public accommodations. Frat. Defs.' Mot. to Dismiss at 12. Defendants refer to the Connecticut Commission on Human Rights and Opportunities' finding that, when analyzing the factors of Connecticut's fair housing statutes, there was no possibility "that further investigation of Plaintiff's claims would result in a finding of probable cause." *Id.* at 13. According to the Fraternity Defendants, the local chapters are "private clubs that on rare occasions welcome guests for social events[,]" the chapters maintain private relationships with their constituencies and offer benefits foreclosed to non-member students, and the organizations are selective, evidenced through application processes and the National organization's ability "to veto [an] applicant's induction." *Id.* 13-14. They further argue that finding local chapters and National Organizations as places of public accommodation threatens First Amendment associational rights and so requires finding the Connecticut statute inapplicable. *Id.* at 16-17.

Plaintiffs argue that the Fraternity Defendants are places of public accommodation for three reasons: (1) they open their facilities and events to the general public, (2) the only membership criteria is being male, and (3) as extensions of Yale, a public accommodation, the

Fraternity Defendants "assume the status and obligations of public accommodations." Pls.' Opp'n to Frat. at 21. In response to the Fraternity Defendants' First Amendment arguments, Plaintiffs note that "the First Amendment's protection of intimate associational rights does not insulate [the Fraternity Defendants] from Connecticut anti-discrimination law." *Id.* at 30.

402 Crown, LLC argues the Court lacks subject matter jurisdiction because the Connecticut Commission on Human Rights and Opportunities has not yet released its jurisdiction. 402 Crown, LLC's Mot. to Dismiss at 13. It further argues that, even if the Connecticut Commission on Human Rights and Opportunities did release jurisdiction, Plaintiffs still fail to demonstrate that 402 Crown, LLC offers public accommodations. *Id.* In its view, the hostile environment claim fails because there are no allegations "that any sexual harassment took place at a party being held on the subject property" and that other defendants who may or may not have discriminated against Plaintiffs are unconnected to 402 Crown, LLC's ownership of the property. *Id.* at 14. Lastly, 402 Crown, LLC argues that Engender does not have standing to make a claim. *Id.*

340 Elm, LLC also argues that the residential rental properties it owns are not places of public accommodation, that the membership of renters in a fraternity does not turn the properties into places of public accommodation, and, even if the properties were considered places of public accommodation, it has "never denied the named plaintiffs the opportunity to lease the premises, nor any applicant because of sex." 340 Elm, LLC's Mot. to Dismiss at 18-19. In its view, requiring landlords or residential property owners to investigate potential discriminatory behavior of prospective tenants or organizations is an unworkable standard. *Id.* at 19.

In opposing 402 Crown, LLC's motion to dismiss, Plaintiffs make several arguments. First, Alpha Epsilon Pi admits men as members, but denies membership to women, resulting in

the loss of social and economic opportunities to women and non-binary students. Pls.' Opp'n to 402 Crown at 18. In their view, 402 Crown, LLC knows the property is used to host parties and events, *id.*, and this is sufficient to impute to it knowledge of the property's use as a public accommodation. *Id.* Plaintiffs also claim that 402 Crown, LLC's arguments regarding administrative exhaustion are premature. Plaintiffs intend to amend their pleadings after the Connecticut Commission on Human Rights and Opportunities issues a decision. *Id.* at 19. Third, Engender has standing: other members of the group would have standing in their own right, the group's claim of public accommodation discrimination "seek[s] to protect interests germane to its purpose" like ending sexual harassment and discrimination of women and gender non-binary Yale students, and the alleged harm affects all members of the group equally, "so no individualized proof is required to assert these claims." *Id.* at 20-21.

As to 340 Elm, LLC, Plaintiffs first argue that determining whether the entity is a public accommodation is a fact-driven inquiry to be ascertained at a later stage, and the facts alleged in the Second Amended Complaint support the survival of the claim for now. Pls.' Opp'n to 340 Elm at 20. In their view, 340 Elm, LLC operates as a public accommodation because the property houses parties with invitations extended to the general public, no inspection of identification occurs before entrance, and other organizations and individuals may rent the property. *Id.* The party, contrary to Defendant's arguments, operates as more than a residence. *Id.* It "also serves as a party venue, base of operations for the Chi Psi Fraternity, and a source of revenue." *Id.* Plaintiffs support their claim with specific allegations that Chi Psi denied them membership, they suffered harassment and assault at parties on the property, and they no longer feel comfortable there. *Id.* at 21. Plaintiffs further allege that Defendants "rented to its tenants knowing that they were members of Chi Psi and would use the premise as a fraternity house[,]"

and that any further determinations of 340 Elm, LLC's awareness of its tenants misconducts would require discovery. *Id.* 21-22. Finally, Plaintiffs argue that Defendants fail to consider that landlords of public accommodations which include dwelling units can be liable under both fair housing laws and public accommodation laws. *Id.* at 22. In their view, the property was a base of operations for an "unselective, but male-only" association to throw house parties and hold public events. *Id.* at 22-23.

In their reply, the Fraternity Defendants urge the Court to take judicial notice of the Connecticut Commission on Human Rights and Opportunities' decision, "which dismissed Plaintiffs' claims in their entirety." Fraternity Defs.' Reply at 5. Fraternity Defendants emphasize that "fraternity brothers living in a house and hosting parties is no way akin to bars or clubs that are open to the public on a daily basis from open-to-close, with numerous employees transacting business with customers[,]" *id.* at 6, that "the Fraternity Defendants are selective" as evidenced by the handbooks and recruitment manuals, *id.* at 7, and that "Plaintiffs fail to plead a 'sybmbiotic' relationship between the Fraternity Defendants and Yale University to transform the Fraternity Defendants into a 'public accommodation[,]'" *id.*

402 Crown, LLC replies that "[t]here is no Connecticut case law, nor provision in the general statutes, that provides for vicarious liability for a property owner if a tenant discriminates in the provision of a public accommodation." 402 Crown, LLC's Reply at 6. It further argues that "[t]here are no facts alleged to show or infer that 402 [Crown, LLC] prevent the Plaintiffs . . . from joining any fraternity" or that Plaintiffs' losses flow from a "denial of some type of public accommodation by 402[,]" as opposed to denial of membership at Alpha Epsilon Pi, Epsiolon Upsilon. *Id.*

340 Elm, LLC reiterates that "Connecticut General Statutes §46a-64 was amended in 1990 *to remove references to housing accommodations from its scope*" and that Plaintiffs "have not allege[d] specific discriminatory behavior of the individual tenants of 340 Elm[.]" 340 Elm LLC's Reply at 9 (emphasis in the original). It further contends that "there is no applicable authority that does not deal with tenant-on-tenant discrimination where the landlord is not alleged to have actual knowledge of alleged discrimination, and the discrimination is not alleged to have occurred on its premises." *Id.* at 10.

The Court agrees with Defendants.

*Twombly* and *Iqbal* demand more than the conclusory allegations provided by Plaintiffs. Plaintiffs do not plead facts that lead to the conclusion that these rental properties are places of public accommodation. They allege no "goods" offered to the general public, nor services. Instead, Plaintiffs point to open invitations from tenants which allegedly transform private properties into places of public accommodation. At this stage in the proceeding, however, Plaintiffs' "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions . . . ." *Twombly*, 550 U.S. at 555 (citation omitted).

Significantly, a recent Connecticut Superior Court decision addressed and dismissed at the analogous stage of the case claims similar to those brought by Plaintiffs here. There, the court found that the "state fair housing act is likewise confined to regulating housing-related discrimination, whereas discrimination by public accommodations and in places of public accommodation are regulated separately" and that "housing-related discrimination claims are not encompassed" by Conn. Gen. Stat. § 46a-64. *Torrey Terrial Townsend*, 2019 WL 2602563, at *6.

Likewise, here, none of the Defendants maintain places of public accommodation. None "cater[ ] or offer[ ] [their] services or facilities or goods to the general public . . . on which it is intended that a commercial building will be constructed or offered for sale or rent.'" *Corcoran*, 99 Conn. App. at 840 n.1. The housing corporations maintain a relationship with their tenants, not the public at large, and the Fraternity Defendants maintain a relationship with the members of their fraternities. *See also Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586, 590 (2d Cir. 1988) (affirming the district court's determination that Greek Orthodox Church did not constitute a public accommodation because the Church was a house of worship and religious edifice, not a commercial building).

While the public accommodations determination is a "fact-specific inquiry," *see* Collins, 781 F. Supp. 2d at 66, Plaintiffs have failed to plead adequately the plausible "entitlement to relief" necessary for this claim to proceed any further. *See Iqbal*, 566 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" (quoting *Twombley*, 550 U.S. at 557).

Accordingly, the Court will dismiss the Plaintiffs' public accommodations claim against the Fraternity Defendants, 402 Crown LLC, and 340 Elm LLC.

### G. State Law Discrimination in Places of Public Accommodation – the Denial of Membership in Fraternities and Hostile Environment Claim

Yale also argues that Plaintiffs' claims alleging discrimination through denial of membership and a hostile environment must fail because Yale is not a public accommodation under Connecticut state law. *Id.* at 26-28. In its view, the analysis must be focused on a "particular establishment[.]" *Quinnipiac Council*, 528 A.2d at 359. Yale further argues that

Plaintiffs "are not concerned with what happens *on* Yale's campus or *in* its programs." Yale's Reply at 12 (emphasis in original).

Plaintiffs argue that the plain language of Conn. Gen. Stat. § 46a-63 "dictates that Yale is a public accommodation," Pls.' Opp'n to Yale at 23-24, and that they have sufficiently pled that Yale is an establishment, a private institution, that serves the general public by opening many of its properties and spaces to the general public. *Id.* at 24. Plaintiffs point to places like the campus, museums, stadiums, and clinics that are open to more than the student body. *Id.*

The Court disagrees.

Because application of the law depends "upon the extent to which a particular establishment has maintained a private relationship with its own constituency or general relationship with the public at large," *Quinnipiac Council*, 528 A.2d at 300, Plaintiffs must focus on a specific facility run by Yale or a location on Yale's campus which is the cause of the discrimination or which is where the discrimination occurs. Plaintiffs, however, fail to do that and instead are focusing on discrimination not on Yale's campus or a facility controlled by Yale, but at facilities controlled by the Fraternity Defendants or by either 402 Crown, LLC or 340 Elm, LLC. Plaintiffs' claim of discrimination against Yale as a public accommodation therefore fails.

Accordingly, Plaintiffs' public accommodations claims against Yale will be dismissed.

### H. Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing Claims

A breach of contract claim consists of the following elements: (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. *Meyers v. Lingston, Adler, Pulda, Meiklejohn and Kelly, P.C.*, 311 Conn. 282, 291 (2014). Connecticut courts have recognized a contractual relationship between students and educational institutions. *See Burns v. Quinnipiac Univ.*, 120 Conn. App. 311, 320-21 (2010);

*Gupta v. New Britain General Hosp.*, 239 Conn. 574, 583 (Conn. 1996) (recognizing a contractual relationship between a resident and a medical school). In examining an educational contract, documents, such as the catalogues, bulletins, circulars, and regulations of an institution, as well as the oral and written expressions of the parties, may result in contractual obligations and define the scope of these obligations. *See Burns*, 120 Conn. App. at 321-22 (allowing the examination of financial aid letter, a document entitled "Policies and Procedures Concerning Financial Aid Awards" and testimony from various deans).

"Interpretation of the written terms of a contract and the degree of compliance by the parties are questions of fact to be determined by the trier of fact." *Burns*, 120 Conn. App. at 322. However, "[w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law." *Issler v. Issler*, 250 Conn. 226, 235 (1999).

All contracts carry "an implied covenant of good faith and fair dealing," which requires both parties to refrain from doing "anything that will injure the right of the other to receive the benefits of the agreement." *Hudson United Bank v. Cinnamon Ridge Corp.*, 81 Conn. App. 557, 576, 845 A.2d 417 (Conn. App. 2004). "The covenant . . . presupposes that the terms and purpose of the contract are agreed upon by the parties and what is in dispute is a party's discretionary application or interpretation of a contract term." *Id.* (citing *Neiditz v. Hous. Auth.*, 43 Conn. Supp. 283, 294 (1994)). To fulfill its duty, a party may not "do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004) (internal quotation marks and citation omitted). Before asserting bad faith or fair dealing, a plaintiff "must prove three elements: 'first, that the plaintiff and defendant were parties in a contract under which the plaintiff reasonably expected to

receive certain benefits, second, that the defendant engaged in conduct that injured the plaintiff's right to receive all or some of those benefits; and third, that when committing acts why which it injured the plaintiff's right to receive benefits he reasonably expected to receive under the contract, the defendant was acting in bad faith." *Bagley v. Yale University*, 42 F. Supp. 3d 332, 359-60 (quoting *Franco v. Yale*, 238 F. Supp. 2d 449, 455 (D. Conn. 2002).

Bad faith implies "both 'actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation . . . prompted . . . by some interested or sinister motive.'" *Habertz v. Condon*, 224 Conn. 231, 237 (1992) (citation omitted).

Yale argues that no contract existed between Yale and Plaintiffs, and that Plaintiffs insufficiently pled breach of any agreements between both parties. Yale's Mot. to Dismiss at 29. Yale further argues that the Equal Opportunity Statement does not promise "to control off-campus, unregistered organizations like fraternities or to exercise control over off-campus, privately owned spaces like fraternity houses." *Id.* at 30. The Undergraduate Regulations only apply to registered student organizations and, furthermore, Plaintiffs do not allege they raised any issues of sexual misconduct to Yale's attention or that Yale failed to follow procedure. *Id.* at 31-32. And finally, the Sexual Misconduct Policies at Yale specifies that it prohibits forms of sexual misconduct through education, training, clear definitions and policies, and ensuring compliance. *Id.* at 34.

Yale also argues that because the breach of contract claim fails, the good faith and fair dealing claim must also fail. Yale's Reply at 16. Plaintiffs have insufficiently pled factual allegations of fraud or an intent to deceive. *Id.*

Plaintiffs argue that Connecticut law finds the relationship between universities and students is based in contract and that policies, promotional materials, and regulations may create express or implied promises. Pls.' Opp'n to Yale at 27. In their view, this claim survives because Plaintiffs have adequately alleged the breach of specific promises made through Yale's Equal Opportunity Statement, its Undergraduate Regulations, and its Sexual Misconduct Policies. *Id.* Plaintiffs argue that these "clear and definitive promises to not discriminate, to prohibit sexual misconduct, and to aim to eradicate sexual misconduct" should be interpreted together and illustrate obligations that are "'specific contractual promises' [which Yale did not fulfill] that Connecticut courts have held form the basis for a valid breach of contract claim against a university." *Id.* 28-29.

Similarly, Plaintiffs argue that they "adequately allege that Yale's actions and omissions in preventing and addressing sex-based discrimination and sexual misconduct at the University were taken in bad faith." *Id.* at 36. By moving opportunities for social interaction off campus, knowing the off-campus environments at fraternities foster discriminatory behavior and sexual misconduct, Yale, in their view, permitted the abuse of its resources and the recruitment of its students all the while turning a blind eye "to the sexual harassment and assault occurring in connection with the Fraternities." *Id.* Yale's policies allegedly created to skirt liability from the conduct and environment created at the fraternities "have 'evaded the spirit' of its contractual obligations, and are fundamentally driven by a dishonest motive." *Id.*

The Court disagrees.

The Supreme Court of Connecticut has recognized two situations "wherein courts will entertain a cause of action for institutional breach of a contract for educational services." *Gupta*, 239 Conn. at 592. The first occurs when "the educational program failed in some fundamental

respect, as by not offering any of the courses necessary to obtain certification in a particular field[,]" and the second occurs when an "educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Id.* (citations omitted). A claim of educational malpractice, or the allegation of "a breach of a duty to educate effectively[,]" is not cognizable. *Vogel v. Maimonides Acad. of W. Connecticut, Inc.*, 58 Conn. App. 624, 630 (2000); *see also Bell v. Bd. of Educ. Of City of W. Haven*, 55 Conn. App. 400, 401 n.3 (1999) ("In educational malpractice cases, a plaintiff sues his or her academic institution for *tortuously* failing to provide adequate educational services; or for *tortiously* failing to diagnose educational impediments." (emphasis in the original) (internal quotation marks and citations omitted)).

Because Plaintiffs' breach of contract claim cannot plausibly be construed as flowing from Yale's alleged failure to offer "any of the courses necessary to obtain certification in a particular field[,]" any viable breach of contract claim hinges solely on Yale's alleged failure "to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program." *Gupta*, 239 Conn. at 592 (citations omitted). Although Plaintiffs cite to three alleged contractual promises contained within Yale's Equal Opportunity Statement[6], Undergraduate

---

[6] Yale's Equal Opportunity Statement allegedly states:

> Yale does not discriminate in admissions, educational programs, or employment against any individual on account of that individual's sex, race, color, religion, age, disability, status as a veteran, or national or ethnic origin; nor does Yale discriminate on the basis of sexual orientation or gender identity or expression.

Second Am. Compl. ¶ 338.

Regulations[7], and Sexual Misconduct Policies[8], these sources all fail to provide a viable claim.

Plaintiffs argue that: "[T]he promise contained in these contracts is to have educational programs and student organizations that are free of discrimination on the basis of sex; to prohibit sexual misconduct; and to seek to eradicate sexual misconduct at the University." Pls.' Opp'n at 30 n.21. In other words, Yale did not do enough to make these alleged promises a reality.

But the Connecticut Supreme Court in *Gupta* fundamentally rejected the notion that these alleged promises could state a viable claim. Such a claim "raise[s] questions concerning the reasonableness of conduct by educational institutions in providing particular educational services to students – questions that must be answered by reference to principles of duty, standards of care, and reasonable conduct associated with the law of torts." Gupta, 239 Conn. at 590 (citation and internal quotations omitted). As a result, courts in Connecticut and elsewhere "have almost universally held that claims of 'educational malpractice' are not cognizable." Just as importantly, "[i]t is as a result of these considerations that contract claims challenging the overall quality of educational programs 'have generally been rejected." *Id.* at 591-592.

---

[7] Yale's Undergraduate Regulations allegedly require "that all student organizations—whether registered or unregistered, operating on or off campus . . . must operate in accordance with Yale polices on equal opportunity." Second Am. Compl. ¶ 339.

[8] Yale's Sexual Misconduct Policies allegedly state:

> Yale University is committed to maintaining and strengthening educational, working, and living environments founded on mutual respect in which students, faculty, and staff are connected by strong bonds of intellectual dependence and trust. Sexual misconduct is antithetical to the standards and ideals of our community. Therefore, Yale University prohibits all forms of sexual misconduct. Yale aims to eradicate sexual misconduct through education, training, clear definitions and policies, and serious consequences for policy violations . . . These policies apply to all members of the Yale community as well as to conduct by third parties (i.e., individuals who are not students, faculty, or staff, including but not limited to guests and consultants) directed toward university students, faculty, or staff members.

Second Am. Compl. ¶ 340.

As a result, any promises allegedly giving rise to a breach of contract claim must be specific. *See Faigel v. Fairfield University*, 75 Conn. App. 37, 42 ("Bearing in mind that it was the plaintiff's burden to allege a factual basis for her claim of breach of promise, we conclude that the promise she has alleged is too imprecise to qualify for consideration as a 'specific contractual promise.'"); *see also Vogel*, 58 Conn. App. at 630 (noting that a viable claim could exist "if the educational institution failed to fulfill a specific contractual promise distinct from any overall obligation to offer a reasonable program.") (citations omitted); *Hope Academy v. Friel*, 2004 WL 1888909, at *2 (Conn. Super. Ct. July 22, 2004) ("The second *Gupta* exception is narrow. It requires proof by a fair preponderance of the evidence, that the educational institution 'failed to provide *specifically promised* educational services.").

The general language relied on by Plaintiffs from Yale's Equal Opportunity Statement, Undergraduate Regulations and Sexual Misconduct Policies cannot result in specific contractual promises. Indeed, Plaintiffs' breach of contract claim, requiring the enforcement of an alleged promise to, *inter alia*, "eradicate sexual misconduct at the University," would "involve the judiciary in the awkward tasks of defining what constitutes a reasonable educational program and of deciding whether that standard has been breached." *Gupta*, 239 Conn. at 591.

In any event, to the extent that Plaintiff's breach of contract claim is based on their characterization of the fraternities or fraternity events as educational programs, neither the fraternities nor their parties can be construed as "specifically promised educational services." *Hope Academy*, 2004 WL 18888909, at *2 (emphasis omitted). Likewise, any alleged deficiency by Yale in addressing sexual misconduct as lacking in "education, training, clear definitions and policies, and serious consequences for policy violations . . . .," Second Am. Compl. ¶ 340,[9] does

---

[9] Plaintiffs refer to ineffective sanctions regarding Delta Kappa Epsilon and Sigma Alpha Epsilon, all of which occurred before the OCR's letter indicating Yale's compliance with Title IX. Second Am. Compl. ¶¶ 76-81, 84-85.

not amount to a viable breach of contract claim. *See Craine v. Trinity College*, 259 Conn. 625, 655-59 (2003) (finding a faculty handbook outlining specific provisions relating to tenure to be a binding contract that defendant-college did not comply with); *Faigel*, 75 Conn. App. at 42 (University's alleged promise to give plaintiff "many credits" was too vague to establish a breach of contract claim).

While Plaintiffs argue, for example, that "failure to prevent acts of discrimination is understood to itself constitute discrimination under most discrimination statutes," Pls.' Opp'n at 31, this argument is bolstered not by a Connecticut Supreme Court or Appellate Court decision resulting in a viable breach of contract claim in the educational context, but instead by reference to a Second Circuit Title VII decision: *Duch v. Jakubek*, 588 F.3d 757 (2d Cir. 2009). There, a factual question existed as to whether an employee's supervisor knew of specific, stated instances of sexual assault or harassment made by a specific, named co-worker and whether he failed a duty to act on that knowledge. *Id.* at 765. In the absence of binding Connecticut law to the contrary – and Plaintiffs cite to none – this Title VII decision cannot plausibly support a breach of contract case here.

Because Plaintiffs' breach of contract claim fails, their breach of the implied covenant of good faith and fair dealing claim also fails. *See Manseau v. Allstate Ins. Co.*, No. 3:16-cv-1231 (MPS), 2017 WL 3821791, at *5 (D. Conn. July 31, 2017) (dismissing breach of implied covenant claim in concrete case after court dismissed breach of contract claim); *Agosti v. Merrimack Mut. Fire Ins. Co.*, No. 3:16-cv-01686 (SRU), 2017 WL 3710786, at *8 (Aug. 28, 2017) (same); *Valls v. Allstate Ins. Co.*, No 3:16-cv-01310 (VAB), 2017 WL 4286301, at *4 (D. Conn. Sept. 27, 2017) ("Because Plaintiffs have not plead a plausible claim for breach of

contract, their claim for breach of the implied covenant of good faith and fair dealing also fails.").

Even if Plaintiffs did have a viable breach of contract claim or a viable contract, however, the breach of the implied covenant of good faith and fair dealing would still fail. Plaintiffs' claim rests on Yale's decision to "move[ ] opportunities for social interaction off campus," and alleges, without support, this was an evasion of "contractual responsibilities to prevent and punish student misconduct[.]" Pls.' Opp'n to Yale at 36. The alleged dishonest motive is an intent to "sidestep its own potential liability." *Id.* Plaintiffs fail, however, to plead what rights Yale neglected, how Yale's conduct injured their rights to receive those benefits, or, when interfering, how Yale acted in bad faith. *See De La Concha of Hartford, Inc.*, 269 Conn. at 433 ("Bad faith means more than mere negligence; it involves a dishonest purpose."). To demonstrate the covenant has been breached, a plaintiff must point to "a specific contract term, often one that allows for discretion on the party of the party alleged to have violated the duty." *Landry v. Spitz*, 102 Conn. App. 34, 37 (2007) (citation omitted). Plaintiffs point to "Yale's actions and inactions" in allegedly moving parties off-campus to fraternities and failing to protect students from discrimination or sexual harassment as "'evad[ing] the spirit of its contractual obligations . . . ." Pls.' Opp'n Yale at 36. But "[b]ad faith in general implies . . . actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some or some contractual obligation," *Greysen v. Securitas Sec. Servs. USA, Inc.*, 322 Conn. 385, 400 (2016), and Plaintiffs point to no specific contractual obligation and only vaguely and conclusorily allude to a sinister motive. Pls.' Opp'n Yale at 36.

These vague factual allegations are insufficient to provide a plausible "entitlement to relief." *See Iqbal*, 566 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent

with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" (quoting *Twombly*, 550 U.S. at 557).

Accordingly, Plaintiffs' breach of contract claim as well as their breach of good faith and fair dealing claim will be dismissed.

## I. The Connecticut Unfair Trade Practices Act Claim

The Connecticut Unfair Trade Practices Act provides that: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). It further provides that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action ro recover actual damages," punitive damages, and equitable relief. Conn. Gen. Stat. § 42-110g(a).

Two threshold requirements must be met to bring a Connecticut Unfair Trade Practices Act claim. "First the plaintiff must establish conduct that constitutes an unfair or deceptive trade practice. Second, the plaintiff must establish a basis for a reasonable estimate of damages." *Chem-Tek*, 816 F. Supp. at 130 (citing *A. Secondino & Son, Inc. v. LoRicco*, 215 Conn. 336 (Conn. 1990)). After the threshold requirements have been met, courts consider "1) whether the practice without necessarily having been considered unlawful, offends public policy as it has been established by statutes, the common law or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory or other established conduct of unfairness; 2) whether it is immoral, unethical, oppressive or unscrupulous; [and] 3) whether it causes substantial injury to consumers [(competitors or other businessmen)]." *Id.* (citing *McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558 (1984)).

All three criteria need not be met to find unfairness; "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Naples v. Keystone Bldg. and Development Corp.*, 295 Conn. 214, 227-28 (2010) (internal quotation marks omitted) (citing *Votto v. American Car Rental, Inc.*, 273 Conn. 478, 484 (2005)). A violation may be established "by showing 'either an actual deceptive practice . . . or a practice amounting to a violation of public policy.'" *Hudson United Bank*, 81 Conn. App. at 570 (citation omitted). Under the act, a natural person, corporation, trust, partnership, incorporated or unincorporated association, or legal entity may bring a claim. *McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558, 566 (1984). Connecticut courts apply the "cigarette rule" used by the Federal Trade Commission to determine when "alleged acts or practices are unfair or deceptive." *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 790 (2019).

Importantly, not every contractual breach "rises to the level" of a Connecticut Unfair Practices Act violation. *Naples*, 295 Conn. at 228, 337 (citing *Hudson United Bank*, 81 Conn. App. at 571 (2004)). Whether a defendant's actions establish deceptive or unfair trade practices is a question of fact. *Naples*, 295 Conn. at 228.

Yale argues that the Connecticut Unfair Trade Practices Act claim fails because it alleges only an invalid breach of contract claim and "lacks the necessary factual basis for falsity or materiality to support a CUPTA claim." *Id.* at 35. The source of the alleged misrepresentations come Yale's policies expressed in the Equal Opportunity Statement, Undergraduate Regulations, and Sexual Misconduct Policies; combined, these policies ensure no discriminatory acts by Yale itself and that Yale will review complaints of sexual misconduct through a full Title IX process. *Id.* Plaintiffs therefore have not alleged a breach. *Id.* at 36. Plaintiffs also fail to plead that Yale's

representations were untruthful or misleading, that Plaintiffs unreasonably misinterpreted Yale's statements, and that any alleged misrepresentations are immaterial. *Id.* at 37-39.

In response, Plaintiffs argue that they decided to matriculate at Yale with "the understanding that the University would ensure a discrimination-free environment and thereby secure their safety and well-being. Pls.' Opp'n to Yale at 37. In their view, they adequately allege Yale's "extensive representations" of its commitment to gender equity and prevention of sexual misconduct "caused them injury and damages[,]" and thus, can sustain a claim under the Connecticut Unfair Trade Practices Act. *Id.* Specifically, the willful distancing of the University "from the epicenter of gender discrimination and sexual misconduct" harming students and its breach of its contractual duty of protection offends public policy. *Id.* at 38-39. The failure to disclose the prevalence of Greek life and the dangers of fraternities to prospective students meant that Plaintiffs discovered the role of fraternities in undergraduate life only after "matriculating, paying tuition, and entering into a contractual relationship with the school." *Id.* at 39.

Plaintiffs further argue they state a claim for a deceptive trade practice. *Id.* at 40. Yale made misrepresentations (the non-discriminatory practices of undergraduate organizations, the dedication to the elimination of sexual misconduct, and the limited role of fraternities in Yale's social life), which Plaintiffs reasonably interpreted (taking these statements as true), and the statements were material (Plaintiffs relied on the statements in deciding whether or not to matriculate). *Id.* at 40-42.

The Court disagrees.

As a preliminary matter, "[t]o successfully state a claim for a CUTPA violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce." *Cenatiempo, N.A.*, 333 Conn. at 788 (citations and footnote omitted). Leaving aside the issue of

whether Yale's alleged "acts occurred in the conduct of trade or commerce," any alleged acts resulting in a viable CUTPA claim must be "unfair or deceptive." *Id.* at 790. Yet again, however, Plaintiffs' factual allegations "stop[ ] short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 566 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Rather than allege facts sufficient to infer that Yale has violated CUTPA by engaging in a deceptive practice or a practice amounting to a violation of public policy, Plaintiffs do little more than recycle the factual allegations already deemed legally insufficient – as discussed above – to support their breach of contract claims. *See* Pls.' Opp'n Yale at 37 (referring to Yale's alleged misrepresentations that it "aims to eradicate" sexual misconduct and that sexual misconduct "will not be tolerated"; that fraternities only play a minor role in undergraduate social life; and "the University's extensive representations regarding its commitment to gender equity and preventing sexual misconduct"). They do not cite or allege "conscious, systematic departure from known, standard business norms[,]" *Cenatiempo*, 333 Conn. at 792 (2019). At best, they allege wrongful advertising, but any such wrongful advertising would have to be "immoral, unethical, oppressive and unscrupulous," *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 123 (2019), and Plaintiffs cite to no case where these factual allegations in this context, brought by students against an educational institution, provides a viable CUTPA claim, particularly after their other claims sounding in both tort and contract fail.

Despite their argument to the contrary, their factual allegations regarding "statements caus[ing] [ ] damages and injury" are not sufficient to "state a claim under CUTPA." Pls.' Opp'n at 37. As the Connecticut Supreme Court made clear recently in *Cenatiempo*: "[u]nder CUTPA, only intentional, reckless, unethical or unscrupulous conduct can form the basis of a claim." 333 Conn. at 791 (citation and internal quotation marks omitted); *see A-G Foods, Inc. v. Pepperidge*

*Farm, Inc.*, 216 Conn. 200, 214 ( 1990) (reversing a jury award finding liability on a CUTPA claim because the defendant's "negligence did not constitute an 'immoral, unethical, oppressive or unscrupulous' practice").

Accordingly, Plaintiffs' CUTPA claim against Yale will be dismissed.

### J.  The Negligent Misrepresentation Claim

Under Connecticut law, the elements of negligent misrepresentation are:

> [o]ne who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Foy v. Pratt & Whitney Grp*, 127 F. 3d 229 (2d Cir. 1997) (quoting *Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 575 (1995)).

 In an action for negligent misrepresentation, a plaintiff must establish "(1) that the defendant made a misrepresentation of fact[,] (2) that the defendant knew or should have known was false, [ ] (3) that the plaintiff reasonably relied on the misrepresentation, and (4) suffered pecuniary harm as a result." *Nazami v. Patrons Mut. Ins. Co.*, 280 Conn. 619, 626 (2006) (citing *Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 78 (2005)). A misrepresented fact may be actionable "if the declarant has the means of knowing, out to know, or has the duty of knowing the truth." *D'Ulisse-Cupo v. Bd. of Directors of Notre Dame High School*, 202 Conn. 206, 217(1987). Plaintiffs "need not prove that the representations made by the defendants were promissory. It is sufficient to allege that the representations contained false information." *Id.* at 218.

Negligent misrepresentation claims are subject to a heightened pleading standard. Under Fed. R. Civ. P. 9(b), a "plaintiff must (1) specify the statement he contends was fraudulent; (2) identify the speaker; (3) identify where and when the statement was made, and (4) explain why

the statement was fraudulent." *Yurevich v. Sikorsky Aircraft Div., United Techs. Corp.*, 51 F.

Supp. 2d 144, 152 (D. Conn. 199) (citing *Catalano v. Bedford Assoc. Inc.*, 9 F. Supp. 2d 133,

136 (D. Conn. 1998)). *But see IM Partners v. Debit Direct Ltd.*, 394 F. Supp. 2d 503, 521 (D.

Conn. 2005) ("[T]he false statements [of] an element of negligent misrepresentation do not have

to be stated with the same degree of particularity to survive a motion to dismiss" as of a claim of

fraud.").

Yale argues that Plaintiffs fail to plead both the heightened pleading standard required for

a negligent misrepresentation claim and fail to plead the necessary pecuniary loss incurred.

Yale's Reply at 19-20.

In response, Plaintiffs argue that their negligent misrepresentation "is based on the same

facts underlying their CUPTA claim," Pls.' Opp'n to Yale at 43, and that Yale misrepresented

how much of the population is involved in Greek life. Plaintiffs further argue Yale either knew

or should have known of the falsity of that statement because of its knowledge of student

organizations and its ability to "tak[e] account of its student population[,]" and that Plaintiffs, as

prospective students, "were justified in relying upon statements that the University made about

its educational programs[.]" *Id.* at 43-45. Plaintiffs suffered pecuniary harm based on this alleged

misrepresentation—the tuition they paid. *Id.* at 45.

The Court disagrees.

Plaintiffs' claim fails under the heightened pleading standard. As Yale points out, the

"*only* specific statement mentioned in the Complaint is the January 31, 2017 Instagram post, but

Plaintiffs do not even allege that any of them read it[.]" Yale's Reply at 20 (emphasis in

original). Plaintiffs admit that "the 10% figure may be an approximation" but go on to suggest

that "an ordinary reader could find it was based on concrete, objective information in the

University's possession." Pl. Opp'n to Yale at 43-44. They do not contend how the statement was fraudulent, other than that it was imprecise. *See IM Partners*, 394 F. Supp. 2d at 525 ("There are many representations that can be made about the prospects of a proposed business that, even if the business turns out not to be successful, are not fraudulent.").

Even under a lower pleading standard, Plaintiffs' claim fails. Plaintiffs allege that the Instagram post from Yale Admissions Office stated, "While only about 10% of students participate in Greek life, sororities and fraternities can be valuable social spaces on campus for those who pursue them." Second Am. Compl. ¶ 172.[10] Plaintiffs allege that this statement is fraudulent because Yale should "not be able to make a statement about participation in Greek life without having a process for taking account of its student population." Pls.' Opp'n to Yale at 44. Taken as a whole, however, the statement implies an approximation of participation both in sororities and fraternities and, possibly, the student body as a whole. Furthermore, the statement was made only after Ms. McNeil and Ms. Walker attended Yale, and there is no specific allegation that Ms. Singer relied on this post.[11] With respect to the 10% statement, Plaintiffs have failed to allege that they relied specifically on this statement. With respect to the other allegations of negligent misrepresentation, *see* Second Am. Compl. ¶¶ 366-74, Plaintiffs have failed to identify the other speakers and when and where the statements were made. *See Ruffalo v. CUC Int'l, Inc.*, 989 F. Supp. 430, 434 (D. Conn. 1997) ("A party need not stake all his future hopes on a promise to show reliance, merely that he incurred some sort of detriment in belief that the promise was true.").

---

[10] Plaintiffs also rely on paragraphs 165-81 of the Second Amended Complaint, which mainly focuses on Yale's Equal Opportunity statement, the Undergraduate Regulations, and the Sexual Misconduct Policies. Plaintiffs do not allege that they relied on these statements in deciding to matriculate at Yale.
[11] Ms. Walker allegedly remembers the 10% statistic as a prospective student, Second Am. Compl. ¶ 172.

Finally, Plaintiffs also suggest liability based on Yale's failure to inform Plaintiffs "that fraternities play a significant role in University social life." Second Am. Compl. ¶ 370. It is unclear, however, that a failure to inform can sustain a claim for negligent misrepresentation. *See Coppola Const. Co., Inc. v. Hoffman Enter. Ltd. P'ship*, 309 Conn. 342, 351 n.5 (2013) (liability is premised on the supply of "false information . . . by [plaintiffs'] justifiable reliance upon the information, if [the defendant] fails to exercise reasonable care or competence in obtaining or communicating the information." (quoting Restatement (Second) of Torts § 552)); *Kramer v. Petisi*, 285 Conn. 674, 681-82 (2008) (citing the Restatement (Second) of Torts that liability attaches in negligent misrepresentation when a party relies on information which was communicated without reasonable care or competence).

Accordingly, Plaintiffs' negligent misrepresentation claim against Yale will be dismissed.

**K.  The Claims against Sigma Alpha Epsilon Fraternity, "LEO"**

Finally, Plaintiffs believe they "have standing to seek monetary damages against [Sigma Alpha Epsilon] for its earlier violations of federal and state laws. Pls.' Opp'n at 34. Plaintiffs argue that their allegations which seek relief to redress past injuries incurred from Sigma Alpha Epsilon do not moot their claims against the national organization or local chapter. *Id.*

For all claims, the Fraternity Defendants argue that Plaintiffs' claims against Defendant Sigma Alpha Epsilon Fraternity ("SAE National") "are moot on the grounds that there is no SAE local chapter at Yale[;] . . . SAE National disaffiliated with the local society at Yale, known as Leo." Frat. Defs.' Mot. to Dismiss at 19.

The Court disagrees.

Plaintiffs plausibly alleged that the relief they seek will redress past injuries incurred by the Yale local chapter of Sigma Alpha Epsilon. *See Already, LLC v. Nike, Inc.*, 568 U.S. 85, 100 (2013) (plaintiffs must be able to demonstrate judicial action would redress past, ongoing, or

future injuries). To the extent the Court has already addressed claims against Sigma Alpha Epsilon, however, the claims against SAE National also must be dismissed. To the extent Plaintiffs wish to allege separate claims against LEO, Plaintiffs have not plausibly alleged that LEO is a registered student group or that LEO receives funding from Yale. *See Iqbal*, 566 U.S. at 678 ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.'" (quoting *Twombly*, 550 U.S. at 557)).

Accordingly, the claims against Sigma Alpha Epsilon Fraternity, "LEO" will be dismissed.

## L. Leave To Amend

Under Federal Rule of Civil Procedure 15(a), a party may amend its pleading as of right within twenty-one days after serving it or "if the pleading is one to which a responsive pleading is required, [within] 21 days after service of a responsive pleading of 21 days after service of a motion" to dismiss, a motion for a more definite statement, or a motion to strike, whichever is earlier. Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). "The court should freely give leave when justice so requires." *Id.* The district court has broad discretion to decide a motion to amend. *Local 802, Associated Musicians of Greater New York v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998); *see also Kassner v. 2nd Ave. Delicatessen, Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (finding the decision to allow a late motion to amend the complaint lie's within the Court's discretion).

The Court is disinclined to grant further leave to amend, as plaintiffs have already had three opportunities to amend the pleadings, and permitting any further amendments are likely to

delay further the resolution of this case. *See De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65,

72 (2d Cir. 1996) (finding the district court did not abuse its discretion in denying a fifth request

to replead where "[p]laintiffs were accorded four opportunities to plead their claims . . . and the

deficiencies in their federal claims were fundamental"); *Mooney v. Vitolo*, 435 F.2d 838, 839 (2d

Cir. 1970 ("Plaintiffs here were twice given an opportunity to replead. Therefore, it was within

the sound discretion of the District Court to deny leave to replead on the third attempt."); *see

also Dietz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) (noting a court's inherent authority to

manage dockets with a "view toward the efficient and expedient resolution of cases").

Moreover, all of their claims, except the limited Title IX claim remaining for Ms.

McNeil, lack a strong basis in law for the reasons stated above. Indeed, Plaintiffs have not

identified a single case against an educational institution and the various other defendants sued

here where these other claims have prevailed. Thus, barring anything unforeseen, it would be

futile for Plaintiffs to amend their pleadings further. *See Lucente v. Int'l Bus. Machine Corp.*,

310 F.3d 243, 258 (2d Cir. 2002) ("An amendment to a pleading is futile if the proposed claim

would not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)." (citation

omitted)); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 55 (2d. Cir 1995) ("One good reason to

deny leave to amend is when such leave would be futile." (citation omitted)); *Ruffolo v.

Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (affirming dismissal with prejudice

because, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is

not an abuse of [the district court's] discretion to deny leave to amend"); *see also Ganley v. City

of New York*, No. 17-1704, 2018 WL 2383533, at *2 (2d Cir. May 25, 2018) (noting that the

district court granted "leave to amend when it dismissed his original complaint, and it provided a

detailed explanation of the deficiencies he should address" and therefore "was not required to give Ganley another opportunity to address the same deficiencies").

Accordingly, with the exception of the limited Title IX claim of Ms. McNeil which remains, all of the remaining claims of all of the Plaintiffs, Ms. McNeil, Ms. Walker, Ms. Singer, and Engender are dismissed with prejudice.

## IV.    CONCLUSION

For the reasons discussed above, the motions to dismiss of the Fraternity Defendants, 402 Crown, LLC, and 340 Elm, LLC are **GRANTED** in their entirety and the motion to dismiss of Yale is **GRANTED** in part and **DENIED** in part.

Although limited in scope, only the Title IX claim of Anna McNeil remains. All other claims are dismissed **WITH PREJUDICE**.

The Clerk of Court is respectfully request to amend the caption to reflect Anna McNeil as the only Plaintiff and Yale University as the only Defendant.

**SO ORDERED** at Bridgeport, Connecticut, this 30th day of January, 2020.

   /s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE